**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re:<br><br>**Vascular Access Centers, L.P.,**<br><br>Alleged Debtor. | Hon. Ashley M. Chan<br><br>Involuntary Chapter 11<br><br>Case No. 19-17117 (AMC) |

**MOTION OF MAJORITY LIMITED PARTNER
FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S
INVOLUNTARY CHAPTER 11 CASE PURSUANT TO SECTION 1112(b)
OF THE BANKRUPTCY CODE, WITH PREJUDICE, OR IN THE
ALTERNATIVE, APPOINTING A CHAPTER 11 TRUSTEE PURSUANT
TO SECTION 1104(a) OF THE BANKRUPTCY CODE**

William Whitfield Gardner, the majority-in-interest limited partner of alleged debtor herein, Vascular Access Centers, L.P. ("VAC" or "Alleged Debtor"), by and through his undersigned counsel, hereby moves (the "Motion") for entry of an order pursuant to section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§101-1532 (the "Bankruptcy Code"), dismissing the involuntary chapter 11 case of the Alleged Debtor (the "Involuntary Chapter 11 Case") for cause and/or in the interests of the debtor and its creditors, with prejudice pursuant to section 349(a) of the Bankruptcy Code or, in the alternative, entry of an order appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.  In support of this Motion, Mr. Gardner respectfully submits the Declaration of William Whitfield Gardner dated November 22, 2019 (the "Gardner Decl.") and the exhibits annexed thereto and represents as follows:

## I.  INTRODUCTION

1.    The "involuntary" petition filed by Philadelphia Vascular Institute ("PVI"), Metter & Company ("Metter") and Crestwood Associates, LLC ("Crestwood" and, together with

121273940.1

PVI and Metter, the "Petitioning Creditors")  is a sham orchestrated by the sole manager and

member of the Alleged Debtor's General Partner, James McGuckin, M.D., to insulate himself

from liability for his various breaches of fiduciary duty and the Alleged Debtor's Limited

Partnership Agreement (defined below), eliminate his limited partners, and take control of the

Alleged Debtor.[1]  In just the latest in a series of his breaches of the Limited Partnership

Agreement, the "involuntary" petition was filed by an entity that McGuckin controls, based on a

loan he made to himself in violation of the Limited Partnership Agreement, and styled as an

"involuntary" petition to avoid a requirement in the Limited Partnership Agreement that he

obtain the limited partners' consent before filing bankruptcy.  The debt to PVI is not bona fide,

and it should be challenged by the Alleged Debtor.  The Alleged Debtor will not, however,

challenge the loan because McGuckin controls the Alleged Debtor and will not challenge a loan

he made to himself.  The Petitioning Creditors filed the petition in bad faith and it is not based on

a valid debt.  As such, the petition must be dismissed.

     2.      In the alternative, if the petition is not dismissed, the Court should appoint a

trustee based on McGuckin's track record of self-dealing transactions, dissipation and misuse of

the Alleged Debtor's assets, and gross mismanagement.  In another example of McGuckin acting

in his own self-interest at the expense of the Alleged Debtor, McGuckin orchestrated the filing of

the "involuntary" petition to avoid his own personal liability in Derivative Litigation (defined

below) filed on behalf of the Alleged Debtor in the Delaware County Court of Common Pleas.

Shamelessly, he directed the filing of the petition on the same day his frivolous appeal in the

Derivative Litigation was denied by the Pennsylvania Supreme Court and the Derivative

---

[1] The operative version of VAC's limited partnership agreement is the Fourth Amended and Restated Limited
Partnership Agreement of Vascular Access Centers, L.P. (the "Limited Partnership Agreement"), dated October 31,
2017.  It is attached to the Gardner Decl. as Exhibit 1.

Litigation was remanded for trial, and the day before a hearing in the trial court on the amount of

fees the plaintiffs should be awarded as sanctions against him for his frivolous and vexatious acts

in the appeal.  In his rush to file and avoid personal liability, McGuckin apparently made no

attempt to plan for the bankruptcy and no legitimate effort to avoid bankruptcy by obtaining

financing from the Alleged Debtor's limited partners.  Instead, he told the limited partners he

would provide the financing in bankruptcy himself in *another* example of his self-serving and

conflicted transactions.  The Derivative Litigation is the largest asset of the bankruptcy estate,

and McGuckin cannot be trusted to control it.  As if his conflicts of interest were not enough, the

reputational and financial harm McGuckin has caused the Alleged Debtor through his fraudulent

and reckless conduct would be sufficient in and of itself to appoint a trustee.  If the Court does

not dismiss the petition, it must appoint a trustee without McGuckin's numerous conflicts of

interest and history of misconduct to protect the estate.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 1334 and 157(b).

The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

4.    Venue of the Motion in this Court is proper under 28 U.S.C. § 1409.

5.    The statutory predicates for the relief requested herein are sections 105(a), 349(a),

1104(a), and 1112(b) of the Bankruptcy Code and related Federal Rules of Bankruptcy

Procedures (the "Bankruptcy Rules") and Local Bankruptcy Rule for the Bankruptcy Court of

the Eastern District of Pennsylvania ("LBR") 9014-1.

## III.    PROCEDURAL HISTORY

6.    This action was commenced on November 12, 2019 via an involuntary petition

filed by three purported creditors:  PVI (an entity owned and controlled by McGuckin), Metter

(an accounting firm owned by a VAC limited partner, which receives 15% of its revenue from

121273940.1

VAC and should therefore not be considered by the Court as independent from VAC), and

Crestwood (signed by its representative **Brian** McGuckin).  [ECF No. 1].  VAC, the Alleged

Debtor, filed an Answer and Consent the following day, November 13, 2019.  [ECF No. 3].

## IV.    BACKGROUND

### A.    An Overview of VAC's History.

7.    VAC was founded by McGuckin, and was initially funded by McGuckin, Mr.

Gardner and a handful of other friends and business acquaintances.  *See* Gardner Decl., Ex 2,

Derivative Litigation Amended Complaint ¶¶ 9-22, 39.  VAC's purpose was to establish, manage

and maintain vascular access centers, which provide medical services to patients undergoing

hemodialysis treatment.  *See id*., Ex. 2 ¶ 40.  VAC was formed on April 22, 2005, via a limited

partnership agreement.  *See id*., Ex. 3, Dialysis Access Centers, L.P. Agreement of Limited

Partnership.  McGuckin is the ultimate owner and manager of VAC's General Partner, Vascular

Access Centers, LLC.  *See id*., Ex. 2 ¶¶ 26-29.  By the first week of May 2005, Mr. Gardner (and

others) had become limited partners of VAC by signing a subscription agreement and submitting

their initial capital contributions.  *See id*., Ex. 2 ¶ 10-22, 39.

8.    McGuckin underestimated VAC's capital needs and was required to raise

substantially more funds than originally anticipated.  Mr. Gardner contributed most of this

capital, investing approximately $10,000,000 in 2006 and 2007.  *See id*., Ex. 2 ¶¶ 11, 47-49.

Without Mr. Gardner's substantial capital contributions in 2006 and 2007, VAC would not have

survived.  As McGuckin stated in July 2007 letter:

> As a result of these unexpected capital needs, the Company
> required approximately $3 million in additional funding between
> late March and today in order for the Company to continue to
> meets its obligations.  Fortunately, ***our largest limited partner,***
> ***Whit Gardner, agreed to make most of this funding available***
> (and I funded the remaining amounts).  ***Without this funding, the***

> ***Company would not have been able to pay its contractors, make
> payroll or pay certain other critical obligations and
> would basically have been forced to discontinue its operations***, at least
> until alternative sources of capital were located, if not
> permanently.

*See id.*, Ex. 4, July 2, 2007 Notice to Limited Partners at GARDNER 0011413 (emphasis added).

9.    In exchange for this funding, Mr. Gardner negotiated for additional protections in the Limited Partnership Agreement for the limited partners and some restrictions on the powers of the General Partner.[2]  *See id.*, Ex. 2 ¶¶ 49, 52-57.  One critical change was an amendment restricting the General Partner's ability to compete with VAC.  Section 5.3 of the April 22, 2005 Agreement, titled "Other Business Activities," states:

> Any Partner, including the General Partner, may engage in any
> other business activities, ***whether or not competitive with the
> business of the Partnership***, and neither the Partnership nor any
> Partner shall have any rights with respect to such activity or any
> income or gain derived therefrom.

*Id.*, Ex. 3 at MCG 000006 (emphasis added).  The amended provision states:

> ***In view of the exclusive and limited purposes of the Partnership,***
> no Partner, or any Affiliate of any Partner, shall have any
> obligation to make any ***other*** investment or business opportunity
> ***not involving the Properties*** available to the Partnership or to any
> of its Partners.

*Id.*, Ex. 1, Limited Partnership Agreement § 6.7.  The amended provision: (1) eliminated the "whether or not competitive" language from Section 5.3; (2) included a qualifier that permissible "other" businesses must be considered "in view of the exclusive and limited purposes of the Partnership;" and (3) specified that the "other investment or business opportunit[ies]" could not "involv[e] the Properties."  *Id.*

---

[2] Mr. Gardner initially invested $1,000,000 in the Limited Partnership, but over the course of the next two years, Mr. Gardner made more than $10,000,000 in additional contributions to VAC.  *See* Gardner Decl. Ex. 2 ¶¶ 11, 47-49.  In total, Mr. Gardner contributed in excess of $11,000,000 to VAC, and owns approximately 72.5% of the equity in the company.  *See id.*, Ex. 5 VAC Cap Table Analysis, 7/29/2019.

121273940.1

10.     Gardner also insisted on adding the following language to Section 6.1.1

confirming McGuckin's fiduciary duties and prohibiting self-dealing:

> Notwithstanding the foregoing, *the General Partner shall act in good faith* in accordance with its fiduciary duties to the Limited Partners at all times and use its reasonable business judgment in exercising such authority.  Without limiting the generality of the foregoing, *the General Partner and its designated officers shall only make financial decisions on behalf of the Partnership that they reasonably believe will have a direct benefit to the Limited Partners and shall not expend Partnership funds to pay their own expenses that do not directly benefit the Partnership or to enrich themselves for their own personal benefit.*

*Id.*, Ex. 1, Limited Partnership Agreement § 6.1.1.  The Limited Partnership Agreement also

provides that the General Partner may obtain services from its affiliates, but "unless approved by

a Majority in Interest of the Partners, the fees paid by the Partnership for such services shall not

be in excess of reasonable arm's-length charges."  *Id.*, Ex. 1, Limited Partnership Agreement

§ 6.6.4.

11.     In addition to the important protections in Sections 6.1.1, 6.6.4, and 6.7, Mr.

Gardner also negotiated for the addition of several "blocking" rights to the Limited Partnership

Agreement.  The Limited Partnership Agreement vests the General Partner with significant

authority to manage the Limited Partnership, including "full and exclusive power . . . to manage,

control, administer, and operate the business and affairs of the Partnership."  *Id.*, Ex. 1, Limited

Partnership Agreement § 6.1.1.  But, the General Partner cannot, however, make certain

"Fundamental Decisions" without the consent of the holders of "at least a Majority in Interest of

all Limited Partners,"[3] including the decisions to:

- "Sell or otherwise dispose of, *or encumber or use as security for any debt*, one or more assets or properties or any interest in one or more assets or properties of the

---

[3] Given Mr. Gardner's ownership of more than 72.5% of VAC's limited partnership interests, this provision effectively requires Mr. Gardner's consent for these Fundamental Decisions.

Partnership **with a value of $500,000** or more . . . ." *Id.*, Ex. 1, Limited Partnership Agreement § 6.3.2 (emphasis added).

- "Execute and file on behalf of the Partnership a petition for relief under any chapter of Title 11, United States Code, under which a partnership may be a debtor." *Id.*, Ex. 1, Limited Partnership Agreement § 6.3.4.

