# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>**Vascular Access Centers, L.P.,**<br><br>Debtor. | Hon. Ashley M. Chan<br><br>Involuntary Chapter 11<br><br>Case No. 19-17117 (AMC) |

### OBJECTION OF MAJORITY LIMITED PARTNER
### TO MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING IT TO OBTAIN POST-PETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING IT TO ENTER INTO THE DEBTOR-IN-POSSESSION CREDIT AGREEMENT, AND (III) GRANTING ADMINISTRATIVE PRIORITY CLAIMS TO DIP LENDER PURSUANT TO SECTION 364 OF BANKRUPTCY CODE AND MODIFYING THE AUTOMATIC STAY TO IMPLEMENT THE TERMS OF THE DIP ORDER

William Whitfield Gardner ("**Gardner**"), the majority-in-interest limited partner of Debtor, Vascular Access Centers, L.P. ("**VAC**" or "**Debtor**"), by and through his undersigned counsel, hereby files this objection and reservation of rights (the "**Objection**") to the *Motion of the Debtor for Entry of Interim and Final Orders: (I) Authorizing It to Obtain Post-Petitioning Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Authorizing It to Enter Into the Debtor-In-Possession Credit Agreement, and (III) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of Bankruptcy Code and Modifying the Automatic Stay to Implement the Terms of the DIP Order* [ECF 114] (the "**DIP Motion**"), filed in this United States Bankruptcy Court for the Eastern District of Pennsylvania ("**Court**").[1] In support of this Objection, Mr. Gardner states as follows:

---

[1] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Motion.

121625424.2

## I. SUMMARY OF OBJECTION

1. By its DIP Motion, the Debtor seeks on an emergency basis to obtain a $1 million interest bearing DIP Loan from Philadelphia Vascular Institute, LLC ("**PVI**"), an entity owned and controlled by James McGuckin. McGuckin is also the principal of the Debtor's general partner, Vascular Access Centers, LLC ("**VAC LLC**"). Thus, the Debtor and PVI are effectively the same person: McGuckin. In exchange, McGuckin Debtor proposes to give McGuckin PVI a superpriority administrative expense claim and other unacceptable consideration as described more fully below.

2. The Court should deny the relief sought in the DIP Motion for myriad reasons. The DIP Loan Agreement provides that the Debtor will pay PVI's professional fees not just in relation to the proposed loan, but in any way related to this Chapter 11 Case. Recall that PVI is one of the three petitioning creditors accused of bad faith conduct in filing the involuntary petition commencing this Chapter 11 Case. Further, the Debtor has failed to effectively assert, much less establish, that it needs a loan to fund its operations. In fact, another pleading filed by the Debtor in this case suggests it can survive on cash operations alone. Even if the Debtor requires a loan to fund its operations, it has failed to explore all avenues of potential funding other than McGuckin-controlled PVI. Despite general statements in the DIP Motion that commercial lenders have little or no interest in providing unsecured funding of only $1 million, the Debtor appears to have made no effort to obtain funding from alternative sources. No such efforts are described in the DIP Motion other than a vague reference to the Debtor having inquired of other non-insider lenders, and no supporting affidavit was filed. Gardner and the other limited partners were not contacted in connection with a need to obtain post-petition financing. Finally, the DIP Motion and related filings contain a number of statements that suggest the PVI prepetition loan is secured, when in fact the security interest appears to be avoidable.

2

121625424.2

3.  In short, rather than avoid PVI's asserted security interest, as any honest good faith debtor-in-possession principal would do, McGuckin instead seeks to improve his own leverage in the case by taking a superpriority claim for a loan the Debtor does not appear to need, and burdening the estate with an obligation to pay PVI's professional fees in matters unrelated to the proposed loan, all on an emergency timeframe.[2] The DIP Motion is just another attempt by McGuckin to advance his own interests ahead of the Debtor's and its creditors and other stakeholders.

## II. FACTUAL BACKGROUND

### A. General Background

4.  This chapter 11 case ("**Chapter 11 Case**") was commenced on November 12, 2019 via an involuntary petition filed by three purported creditors: PVI (an entity owned and controlled by McGuckin), Metter (an accounting firm owned by a VAC limited partner, which receives 15% of its revenue from VAC and should therefore not be considered by the Court as independent from VAC), and Crestwood (signed by its representative Brian McGuckin, McGuckin's brother). [ECF No. 1]. On November 13, 2019, VAC, filed an Answer and Consent. [ECF No. 3].

