**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Case No. 19-17117 (AMC) |
| | : | |
| Vascular Access Centers, L.P., | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

### I.    Introduction

Although the appointment of a chapter 11 trustee is an extraordinary remedy, the facts in this case easily satisfy the requirements in §1104(a) of the Bankruptcy Code. Based upon the prepetition and postpetition conduct of Dr. James McGuckin ("McGuckin"), who is the sole member of the general partner of Vascular Access Centers, L.P. ("VAC"), the Court finds that McGuckin is unable to discharge his fiduciary responsibilities to VAC and holds multiple conflicts of interest with VAC. Furthermore, based upon testimony that McGuckin provided at trial yesterday, the Court finds that McGuckin is not credible and untrustworthy, and consistently puts his own interests ahead of VAC. Accordingly, the Court concludes that the appointment of a chapter 11 trustee in this case will be in the best interests of VAC's creditors and the bankruptcy estate.

### II.    Factual Background

VAC was founded by McGuckin as a Pennsylvania limited partnership through a limited partnership agreement executed on April 22, 2005. Case. No. 19-17117 ECF 21 Mot. for Cash Coll. ¶ 7; Gardner Decl. Ex. 3. The general partner of VAC is a non-debtor entity, Vascular Access Centers, LLC ("General Partner"). Case No. 19-17117 ECF 21 Mot. for Cash Coll. ¶ 7. McGuckin is the sole member and manager of the General Partner. *Id.* In May 2005, William

1

Whitfield Gardner ("Gardner"), who was a longtime friend and business partner of McGuckin, and others became limited partners of VAC by signing a subscription agreement and submitting their initial capital contributions to fund VAC. Gardner Decl. Ex. 2 Deriv. Litig. Am. Compl. ¶¶ 9-22, 39; Debtor's Response to Gardner's Mot. to Dismiss ¶ 8.

VAC operates its business through a number of limited liability company subsidiaries. Case No. 19-17117 ECF 21 Mot. for Cash Coll. ¶ 8. The subsidiaries operate and manage outpatient vascular access centers, whereby physician interventionalists perform dialysis access procedures and certain other vascular access procedures on patients with end-stage renal disease ("ESRD") and other vascular conditions or diseases. *Id.* at ¶ 9. Currently, VAC operates twelve centers in six states and employs 151 physicians and other employees. Case No. 19-17117 ECF 106 Debtor Opp. Resp. to MLP Mot. to Dismiss n. 2.

Shortly after VAC was formed, Gardner, who initially had contributed $1,000,000 to VAC, agreed to invest an additional $10,000,000 into VAC over the course of 2006 and 2007 in response to McGuckin's request for a substantial capital infusion in exchange for certain additional protections in the limited partnership agreement. MLP Mot. to Dismiss n. 2; Gardner Decl. Ex. 2 Deriv. Litig. Am. Compl. ¶¶ 49, 52-57. Based upon Gardner's substantial infusion of capital, he is VAC's majority-in-interest limited partner, holding 72.5% of VAC's equity. Gardner Decl. Ex. 5.

On October 31, 2007, the limited partnership agreement was amended ("Amended L.P. Agreement"). Gardner Decl. Ex. 1. The Amended L.P. Agreement eliminated a provision from the original limited partnership agreement which had read:

> [a]ny Partner, including the General Partner, may engage in any
> other business activities, whether or not competitive with the
> business of the Partnership, and neither the Partnership nor any

Partner shall have any rights with respect to such activity or any
income or gain derived therefrom. Gardner Decl. Ex. 3 LPA § 5.3.

The Amended L.P. Agreement added a new § 6.7, which provides:

> [i]n view of the exclusive and limited purposes of the Partnership,
> no Partner, or any Affiliate of any Partner, shall have any
> obligation to make any other investment or business opportunity
> not involving the Properties available to the Partnership or to any
> of its Partners. It is further expressly agreed that any Partner and/or
> its Affiliates may engage in and possess interests in other
> businesses and ventures…independently or with others, and any
> such engagement will not constitute a breach of the Partners'
> fiduciary duties to the Partnership, and neither the Partnership nor
> any Partner shall have any rights by virtue of this Agreement or the
> existence of this Partnership in and to such independent ventures or
> to the income or profits derived therefrom. Gardner Decl. Ex. 1
> Am. LPA § 6.7.

The Amended L.P. Agreement also states that, although the General Partner may

authorize VAC to obtain management services from affiliates of some or all of the partners, the

fees paid by VAC for such services shall not be in excess of reasonable "arm's-length charges"

"unless approved by a Majority in Interest of the Partners." *Id.* at § 6.6.4. In addition, the

Amended L.P. Agreement states that "the General Partner shall cause the necessary federal, state

and local income tax returns and reports required of the Partnership to be prepared and timely

filed" and requires the General Partner to ensure that annual financial statements are delivered to

the limited partners within 120 days of the end of each fiscal year. *Id.* at §§ 7.2.1, 7.2.2.

Notably, the Amended L.P. Agreement prohibits the General Partner from making certain

"Fundamental Decisions" without the consent of the holders of a majority of all limited partners,

such as decisions to:

> [e]xecute and file on behalf of the Partnership a petition for relief
> under any chapter of Title 11, United States Code, under which a
> partnership may be a debtor

and to

3

> sell or otherwise dispose of, or encumber or use as security for any
> debt, one or more assets or properties or any interest in one or
> more assets or properties of the Partnership with a value of
> $500,000 or more, including the sale of substantially all of the
> Partnership's assets. *Id.* at §§ 6.3.2, 6.3.4.

Finally, § 6.1.1 of the Amended L.P. Agreement places fiduciary duties on the General

Partner as follows:

> the General Partner shall act in good faith in accordance with its
> fiduciary duties to the Limited Partners at all times and use its
> reasonable business judgment in exercising such authority.
> Without limiting the generality of the foregoing, the General
> Partner and its designated officers shall only make financial
> decisions on behalf of the Partnership that they reasonably believe
> will have a direct benefit to the Limited Partners and shall not
> expend Partnership funds to pay their own expenses that do not
> directly benefit the Partnership or to enrich themselves for their
> own personal benefit. *Id.* at § 6.1.1.

VAC subsequently generated substantial profits for several years. MLP Mot. to Dismiss

¶13. However, conflict arose between McGuckin and Gardner based upon Gardner's growing

concern that McGuckin was engaging in impermissible self-dealing transactions and violating

his duties as sole member of the General Partner under the Amended L.P. Agreement. *Id.*

For instance, in 2011 and 2012, McGuckin began opening and operating his own dialysis

access centers which competed directly with VAC's subsidiaries. Specifically, Gardner alleges

that, in 2011, McGuckin rejected a proposal for VAC to partner with another doctor in the "Slate

Belt" region of Pennsylvania to open a multi-use facility and, instead, opened his own center in

the same region in Pen Argyl, Pennsylvania through PA Vascular Institute ("PAVI"), an entity

owned solely by McGuckin, without informing the limited partners. Gardner Decl. Ex. 8

McGuckin Dep. 151:21-152:7, 152:8-17.

Additionally, Gardner also alleges that, when VAC's Philadelphia center was performing poorly, McGuckin failed to devote efforts to saving VAC's Philadelphia center and, instead, opened his own competing center in Philadelphia through an entity owned solely by him, Philadelphia Peripheral Vascular Institute ("PeVI"), without presenting this opportunity to the limited partners. Gardner Decl. Ex. 2 Deriv. Litig. Am. Compl. ¶¶ 58, 61-63; Ex. 8 McGuckin Dep. 150:5-9. Gardner also alleges that McGuckin made VAC act as surety to the lease for the PeVI center in violation of the Amended L.P. Agreement which required limited partner approval before using Partnership assets to secure a loan greater than or equal to $500,000. Gardner Decl. Ex. 1 LPA § 6.3.2; Ex. 2 Deriv. Litig. Am. Compl. ¶¶ 87-88. As McGuckin opened more of his own centers, he began spending significantly less time managing VAC or working in centers owned by VAC. *Compare* Gardner Decl. Ex. 15 *to* Ex. 16.

Then, on January 2, 2014, VAC received a civil investigative demand from the Civil Division of the United States Attorney's Office for the Southern District of New York ("DOJ") in connection with a qui tam complaint which had been filed in 2012 by a whistleblower against VAC, McGuckin, Philadelphia Vascular Institute ("PVI"), an entity owned solely by McGuckin, and others, alleging that McGuckin had instructed him to perform unnecessary medical procedures, thereby violating the False Claims Act pursuant to 28 U.S.C. § 3732(a). Gardner Decl. Ex. 19.

Based upon the foregoing, Gardner commenced a derivative action on behalf of VAC by filing a complaint in the Delaware County Court of Common Pleas ("State Trial Court") against the General Partner and McGuckin, as sole member and manager of the General Partner, for breach of fiduciary duty, breach of contract, and unjust enrichment ("Derivative Litigation") on January 13, 2016. *See Gardner v. Vascular Access Centers, LLC et al.,* No. 16-cv-00367.

5

Gardner also alleges that McGuckin, through an entity owned separately by him named the Main Line Vascular Institute ("MLVI"), opened a new competing center in King of Prussia, Pennsylvania in 2016 without presenting the opportunity to the limited partners. MLP Mot. to Dismiss n. 8; Gardner Decl. Ex. 8 McGuckin Dep. 154:5-155:22. McGuckin subsequently formed another center through the Lehigh Valley Vascular Institute ("LVVI") in Bethlehem, Pennsylvania (collectively with PAVI, PeVI, and MLVI, the "McGuckin Centers"), but this center never officially opened. MLP Mot. to Dismiss ¶ 20.

