## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

Vascular Access Centers, L.P.,

Debtor.

Chapter 11

Case No. 19-17117 (AMC)

## MOTION OF MAJORITY LIMITED PARTNER FOR AN ORDER
## IMPOSING SANCTIONS AGAINST DR. JAMES F. MCGUCKIN
## AND PHILADELPHIA VASCULAR INSTITUTE, LLC

William Whitfield Gardner ("Mr. Gardner"), the majority-in-interest limited partner of

the Debtor herein, Vascular Access Centers, L.P. ("VAC" or "Debtor"), by and through his

undersigned counsel, hereby moves (the "Motion") for entry of an order substantially in the form

attached hereto as Exhibit A pursuant to sections 105(a) of the United States Code, 11 U.S.C.

§§101-1532 (the "Bankruptcy Code"), and Rule 9011 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), imposing sanctions against Dr. James F. McGuckin

("McGuckin") and Philadelphia Vascular Institute, LLC ("PVI") and represents as follows:

### I.    INTRODUCTION

1.    In its February 7, 2020 Opinion appointing a Chapter 11 Trustee for the Debtor

[Docket No. 234] (the "Opinion"), the Court stated:

> Given the troubling inconsistencies in the involuntary petition, the Cash Collateral
> Motion, and the documents and testimony given at trial, the Court will review the
> transcript of the trial when it becomes available and, unless an interested party files
> a motion for sanctions under, inter alia, Rule 9011 in a timely fashion, the Court
> will consider whether it would be appropriate to enter an order to show cause why
> certain parties or attorneys should not be subject to sanctions.

Opinion at 27.  By way of this Motion, Mr. Gardner moves for the entry of sanctions against

McGuckin and PVI for the egregious conduct described by the Court, which includes filing an

involuntary bankruptcy petition based on false and manufactured claims in an attempt to derail

state court proceedings and avoid, among other things, a hearing scheduled for the next day to

assess sanctions against McGuckin personally for his frivolous litigation conduct, and repeatedly

reaffirming the validity of the false and manufactured claims in pleadings and testimony submitted

to the Court.

2.      McGuckin and PVI should be sanctioned under Section 105(a) of the Bankruptcy

Code, the Court's inherent power, and Bankruptcy Rule 9011.  Given the significant litigation

costs Mr. Gardner incurred in his efforts to (i) expose McGuckin's and PVI's abuse of process and

misrepresentations and (ii) obtain a Chapter 11 trustee to supervise VAC and safeguard the estate,

the appropriate measure of sanctions is Mr. Gardner's reasonable attorneys' fees and costs.

## II.      JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(A) and (O).  Venue

is proper in this Court under 28 U.S.C. § 1408 and 1409.

4.      The statutory predicates for the relief sought herein are section 105(a) of the

Bankruptcy Code and Bankruptcy Rule 9011.

## III.      BACKGROUND

### A.      McGuckin and PVI.

5.      VAC was founded by McGuckin as a Pennsylvania limited partnership through a

limited partnership agreement executed on April 22, 2005.  *See* Opinion at 1.  The limited

partnership agreement was amended on October 31, 2007 (the "Amended L.P. Agreement").  *Id.*

at 2.  McGuckin is the ultimate owner and manager of VAC's former general partner, Vascular

Access Centers, LLC (the "General Partner"). *See id.* McGuckin is also the former Chief

Executive Officer and Chief Medical Officer of VAC. *See id.* at 6.

6.      PVI is an entity solely owned and controlled by McGuckin. *See id.* at 21.

7.      Mr. Gardner has contributed in excess of $13,000,000 to VAC and owns

approximately 72.5% of VAC's equity and therefore holds the majority of the limited partnership

interests in VAC. *See id.* at 2.

8.      Mr. Gardner commenced a derivative action on behalf of VAC by filing a

complaint in the Delaware County Court of Common Pleas against the General Partner and

McGuckin, as sole member and manager of the General Partner, for breach of fiduciary duty,

breach of contract, and unjust enrichment ("Derivative Litigation") on January 13, 2016. *See*

Opinion at 5.

**B.      The Involuntary Petition and VAC's Answer and Consent.**

9.      On the evening of November 12, 2019, an involuntary Chapter 11 Petition

[Docket No. 1]  (the "Involuntary Petition") was filed by three purported creditors of VAC:

(1) PVI; (2) Metter & Company ("Metter"), an accounting firm owned by Stan Metter, one of

VAC's limited partners; and (3) Crestwood Associates, LLC, an entity owned in part by Brian

McGuckin, McGuckin's brother ("Crestwood" and, together with PVI and Metter, the

"Petitioning Creditors"). *See id.* at 21. The Involuntary Petition, which McGuckin signed on

behalf of PVI, described PVI's claim as "secured loans" with a principal balance of $1,202,120,

and represented that Metter had an $11,911.25 claim and that Crestwood had a $6,090 claim.

Involuntary Petition at 2.

10.      McGuckin "orchestrated" the filing by these three friendly "creditors" to evade a

requirement in the Amended L.P. Agreement that he obtain the approval of a majority in interest

of the limited partners before filing a voluntary bankruptcy petition, which effectively required

Mr. Gardner's consent.  *See* Opinion at 3, 36.  While McGuckin claimed that Mr. Gardner

refused to consent to a voluntary filing, the Court correctly noted that Mr. Gardner was willing to

consider consenting but requested basic financial information first, and the Court further found

that Mr. Gardner "reasonably refused to consent to VAC's bankruptcy filing without McGuckin

stepping down as General Partner of VAC."  *See* Opinion at 20, 36.  Instead of stepping down,

which would have given the limited partners control over the Derivative Litigation, McGuckin

"engineered the filing of VAC's involuntary petition in order to automatically stay the Derivative

Litigation" and, specifically, "to stay the sanctions hearing against McGuckin."  *Id*. at 36; *see*

*also* Argentina Decl., Ex. A, 2/6/2020 Hr'g Tr. at 345:14-24 ("[The petition] was clearly filed to

avoid the sanctions hearing . . . [McGuckin's] explanation was completely not credible.  The

discovery on the various petitioning creditors' claims, it was a completely manufactured invoice

. . . [and] there was no reason why VAC had to be in bankruptcy on November 12th other than to

avoid the sanctions hearing against Dr. McGuckin, period, end of story.").

