**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **VASCULAR ACCESS CENTERS, L.P.,** | : | |
| | : | **Bankruptcy No. 19-17117-AMC** |
| **DEBTOR** | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

## I.    INTRODUCTION

In this case, Dilworth Paxson LLP ("Dilworth") initially performed services for, and entered into an engagement letter with, the Debtor's general partner, Vascular Access Centers, LLC ("LLC") which was contemplating a bankruptcy filing. Within days, Dilworth determined that the Debtor was the entity that should be in bankruptcy and proceeded to represent the Debtor in this bankruptcy proceeding. Because the LLC is adverse to the Debtor in certain state court litigation, Dilworth had a potential conflict of interest arising from its initial representation of the LLC. However, given the limited extent and duration of Dilworth's representation of the LLC and the fact that Dilworth never billed, or received payment from, the LLC, the Court will not disqualify Dilworth as counsel to the Debtor under § 327(a) based upon its potential conflict of interest.

The Court also finds that, although Dilworth received a preferential transfer from the Debtor, Dilworth's new value and contemporaneous value defenses exceed the amount of such preference. Accordingly, the Court will not disqualify Dilworth as counsel to the Debtor under § 327(a) based upon its receipt of a preference.

The Court finds, however, that Dilworth clearly violated Fed. R. Bankr. Proc. 2014(a)

("Rule 2014(a)") when it failed to disclose its initial representation of the LLC and the existence

of its engagement letter with the LLC. The Court also finds that Dilworth violated Rule 2014(a)

when it failed to disclose its connections to certain affiliates of Dr. McGuckin ("McGuckin"),

who is the founder and CEO of the Debtor and founder and owner of the LLC. Based upon

Dilworth's flagrant violation of Rule 2014(a), and in order to deter Dilworth from violating Rule

2014(a) in the future, the Court will prospectively deny all fees and costs charged to the Debtor

by Dilworth in this case prior to its actual disclosure to the Court of its connections to the LLC

and McGuckin entities, which did not occur until January 3, 2020.

## II.    FACTUAL HISTORY

On November 12, 2019 ("Petition Date"), an involuntary chapter 11 petition was filed

against the Debtor by three alleged creditors of the Debtor. The Debtor consented to the

involuntary filing on November 13, 2019.

On November 20, 2019, the Debtor filed an Application for Authority to Employ

Dilworth Paxson LLP pursuant to 11 U.S.C. § 327(a), FRBP 2014 and LBR 2014-1

("Application"). The Debtor attached to the Application: (1) a Declaration of Lawrence

McMichael of Dilworth Paxson LLP and Statement Pursuant to Bankruptcy Rules 2014 and

2016(b) ("Declaration"); and (2) an engagement letter dated October 17, 2019 from Dilworth to

the Debtor ("Debtor Engagement Letter") which was signed by the Debtor on November 19,

2019.

In the Declaration, McMichael stated that:

> Dilworth was initially approached by counsel to the Debtor's
> founder and CEO, Dr. James McGuckin, and the Debtor's general
> partner, to evaluate Chapter 11 reorganization options, on or about
> October 15, 2019. Dilworth does not represent either Dr.

> McGuckin or the general partner, and has made it clear to them
> that it will represent only the Debtor in this bankruptcy case.

> Declaration ("Decl.") ¶ 5.

The Declaration also disclosed that, on November 1, 2019, Dilworth received a retainer of $100,000 from the Debtor ("Retainer"). *Id.* at ¶ 6. On November 6, 2019, Dilworth issued an invoice to the Debtor in the amount of $26,411 for services rendered prior to receipt of the Retainer and immediately paid such invoice from the Retainer. *Id.* at ¶ 7. On November 8, 2019, Dilworth again drew down on the Retainer in the amount of $35,000 for fees incurred between November 1, 2019 through November 8, 2019. *Id.* at ¶¶ 7, 8.

As of the Petition Date, Dilworth was owed $19,182.75 for legal services, but wrote off such amount so that the firm was owed zero as of such date. In a later response filed by Dilworth, Dilworth stated that such amount related to services performed between November 8, 2019 and November 12, 2019. *Id.* at ¶ 9; Response 2. Dilworth subsequently applied the remainder of the Retainer in the amount of $38,589 to fees and costs incurred between November 13, 2019 through the date of the order for relief ("Gap Period"). Decl. ¶ 9. Dilworth stated that it had "written off the remaining balance such that the balance owed to Dilworth as of November 25, 2019 will be zero." *Id.*

The following is a chart that sets forth the amounts incurred by, and paid to, Dilworth:

| Date | Invoice Dates of Service | Invoice Amount | Debtor Payment | Balance of Retainer |
|------|--------------------------|----------------|----------------|---------------------|
| 11/1/19 | | | $100,000 | $100,000 |
| 11/6/19 | 10/15/19-10/31/19 | $26,411 | | $73,589 |
| 11/8/19 | 11/1/19-11/8/19 | $35,000 | | $38,589 |
| 11/12/19 | 11/8/19-11/12/19 | $19,182.75 (written off) | | $38,589 |
| 11/20/19 | 11/13/19-11/25/19 | $38,589 | | $0 |
| **Total Fees:** | | **$119,182.75** | | |

The Court entered the order for relief on November 25, 2019 ("Relief Date").

On December 3, 2019, the Debtor filed a Supplemental Declaration of Lawrence G. McMichael of Dilworth Paxson LLP and Statement Pursuant to Bankruptcy Rules 2014 and 2016(b) ("Supplemental Declaration"). In the Supplemental Declaration, McMichael disclosed that, approximately 4 hours before the Court entered the order for relief on November 25, 2019, Dilworth received an additional payment from the Debtor by wire transfer in the amount of $50,000 ("Wire Transfer"). Supplemental Declaration ("Supp. Decl.") ¶ 4.