12.     The Limited Partnership Agreement also has important information sharing and tax reporting requirements, including a requirement that the General Partner will cause the necessary state, local, and federal income tax returns of the Partnership to be prepared and "timely filed." *Id.*, Ex. 1, Limited Partnership Agreement § 7.2.1.  The General Partner is also obligated to ensure that annual financial statements containing a statement of operations and balance sheet are prepared and delivered to the Limited Partners within 120 days of the end of each fiscal year. *Id.*, Ex. 1, Limited Partnership Agreement § 7.2.2.

**B.     McGuckin Competes Against VAC.**

13.     Over the next several years, during which McGuckin was free of conflicts of interest and seemingly invested in VAC's success, VAC generated substantial profits and used those profits to expand by opening additional centers throughout the country.  Indeed, by 2012 VAC was operating 21 of its own centers.  After attempts to sell VAC failed because VAC failed to meet McGuckin's inflated projections and potential purchasers uncovered compliance concerns in due diligence,[4] McGuckin decided he no longer wanted to share profits or any increases in value of the limited partnership with his partners.  From that point forward, McGuckin:  (1) engaged in a series of self-dealing transactions, (2) usurped VAC's corporate

---

[4] *See* Gardner Decl., Ex. 6 Email from Gregory Hoover, dated September 17, 2012, recounting that a deal failed due to "[i]nternal factors such as: A high level of uncertainty related to predicting future results in a consistent and reliable way," among other things.; *id.*, Ex. 7 Email from Tom Usilton, dated September 21, 2012, noting that any purchase of VAC would be predicated on a "clean asset," in which "all the compliance issues that we raised before [are] mitigated."

opportunities for himself, and (3) utilized VAC's money, employees, and facilities for his own personal gain, as discussed below.

14.    McGuckin first usurped an opportunity to operate a center in Philadelphia from VAC. As a result of McGuckin's gross mismanagement, VAC's Philadelphia location was performing poorly. Instead of devoting his efforts to turning the center around for the benefit of VAC and its limited partners, McGuckin decided secretly to re-open the Center through Peripheral Vascular Institute of Philadelphia ("PeVI"), an entity exclusively owned by McGuckin. *See id.* Ex. 2, ¶¶ 58, 61-62. He never presented this opportunity to the limited partners for their consideration but instead usurped it for himself and concealed his actions from the limited partners. *See id.* Ex. 2, ¶ 63. As a part of that scheme, McGuckin caused VAC to act as surety to his lease for the location in breach of the Limited Partnership Agreement, which requires limited partner approval before assets are used to secure a loan of greater than or equal to $500,000. *See id.*, Ex. 2, ¶¶ 87-88; Ex. 1, Limited Partnership Agreement § 6.3.2.

15.    Similarly, in 2011, VAC considered a joint venture with a doctor in the "Slate Belt" region of Pennsylvania, who proposed opening a multi-use facility. McGuckin rejected that opportunity for VAC, *see id.*, Ex. 8 (McGuckin Dep. at 151:10 – 152:7), and instead opened his own center through PA Vascular Institute ("PAVI"), another entity owned by McGuckin[5], a few miles down the road in Pen Argyl, PA. Again, he never presented the limited partners with the opportunity to open this center under his management and hid the center from his limited partners. *See id.* Ex. 8, at 152:8 – 153:2.

---

[5] At one point, PAVI had a minority partner that owned 10% of the entity, but upon information and belief, McGuckin purchased that interest and now owns 100% of PAVI.

121273940.1

**C.      VAC's Largest Asset—the Derivative Litigation—Is Born.**

16.      Prior to June 2014, Mr. Gardner had no idea that McGuckin was competing against VAC.  After attempts at mediation failed, Mr. Gardner commenced a derivative action on VAC's behalf on January 13, 2016, by the filing of a Complaint in the Pennsylvania Court of Common Pleas for Delaware County, captioned as *Gardner v. Vascular Access Centers, LLC et al.*, case no. 16-cv-000367 (the "Derivative Litigation").  The Complaint asserted claims against VAC's General Partner and McGuckin (as the sole member and manager of the General Partner) for:  (1) breach of fiduciary duty, (2) breach of contract, and (3) unjust enrichment.

### 1.      Discovery in the Derivative Litigation Reveals Further Self-Dealing.

17.      While certain breaches were known before the Derivative Litigation was filed, discovery revealed several instances of self-dealing conduct by McGuckin.  First, McGuckin forced VAC to enter into several Management, Billing, and Services Agreements with his separately owned centers pursuant to which VAC provided, among other things, management, accounting, legal, human resources, billing, and administrative services for McGuckin's centers. VAC provided nearly identical services to the centers that it owned and generally charged those centers 11% of their revenues for those services, which VAC's President testified was a market rate.  *See id.*, Ex. 9, Supplemental Expert Report of Joseph W. Lesovitz at 37.  McGuckin forced VAC to charge his centers a much lower rate for those services, including a cap of between $100,000 and $125,000 on the total amount of fees that his centers paid VAC each year.  The Plaintiffs' expert in the Derivative Litigation opined that, if the McGuckin centers had been required to pay the same percentage of revenue as the VAC centers, VAC would have received an additional $███████ in revenues for the services it provided McGuckin.  *See id.*, Ex. 9, Lesovitz Supp. Rep. at 38.

18.    Second, discovery also revealed that McGuckin hired himself to perform multiple executive roles in the company and paid himself a generous salary for each.  First, McGuckin appointed himself Chief Executive Officer (CEO) in an employment agreement effective as of January 1, 2009 (retroactive to 2007), which awarded McGuckin a salary ranging from $███ to $████, a profits interest, six-weeks of vacation, and a bonus—*to be awarded at his own discretion*.  *See id.*, Ex. 10, McGuckin CEO Employment Agreement.  Second, after his physician compensation declined as the result of his abandonment of VAC (discussed below), McGuckin replaced that salary by appointing himself Chief Medical Officer (CMO) and awarding himself a $████ per year salary for that part-time role.  These salaries were on top of the more than $████ he received from 2012 through 2015 to serve as General Partner. McGuckin did not seek approval from the limited partners before entering into these self-dealing contracts.  Indeed, McGuckin actually signed both sides of the CEO Agreement.  *See id.*, Ex. 10, McGuckin CEO Employment Agreement.  As shown below, without the approval of the limited partners, McGuckin siphoned more than $████ in compensation from VAC between 2012 and 2016:



[6]

19.    Third, McGuckin used VAC resources to open and operate his separately owned centers.  VAC's former Chief Executive Officer and Chief Operating Officer, Kim Parkinson, testified at her deposition that VAC staff was used to open, operate, and market McGuckin's Philadelphia and Pen Argyl centers, and her testimony was confirmed by contemporaneous documents.  *See id.*, Ex. 11 , Email dated Oct. 19, 2012 from J. Biggs (listing tasks performed by VAC to open Pen Argyl location); Ex. 12, Email dated Jan. 8, 2012 from F. Mita (reflecting extensive VAC efforts to reopen PeVI location).  In addition to these services, McGuckin used VAC's capital to open his centers.  VAC's former President testified that it cost $2 million to open a center to the ASC standard that was used for the McGuckin's centers, and  VAC confirmed that number in a Confidential Offering Memorandum sent to the Limited Partners on December 1, 2017.  *See id.*, Ex. 12 ;Ex. 16, Dec. 1, 2017 Offering Memorandum (VAC

---

[6] McGuckin's undisclosed employment contracts are self-dealing transactions by a fiduciary and void as a matter of law.  *See* 15 Pa.C.S. § 8649 (self-dealing transaction by general partner is void unless (1) the general partner discloses all material facts to the limited partners; (2) the limited partners "authorize or ratify" the transaction; **and** (3) the general partner can demonstrate that the challenged transaction "was fair to the limited partnership at the time it [wa]s authorized or ratified."); *see also In re Kogen*, Nos. 1787 IV of 2004, 056819, 2007 WL 6867149, at *15 (Pa. Ct. Com. Pl., Phila. Cty. May 14, 2007) (holding that courts have authority to set aside a self-dealing transaction by a fiduciary); *Woods v. Kolsky*, Nos. 053466, 060497, 062095, 2006 WL 3696766, at *12 (Pa. Ct. Com. Pl., Phila. Cty. July 18, 2006) (declaring note void because fiduciary engaged in prohibited self-dealing).

11

"estimates it will cost approximately $2 million per center to transition to the ASC model.")].

Based on this estimate, VAC spent approximately $█████████ to open the McGuckin centers

that was not reimbursed.  *See id.*, Ex. 9, Lesovitz Supp. Rep. at 28-30.[7]

### 2.    McGuckin Abandons VAC in Favor of His Competing Business.

20.    As McGuckin began to focus all of his attention and efforts on his competing

businesses:  PeVI, PAVI, and eventually a third center in King of Prussia, Pennsylvania that he

owned through Main Line Vascular Institute ("MLVI")[8] and a fourth center that he owned

through Lehigh Valley Vascular Institute ("LVVI") (and together with PeVI, PAVI, and MLVI,

the "McGuckin Centers"), his gross mismanagement of VAC became more pronounced.

McGuckin spent significantly less time managing VAC or working in centers owned by VAC.

In 2011, prior to opening any of the McGuckin centers, McGuckin spent ██ days at VAC

centers doing clinical work.  *See id.*, Ex. 15, 2011 McGuckin Attendance Record, MCG 91324.

By 2014, after McGuckin had opened PeVI and PAVI, McGuckin spent ██ days doing clinical

work, but only ██ days were in VAC centers.  *See id.*, Ex. 16, 2014 McGuckin Attendance

---

[7] McGuckin claims that he later reimbursed VAC for all amounts he misappropriated to open the McGuckin centers. The Financial Monitor (defined below) accepted McGuckin's story but stated that "some of the reimbursements were not made timely, possibly including significant reimbursements made in 2017, but the effect of these late reimbursements, which in essence constituted an ***interest free loan***, also do not have a material effect on VAC's financial position or solvency."  *See id.*, Ex. 14 July 3, 2019 Report of Michael F. Dubin, Monitor at 23 (emphasis added)].  Even if McGuckin "refunded" all amounts "owed" to VAC, his use of VAC funds to establish centers not owned by VAC is a breach of Defendants' fiduciary duties and the Limited Partnership Agreement, which states that the General Partner and its officers "shall not expend Partnership funds to pay their own expenses that do not directly benefit the Partnership or to enrich themselves for their own personal benefit," *see* Limited Partnership Agreement § 6.1.1 as well as the Limited Partnership Agreement requirement that transactions with affiliates be on market terms, *id.* § 6.6.4.  The capital that McGuckin hijacked for his competing enterprise and the interest he failed to pay for use of that capital could have been used to convert VAC's centers to the ASC model (as McGuckin now claims is necessary) or some other project benefitting VAC.  It was certainly not in VAC's best interest to give McGuckin an unsecured, interest-free loan in breach of the Limited Partnership Agreement (a loan which would not have been repaid to the extent it has been thus far, were it not for the Derivative Litigation) and absorb the risk should McGuckin's competing enterprise fail.  Nor was it in VAC's best interest to fund a competitor.

[8] McGuckin opened his King of Prussia center in 2016.  Like PeVI and PAVI, McGuckin opened MLVI without first presenting the opportunity to the Limited Partners, *see id.*, Ex. 8, McGuckin Dep. at 154:5 – 155:8.

121273940.1

Record, MCG 91397.  He spent the remaining ███ clinical days, or ███ of his clinical time, in the McGuckin Centers.

21.      McGuckin's mismanagement and abdication of responsibility resulted in VAC closing down five centers in 2014 and five more centers in 2015.  As of the Financial Monitor's July 3, 2019 Report, VAC only operated 11 centers.  *See id.*, Ex. 14 at 20.

### 3.      The Court Denies McGuckin's Motion for Summary Judgment and Plaintiffs Estimate Damages.

22.      McGuckin moved for complete summary judgement on all claims in April 2017. Principal among McGuckin's arguments was that the Limited Partnership Agreement permitted McGuckin to own and operate competing medical centers.  The Court denied McGuckin's Motion for Summary Judgment in its entirety, thereby rejecting McGuckin's argument that the Limited Partnership Agreement authorized his activity as a matter of law.  In September 2017, Plaintiffs filed a First Amended Complaint, which, among other things: (1) added limited Partners Anish Shah, Rasesh Shah, Pravin Shah, Veena Shah, and Warren Yu (together with Gardner, "Plaintiffs"); (2) detailed additional evidence of McGuckin's breaches of their contractual and fiduciary duties; and (3) amended Plaintiffs' request for relief to, among other things, request that the Court appoint a receiver for VAC.  *See id.*, Ex. 2.