5.  Two motions have been filed seeking dismissal of the Chapter 11 Case on numerous grounds, including bad faith on the part of the Debtor and PVI and the other petitioning creditors. On November 22, 2019, the Majority Limited Partner, Whit Gardner, filed his *Motion for Entry of an Order Dismissing the Debtor's Involuntary Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code, With Prejudice, or In the Alternative, Appointing a Chapter 11 Trustee Pursuant to Section 1104(a) of the Bankruptcy Code* [ECF No. 42] ("**Gardner Motion**"). On

---

[2] The Debtor's motion to expedite consideration of the DIP Motion contains no basis for expedited consideration, only more vague references to an immediate need for funding.

3

121625424.2

December 19, 2019, the Office of the United States Trustee filed its *United States Trustee's Motion to Dismiss Case and Supporting Memorandum* [ECF No. 104] ("**UST Dismissal Motion**").

6. The Gardner Motion describes in detail how McGuckin has abused his position as controller of VAC LLC to harm the Debtor. A hearing on the two motions to dismiss is currently scheduled for January 22, 2020.

**B. The DIP Motion and Related Pleadings**

7. On December 23, 2019, the Debtors filed the DIP Motion, which requests authorization to (i) obtain post-petition financing in the aggregate not to exceed $1,000,000 ($500,000 on an interim basis) ("**DIP Loan**"), (ii) enter into the Debtor-In-Possession Credit Agreement; and (iii) grant administrative priority claims to PVI [ECF 114]. Mot. at ¶ 1.

8. The Debtor asserts that it will use the credit provided under the Credit Agreement to satisfy its vendors, service its customers, pay its employees and operate its network in the ordinary course to preserve the value of the estate while the Debtor pursues reorganization. Mot. at ¶ 23. However, the proceeds of the DIP Loan will also be used to pay PVI's fees and expenses, including its attorneys' fees. While the Debtor assures the Court and parties in interest that the term "Allowed Professional Fees" does not include the fees and costs of the "Lender" (presumably PVI) (*see* DIP Motion at 3-4), in fact, the Debtor will be paying the fees of PVI's counsel and other professionals engaged "relating to the DIP Facility **and the case**." *Id.* at 4.

9. The proceeds of the DIP Loan are also purportedly limited to the use as described in the "budget to be approved as part of the Financing Orders." *Id.* at 4. However, no budget was attached to the DIP Motion, proposed Interim Order, or DIP Loan Agreement. Thus, the Court and parties in interest have no idea how the proceeds will be used, other than to pay PVI's (McGuckin's) counsel and other professionals for any purpose "relating to the case."

10. While no budget was submitted with the DIP Motion, the Debtor has filed two budgets in this Chapter 11 Case to date. First, the Debtor filed a budget with its Cash Collateral Motion [ECF 21]. The Debtor apparently withdrew its Cash Collateral Motion after the United States Trustee discovered the Debtor's underhanded attempt to grant replacement liens to PVI, notwithstanding the avoidability of PVI's security interest (*See* UST Dismissal Motion at 5-6]. However, before the Cash Collateral Motion was withdrawn, it contained a 13-week budget that showed the Debtor's cash position never dropped below zero ("**Cash Collateral Budget**"). A copy of the Cash Collateral Budget is attached here as "Exhibit A". According to the Cash Collateral Budget, the Debtor believed as of November 19, 2019 that at the end of the 13-weeks beginning November 11, 2019, it would be cash flow positive in the aggregate amount of $71,648.

11. Since no budget was filed with the DIP Motion a month later on December 23, 2019, it is unclear what expenses the Debtor later decided require an additional $1 million. However, the Debtor's November Monthly Operating Report, filed three days before the DIP Motion, contains a budget through October 2020 ("**November MOR Budget**"). The November MOR Budget is attached here as "Exhibit B". According to the November MOR Budget, the Debtor's cash position—absent the DIP Loan and based on operations only—at the end of October 2020 will be an aggregate negative $14,230.