Through discovery in the Derivative Litigation, Gardner learned that McGuckin had entered VAC into several management, billing, and services agreements in January 2012 and January 2016 with certain McGuckin Centers, whereby VAC provided management, accounting, legal, human resources, billing, and administrative services to McGuckin's Centers for a reduced percentage of revenue than VAC typically charged for providing those services to its own subsidiaries. MLP Mot. to Dismiss ¶ 17; Gardner Decl. Ex. 9 p. 36-37.

Gardner also learned through discovery that, on June 10, 2010, McGuckin had unilaterally executed an employment agreement naming himself as Chief Executive Officer ("CEO Employment Agreement") of VAC, retroactive to 2007. MLP Mot. to Dismiss ¶ 18; Gardner Decl. Ex. 10. Pursuant to the CEO Employment Agreement,[1] on top of the $150,000 base annual compensation he received as General Partner under the Amended L.P. Agreement, with certain allowable increases of $25,000 per year for each center in excess of three that are in operation each year, McGuckin would receive a deferred bonus of $400,000 for his "efforts as Chief Executive Officer" dating back to 2007 and 2008, as well as an aggregate base salary of

---

[1] The CEO Employment Agreement and other documents, including reports from the financial monitor in the State Trial Court, which Gardner had initially sought to file under seal, have since been admitted into evidence in un-redacted form with no objections from any party and, accordingly, the Court considers any objections to the inclusion of substance contained therein waived.

$200,000 beginning January 1, 2009. Gardner Decl. Ex. 1 § 6.6.1; Ex. 10. His CEO salary could

be adjusted at a rate of $10,000 for each subsidiary with two consecutive calendar months of net

profits, not to exceed $350,000 per year. Gardner Decl. Ex. 9 p. 25; Ex. 10. The CEO

Employment Agreement also gave McGuckin six weeks paid vacation and a profits interest of

1.8% in each subsidiary of VAC effective upon commencement of operations. Gardner Decl. Ex.

10. The CEO Employment Agreement was signed solely by McGuckin as employee and

manager of the General Partner without knowledge or consent of the limited partners. MLP Mot.

to Dismiss ¶ 18; Gardner Decl. Ex. 10; Ex. 17.

 Similarly, Gardner learned that, in 2015, McGuckin also hired himself as Chief Medical

Officer (CMO) of VAC and awarded himself an annual salary of $450,000 for this part-time role

without approval from the limited partners, despite the fact that by 2014, his time as a physician

in VAC's centers had drastically declined since opening some of the McGuckin Centers. MLP

Mot. to Dismiss ¶ 18; Gardner Decl. Ex. 26.

 Finally, discovery revealed that McGuckin had allegedly used VAC's resources to open,

operate, and market some of the McGuckin Centers. MLP Mot. to Dismiss ¶ 19. *See* Gardner

Decl. Ex. 9 p. 28-30; Ex. 11 (email dated October 19, 2012 from J. Biggs listing tasks performed

by VAC to open McGuckin's Pen Argyl center); Ex. 12 (email dated January 8, 2012 from F.

Mita reflecting extensive Debtor efforts to reopen PeVI location).

 Meanwhile, in early 2017, the Centers for Medicare and Medicaid Services implemented

significant rate reductions for the types of services VAC's centers perform. Gardner Decl. Ex. 14

p. 7-8; Debtor Opp. Resp. to MLP Mot. to Dismiss ¶ 11. Later, in September 2017, Gardner filed

his first amended complaint which, in relevant part, added limited partners Anish Shah, Rasesh

Shah, Pravin Shah, Veena Shah, and Warren Yu as plaintiffs (together with Gardner,

"Plaintiffs"); detailed additional allegations of McGuckin's alleged breaches of contractual and fiduciary duties; and requested that the Court appoint a receiver for VAC. Gardner Decl. Ex. 2. On October 2, 2017, after denying McGuckin's motion for summary judgment, the State Trial Court set July 12, 2018 as the trial date for the Derivative Litigation. MLP Mot. to Dismiss ¶ 23.

On October 20, 2017, McGuckin sent a letter to the limited partners requesting an infusion of capital to convert VAC's centers to ambulatory surgical centers ("ASCs") to enable VAC to take advantage of the higher reimbursement rates associated with ASCs. Gardner Decl. Ex. 35. He also put them on notice that a confidential offering memorandum would be prepared and distributed in the coming weeks, emphasizing that "[a]t our meeting, I discussed financials clearly showing the company is destined to run out of money in February 2018" and "without converting our company to an Ambulatory Surgical Center based entity…we do not have a future." *Id.*

On December 1, 2017, McGuckin issued a confidential offering memorandum to the limited partners accompanied by another letter representing that "VAC, LP is in need of additional capital in order to convert its existing centers into Ambulatory Surgical Centers. I estimate we will need $20 to $25 million. Without this capital, the company will not be able to convert to an ASC model and will face difficult hurdles." Gardner Decl. Ex. 34; *see also* MLP Mot. to Dismiss ¶ 19. He also represented that "VAC's existing Centers must be converted to ASCs in order for VAC to remain economically viable." Gardner Decl. Ex. 34. McGuckin committed to contributing $5 million of the $20 million capital requested. *Id.* However, many limited partners had previously expressed in writing their desire to have McGuckin step down as General Partner. *Id.*

On January 31, 2018, McGuckin sent another letter to the limited partners requesting additional capital to convert VAC's centers to ASCs, stating that "it was a disappointing year due to Draconian cutbacks on ESRD related cases and the failed opportunity to settle the DOJ investigation" and "if these centers are not converted to ASCs, VAC will go out of business." Gardner Decl. Ex 36. In this letter, McGuckin mentions having consulted VAC's corporate counsel's associate in bankruptcy to set priorities for payment of VAC's obligations, starting with staff salaries/wages, then physician incentives, and finally, contractual obligations involving property and equipment loans. *Id.*

Meanwhile, on March 28, 2018, an article ran in *USA Today* ("Article") revealing that McGuckin had regularly performed a controversial procedure, which had never been proven to work, had not been approved by the Food and Drug Administration (FDA), and was challenged by the medical community, on hundreds of patients to treat multiple sclerosis as part of an experimental study without obtaining FDA approval. Gardner Decl. Ex. 22. The Article told the story of one patient who almost died as a result of McGuckin's performance of the procedure. *Id.*

The Article also detailed the Washington Medical Quality Assurance Commission's ("Commission") investigation into the circumstances surrounding McGuckin's performance of the procedure, as well as the Commission's 2015 decision which found that McGuckin had performed the procedure on 233 patients in Washington between 2010 and 2013; engaged in unprofessional conduct; created an unreasonable risk of harm for his patients; and failed to meet the basic standard of patient care. Gardner Decl. Ex. 22; *see also* Ex. 23. During the investigation, McGuckin told the Commission that he had adhered to the experimental study's protocol when, in fact, he had not, and that the procedure was no longer advertised on VAC's website as a service when, in fact, it still was. Gardner Decl. Ex. 23.

Ultimately, the Commission ordered McGuckin to stop performing the procedure, repay patients who had paid their own money to have the procedure performed after May 10, 2012, pay a $17,500 fine, and take and pass an ethics course. Gardner Decl. Ex. 22; Ex. 23. McGuckin failed the ethics course twice and only passed after taking the course with the help of a one-on-one tutor. Gardner Decl. Ex. 22. Subsequent to the Commission's decision, medical boards in Florida, Illinois, North Carolina, Pennsylvania, California, Georgia, and New Jersey all took disciplinary action against McGuckin. MLP Mot. to Dismiss n. 11. Gardner believes that, since the article ran, VAC has lost key sources of revenue, patients, and physicians due to reputational damage. *Id.* at ¶ 35.

On July 9, 2018, just days before the trial in the Derivative Litigation, McGuckin filed a petition to compel arbitration based on an arbitration provision in the CEO Employment Agreement. *See Gardner v. Vascular Access Centers, LLC,* 2019 WL 177063, at *1 (Pa. Super. Ct. Apr. 22, 2019); MLP Mot. to Dismiss ¶ 24. On July 13, 2018, after an evidentiary hearing, the State Trial Court denied the petition to compel arbitration, finding that there was no evidence proving notice was given to the limited partners on behalf of the General Partner that VAC intended to enter into the CEO Employment Agreement, and rejecting McGuckin's testimony to the contrary. UST Mot. to Dismiss Ex. 1; Gardner Decl. Ex. 17. On July 16, 2018, McGuckin filed a notice of appeal of the denial of his petition to the Pennsylvania Superior Court ("Superior Court"). MLP Mot. to Dismiss ¶ 25; UST Mot. to Dismiss Ex. 2. A few days later, on July 18, 2018, the Plaintiffs filed a motion seeking the appointment of a receiver. MLP Mot. to Dismiss n. 15. At the August 13, 2018 hearing on the Plaintiffs' motion to appoint a receiver, the parties agreed to appoint a financial monitor to assess VAC's financial condition and solvency. *Id.*

10

However, the parties struggled to agree upon terms of an order appointing a financial monitor.

*Id.*

On October 9, 2018, McGuckin resolved the qui tam litigation on VAC's behalf through a burdensome settlement agreement with the DOJ and the whistleblower which required VAC to (1) to admit that it regularly scheduled, performed, and billed for procedures without any evidence of need for the procedures; (2) pay the United States a minimum of $3.825 million over five years; (3) pay the United States up to $14.6 million in additional payments over five years in the event VAC's annual revenues exceed $48.5 million; (4) pay additional amounts in the event of a sale or partial sale of VAC or its assets; (5) pay certain qui tam relators' legal fees, amounting to thousands of dollars; and (6) comply with an onerous and expensive corporate integrity agreement ("DOJ Settlement"). Gardner Decl. Ex. 20 DOJ Settlement ¶¶ 2k, 3a-h, 8, 10; Ex. 14 p. 19. In exchange, McGuckin secured his own personal release of the whistleblower's claims against him and was not required to make any payments, or guarantee any of VAC's obligations, to the DOJ or the whistleblower. MLP Mot. to Dismiss ¶ 32; Gardner Decl. Ex. 20 ¶ 8; Ex. 32.