11.    VAC filed an Answer and Consent the following day [Docket No. 3] ("<u>Answer</u>

<u>and Consent</u>").  In the Answer and Consent, VAC stated that "VAC has reviewed its records

regarding the claims of the Petitioning Creditors and believes that it is liable to those creditors in

the amounts asserted."  Answer and Consent at 4.  The "Consent of Sole General Partner," which

was signed by McGuckin, is attached to the Answer and Consent.

**C.    The Cash Collateral Motion.**

12.    On November 19, 2019, VAC filed a motion to use cash collateral and provide

adequate protection to PVI [Docket No. 21] (the "<u>Cash Collateral Motion</u>").  In the Cash

Collateral Motion, VAC represented that:

15.    The Debtor's sole secured creditor is Philadelphia Vascular Institute LLC ("PVI"), of which Dr. McGuckin is the sole member and manager.

16.    Pursuant to certain promissory notes issued on various dates beginning in 2007 and continuing through October 2019, PVI has loaned funds to the Debtor.

17.    As of the Petition Date, the aggregate outstanding indebtedness under the various promissory notes is $4,257,626, secured by a properly perfected, first priority security interest in and lien on substantially all of the assets of the Debtor, including all of the Debtor's accounts receivable.  Attached hereto as **Exhibit A** is a spreadsheet reflecting the outstanding balance of principal and interest under the promissory notes.

Cash Collateral Motion at ¶¶ 15-17.

13.    In contrast to the Involuntary Petition, which listed the principal amount of PVI's

secured claim as $1,202,120, the Cash Collateral Motion asserted that PVI was owed

$4,257,626, "secured by a properly perfected, first priority security interest in and lien on

substantially all of the assets of the Debtor."  *Id.* at ¶ 17.  VAC requested that the Court grant

PVI adequate protection in the form of "replacement liens" upon "the Debtor's personal property

and the Cash Collateral."  *Id.* at ¶ 30.

14.    VAC failed to submit any promissory notes, UCC filings or other documentation

evidencing PVI's alleged loans or prepetition security interests.  *See* Opinion at 23.

Accordingly, on November 20, 2019, the U.S. Trustee requested copies of PVI's promissory

notes, UCC filings, and the payment history on PVI's liens.  *See id.*  VAC failed to provide any

of the requested information.  *See id.*  On November 21, 2019, the U.S. Trustee informed

counsel for VAC that he had discovered that PVI had filed a UCC-1 financing statement against

VAC on November 4, 2019, less than 2 weeks before the filing of the Involuntary Petition, and

inquired about a potential preference action against PVI.  *See id.* at 24.  On November 22, 2019,

VAC withdrew the Cash Collateral Motion.  [Docket No. 41].

**D.**   **Mr. Gardner's Motion to Dismiss the Involuntary Chapter 11 Case or, in the Alternative, Appoint a Chapter 11 Trustee.**

15.     On November 22, 2019, Mr. Gardner filed a motion for entry of an order dismissing VAC's involuntary Chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code or, in the alternative, appointing a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code [Docket Nos. 42, 43] (the "Dismissal/Trustee Motion").  In the Dismissal/Trustee Motion, Mr. Gardner argued that, *inter alia*, the filing of Involuntary Petition was a sham orchestrated by McGuckin to obtain a tactical litigation advantage in the Derivative Litigation.  Mr. Gardner argued that such gamesmanship warranted dismissal of the bankruptcy case, or, at a minimum, the appointment of a Chapter 11 trustee to safeguard the estate from McGuckin's self-dealing, dissipation and misuse of assets, and gross mismanagement.

16.     On December 19, 2019, VAC filed its objection to the Dismissal/Trustee Motion [Docket No. 106] (the "Objection").  In the Objection, VAC doubled down on the purported validity of the claims of the Petitioning Creditors.  With respect to PVI, VAC asserted that "PVI has made loans to the Debtor" and "the Debtor agrees that it owes at least $1,202,120 to PVI." Objection at 14-15.

17.     In connection with the Dismissal/Trustee Motion, Mr. Gardner elicited discovery, in the form of written responses, documents and deposition testimony, from McGuckin, VAC, PVI, Metter, Crestwood and Michael F. Dubin, who is the financial monitor appointed for VAC in the Derivative Litigation.  PVI and the other Petitioning Creditors refused to respond to the majority of Mr. Gardner's discovery requests, taking the position that, following VAC's sham consent and the subsequent entry of the order of relief, "the propriety of the filing of the involuntary petition is no longer an issue in the case, including the qualifications of the petitioning creditors, whether the involuntary petition meets the substantive standard for the

entry of an order for relief and whether the filing of the involuntary petition was filed in bad faith." *See* Argentina Decl., Ex. B, 12/6/19 Email from David Smith, Esq.  Mr. Gardner was forced to engage in several meet and confers and ultimately sought the intervention of Court, who, during a conference on December 13, 2019, rejected the efforts of PVI and the other Petitioning Creditors' to shield their actions from discovery.  Notwithstanding the Court's direction, the Petitioning Creditors continued to stonewall Mr. Gardner, necessitating another conference with the Court on January 6, 2020, at which the Court ordered the Petitioning Creditors to produce documents and cooperate in the scheduling of depositions.