McMichael stated that Dilworth applied the Wire Transfer to the time charges that were incurred during the Gap Period and that, as of the Relief Date, Dilworth was not owed any amount by the Debtor. *Id.* Accordingly, McMichael stated that Dilworth did not hold or represent any interest adverse to the Debtor. *Id.* at ¶¶ 4, 5.

The Supplemental Declaration, however, is inconsistent with the Declaration. In the Declaration, McMichael stated that Dilworth incurred a total of $38,589 in fees and costs during the Gap Period which was paid off with the remainder of the Retainer, and that the "remaining balance" owed to Dilworth for the Gap Period was going to be written off. Decl. ¶ 9. In addition, Dilworth later stated in its response to the Trustee's objection to the Application that it had total "billings…up to the Relief Date [of November 25, 2019] of $119,182.75." Response 2. It appears, therefore, that the fees and costs incurred by Dilworth prior to the Relief Date totaled $119,182.75.

In the Supplemental Declaration, however, McMichael states that Dilworth incurred additional fees and costs prior to the Relief Date, during the Gap Period, which were not written off. McMichael fails to state the additional amount of fees and costs allegedly incurred by

Dilworth prior to the Relief Date, or the amount of the Wire Transfer used to pay such amount. Based upon the foregoing, it is unclear whether Dilworth actually incurred additional fees and costs during the Gap Period (which would be inconsistent with the Declaration and Dilworth's response) and, if so, whether such amount was written off by Dilworth (as stated by McMichael in the Declaration) or paid with the Wire Transfer (as stated by McMichael in the Supplemental Declaration).

On December 10, 2019, the United States Trustee ("Trustee") filed an objection to the Application ("Objection"). In the Objection, the Trustee stated that he previously had questioned Dilworth regarding the discrepancy between the date of the Debtor Engagement Letter, October 17, 2019, and the date that it was finally executed by the Debtor, November 19, 2019. Objection ¶¶ 21, 22.

In response to the Trustee's inquiry and, for the first time, McMichael disclosed in an email exchange with the Trustee that Dilworth initially had been retained by the Debtor's general partner, the LLC, to represent the LLC in a bankruptcy proceeding pursuant to an engagement letter dated, and signed by the LLC, on October 17, 2019 ("LLC Engagement Letter"). Objection, ¶ 22 and Ex. 2. McMichael forwarded a copy of the LLC Engagement Letter to the Trustee. Objection, Ex. 2.

McMichael also stated in the email exchange that, within days of executing the LLC Engagement Letter, he realized that the Debtor needed to be in bankruptcy, not the LLC, and thereafter acted only on behalf of the Debtor. *Id.* He stated that, on November 11, 2019, Dilworth "amended retroactively" the LLC Engagement Letter to reflect that Dilworth represented the Debtor. The "amended" LLC Engagement Letter (which previously was, and will be, referred to

by the Court as the Debtor Engagement Letter) was retroactively backdated to October 17, 2019 and executed by the Debtor on November 19, 2019. *Id.*

Notably, the Debtor Engagement Letter did not state that it was amending or restating any prior agreement and did not reference the LLC Engagement Letter at all. When Dilworth filed its Application, it only attached the Debtor Engagement Letter, and there was no mention in the Application or the Declaration of the existence of the LLC Engagement Letter.

McMichael also stated in the email exchange that, during calls and meetings with opposing counsel and the Trustee, he has consistently stated that Dilworth only represents the Debtor. *Id.* He also confirmed that Dilworth has only received payments from the Debtor, not the LLC, and that the LLC had not been billed for any services. *Id.* McMichael offered to the Trustee to "put all of this into a revised declaration if you think that it is necessary." *Id.*

In its Objection, the Trustee stated that, based upon certain time entries of Dilworth, it was unclear which entity Dilworth was representing. Objection ¶ 31. In particular, the Trustee was concerned that Dilworth may have provided legal advice to the LLC and McGuckin based upon certain time entries that referred to "Rex" and "MLVI," which were entities affiliated with the LLC and/or McGuckin. *Id.* at ¶¶ 33, 38.

It appears that Rex was a reference to Rex Medical, LP ("Rex"), an entity in which McGuckin has an ownership interest. *Id.* at ¶¶ 34, 35. Apparently, a jury verdict was entered against Rex for $34 million in the Pennsylvania Court of Common Pleas for Philadelphia County on October 23, 2019. *Id.* at ¶ 36.

Specifically, the Trustee noted the following time entries billed by Dilworth in connection with Rex:

> 10/30/19 AMA REVIEW INFORMATION FROM CLIENT RE:
> REX LITIGATION .2 120.00

> 10/31/19 AMA CALL WITH M. TUCCI RE: RETAINER AND
> BEGIN REVIEW OF REX DOCUMENTS .4  240.00
>
> 11/1/19 AMA REVIEW ADDITIONAL REX MEDICAL
> DOCUMENTS .7  420.00
>
> 11/12/19 AMA EMAILS WITH M. WEIS RE: VAC AN [SIC]
> REX HISTORY .2  120.00

*Id.* at n. 4.

It appears that MLVI was a reference to Main Line Vascular Institute, LLC ("MLVI"), an

entity owned either directly or indirectly by Dr. McGuckin. *Id.* at ¶¶ 39, 40. The Trustee noted

the following time entries billed by Dilworth in connection with MLVI:

> 11/5/19 AMA REVIEW EMAILS FROM LGM AND DR.
> MCGUCKIN RE: MLVI BANKRUPTCY STRATEGY .3 180.00
>
> 11/5/19 AMA REVIEW ADDITIONAL MILV [SIC]
> DOCUMENTS FROM CLIENT. .3. 180.00

*Id.* at n. 5.