23.      On October 2, 2017, at the parties' request, the Honorable G. Michael Green set July 12, 2018, as the date-certain for trial in the Derivative Litigation.  In the ensuing months, the parties engaged in substantial additional discovery, submitted their respective pre-trial statements, filed and responded to motions *in limine*, submitted proposed jury instructions, verdict sheets, *voir dire* questions, exhibit lists, witness lists, and made all other preparations for trial.  In May 2018, Plaintiffs submitted a supplemental expert report that detailed damages to

VAC by McGuckin of at least $█████████, including among other things, the profits of McGuckin's competing centers as of July 12, 2018.[9]  *See id.*, Ex. 9 Lesovitz Supp. Rep.

**D.    McGuckin Delays VAC's Day in Court in the Derivative Litigation.**

24.    On July 9, 2018—three days before trial and after jurors had been summoned— McGuckin filed a petition to compel arbitration to delay the trial and VAC's day in court based on an arbitration provision buried in the CEO Agreement he signed with himself.  Following expedited briefing and a full day of testimony from multiple witnesses on July 12, 2018 (with a full panel of jurors waiting in the wings), Judge Green issued an Order on July 13, 2018, denying McGuckin's last-minute attempt to compel arbitration.  *See id.*, Ex. 17, July 13, 2018 Order from Hon. G. Michael Green.

25.    After weighing the content and credibility of the testimony of the witnesses, and considering the exhibits offered by the parties, the trial court concluded that "there is no evidence of a valid agreement to arbitrate the claims before this Court."  *Id.*  This holding was based in part on the trial court's finding that there was "an absence of any evidence presented which tends to prove notice was given on behalf of the general partner to the limited partners of the intention on the part of [VAC] to enter into [the CEO Agreement]."  *Id.*  In reaching this finding, the trial court necessarily determined that McGuckin, who had testified to the contrary, lied under oath.  Specifically, McGuckin testified that "Mr. Gardner received the document [the CEO Employment Agreement].  He reviewed it in entirety and he found one issue that he did not agree with and he raised that issue on a conference call with John Royer, himself, and me . . . ."  McGuckin was ultimately forced to admit that he was not aware of a single document or communication substantiating his claim that Mr. Gardner received the CEO Agreement before it

---

[9] VAC's damages are likely now substantially higher as McGuckin's competing centers have earned another sixteen (16) months of profits.

121273940.1

was signed.  Despite the trial court's clear and undeniable rejection of McGuckin's testimony, McGuckin filed a Notice of Appeal on the next business day—July 16, 2018.

26.    McGuckin's appeal achieved his true goal—delay.  By taking an interlocutory appeal of the denial of his last-minute and frivolous petition to compel arbitration, McGuckin was able to divest the trial court of jurisdiction for nearly 16 months.   While McGuckin achieved his goal of delay, he lost—resoundingly—at every step of the appellate process.  The Pennsylvania Superior Court ruled against McGuckin in a unanimous unpublished opinion.  *See Gardner v. Vascular Access Centers, LLC*, 2019 WL 177063 (Pa. Super. Ct. Apr. 22, 2019). When McGuckin later petitioned for *en banc* reargument, not only was that petition denied, but the Superior Court later found that the petition was "frivolous, and only done to further delay this matter."  *See id*., Ex. 18 Pennsylvania Superior Court Order, dated July 31, 2019.  The Superior Court ruled that Plaintiffs were entitled to sanctions to recover the attorneys' fees they incurred in responding to the reargument petition, among other things.  *See id.*  Undeterred, McGuckin insisted upon causing further delay by filing a Petition for Allowance of Appeal with the Pennsylvania Supreme Court.  The Pennsylvania Supreme Court denied his Petition on November 12, 2019 after another delay of four months.  *See Gardner v. Vascular Access Centers, LLC*, 2019 WL 5883526 (Pa. Nov. 12, 2019).

**E.    McGuckin Engaged In Additional Self-Dealing After the Derivative Litigation Was Filed and Caused Substantial Harm to VAC's Reputation.**

27.    Even after the Derivative Litigation was filed, McGuckin continued to engage in several more examples of self-dealing and dissipation of VAC's assets, many of which caused additional harm to VAC's reputation.  We summarize some of those examples here:

1.    **McGuckin's Self-Dealing Settlement with the DOJ.**

28.    On or about January 2, 2014, VAC received a Civil Investigative Demand from
the Civil Division of the United States Attorney's Office for the Southern District of New York
("DOJ") in connection with a qui tam complaint filed by a whistleblower who alleged that
McGuckin instructed him to perform unnecessary procedures.  *See id.*, Ex. 19.  In ordering the
whistleblower to perform one unnecessary procedure, McGuckin told his fellow physician to
"bang 'em all" because "this is New Jersey."  *Id.* ¶ 85.

29.    Despite the massive risk presented to VAC by such an investigation, McGuckin's
interactions with the DOJ were reckless.  When deposed in May of 2017, McGuckin claimed that
he told the DOJ attorney to "█████" and postured that the qui tam actions would be settled for a
"████████," testifying:



*See id.*, Ex. 8 [183:18-21, 183:25, 184:17–185:5, 185:13-17] (emphasis added).

30.    McGuckin's aggressive confrontation of the DOJ failed.  Ultimately, McGuckin
elected to resolve the qui tam actions not through paying a "minimal fine" (as he had predicted
the year prior), but through a settlement agreement that required VAC to pay a minimum of
$3.825 million over five (5) years, enter into an onerous and expensive Corporate Integrity

Agreement, and pay substantially more in fines if its earning improve. *See id.*, Ex. 20, DOJ

Settlement ¶¶ 3a-d and 10. In doing so, VAC had to admit that it regularly scheduled,

performed, and billed for procedures "without any documented evidence that they exhibited a

need for therapies." *Id.*, Ex. 20, ¶ 2k. In addition, VAC is responsible for paying the qui tam

relators' legal fees, including $156,564 in the Eastern District of Louisiana and $50,000 in the

Southern District of New York. *Id.*, Ex. 20, ¶ 8; *see also United States of America ex rel.*

*Bogaerts v. Vascular Access Centers, L.P.*, No. 17-cv-2786 (E.D. La.), Order and Reasons (Dkt.

No. 18), dated Feb. 12, 2019. ██████████████████████████████

████████████████████████████████████████████████

████████████████" Gardner Decl, Ex. 21, Oct. 12, 2019 Report of Michael F. Dubin,

Monitor.

31.     As a part of the settlement agreement signed on October 9, 2018, McGuckin

represented and warranted on behalf of VAC that VAC and its affiliates had "reviewed their

financial statements" and were not insolvent and that they "reasonably believe[d] that they would

remain solvent following payment to the United States of the settlement payments." *See* Gardner

Decl., Ex. 20, DOJ Settlement ¶ 15. If McGuckin performed such a solvency analysis before

making these representations to the Department of Justice, and there is no evidence he did, it was

obviously flawed as VAC is in bankruptcy just over a year later.

32.     McGuckin was a named defendant in both of the qui tam actions, as was PVI—

the entity McGuckin owns that he used to cause the filing of this involuntary petition. Despite

this conflict of interest, McGuckin refused to recuse himself from negotiating on VAC's behalf

and instead took the lead in negotiations with the DOJ. That conflict of interest is apparent from

the terms of the settlement agreement with the DOJ. McGuckin secured a personal release for

himself but is not responsible for making any of the settlement payments.  The financial and reputational harm caused by the DOJ Settlement is real: as put by VAC's Independent Financial Monitor, "█████████████████████████████████████████████████ ██████████████████████████████████████."  *See id.*, Ex. 14, Report of Michael F. Dubin, Monitor, dated July 3, 2019 at 16.

33.    Importantly, the DOJ Settlement Agreement (that McGuckin forced upon VAC to obtain his own personal release) contains a provision that entitles the DOJ to special rights if a bankruptcy petition is filed by or against VAC.  *See id.*, Ex. 20, DOJ Settlement ¶ 16.  If VAC initiates a voluntary petition, or has a petition initiated against it by a third party, the DOJ is entitled to a judgement of the "Maximum Settlement Amount," that is *$18,360,794*.  *See id.*, Ex. 20, DOJ Settlement ¶¶ 3, 16.  By orchestrating the filing of the involuntary petition through his entity PVI, *McGuckin caused VAC's liability to the DOJ to increase by more than $14.5 million*.

## 2.    Washington Sanctions McGuckin for Performing Unapproved Procedures.

34.    The publicity from the DOJ settlement is not the only reputational harm that McGuckin has caused VAC.  On March 28, 2018, a story appeared in USA Today (and was republished in other newspapers) titled "From Hope to Medical Nightmare." *See id.*, Ex. 22, John Fauber, *From Hope to Medical Nightmare*, USA Today, Mar. 28, 2018, *available at* https://projects.jsonline.com/news/ 2018/3/28/state-boards-take-no-action-on-controversial-mstreatment.html.  One of the "medical nightmares" was experienced by a woman who nearly died and required open-heart surgery following McGuckin's performance of "a risky, unproven procedure" to treat her multiple sclerosis (MS)—a treatment that "had not been approved by the United States Food and Drug Administration." *Id*.  Following an investigation by Washington's

Medical Quality Assurance Commission, McGuckin was fined, ordered to stop performing the

procedure, and required to issue refunds to patients who paid for the procedure. *See id.*, Ex. 23,

Stipulated Findings of Fact, Conclusions of Law and Agreed Order. The Washington State order

noted that McGuckin twice lied to the Commission, once when he said he adhered to a certain

medical protocol (he did not), and a second time when he said the questioned procedure was no

longer being advertised (when it was still listed as a service on VAC's website). *Id.* McGuckin

was also ordered to take and "pass" an ethics course, which proved to be a nearly impossible task

for McGuckin.[10] In his own words, McGuckin has experienced "▓▓▓▓▓▓▓▓" with his

medical licenses in multiple states as a result of performing risky, unapproved procedures on

vulnerable MS patients.[11]

35.    As admitted by Dr. McGuckin: "



."  *See id.*, Ex. 25, Mar. 4, 2019 Letter from J. McGuckin to

Limited Partners at 1. Dr. McGuckin attributes the root cause of this slowdown to the DOJ

Settlement, but he fails to acknowledge that this slowdown also started about the same time as

the reports of his "risky, unproven procedures" in *USA Today*. VAC's loss of business from key

referral physicians, and the resulting decrease in caseload and revenue are catastrophic for VAC.

---

[10] McGuckin failed his first of three times taking the ethics course because "his essay [did not demonstrate] a capacity to think ethically about why he [was] being held to account." *Id.*, Ex. 24 ProBE Program Report for J. McGuckin (Feb. 2016). McGuckin earned only a conditional pass on his second attempt because his essay attempted to justify his conduct and blamed the oversight committee instead of reflecting on his own shortcomings. *See id.*, Ex. 22.

[11] The Washington disciplinary action was reported to other states, and many of those other states also disciplined Dr. McGuckin. For example, the Pennsylvania Board of Medicine imposed a $10,000 fine on Dr. McGuckin. The medical boards in Florida, Illinois, North Carolina, Pennsylvania, California, Georgia, and New Jersey all took action against him.

121273940.1

This reputational damage is not only impacting referral physicians, but it is also causing VAC physicians to resign as well.  At least four doctors have left VAC over the last year.  *See id*., Ex. 21 at 9-11.  Clearly, doctors both inside VAC and outside of VAC have lost confidence in Dr. McGuckin and no longer want to be associated with the company he is running.  As a result of McGuckin's harm to VAC's reputation, VAC's ███████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.”  *See id.*, Ex. 14, July 3, 2019 Report of Michael F. Dubin at 16.