12. The DIP Motion and related documents are not clear with respect to PVI's purported security position. The Debtor states that it "has reached no conclusion regarding a security interest or additional indebtedness to PVI."[3] DIP Motion at 6. However, just two paragraphs above, the Debtor assert that PVI "is a secured creditor of the Debtor." *Id*. at ¶ 12. Other provisions of the DIP Loan further suggest that PVI is a secured creditor, or otherwise

---

[3] Presumably, the Debtor has at least reached the conclusion to borrow an additional $1 million from PVI.

5

121625424.2

provide terms to PVI that only a secured creditor would enjoy. For example, the Debtor agrees to repay in full the entire DIP Loan upon the occurrence of, among other things, "the sale of all or substantially all of the collateral securing the Pre-Petition Loan [from PVI]". *See* DIP Motion at 3. Similarly, the Debtor may not "directly or indirectly, create, incur, assume or permit to exist any Liens on or with respect to the Collateral of any kind …" DIP Credit Agreement at § 6.2. The term "Collateral" is not defined, but can only be read as referring to the Debtor's assets purportedly pledged to PVI for the Pre-Petition Loan.

13. Despite the vagaries of the Debtor's need for $1 million loan and PVI's dubious security interest, the Proposed Interim Order suggests the Court tacitly endorse both the Debtor's need for the loan and PVI's liens, at least in the Debtor's cash. Paragraph E of the proposed Interim Order provides:

> An immediate and critical need exists for the Debtor to obtain funds and use cash collateral to continue the operation of its business. However, the use of "cash collateral," as defined by section 363(a) of the Bankruptcy Code and including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of the Prepetition Collateral ("***Cash Collateral***"), alone would be insufficient to meet the Debtor's immediate postpetition liquidity needs.

Proposed Interim Order at 4.

14. The DIP Motion does not detail the Debtor's efforts to obtain financing from anyone other than PVI. No affidavit was filed with the DIP Motion. The Debtor asserts that it "has inquired of other lenders who are not insiders of the Debtor, including commercial lenders, and none are willing to lend funds to the Debtor on terms more favorable." DIP Motion at 7-8. The Debtor asserts there was "little or no interest by commercial lenders in providing DIP financing on an unsecured basis and little or no interest by commercial lenders in providing DIP financing

6

121625424.2

in an amount as low at $1 million."[4] *Id.* at 8. In any event, no further details of the Debtor's efforts appear in the DIP Motion. Gardner was not approached in connection with a possible DIP loan to the Debtor.

15. The proposed superpriority administrative claim provided to PVI takes priority over all other claims and expenses other than professional fees, court costs and United States Trustee Fees. Specifically, "The DIP Credit Agreement shall constitute allowed administrative expenses in the Bankruptcy Case, pursuant to section 364(b) and 503(b)(1) of the Bankruptcy Code, and subject only to the prior payment of Agreed Administrative Expense Priorities, as and to the extent set forth in the Final DIP Order or any subsequent order of the Bankruptcy Court." DIP Motion at 5. The term "Agreed Administrative Expense Priorities" includes only unpaid fees to the Clerk of the Bankruptcy Court, fees owed to the United States Trustee, and certain professional fee claims. Thus, the superpriority claim held by PVI under the DIP Credit Agreement (which, recall, includes PVI's attorney fees incurred "related to the case") will take priority over all other administrative expense claims.

### III. OBJECTION TO THE RELIEF REQUESTED

16. The Court should deny McGuckin's blatant attempt to obtain additional leverage in this Chapter 11 Case. Certain terms of the DIP Loan are objectionable on their face. Most egregiously, the Debtor's estate should not be saddled with paying PVI's attorney and other professional fees in matters unrelated to the DIP Loan. Also, any DIP Loan should be limited to the amount actually needed for the Debtor to sustain its operations.

---

[4] Apparently the Debtor believes that granting a superpriority administrative claim that includes attorneys' fees to a party in active litigation for bad faith is "more favorable" than a larger secured loan from a disinterested commercial lender.

7

121625424.2

17. Even if the terms of the DIP Loan were acceptable, more generally, the Debtor has failed to provide the information for the Court and parties in interest to understand why it needs this loan and how the proceeds will be used.