Notably, the DOJ Settlement provides that, with regard to bankruptcy filings by or against VAC:

> [i]f within 91 days of the Effective Date of this Stipulation or any payment made under this Stipulation, the VAC Defendants, or any of them, commence any case, action, or other proceeding under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors or a third party commences any case, action, or other proceeding under any law related to bankruptcy insolvency, reorganization, or relief of debtors (a) seeking an order for relief of their, or any of their debts, or seeking to adjudicate them, or any of them, as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for them, or any of them, or for all or part of their assets, the VAC Defendants agree as follows: (b) If any of the obligations of the VAC

11

Defendants, or any of them, under this Stipulation are avoided for any reason…the Government, at its option, may rescind the release in this Stipulation and bring any civil and/or administrative claim, action, or proceeding against the VAC Defendants for the claims that would otherwise be covered by the release in Paragraph 6 above…The VAC Defendants agree that (i) any such claim, action, or proceeding described in the first sentence of this Paragraph, and the VAC Defendants, or any of them, shall not argue…that the Government's claim, action, or proceeding is subject to an automatic stay; (ii) the VAC Defendants, or any of them, shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any claim, action, or proceeding that is brought by the Government within 60 calendar days of written notification to them that the release has been rescinded to this Paragraph…and (iii) the Government has a valid claim against the VAC Defendants, jointly and severally, in the amount of the Maximum Settlement Amount [$18,360,794] and the Government may pursue its claim in the case, action, or proceeding described in the first sentence of this paragraph, as well as in any other case, action, or proceeding. Gardner Decl. Ex. 20 DOJ Settlement ¶ 16.

In order to induce the DOJ to enter into the settlement agreement, McGuckin shared optimistic projections of VAC with the DOJ and certified that VAC was not insolvent and would not become insolvent by the settlement payments when, just months earlier, McGuckin had represented to the limited partners that VAC had a disappointing year, was on the verge of bankruptcy, and would not survive in the absence of a substantial capital contribution to convert its centers to ASCs. Gardner Decl. Ex. 20 ¶ 15; Ex. 35; Ex. 36; Ex. 37.

Then, in early December 2018, McGuckin entered VAC into another burdensome settlement agreement in connection with litigation initiated by a former employee of one of VAC's centers, Dr. Wadah Atassi ("Dr. Atassi"), who had sued VAC in November 2013 after being fired from VAC's Jacksonville center ("First Atassi Action"). Gardner Decl. Ex. 8 McGuckin Dep. 11:14-12:22; Ex. 27. McGuckin initially authorized VAC to spend years and thousands of dollars of its funds fighting the First Atassi Action, describing Dr. Atassi as

essentially incompetent. MLP Mot. to Dismiss ¶ 39; Gardner Decl. Ex. 8 McGuckin Dep. 11:17, 50:15-17.  However, when Dr. Atassi filed a lawsuit against McGuckin personally in 2018 ("Second Atassi Action," collectively with First Atassi Action, "Atassi Litigation"), McGuckin suddenly became willing to settle both actions. MLP Mot. to Dismiss ¶ 39. Without telling the limited partners, McGuckin executed a settlement agreement on behalf of VAC with Dr. Atassi which incorporated an employment agreement, wherein VAC would rehire Dr. Atassi as Chief Medical Officer and pay him a $250,000 annual salary for a five-year term starting December 1, 2018 ("Atassi Employment Agreement"). Gardner Decl. Ex. 28; Ex. 29. The Atassi Employment Agreement obligated VAC to continue paying Dr. Atassi his salary for the full five-year term, *even if he resigned*, which he did a few months later. Gardner Decl. Ex. 28, 29. In exchange, McGuckin obtained a personal release of all claims held by Dr. Atassi against him and was not required to make any payments to Dr. Atassi. Gardner Decl. Ex. 29.

Meanwhile, in the Derivative Litigation, after the Plaintiffs and McGuckin failed to decide on mutually agreeable terms of the Financial Monitor's appointment after months of negotiation, the Plaintiffs filed a petition to enforce settlement in the State Trial Court to facilitate the Financial Monitor's appointment. MLP Mot. to Dismiss n. 15. On December 19, 2018, the State Trial Court finally ordered the appointment of independent CPA Michael F. Dubin as Financial Monitor ("Monitor") for VAC and its subsidiaries. Gardner Decl. Ex. 14 p. 3. On January 16, 2019, the State Trial Court amended its order appointing the Monitor to read "the Monitor shall exercise his best efforts to submit a report to the Court and Limited Partners…assessing VAC's financial condition, including an assessment of VAC's financial solvency." *Id.* However, it was not until March 2019 that McGuckin finally signed the Financial Monitor's engagement letter, significantly delaying the issuance of the Monitor's first report. *Id.*

13

On January 18, 2019, the Pennsylvania Department of Health ("DOH") sent letter orders to McGuckin revoking licenses to operate at least three of the McGuckin Centers and one of VAC's subsidiaries based upon McGuckin's inaccurate and misleading responses to license application questions inquiring whether any state or federal agency had taken adverse action against any of his facilities, whether any of his facilities had been ordered to pay a civil monetary penalty, whether any of his facilities had been subject to criminal or civil fraud charges, whether any of his facilities had been convicted of Medicare or Medicaid fraud and abuse, and whether there were any ongoing fraud or abuse investigations at any of his facilities. Gardner Decl. Ex. 30. In answering these questions, McGuckin either failed to inform the DOH about the qui tam complaint and DOJ investigation, and/or failed to update the applications to include information about the DOJ Settlement. *Id.* As a result, the DOH concluded that McGuckin had directly withheld information pertinent to issuing a license under the Healthcare Facilities Act, 35 P.S. § 448.808. *Id.*

Then, on March 4, 2019, McGuckin sent another letter to the limited partners informing them of VAC's poor revenues for November and December 2018. Gardner Decl. Ex. 25. He also told them that, due to VAC's poor financial condition, all executive team members had reduced their salaries with hope of eventual repayment and that he was deferring his General Partner and CEO salaries. *Id.* In the letter, McGuckin stated that "since the DOJ news release in October 2018, and the public acknowledgment of our Corporate Integrity Agreement, VAC has sustained a 27% decrease in overall case load, yielding a 25% decrease in revenues, which was unprecedented and unpredicted." *Id.* Due to the "accusations," referral physicians "changed their referral patterns." *Id.* Additionally, he identified increased physician attrition as a significant issue contributing to the overall perception of instability in the organization. *Id.*  Finally, he

14

notified the limited partners that their K-1s would be deferred due to the "massive cost" of the Monitor. *Id.*

Subsequently, VAC submitted a request to the DOJ to defer its quarterly settlement payments for nine months. Gardner Decl. Ex. 31. In order to obtain the deferral, McGuckin told the DOJ that he was deferring 100% of his CEO compensation and a portion of his General Partner compensation for 12 months. Gardner Decl. Ex. 31, 32. Gardner alleges that, in reality, McGuckin had merely changed the payee for his salaries from himself to PVI based upon a promissory note dated December 19, 2018 wherein VAC: (1) promised to pay PVI, which is solely owned by McGuckin, $500,000 at 9% interest by the maturity date of January 1, 2019 and (2) granted PVI a supposed security interest upon all VAC's accounts receivable and cash proceeds. Gardner Decl. Ex. 33. McGuckin signed the promissory note as CEO of VAC and manager of PVI without informing the limited partners, thereby violating the Amended L.P. Agreement which required the General Partner to obtain the consent of a majority of the limited partners to encumber assets of VAC as security for an obligation greater than or equal to $500,000. *Id.*; Ex. 1 Am. LPA § 6.3.2.

Later, in the Derivative Litigation, on April 22, 2019, the Superior Court unanimously ruled against McGuckin on appeal and affirmed the State Trial Court's decision to deny McGuckin's petition to compel arbitration. *See Gardner v. Vascular Access Centers, LLC,* 2019 WL 177063 (Pa. Super. Ct. Apr. 22, 2019). McGuckin subsequently filed an application for reargument *en banc* on May 6, 2019. UST Mot. to Dismiss Ex. 2. On June 12, 2019, the Superior Court denied McGuckin's application for reargument. *Id.* The Plaintiffs subsequently filed a motion to recover certain attorneys' fees and costs. *Id.*

On July 3, 2019, nearly a year after McGuckin first agreed to his appointment, the

Monitor filed his first report ("First Monitor Report") assessing VAC's financial condition as of

March 31, 2019. Gardner Decl. Ex. 14 p. 1. The First Monitor Report found that VAC's principal

source of liquidity, as of March 31, 2019, was the collection of accounts receivable in the

amount of $4.2 million due from Medicare and private insurance. *Id.* at p. 12. However, more

importantly, the Monitor concluded that VAC was in poor financial health, had negative equity

of as much as $22.5 million, was losing money from operations, and had liabilities that

substantially exceeded its assets. *Id.* at p. 4, 13, 15. While the Monitor expressed his belief that

the company could stabilize and survive its present financial condition, he concluded that it

would be unlikely to "greatly prosper" without adequate capital to build new centers and convert

old ones to the ASC model. *Id.* at p. 5. Ultimately, the Monitor assessed that VAC is not likely

solvent because of the significant difference in its liabilities over its assets and that VAC

required a substantial infusion of cash to make its centers profitable in the future. *Id.* at p. 6, 13,

15.