18.    One of the Petitioning Creditors, Crestwood, likely resisted discovery because postpetition discovery showed that, among other things, PVI and Crestwood submitted false claims in support of the involuntary petition. *See* Opinion at 37.  On November 9, 2019, Brian McGuckin explained that Crestwood did not have any open accounts receivable with VAC because its practice was to bill at the end of the year.  *See* Argentina Decl., Ex. C (Text messages between McGuckin and Brian McGuckin, at CW00013) ("Just checked and we have no open AR now but we always bill you at end of the year to help with the fiscal close.").  The fact that, as of November 2019, Crestwood was not actually a creditor of VAC did not deter McGuckin; he directed his brother "to have them submit an invoice Monday." *Id.*  By Tuesday, November 12, Crestwood had yet to manufacture the invoice, prompting McGuckin to instruct his brother to "[p]lease call David Smith" because "[i]t's gotta go down today." *Id.*  As the Court found based in part on this postpetition discovery, the only reason it had to "go down" on November 12, 2019 was because McGuckin wanted to stay the sanctions hearing that was to take place the next day in connection with his frivolous litigation tactics in the Derivative Litigation. *See* Opinion at 36.

19.    Mr. Gardner filed a reply in further support of the Dismissal/Trustee Motion on January 16, 2020, incorporating certain discovery he had obtained, including the discovery from Crestwood described above.  [Docket Nos. 188, 189].

**E.    The February 6, 2020 Hearing.**

20.    On February 6, 2020, the Court held a hearing on the Dismissal/Trustee Motion and a separate motion to dismiss the bankruptcy case brought by the U.S. Trustee.   [Docket No. 104].  The Court heard testimony from Mr. Dubin, McGuckin and Mark Tucci, who is VAC's CFO.

21.    During McGuckin's testimony, VAC's counsel showed him a spreadsheet titled "PVI Promissory Notes."  *See* Argentina Decl., Ex. A, 2/6/2020 Hr'g Tr. at 110:16 – 111:9; Argentina Decl., Ex. D, Spreadsheet of "PVI Promissory Notes."  With respect to PVI's alleged loans to VAC, McGuckin offered the following testimony:

Q:    Has PVI lent money to the Debtor?

A:    Yes, sir.

Q.    Okay. So if you look at the first column on the sheet, it says PVI loan number 1; do you see that column?

A.    Yes, sir.

Q.    All right. And it's dated December 2018.  You see that?

A.    Yes, sir.

Q.    Did PVI lend actual cash to the debtor in December of 2018 in the amount of $500,000?

A.    Yes. $500,000 cash.

Q.    All right. At the time did the debtor sign a note for $500,000?

A.    Yes, sir.

Q.      []  And was it intended that that note be secured?

A       Yes. It's called a UCC filing.

*See id.*, 2/6/2020 Hr'g Tr. at 116:6-25.

22.     VAC's counsel then showed McGuckin a copy of a "Secured Promissory Note" from VAC to PVI, dated December 19, 2018.  *See id.*, 2/6/2020 Hr'g Tr. at 122:6-7.  When asked whether it was the "promissory note you just alluded to concerning the $500,000 loan in December of 2018," McGuckin responded "Yes, sir."  *See id.*, 2/6/2020 Hr'g Tr. at 122:7-9.

23.     Regarding the UCC filing by PVI, VAC's counsel asked "[a]nd that's the company that lent the actual $500,000 of cash to the debtor?"  *See id.*, 2/6/2020 Hr'g Tr. at 123:2-4.  In response, McGuckin again testified that PVI had loaned funds to VAC.  *See id.*, 2/6/2020 Hr'g Tr. at 123:4 ("Correct.")

24.      VAC's counsel then moved on to the other loans purportedly made by PVI and which, together with the $500,000 loan, formed the basis of its alleged claim against VAC:

Q.      So we just talked about the $500,000 loan in December of '18. Did you make subsequent loans?

A.      Yes, sir.

Q.      Okay. So look at the column that says -- now we're back on Debtor's Exhibit 9 -- the column that says PVI loan number 2.

A.      Yes, sir.

Q.      Dated 2019; do you see that?

A.      Yes, for $225,000 of cash.

Q.      Okay. And that was cash?

A.      Yes, sir.

Q.      Okay. And then you made another loan in September of 2019?

A. Yes. It's PVI loan 3, $250,000 of cash, September 2019.

Q. Okay. And you made one more loan before the bankruptcy; right? PVI loan number 4?

A. Yes. That was $227,000 and 120 in October of 2019.

Q. Okay. Was that also an actual cash loan to the debtor?

A. It was cash, yes, sir.

*See id.*, 2/6/2020 Hr'g Tr. at 123:5-25.