The Trustee argued that Dilworth's lack of adequate disclosures, conflicts of interest and

adverse interest to the estate prohibits approval of the Application. *Id.* at ¶ 43. Specifically, the

Trustee argued that Dilworth had an obligation under Rule 2014(a) to provide clear and candid

disclosures regarding all of its connections to the debtor, creditors, and parties in interest. *Id.* at

¶ 50. Accordingly, the Trustee asserts that Dilworth was required to disclose that it had been

retained by the LLC and had rendered services in connection with the LLC, Rex, MLVI, and any

other entity related to McGuckin. *Id.* at ¶ 54-55. The Trustee argued that Dilworth is not

permitted to choose which disclosures to make, and that all of Dilworth's connections should

have been disclosed. *Id.* at ¶ 56. Based upon Dilworth's failure to adequately disclose its

connections to the LLC, Rex, MLVI, and other McGuckin entities, the Trustee requested that the Application be denied. *Id.* at ¶ 57.

The Trustee also argued that Dilworth's dual representation of the LLC and the Debtor create a conflict of interest because the Debtor is adverse to, and holds potential claims against, the LLC in connection with the prepetition derivative litigation filed on behalf of the Debtor against the LLC and McGuckin. *Id.* at ¶ 60. As a result, the Trustee argued that Dilworth cannot properly represent the Debtor in investigating and prosecuting potential causes of action against the LLC and McGuckin. *Id.* Based upon Dilworth's undisclosed conflict of interest, the Trustee requested that the Application be denied. *Id.* at ¶ 61.

In addition, the Trustee argued that Dilworth's receipt of an avoidable preference also served as a basis to deny the Application since professionals, who are potential defendants in a preference action, hold an adverse interest to the estate and are, therefore, disinterested. *Id.* at ¶¶ 62, 63. Essentially, the Trustee argued that Dilworth received a preference, and became a creditor of the Debtor, when it rendered services of $26,411 to the Debtor before receiving, and applying, the Retainer of $100,000 toward such invoice. *Id.* at ¶¶ 66, 67.

On January 3, 2020, Dilworth filed a Second Supplemental Declaration of Lawrence McMichael ("Second Declaration") and its response to the Objection ("Response"). In the Second Declaration, McMichael finally disclosed the existence of the LLC Engagement Letter to the Court. Second Declaration ("Sec. Decl.") ¶ 8. He stated that it was signed by the LLC on October 17, 2019, prior to any consultation between Dilworth and the LLC, but "was never acted upon or implemented by the parties" and "was replaced by a corrected engagement letter as of the same date, October 17, 2019, but signed later. " *Id.* at ¶¶ 8, 10. McMichael stated that

Dilworth never rendered legal services to the LLC, never sent an invoice to the LLC, and never received any payment from the LLC. *Id.* at ¶ 9.

McMichael also disclosed in his Second Declaration that:

> *Rex Medical was raised with us by Mr. Bochetto because Dr. McGuckin has an ownership interest in it.* We reviewed certain information about Rex Medical for two purposes: (1) to see if it had any relationship with the Debtor that could impact upon the Debtor's bankruptcy proceedings (it does not) and (2) to consider whether we should also represent Rex Medical. . . We reviewed some information about MLVI for the same reasons as stated above regarding Rex Medical. MLVI is controlled by Dr. McGuckin and we concluded that it would be inappropriate for Dilworth to represent MLVI.

> Sec. Decl. ¶¶ 14,15 (emphasis added.)

In its Response, Dilworth argued that its contact with the LLC, Rex and MLVI did not create an appearance of a conflict of interest and, even if it had, it would not justify Dilworth's disqualification. Response at 3-11. Dilworth also argued that, although Rex and MLVI are affiliates of Dr. McGuckin, "[n]either of these entities are or were Dilworth clients at any time" and neither "executed engagement letters with Dilworth." *Id.* at 10-11. Furthermore, Dilworth stated that:

> The very few time entries that reference either entity involve services provided by Dilworth to the Debtor to determine any impact that these entities might have on the Debtor's restructuring needs.

> *Id.* at 11.

Dilworth also argued that it held defenses to the alleged preferential transfers, including the contemporaneous exchange, ordinary course, and new value defenses under § 547(c). *Id.* at 11-13. Specifically, Dilworth argued that, after it applied the Retainer to satisfy its first invoice totaling $26,411, it subsequently provided legal services worth $54,182.75 and that, of that

amount, Dilworth was not paid for $19,182.75 of such services, which constitutes new value. *Id.* at 12. Dilworth argued therefore, that, after the new value, in the form of unpaid services totaling $19,182.75, is deducted from the alleged preference of $26,411, Dilworth received, at most, a preference of about $7,000. *Id.*

Furthermore, of the prepetition services that Dilworth provided to the Debtor totaling $26,411, Dilworth argued that $9,636 of such services were provided within one week of the Retainer and, therefore, constituted a contemporaneous exchange. *Id.* at 12-13.

On January 13, 2020, the Court held a hearing on the Application and heard from McMichael, who initially made statements to the Court, not under oath, but which he later verified were "accurate and correct." Trial Tr. 65:10-11. McMichael stated that, despite Dilworth's initial intention to represent the LLC pursuant to the LLC Engagement Letter, Dilworth quickly realized that its client needed to be the Debtor and never actually provided any legal services to the LLC, never billed the LLC for legal services, and never received any payments from the LLC. Trial Tr. 25:4-36:4. He also asserted that the LLC Engagement Letter was subsequently revoked and superseded by the Debtor Engagement Letter. *Id.* at 41:10-17.

McMichael also stressed that, when Dilworth prepared the Declaration, he wanted to "be sure that we disclose that we first talked with the general partner." *Id.* at 39:5-7. He then said that paragraph 5 of the Declaration "says, we were first contacted by Mr. Bochetto, representing the general partner about restructuring advice *for the general partner*." *Id.* at 39:13-15 (emphasis added).

McMichael also stated that, in November 2019, Dilworth considered representing Rex as a potential client but ultimately "determined not to undertake the representation." *Id.* at 42:24,

43:6-12. Ms. Aaronson later clarified that Dilworth's first contact with Rex occurred in late October. *Id.* at 51:8-9.