### 3.    McGuckin Hired a "Crazy" and "Clinically Insane" Doctor to be VAC's Chief Medical Officer to Settle Litigation Against McGuckin.

36.    VAC's Chief Medical Officer position has a sordid past and the latest chapter may be the most troubling.  First, as discussed above, McGuckin appointed himself to serve as the Chief Medical Officer, ***paying himself $*████ *** a year for a part-time position***, without seeking any approval from the Limited Partners for this self-dealing transaction.  Then, after Plaintiffs filed the Derivative Litigation, McGuckin hired a more qualified candidate—Dr. Steve Ferrara, the former Chief Medical Officer for the United States Navy—and ***paid him $*████ ***for a full-time position***.  When confronted about this disparity during the hearing on his petition to compel arbitration, McGuckin: (1) lied, saying that Dr. Ferrara was only paid for part-time work when it was, in fact, a full time position; and (2) suggested that he got VAC "a deal" by paying Dr. Ferrara $████ less, instead of realizing that Dr. Ferrara's salary is proof McGuckin was paying himself at least $████ too much.  *See id.*, Ex. 26 Hr'g Tr. (July 12, 2018).

37.    On January 5, 2019, McGuckin informed the Limited Partners that he had hired

Dr. Wadah Atassi as VAC's new Chief Medical Officer.  While McGuckin's opinion on the

qualifications of a physician cannot be trusted given his own checkered medical history,

McGuckin's sworn statements about Dr. Atassi raise disturbing questions about the appointment.

Dr. Atassi practiced in VAC's Jacksonville center, but McGuckin fired Dr. Atassi, and Dr. Atassi

sued VAC and VAC's Jacksonville center.  *See id.*, Ex. 27, Complaint in *Atassi v. Vascular*

*Access Center of Jacksonville, LLC*, Case No. 2016-CA-010396 (Duval County, FL Fourth

Judicial Circuit) at 1–6.  When asked at his deposition in the Derivative Litigation about Dr.

Atassi, McGuckin testified:



*Id.*, Ex. 8,  J. McGuckin Dep. at 11:17–24.  McGuckin did not stop there.  He also said:



*Id.* at 50:15–18.

38.    It gets worse.  McGuckin did not disclose to VAC's limited partners that, when he

"hired" Dr. Atassi to be VAC's CMO, he did so pursuant to a completely unorthodox

employment agreement that guaranteed Dr. Atassi the full amount of his compensation—

$▮▮▮▮▮▮▮▮▮▮▮—even if Dr. Atassi resigned from the position.  *See id.*, Ex. 28, Chief

21

Medical Officer Agreement for Dr. Atassi.  Unsurprisingly, Dr. Atassi resigned several months

after he was "hired," but due to this sham "employment agreement," Dr. Atassi is still seeking to

recover the full amount of his "salary."

39.     This $███████ payment to Dr. Atassi is an improper settlement, including of

claims brought against McGuckin personally, masquerading as an employment agreement.

When Dr. Atassi was suing just VAC and VAC's Jacksonville center, McGuckin spent years and

thousands of dollars of VAC's money litigating the dispute and was only willing to offer Dr.

Atassi $█████ of VAC's money to settle the claims.  When Dr. Atassi commenced a second

civil suit in 2018 naming McGuckin and threatened McGuckin with personal liability,

McGuckin's offer suddenly increased.  *See Atassi v. McGuckin*, Case No. 2018-CA-005085

(Duval County, FL Fourth Judicial Circuit).  To absolve himself of personal liability, McGuckin

more than doubled his settlement offer and concocted his scheme to use a sham, no-show

employment agreement as settlement compensation.[12]  Despite specific provisions of the Limited

Partner Agreement barring him from doing so without limited partner approval, Dr. McGuckin

was so bold as to enter VAC into a settlement agreement that documented this unlawful scheme.

*See* Gardner Decl., Ex. 29, Settlement Agreement between VAC and Dr. Atassi.  Once again,

McGuckin has perpetuated a fraud to circumvent the restrictions on his actions in the Limited

Partnership Agreement—a fraud that benefits himself at VAC's expense.

---

[12] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████." *See id.*, Ex. 14 at 20.

### 4.    McGuckin Files Litigation Against the Pennsylvania Department of Health to Benefit His Separately Owned Centers.

40.    After McGuckin caused VAC to enter into the DOJ settlement in October 2018, he either neglected to tell the Pennsylvania Department of Health ("DOH") about it or concealed it.  As a consequence of McGuckin's notification failure, the DOH revoked the medical licenses of at least three of the McGuckin Centers and one facility owned by VAC.  *See id.*, Ex. 30, Letter Orders from the DOH to Dr. McGuckin, dated January 18, 2019.  The DOH concluded that McGuckin was not a "responsible party" under the Health Care Facilities Act ("HCFA") because he "directly withheld information pertinent to issuing a license" and thereby caused the entities to present "misleading and fraudulent information."  *See id.*  This revocation required the facilities to cease operations and notify patients of their status by February 17, 2019.  *Id.*

41.    McGuckin appealed the DOH's decision and asked the DOH to allow the centers to remain open while that appeal was pending.  The DOH agreed to allow the facilities to continue operations pending a final determination on one condition:  "Dr. McGuckin will not perform procedures or provide training to the medical staff who perform procedures at [the facility] pending the outcome of this appeal."  *Id.*  Instead of accepting this offer, ***which would have guaranteed that VAC's Pittsburgh center could continue operations and earn revenue during the appeal***, McGuckin filed a preliminary injunction in federal court asserting a violation of his constitutional rights.  *See McGuckin v. Gladfelter*, No. 2:19-cv-6410CDJ (E.D. Pa.).  Accordingly, McGuckin once again put his interests (*i.e.*, his ability to practice medicine wherever he pleases and keep his McGuckin Centers open) ahead of the interests of VAC (*i.e.*,

121273940.1

guaranteeing that VAC's center in Pittsburgh would maintain its license and continue operations).[13]

### 5.    McGuckin Agrees to Pay Himself $███████ in Breach of the Partnership Agreement.

42.    In March 2019, VAC submitted a request to the DOJ seeking to defer its quarterly settlement payments for nine months.  *See* Gardner Decl. Ex. 31, March 2019 emails from C. Hall.  This request was made just six months after McGuckin represented and warranted to the DOJ that VAC was solvent and would remain solvent after the settlement payments were made. In responding to this request, the DOJ requested updated financial information from VAC, including information about McGuckin's compensation.  *Id.*  In order to obtain the deferral of VAC's payment obligations, McGuckin told the DOJ he was foregoing ████ of his CEO compensation and a sufficient amount of his General Partner compensation to ensure that his total compensation did not exceed ████ of what he was receiving in October 2018.  *See id.*, Ex. 32, Apr. 18, 2019 Letter from J. McGuckin.[14]  Upon information and belief, McGuckin was not, however, "foregoing" his compensation; he simply changed the payee from himself to PVI and attempted to memorialize the arrangement with a ██████ "secured" promissory from VAC at ███ interest.  *See id.*, Ex. 33, Dec. 19, 2018 Secured Promissory Note from VAC to PVI. McGuckin signed both sides of the promissory note—which was given "for value received"— and in violation of the Limited Partnership Agreement requirement that he obtain the consent of the Majority in Interest of the Limited Partners for any secured loan of $██████ or more as well

---

[13] In addition, McGuckin has refused to share VAC's legal invoices with the Financial Monitor, *see* Gardner Decl. Ex. 14 at 20, likely to conceal that he is using VAC's resources to challenge a DOH decision that primarily affects his separately-owned, competing McGuckin Centers.  McGuckin's selfishness caused VAC to incur substantial professional fees to fight the DOH, and put VAC's Pittsburgh center in jeopardy.

[14] Of course, as discussed above, McGuckin is not entitled to any CEO compensation because his CEO Agreement was signed without the consent of the Limited Partners in violation of the Limited Partnership Agreement and his fiduciary duties.

121273940.1

as Pennsylvania law requiring a general partner to disclose self-dealing transactions.  *See id.*; 15 Pa.C.S. § 8649.  This is likely only one example of many liabilities on VAC's balance sheet that are invalid because they were incurred in violation of the Limited Partnership Agreement or Pennsylvania law.

> **6.**      **McGuckin Breaches the Limited Partnership Agreement By Refusing to Provide the Limited Partners with Tax Information.**

43.      In yet another example of McGuckin's refusal to execute the most basic functions of the General Partner, McGuckin declared that he would not prepare necessary tax documents to permit VAC and its Limited Partners to accurately and timely file their taxes.  VAC's Limited Partnership Agreement appoints the General Partner (controlled by McGuckin) as the "tax matters partner" of VAC, and dictates that it make all decisions about tax matters.  *See id.*, Ex. 1, Limited Partnership Agreement at §§ 7.3, 7.6.  Principal among McGuckin's responsibilities regarding taxes is to ensure that VAC timely prepares and files all of its required tax records.  *Id.* at § 7.2.1 ("The General Partner shall cause the necessary federal, state and local income tax returns and reports required of the Partnership to be prepared and timely filed.").

44.      Despite these obligations, McGuckin announced that he would not prepare the K-1 schedules for the limited partners in a timely fashion.  In a March 4, 2019 letter, McGuckin wrote: "The Limited Partnership's K-1s will be on deferral due to taking on additional massive cost burden of the Court appointed Monitor and there will also be no tax distributions."  *See id.*, Ex. 25 at 2.  By failing to prepare these tax documents on time, McGuckin breached Section 7.2.1 of the Limited Partnership Agreement.  McGuckin's "excuse" for not executing his contractual duties further demonstrates his mismanagement.  McGuckin knew about the cost burden of the Financial Monitor as early as August 2018 – *when he agreed to the appointment of a monitor who would be paid by VAC*.  McGuckin's failure to plan and prepare for this

25

known cost is further evidence that McGuckin has proven himself incompetent to manage the

most basic components of VAC's finances.

**F.      History of VAC's Inaccurate Financial Representations and Projections.**

45.    On December 1, 2017, McGuckin caused VAC to issue a costly Confidential

Offering Memorandum, seeking to raise up to $████████ in additional capital. *See id.*, Ex. 34,

Dec. 1, 2017 Letter from J. McGuckin.  McGuckin nevertheless pushed forward with this effort

despite not having the support of a single other limited partner, and despite refusing to provide a

meaningful analysis showing that the increased profits from the projects funded by the capital

raise would exceed the costs of those changes, i.e.,. a cost benefit analysis. *See id.*, Ex. 13.

When no limited partners participated in the capital raise, McGuckin started threatening the

possibility of bankruptcy. *See id.*, Ex. 35, Oct. 20, 2017 Letter from J. McGuckin ("At our

meeting I discussed financials clearly showing the company is destined to run out of money in

February, 2018."); Ex. 36, Jan. 31, 2018 Letter from J. McGuckin  ("As I mentioned before it

was a disappointing year . . . Our corporate attorney John Royer, and his associate in bankruptcy,

were consulted and priorities discussed.")].

46.    Despite these dire predictions that VAC would run out of money in February

2018, McGuckin turned around and submitted optimistic projections to the DOJ a few months

later to convince them to accept an ability-to-pay settlement that would absolve McGuckin of

personal liability. *See, e.g.*, Ex. 37 May 21, 2018 Consolidated Cash Flow Projection (████████

████████████████████████████).  As discussed above, VAC also represented in

connection with the DOJ settlement in October 2018 that it was not insolvent and that the

payments thereunder would not make it insolvent. *See id.*, Ex. 20 ¶ 15.  McGuckin, however,

121273940.1

refused to share any solvency analysis VAC performed before making that representation, despite promises that he would do so.