18. Section 364(b) of the Bankruptcy Code permits a debtor-in-possession to obtain post-petition financing on an unsecured basis, allowable under 503(b)(1) of the Bankruptcy Code. 11 U.S.C. § 364(b). Gardner does not contest the Debtor's authority to obtain post-petition financing as a general matter. However, the Debtor has failed to meet its burden to show that post-petition financing is necessary, or that the loan must come from PVI on the terms presented.

19. As an initial matter, the standard debtors must meet when seeking to obtain post-petition financing enjoys the protections of the business judgment rule. Stated in general terms, the business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Although a court will defer to decisions of a board under the business judgment rule, the substantive decision must be attributed to a rational business purpose and must be free of self-dealing. *See e.g.*, *In re Total Containment, Inc.*, 355 B.R. 589, 606 (Bankr. E.D. Pa 2005) (noting that where it is demonstrated that directors or majority shareholders are self-interested in a corporate transaction, the company's business judgment is no longer entitled to deference).

20. Here, the Debtor's general partner is self-dealing. VAC LLC, the Debtor's general partner, is owned by McGuckin. McGuckin also owns PVI, the proposed DIP Lender. This transaction is not entitled to the protections of the business judgment rule.

21. Regardless of the standard applied in this case, the Court must deny the DIP Motion. First, it is entirely inappropriate for the Debtor to pay PVI's attorney and other

8

professional fees "related to the case" when PVI is in active litigation as a bad faith petitioning creditor. Further, the DIP Credit Agreement and any DIP Order must be clear that PVI is not a secured creditor. To the extent the Debtor resists that clarity, it is further evidence of its bad faith in this process.

22. The Debtor cannot grant a superpriority claim to PVI under the authority cited in the DIP Motion. The Debtor seeks to obtain the DIP Loan pursuant to Section 364(b) of the Bankruptcy Code. *See* DIP Motion at ¶ ¶ 24, 25, 28. That section does not authorize a trustee or debtor-in-possession to grant a superpriority claim. Instead, the claim is only entitled to treatment as an administrative expense under Section 503(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 364(b). The authority to grant a superpriority claim superior to "any or all administrative expenses of the kind specified in section 503(b) or 507(b)" is found in Section 364(c) or (d). The Debtor does not move under those sections and therefore cannot grant a superpriority claim in connection with the DIP Loan. As a result, any claim granted to PVI is only entitled to priority treatment equal in priority to other administrative expense claims.

23. More generally, the Debtor has failed to establish that it needs this loan or what it will be used for. The DIP Motion and related filings do not include a proposed budget. However, the Debtor's Cash Collateral Budget showed a positive cash flow, and the November MOR Budget showed a 12-month budgeted cash shortfall of $14,230. A cash need of $14,230 does not justify incurring a $1 million loan.

24. Although Gardner is challenging whether the Chapter 11 filing was appropriate in this case, he acknowledges that many successful reorganization proceedings require debtor-in-possession financing shortly after the commencement of a chapter 11 case. However, a bankruptcy court must scrutinize a proposed debtor-in-possession financing arrangement to ensure that it does

9

121625424.2

not contain terms that leverage the bankruptcy process and powers or its purpose not so much to benefit the estate, but to benefit a party-in-interest. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990). Such heightened scrutiny is particularly appropriate in this case.

25. Courts have made clear that a moving party is "obligated to file with a motion the evidentiary materials necessary to justify the relief it seeks." *Paz Sys., Inc. v. Dakota Grp. Corp.*, No. Civ. 054763 (LDW) (WDW) 2006 WL 8430241, at *3 (E.D.N.Y. June 16, 2006); *See also U.S. ex rel. Hendow v. University of Phoenix*, No. 03-CV-457 (GEB), 2009 WL 2705851, at *3 (E.D. Cal. Aug. 25, 2009) (citations omitted). *See also Lewis v. Gotham Ins. Co.*, No. 09-CV-252 (POR), 2009 WL 3698028, at *1 (S.D. Cal. Nov. 5, 2009) (same); *Mercado v. Sandoval*, No. 08-CV-2648 (GEB), 2009 WL 2031715, at *1 (E.D. Cal. July 9, 2009) (same). Such a rule prevents "sandbagging" the nonmoving party and affords the nonmoving party a meaningful opportunity to respond. *Lewis*, 2009 WL 3698028, at *1.