The Monitor opined that "the underlying causes and reasons for the company's poor

financial condition…broadly relate to (1) the changes in the Medicare reimbursement structure;

(2) the Derivative Litigation; and (3) the DOJ litigation" and that he considered all of those

factors major impediments to improvement of the company's financial condition. *Id.* at p. 4. In

particular, both the DOJ litigation and Derivative Litigation had consumed VAC's resources and

caused lost revenue. *Id.* at p. 16, 18-20. For instance, the publicity of the DOJ litigation damaged

VAC's reputation in the industry, caused physicians to leave for other providers, and resulted in

a decrease in physician referrals. *Id.* at p. 16, 25, 26. Also, complying with the corporate integrity

agreement required substantial internal resources and external consulting services from an

16

independent review organization and outside counsel, all of which the Monitor estimated would cost about $800,000 over the course of 2019 and 2020. *Id.* at p. 19. Finally, the Monitor determined that the additional payments that VAC would be obligated to make under the DOJ Settlement, in the event of a sale of the company, would serve as an impediment to VAC securing external financing or selling the company. *Id.* at p. 19.

The Monitor further estimated that, pursuant to § 6.10.2 of the Amended L.P. Agreement, VAC had to have incurred hundreds of thousands of dollars of litigation costs defending the General Partner in the Derivative Litigation, although he had not seen the legal bills due to their privileged nature. *Id.* at 20. Furthermore, uncertainty from the Derivative Litigation caused unrest within the organization and led to some key physician resignations who started their own competing practices. *Id.* In fact, the Monitor concluded that, the longer the Derivative Litigation continued, the more damaging its effect on VAC's financial position. *Id.* at p. 25.

Regarding the Monitor's assessment of "related party transactions" between VAC and McGuckin-owned entities, such as VAC providing working capital and services in support of the McGuckin Centers, the Monitor found that

> [t]he Monitor's testing and analysis of these matters suggests that generally, the appropriate amount of reimbursements was made to VAC by non-VAC entities [owned by McGuckin] and/or to Dr. McGuckin and the minor reimbursements that were not made would not have materially affected VAC's financial position or solvency. *Id.* at p. 22-23.

However, the Monitor also noted that "some of the reimbursements were not made timely, possibly including some significant reimbursements made in 2017, but the effect of these late reimbursements, which in essence constituted an interest free loan, also do not have a material effect on VAC's financial position or solvency." *Id.* at p. 23.

17

Although the Monitor commented that the management team, including the controller, Chief Operating Officer, Chief Compliance Officer, and CEO had generally been cooperative, competent, and capable in responding to his requests for information, he also observed that "the Company's process for the preparation of its financial statements requires significant revision" since the current process results in significant delay; that the company would benefit from internal, fully adjusted monthly, quarterly, and annual financial statements; that "it is clear that better internal controls are required to be implemented as relates to matters such as this [McGuckin's CEO Employment Agreement] wherein both parties to the agreements are one person"; and that "there are fewer individuals than would be optimal to maintain a system of checks and balances" which subjects the company to a "greater likelihood of errors and/or misstatements in its financial reporting." *Id.* at p. 23, 27. In fact, the Monitor found that VAC's past financial forecasts had not been reliable or consistent and differed depending on the intended purpose of the forecast. *Id.* at p. 27-28. Most troubling of all, the Monitor noted that "the Company has over the period circa 2012 through 2017…sometimes 'comingled' funds of various entities including entities not owned by the Company. This practice is not appropriate and results in internal control weakness that can materially negatively affect the Company." *Id.* at p. 28.

Meanwhile, on July 10, 2019, McGuckin filed a petition for allowance of appeal with the Pennsylvania Supreme Court. *See Gardner v. Vascular Access Centers, LLC*, No. 402 MAL 2019. On July 31, 2019, the Superior Court granted the Plaintiffs' motion to recover certain attorneys' fees and costs, concluding that McGuckin's "submission and reliance upon documents that were not part of the record at the trial court was frivolous, and therefore [Plaintiffs] are entitled to reasonable attorneys' fees for having to respond to the documents on appeal" and that

18

"the petition for re-argument was also frivolous, and only done to further delay this matter,"
entitling the Plaintiffs to fees for responding to the petition. Gardner Decl. Ex. 18.

On October 12, 2019, the Monitor issued another report ("Second Monitor Report")
comparing VAC's financial condition in August 2019 to June 2019. Gardner Decl. Ex. 21 p. 3.
The Monitor concluded that VAC's financial condition "is not materially worse at August 31,
2019 as compared to June 30, 2019," partly because the General Partner had loaned additional
amounts to VAC, but that "the Company's cash position remains extremely tight and is
inadequate to satisfy its obligations on a current basis." *Id.* at p. 4, 7. Therefore, VAC remained
in extremely poor financial health, tended to delay as many payments on its obligations as
possible, and was still likely insolvent. *Id.* at p. 4, 6-7. Furthermore, the Monitor continued to
identify the Medicare reimbursement structure, Derivative Litigation, and the DOJ Settlement as
the primary causes of VAC's poor financial condition. *Id.* at p. 4-5.

Importantly, the Monitor emphasized that VAC still needed capital to convert its centers
to the ASC model and that, if VAC was going to survive, it had to quickly find a way to satisfy
"a variety of demands on its cash through December 31, 2019, including lease maturities, DOJ
penalties, costs associated with Medicare litigation, legal costs related to the derivative litigation,
settlements, and many other costs." *Id.* at p. 5-7. These demands would require VAC to pay in
excess of $750,000 between October 1, 2019 and December 31, 2019. *Id.* at p. 5. Ultimately, the
Monitor concluded that it would be challenging, but not impossible, for VAC to continue
operating through December 31, 2019. *Id.* Finally, the Monitor warned that "the Company also
needs to improve its ability to prepare accurate, complete financial statements supported by trial
balances and appropriate supporting documentation." *Id.* at p. 14.

On October 17, 2019, the General Partner, through McGuckin, met with Dilworth Paxson

LLP ("Dilworth") to obtain legal services in connection with VAC's financial restructuring. UST

Mot. to Dismiss ¶ 18. Subsequently, Dilworth sought the majority limited partner's consent to

file a voluntary chapter 11 bankruptcy petition on behalf of VAC. MLP Mot. to Dismiss ¶ 49.

Initially, Gardner preferred to explore resolutions outside of bankruptcy and requested terms for

consent. *Id.*

On November 4, 2019, PVI filed a UCC-1 financing statement ("UCC Statement")

against VAC asserting a purported lien on any and all receivables and equipment, personal

property, and licenses in connection with a series of loans allegedly extended to VAC since 2007

totaling $4,257,626. UST Mot. to Dismiss Ex 4.

On November 7, 2019, Dilworth contacted counsel for Gardner in the Derivative

Litigation seeking Gardner's consent to the filing of a chapter 11 bankruptcy petition. Gardner

Decl. Ex. 38. On November 8, 2019, counsel responded that Gardner, as the majority-in-interest

limited partner, would be willing to consider consenting to a bankruptcy petition upon receiving

more information about who would run VAC during the bankruptcy, which leases would be

rejected, which centers would continue to operate, how much DIP financing would be necessary,

how to deal with the DOJ liability, who would own the company after bankruptcy, and what a

13-week budget would look like. *Id.*

Dilworth responded on November 11, 2019 that VAC contemplated no management

changes, that it was too early in the restructuring process to have answers to most of Gardner's

other questions, and that due to the precarious, dire financial position of VAC, there was no time

for protracted negotiations prior to a bankruptcy filing. *Id.* The same day, opposing counsel

responded with disappointment at the lack of detailed information and represented that Gardner

20

had offered multiple times to provide additional capital to VAC predicated on governance changes. *Id.* On November 12, 2019, Dilworth responded that more detailed discussion and negotiations could occur within the chapter 11 bankruptcy forum, the need for a bankruptcy filing was extremely urgent, and VAC preferred obtaining capital from McGuckin which was not accompanied by demands or conditions. *Id.*

That same day, the Pennsylvania Supreme Court denied McGuckin's petition for allowance of appeal in the Derivative Litigation. *See Gardner v. Vascular Access Centers, LLC*, 2019 WL 5883526 (Pa. Nov. 12, 2019). In addition, the parties were scheduled to appear before the State Trial Court the next day for a hearing on the amount of sanctions to be awarded against McGuckin personally on account of McGuckin's "frivolous" submission and reliance upon documents not part of the trial record, as well as his "frivolous" petition for reargument which was "only done to further delay this matter." Gardner Decl. Ex. 18; MLP Mot. to Dismiss ¶ 51.

However, hours after VAC's petition for allowance of appeal was denied, three purported creditors of VAC: (1) PVI, an entity owned and controlled by McGuckin; (2) Metter & Company ("Metter"), an accounting firm owned by Stan Metter, one of VAC's limited partners; and (3) Crestwood Associates, LLC ("Crestwood"), an entity owned by the brother of McGuckin, Brian McGuckin ("Brother"), filed an involuntary petition under chapter 11 of the Bankruptcy Code against VAC, thereby staying the Derivative Litigation. Case No. 19-17117 ECF 1; MLP Mot. to Dismiss ¶ 6; UST Mot. to Dismiss ¶ 78. The involuntary petition, signed by McGuckin as the representative of PVI, describes PVI's claim as a secured loan with a principal balance of $1,202,120, and represents that Metter has an $11,911.25 claim and that Crestwood has a $6,090 claim. Case No. 19-17117 ECF 1.