25. The U.S. Trustee's cross examination of McGuckin followed, during which "McGuckin completely contradicted his testimony during direct examination and admitted, for the first time, that PVI actually had not loaned *any* amount to VAC." Opinion at 26. On January 31, 2020, VAC's counsel had provided the U.S. Trustee with "documentation of the PVI loans to VAC." *Id*; Argentina Decl., Ex. E, "PVI loans" documentation. The documentation listed the following payments to VAC, totaling $1,202,119.57: "(1) a $300,000 wire to VAC from Peripheral Vascular[1] on December 18, 2018; (2) a $200,000 wire to VAC from PA Vascular Institute on December 19, 2018; (3) a $155,000 wire to VAC from Peripheral Vascular on May 17, 2019; (4) a $70,000 wire to VAC from Peripheral Vascular on May 23, 2019; (5) a $250,000 check to VAC from Peripheral Vascular on September 9, 2019; (6) a $145,523.92 check to VAC from James and Allison McGuckin on October 10, 2019 (with a "Credit to non-VAC 401k of $18,404.35"); and (7) a $100,000 check to VAC from James and Allison McGuckin on October 31, 2019. Opinion at 26-27. Critically, *none* of the payments making up the claim which PVI asserted against VAC and for which VAC sought to give PVI adequate protection actually came

---

[1] Peripheral Vascular or "PeVI" is the entity that McGuckin formed to own and operate a center in Philadelphia to compete with the Debtor, *see* Opinion at 5, and it is distinct from Philadelphia Vascular Institute, LLC or "PVI," which is another entity owned by McGuckin that supplies physicians to the VAC centers and his separately owned, competing centers. *See* Argentina Decl., Ex. A, 2/6/2020 Hr'g Tr. at 85:2-18, 177:9-15.

from PVI, as McGuckin acknowledged.[2]  Despite this disclosure by VAC's counsel, McGuckin

and VAC's counsel (acting at McGuckin's direction) continued to press the false narrative that

PVI had a secured loan for more than $1.2 million at the hearing on the Dismissal/Trustee

Motion.  McGuckin professed to believe that he considers PVI, Peripheral Vascular, PA

Vascular Institute and himself to be the same entity since all of the money came from him:

> Q.    But the involuntary petition which is Exhibit Number 2 that you signed under
> penalty of perjury reflects and represented to this court that PVI was owed 1.2
> million dollars from the debtor, but now you're telling me that Exhibit 9 which is
> supposed to be the backup documentation for that 1.2 million dollars actually
> undermines that and makes that statement incorrect; right?
>
> A.    Cash is cash.
> . . .
>
> THE COURT:  So Dr. McGuckin, let me just be clear here, so we can kind of clear this
> up. So what the U.S. Trustee is trying to say is that as part of filing an involuntary
> petition you have to come up with three creditors who are owed money. And so
> the involuntary petition that was filed in this case says that PVI was owed 1.2
> million dollars, but he's -- he just showed me this tab, which I've seen for the first
> time and it looks like the 1.2 million dollars that PVI was owed according to the
> involuntary petition is actually incorrect. So can you explain why the involuntary
> petition says that PVI is owed 1.2 million dollars, but this document says that
> these various entities loaned these amounts? Why -- why does it say that?
>
> THE WITNESS:  The monies that I submitted to VAC for the purpose of sustaining its
> existence through funding through PVI came from any source I could get my
> hands on. You have to understand, I'm a practicing physician and Mr. Tucci, the
> CFO, would reach out to me and say, hey, Jim, we can't make the payment today
> or tomorrow –
>
> THE COURT:  I total[ly] get that, so –
>
> THE WITNESS:   -- for whatever, so I had to come up with cash.
>
> THE COURT:  -- in your view -- in your view, PVI peripheral vascular, PA Vascular,
> James and Allison McGuckin are all basically the same – it's from the same pot,
> it's your money; right?

---

[2] Even if any of the money had come from PVI, the loan would have been improper as it violated a provision in the
Amended L.P. Agreement requiring the Debtor to obtain approval from a majority in interest of its limited partners
before entering into a secured loan of greater than or equal to $500,000.  Opinion at 3.  Therefore, at the very least,
this loan was subject to a bona fide dispute and should have been challenged by the Debtor.

THE WITNESS:  Yes.

THE COURT:  So when they said, well, how much is PVI owed, you said that [they are] owed 1.2, because you view all of those entities as one entity?

THE WITNESS:  Yes.

THE COURT:  Okay. I mean, technically, though, you understand that they're not actually?

THE WITNESS: I could've done another wire transfer for another $35 and I could've transferred and transferred and transferred and then, yes, I could've done that.

*See id.*, 2/6/2020 Hr'g Tr. at 179:11-19, 179:21-181:7.

26.    Regarding the suspicious timing of the filing of the Involuntary Petition—the same day the Pennsylvania Supreme Court denied McGuckin's petition for allowance of appeal in the Derivative Litigation and on the eve of a hearing on the amount of sanctions to be awarded against McGuckin personally on account of McGuckin's "frivolous" litigation conduct—McGuckin feigned ignorance:

Q.    Well, let's look at Tab Number 31. Have you seen this document before?

A.    No.

Q.    All right. Well, for the record, it's a notice of a hearing that's been issued by the Court of Common Pleas for Delaware County, dated September 16, 2019, that there was supposed to be a hearing to be conducted on November 13, 2019 at 9:30 with regards to sanctions and fees being assessed. So were you not aware that there was a hearing coming up on November 13th?

A.    I never heard of this. And I never even heard of the Superior Court decision. We needed to go into bankruptcy in October. We needed to even do it before that. I had multiple people tell me we should have done it over the past year.

. . .

THE COURT:  So this was just a total and utter coincidence, that's the argument? It was just a total and utter coincidence –

THE WITNESS:  100%.

THE COURT:  -- that it had to be November 12th? Just a coincidence. In fact, it -- is that a coincidence?

COUNSEL FOR VAC: Your Honor, you know, remember this is an involuntary. That question should go to Mr. Smith, because he's the one who filed it.

THE COURT: Throw [] Mr. Smith under the bus, huh?

*See id.*, 2/6/2020 Hr'g Tr. at 209:6-19, 212:23-213:8.