McMichael also said that McGuckin called him about MLVI and that McMichael initially believed that MLVI was a subsidiary of the Debtor. *Id.* at 44:12-20. When he realized that MLVI was not a subsidiary of the Debtor, McMichael told McGuckin that Dilworth could not represent MLVI. *Id.* at 44:22-24. McMichael also acknowledged that "[T]here are some time entries from Ms. Aaronson that were charged to the debtor, because we wanted to see what relationship, if any, of these had to the debtor and what impact they might have on the debtor's case." *Id.* at 45:17-20. At the conclusion of the hearing, the Court requested additional briefing by the Trustee on the legal issues raised by Dilworth in its Response.

On January 27, 2020, the Trustee filed a Supplemental Brief ("Trustee Brief") and argued that Dilworth's disclosures fell short of the mandatory requirements imposed by Rule 2014(a), which required Dilworth to disclose all of the firm's "connections" with the debtor, creditors, or any party in interest, and not just "possible conflicts," as suggested by Dilworth. Trustee Brief, ¶¶ 2-3. The Trustee argued that Dilworth did not have the discretion to selectively omit its initial engagement by the LLC. *Id.* at ¶ 4. Furthermore, the Trustee argued that "one cannot revoke or supersede a contract that was never in existence." *Id.* at ¶ 10. The Trustee also argued that, even if Dilworth's nondisclosures were only careless or inadvertent, Dilworth had an obligation to disclose all possible conflicts of interest. *Id.* at ¶ 15.

In addition, the Trustee argued that Dilworth's prior representation of the LLC created a conflict of interest, since the Debtor had potential claims against the LLC which are property of the estate. *Id.* at ¶¶ 18, 19. Given this conflict of interest, the Trustee asserted that Dilworth's duty of loyalty is necessarily undermined. *Id.* at ¶ 21.

With regard to the alleged preferences, the Trustee disputed that Dilworth provided any contemporaneous value when the Retainer was paid. *Id.* Nor, the Trustee argued, could Dilworth have received the alleged preference in the ordinary course of business, since it received the Retainer prior to the issuance of any invoice for legal services. *Id.* at ¶ 29. Moreover, the Trustee pointed out that the retainer agreement provided that Dilworth would send monthly invoices payable within thirty days, and yet the $26,411 was paid immediately upon being invoiced. *Id.* at ¶ 30. Finally, the Trustee argued that Dilworth's waiver of its outstanding fees of $19,182.75 did not constitute new value. *Id.* at ¶ 33.

On January 29, 2020, Dilworth filed its Third Supplemental Declaration ("Third Declaration"). In the Third Declaration, Anne Aaronson ("Aaronson") stated that, on January 28, 2020, Dilworth was engaged by Rex "for the limited purpose of evaluating certain legal issues and providing a report to Rex Medical of our views on those legal issues." Third Declaration ¶ 4. Aaronson stated that Rex's legal issues were entirely unrelated to the Debtor, Rex was not a creditor of the Debtor, and the Debtor was not a creditor of Rex. *Id.* at ¶¶ 5, 7 and 8. She asserted, therefore, that Dilworth's representation of Rex was not adverse to the Debtor. *Id.* at ¶ 9.

On February 3, 2020, Dilworth filed its Sur-Reply to the Trustee Brief. In its Sur-Reply, Dilworth argued that, even if the firm was required to disclose the LLC Engagement Letter, the Court has broad discretion to fashion an appropriate remedy that would be far less "draconian" than the Trustee's request that Dilworth be disqualified altogether. Sur-Reply ¶ 6. Moreover, Dilworth pointed out that, after the Trustee initially inquired about the discrepancy of the dates on the Engagement Letter, the firm immediately produced all related information and documentation. *Id.* at ¶10.

Dilworth also argued that the Trustee failed to identify any law which contradicts the cases set forth by Dilworth which provide that a payment for services performed within one week of such services constitutes a contemporaneous exchange. *Id.* at ¶ 14. In addition, Dilworth argued that its performance of unpaid services worth $19,182.75 *after* it received the alleged preference constitutes new value (not the subsequent waiver of payment for such services). *Id.* at ¶ 15. Dilworth argued that the wavier of such fees demonstrates that the firm was disinterested as of the Relief Date. *Id.*

On February 7, 2020, the Court entered an order appointing a chapter 11 Trustee in this case, which currently is on appeal. Accordingly, unless that order is reversed on appeal, the term of Dilworth's potential retention by the Debtor effectively ended on February 7, 2020.

## III.    LEGAL ANALYSIS

The Trustee argues that the Application should be denied: (1) under § 327(a) based upon Dilworth's conflict of interest arising from its representation of the LLC and its receipt of a preference; and (2) under Rule 2014(a) based upon Dilworth's failure to adequately disclose its connections to the LLC, Rex and MLVI. In response, Dilworth argues that it has no conflict of interest because the LLC Engagement Letter never took effect since it was amended and restated by the Debtor Engagement Letter and that it holds several defenses to the alleged preference. Dilworth also argues that it adequately disclosed all of the potential conflicts that it has and that, even if the Court determines that Dilworth failed to make adequate disclosures, the Court has discretion to remedy such failure in a less draconian fashion that denying the Application.

The Court finds that, although Dilworth had a potential conflict of interest based upon its initial representation of the LLC, the Court will exercise its discretion and not disqualify Dilworth under § 327(a), based upon Dilworth's limited representation of the LLC. In addition,

the Court finds that Dilworth holds valid defenses to the alleged preference and, therefore, does not have a conflict of interest under § 327(a).

However, the Court finds that Dilworth failed to disclose its connections to the LLC, Rex and MLVI in violation of Rule 2014(a). Because Dilworth did not disclose such connections to the Court until January 3, 2020 and, in order to deter Dilworth from failing to disclose all of its connections to the debtor, creditors and other parties of interest under Rule 2014(a) in the future, the Court will sanction Dilworth for such violation by prospectively denying all of the fees and costs charged to the Debtor by Dilworth in this case prior to January 3, 2020.