47.    The first report from VAC's Financial Monitor[15] suggested that VAC could continue as a going concern.  *See id.*, Ex. 14 at 5 ("████████████████████████ ████████████████████████████████████████████████ ████████████████████████.").  The Financial Monitor did, however, note several concerns with VAC's financial reporting and practices.  Among other things, the Financial Monitor observed:



---

[15] While McGuckin's frivolous appeal was pending, the Plaintiffs filed an Emergency Petition for Special Injunction on July 18, 2018 seeking, among other things, the appointment of a receiver.  At the hearing on that petition on August 13, 2018, the parties agreed to appoint a financial monitor to assess VAC's solvency.  The parties could not agree upon the terms of the order appointing the Financial Monitor, so the Plaintiffs filed a Petition to Enforce Settlement on November 8, 2018.  Following the Court's issuance of an Order appointing the Financial Monitor on December 19, 2018, McGuckin objected to several terms in the Financial Monitor's engagement letter, forcing the Plaintiffs to file another petition to amend the order appointing the Financial Monitor on December 26, 2018, which McGuckin opposed.  The Court granted that petition on January 16, 2019.  McGuckin finally signed the Financial Monitor's engagement letter in March 2019.  As a result of these delays, the Financial Monitor did not issue his first report assessing VAC's solvency to the limited partners until July 6, 2019, or nearly a year after McGuckin agreed to appoint him.

121273940.1

████████████████████████████████████████████████████████████

48.    The Financial Monitor issued his most recent report to the limited partners on Saturday, October 19, 2019, the day after McGuckin's lawyer in the Derivative Litigation requested a call on Monday with Plaintiff's counsel in the Derivative Litigation and introduced VAC's bankruptcy counsel.  While apparently orchestrated to present a more negative financial picture, the Financial Monitor described VAC's financial situation as improved from his prior report.  Among other things, VAC revised its 2019 projection, "████████████████████████ ████████████████████████████████████ ██████████████████████████████████." *See id.*, Ex. 21, Oct. 12, 2019 Report of Michael F. Dubin, Monitor at 5.  More importantly, ████████████████████████ ████████████████████████████████████████████ █████████████████████████. *See id.* at 5-6, 7, 13. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████." *Id.* at 14.

G.    **McGuckin Orchestrates the Filing of the Involuntary Chapter 11 Case.**

49.    On calls between counsel the following week, VAC's counsel asked the limited partners to consent to a bankruptcy filing, and the limited partners, first knowing that to the

extent VAC was capital deficient, funds could be secured outside of bankruptcy (likely through

them) and knowing how onerous the DOJ penalty for bankruptcy is, questioned whether or not

resolution outside of bankruptcy had been explored and requested a specific proposal from VAC

regarding the terms for such a consent were VAC to file.  The limited partners received no

response to that request until a phone call from VAC's bankruptcy counsel on November 7, 2019

followed by an email later that day again asking the limited partners to consent to a Chapter 11

filing.  *See id.*, Ex., 38 Nov. 2019 Emails between R. Coe and L. McMichael.  The limited

partners responded the next day by stating that they were willing to consider providing consent

but needed more information about what other options had been considered and the plan in

bankruptcy including, among other things, whether any governance changes would be made.  *See

id.*  The limited partners also urged VAC, if it were to file, to consider a pre-packaged

bankruptcy.  *See id.*  VAC bankruptcy counsel's response did not contain any specifics other

than a statement that "no change in management is contemplated by the Alleged Debtor."  *Id.*

The limited partners responded by, among other things, noting that VAC had made no serious

effort to obtain financing from its limited partners and again expressing a willingness to consider

providing the company with funds if the company made "reasonable governance changes."  *Id.*

The limited partners suggested hiring "an experienced financial adviser to devise a plan for

turning around VAC's operations and restructuring its balance sheet" and offered to meet with

VAC's bankruptcy counsel.  *Id.*

  50.  The response from VAC's bankruptcy counsel the next day confirmed that,

despite having threatened a bankruptcy filing for almost two years, VAC has done almost

nothing to prepare for bankruptcy.  VAC's counsel confirmed that he had no "detailed

information" for the limited partners, including something as basic as a 13-week budget.  *Id.*

According to VAC's counsel a "considerable amount of work needs to be done to analyze VAC's operations and determine exactly how to restructure it." *Id.* VAC's counsel refused to meet with the limited partners before the bankruptcy petition was filed and expressed a preference for obtaining capital from McGuckin because his loans were not "accompanied by any demands or conditions." *Id.*

51.    The following Tuesday, the Pennsylvania Supreme Court denied McGuckin's Petition for Allowance of Appeal and remanded the Derivative Litigation to the trial court. The parties were scheduled to appear in the trial court the following day for a hearing on the amount of sanctions to be awarded on the sanctions order entered by the Superior Court discussed above. That night, McGuckin's counsel in the Derivative Litigation sent an email to the Plaintiffs stating that "the filing of bankruptcy petitions are imminent" and upon filing he would submit a suggestion of bankruptcy to the trial court "which would stay the matter and of course adjourn tomorrow's proceeding." *See id.*, Ex. 39, Nov. 12, 2019 Email from D. Heim. At approximately 7:00 pm that evening, McGuckin's counsel forwarded the involuntary petition. In the petition, PVI claims that it has a $1,202,120 secured loan from VAC. If that is true, such a loan would violate the provision of the Limited Partnership Agreement requiring the consent of a Majority in Interest of the Limited Partners to a secured loan greater than or equal to $500,000 because the limited partners did not consent to a loan to PVI. Less than eighteen (18) hours later, VAC consented to the involuntary petition. The timing of the filing and VAC's immediate consent substantiate that the filing was orchestrated by McGuckin to evade liability for his various breaches of his duties to the limited partners in the Derivative Litigation.

## V.    **ARGUMENT**

52.    As evidenced by the conduct outlined above, McGuckin has a shameful history of mismanagement, conflicts of interest and self-dealing. McGuckin reached a new low with the

121273940.1

commencement of the Involuntary Chapter 11 Case, which is nothing more than a transparent

attempt to stave off an award of sanctions and ultimate judgment in the Derivative Litigation, to

the detriment of the Alleged Debtor and its creditors.

53.    Fortunately for the estate and the Alleged Debtor's creditors, the Bankruptcy

Code and related case law does not permit a debtor's principal to blatantly abuse and impugn the

integrity of the bankruptcy process and the bankruptcy courts and system.  The Bankruptcy Code

and applicable law provide for the dismissal of a petition, like the involuntary petition, that was

filed in bad faith or, alternatively, removal of the debtor-in-possession and appointment of a

bankruptcy trustee.  Here, McGuckin and the Petitioning Creditor's conduct, as well as the

inherent conflict presented when the largest assets available to pay creditors are claims against

the Alleged Debtor's management, compel either the dismissal of the Involuntary Chapter 11

Case or the appointment of a Chapter 11 trustee.

**A.    This Case Must Be Dismissed For "Cause" Pursuant To Section 1112(b) Of The Bankruptcy Code.**

54.    "The filing of an involuntary petition by a creditor must be carefully scrutinized

by the Court because such an action is extreme in nature and carries with it serious consequences

to the alleged debtor, examples of which include loss of credit standing, interference with general

business affairs and public embarrassment." *In re Landmark Distribs., Inc.*, 189 B.R. 290, 306

(Bankr. D.N.J. 1995) (quoting *In re McDonald Trucking Co.*, 76 B.R. 513, 516 (Bankr. W.D. Pa.

1987)).  The Bankruptcy Code was created by Congress to act "as a shield for debtors, [rather

than] a sword for creditors" (*In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D. Ohio 1983)), and

even the good-faith filing of an involuntary petition creates onerous circumstances for an alleged

debtor.  *See Schmid v. Yorke (In re Reid)*, 773 F.2d 945, 946 (7th Cir. 1985) (the filing of an

involuntary petition is "an extreme remedy with serious consequences to the alleged debtor").

31

55.     Section 1112(b) of the Bankruptcy Code, provides, in pertinent part that

> on request of a party in interest, and after notice and a hearing, the
> court *shall* . . . dismiss a case under this chapter . . . for cause unless
> the court determines that the appointment under section 1104(a) of
> a trustee or an examiner is in the best interests of creditors and the
> estate.

11 U.S.C. § 1112(b)(1) (emphasis added).  A request for dismissal under § 1112(b) must be

scheduled by the Court no later than thirty (30) days after filing of the motion, and must be

decided by the Court no later than fifteen (15) days after commencement of the hearing unless

the movant expressly consents to a continuance for a specific period of time or "compelling

circumstances" prevent the Court from meeting the time limits.  11 U.S.C. § 1112(b)(3).

### 1.    The Involuntary Petition Was Filed In Bad Faith.

56.     "Chapter 11 bankruptcy petitions are subject to dismissal under § 1112(b) unless

filed in good faith, and the burden is on the bankruptcy petitioner to establish good faith."  *In re*

*15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009).  While accounting for the petitioner's

subjective intent, the "good faith" filing requirement "encompasses several distinct equitable

limitations that courts have placed on Chapter 11 filings . . . . to deter filings that seek to achieve

objectives outside the legitimate scope of the bankruptcy laws.  *Official Comm. Of Unsecured*

*Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999).

57.     The Third Circuit has identified two essential elements for a "good faith"

bankruptcy filing.  First, the bankruptcy petition must "serve[] a valid bankruptcy purpose."

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,*

*Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004); *see also 15375 Memorial*, 589 F.3d at 618*; SGL Carbon*,

200 F.3d at 165; *In re Schaffer*, 597 B.R. 777, 791 (Bankr. E.D. Pa. 2019).  Second, the

bankruptcy cannot be filed "merely to obtain tactical litigation advantage." *15375 Memorial*, 589

F.3d at 605; *SGL Carbon*, 200 F.3d at 165; *Schaffer*, 597 B.R. at 791. These equitable

limitations on the chapter 11 process are necessary to ensure that the hardship on particular

creditors resulting from the bankruptcy code's considerable powers (the automatic stay, the

discharge of debts, etc.) are justified. *SGL Carbon*, 200 F.3d at 165-66; *see also Integrated*

*Telecom*, 384 F.3d at 120 n.4 (observing that "[t]he good faith requirement is necessitated as

much by the hardship of Chapter 11 to certain interests as it is by the benefit to others.").

58.    Further, in the context of involuntary bankruptcy petitions, the Third Circuit has

held that bad faith may serve as a basis for dismissal. *See In re Forever Green Athletics Fields,*

*Inc.*, 804 F.3d 328, 335 (3d Cir. 2015). The Third Circuit adopted the "totality of circumstances"

standard to determine the existence of bad faith, which is a fact-intensive review pursuant to

which a court may consider a number of factors, including whether:

> [1] the creditors satisfied the statutory criteria for filing the petition;
> [2] the involuntary petition was meritorious; [3] the creditors made
> a reasonable inquiry into the relevant facts and pertinent law before
> filing; [4] there was evidence of preferential payments to certain
> creditors or of dissipation of the debtor's assets; [5] the filing was
> motivated by ill will or a desire to harass; [6] the petitioning
> creditors used the filing to obtain a disproportionate advantage for
> themselves rather than to protect against other creditors doing the
> same; [7] the filing was used as a tactical advantage in pending
> actions; [8] the filing was used as a substitute for customary debt-
> collection procedures; and [9] the filing had suspicious timing.

*See id.* at 336.

> a.  *The Involuntary Chapter 11 Case Serves No Valid Bankruptcy*
> *Purpose and Was Commenced Primarily to Obtain a Tactical*
> *Litigation Advantage*

63.    The basic purposes of chapter 11 are (i) "preserving going concerns," and

(ii) "maximizing property available to satisfy creditors." *Integrated Telecom*, 384 F.3d at 119.

Further, "because filing a Chapter 11 petition merely to obtain tactical litigation advantages is

not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter

121273940.1

11 petitions under these circumstances as well." *SGL Carbon*, 200 F.3d at 165 (quoting *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994); *see also Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

64.     Here, the Petitioning Creditors have yet to articulate any "bankruptcy purpose", valid or otherwise, for commencing the Involuntary Chapter 11 Case.  Notwithstanding, Mr. Gardner is confident that any purported justification for the filing of the involuntary petition will not withstand scrutiny in light of the extraordinary circumstances presented by the case.  PVI, the Petitioning Creditor with the largest alleged debt, is an entity owned and controlled by McGuckin.  Indeed, McGuckin signed the involuntary petition against VAC—an entity which he controls as the sole owner and manager of VAC's General Partner.  The involuntary petition was also signed by Brian McGuckin, an apparent relation of McGuckin, on behalf of Crestwood—an entity that claims to be owed approximately $6,000.  McGuckin and the Petitioning Creditor's purpose in commencing the Involuntary Chapter 11 Case was not to preserve a going concern or maximize the value of the Alleged Debtor's estate, but rather to compromise the Derivative Litigation and prevent the imminent assessment of sanctions against McGuckin.