26. The Debtor maintains in its Motion that it lacks sufficient cash to continue operations uninterrupted and preserve going concern value. Motion at ¶ 17. It further represents generically that it needs debtor-in-possession financing to pay its current and ongoing operating expenses, including post-petition wages, salaries and vendor costs. However, the Debtor does not provide a shred of evidence or explanation reflecting why additional funding is necessary to pay these expenses. Furthermore, as stated above, Debtor did not provide supportive documentation under oath that establishes the need or proposed use of the DIP financing. The failure of Debtor to justify with competent evidence in the Motion why debtor-in-possession funding is needed is fatal to the requested relief because it deprives creditors and other potentially affected parties from having a meaningful opportunity to respond. Simply, the Debtor has provided no factual basis to support the Court granting its request for DIP financing.

121625424.2

27. The Debtor's vague representations that it lacks sufficient cash to continue its operations uninterrupted are simply not enough. It failed to justify the necessity and details of disbursements of $1,000,000 ($500,000 in the interim), and to articulate how the decision is in the best interest of the estate, fair, and reasonable. Therefore, until the parties have been provided adequate information regarding the need for DIP financing and time to evaluate the restructuring transaction, the court should not approve the relief sought.

28. Further, the interim relief requested in the DIP Motion must be denied regardless of what evidence is presented at the hearing on January 13, 2020. The Debtor must explain why it needs the proposed DIP Loan, and what the proceeds will be used for, each in sufficient detail. <u>Then</u> the Court and parties in interest must be given appropriate notice and time to evaluate the appropriateness of the proposed transaction. That requirement is not satisfied when the necessary information is not provided to the Court or interested parties until the hearing to consider approval of the interim relief (a/k/a half of the $1 million loan). Here, the Debtor failed to provide the necessary information when it filed the DIP Motion. Any details the Debtor provides between now and the interim hearing are irrelevant, because the Court and parties-in-interests are entitled to sufficient notice of such a proposed transaction. *See* 11 U.S.C. § 364(b) ("The court, **<u>after notice and a hearing</u>**, may authorize the trustee to obtain unsecured credit…") (emphasis added). The Court cannot permit McGuckin to sandbag the process by filing a facially defective motion and then providing the necessary details at the hearing. Alternatively, the Interim Order must include clear language that the findings of fact are found on an interim basis only, subject to proof offered at the final hearing, and the relief granted in the Interim Order is on an interim basis only, subject to proof offered at the final hearing.

29. Mr. Gardner reserves the right to supplement or amend this Objection and to introduce evidence at any hearing related to the DIP Motion or this Objection. Mr. Gardner understands entry of the Interim Order would grant the relief set forth therein on an interim basis and only result in a loan of a maximum principal amount of $500,000. Mr. Gardner reserves the right to raise any and all objections, including, without limitation, the objections raised herein, in connection with proposed entry of an order granting the relief sought in the Interim Order on a further interim or final basis.

### IV.  CONCLUSION

For the foregoing reasons, Mr. Gardner respectfully requests that the Court: (i) sustain this Objection; (ii) and grant Mr. Gardner such other relief as may be just and appropriate.

Dated: January 7, 2019
Philadelphia, Pennsylvania

**DRINKER BIDDLE & REATH LLP**

*/s/ Joseph N. Argentina, Jr.*
Andrew C. Kassner
Joseph N. Argentina, Jr.
Richard E. Coe
Nicholas S. Feltham
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Phone:  (215) 988-2700
Fax:  (215) 988-2757
Joseph.Argentina@dbr.com
Andrew.Kassner@dbr.com
Richard.Coe@dbr.com
Nicholas.Feltham@dbr.com

-and-

Vince Slusher
Kristen L. Perry
1717 Main Street, Ste. 5400
Dallas, TX 75201-7367
Phone: (469) 357-2500
Fax: (469) 327-0860
Vince.Slusher@dbr.com

*Counsel for William Whitfield Gardner*

121625424.2