In the days leading up to the involuntary filing, it appears that McGuckin and his Brother were coordinating the logistics of VAC's bankruptcy filing. UST Tr. Ex. 27, 28. Although the Brother knew that Crestwood did not have any open accounts receivable with VAC, the Brother nevertheless directed a Crestwood employee to "create an invoice for $6,000" and stated that the "invoice absolutely has to be dated today." UST Tr. Ex. 27, 28. When the Crestwood employee asked the Brother for the applicable rate and how many hours VAC should be billed, the Brother replied "just use the rate that we charge them and then extrapolate the hours based on that and the $6k." UST Tr. Ex. 28. The Crestwood employee then replied "[t]heir Bill Rate is $210/hr which comes out to 28.57 hours. Can we add $90 to make our lives easier and bill them for $6,090.00 to make it an even 29 hours?" to which the Brother said "[s]ure thing." *Id.*

Gardner disputes the validity of PVI's claim as he avers that his consent would have been required pursuant to the Amended L.P. Agreement in order to encumber VAC's assets on account of a secured loan greater than or equal to $500,000, and he never gave it. MLP Mot. to Dismiss ¶ 51.

On November 13, 2019, VAC consented to the involuntary petition. Case No. 19-17117 ECF 3. On November 14, 2019, VAC filed its list of top 20 unsecured creditors, reflecting nineteen non-insider unsecured creditors with claims totaling $1,758,733.66.[2] Case No. 19-17117 ECF 8.

On November 19, 2019, VAC filed a motion to use cash collateral and provide adequate protection to PVI ("Cash Collateral Motion"). Case No. 19-17117 ECF 21 Cash Coll. Mot. ¶22(b), (e). The Cash Collateral Motion represented that:

> 15. The Debtor's sole secured creditor is Philadelphia Vascular Institute LLC ("PVI"), of which Dr. McGuckin is the sole member and manager.

---

[2] A claim for PVI in the amount of $3,100,000 was also included on this list. Case No. 19-17117 ECF 8.

22

> 16. Pursuant to certain promissory notes issued on various dates
> beginning in 2007 and continuing through October 2019, *PVI has
> loaned funds to the Debtor.*
> 17. *As of the Petition Date, the aggregate outstanding
> indebtedness under the various promissory notes is $4,257,626,
> secured by a properly perfected, first priority security interest in
> and lien on substantially all of the assets of the Debtor, including
> all of the Debtor's accounts receivable.* Attached hereto as Exhibit
> A is a spreadsheet reflecting the outstanding balance of principal
> and interest under the promissory notes. *Id.* at ¶¶ 15-17 (emphasis
> added).

Although the involuntary petition had listed PVI's debt as $1,202,120, the Cash

Collateral Motion now represented that PVI held "various promissory notes" totaling $4,257,626

which was "secured by a properly perfected, first priority security interest in and lien on

substantially all of the assets of the Debtor." *Id.* at ¶ 17; *see* Involuntary Petition. Accordingly,

the Debtor requested that the Court grant PVI, as adequate protection:

> security interests ('Replacement Liens') equivalent to a lien
> granted under § 364(c)(2) and (3)…in and upon Debtor's personal
> property and the cash collateral whether acquired before or after
> the Petition Date to the extent (i) that PVI's prepetition security
> interests in the collateral are valid and properly perfected and (ii)
> the amount of any diminution in value of the [sic] PVI's collateral.
> *Id.* at ¶ 30.

The Cash Collateral Motion failed to attach *any* promissory notes or other documentation

of PVI's alleged security interest, including the UCC Statement filed on November 4, 2019. On

November 21, 2019, the Debtor filed Exhibit A to the Cash Collateral Motion ("Exhibit A")

which was described as a "spreadsheet reflecting the outstanding balance of principal and

interest under the promissory notes." Cash Collateral Motion ¶ 17.

On November 20, 2019, the United States Trustee ("UST") requested copies of PVI's

promissory notes, UCC filings, and the payment history on PVI's liens. UST Mot. to Dismiss

¶38. VAC failed to provide any of the requested information. *Id.* at ¶ 39. On November 21, 2019,

the UST informed Dilworth that he had located the UCC Statement and inquired about a possible

preference action against PVI. *Id.* at ¶ 40. Shortly thereafter on the same day, VAC withdrew the

Cash Collateral Motion. *Id.* at ¶ 41; *see also* Case No. 19-17117 ECF 41.

On November 22, 2019, Gardner filed a motion to dismiss the involuntary chapter 11

petition pursuant to § 1112(b) or to appoint a chapter 11 trustee ("Chapter 11 Trustee") under

§1104(a) ("Gardner Motion"), alleging that the petitioning creditors had instituted involuntary

proceedings in bad faith in conjunction with McGuckin so that McGuckin could get VAC into

bankruptcy without the limited partners' consent, in order to further delay the Derivative

Litigation. Case No. 19-17117 ECF 52.

On November 25, 2019, the Court entered an Order for Relief. *Id.* at ECF 46. The same

day, at the hearing on other "First Day" Motions which had been filed by VAC, Dilworth

represented

> [w]e don't have any secured debt at VAC level right here. And
> that's why I withdrew the cash collateral motion. We thought we
> did, because the loans from the general partner were the subject of
> a UCC filing which we picked up. It was filed within the 90-day
> period and the loan documentation is not perfect, so at this point,
> the loans that came in from an affiliate of the general partner we're
> looking at as unsecured debt at this point. That may change, but
> they don't have any issue with our continuing use of cash collateral
> order and we withdrew it so that the court and other parties weren't
> distracted by it. Tr. 14:23-15:9, Nov. 25, 2019 Hearing ("Nov. 25
> Tr.").

Subsequently, the UST filed its own motion to dismiss ("UST Motion" and collectively,

with the Gardner Motion, the "Dismissal Motions") on December 19, 2019, largely on the bases

that McGuckin orchestrated the involuntary filing in conjunction with the petitioning creditors to

gain a tactical litigation advantage in the Derivative Litigation, McGuckin's conflicts of interest

would make it impossible for him to satisfy his fiduciary duties as General Partner controlling

24

VAC-in-possession, VAC's failure to accurately disclose PVI's security interest and the UCC

Statement in its Cash Collateral Motion, and Dilworth's later acknowledgement that PVI only

held an unsecured claim against VAC. Case No. 19-17117 ECF 104.

The Debtor filed its objection to Gardner's Motion ("Objection") on December 19, 2019

and an objection to the UST Motion on December 24, 2019, arguing that it was premature and

unnecessary to dismiss the bankruptcy case or appoint a Chapter 11 Trustee.

On January 10, 2019, VAC filed its schedules and statement of financial affairs. *Id.* at

ECF 158-165. Schedule D reflects that VAC has five other secured creditors in addition to PVI

who all have security interests in VAC's equipment. *Id.* at ECF 159. Schedule E reflects one

priority unsecured claim in the amount of $472.00. *Id.* Schedule F reflects 177 nonpriority

unsecured claims in the total amount of $2,213,845.03. *Id.*

On January 16, 2020, Gardner filed a reply to the Objection ("Reply") and incorporated

certain discovery that he had obtained in connection with the involuntary filing.

On February 6, 2020, the Court held a hearing on the Dismissal Motions and heard

testimony from the Monitor, Michael Dubin, McGuckin and Mark Tucci, who is the CFO of

VAC.[3] The Monitor testified about VAC's financial condition at the time that he produced the

various reports during the Derivative Litigation, which apparently were based upon financial

information that he received from Metter. He identified three causes for VAC's financial distress

which were: the change in Medicare reimbursements, the settlement payments to the DOJ, and

VAC's legal costs in the Derivative Litigation.

During McGuckin's testimony, VAC's counsel showed McGuckin a copy of a Secured

Promissory Note dated December 19, 2018 in favor of PVI from VAC in the principal amount of

---

[3] In the interest of filing this Opinion expeditiously, the Court is unable to provide citations to the transcript from the hearing.

$500,000. VAC's counsel elicited testimony from McGuckin about the details of PVI's loan to VAC and confirmed that PVI had loaned VAC: (1) $500,000 in December 2018, (2) $225,000 in May 2019, and (3) $250,000 in September 2019. Based upon McGuckin's testimony, it did not appear that PVI loaned any other amounts to VAC despite the statement in the Cash Collateral Motion that PVI had loaned a total of $4,257,626 to VAC.

McGuckin also testified that, although he had signed a consent decree ("Consent Decree") with the State of Washington Medical Quality Assurance Commission on September 3, 2015, there were certain statements that he made in the Consent Decree that he believed were not true, but that he had signed it because he did not feel that he had any choice but to do so. Essentially, McGuckin did not believe that he had done anything wrong in treating patients with angioplasty and stenting procedures despite his admission in the Consent Decree that such procedures were inappropriate.

During the UST's cross examination of McGuckin, McGuckin completely contradicted his testimony during direct examination and admitted, for the first time, that PVI actually had not loaned *any* amount to VAC. In fact, VAC's counsel had sent an email to the UST on January 31, 2020 attaching "the documentation of the PVI loans to VAC." UST Tr. Ex. 9. The email listed the following payments totaling $1,202,119.57 which were loaned to VAC: (1) a $300,000 wire to VAC from Peripheral Vascular on December 18, 2018; (2) a $200,000 wire to VAC from PA Vascular Institute on December 19, 2018; (3) a $155,000 wire to VAC from Peripheral Vascular on May 17, 2019; (4) a $70,000 wire to VAC from Peripheral Vascular on May 23, 2019; (5) a $250,000 check to VAC from Peripheral Vascular on September 9, 2019; (6) a $145,523.92 check to VAC from James and Allison McGuckin on October 10, 2019 (with a "Credit to non-

VAC 401k of $18,404.35"); and (7) a $100,000 check to VAC from James and Allison McGuckin on October 31, 2019.

When asked to explain why he had testified that PVI had loaned these amounts to VAC, McGuckin testified that he essentially considered Peripheral Vascular, PA Vascular, PVI and himself to be the same entity since all of the money came from him.

In addition, when asked why VAC had to be in bankruptcy by November 12, 2019, McGuckin could not come up with any credible explanation and testified that he had no idea that the sanctions hearing against him in the Derivative Litigation was scheduled to be held on November 13, 2019.