27.    McGuckin persisted with the fiction that the timing of the Involuntary Petition had nothing to do with the Derivative Litigation even after it was apparent that he could give no other explanation for the filing date and despite the text message to his brother insisting that the Involuntary Petition "gotta go down today" or November 12, 2020.  *See id*., 2/6/2020 Hr'g Tr. at 142:13-24, 208:15-209:04, *see supra* ¶ 18.  Indeed, McGuckin went so far as to contradict his attorney.  McGuckin's attorney told the Court at the hearing that McGuckin knew about the sanctions hearing but not the date, but McGuckin claimed he did not know about the sanctions at all.  *See id.*, 2/6/2020 Hr'g Tr. at 210:4-211:16 ("He knew that it was happening.  He didn't know the date, Judge."); 2/6/2020 Hr'g Tr. at 213:11-14 (Q: "[E]ither you knew about sanctions and didn't know about the date or you didn't know about the sanctions at all."  Which one is it?" A:  "I didn't know about either.").

**F.    The February 7, 2020 Opinion.**

28.    At the conclusion of the all-day hearing on February 6, 2020, the Court delivered an oral ruling granting Mr. Gardner's request for the appointment of a Chapter 11 trustee.  *See id.*, 2/6/2020 Hr'g Tr. at 338:24 – 349:15.  On February 7, 2020, the Court entered a thorough, well-reasoned written Opinion memorializing the ruling.  [Docket No. 234].  In the Opinion, the Court made the following factual findings:

(1) the petitioning creditors did not satisfy the statutory criteria for filing the petition, the involuntary petition was not meritorious, and the creditors failed to make a reasonable inquiry into the relevant facts and pertinent law before filing, as evidenced by the fact that: (a) *Crestwood did not hold any claims against VAC immediately prior to the involuntary filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin* and (b) *PVI's $1.2 million claim was entirely false*; (2) McGuckin caused PVI to file a UCC Statement on the eve of the involuntary filing which constituted a preference and, more importantly, *PVI never loaned any money to VAC*; (3) *the involuntary filing was used by McGuckin to obtain a disproportionate advantage for himself, and a tactical advantage, in the Derivative Litigation, rather than to protect VAC's interests*; and (4) as discussed supra, *the timing of the filing of the involuntary petition was suspicious since there was no reason that VAC had to be in bankruptcy by November 12, 2019 and McGuckin needed VAC to be in bankruptcy by such date in order to avoid being sanctioned in the Derivative Litigation*.

Opinion at 37-38 (emphasis added).

29.     The Court also found that "it is apparent that, based on the totality of the circumstances, *McGuckin*, acting as the General Partner of VAC, *orchestrated the filing of this bankruptcy in bad faith* in order to stop the Derivative Litigation from proceeding and to protect his own personal interests, as well as the interests of the General Partner and PVI." Opinion at 39 (emphasis added).

30.     With respect to the Cash Collateral Motion, the Court found that McGuckin "directed the filing of the unfounded Cash Collateral Motion which sought to give PVI replacement liens on VAC's assets, even though PVI has never loaned any funds to VAC." Opinion at 40. While VAC ultimately withdrew the Cash Collateral Motion, the Court noted, "it was only after the UST discovered the preferential UCC Statement and before the UST even realized that PVI had not loaned VAC any money at all." *Id.*

31.     In addressing the timing of the Involuntary Petition and McGuckin's motivation, the Court found that "when asked why VAC had to be in bankruptcy by November 12, 2019, McGuckin could not come up with any credible explanation and testified that he had no idea that

the sanctions hearing against him in the Derivative Litigation was scheduled to be held on

November 13, 2019." *Id.* at 27. "[T]he Court found McGuckin's testimony, that he was

unaware that the sanctions hearing was scheduled for November 13, 2019 to be entirely

unbelievable and self-serving." *Id.* at 37. Ultimately, the Court concluded that McGuckin "is

not credible and trustworthy, and consistently puts his own interests ahead of VAC." *Id.* at 1.

## IV. **ARGUMENT**

32.     Consistent with the Court's suggestion that an interested party move for sanctions

"[g]iven the troubling inconsistences in the involuntary petition, the Cash Collateral Motion, and

the documents and testimony given at trial," Opinion at 27, Mr. Gardner requests an Order

awarding him his reasonable attorneys' fees and costs incurred in connection with the

Dismissal/Trustee Motion. Mr. Gardner is entitled to such fees and costs in the form of sanctions

against McGuckin and PVI under Section 105(a) of the Bankruptcy Code, the Court's inherent

power and Bankruptcy Rule 9011.

### A.     Sanctions are Warranted Against McGuckin and PVI, Jointly and Severally, Under 11 U.S.C. § 105(a).

33.     Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad statutory

authority to prevent abuse of the bankruptcy process and enforce the Bankruptcy Code's

provisions. Under Section 105(a), this Court may issue any "order, process, or judgment that is

necessary or appropriate to carry out the provisions" of Title 11. 11 U.S.C. § 105(a). Section

105(a) also authorizes this Court, *sua sponte*, to "tak[e] any action or mak[e] any determination

necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of

process." 11 U.S.C. § 105(a); *In re Schemelia*, 607 B.R. 455, (Bankr. D.N.J. 2019). In addition,

Section 105(a) may be used "to protect the integrity of the Bankruptcy Code as well as the

judicial process." *In re Miller*, 529 B.R. 73, 85 (Bankr. E.D. Pa. 2015) (citing *Brown v. Mitchell*

(*In re Arkansas Communities, Inc.* ), 827 F.2d 1219, 1222 (8th Cir. 1987)).  Section 105(a) also enables this Court to "maintain control of [its] courtroom and administration of the dockets in cases before [it]."  *Id.* (citing *In re Volpert*, 110 F.3d 494, 501 (7th Cir. 1997)).