## A.    Section 327(a)

Section 327(a) permits a debtor-in-possession to employ attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons[.]" An "adverse interest" is defined as "any economic interest that would tend to lessen the value of the bankruptcy or that would create either an actual or potential dispute in which the estate is a rival claimant." *In re eToys, Inc.,* 331 B.R. 176, 189 (Bankr. D.Del. 2005). A "disinterested person" is defined under § 101(14) as a person who:

> (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

The professional seeking to be retained under § 327(a) bears the burden of establishing that it is "both disinterested and [does] not represent an interest adverse to the estate." *In re Big Mac Marine, Inc.*, 326 B.R. 150, 154 (8th Cir. BAP Cir. 2005) (citing *Interwest Bus. Equip. Inc. v. United States Trustee*, 23 F.3d 311, 318 (10th Cir. 1994)).

In determining whether an attorney holds or represents an interest adverse to the estate, the Third Circuit has held that § 327(a) "mandates disqualification when there is an actual conflict of interest, allows for it when there is a potential conflict, and precludes it based solely on an appearance of conflict." *In re First Jersey Sec., Inc*., 180 F.3d 504, 509 (3d Cir. 1999); *see also In re Marvel Entm't Group, Inc*., 140 F.3d 463, 477 (3d Cir. 1998) (Section 327(a) "presents a *per se* bar to the appointment of a law firm with an actual conflict, and gives the district court wide discretion in deciding whether to approve the appointment of a law firm with a potential conflict."); *In re Pillowtex, Inc*., 304 F.3d 246, 251–52 (3d Cir. 2002); *In re BH & P, Inc*., 949 F.2d 1300, 1316–17 (3d Cir. 1991).

The Third Circuit has held that "a conflict is actual, and hence *per se* disqualifying, if it is likely that a professional will be placed in a position permitting [her] to favor one interest over an impermissibly conflicting interest." *Pillowtex*, 304 F.3d at 251 (citation omitted). The Third Circuit "eschew[s] bright-line rules in the determination whether a given arrangement constitutes an actual or potential conflict of interest." *In re Jade Management Services*, 386 Fed.Appx. 145, 149 (3d Cir. 2010). Accordingly, "denomination of a conflict as 'potential' or 'actual' and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion." *BH&P*, 949 F.2d at 1316–17; *see also In re Martin*, 817 F.2d 175, 182–83 (1st Cir. 1987) ("The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails.... [E]ach situation must be judged prospectively on its own merits.... [H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds.").

A court may approve employment of a professional with a potential conflict "where the possibility that the potential conflict will become actual is remote[.]" *BH & P*, 949 F.2d at 1316. Furthermore, "[s]imultaneous representation of a debtor corporation and the controlling shareholders, although not a disqualifying conflict *per se*, becomes a basis to disqualify counsel when adverse interests either exist or *are likely to develop*." *In re Plaza Hotel Corp.*, 111 B.R. 882, 890 (Bankr. E.D. Cal. 1990) (emphasis added; citations omitted); *see also TWI Int'l, Inc. v. Vanguard Oil & Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y. 1994) ("[A]n attorney that represents a corporation in bankruptcy and its principal is not *per se* interested.") (citation omitted); *In re Hurst Lincoln Mercury, Inc.*, 80 B.R. 894, 895 (Bankr. S.D. Ohio 1987) ("It is fundamental that simultaneous representation of a corporation and its sole stockholder is not in and of itself improper.") (citation omitted).

With regard to preferential transfers, courts also have held that such transfers to a professional "constitute an actual conflict of interest between counsel and the debtor, and would require the firm's disqualification." *In re First Jersey Securities, Inc.*, 180 F.3d 504, 509 (3d Cir. 1999); *see also Pillowtex,* 304 F.3d at n. 5 (since professionals must be disinterested, as defined under § 101(14)(A), if a professional is determined to have received a preference, "its resulting claim for fees would transform it into a prepetition creditor, which would pose a disqualifying conflict.").

### B.    Rule 2014(a)

Rule 2014(a) "effectuates § 327(a)'s disinterestedness requirement, and mandates that a debtor's application to employ the professional 'be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.'" *Jade*, 386 Fed.Appx. at 150

(quoting Rule 2014(a).) The professional seeking to be retained must make "full, complete, and timely disclosure" of all of the professional's connections to the debtor, creditors and any other party in interest. *In re Harris Agency, LLC,* 451 B.R. 378, 390 (Bankr. E.D. Pa. 2011); *see also In re B.E.S. Concrete Prods., Inc.,* 93 B.R. 228, 237 (Bankr. E.D. Cal. 1988).

The Third Circuit has stated that, "[u]nder the rule, '[a]ll facts that *may* be pertinent to a court's determination of whether an attorney is disinterested or holds an adverse interest to the estate must be disclosed.'" *Jade*, 386 Fed.Appx. at 150 (quoting *In re Hathaway Ranch P'ship*, 116 B.R. 208, 219 (C.D.Cal.1990) (emphasis in original; citations omitted).). "These disclosures are not discretionary" and lawyers "cannot pick and choose which connections are irrelevant or trivial." *In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr. W.D. Okl. 1992). Furthermore, "[i]t is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest." *BH&P*, 949 F.2d at 1317; *see also In re TJN, Inc.*, 194 B.R. 400, 403 (Bankr. D.S.C. 1996) (it is not the responsibility of the bankruptcy court or the United States Trustee to "ferret out facts" which F.R.B.P. 2014(a) clearly require professionals to disclose.). Instead, "[t]hat obligation belongs to the party who seeks employment by the estate." *BH&P*, 949 F.2d at 1317.

The Third Circuit also has held that "[n]egligence does not excuse the failure to disclose a possible conflict of interests." *Id.* Accordingly, an attorney's subjective good faith efforts are not the measure of the duty of disclosure under Rule 2014(a) and are irrelevant. *Id.*

Courts have held that professionals "who do not proceed carefully under the requirements of Rule 2014(a) do so at their own risk." *Harris,* 451 B.R. at 391. Violation of Rule 2014(a) alone "is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connection or fee arrangements were materially adverse to the interests of the estate or were *de minimis.*" *EWC*, 138 B.R. at 280 (citing *Woods v. City National Bank & Trust Co.*,

312 U.S. 262, 269 (1941); *see also Harris,* 451 B.R. at 391 ("Failure to disclose relevant

connections is considered so serious that it is an independent basis on which to sanction an

attorney and deny compensation.").