65.     It is well-established that a petitioner has no valid bankruptcy purpose—and acts in bad faith—when his goal is to stall or disrupt litigation in another court.  *See, e.g., Forever Green*, 500 B.R. at 427; *In re Merrifield Town Ctr. L.P.*, No. 09–18119–SSM, 2010 WL 5015006, at *5 (Bankr. E.D. Va. Dec. 3, 2010) (finding bad faith where petition was filed "for an improper purpose, namely, derailing the trial in another court"); *In re Privada, Inc.*, No. 07–10940 FRM, 2008 WL 4692372, at *4 (Bankr. W.D. Tex. Oct. 22, 2008) (finding bad faith

where petition was "a mere litigation tactic to stall, drag out and disrupt" litigation "that was not

moving in Petitioners' favor"); *In re Springs Hospitality, Inc.*, No. 06–13331 HRT, 2006 WL

2458679, at *4–5 (Bankr. D. Colo. Aug. 22, 2006) (calling involuntary case "the poster-child for

bad faith" where petitioners candidly admitted filing the case only to stall other litigation).

66.     Here, the facts are even worse than the typical example of a debtor filing a

bankruptcy petition to get the benefit of the automatic stay and avoid a negative litigation

outcome.  McGuckin caused VAC, an entity he dominates and controls, to be thrown into

bankruptcy in order to protect himself in litigation brought on VAC's behalf.  Thus, McGuckin

did not just seek a tactical litigation advantage, he did so ***at the expense of the Alleged Debtor***.

67.     The timing of the involuntary petition leaves no doubt that McGuckin hoped to

obtain a tactical litigation advantage.[16]  On Tuesday, November 12, 2019, the Pennsylvania

Supreme Court denied McGuckin's requested appeal and remanded the Derivative Litigation to

the trial court.  On Wednesday, November 13, the parties were scheduled to appear before the

trial court for a hearing on the amount of sanctions to be awarded against McGuckin for his

frivolous and vexatious conduct.  It is no coincidence that the involuntary petition was filed

immediately before the hearing, in an attempt to adjourn the hearing and at least delay (if not

eliminate) the payment of sanctions.  In these circumstances, bankruptcy courts regularly

conclude that the bankruptcy case was filed only to stall litigation.  *See, e.g., Keiter v. Stracka*,

192 B.R. 150, 160 (S.D. Tex. 1996) (petition filed "only one day" before a scheduled

foreclosure); *Forever Green*, 500 B.R. at 428 (petition filed one week before critical filing date

---

[16] As discussed above, filing the bankruptcy petition was not McGuckin's only effort to stall the litigation and
increase the expense of the litigation for Plaintiffs and VAC.  McGuckin also filed a frivolous motion to compel
arbitration three days before the trial in the Derivative Litigation was scheduled to commence and then filed a
frivolous appeal when that motion was denied.  If not for this frivolous appeal, the litigation would have been
resolved last July – at a time when McGuckin was representing to the trial court and the United States government
that VAC was solvent.

121273940.1

in a related action); *Fox Island*, 106 B.R. at 968 (petition filed one week before trial in a foreclosure action).

68.    McGuckin and Petitioning Creditors cannot plausibly claim that the filing of the Involuntary Chapter 11 Case was intended to maximize the property available to satisfy creditors.  If the Derivative Litigation is litigated to a successful conclusion, the proceeds would be more than sufficient to satisfy VAC's debts and continue operations without diluting or eliminating current equity holders.  Moreover, by filing the involuntary petition, McGuckin and the Petitioning Creditors triggered a provision of the DOJ Settlement Agreement entitling the DOJ to judgment against the Alleged Debtor in the amount of $18,360,794, i.e., $14.5 million more than the total amount of payments VAC is required to make over five years if it does not declare bankruptcy. ***Because the involuntary filing threatens the viability of the Alleged Debtor's largest asset (the Derivative Litigation) and increases its liabilities by nearly $15 million***, it could only have been motivated by ill will, malice or some other improper purpose.

69.    The sole petitioning creditor not directly affiliated with McGuckin also lacks a valid bankruptcy purpose for commencing the Involuntary Chapter 11 Case.  According to the involuntary petition, Metter is owed less than $12,000 by VAC.  Assuming the alleged debt is valid, Metter has less extreme remedies at its disposal, including the commencement of a collection action in state court.  *See, e.g., Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 n.11 (4th Cir. 1993) ("Debt collection is not a proper purpose of bankruptcy."); *In re Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985) ("A creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt."); *MAG Bus. Servs. v. Whiteside (In re Whiteside)*, 240 B.R. 762, 766 (Bankr. W.D. Mo. 1999) ("[T]he remedy of involuntary bankruptcy was not intended to be a substitute for ordinary debt collection

procedures.").  Moreover, Metter receives a substantial amount of its income from McGuckin

and the entities he controls.  Upon information and belief, Metter joined the Petition at

McGuckin's direction to meet the three-creditor requirement.

70.    In sum, taking into account the timing of the filing of the involuntary petition, the

tactical advantages gained from the bankruptcy filing by McGuckin, and the lack of a valid

bankruptcy purpose for the Involuntary Chapter 11 Case, the only reasonable conclusion is that

the Petitioning Creditors, acting at McGuckin's instruction, filed the involuntary petition

primarily as a litigation tactic to stall or disrupt the Derivative Litigation, which is not a good

faith purpose for seeking bankruptcy protection.

> c.  The "Totality of Circumstances" Demonstrate the Petitioning
> Creditor's Bad Faith

71.    As discussed above, a bankruptcy court may also dismiss an involuntary

bankruptcy case if the petition was filed in bad faith, as evidenced by the presence of one or

more of the nonexclusive factors set forth in *Forever Green.  See Forever Green*, 804 F.3d at

335-36.  Here, the relevant factors overwhelmingly support a finding that the involuntary petition

was filed in bad faith and should be dismissed accordingly.

72.    First, the involuntary petition does not satisfy the statutory criteria because there

is a bona fide dispute as to the validity of the loan to PVI.  Section 303(b) of the United States

Bankruptcy Code provides, in relevant part:

> An involuntary case against a person is commenced by the filing within the
> bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is [] a holder of a claim against
>     such person that is not contingent as to liability or the subject of a bona
>     fide dispute as to liability or amount . . .;
>
> (2) if there are fewer than 12 such holders, excluding any employee or
>     insider of such person and any transferee of a transfer that is voidable

under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or
more of such holders . . . .

11 U.S.C. § 303(b)(1).  Therefore, pursuant to Section 303(b), where a debtor has twelve or more

creditors, an involuntary bankruptcy proceeding can be only be filed by three or more claimholders

whose claims are "not contingent as to liability" or "the subject of a bona fide dispute as to liability

or amount."  11 U.S.C. § 303(b)(1); *see also Landon v. Hunt*, 977 F.2d 829, 832 (3d Cir. 1992).

The test for determining whether there is a bona fide dispute for purpose of section 303 is whether

there is an objective basis for either a legal or factual dispute as to the validity of the debt.  *See In

re Prisuta*, 121 B.R. 474, 476 (Bankr. W.D. Pa. 1990) (citing *Matter of Busick*, 831 F.2d 745, 749

(7th Cir. 1987)).  "The outcome of a dispute need not be resolved, only its presence or absence."

*Id.*

73.    Here, there is bona fide dispute as to the validity of the debt asserted by PVI.  PVI

alleges that it holds a secured debt in the amount of $1,202,120.  However, the Limited

Partnership Agreement provides that the consent of the General Partner *and* the affirmative vote

of a majority in interest of the limited partners is required for VAC to "use as security for any

debt . . . assets or properties or any interest in one or more assets or properties of the Partnership

with a value of $500,000 or more[.]"  Limited Partnership Agreement § 6.3.2.  The limited

partners never knew about, voted on or approved the grant of security to PVI in exchange for a

loan in any amount.  Further, the limited partners do not know whether the Alleged Debtor

actually received any funds from PVI, or whether this is another instance of McGuckin

defrauding the Alleged Debtor to benefit a different McGuckin entity or McGuckin personally.

For example, after DOJ asked him to forego receiving compensation from VAC, McGuckin

caused VAC to agree to pay PVI (an entity McGuckin owns) $▮▮▮▮▮ through a "Secured

Promissory Note," but that agreement is void as self-dealing transaction by a general partner that

38

was not disclosed to the limited partners.  *See supra* § IV.E.5.  The Alleged Debtor's List of

Creditors states that the loan to PVI is for "deferred compensation and services," among other

things, suggesting that the loan to PVI is another example of McGuckin "deferring"

compensation he was never entitled to receive in the first place.  [ECF No. 8].  In any event,

given the fact that McGuckin concealed the alleged loan and grant of security interest from the

limited partners in violation of the Limited Partnership Agreement, and the absence of any

arm's-length relationship between McGuckin and PVI, there are objective grounds to dispute the

validity of the alleged debt.  Because the alleged debt to PVI, one of the three Petitioning

Creditors, is the subject of a bona fide dispute, the involuntary petition does not satisfy the

statutory criteria.

74.    Second, the involuntary petition is not meritorious.  As discussed above, in his

capacity as the sole manager and member of the Alleged Debtor's General Partner and the

principal of PVI, McGuckin had no reasonable basis to believe that PVI's claim was not subject

to a bona fide dispute.  Moreover, he was aware of the restrictions the Limited Partnership

Agreement places on the General Partner's ability to file for bankruptcy and orchestrated the

involuntary filing in order to avoid those restrictions.   Specifically, the Limited Partnership

Agreement provides that VAC may not file for bankruptcy without the affirmative vote of a

majority in interest of the limited partners.  Limited Partnership Agreement 6.3.4.  VAC's

counsel sought the consent of the limited partners to a Chapter 11 filing immediately prior to the

commencement of the Involuntary Chapter 11 Case, but was unable to provide them with basic

information about the company's plan for bankruptcy and, more troublingly, expressed a

preference for McGuckin to remain in control.  When it became clear that the limited partners

would not agree to a free-fall bankruptcy with McGuckin at the helm, McGuckin subverted the

Limited Partnership Agreement by causing PVI to file the involuntary petition.  Thus, the

involuntary petition lacks merit.

75.    <u>Third</u>, the Petitioning Creditors failed to make a reasonable inquiry into the

relevant facts and pertinent law before filing the Involuntary Petition.  PVI knew, or should have

known, that its alleged claim is the subject of a bona fide dispute.  PVI should also have known

that the Limited Partnership Agreement precluded the filing of bankruptcy without the limited

partner's approval, and that McGuckin was using PVI and its dubious claim against the Alleged

Debtor to unlawfully sidestep this restriction.

76.    <u>Fourth</u>, there is extensive evidence of preferential payments to certain creditors or

of dissipation of the Alleged Debtor's assets.  As set forth at length above, since as early as 2012,

McGuckin has taken every opportunity to enrich himself and companies he controls at the

expense of VAC.  In the last year alone, McGuckin has taken a $███████ security interest in

VAC in exchange for a "loan" in the form of deferred compensation, wasted the Alleged

Debtor's assets on frivolous appeals and made preferential payments to his personal attorneys.

77.    <u>Fifth</u>, the filing of the Involuntary Chapter 11 Case was motivated by ill will or a

desire to harass.  In orchestrating the filing of the involuntary petition by entities controlled or

affiliated with him, McGuckin was motivated by a desire to avoid payment of attorneys' fees in

the Derivative Litigation, deprive the limited partners of their day in court, and insulate himself

from personal liability to the Alleged Debtor for his breaches of fiduciary duty.