Ultimately, the Court did not find McGuckin to be credible or trustworthy in any respect. In fact, it is clear to the Court that McGuckin is willing to sign documents, like the Consent Decree, even if he does not believe that his statements are true. In addition, McGuckin was either lying when he testified that PVI loaned millions of dollars to VAC or he is delusional. The Court suspects that PVI did not actually loan any amount to VAC. In any event, the Court finds that McGuckin is not truthful and cannot be relied upon for anything that he says.

Given the troubling inconsistencies in the involuntary petition, the Cash Collateral Motion, and the documents and testimony given at trial, the Court will review the transcript of the trial when it becomes available and, unless an interested party files a motion for sanctions under, *inter alia,* Rule 9011 in a timely fashion, the Court will consider whether it would be appropriate to enter an order to show cause why certain parties or attorneys should not be subject to sanctions.

This matter is now ripe for disposition.

### III.    Legal Analysis

At trial, Gardner argued that a Chapter 11 Trustee should be appointed based upon, *inter alia*, McGuckin's frivolous and abusive litigation tactics in the Derivative Litigation, McGuckin's orchestration of the involuntary filing against VAC, and McGuckin's numerous conflicts of interest. The UST similarly argued that McGuckin has breached his fiduciary duties to VAC in this bankruptcy proceeding by advancing his own interests ahead of the creditors and the bankruptcy estate, is not credible based upon his false statements about PVI's alleged loan to VAC, has a conflict of interest based upon the alleged claims held by VAC against McGuckin in the Derivative Litigation, and acted in bad faith in having the involuntary petition filed in order to obtain a litigation advantage in the Derivative Litigation. UST Objection ¶¶ 58, 62-64, 69, 70 and 72.

In response, VAC argues that the bankruptcy serves a legitimate bankruptcy purpose, consistent with the Monitor's independent reporting, in that it provides a breathing spell from the legal costs of the Derivative Litigation and will allow VAC to develop a plan to raise sufficient funds to reorganize. Gardner Objection ¶¶ 4, 5. VAC does not believe that there is any significance with the fact that PVI did not actually loan any amounts to VAC and argued that the entities who actually loaned the money to VAC could have assigned such debt to PVI, although the Debtor acknowledged that no assignment had ever been made. In addition, the Debtor previously objected to the appointment of a Ch. 11 Trustee because "[n]o amount of 'investigating' by a trustee will change the Debtor's circumstances." Debtor's Objection at ¶ 5.

After considering all of the evidence and the testimony given at trial, the Court finds that, based upon the totality of the circumstances, this bankruptcy case was indeed filed in bad faith. However, the Court also finds that it is in the best interests of VAC's creditors and the bankruptcy estate to appoint a Chapter 11 Trustee given McGuckin's clear inability to discharge

his fiduciary responsibilities to VAC, his various conflicts of interest with VAC, his self-dealing, and the fact that he is not trustworthy on any level.

### A. Dismissal for Cause Under § 1112(b)(1)

According to 11 U.S.C. § 1112(b)(1), on request of a party in interest and after notice and a hearing, the court shall convert or dismiss a case, whichever is in the best interests of creditors and the estate, for cause, unless the court determines that the appointment under § 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate. The Bankruptcy Code does not define what constitutes "cause," but § 1112(b)(4) includes a list of non-exhaustive factors constituting cause.[4] *In re Brown,* 951 F.2d 564, 572 (3d Cir. 1991). The movant bears the initial burden to demonstrate "cause" by a preponderance of the evidence. *Wilmington Trust, N.A. v. Pinnacle Land Grp., LLC (In re Pinnacle Land Grp., LLC),* No. 17-23339-GLT, 2018 Bankr. LEXIS 2764, at *20 (Bankr. W.D. Pa. 2018); *In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007). Once the movant shows "cause," the burden shifts to the debtor to establish an exception under § 1112(b)(2).[5] *In re Alston*, No. 13-cv-1855, 2013 WL 6210249, at *4 (E.D. Pa. Nov. 27, 2013).

---

[4] Those factors include: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

[5] Under 11 U.S.C. § 1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable, within a reasonable period

The Third Circuit Court of Appeals ("Third Circuit") has adopted a "good faith requirement" as a prerequisite for filing Chapter 11 petitions. *Official Comm. of Unsecured Creditors v. Nucor Corp., (In re SGL Carbon Corp.),* 200 F.3d 154, 160 (3d Cir. 1999); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009). In doing so, the Third Circuit made Chapter 11 petitions filed in bad faith subject to dismissal. *In re SGL Carbon Corp.,* 200 F.3d at 160. In fact, the Third Circuit has held that filing a petition in bad faith constitutes an independent basis for dismissing both voluntary and involuntary petitions. *In re Forever Green Athletics Fields, Inc.,* 804 F.3d 328, 333-34 (3d Cir. 2015) ("[B]y including an express reference to bad faith in § 303, Congress intended for bad faith to serve as a basis for both dismissal and damages," even when the petitioning creditors satisfy all of the § 303(b) requirements for filing the petition.) When the movant satisfies the initial burden of demonstrating cause by putting a debtor's good faith at issue, the debtor then bears the burden of proving good faith by a preponderance of the evidence. *In re Forever Green,* 804 F.3d at 335; *Cross Appellees in 09-1432 v. BEPCO, LP (In re 15375 Memorial Corp.),* 589 F.3d 605, 618 (3d Cir. 2009); *In re SGL Carbon Corp.,* 200 F.3d at 162 n.10; *In re DCNC,* 407 B.R. at 662.

Determining whether a voluntary or involuntary chapter 11 petition has been filed in good faith depends upon the totality of the circumstances and requires courts to conduct a "fact intensive inquiry." *In re Forever Green,* 804 F.3d at 335-36; *In re 15375 Memorial Corp.,* 589 F.3d at 618. The Third Circuit has further explained that:

> [t]he term 'good faith' is somewhat misleading. Though it suggests that debtor's subjective intent is determinative, this is not the case. Instead, the 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings. Courts have implied such limitations to deter filings that

---

and (2) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification for the act or omission; and that will be cured within a reasonable period of time fixed by the court.

> seek to achieve objectives outside the legitimate scope of the
> bankruptcy laws. Pursuant to 11 U.S.C. § 1112(b), courts have
> dismissed cases filed for a variety of tactical reasons unrelated to
> reorganization. *In re SGL Carbon Corp.,* 200 F.3d at 165 (citation
> omitted).

With that in mind, two fundamental inquiries are particularly relevant to the

determination of whether a petition was filed in good faith: (1) whether the petition serves a valid

reorganizational purpose and (2) whether the petition is filed merely to obtain a tactical litigation

advantage. *In re SGL Carbon Corp.,* 200 F.3d at 165; *In re Pinnacle Land Grp.,* 2018 Bankr.

LEXIS 2764, at *23. Valid reorganizational purposes include (1) preserving and rehabilitating a

going concern or (2) maximizing the value of a debtor's estate for the benefit of creditors

through an orderly liquidation. *In re 15375 Memorial Corp.,* 589 F.3d at 619; *In re DCNC,* 407

B.R. at 661.

When the timing of a filing "is such that there can be no doubt that the primary, if not

sole purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed

in good faith." *In re 15375 Memorial Corp.,* 589 F.3d at 625. Because filing a chapter 11 petition

merely to obtain tactical litigation advantages is not within the legitimate scope of the

bankruptcy laws, courts have typically dismissed Chapter 11 petitions under these circumstances.

*In re SGL Carbon Corp.*, 200 F.3d at 165. Similarly, filing only to obtain the protection of the

automatic stay does *not* constitute a good faith justification for a Chapter 11 filing, and neither

does initiating a case solely to hinder or delay creditors. *NMSBPCSLDHB, L.P. v. Integrated*

*Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 128 (3d Cir.

2004); *In re DCNC*, 407 B.R. at 661. In fact "courts universally demand more of Chapter 11

petitions than a naked desire to stay pending litigation, and any perceived benefit of the

31

automatic stay, without more, cannot convert a bad faith filing into a good faith one." *In re*

*15375 Memorial Corp.,* 589 F.3d at 620.

Courts also have considered various factors in determining whether a bankruptcy case has

been filed in bad faith under the totality of the circumstances, including whether:

> (1) the debtor has few or no unsecured creditors; (2) there has been
> a previous bankruptcy petition by the debtor or a related entity; (3)
> the prepetition conduct of the debtor has been improper; (4) the
> petition effectively allows the debtor to evade court orders; (5)
> there are few debts to non-moving creditors; (6) the petition was
> filed on the eve of foreclosure; (7) the foreclosed property is the
> sole or major asset of the debtor; (8) the debtor has no ongoing
> business or employees; (9) there is no possibility of reorganization;
> (10) the debtor's income is not sufficient to operate; (11) there was
> no pressure from non-moving creditors; (12) reorganization
> essentially involves the resolution of a two-party dispute; (13) a
> corporate debtor was formed and receive title to its major assets
> immediately before the petition; and (14) the debtor filed solely to
> create the automatic stay. *In re DCNC,* 407 B.R. at 662.

Courts may explore these and other relevant considerations to ascertain whether a petition "falls

along the spectrum ranging from the clearly acceptable to the patently abusive." *In re SGL*

*Carbon Corp.,* 200 F.3d at 165.

In the context of involuntary petitions, courts also have considered factors such as

whether:

> the creditors satisfied the statutory criteria for filing the petition;
> the involuntary petition was meritorious; the creditors made a
> reasonable inquiry into the relevant facts and pertinent law before
> filing; there was evidence of preferential payments to certain
> creditors or of dissipation of the debtor 's assets; the filing was
> motivated by ill will or a desire to harass; the petitioning creditors
> used the filing to obtain a disproportionate advantage for
> themselves rather than to protect against other creditors doing the
> same; the filing was used as a tactical advantage in pending
> actions; the filing was used as a substitute for customary debt-
> collection procedures; and the filing had suspicious timing. *In re*
> *Forever Green,* 804 F.3d at 336.