34.     Sanctions may be awarded against both attorneys and litigants without regard to the signed writing or safe harbor provisions of Bankruptcy Rule 9011.  *See Miller*, 529 B.R. at 85; *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005); *Schemalia*, 607 B.R. at 462; *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273, 1274 (11th Cir. 2009).  In that circumstance, however, an explicit finding of bad faith or willful misconduct is required in order to award sanctions.  *See Miller*, 529 B.R. at 85; *Bailey*, 321 B.R. at 178.

35.     Here, the Court has already found that "McGuckin . . . orchestrated the filing of this bankruptcy in bad faith in order to stop the Derivative Litigation from proceeding and to protect his own personal interests, as well as the interests of the General Partner and PVI."  Opinion at 39.  In connection with the bad faith filing, McGuckin, *inter alia*:  (1)  directed Crestwood to manufacture a false invoice for VAC so that it could serve as a petitioning creditor; and (2) asserted a claim on behalf of PVI against VAC despite the fact that PVI never loaned any money to VAC in order to create another fraudulent petitioning creditor.  *See id.* at 37-38.  McGuckin did not orchestrate the filing in order to protect the interests of VAC or its legitimate creditors, but rather to "obtain a disproportionate advantage for himself, and a tactical advantage, in the Derivative Litigation."  *Id.*  After McGuckin and PVI filed the false Involuntary Petition, VAC, at McGuckin's direction, immediately consented to the filing and affirmed the validity of the manufactured debts.  Answer and Consent at 4.  McGuckin also moved quickly to grant "replacement liens" to PVI as adequate protection for the use of collateral in which PVI had absolutely no interest.  Cash Collateral Motion at ¶ 30.  McGuckin abandoned this effort when

the U.S. Trustee asked too many questions, but he maintained the fiction that PVI had loaned at least $1.2 million to the Debtor in multiple court filings and at the hearing on Dismissal/Trustee Motion before finally acknowledging, under questioning from the U.S. Trustee and the Court, that actually PVI itself did not loan *any* monies to VAC. *See id.*, 2/6/2020 Hr'g Tr. at 179:11-19, 179:21-181:7.

36.     McGuckin's and PVI's conduct amounts to an intentional abuse of the bankruptcy process and was intentionally undertaken in bad faith in an effort to stay and ultimately gain control over the Derivative Litigation.   McGuckin knew full well that Crestwood and PVI lacked eligible claims against VAC but chose to assert them, affirm them and defend them long after Mr. Gardner challenged such claims and discovery confirmed their invalidity.  Under these circumstances, sanctions are warranted under section 105(a) and should be imposed, jointly and severally, against McGuckin and PVI.

**B.     Sanctions are Warranted Against McGuckin Pursuant to the Court's Inherent Power to Sanction Parties Who Appear Before It.**

37.     Federal courts, including bankruptcy courts, possess the inherent power "to assess attorney's fees when a party 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Miller*, 529 B.R. at 91 (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).  "[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party."  *Chambers*, 501 U.S. at 45-46 (quoting *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946)).  The Supreme Court has held that "[t]he inherent powers of a court can be invoked even if procedural rules exist which sanction the same conduct."  *Id.* at 498; *see also Fellheimer, Eichen & Braverman, P.C. v.*

*Charter Technologies, Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995) ("[T]he advent of Rule 11 and the

other statutory sanctions did not eviscerate the courts' inherent power to sanction").

38.    As with section 105(a), sanctions may be imposed under the court's inherent

power despite the absence of a signed writing by the party to be sanctioned or compliance with

the safe harbor provision of Rule 9011. *See Fellheimer*, 57 F.3d at 1228; *In re Miller*, 730 F.3d

198, 206 (3d Cir. 2013). Likewise, the court may only impose sanctions under its inherent power

upon a finding that the party against whom sanctions are to be imposed acted in bad faith. *See*

*Miller*, 529 B.R. at 91. The party to be sanctioned must also be afforded due process, including

notice of "the legal basis for the sanctions." *In re Theokary*, 469 B.R. 729, 748 (Bankr. E.D. Pa.

2012). However, notice of the "precise sanctioning tool" is not required, as "[n]otice is sufficient

if the responding party is aware that he or she is being charged with bad faith conduct and needs

to confront this charge to defend against the imposition of sanctions." *Id.*

39.    Here, McGuckin was on notice, since the filing of the Dismissal/Trustee Motion,

that he was being accused of filing the Involuntary Petition in bad faith. Dismissal/Trustee

Motion at 32-41. Rather than acknowledge that the Involuntary Petition was factually and

legally deficient and consent to its dismissal, McGuckin insisted, in VAC's opposition to the

Dismissal/Trustee Motion and at the evidentiary hearing, that the Petitioning Creditors' claims

were valid and that the filing of the Involuntary Petition on the eve of the sanctions hearing was a

coincidence. The Court correctly found that McGuckin orchestrated the filing of the Involuntary

Petition in bad faith. By defending the Involuntary Petition and moving forward with his bad

faith effort to stall the Derivative Litigation, McGuckin acted vexatiously, wantonly and for

oppressive reasons. Accordingly, the Court should sanction him under its inherent power to

sanction litigants who appear before it.