In fact, "[t]he Supreme Court has held that the only way to assure that professionals

maintain the requisite standards of fiduciary conduct is to strictly enforce compliance with the

conflict of interest rules by denial of compensation" because "strict enforcement of the conflict

of interest rules would act to deter violations of fiduciary duties by persons employed for the

estate." *Id.* Moreover, a professional's belated disclosure, as a result of a United States Trustee's

objections, cannot overcome a professional's violation of Rule 2014(a). *See Metropolitan*

*Environmental, Inc.*, 293 B.R. 871, 890 (Bankr. N.D. Ohio 2003).

In addition, if a professional fails to properly disclose a connection under Rule 2014(a),

the professional may still be sanctioned for incomplete disclosures even if proper disclosure

would have shown that the professional was disinterested. *Jacques H. Geisenberger, Jr., P.C. v.*

*DeAngelis*, 2011 WL 4458779 at *6 (M.D. Pa. 2011). Accordingly, "the mere presence of a

conflict, even if no resulting harms had befallen the estate, justif[y] denial of compensation." *Id.*

> **C.    Although the Court Will Not Disqualify Dilworth under § 327(a) for Its
> Potential Conflict of Interest Arising from Its Initial Representation of the LLC, the
> Court Will Sanction Dilworth for Its Failure to Adequately Disclose Its Connections
> to the LLC, Rex and MLVI in Violation of Rule 2014(a)**

> **1.    Conflict of Interest under § 327(a)**

In determining whether Dilworth holds or represents an interest adverse to the estate

under § 327(a), the Court must decide whether Dilworth has an actual conflict of interest, a

potential conflict of interest, or merely an appearance of conflict. *See First Jersey Sec.,* 180 F.3d

at 509. As discussed *supra,* the Court must disqualify Dilworth if it determines that Dilworth has

an actual conflict of interest, may disqualify Dilworth if it determines that Dilworth has a

potential conflict of interest, and may not disqualify Dilworth if it is based solely upon an appearance of conflict. *See id.*

The Trustee argues that Dilworth has an actual conflict of interest based upon its representation of the LLC, which is adverse to the Debtor. *See* Objection ¶¶ 58, 60. Dilworth asserts that it "never represented VAC, LLC" because the LLC Engagement Letter "was corrected" and "never implemented or acted upon." Response 4.

The Court recognizes, at the outset, that the Debtor is adverse to the LLC in this case, because it has an "economic interest that would tend to lessen the value of the bankruptcy" based upon the pending claims filed on behalf of the Debtor against the LLC and McGuckin in the state court derivative litigation. *In re eToys,* 331 B.R. at 189. As a result, Dilworth cannot simultaneously represent both the LLC and the Debtor in this bankruptcy proceeding, because it would place Dilworth in a position permitting it "to favor one interest over an impermissibly conflicting interest." *Pillowtex*, 304 F.3d at 251.

Although Dilworth asserts that it never "implemented" the LLC Engagement Letter and never represented the LLC, it is clear that Dilworth performed services for, and represented, the LLC for a few days in October 2019. On October 15, 2019, Dilworth was approached by the LLC's counsel to represent the LLC in a bankruptcy proceeding, and the firm immediately began to review documents for the LLC. Dilworth sent the LLC Engagement Letter to the LLC on October 17, 2019, and both parties signed the Engagement Letter that day. By the next day, Dilworth concluded that the Debtor was the appropriate party to be in bankruptcy and, from that point on, purported to only represent the Debtor, with the consent of both the LLC and the Debtor. Accordingly, Dilworth performed services for, and represented, the LLC from October

15, 2019 until October 18, 2019 when the firm concluded that the Debtor was the appropriate party to be in bankruptcy.

The Court dismisses Dilworth's assertion that the Debtor Engagement Letter amended and restated the LLC Engagement Letter. The Debtor Engagement Letter makes no mention of the LLC Engagement Letter, nor does it not state that the Debtor Engagement Letter amends or restates any prior agreement. Moreover, it strains credulity to suggest that the Debtor Engagement Letter amended and restated the LLC Engagement Letter when the parties to each letter were totally separate entities.[1]

Accordingly, the Court finds that Dilworth represented the LLC from October 15, 2019, when it was first approached by the LLC's counsel, until the moment on October 18, 2019 when it concluded that the Debtor was the party that should be in bankruptcy. Dilworth represented the Debtor from that moment on October 18, 2019 until February 7, 2020, when the Court entered the order granting the motion to appoint a chapter 11 trustee in this case.

Based upon Dilworth's initial representation of the LLC, at a time when the LLC clearly was adverse to the Debtor, Dilworth had, at a minimum, a potential conflict of interest. However, because Dilworth did not simultaneously represent the LLC and the Debtor, the Court concludes that the Dilworth's potential conflict of interest did not rise to an actual conflict of interest. Throughout the Debtor's bankruptcy proceeding, Dilworth only filed pleadings on behalf of the Debtor, not the LLC, and did not send any invoices to, or receive payment from, the LLC.

In light of the short period of time that Dilworth represented the LLC, which did not overlap with the firm's representation of the Debtor, the Court declines to exercise its discretion to disqualify Dilworth based upon its potential conflict of interest.

---

[1] Dilworth's attempt to characterize the Debtor Engagement Letter as a backdated amendment and restatement of the LLC Engagement Letter is disingenuous and misleading.

With regard to the alleged preference that Dilworth received, the Court finds that Dilworth received an avoidable preferential transfer on November 6, 2019 when it applied $26,411 from the Retainer to immediately pay for services that Dilworth previously performed for the Debtor during the preference period. The ordinary course defense would not apply to such transfer because Dilworth agreed to provide monthly invoices to the Debtor, and the November 6, 2019 invoice, and immediate payment, of $26,411, clearly constitutes an early payment of Dilworth's invoice outside of the ordinary course.