78.    <u>Sixth</u>, McGuckin and the Petitioning Creditors used the Involuntary Chapter 11

Case to obtain a disproportionate advantage for themselves rather than to protect against other

creditors doing the same.  Again, the filing was motivated by a desire to shield McGuckin from

liability in the Derivative Litigation.  There is no evidence that any of the Alleged Debtor's

121273940.1

creditors unaffiliated with McGuckin were contemplating a potential involuntary filing.  Given

his track record, there is every reason to suspect that McGuckin will use the bankruptcy filing to

prefer entities he owns or controls (such as PVI) to the detriment of VAC and its other creditors.

79.    Seventh, as discussed above, the filing was used as a tactical advantage in

pending actions, namely the Derivative Litigation.

80.    Eighth, the filing was used as a substitute for customary debt-collection

procedures.  There is no indication the Petitioning Creditors exhausted the traditional avenues of

collecting a debt before taking the drastic step of filing the involuntary petition.  Metter and

Crestwood are allegedly owed, collectively, approximately $18,000.  If their true motivation was

simply to recover these amounts, and not provide McGuckin with a workaround of the Limited

Partnership Agreement's restrictions on filing for bankruptcy, they could have commenced state

court collection actions with relatively little expense or effort.  Instead, they filed the Involuntary

Chapter 11 Case, potentially subjecting themselves to costs, attorneys' fees, compensatory

damages and/or punitive damages if the involuntary petition is dismissed.  11 U.S.C. § 303(i)(1),

(2).

81.    Lastly, the filing of the Involuntary Chapter 11 Case had suspicious timing.  The

involuntary petition was filed by entities affiliated with McGuckin immediately before a hearing

in which the court overseeing the Derivative Litigation was going to award sanctions against him

and immediately after McGuckin's appeals were exhausted and he faced the prospect of a trial

on the merits.

82.    Thus, *all* of the factors articulated by the Third Circuit support a finding that the

Involuntary Chapter 11 Case was filed in bad faith.  The involuntary petition should be dismissed

accordingly.

121273940.1

**B.    Dismissal Of The Chapter 11 Case Should Be With Prejudice Pursuant To Section 105(a) And 349(a) Of The Bankruptcy Code.**

83.    Section 349(a) of the Bankruptcy Code provides that "[u]nless the court, *for cause*, orders otherwise, the dismissal of a case under this title does not bar a discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title." 11 U.S.C. § 349(a) (emphasis added); *see* 11 U.S.C. § 109(g) (applicable to individuals and family farmers only).

84.    Under section 105(a) of the Bankruptcy Code, the Court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, *or to prevent an abuse of process.*" 11 U.S.C. § 105(a) (emphasis added).

85.    A bankruptcy court may apply its inherent powers under sections 105(a) and 349(a) to dismiss a debtor's chapter 11 case with prejudice and proscribe subsequent filings where the debtor has commenced its bankruptcy case for an improper purpose and in bad faith. *See Casse v. Key Bank Nat'l Assoc'n (In re Casse),* 198 F.3d 327, 336 (2d Cir. 1999).

86.    It is necessary for the Court to dismiss this case with prejudice to prevent McGuckin from orchestrating a successive bankruptcy petition in this or some other jurisdiction to further forestall the pending Derivative Litigation.  The Petitioning Creditors' bad faith filing provides ample justification for the Court to proscribe McGuckin and any entity he controls or with which he is affiliated from seeking further relief under the Bankruptcy Code without first seeking leave of this Court.

121273940.1

C.    **Alternatively, If The Court Does Not Dismiss This Case, The Appointment
Of A Chapter 11 Trustee Is Necessary Under Section 1104(a) Of The
Bankruptcy Code.**

87.    Section 1104(a) of the Bankruptcy Code governs the appointment of a Chapter 11

trustee, and provides that the Court, after notice and a hearing,

*shall* order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement
of the affairs of the debtor by current management, either before or after the
commencement of the case, or similar cause . . . or

(2) if such appointment is in the interests of creditors, any equity security holders,
and other interests of the estate, without regard to the number of holders of
securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis added).

88.    In addition to the provisions of section 1104(a), a trustee shall be appointed if

grounds exist to convert or dismiss a Chapter 11 case, but the court determines that the

appointment of a trustee is in the best interests of creditors and the estate. 11 U.S.C.

§ 1112(b)(1); *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016)

89.    The party seeking appointment of a trustee bears the burden of demonstrating the

need for a trustee by clear and convincing evidence.  *See In re Marvel Entertainment Group,*

*Inc.*, 140 F.3d 463, 473 (3d Cir. 1998); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.

1989).  The "clear and convincing" standard requires the moving party to "show that the

evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without

hesitation," about the matter at issue.  *Treadways LLC v. Travelers Indem. Co.*, 467 Fed. Appx.

143, 147 (3d Cir. 2012) (internal quotations omitted).  Once the movant demonstrates the need

for a trustee by clear and convincing evidence, the court has no discretion—it must appoint a

trustee.  *See Marvel*, 140 F.3d at 471; *Sharon Steel Corp.*, 871 F.2d at 1225-1226.

43

**1.     Cause Exists Under Section 1104(a)(1) for the Appointment of a Trustee.**

90.     Section 1104(a)(1) "does not promulgate an exclusive list of causes for which a

trustee must be appointed." *Marvel*, 140 F.3d at 472.  "Cause" for appointment of a trustee in a

Chapter 11 case may be found based on factors including:

> [1] conflicts of interest, including inappropriate relations between corporate parents and
> the subsidiaries; [2] misuse of assets and funds; [3] inadequate recordkeeping and
> reporting; . . . various transgressions as to taxes, including nonpayment of taxes, failure to
> file returns, and nonwithholding of taxes; [4] various instances of conduct found to
> establish fraud or dishonesty; [5] failure to make required payments; and [6] lack of
> credibility and creditor confidence.

*In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988); *see also Marvel*, 140

F.3d at 473 (finding sufficient cause based on "deep-seeded [sic] conflict and animosity"

between the debtor and the creditors, as well as the lack of confidence of all creditors in the

ability of the entities controlling the debtor to act as fiduciaries); *In re Cardinal Indus., Inc.*, 109

B.R. 755, 765 (Bankr. S.D. Ohio 1990) (appointing trustee based on creditors' "serious and

general loss of confidence in the Debtors' management"); *In re Savino Oil & Heating Co.*, 99

B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (debtor's failure to disclose material and relevant

information to the bankruptcy court and its creditors constituted cause for appointment of a

trustee).

91.     Cause exists under Section 1104(a)(1) for the appointment of a trustee in this

case.

92.     <u>First</u>, McGuckin is hopelessly conflicted.  Where, as here, a debtor is controlled

by parties who hold interests adverse to its estate, the court must appoint a trustee.  *See, e.g.*, *In*

*re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr.W.D. Tenn. 1989)(chapter 11

trustee appointed where debtor was not in a "strong position" to pursue possible claims due to a

conflict of interest and fraudulent transfers, and "a trustee would likely be able to investigate

claims that could result in additional sums of money coming into the estate"); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (conflicting interest in various related entities held by the debtor's directors warranted the appointment of a trustee); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62–63 (Bankr. E.D.Pa. 1981) (appointing a trustee in the best interests of the creditors when the principals of the debtor occupied conflicting positions in transferee companies); *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552, 554 (Bankr. W.Va. 1981) (appointment of a trustee was justified where loyalty of debtor's current management was called into question due to competing business interests and potential for intercompany dealings); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. W.Va. 1980) (appointing trustee under § 1104(a)(2) where "[t]he magnitude of the number of intercompany transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor].")

93.    McGuckin's conflicts are irreconcilable.  The largest asset of the Alleged Debtor's estate is the Derivative Litigation against McGuckin.  He cannot be in a position, as the sole manager and member of the Alleged Debtor's General Partner, to decide whether or not to pursue that action, or what amount would constitute a fair settlement.  In addition, the largest creditor is PVI, an entity that McGuckin owns.  As discussed above, the purported debt is invalid because McGuckin gave himself the loan in violation of the Limited Partnership Agreement and Pennsylvania statutes governing self-dealing transactions by a general partner.  However, it is not McGuckin's interest to dispute the purported loan because he owns PVI, and he breached the Limited Partnership Agreement to consummate the transaction.  In addition, McGuckin has

commingled funds inappropriately between VAC, the McGuckin Centers, and PVI, as confirmed

by the Financial Monitor.  *See supra* § IV.F.  Such conflicts of interest compel the appointment

of a Chapter 11 Trustee.

94.    Second, the Alleged Debtor, under McGuckin's control, also has an extensive

track record of misuse of its assets and funds.  As detailed above, McGuckin used VAC

resources to start and operate his competing businesses, pay himself excessive and prohibited

compensation, and used VAC assets to pay his legal bills.[17]  He also agreed to unconscionable

settlements, such as with Dr. Atassi and the DOJ, that released him from personal liability while

saddling VAC with millions of dollars of debt.  Essentially, McGuckin treated VAC like his own

personal piggy bank up until the time it became necessary to sacrifice VAC to save himself from

the Derivative Litigation.  Such self-dealing constitutes "cause" for the appointment of a trustee.

*See Sharon Steel*, 86 B.R. at 463 (finding "conclusive evidence of self-dealing" warranting the

appointment of a Chapter 11 trustee where the debtor's management made large prepetition

transfers of funds and property of the debtor to companies under the same management).

95.    Third, under McGuckin's leadership, the Alleged Debtor's recordkeeping and

reporting have been abysmal.  Despite the General Partner's obligation under the Limited

Partnership Agreement to provide the limited partners with annual financial statements within

120 days of the end of the fiscal year, it has failed to do so for years.  While the annual financial

statements were released to some of the limited partners this year, it was only because they were

distributed by the Financial Monitor—as a part of his July 3, 2019 initial report, which is months

---

[17] In addition to the examples described above, McGuckin is also forcing VAC to advance his fees in the Derivative Litigation, including the fees associated with his frivolous appeal.  While Plaintiffs' fees in responding to at least some of McGuckin's frivolous and vexatious conduct will be refunded as sanctions, McGuckin should also return all fees that were advanced to him for his frivolous filings because he is only entitled to indemnification for "reasonable" attorneys' fees.  Limited Partnership Agreement § 6.10.2.  Of course, McGuckin is not going to seek reimbursement from himself, so a trustee needs to be appointed to recover these fees as well.

121273940.1

past the 120-day deadline. ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████.''

Gardener Decl., Ex. 14. Mr. Gardner submits that, currently, there are *no* individuals capable of

acting as a check on McGuckin, as the Alleged Debtor's officers are either related to McGuckin

or intimately connected to him. Other than McGuckin, the two "Authorized Officers" identified

in VAC's Consent [ECF No. 3 at Ex. A], are Mark Tucci, VAC's CFO and McGuckin's brother-

in-law, and Andrea Vernon, VAC's COO █████████████████████████████████████

██████████████████████████████████).

96.    Fourth, the General Partner is also in default of its tax-related obligations under

the Limited Partnership Agreement. As discussed above, the Limited Partnership Agreement

requires the General Partner to prepare and file federal, state and local income tax returns,

including Schedule K-1s. McGuckin refused to prepare the K-1 schedules on time, thereby

forcing VAC's limited partners to apply for extensions of the time to file lest VAC be exposed to

additional financial and regulatory liability.

97.    Fifth, the instances of fraudulent or dishonest conduct are almost too numerous to

list. In brief:

- McGuckin has repeatedly usurped VAC's corporate opportunities for himself.

- McGuckin was found to have lied to investigators from Washington's Medical
  Quality Assurance Commission.

- McGuckin failed an ethics course required by Washington State twice due to his
  inability to acknowledge his misconduct.

- While McGuckin was the General Partner, CEO, and CMO of VAC, the company
  engaged in Medicare fraud.

121273940.1

- The DOH found McGuckin was not a "responsible party" because he "directly withheld information pertinent to issuing a license" and caused centers to present "misleading and fraudulent information."

- The court overseeing the Derivative Litigation rejected McGuckin's testimony that Mr. Gardner received the CEO Agreement before it was signed.