In considering the totality of the circumstances, courts must not overemphasize any particular factor nor apply any set of factors rigidly, as none are dispositive. *In re DCNC,* 407 B.R. at 662; In fact, no list is exhaustive of all the factors which could be relevant when analyzing good faith in filing a chapter 11 petition. *Id.*

### B. <u>Appointment of Chapter 11 Trustee Under § 1104(a)</u>

Pursuant to 11 U.S.C. § 1104(a),

> at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-- (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of VAC by current management, either before or after the commencement of the case, or similar cause…or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities or the amount of assets or liabilities of VAC.

Decisions to appoint a trustee pursuant to § 1104(a) are fact intensive and must be made on a case-by-case basis. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re Circulatory Ctrs. of Am., LLC),* 579 B.R. 752, 758 (Bankr. W.D. Pa. 2017). The appointment of a chapter 11 trustee is an extraordinary remedy and "should be the exception rather than the rule." *Martelli v. Colts Neck Golf & Country Club,* No. 14–8101 (FLW), 2015 WL 5032621, at *5 (D. N.J. Aug. 25, 2015) (citing *In re Sharon Steel Corp.*, 871 F.2d at 1226).

The moving party bears the burden of proving the need for a chapter 11 trustee under either § 1104(a)(1) or (2) by clear and convincing evidence. *In re Marvel Entertainment Group,* 140 F.3d 463, 471 (3d Cir. 1998). "If a court finds that the moving party has discharged this burden, it 'shall' appoint a trustee, but determining whether the moving party has satisfied its

burden under either subsection is committed to the court's discretion." *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),* 385 F.3d 313, 318 (3d Cir. 2004). The Third Circuit has noted that

> [i]n the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because 'current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate.' Thus the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: 'the debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.'…The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization. *Id.* at 319 (citations omitted).

Nevertheless, "[t]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *In re Circulatory Ctrs. of Am., LLC,* 579 B.R. at 760. A debtor-in-possession's inability or unwillingness to discharge its fiduciary responsibilities necessitates the appointment of an independent trustee who can. *In re Marvel Entertainment Group,* 140 F.3d at 474 (citation omitted).

### i. <u>Appointment of Trustee for Cause Pursuant to § 1104(a)(1)</u>

The Bankruptcy Code does not specifically define "cause" and legislative history provides little guidance. *In re Clinton Centrifuge, Inc.,* 85 B.R. 980, 983 (Bankr. E.D. Pa. 1988). Section 1104(a)(1) simply indicates that such "cause" must be in the nature of "fraud,

dishonesty,[6] incompetence, or gross mismanagement[7]" of the debtor by current management before or after commencement of the case. *In re Sanders,* No. 99 B 9876, 2000 WL 329574, at *3 (Bankr. N.D. Ill. Mar. 2, 2000) (noting that the court may examine both pre and post-petition conduct in determining the existence of cause); *In re Clinton Centrifuge, Inc.,* 85 B.R at 983-84. However, these concepts do not make up an exclusive list of causes. *In re Marvel Entertainment Group,* 140 F.3d at 472. They cover a wide range of conduct and the court has broad discretion in applying such concepts to determine the existence of cause. *Id.*

Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties.  *In re Clinton Centrifuge, Inc.,* 85 B.R. at 985; *7 Collier on Bankruptcy P 1104.02[c][i]-[ii].*

### ii.  Appointment of Trustee Pursuant to § 1104(a)(2)

Section 1104(a)(2), unlike (a)(1), which mandates the appointment of a trustee upon a finding of cause, "envisions a flexible standard . . . giv[ing]… discretion to appoint a trustee 'when to do so would serve the parties' and estate's interests.'" *In re Marvel Entertainment Grp.,* 140 F.3d at 474 (citations omitted). Frequently, findings of "cause" and "best interests" are "intertwined and dependent on the same facts." *In re Grasso,* 490 B.R. 500, 506 (Bankr. E.D. Pa. 2013). Under this section, the court is empowered to use its broad equity powers to engage in a

---

[6] Dishonesty generally refers to a lack of honesty or integrity, lack of fairness and straightforwardness, or a disposition to deceive or betray. *In re Ridgemour Meyer Props., LLC,* 413 B.R. 101, 108 (Bankr. S.D. N.Y. 2008).
[7] To base a finding of cause on gross mismanagement, the court must find that the conduct establishing cause is more aggravated than simple mismanagement. *In re Clinton Centrifuge, Inc.,* 85 B.R. at 983-84.

cost-benefit analysis of the impact of appointing a chapter 11 trustee. *In re Circulatory Ctrs. of Am., LLC,* 579 B.R. at 758.

Among factors which may be considered in appointing a trustee under section 1104(a)(2) are: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *In re Madison Management Group, Inc.*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992). These factors are not applied mechanically or formalistically. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D. N.Y. 1990).

### C.  The Court Will Appoint a Chapter 11 Trustee Based upon McGuckin's Inability to Discharge His Fiduciary Responsibilities to VAC and His Conflicts of Interest with VAC

The Court ultimately finds that the involuntary petition was orchestrated by McGuckin in order for McGuckin and the General Partner to obtain a tactical litigation advantage in the Derivative Litigation. By way of background, McGuckin, through the General Partner, was not authorized to file a voluntary bankruptcy case on behalf of VAC without the consent of a majority of the limited partners of VAC. When Gardner reasonably refused to consent to VAC's bankruptcy filing without McGuckin stepping down as General Partner of VAC, McGuckin engineered the filing of VAC's involuntary petition in order to automatically stay the Derivative Litigation.

Based upon postpetition discovery obtained by Gardner and McGuckin's testimony, it is clear that McGuckin directed the petitioning creditors to file the involuntary petition against VAC on November 12, 2019 in order to stay the sanctions hearing against McGuckin which was to take place the next day in connection with McGuckin's "frivolous" litigation tactics in the

Derivative Litigation. Gardner Decl. Ex. 18; MLP Mot. to Dismiss ¶ 51. The timing of the

involuntary petition also was questionable because the Pennsylvania Supreme Court denied

McGuckin's petition for allowance of appeal in the Derivative Litigation on the same date that

the involuntary petition was filed. *See Gardner v. Vascular Access Centers, LLC*, 2019 WL

5883526 (Pa. Nov. 12, 2019). Furthermore, there was no independent reason why VAC had to be

in bankruptcy by November 12, 2019.[8] Finally, the Court found McGuckin's testimony, that he

was unaware that the sanctions hearing was scheduled for November 13, 2019, to be entirely

unbelievable and self-serving.

In addition, upon consideration of the factors surrounding the filing of the involuntary

petition, the Court finds that: (1) the petitioning creditors did not satisfy the statutory criteria for

filing the petition, the involuntary petition was not meritorious, and the creditors failed to make a

reasonable inquiry into the relevant facts and pertinent law before filing, as evidenced by the fact

that: (a) Crestwood did not hold any claims against VAC immediately prior to the involuntary

filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin and

(b) PVI's $1.2 million claim was entirely false; (2) McGuckin caused PVI to file a UCC

Statement on the eve of the involuntary filing which constituted a preference and, more

importantly, PVI never loaned any money to VAC; (3) the involuntary filing was used by

McGuckin to obtain a disproportionate advantage for himself, and a tactical advantage, in the

Derivative Litigation, rather than to protect VAC's interests; and (4) as discussed *supra,* the

timing of the filing of the involuntary petition was suspicious since there was no reason that

---

[8] Despite expressing concerns to the limited partners about VAC's financial condition for two years, it does not appear that McGuckin took any meaningful steps to prepare for a bankruptcy or to seek the limited partners' consent. While VAC certainly had upcoming payments, there has been no explanation regarding why these payments required a bankruptcy filing on the eve of McGuckin's sanctions hearing, as opposed to a few weeks later after more meaningful discussions could occur between Dilworth and counsel for the limited partners.

VAC had to be in bankruptcy by November 12, 2019 and McGuckin needed VAC to be in

bankruptcy by such date in order to avoid being sanctioned in the Derivative Litigation.

Furthermore, the Court finds that: (1) the bankruptcy filing effectively allowed

McGuckin to evade the State Trial Court's order to conduct a sanctions hearing against him and

the Pennsylvania Supreme Court's denial of McGuckin's appeal to stop the Derivative

Litigation; (2) the involuntary petition was filed on the eve of the sanctions hearing against

McGuckin in the Derivative Litigation; (3) the Derivative Litigation is potentially one of VAC's

largest assets; (4) there was no pressure from VAC's non-moving creditors to be in bankruptcy

on November 12, 2019; and (5) the petition was filed solely to create the automatic stay. *In re*

*DCNC,* 407 B.R. at 662.

Finally, VAC has failed to demonstrate any unusual circumstances to avoid dismissal of

this case. Instead, VAC attacks Gardner's motivation for filing the Derivative Litigation and

complains that the Derivative Litigation was one of the major factors which contributed to

VAC's financial distress. However, it is clear that Gardner will not receive anything from the

Derivative Litigation. Rather, the proceeds of any judgment awarded against the General Partner

or McGuckin in the Derivative Litigation will directly benefit VAC and its creditors. Based

upon, *inter alia,* McGuckin's unilateral decision to settle litigation with (1) the DOJ (which

raised serious allegations about McGuckin's operation of VAC) in a manner which saddled VAC

with significant debt; and (2) Dr. Atassi (only after Dr. Atassi filed claims against McGuckin

personally) in a manner which obligated VAC to pay Dr. Atassi five years' worth of salary, even

if he terminated his employment with VAC (which he did months later), while entirely

eliminating McGuckin's liability and obligation to make any payment to the DOJ and Dr. Atassi,

the filing and pursuit of the Derivative Litigation by Gardner and VAC's other limited partners

do not constitute unusual circumstances justifying the filing of this bankruptcy. In fact, as discussed *infra,* these underlying facts support the Court's finding that McGuckin is unable to discharge his fiduciary responsibilities to VAC and evidence McGuckin's many conflicts of interest.