C.      **Sanctions are Warranted Against McGuckin and PVI, Jointly and Severally,
Under Bankruptcy Rule 9011.**

1.      **Bankruptcy Rule 9011.**

40.      Bankruptcy Rule 9011 is the bankruptcy analogue of Rule 11 of the Federal Rules

of Civil Procedure.  *See Cinema Serv. Corp. v. Edbee Corp.*, 774 F.2d 584, 585 (3d Cir. 1985)

("The text of the Rule tracks Fed. R. Civ. P. 11, with only such modifications as are appropriate

in bankruptcy matters.").  Bankruptcy Rule 9011(b) provides that:

> By presenting to the court (whether by signing, filing, submitting, or later
> advocating) a petition, pleading, written motion, or other paper, an attorney or
> unrepresented party is certifying that to the best of the person's knowledge,
> information, and belief, formed after an inquiry reasonable under the
> circumstances,--
>
> > (1) it is not being presented for any improper purpose, such as to harass or to
> > cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions therein are warranted by
> > existing law or by a nonfrivolous argument for the extension, modification, or
> > reversal of existing law or the establishment of new law;
> >
> > (3) the allegations and other factual contentions have evidentiary support or, if
> > specifically so identified, are likely to have evidentiary support after a
> > reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if
> > specifically so identified, are reasonably based on a lack of information or
> > belief.

Fed. R. Bankr. P. 9011(b).

41.      Thus, under Bankruptcy Rule 9011(b), parties making representations to the court

make four certifications based on an "inquiry reasonable under the circumstances."  *Id.*  Three

are certifications that the legal assertions in the case have a basis in law (or a reasonable

argument for the law's modification) and that the factual contentions or denials have evidentiary

support or are likely to, after a reasonable opportunity for further investigation or discovery.  *See*

*id.* at (b)(2)-(4).  In determining whether a party has made a false representation in violation of

Rule 9011(b), the court does not need to find that the party acted in bad faith.  *See In re Taylor*,

6555 F.3d 274, 282 (3d Cir. 2011).  Rather, "[t]he imposition of Rule 11 sanctions . . . requires

only a showing of objectively unreasonable conduct." *Fellheimer*, 57 F.3d at 1225.  Further, the

obligations imposed by Bankruptcy Rule 9011(b) include later advocating or reaffirming

positions after learning that the position no longer has merit.  *See In re Coquico, Inc.*, 508 B.R.

929, 940 (Bankr. E.D. Pa. 2014) (citing *Theokary*, 468 B.R. at 746).

42.      The fourth certification is that the submission in question "is not being presented

for any improper purpose," including causing "unnecessary delay."  *See id.* at (b)(1).  The

"improper purpose" clause prohibits the filing of a submission for any improper purpose,

regardless of "whether or not it is supported by the facts and the law, and no matter how careful

the pre-filing investigation." *In re Ryan*, 411 B.R. 609, 615 (Bankr. N.D. Ill. 2009) (internal

quotations omitted).   In determining whether Bankruptcy Rule 9011(b)(1) has been violated,

"the critical question is *why* the allegedly offending paper was filed." *In re Letourneau*, 422

B.R. 132 (Bankr. N.D. Ill. 2010) (emphasis in original).

43.      Under Bankruptcy Rule 9011(c), if a court determines that a violation of Rule

9011(b) has occurred, the court "may . . . impose an appropriate sanction upon the attorneys, law

firms, or parties that have violated subdivision (b) or are responsible for the violation."  Fed. R.

Bankr. P. 9011(c) (emphasis added).  Represented parties may be sanctioned under Bankruptcy

Rule 9011(c) provided "they are found to be the person responsible for a false certification." *In

re Wall*, No. 16-00763, 2019 WL 522545, at *4 (Bankr. N.D. Iowa Feb. 8, 2019) (citing Fed. R.

Civ. P. advisory committee note); *see also* Fed. Bankr. P. 9011(c)(2)(A) (precluding the

imposition of monetary sanctions against a represented party for a violation subsection (b)(2),

- 20 -

but not (b)(1), (b)(2) or (b)(3)); *In re Collins*, 250 B.R. 645, 660-61 (N.D. Ill. 2000) (holding that

the provisions of Rule 9011 apply to a represented party).

44.     Bankruptcy Rule 9011(c) also details the procedure that must be followed before

sanctions can be imposed.  In most cases, the moving party must provide the party to be

sanctioned with 21 days to withdraw or correct the challenged submission.  Fed. R. Bankr. P.

9011(c)(1)(A).  However, this safe harbor provision does not apply if the challenged filing is a

petition.  *See id* (". . . except that this limitation shall not apply if the conduct alleged is the filing

of a petition in violation of subdivision (b)"); *see also Schemelia*, 607 B.R. at 460 ("Thus,

pursuant to Rule 9011(c), no safe harbor letter need be sent if a party seeks sanctions for the

filing of a petition.").

45.     Finally, Bankruptcy Rule 9011 authorizes the Court to imposes sanctions on its

own motion:  "On its own initiative, the court may enter an order describing the specific conduct

that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause

why it has not violated subdivision (b) with respect thereto."  Fed. R. Bankr. P. 9011(c)(1)(B).

## 2.     McGuckin and PVI Violated Bankruptcy Rule 9011(b) by Filing a Petition Based on False Claims.

46.     This Court has already found that the Involuntary Petition, which McGuckin

signed on behalf of PVI, was filed for an improper purpose—"to obtain a tactical litigation

advantage in the Derivative Litigation"—which constitutes a violation of Bankruptcy Rule

9011(b)(1).  Opinion at 36.  Specifically, "[w]hen Gardner reasonably refused to consent to

VAC's bankruptcy filing without McGuckin stepping down as General Partner of VAC,

McGuckin engineered the filing of VAC's involuntary petition in order to automatically stay the

Derivative Litigation."  *Id.*  McGuckin "directed the petitioning creditors to file the involuntary

petition against VAC on November 12, 2019 in order to stay the sanctions hearing against

McGuckin which was to take place the next day in connection with McGuckin's 'frivolous' litigation tactics in the Derivative Litigation." *Id.* at 36-37.  Though McGuckin testified that he was unaware that the sanctions hearing was scheduled for November 13, 2019, this Court found his testimony to be "entirely unbelievable and self-serving." *Id.* at 37.