However, Dilworth incurred legal fees and costs totaling $19,182.75 after receiving the $26,411 payment, which were not paid. Accordingly, this amount constitutes new value which must be deducted from the preferential transfer of $26,411. Thus, after application of this new value, Dilworth received a net preference of $7,228.25.

In addition, based upon the evidence and testimony submitted, the Court finds that the Debtor and Dilworth intended that the work performed by Dilworth during the week prior to receipt of the Retainer be part of a contemporaneous exchange for new value. Dilworth, therefore, has adequately demonstrated that, during the one week prior to receiving the preferential transfer, the legal services performed by the firm totaling $9,636 constitutes a contemporaneous exchange. *See In re CCG 1355, Inc.* 276 B.R. 377, 386 (Bankr. D.N.J. 2002). After these legal services are deducted from the net preference, the Court finds that Dilworth did not receive a net preference during the preference period. Accordingly, Dilworth was not a prepetition creditor of the Debtor at the time of the Petition Date and, therefore, will not be disqualified under § 327(a) on such basis.

### 2.    Disclosure Requirements under Rule 2014(a)

The Trustee asserts that Dilworth failed to adequately disclose its connection to the LLC by not disclosing the existence of the LLC Engagement Letter until the Trustee objected to the Application. The Trustee also asserts that Dilworth failed to adequately disclose its connection to Rex and MLVI by not disclosing that it performed services related to these entities on behalf of McGuckin.

In response, Dilworth argues that: (1) it adequately disclosed its connection to the LLC in the Application and Declaration; (2) it only had to disclose potential conflicts and did not need to make disclosures related to Rex and MLVI; and (3) even if the Court finds that Dilworth violated Rule 2014(a), the Court should exercise its discretion and impose a less draconian sanction than disqualification.

Contrary to Dilworth's contention that it had the discretion to disclose only what it believed were potential conflicts of interest (and putting aside that it had a potential conflict arising from its representation of the LLC), the Court agrees with the Trustee that Dilworth failed to fulfill its obligation under Rule 2014(a) to provide full, complete, and timely disclosure of all of Dilworth's *connections* to the Debtor, its creditors and any other party in interest. *See* Rule 2014(a).

### a)   Dilworth's Failure to Disclose Its Connection to the LLC

The Court finds that Dilworth clearly was required to disclose its connection to the LLC. The LLC is a party in interest because it is the Debtor's general partner and, as discussed *supra,* it is adverse to the Debtor. Accordingly, Dilworth was required to disclose that it initially performed services for the LLC in contemplation of the LLC's own bankruptcy filing and that it entered into the LLC Engagement Letter with the LLC on October 17, 2019.

Dilworth argues that it adequately disclosed its connection to the LLC in its Declaration when it stated that:

> Dilworth was initially approached by counsel to the Debtor's
> founder and CEO, Dr. James McGuckin, and the Debtor's general
> partner, to evaluate Chapter 11 reorganization options, on or about
> October 15, 2019. Dilworth does not represent either Dr.
> McGuckin or the general partner, and has made it clear to them
> that it will represent only the Debtor in this bankruptcy case.

Decl. ¶ 5.

However, this disclosure completely omits the critical fact that it was *the LLC*, not the

Debtor, who initially sought bankruptcy representation. In the absence of such disclosure,

paragraph 5 of the Declaration is misleading because it suggests that the Debtor's representatives

approached Dilworth regarding *the Debtor's* reorganization options, not *the LLC's*

reorganization options. Clearly, this statement does not rise to the requisite level of full and

complete disclosure of Dilworth's connection to the LLC required under Rule 2014(a).

In addition, although McMichael testified that paragraph 5 of the Declaration "says, we

were first contacted by Mr. Bochetto, representing the general partner about restructuring advice

*for the general partner,*" paragraph 5 does not say that. *Id.* at 39:13-15 (emphasis added.) The

Declaration completely fails to disclose that Dilworth was first approached by the LLC to

represent it in its own bankruptcy proceeding and that Dilworth entered into the LLC

Engagement Letter with the LLC.

Furthermore, backdating the Debtor Engagement Letter to October 17, 2019 without any

explanation in the Declaration was misleading and, in the absence of any disclosure, incorrectly

reflected that Dilworth sent the Debtor Engagement Letter to the Debtor on October 17, 2019.

The only reason that the Trustee inquired about Dilworth's engagement was the month-long gap

between the date that Dilworth sent the Debtor Engagement Letter to the Debtor and the date that

the Debtor signed it. If not for that discrepancy and the Trustee's diligence, Dilworth's

representation of the LLC would never have come to the Court's attention.

        **b)**        **Dilworth's Failure to Disclose Its Connections to Rex and MLVI**

At the outset, it must be recognized that Rex and MLVI are affiliates of Dr. McGuckin. Response at 10. ("Rex Medical and MLVI are affiliates of Dr. McGuckin…"). Notably, Dilworth admits that "Rex Medical was raised with us by Mr. Bochetto because Dr. McGuckin has an ownership interest in it," and "MLVI is controlled by Dr. McGuckin." Sec. Decl. ¶ 14; Response at 10. McGuckin, of course, is a party in interest under Rule 2014(a) based upon his role as the principal and CEO of the Debtor and principal owner of the Debtor's general partner, the LLC. As a result, Dilworth was required to disclose any connection that it had to McGuckin. Here, it appears that Dilworth either performed legal services directly for McGuckin's affiliates or on behalf of McGuckin. In either event, Dilworth was required under Rule 2014(a) to disclose its connection to these entities.