98.    Given his history, McGuckin simply cannot be trusted to conduct himself with the candor, accuracy and integrity that the bankruptcy process demands.  *See Holder v. Bennett (In re Bennett)*, 126 B.R. 869, 875 (Bankr. N.D. Tex. 1991) (stating that "[c]andor, accuracy and integrity are required of a debtor in bankruptcy"); *In re Charles*, 474 B.R. 680, 687 (8th Cir. B.A.P. 2012) ("It is crucial to the effectiveness of the bankruptcy system that the Debtor proceed with complete candor.").

99.    <u>Sixth</u>, the Alleged Debtor will also lack credibility with its creditors, the medical community and potential patients as long as McGuckin remains in control.  McGuckin's egregious conduct, which is now public knowledge by virtue of the settlement with the DOJ and several news reports in national publications, has caused extensive reputational harm to VAC. McGuckin's "leadership" has driven talented medical professionals away from VAC and the revelations regarding McGuckin's improper practices have caused VAC's revenues to plummet.

100.    Further cause is established by McGuckin's failure to act as a fiduciary to the Alleged Debtor.  Although a debtor-in-possession generally remains in control of its business operations, this practice is "premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v Weintraub*, 471 U.S. 343, 355 (1985) (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651, 83 S. Ct 969, 980, 10 L.Ed2d 33 (1963)).  "As a *de jure* trustee, the debtor-in-possession holds its powers in trust for the benefit of creditors." *In re V. Savino Oil & Heating Co.*, 99 B.R at 524-25, and the "debtor-in-possession's fiduciary obligation to its

48

creditors includes refraining from acting in a manner that could damage the estate or waste its

assets." *Jackson v Levy*, No. 998 Civ 8890, 2000 U.S. Dist LEXIS 825, at *19 (S.D.N.Y. Feb. 2,

2000). "The willingness of Congress to leave a debtor-in-possession is premised upon an

expectation that current management can be depended upon to carry out the fiduciary

responsibilities of a trustee." *Savino Oil*, 99 B.R. at 526.

101.    If the debtor in possession fails to exercise its fiduciary duties in this respect,

Section 1104(a)(l) commands that stewardship over the reorganization effort be turned over to a

trustee. *Id.*; *see also In re Holly's, Inc.*, 140 B.R. 643,686 (Bankr. N.D. Mich. 1992) ("When a

debtor in possession breaches its fiduciary duties, this section provides a meaningful remedy to

remove the debtor in possession and obtain an independent trustee fiduciary to administer the

estate.").

102.    Importantly, prepetition conduct, of the nature we have here, alone is sufficient to

warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(l) (the relevant "cause" for

appointment of a trustee may exist "*either before or after* the commencement of the case.)

(emphasis added); *In re Rivermeadows Assoc, Ltd.*, 185 B.R. 615, 619 (Bankr. D Wyo. 1995)

("[The Code is clear that the prepetition conduct of the debtor's management may be the sole

deciding factor" in the appointment of a Chapter 11 trustee); *see also Savino Oil*, 99 B.R. at 526

("[T]his prepetition course of conduct, in and of itself, constitutes 'cause' for the appointment of

a chapter 11 trustee.").

103.    Here, McGuckin is using this proceeding to further his personal agenda in

violation of his fiduciary obligations, the estate and this Court.  McGuckin caused the

Involuntary Chapter 11 Case to be filed without seriously considering any alternatives, such as

additional financing from the limited partners or a pre-packaged bankruptcy.  McGuckin also

consented to the involuntary petition despite his knowledge of the invalidity of PVI's alleged

debt.  McGuckin's actions are a breach of his fiduciary duty to creditors and are putting VAC

unduly at risk.  The only means of stabilizing VAC is through the appointment of a Chapter 11

trustee.

104.    McGuckin's conduct to date also calls into question his ability to fulfill his

obligation to creditors to pursue avoidance actions.  Because the "debtor in possession is vested

with essentially the same fiduciary duties as the trustee . . . cause may exist pursuant to

§ 1104(a)(1) for the appointment of a trustee when the debtor in possession breaches this duty

and unjustifiably fails to institute a suit to recover a voidable preference." *In re SRJ Enterprises,

Inc.*, 151 B.R. 189 (Bankr N.D. Ill. 1993) (citing *Commodity Futures Trading Comm'n v.

Weintraub*, 471 U.S. 343, 355 (1985); *Matter of Holly's Inc.*, 140 B.R. 643, 686 (Bankr. W.D.

Mich. 1992)); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,

330 F.3d 548, 573 (3d Cir. 2003) (the debtor-in-possession has a "fiduciary duty to maximize the

value of the bankruptcy estate," which includes the assertion of avoidance actions).

105.    In *In re Bryd*, Nos. 04–35620–TJC, 01–25006–TJC, 2007 WL 4287548 (Bankr.

D. Md. Dec. 5, 2007), the bankruptcy court noted that "a debtor in possession's failure to

prosecute a preference claim on behalf of the estate may constitute cause to appoint a chapter 11

Trustee." *Id.* at *13.  Notwithstanding the debtor's contention that it was not going to file any

avoidance actions because it believed such suits lacked merit, the bankruptcy court found that the

appointment of a Chapter 11 trustee was warranted because "[t]he appointment of the Chapter 11

Trustee, who could objectively review the merit of such potential actions and bring them as

appropriate, was necessary to preserve whatever value those actions had for the estate."  In

*Sharon Steel*, the bankruptcy court found that the failure of the debtor's management to pursue

recoveries of insider preferences and fraudulent conveyances and its apparent inability to do so

because of conflicts of interest is a violation of its fiduciary duty, amounts to gross

mismanagement and warrants the appointment of a trustee" under both subsections of Section

1104(a). *See In re Sharon Steel Corp.*, 86 B.R. 455, 465 (Bankr. W.D. Pa. 1998), *aff'd*, 871 F.2d

1217 (3d Cir. 1989).

106.    While the Involuntary Chapter 11 Case is still in its early stages, there is no

reason to believe the Alleged Debtor will, while under McGuckin's control, fulfill its obligation

to diligently investigate potential preferences or fraudulent conveyances or pursue avoidance

actions, at least not where the target is McGuckin himself, entities owned or controlled by him,

or entities that provide him with personal services, such as his attorneys or Metter.  In these

circumstances, there is cause to appoint a Chapter 11 trustee to investigate potential sources of

recovery and commence avoidance actions, as appropriate.  *See Sharon Steel*, 86 B.R. at 465.

107.    The elements of "cause" for appointment of a trustee in this case, thus, include

irreconcilable conflicts of interest, a history of dissipation and self-dealing, inadequate

recordkeeping and commingling of funds, tax transgressions, a proven history of fraudulent and

dishonest conduct, lack of credibility and the Alleged Debtor's likely refusal to perform its

fiduciary obligations.  Accordingly, the Court should appoint a Chapter 11 trustee for the

Chapter 11 Cases.

> **2.    Appointment of A Trustee is in the Best Interests of Creditors Under
> Section 1104 (a)(2).**

108.    Section 1104(a)(2), unlike subsection (a)(1) where appointment of a trustee is

mandatory upon specific finding of cause, "envisions a flexible standard . . . . giv[ing] discretion

to appoint a trustee 'when to do so would serve the parties' and estate's interests.'"  *Marvel*, 140

F.3d at 474 (citation omitted).  In determining whether a trustee should be appointed under

121273940.1

Section 1104(a)(2), courts "eschew rigid absolutes and look[] to the practical realities and necessities." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). Among the factors considered in appointing a trustee under section 1104(a)(2) are:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*Id.* These factors are not applied mechanically or formalistically. *See id.* "Code § 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no 'cause' exists." *Ionosphere Clubs*, 113 B.R. at 168.

109.    The factors generally considered when assessing the appointment of a Chapter 11 trustee are all met here. Specifically, (a) the Alleged Debtor cannot be trusted to protect the interests of the estate, (b) the Alleged Debtor has shown no ability or, even willingness, to work with anyone other than McGuckin, thereby diminishing the prospects for rehabilitation, (c) the medical community rightfully has no confidence in the Alleged Debtor's present management, and (d) the benefits derived from the appointment of a trustee will far outweigh the cost of the appointment.

110.    With respect to the prospects for rehabilitation, the Alleged Debtor's conduct prior to the filing of the Involuntary Chapter 11 Case suggests that it is unlikely to achieve a consensual plan. When VAC's counsel approached the limited partners about consenting to a bankruptcy filing, they did not reject the request out of hand but rather asked for basic information about the Alleged Debtor's plan for the bankruptcy, including who would run the company, which leases would be rejected, which centers would continue to operate, how much debtor-in-possession financing would be necessary, how the DOJ settlement would be impacted,

and the exit strategy.  VAC's counsel was unable to provide any specific details in response to the limited partners' inquiries, other than to say that "no change in management is contemplated by the Alleged Debtor."  VAC's counsel also declined to consider obtaining financing from the limited partners and expressed, instead, his preference for obtaining capital from McGuckin because his loans were not "accompanied by any demands or conditions."  If the Alleged Debtor continues to refuse to engage with any restructuring proposal that does not vest McGuckin with all of the equity in the reorganized VAC, it should expect a lengthy confirmation fight.

111.    Finally, the benefits to be derived from the appointment of a Chapter 11 trustee far outweigh the costs of appointment.  There is no reason to believe that McGuckin will not deplete the estate's assets in the same manner he depleted the assets of VAC.  While the appointment of a trustee will include costs of its own, those costs will almost certainly be significantly less than the losses that are certain to occur if the Alleged Debtor, under McGuckin's control, remains as debtor-in-possession.

**3.    The Court May Appoint a Trustee Rather than Convert or Dismiss the Involuntary Chapter 11 Case.**

112.    As set forth above, because McGuckin and the Petitioning Creditors filed the Involuntary Chapter 11 Case in bad faith, without a legitimate bankruptcy purpose and solely to obtain a tactical litigation advantage, it is subject to dismissal.  However, section 1112(b)(1) provides that, as an alternative to dismissal, the Court may appoint a Chapter 11 trustee if the Court determines that such an appointment is in the best interests of creditors.  11 U.S.C. § 1112(b)(1).  To the extent the Court is not inclined to dismiss the Involuntary Chapter 11 Case, Mr. Gardner submits that it would be beneficial to the Alleged Debtor's creditors to appoint a Chapter 11 Trustee to operate the Alleged Debtor and examine its history of transactions and transfers with a view towards maximizing the value of the estate.

121273940.1

## V. NOTICE

113.    Notice of the Motion has been given to (i) counsel for the United States Trustee for the Eastern District of Pennsylvania, (ii) proposed counsel for the Alleged Debtor, (ii) counsel for the Petitioning Creditors, and (iii) all parties who have filed appearances in the chapter 11 case.  Mr. Gardner respectfully submits that no other or further notice is necessary under the circumstances.

121273940.1

## VI. CONCLUSION

For the foregoing reasons, Mr. Gardner respectfully requests the entry of an order

dismissing the above-captioned chapter 11 case pursuant to section 1112(b) of the Bankruptcy

Code with prejudice or, in the alternative, appointing a chapter 11 trustee pursuant to section

1104(a) of the Bankruptcy Code, and granting such other relief as may be just and appropriate.

Dated: November 22, 2019  
      Philadelphia, Pennsylvania

**DRINKER BIDDLE & REATH LLP**

*/s/ Joseph N. Argentina*  
Andrew C. Kassner  
Joseph N. Argentina, Jr.  
Richard E. Coe (*pro hac vice* pending)  
Nicholas S. Feltham (*pro hac vice* pending)  
One Logan Square, Ste. 2000  
Philadelphia, PA 19103-6996  
Phone:  (215) 988-2700  
Fax:  (215) 988-2757  
Andrew.Kassner@dbr.com  
Joseph.Argentina@dbr.com  
Richard.Coe@dbr.com  
Nicholas.Feltham@dbr.com

-and-

Vince Slusher (*pro hac vice* pending)  
1717 Main Street, Ste. 5400  
Dallas, TX 75201-7367  
Phone: (469) 357-2500  
Fax: (469) 327-0860  
Vince.Slusher@dbr.com

*Counsel for William Whitfield Gardner*

121273940.1