Based upon the foregoing, it is apparent that, based on the totality of the circumstances, McGuckin, acting as the General Partner of VAC, orchestrated the filing of this bankruptcy in bad faith in order to stop the Derivative Litigation from proceeding and to protect his own personal interests, as well as the interests of the General Partner and PVI. However, before dismissing this bankruptcy case for bad faith, the Court will determine whether it is in the best interests of the creditors and bankruptcy estate of VAC to appoint a Chapter 11 Trustee in this case.

In order to demonstrate whether cause exists under § 1104(a)(1) to appoint a Chapter 11 Trustee in this case, Gardner must prove, by clear and convincing evidence, that McGuckin has a conflict of interest with VAC, misused VAC's assets, maintained inadequate recordkeeping and reporting, failed to file required documents, failed to adequately disclose information, failed to impose appropriate cost controls, committed transgressions related to taxes, failed to make required payments, lacks credibility and creditor confidence; or breached his fiduciary duties. *In re Clinton Centrifuge, Inc.,* 85 B.R. at 985; *7 Collier on Bankruptcy P 1104.02[c][i]-[ii].* Based upon the evidence submitted to the Court and the testimony provided at the hearing on the Dismissal Motions, the Court finds that almost all of these factors have been proven by clear and convincing evidence and that McGuckin's prepetition and postpetition misconduct clearly warrant the appointment of a Chapter 11 Trustee in this case.

First, McGuckin has numerous conflicts of interest with VAC that are problematic and clearly make it impossible for him, as the General Partner, to faithfully discharge his fiduciary duties to VAC to preserve and maximize assets of the estate by, *inter alia*, pursuing causes of action on the estate's behalf. *See Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 175 (2d Cir. 2005). In fact, McGuckin admitted at trial that he holds multiple conflicts of interest. McGuckin is adverse to VAC in the Derivative Litigation, which appears to be a significant estate asset, potentially entitling VAC to substantial damages against McGuckin and the General Partner. McGuckin admitted at trial that he wants the Derivative Litigation to end and has gone to great lengths to hinder this potentially valuable litigation through frivolous litigation tactics. McGuckin also holds a conflict of interest in pursuing preference claims against his company, PVI, and other McGuckin-owned entities, potentially depriving the estate and creditors of additional assets.

In fact, not only did McGuckin put his own interests ahead of VAC when he attempted to perfect PVI's purported security interest by filing the UCC Statement on the eve of VAC's bankruptcy, he directed the filing of the unfounded Cash Collateral Motion which sought to give PVI replacement liens on VAC's assets, even though PVI has never loaned any funds to VAC. It is clear that, when faced with conflicts of interest with VAC, McGuckin always takes action to protect his own personal interests at the expense of VAC's interest. Although VAC later withdrew the Cash Collateral Motion, it was only after the UST discovered the preferential UCC Statement and before the UST even realized that PVI had not loaned VAC any money at all. These conflicts alone would support the Court's finding that McGuckin has violated his fiduciary duty to the estate and that cause exists to appoint a Chapter 11 Trustee. *See In re Microwave Products of America, Inc.*, 102 B.R. 666, 672 (Bankr. W.D. Tenn. 1989).

40

In addition, McGuckin has inappropriately misused VAC's funds for his own purposes by comingling VAC's funds with funds of his entities; by giving the McGuckin Centers a discount for use of VAC's resources to open, operate, and manage these competing centers without informing the limited partners until discovery during the Derivative Litigation; by committing VAC's resources to highly burdensome settlements in the DOJ litigation and Atassi Litigation in order to secure releases for himself without having to make settlement payments from his personal funds or even guarantee VAC's settlement obligations; and by paying himself excessive compensation from VAC's funds for duplicative roles without the limited partners' knowledge or approval, as only discovered during the Derivative Litigation. Although McGuckin has represented that he deferred his compensation in order to secure an extension of the DOJ payments and testified that he has not received a salary from VAC during the bankruptcy, the Court has no faith in these statements and believes that an independent investigation should be made regarding the payments that McGuckin actually has received from VAC during the last year. Based upon the foregoing, the Court finds that McGuckin repeatedly has secretly diverted and leveraged VAC's assets to serve his own personal interests.

Third, as the Monitor found, under McGuckin's leadership, VAC's record keeping and reporting are inadequate. In fact, the First Monitor's Report identified a number of significant defects in this regard, noting that the McGuckin's process for preparing financial statements resulted in significant delay, which often prevented the limited partners from receiving them in accordance with the timeline set out in the Amended L.P. Agreement. Additionally, the First Monitor's Report noted that the lack of a system of checks and balances subjects VAC to a greater likelihood of errors and misstatements in financial statements. Even more troubling, the First Monitor's Report observed that past financial forecasts have not been reliable or consistent

with forecasts for the same or similar time periods and differed depending on the purpose of the

forecast. The unreliability of the forecasts and financial statements is further demonstrated by the

fact that, in his January 2018 letter to the limited partners, only several months prior to certifying

to the DOJ that VAC was and would remain solvent throughout the DOJ Settlement term,

McGuckin told the limited partners that VAC had had a disappointing year, was in a dire

financial position, could not pay all of its bills as they came due, and would go out of business if

they did not raise substantial capital. Such capital had not been secured by the time the DOJ

Settlement was executed. That McGuckin misrepresents the nature of VAC's financial condition

when it serves him renders his financial projections and statements untrustworthy and

compromises his credibility.

Some of McGuckin's other actions have further damaged his credibility. For instance, the

Commission found that he performed and billed for experimental, ineffective procedures

unapproved by the FDA and lied at least *twice* during the course of the Commission's

investigation. As discussed *supra,* the Court also is dismayed with McGuckin's willingness to

sign the Consent Decree when he believed that certain statements that he had agreed to were

false and McGuckin's lack of remorse for performing the unauthorized procedures. Similarly,

McGuckin's failure to accurately respond to questions on his applications to the DOH for

licenses to operate medical facilities further impairs his credibility. As the party controlling

VAC, the Court also finds it troubling that McGuckin failed an ethics course twice and questions

his representation to the limited partners and the DOJ that he was deferring his General Partner

and CEO salaries. Finally, the reputational harm stemming from McGuckin's performance of

ineffective procedures and from publicity of the DOJ Settlement has cost VAC substantial

revenue, physicians, staff, referrals, and patients.

Ultimately, McGuckin, as sole member and manager of the General Partner, has repeatedly put his own interests above VAC, may have competed actively with VAC for years, engaged in numerous secret, self-dealing transactions, and sacrificed VAC's resources and reputation when it served him to do so. Based upon the foregoing, the Court finds McGuckin to be dishonest, not credible, incompetent, and completely untrustworthy to operate VAC and guide VAC through this chapter 11 reorganization. Accordingly, there is sufficient cause under §1104(a)(1) to appoint a chapter 11 trustee and doing so will serve the interests of creditors and the estate over dismissal, because it appears from all of the evidence that there is a valid reorganizational purpose for VAC to be in bankruptcy. In addition, Gardner and the other limited partners appear willing to fund a reasonable amount of reorganizational costs provided that McGuckin is not in control of VAC. Appointing a Chapter 11 Trustee will give VAC an opportunity to reorganize as a going concern and maximize VAC's resources to allow many more creditors to recover on account of their claims.

For these same reasons, the Court also finds that appointment of a Chapter 11 Trustee is justified under § 1104(a)(2). In particular, McGuckin has demonstrated that he is not trustworthy and consistently puts his own interests, as well as the interests of the General Partner and PVI, ahead of VAC's interests to the detriment of all of VAC's creditors. McGuckin's numerous acts of misconduct, both prepetition and postpetition, also justify the appointment of a Chapter 11 Trustee. Based upon McGuckin's willingness to deceive others prior to, and during, this bankruptcy proceeding, no creditor could reasonably have any confidence in McGuckin.

Based upon the potentially significant value that VAC will have under trustworthy management balanced against the costs of appointing a Chapter 11 Trustee, the Court finds that it is in the best interests of VAC's creditors and the bankruptcy estate to appoint a Chapter 11

Trustee. The Court notes that VAC has operated profitably in the past and could potentially be highly profitable if it obtains sufficient financing from its limited partners or other financial institutions. This can only happen if McGuckin is removed from management of VAC and an independent Chapter 11 Trustee is appointed. Accordingly, the Court is convinced that the cost of the appointment of a Chapter 11 Trustee in this case will be greatly outweighed by the benefits derived from such appointment and will make the reorganization more efficient while ensuring the integrity of the process. The Court therefore concludes that these circumstances justify the appointment of a Chapter 11 Trustee under § 1104(a)(2).

Based upon the foregoing, in light of McGuckin's total lack of credibility and trustworthiness and his self-serving conduct before and during this bankruptcy, as well as the potential benefits of allowing VAC to reorganize as a going concern, the Court concludes that the appointment of a Chapter 11 Trustee is justified under both § 1104(a)(1) or 1104(a)(2) and is preferable to dismissal.

## IV.    **Conclusion**

Based upon the foregoing, the Court will deny the UST's Motion and grant Gardner's Motion to immediately appoint a Chapter 11 Trustee in this case.

Date:    February 7, 2020

_____
Honorable Ashely M. Chan