47.    McGuckin's improper filing of the Involuntary Petition had the desired effect. The Delaware County Court of Common Pleas, the court overseeing the Derivative Litigation, stayed the case and put off the sanctions hearing.  Mr. Gardner was forced to incur significant litigation costs in order to secure the appointment of a Chapter 11 trustee to protect VAC from McGuckin's self-dealing and conflicts of interest.  *See* Opinion at 43 ("Ultimately, McGuckin, as sole member and manager of the General Partner, has repeatedly put his own interests above VAC, may have competed actively with VAC for years, engaged in numerous secret, self-dealing transactions, and sacrificed VAC's resources and reputation when it served him to do so.").  McGuckin's conduct violated Rule 9011(b)(1), and he should be sanctioned accordingly.

48.    McGuckin's and PVI's filing of the Involuntary Petition also constituted a violation of Rule 9011(b)(3), under which parties certify that factual contentions submitted to the Court have evidentiary support.  This Court expressly found that the Petitioning Creditors "failed to make a reasonable inquiry into the relevant facts and pertinent law before filing" the Involuntary Petition, as evidenced by, *inter alia*:  "Crestwood did not hold any claims against VAC immediately prior to the involuntary filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin"; "PVI's $1.2 million claim was entirely false"; and "PVI never loaned any money to VAC."  Opinion at 37.  All of these facts were known to McGuckin and PVI at the time of filing, yet McGuckin and PVI proceeded with filing the Involuntary Petition.  Moreover, McGuckin continued to defend and reaffirm the false claims through the

hearing on the Dismissal/Trustee Motion even though postpetition discovery confirmed that

Crestwood did not have a valid claim and VAC's counsel sent an email to the U.S. Trustee in

January admitting that PVI was not the source of any of the funds that supposedly supported its

secured claim. By engaging in this behavior, McGuckin and PVI violated Bankruptcy Rule

9011(b)(3).

### D.    Mr. Gardner is Entitled to his Attorneys' Fees and Costs.

49.    In light of the circumstances under which Mr. Gardner was forced to seek

dismissal of the Involuntary Petition and/or the appointment of a Chapter 11 trustee, Mr. Gardner

is entitled to be reimbursed for the attorneys' fees and costs reasonably incurred because of

McGuckin's and PVI's conduct. *See* Fed. R. Bankr. P. 9011(c)(1)(B) (where sanctions are

"imposed on motion and warranted for effective deterrence," they may consist of "an order

directing payment to the movant of some or all of the reasonable attorneys' fees and other

expenses incurred as a direct result of the violation."); *In re NNN 400 Capital Center 16, LLC*,

No. 18-50384, 2019 WL 5073844, at *2 (Bankr. D. Del. Oct. 9, 2019) (holding that Section

105(a) "includes the authority to impose sanctions, including an award of attorney's fees, if a

party violates a court order or rule") (citing *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 105

(3rd Cir. 2008)).

50.    Instead of responding to Mr. Gardner's reasonable requests for information and

governance changes as a predicate to a voluntary and consensual bankruptcy filing, McGuckin

and PVI engineered the Involuntary Petition, based on false and manufactured claims, in order to

obtain an advantage in the Derivative Litigation. When Mr. Gardner filed the Dismissal/Trustee

Motion, McGuckin did not consent to the relief sought or seek to remedy the deficiencies in the

Involuntary Petition. Rather, he continued to defend his conduct and repeatedly affirmed the

validity of the false claims in filings with the Court and during deposition and hearing testimony, thereby exacerbating Mr. Gardner's costs.  PVI also contributed to Mr. Gardner's litigation expenses by taking the frivolous position that the circumstances surrounding the filing of the Involuntary Petition and the statutory eligibility of the Petitioning Creditors were no longer relevant, necessitating multiple meet and confers and two conferences with the Court.

51.    Mr. Gardner's reasonable attorneys' fees and costs are an appropriate measure of sanctions for such misconduct.  *See, e.g.*, *In re Law Center*, 261 B.R. 607, 610-13 (Bankr. M.D. Pa. 2001) (holding that filing of an involuntary petition against a partnership by one of the partners where the only debt alleged was clearly the subject of a bona fide dispute was objectively unreasonable conduct, warranting the award of Rule 9011 sanctions, including attorneys' fees and costs); *In re Klitsch*, 587 B.R. 287, 295-96 (Bankr. M.D. Pa. 2018) (finding that, where bankruptcy petitions were improperly filed, "the minimum sanction needed to deter future violations is the imposition of Movant's attorneys' fees").  Upon an Order from this Court awarding such sanctions, Mr. Gardner will promptly file a fee application for a determination of reasonableness.

## V.    CONCLUSION

52.    WHEREFORE, Mr. Gardner respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and providing Mr. Gardner such other and further relief as is just and proper.

*[Remainder of page intentionally left blank.]*

Dated: March 20, 2020

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Joseph N. Argentina, Jr.*
Joseph N. Argentina, Jr.
Richard E. Coe (admitted *pro hac vice*)
Nicholas S. Feltham (admitted *pro hac vice*)
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Phone: (215) 988-2700
Fax: (215) 988-2757
Joseph.Argentina@ faegredrinker.com
Richard.Coe@ faegredrinker.com
Nicholas.Feltham@ faegredrinker.com

-and-

Vince Slusher (admitted *pro hac vice*)
Kristen L. Perry (admitted *pro hac vice*)
1717 Main Street, Ste. 5400
Dallas, TX 75201-7367
Phone: (469) 357-2500
Fax: (469) 327-0860
Vince.Slusher@ faegredrinker.com
Kristen.Perry@ faegredrinker.com

*Counsel for William Whitfield Gardner*