In defending its failure to disclose its connection to these entities, Dilworth provides inconsistent, conflicting and unclear explanations regarding its connection to these entities which are unsupported by its time entries. In the Second Declaration, McMichael stated that Dilworth:

> reviewed certain information about Rex Medical for two purposes
> (1) to see if it had any relationship with the Debtor that could
> impact upon the Debtor's bankruptcy proceedings (it does not) and
> (2) to consider whether we should represent Rex Medical.

Sec. Decl. ¶ 14.

McMichael stated that Dilworth decided not to represent Rex at that time. *Id.* With regard to MLVI, Dilworth reviewed information about MLVI "for the same reasons as stated above regarding Rex Medical." *Id.* at ¶ 15.

In its Response, Dilworth also suggested that it contemplated representing both entities and stated that disclosure of its discussions with Rex and MLVI "would violate standards of professional conduct" because "[i]nquiries about a potential representation do not establish a

connection with an entity requiring disclosure where such inquiries lead to nothing." Sec. Decl.
10-11. However, if Dilworth was contemplating representing Rex and MLVI, then why did it bill
*the Debtor* for time entries related to these entities?

Dilworth also states in its Response that the "very few time entries that reference either
entity involve services provided by Dilworth to the Debtor to determine any impact that these
entities might have on the Debtor's *restructuring needs*." Sec. Decl. 11 (emphasis added). The
firm provides no further explanation of this statement, which suggests that the Debtor
contemplated obtaining financing from these entities and it is inconsistent with McMichael's
explanation that Dilworth was exploring a potential representation of these entities.

In addition, the time entries billed in connection with these entities is inconsistent with
Dilworth's explanations that the Debtor was trying to determine if it had any relationship with
these entities or trying to obtain financing from these entities. With regard to Rex, Dilworth
reviewed Rex medical documents, information regarding "Rex litigation" and the history
between Rex and "VAC." No explanation is provided for why Dilworth would need to review
any of Rex's medical documents in connection with its representation of the Debtor. Nor is it
clear why Dilworth would need to review information regarding Rex's litigation, which
presumably referred to the October 2019 jury verdict against Rex, since it appears that there is no
connection between such litigation and the Debtor. It also is unclear whether the reference to the
history between "VAC" and Rex was a reference to the history between the LLC and Rex or the
Debtor and Rex, since there does not appear to be any history between the Debtor and Rex. On
the other hand, McGuckin had ownership interests in both Rex and the LLC, so there may have
been some history between those two entities. In any case, contrary to the Second Declaration, it

does not appear that Dilworth performed any work for the Debtor related to either the Debtor's alleged relationship with Rex or the Debtor's alleged interest in obtaining refinancing from Rex.

With regard to MLVI, Dilworth reviewed emails regarding a "MLVI bankruptcy strategy." Again, this time entry does not appear related to any work that Dilworth may have performed in connection with the Debtor's alleged relationship with MLVI or the Debtor's alleged interest in obtaining financing from MLVI.

Going back to McMichael's admission in the Second Declaration that Rex was raised with Dilworth "because McGuckin has an ownership interest in it," and based upon the work that Dilworth actually performed in connection with Rex, it appears that Dilworth was either providing legal services directly to Rex or on behalf of McGuckin. Similarly, given that MLVI was controlled by McGuckin, and based upon the work that Dilworth performed related to MLVI, it appears that Dilworth also was either providing legal services directly to Rex or on behalf of McGuckin. Based upon the foregoing, the Court concludes that Dilworth was required to disclose its connections to Rex and MLVI and violated Rule 2014(a) by failing to do so.

### 3.    Consequences of Dilworth's Violation of Rule 2014(a)

As discussed *supra*, Dilworth had no discretion to decide which connections were irrelevant or trivial. *See EWC,* 138 B.R. at 280. Nor was it the responsibility of the Trustee or the Court "to search the record for possible conflicts of interest." *BH&P*, 949 F.2d at 1317. Here, Dilworth unilaterally decided that it was unnecessary to disclose its initial decision to represent the LLC, the existence of the LLC Engagement Letter, and its connections to McGuckin's affiliates. By failing to disclose these connections, Dilworth proceeded at its own risk and must now face the consequences of such decision. *See Harris,* 451 B.R. at 391.

In addition, Dilworth's alleged subjective good faith efforts to comply with Rule 2014(a) are not the measure of the duty of disclosure under Rule 2014(a) and are, therefore, irrelevant.

*See BH & P*, 949 F.2d at 1317. Moreover, Dilworth's belated disclosure, which only was

provided as a result of the Trustee's Objection, cannot overcome Dilworth's violation of Rule

2014(a). *See Metropolitan Environmental*, 293 B.R. at 890. In fact, Dilworth may still be

sanctioned for these incomplete disclosures, even if proper disclosure would have demonstrated

that Dilworth was disinterested and had no conflict of interest. *Geisenberger*, 2011 WL at *6.

Violation of Rule 2014(a) alone "is enough to disqualify a professional and deny

compensation, regardless of whether the undisclosed connection or fee arrangements were

materially adverse to the interests of the estate or were *de minimis.*" *EWC*, 138 B.R. at 280

(citing *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 269 (1941)). While the Court

declines to exercise its discretion to disqualify Dilworth for its violation of Rule 2014(a), the

Court has determined that it is necessary and appropriate to sanction Dilworth for its blatant

disregard of the disclosure requirements under Rule 2014(a) and to deter Dilworth from violating

Rule 2014(a) in the future. Accordingly, the Court will prospectively deny all fees and costs

charged to the Debtor by Dilworth in this case prior to its actual disclosure to the Court of its

connections to the LLC, Rex and MLVI, which did not occur until January 3, 2020.

## IV.    CONCLUSION

Based upon the foregoing, Dilworth's Application to be retained as Debtor's counsel is

granted. However, based upon Dilworth's flagrant violation of Rule 2014(a), the Court will

prospectively deny all fees and costs charged to the Debtor by Dilworth in this case prior to its

actual disclosure to the Court of its connections to the LLC and McGuckin entities, which did

not occur until January 3, 2020.

Date: April 6, 2020

_____
Honorable Ashely M. Chan