**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| VASCULAR ACCESS CENTERS, L.P., | Case No. 19-17117-AMC |
| Debtor. | |

## DECLARATION OF STEPHEN V. FALANGA, CHAPTER 11 TRUSTEE OF VASCULAR ACCESS CENTERS, L.P.

I, Stephen V. Falanga, of full age, hereby declare as follows:

1.      I am the chapter 11 trustee (the "Trustee") for the bankruptcy estate of the above-captioned debtor, Vascular Access Centers, L.P. (the "Debtor").

2.      I make this Declaration in support of the motion (the "Motion") pursuant to 11 U.S.C. §§ 105(a), 363, and 365, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and Local Bankruptcy Rule 6006-1 for entry of an Order: (a) approving the Equity and Asset Term Sheet (the "Term Sheet") and related Purchase Agreement (the "Purchase Agreement") by and between the Trustee, Endovascular Health Services, LLC ("Buyer") and William Whitfield Gardner ("Gardner"); (b) authorizing and approving the sale of the Debtor's interests in (the "Acquired Equity Interests") certain of the Debtor's non-debtor subsidiaries attached as **Exhibit A** to the Motion (the "Purchased Centers") and other assets (the "Acquired Assets") free and clear of liens, claims, interests, and encumbrances; (c) authorizing and approving the assumption and/or assignment of certain related executory contracts and unexpired leases; (d) waiving the fourteen day stay; and (e) granting other related relief.

3.      The Debtor conducts its business through several limited liability company subsidiaries throughout the United States (the "Centers"), including the Purchased Centers.

4.      The Centers operate and manage outpatient vascular access centers, whereby physician interventionalists perform dialysis access procedures and certain other vascular access procedures on patients with end-stage renal disease and other vascular conditions or diseases.

5.      As set forth in detail in the Motion, the Debtor and the Centers are parties to a settlement agreement (the "<u>DOJ Settlement</u>") with the Civil Division of the United States Attorney's Office for the Southern District of New York ("<u>DOJ</u>"), which requires the Debtor and the Centers to make substantial quarterly payments and comply with a Corporate Integrity Agreement, among other things.

6.      As further set forth in the Motion, the DOJ Settlement also requires the Debtor to pay additional amounts in the event of a sale or partial sale of the Debtor or its assets.

7.      Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the Report of Michael F. Dubin, Monitor (the "<u>Monitor</u>"), dated July 3, 2019 and filed in the case of *William Whitfield Gardner, et al. v. Vascular Access Centers, LLC, et al.*, Case No. 2016-00367, Court of Common Please, Delaware County, Pennsylvania, which discusses the impact of the DOJ Settlement upon the Debtor's business.

8.      After my appointment as Trustee, a Stipulation and Consent Order was entered by the Bankruptcy Court on June 11, 2020 [D.E. No. 395], which authorized the Debtor to continue to honor and perform under the DOJ Settlement and authorized the Government to receive payments as provided for under the Settlement Stipulation.

9.      Due to issues related to the Debtor's bankruptcy and operations including those of the Centers, the Debtor was unable to make two (2) required payments under the DOJ Settlement.

10.      In October 2020, after the DOJ issued a notice of default for the payment due October 1, 2020, which the Debtor lacked the funds to pay, I, as Trustee on behalf of the Debtor,

Gardner (the Debtor's post-petition secured lender), and the DOJ entered into a Stipulation and

Consent Order with respect to the quarterly payment of $201,250, granting the DOJ a first priority,

adequate protection lien against the Debtor's assets to secure payment.  (*See* Stipulation and

Consent Order [D.E. No. 595].)

11.    In January 2021, I, as Trustee on behalf of the Debtor, and Gardner entered into a

Stipulation pursuant to which the Court granted the DOJ a second adequate protection lien

(collectively, the "Adequate Protection Liens") securing the $201,250 payment due on January 1,

2021 pursuant to the DOJ Settlement, which the Debtor lacked funds to pay.  (*See* Stipulation and

Consent Order [D.E. No. 656].)

12.    The Debtor has since not been able to make the required payments and on March

1, 2021, the DOJ issued a notice of intent (the "Notice of Intent") to exercise certain alleged offsets

and other rights pursuant to the DOJ Settlement against receivables due the Centers.  A true copy

of the Notice of Intent is attached hereto as **Exhibit B**.

13.    The DOJ has also applied to the United States District Court for the Southern

District of New York to enter judgment against the VAC Defendants for a sum up to the maximum

amount of $18,360,794 under the DOJ Settlement and has frozen and will potentially offset

accounts receivables due the VAC Centers which are critically needed to continue operations.

14.    In addition, the Debtor has been unable to remain current with accounts payable to

certain vendors critical to the Debtor and the Centers' operations and a significant number of key

employees, including physicians, have departed and none of the remaining physicians are currently

under long-term contracts.  As a result, the Debtor and Centers have suffered significant operating

losses in 2020 and are projected to suffer ongoing losses in the years ahead.

15.    During the previous three (3) weeks, due in part to the default under the DOJ

Settlement and a severe lack of working capital sufficient to operate the Debtor and all the Centers, the Debtor was forced to suspend the operations of the West Orange, Central Jersey, Pittsburgh and Memphis Centers.

16.     In part due to Gardner's providing $400,000 of additional discretionary funding under the prior orders authorizing such funding and pursuant to the Term Sheet, the Debtor is currently operating the Purchased Centers other than Vascular Access Center of Prince George's County, LLC and Vascular Access Center of Atlantic County, LLC while approval of the proposed sale is sought.

17.     The Debtor and the Purchased Centers collectively employ 37 employees, including physicians, nurse practitioners, and other support staff. The Purchased Centers provide critically needed outpatient surgical procedures to patients suffering from acute and life-threatening medical conditions.

18.     In an attempt to save as many remaining jobs as possible, continue to serve the communities in which the Centers operate, and preserve the remaining value of the Debtor and the Purchased Centers as going concerns, it is critical that the Transaction[1] proceed expeditiously to closing.

19.     The Debtor owns a majority of the equity interests in the Purchased Centers as set forth on **Exhibit A** to the Motion.

20.     As the holder of the majority of the equity interests in each of the Purchased Centers, and pursuant to the Operating Agreements for the Purchased Centers, I am seeking authority to enter into the Transactions on behalf of the Debtor.

21.     Gardner is the Debtor's majority-in-interest limited partner, holding approximately

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Motion.

72.5% of the equity in the Debtor.

22.    I have been advised that Gardner also owns one hundred percent (100%) of the interests of Buyer.

23.    Gardner has supported the Debtor and its opportunity to emerge from this process and to date, has loaned the Debtor $3,500,000.

24.    Since the outset of my appointment as chapter 11 trustee of the Debtor, I have continuously engaged in extensive discussions with Gardner regarding a potential restructuring of the debtor or Gardner's potential purchase of all or certain of the Debtor's business and/or assets in an attempt to preserve the Debtor and/or the Centers as a going concern and prevent or reduce the job losses associated with closing the Centers and to maximize recoveries for creditors and other stakeholders.

25.    On March 22, 2021, Buyer, Gardner and I, on behalf of the Debtor, signed the Equity and Asset Purchase Term Sheet (the "Term Sheet") setting forth the principal terms and conditions of Buyer's acquisition of the Acquired Equity Interests and Acquired Assets subject to Buyer's satisfactory completion of due diligence and the documentation of such transaction in the Purchase Agreement.  A true copy of the Term Sheet is attached hereto as **Exhibit C**.

26.    Given the exigencies of the Debtor's current financial operations, the parties are working on negotiating the terms of the Purchase Agreement which will be substantially consistent with the Term Sheet and which shall be submitted to the Court prior to the return date of this Motion.

27.    The DOJ has consented to the Term Sheet and supports the Transaction.  Upon approval of the Transaction by the Court, the DOJ has agreed to release the freeze of the receivables due the Purchased Centers, provided Gardner or the Buyer pay to the DOJ $402,500

in satisfaction of the adequate protection liens.

28.    I believe, in my business judgment, that Buyer has the expertise, experience, and financial capability to consummate the contemplated transaction and continue the operations of the Purchased Centers as a going concern.

29.    In addition, based on Gardner's support efforts to date, I believe the Buyer has the financial capability to provide additional funding needed to support the Purchased Centers through their significant projected financial losses in the coming years.

30.    In the exercise of my business judgment, I believe that a sale of the Acquired Equity Interests and Acquired Assets is in the best interests of the Debtor, its estate, creditors, and other stakeholders.

31.    With the assistance of my professionals, I believe the Debtor's business and its assets have been thoroughly marketed for nearly a year and believe with reasonable confidence based on the efforts of SSG that the pool of potentially interested parties has been fully explored.

32.    Given the current dire financial situation impacting the Debtor and the Centers from the DOJ Settlement and further erosion of working capital, I believe the Buyer's offer to acquire the Acquired Equity Interests and Acquired Assets is the highest and best offer available to save as many remaining jobs as possible and maximize the value of the Debtor and the Purchased Centers as a going concern for the benefit of all of the estate's creditors.

33.    If the sale is not swiftly consummated, due to the lack of additional access to financing and the DOJ offsetting against accounts receivable, the remaining operations of the Debtor will likely have to cease immediately.

34.    The proposed sale to Buyer has been negotiated in good faith as a result of arm's length negotiations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Stephen V. Falanga

Dated: March 26, 2021

# EXHIBIT A

## IN THE COURT OF COMMON PLEAS, DELAWARE COUNTY, PENNSYLVANIA

_____

William Whitfield Gardner, Anish Shah, Rasesh
Shah, Pravin Shah, Veena Shah, and Warren Yu,
On behalf of Vascular Access Centers, L.P.,

        Plaintiffs,

      v.                                    CASE No. 2016-000367

Vascular Access Centers, LLC, and James F.
McGuckin Jr., M.D.,

        Defendants.

_____

**REPORT OF MICHAEL F. DUBIN, MONITOR**

**July 3, 2019**

## Contents

I.    Introduction (3)
II.   Executive Summary (4)
III.  The Company (6)
      i.    Business (6)
      ii.   Management (6)
      iii.  Operations and Structure (6)
      iv.   Business model (7)
      v.    Reimbursements (7)
            a. Medicare (7)
            b. Private Reimbursement/Acute Care Contracts (7)
      vi.   Related Party Transactions (8)
      vii.  Commitments (9)
            a. Capital Leases (9)
            b. Operating Leases (9)
            c. Pension Plan (9)
            d. Executive Contract (10)
IV.   The Engagement (10)
      i.    Purpose (10)
      ii.   Scope (11)
V.    Detailed Financial Analysis and Assessment of the Company (12)
      i.    Financial Position (12)
      ii.   Going Concern Note to the 2018 Financial Statements (13)
      iii.  Solvency (14)
      iv.   Results of Operations (15)
      v.    Cash Flow (17)
      vi.   Analysis of Specific Business Issues (18)
      vii.  Analysis of Company Centers (20)
      viii. Other Matters Affecting Financial Position (22)
      ix.   Prospects (23)
VI.   Other Comments, Observations and Recommendations (27)
VII.  Exhibits
      i.    Compiled Financial Statements as of and for the Years Ended December 31, 2018
            and 2017
      ii.   Internal Financial Statements as of and for the Three Months Ended March 31,
            2019
      iii.  Selected Schedules From the Company's April 2019 and May 2019 MBB
      iv.   Summary Page of Internal Forecast for the Years 2019 and 2020
      v.    Accounts Receivable as of March 31, 2019 and December 31, 2018

## I. Introduction

Report of Monitor, Michael F. Dubin ("Dubin") in accordance with the Order in the Court of Common Pleas of Delaware County, Pennsylvania Civil Action – Law ("Court") dated December 19, 2018 and as amended by the Court's Order of January 16, 2019.

Paragraph 1 of the December 19, 2018 Order appointed Dubin as a Temporary Independent Financial Monitor ("Monitor") for Vascular Access Centers, LP and its subsidiaries ("VAC" or "Company"). The Monitor is to serve until the conclusion of the matter (the referenced litigation), or until the parties agree otherwise, or until further Order of the Court. The December 19, 2018 Order was amended by the January 16, 2019 Order to read "the Monitor shall exercise his best efforts to submit a report to the Court and the Limited Partners within sixty (60) days of this Order assessing VAC's financial condition, including an assessment of VAC's financial solvency." The Order also requires the Monitor to "distribute a monthly report on VAC's financial condition to the Court and all Limited Partners of VAC." The Monitor's work is sometimes referred to as "The Engagement" below.

The date of this submission of the Monitor's Order is July 3, 2019, which is well past the Court's sixty (60) day "best efforts" statement, for a variety of reasons, including, but not limited to:

- The Monitor's engagement letter with VAC was not signed until early in March 2019, soon after the parties to the litigation reached agreement as to the terms of the engagement letter. The Monitor's work at VAC began shortly after the engagement letter was signed;

- Because of the industry, regulatory and financial issues affecting VAC and VAC's business decisions made in the interest of expense management, VAC personnel have needed to address a myriad of issues in the past year. Although VAC personnel did an excellent job responding to the Monitor's many requests for information, the combination of these consequential business decisions and the increase in work required by VAC personnel, especially considering some personnel decisions which substantially increased the volume of work for the remaining VAC personnel, resulted in some delays in providing relevant financial and other business information to the Monitor;

- Because of the financial condition of VAC and attendant cash flow issues, the Company's external Accounting Firm, Metter & Company, was not able to provide the compilation of VAC's 2018 financial statements required by the Monitor to assess VAC's financial condition and solvency, until less than one month ago. In addition, the delay in the receipt of the Company's 2018 compiled financial statements further delayed the Company's production until June 2019, of its March 31, 2019 financial statements, which were also required by the Monitor to assess VAC's financial condition and solvency;

3

- Some of the requested financial information, including the December 31, 2018 financial statements and the Company's cash flow forecast for 2019 and 2020, required modification numerous times due to changes in facts and circumstances;

- With the submission of this Report to the Court, the Monitor will begin to distribute monthly reports to the Court and the Limited Partners of VAC commencing in August 2019 and based upon VAC's July 31, 2019 financial position.

## II. Executive Summary: Assessment of Financial Condition and Solvency of VAC

Although much of the information contained in this Report is as of March 31, 2019 (the reasons for which are described in this Report), for purposes of this Executive Summary, the Monitor obtained and evaluated certain selected key VAC information for April 2019 and May 2019, so as to make the summary as up to date as possible. This Executive Summary is a condensed synopsis of the more comprehensive and thorough information, analysis and assessment that is detailed in this Report and it is suggested that this Report be read in its entirety.

The Company's financial condition is precarious and tenuous. It has closed a significant percentage of its medical centers over the past several years. By any standard, the Company is in "poor financial health." Its liabilities substantially exceed its assets. Its current liabilities significantly exceed its current assets. It has a deficiency in Partners' equity of $17.7 million ($22.5 million if one considers only the actual owners of the Company). Its results of operations for the three months ended March 31, 2019 and the year 2018 were significant losses of ($1.2 million) and ($10.2 million), respectively (although on a cash basis, the losses were significantly less ($600,000) and ($1.8 million), respectively). The Company's current cash flow is challenging to say the least. The significant excess of liabilities over assets reflects the Company's cash flow challenges to some extent. Cash flow issues are the main bailiwick of the Company's Controller and the Company's business decisions are often based on the lack of adequate cash flow. The underlying causes and reasons for the Company's poor financial condition, results of operations and inadequate cash flow are more fully described in this Report, but broadly relate to: (1) the changes in the Medicare reimbursement structure. These changes, coupled with the Company's current business model, make it unable to take advantage of the existing Medicare reimbursement structure because of the lack of adequate capital to make substantive changes in the Company's medical centers ("centers") and their operational status; (2) the derivative litigation that occasioned this Report; and (3) the DOJ litigation and settlement with the Company pursuant to the Company's violation of the U.S. False Claims Act. The consequences, both financial and non-financial, of these three matters, along with the numerous associated and related consequences, continue to serve as a major impediment to significant improvement in the Company's financial condition.

The Company has initiated numerous substantive and significant changes to its operations in an endeavor to maximize revenue by increasing the volume of procedures performed in its centers as well as changing the "mix" of procedures to take advantage of the existing Medicare reimbursement structure. It has also made some considerable expense reductions both in its centers and in its "corporate" and overhead expenses. The Company continues to change personnel, most notably physicians, in an attempt to employ those physicians most capable and competent, hoping to enhance the Company's reputation in the market while concurrently increasing referrals from other physicians in the market.

The Company has prepared cash flow forecasts for the years 2019 and 2020. The cash flow forecasts show expected cash flow after one-time and non-cash items of ($300,000) for 2019 and $2.8 million for 2020. A summary analysis (see pages 25-26 in this Report) of the results of the cash flow forecast, for the balance of 2019 and the year 2020, suggests that the forecasted results for both 2019 and 2020 will be somewhat difficult to achieve. It does seem likely that the Company will, over the next several years, be able to achieve positive cash flow and improve its very fragile financial position. However, considering its many challenges (which are more fully described in this Report), the Company does not, in the opinion of the Monitor, seem likely to quickly (if at all) "earn" its way out of its poor financial position.

As the effects of the Company's major challenges do somewhat abate over time as a result of the Company's efforts and actions, the expected gradual increase in Medicare reimbursement rates, the improvement in the Company's reputation in the market and the attendant anticipated gradual improvement in cash flows, the Company should stabilize. In fact, the Company arguably would be operating profitably were some of its cash flow drain ceased, most notably, the derivative litigation.

The Monitor's assessment is that the Company will somewhat stabilize and therefore "survive" its present fragile financial position, inadequate cash flow and a variety of other challenges. However, it is unlikely that the Company will greatly prosper, achieve substantial profitability and significantly grow without adequate capital. Sufficient capital would allow the Company to facilitate building additional centers and/or converting many of its remaining centers to ambulatory surgical centers ("ASC") from office-based labs ("OBL"), which represent the configuration of most of its existing centers. These conversions would allow the Company to diversify the services it provides, as well as maximize Medicare reimbursement as more fully described in this Report.

Eventually, without the Company being able to raise sufficient capital, demonstrate the proven ability to grow, earn realistic "returns" for its owners and provide career growth and financial incentives for its physicians and other executives, it is likely that these individuals will depart and seek more opportunistic circumstances and the Company's owners will be forced to consider strategic options including potential sale of the Company.

5

The issue of the Company's solvency is complex and not easily summarized. The Monitor's assessment is that the Company is not likely solvent. The issue is discussed in greater detail on pages 14-15 of this Report.

### III. The Company

i. Business:

The Company provides comprehensive hemodialysis ("HD") access maintenance including thrombectomy/thrombolysis, fistulagrams, fistula maturation procedures, vessel mapping, central nervous occlusion treatment and complete catheter services. It also offers an alternative setting for a wide spectrum of vascular interventional procedures, including central venous access for oncology, nutritional and medication delivery, venous insufficiency (including venous ulcer/non-healing ulcer treatments), peripheral arterial disease ("PAD"), limb salvage, uterine fibroid embolization and pain management. These services are provided at the Company's medical centers ("centers"), which are described below in this Report.

ii. Management:

*Dr. James F. McGuckin, MD, FSIR – General Partner, Chief Executive Officer and Chief Medical Officer*

Dr. McGuckin founded the Company in 2005, currently serves as the Company's Chief Executive Officer, and is the sole owner and manager of the Company's General Partner.

iii. Operations and Structure:

The Company contracts most of its centers' physician/provider services with Philadelphia Vascular Institute, LLC ("PVI"), a Pennsylvania limited liability company whose sole member and manager is Dr. McGuckin. Through a professional services agreement with the Company, PVI provides most of the Company's physician staffing needs. PVI was originally formed with its sole purpose being to provide the Company access to physician coverage. Due to corporate medical regulations, there are many states that prohibit a corporation from employing providers. PVI employs the physicians and supplies them to the Company as independent contractors pursuant to a professional services agreement. The Company generally staffs its centers with PVI-employed physicians. The Company executes management and billing services agreements with each of the centers to provide centralized management and oversight and healthcare billing services.

6

iv. Business Model:

The centers currently operate as the office-based labs ("OBL") category for reimbursement established by the Center for Medicare & Medicaid Services ("CMS"). The OBL model falls under the physician office global billing structure. The Company believes this model historically made the most sense, as it allowed for non-interventional referring physicians/practices to hold minority equity positions in the subsidiaries that run the centers, and provided a more favorable reimbursement fee schedule for the services offered than any of the other reimbursement categories. Additionally, the legal and regulatory compliance requirements for OBLs are less arduous than those for ambulatory surgery centers ("ASC") and, therefore, OBLs cost significantly less overall to build and bring to market than ASCs.

v. Reimbursements:

a. *Medicare*

The Social Security Act provides that U.S. citizens and resident aliens who are over the age of 65, who are disabled under age 65, or who are diagnosed with End Stage Renal Disease ("ESRD") are entitled to Medicare coverage.  Medicare coverage is secondary for patients who have qualifying employer-based health insurance. After a period, Medicare becomes the primary coverage for such patients, and the patient's other health insurance generally pays applicable Medicare coinsurance payments and deductibles. Medicare currently comprises about 62%-65% of the Company's total reimbursement across all services lines.

b. *Private Reimbursement/Acute Care Contracts*

Before Medicare becomes a patient's primary payor, if a patient has private health insurance coverage, then the patient's own insurance plan or other health care coverage pays for his or her treatments. Reimbursement from private payors covers most of the remaining 35% of the patients to whom the Company provides care; however, this private reimbursement may represent significantly more than 35-38% of the Company's net revenues because reimbursement rates from these private payors are often significantly higher than the rates paid by Medicare. After Medicare becomes a patient's primary payor, private secondary payors generally reimburse the Company for this patient's co-payment, which is 20% of the applicable Medicare rate.

In January 2017, CMS implemented a significant reduction in reimbursement of HD access-related procedures. This resulted in an average overall reimbursement reduction for HD services performed by the Company, of about 30%.  While PAD remains at a higher reimbursement rate than HD in the OBL model, the Company estimates that HD access procedures will, in 2019, comprise approximately 80% of the Company's overall case volume and approximately 50% of

its total revenues and PAD, the second largest service line, will generate 13% of cases by volume and most of the remaining revenue.

In the Company's opinion, the changes in the reimbursement for HD access procedures have made the current OBL model unsustainable. Management of the Company believes that in order for the Company to have an opportunity for future success, many of the centers must be converted from OBLs to ASCs, in order to to adopt the more favorable ASC reimbursement fee schedule for HD. The Company plans to execute such conversion by acquiring existing ASCs in the centers' current markets or leasing new properties and building out those properties to meet state and federal ASC regulatory and clinical compliance parameters. The Company intends that the existing centers would continue to operate as usual in their existing space until the new ASC space is acquired or developed.

The Company plans to transition the conversion of the centers from OBLs to ASCs using an interim hybrid model, whereby both the OBL operating subsidiary and the new ASC operating subsidiary would share the same new space. This hybrid model would allow the OBL center to operate on certain days, thereby capitalizing on the more favorable OBL Medicare reimbursement on PAD services, and the ASC center to operate on the opposing days, in order to maximize the more favorable ASC Medicare reimbursement for HD. The Company expects to use the hybrid model until the fee schedule equalizes, at which time it is anticipated the Company will only have ASCs.

vi. Related Party Transactions:

The General Partner of VAC, Vascular Access Centers, LLC, receives management fees from the centers. Reasonable costs and expenses paid to third parties and incurred in connection with the business and affairs of the Company are considered to be Company expenses and the General Partner and its Affiliates are entitled to reimbursement to the extent they pay such expenses. The General Partner is authorized to cause the Company to obtain management services from Affiliates or some or all of the Partners and such services are to be reasonable arm's-length charges.

During 2018 and 2017, the Company paid $9,607,000 and $13,865,000 in fees and reimbursements to Vascular Access centers, LLC and PVI.

The Company also had a management services agreement throughout October 2017 with four physician practices owned by the General Partner. The agreement called for certain management, personnel, finance, administrative and billing services sufficient to operate, manage and supervise operations of the Companies. Fees paid for these services were $279,000 in 2017. During 2017, the Company billed $7,878,000 in fees and expenses, related to the above agreement. The agreement was canceled on October 13, 2017.

vii. Commitments:

a. *Capital Leases*

The Company has acquired equipment under the provisions of long-term leases. The following schedule shows the future minimum lease payments under the capital leases:

Year Ended December 31,

| | | |
|---|---|---:|
| 2019 | $ | 571,000 |
| 2020 | | 559,000 |
| 2021 | | 469,000 |
| 2022 | | 8,000 |
| Total | | 1,607,000 |

b. *Operating Leases*

The Company has a number of operating lease agreements primarily relating to the lease of surgical offices and equipment. These leases are mainly non-cancelable and expire on various dates through 2025. The following is a schedule of future minimum lease payments required under the operating leases that have initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2018:

| | | |
|---|---|---:|
| 2019 | $ | 2,298,000 |
| 2020 | | 1,943,000 |
| 2021 | | 1,287,000 |
| 2022 | | 483,000 |
| 2023 | | 260,000 |
| Thereafter | | 377,000 |
| Total | | 6,648,000 |

c. *Pension Plan*

The Company maintains a salary reduction/profit-sharing plan under the provisions of Section 401(k) of the Internal Revenue Code. The Company provided for contributions in the amounts of $211,000 in 2018 and $180,000 in 2017.

d. *Executive Contract*

A Chief Executive Officer ("CEO") contract was executed by the General Partner with an effective date of January 1, 2007. This agreement was subsequently amended on January 1, 2010 to include a deferred component. The annual compensation was originally limited to $350,000. The 2010 amendment reduced base compensation to $200,000 per year during the deferral period, beginning in 2007 through February 2010. Effective March 1, 2010, the Chief Executive Officer was then contracted to receive annual compensation of $200,000 adjusted under various circumstances. The CEO was paid $25,000 in current compensation per month effective January 2010. Bonus payments during that period totaled $14,000. The deferred compensation covering the period January 2007 through February 2010 remains payable when the Company's cash flow permits, but no later than upon a sale of substantially all of the Company's assets or equity, with interest accruing at 9%. Interest on the unpaid amount accrued and included in the consolidated statements of operations in 2018 and 2017 was $182,000 and $167,000, respectively. The Chief Executive Officer contract was amended beginning March 1, 2019. The compensation (base salary) is at the rate of zero dollars per year. The CEO is eligible for a discretionary bonus up to the amount of the difference between the base salary and the reduced salary ("differential") plus an amount equal to interest on the differential at an annual rate of (9%).


## IV. <u>The Engagement</u>

i. Purpose:

The engagement was performed for the purpose of understanding and assessing VAC's financial condition and solvency ("assessment") so as to provide the Court with an independent and objective assessment of the financial position and solvency of VAC. As discussed above, there were numerous facts and circumstances that delayed the assessment. Since an assessment of financial condition relates to a period in time, and since the Company prepares actual historical internal financial statements only on a quarterly basis, and the preparation of the financial statements occurs a fairly significant period of time subsequent to the end of each calendar quarter, the most recent assessment practical was of the Company's March 31, 2019 quarterly financial statements. Although the Company does prepare internal financial statements quarterly, its process does not necessarily apply all of its internal reconciling, adjusting and estimating procedures that are applied to its annual financial statements, nor does the Company's external accounting firm, Metter & Company, perform a compilation of the quarterly financial statements as they do for the annual financial statements. Therefore, some portion of the assessment and attendant analysis does consider and rely upon the Company's financial statements for the year ended December 31, 2018.

ii. Scope:

The Assessment was based upon the Monitor's (the "Monitor" includes Michael F. Dubin and the Monitor's Assistant, Matthew Schoettler, who performed work at the direction of the Monitor) reading, review, analysis and evaluation of numerous documents and sources of information, including:

- The litigation related documents and Court filings over the past several years, including reports of various expert witnesses;

- Company prepared monthly, quarterly and annual Monthly Business Briefings ("MBB") for various periods in 2017, 2018 and 2019;

- Company prepared trial balances, schedules, accounting and financial analyses, etc.;

- Company prepared daily and monthly cash flow worksheets and forecasts;

- Company prepared analyses of its centers where it performs medical procedures;

- Company prepared forecasts and projections for various periods over the last few years.

- Annual financial statements of the Company, compiled by the Company's external accountants, for the last four years;

- Agreements and settlements to which the Company is a party, including the agreements and settlement with the Department of Justice ("DOJ"), consultants, physicians and other miscellaneous agreements;

- Valuation (reports) of the Company prepared by external valuation experts; and

- Selected correspondence from the Company's CEO to the Company's Limited Partners.


At the request of and pursuant to an agreement between Attorneys for both the Plaintiffs and Defendants, the Monitor met, prior to the start of the "fieldwork," on an e*x parte* basis, individually, with Attorneys for the Plaintiffs and the Defendants;

The Monitor conducted meetings and interviews with members of VAC's executive team.

The Monitor performed limited consulting procedures with respect to certain of the Company's financial statements, trial balances, records, schedules and transactions in order to understand the Company's financial statements and facilitate this consulting engagement. The Monitor had no access to centers owned by the General Partner. These consulting procedures were performed for the three months ended March 31, 2019 and the years 2018, 2017, and selected years prior to 2017.

The engagement is a consulting engagement and is not:

11

- Work performed in accordance with AICPA standards (despite the Monitor being a CPA);

- Any type of forensic audit;

- A judgment with respect to any legal matters that will ultimately be decided by the Court.


Amounts included in this Report are generally rounded and stated at approximate amounts. Comparisons between periods are based on annualized amounts when appropriate.


## V. Detailed Financial Analysis and Assessment of the Company

i. Financial Position:

The Company's actual financial condition at March 31, 2019 is fragile. Aside from property and equipment and some limited miscellaneous other assets, its principal source of liquidity is collection of its accounts receivable ("A/R") of $4.2 million, due primarily from Medicare and private insurance. (A/R is discussed in more detail below). Professional supplies of $1.5 million are significant, serving as supplies to be used in performing medical procedures which, along with physician services, generate A/R. The Company's cash balance is negligible. However, the Company's obligations are varied, substantial and require cash to satisfy. Current liabilities, meaning obligations that are considered to be due and payable within one year, aggregate $8.2 million, exclusive of a loan to the Company of $500,000 by its CEO. Other liabilities of $5.2 million, which are classified as long-term, are obligations which will negatively affect the Company's cash flow.

As stated above, A/R is the Company's most important and largest cash generating asset. Because of that, the Monitor performed procedures to understand how this asset is determined, including gaining an understanding of the process by which VAC recognizes revenue and calculates the A/R. Based on their experience, VAC's management expects to collect about 41% of their billings (which also represents about 80+% of the Medicare allowable reimbursement), considering contractual allowances, retroactive adjustments, audits, billing reviews and other matters. This estimate factors in VAC's estimate that Medicare accounts for approximately 62%-65% of all billings and reimburses at government set specific rate for procedures. Private insurance or other "non-Medicare" payors account for approximately 35%-38% of all billings and reimburse at different amounts than Medicare. Private Pay cases account for less than 1% of billings and reimburse varied amounts. A/R balances were $4,215,733 and $4,544,662 at March 31, 2019 and December 31, 2018, respectively, as reflected on the Exhibits attached to this Report. The Company determines its A/R by calculating the difference between revenue and collections per center and using that difference to adjust prior period A/R balances. A/R balances materially agree to the Company's financial statements at their respective dates.

The Company's equity position at March 31, 2019 reflects a deficiency in total members' (also referred to as "partners") equity of approximately $17.7 million, which is actually somewhat worse because the deficit attributable to the actual partners of the Company is ($22.5 million), which is offset by $4.8 million of partners' equity attributable to individuals (generally physicians) who own equity interest in some of the Company's centers but typically own no interest in the Company itself (this occurs because accounting rules require consolidation of these physicians' interests in the Company's financial statements). The Company's financial position is further exacerbated by its redeemable preferred stock of $14.4 million, the vast majority of which is owned by the Company's Limited Partners, including some individuals who represent the Plaintiffs in the derivative litigation against the Company and who have the right to demand redemption of the preferred stock in cash at any time. There are certain limitations as to the ability of the owners of the preferred stock to demand cash redemption, such as unavailability of funds that are otherwise required to pay taxes, debt payments and certain other expenses of the Company. However, a choice by the Limited Partners to demand cash redemption of their preferred stock by the Company would dramatically impair the Company's ability to operate effectively, if not actually causing the Company to potentially cease operations. Notwithstanding, the preferred stock is carried as a liability (as opposed to equity) on the Company's balance sheet. As such, the Company's liabilities, $28.3 million, exceed its assets of $10.6 million by $17.7 million as of March 31, 2019.

It should be noted that the Company's consolidated financial statements as of December 31, 2018, compiled by Metter & Company and issued June 12, 2019, include a note to the financial statements (as shown below) which is a consequence of the doubt expressed by the outside accountants as to the Company's ability to continue as a going concern through June 12, 2020 (twelve months subsequent to the date of issuance of the financial statements).

ii. Going Concern Note to the 2018 Financial Statements:

The financial statements have been prepared on a going concern basis which assumes the Company will be able to realize its assets and discharge its liabilities in the normal course of business for the foreseeable future.  The Company had losses of $9,518,255 in 2018 and $2,881,888 in 2017.

Management believes these losses are the result of a change in Medicare reimbursements in early 2017 coupled with reductions in volume related to the Limited Partnership derivative lawsuit and the Department of Justice settlement. This condition raises substantial doubt about the Company's ability to continue as a going concern within the next twelve months from the date these financial statements are available to be issued, due to the fact that they may be unable to generate enough cash flow to meet future obligations.

13

Management intends to finance operating costs over the next twelve months with existing cash on hand and loans from its members. Management is also working to secure external financing. The Company's ability to obtain loans from its members and the new financing is not known at this time.

iii. Solvency:

In order to evaluate the solvency of VAC at March 31, 2019, it is first necessary to define the term and consider what definition is most applicable to VAC, since there is no agreed-upon definition of solvency in literature dealing with financial matters, exclusive of the definition in the U.S. Bankruptcy Code.

Many of the following definitions are similar and warrant analysis with respect to VAC:

- (Wikipedia) Solvency, in finance or business, is the degree to which the current assets of an individual or entity exceed the current liabilities of that individual or entity;

- (Standard dictionary) The possession of assets in excess of liabilities; the ability to pay one's debts;

- (Merriam Webster) Solvency is a company's ability to pay its debts as they become due;

The definitions above can be summarized as follows:

1. The excess of current assets over current liabilities;

2. The excess of assets over liabilities;

3. The ability to pay one's debts.

Based on the financial position of VAC, the answers to #1 and #2 very clearly suggest VAC is insolvent since its current liabilities exceed its current assets and its total liabilities exceed its total assets. As regards #3, this is a judgment call. VAC is paying its debts, but the excess of current liabilities over current assets and the cash flow difficulties described below in this Report certainly suggest that VAC is generally not necessarily paying its debts as they become due.

The U.S. Bankruptcy Code views solvency somewhat differently in that its definition is actually a definition of *insolvency*, as follows:

- (U.S. Bankruptcy Code – Insolvency) With reference to a partnership, financial condition such that the sum of such partnership debts is greater than the aggregate of, at a fair valuation:

14

     o  All of such partnership's property;

     o  The sum of the excess of the value of each general partner's non-partnership property over such partner's non-partnership debts;

This definition is somewhat problematic because:

1. The Bankruptcy Code introduces the term "fair valuation" which is not used in the other standard definitions. "Fair valuation" generally implies a market approach rather than a book value (historical cost basis) approach; and

2. The Monitor has no information related to the General Partner of VAC.

As regards #1, it should be noted that the Company did actually engage an independent valuation firm to do a "fair valuation" at December 1, 2018. This valuation was done in connection with the DOJ litigation and settlement. The valuation report made it clear that the valuation was on a "non-marketable and non-controlling interest basis," which would not necessarily seem to be a "fair valuation" as defined by the Bankruptcy Code. The valuation determined that the Company had a significant fair value at December 1, 2018. The Company ultimately chose to use the assets versus liabilities definition although the calculation was made on a VAC subsidiary-by-subsidiary basis since the DOJ settlement involved warranties by individual subsidiaries. There does not appear to be a reason, for the purposes of this analysis, to apply the assets versus liabilities test on other than an entity (entire Company) basis.

A "fair valuation" (which would require an independent valuation expert) would value the entity's cash flows or apply a "market" based approach, but it was out of the scope of this Engagement to postulate the value of the Company's cash flows in the market, or determine a "market" valuation, although it is certainly conceivable that a buyer might find value in the Company because of the ability to eliminate a material amount of the Company's administrative and/or operating expenses.

As such, based on all of the potential definitions, the Monitor's opinion is that, in its present condition, the Company is likely not solvent because the Monitor believes that the liabilities over assets test is the most reliable and the Company's excess of liabilities over assets is substantial. However, were the Company to raise capital and generate significant income, it is conceivable that it could achieve solvency.

iv. Results of Operations:

The Company continues to operate under some difficult constraints, most notably the significant changes in Medicare reimbursement rates which became effective in 2017, the ramifications of

the DOJ litigation and settlement, which occurred in 2018 and the derivative litigation (which has occasioned this Report to the Court) which commenced in 2016. All of these matters (which are described in more detail later in this Report) have required substantial resources of the Company, including cash and time and effort of VAC employees. However, the DOJ litigation and the derivative litigation have required the Company not only to expend cash, but have dramatically affected the Company in the market, since the DOJ litigation and derivative litigation have apparently caused many of the Company's physicians to leave the Company, some of whom operated the more profitable Company centers, and referrals to VAC centers decreased significantly, and in some cases, precipitously, because of the adverse publicity related to the DOJ litigation. In fact, some of the Company's centers actually closed in the year ended June 30, 2019. These events and circumstances have substantively and negatively affected the Company's revenues and results of operations.

Management of the Company has reacted to its loss of physicians by actively recruiting new physicians, forming in one case, a joint venture with an existing unrelated physician group, rotating physicians among centers, where feasible and practical, and in some cases, simply closing centers that are deemed unsustainable, not profitable or incapable of being profitable. Management has also initiated substantial expense reduction actions, including layoffs of numerous employees, reduction in and/or deferral of compensation for highly paid and/or key employees, consolidation of medical, clerical and administrative staff where appropriate and outright reductions in various other expenses deemed non-essential. The Company's management and physicians have also worked hard to increase the percentage of medical procedures ("cases") the Company performs for which insurance reimbursement has been and is far more favorable e.g. peripheral artery disease ("PAD") cases as opposed to hemodialysis cases ("HD"). However, notwithstanding the significant efforts expended and actions taken to improve, results of operations and cash flows are still suffering.

To be more specific, the Company's revenues for the three months ended March 31, 2019 were $8.6 million. By comparison, revenues for the three months ended March 31, 2019 (annualized), the year ended December 31, 2018 and the year ended December 31, 2017 were $34.3 million, $44.4 million and $58 million, respectively, which represented decreases of 22.7% and 23.4% from each of those respective prior periods. The volume of cases in 2018 decreased by 14% and revenue per case decreased by 11% compared to 2017. Results of operations for the three months ended March 31, 2019 (the latest period for which interim financial results are available) and the year ended December 31, 2018 were losses of approximately $1.2 million and $10.2 million, respectively. However, a substantial portion of those losses was comprised of non-cash items e.g. depreciation, amortization, accretion of interest expense, impairment of certain assets, etc. and/or non-recurring items e.g. a $3.8 million settlement of the DOJ litigation, a gain of $800,000 relating to the settlement of litigation involving the Company's closed Georgia center, $225,000 in reimbursement paid to the federal government related to overbilling Medicare by the Company's Pittsburgh center, and $750,000 of income related to restructuring

16

various physician contracts in several of the Company's centers. Adjusting for these non-cash and one-time items, the Company's losses for the three months ended March 31, 2019 and December 31, 2018 are estimated as ($600,000) and ($1.8 million), respectively. The Company's financial statements for the three months ended March 31, 2019 and the years ended December 31, 2018 and 2017 are attached as Exhibits to this Report.

v. Cash Flow:

The Company's cash flow has been greatly impacted by the events and circumstances described below. The Company manages cash on a daily basis with the Controller often spending the majority of his time managing the Company's limited cash. The Company utilizes both daily and monthly internal cash projections. Cash has generally not been adequate to pay all of the Company's expenses and obligations when they are technically due, so many of the more flexible payments e.g. physicians' incentives, 401(k) payments, vendors, etc. are strategically deferred. There is less flexibility with respect to matters governed by law or regulations, such as payroll, litigation matters, DOJ matters, rent, etc.

For the year ended December 31, 2018, the Company experienced negative cash flow from "normal" operations (i.e. exclusive of unusual litigation expenses, penalties, non-cash items, one-time costs, etc.) of approximately ($1.8 million). Negative cash flow from "normal" operations in the first quarter of 2019 was approximately ($600,000), which was somewhat higher than the average negative cash flow of the average quarter in 2018. Management expects that the changes, improvements and actions that it has taken, as discussed above, will begin to significantly improve the Company's cash flow from operations.

The Company has prepared detailed forecasts for the balance of 2019 and for the year 2020. The forecasts have been prepared both in the aggregate and for each of the Company's centers and are detailed by volume of cases performed for each service provided by the Company e.g. PAD, HD and vein cases, etc. as well as expected reimbursement by case, based on current and forecasted Medicare, private and other insurance reimbursement rates, considering center location, physician, "acuity" and other pertinent factors. Based on the Company's internal forecast, cash flow from "normal" operations (referred to as "subtotal profit" on the forecast) is expected to increase to $1.6 million for 2019 and $5.3 million for 2020. However, the other costs that will continue to affect the Company's cash flow e.g. litigation, penalties, costs of compliance with DOJ litigation, various agreements and settlements and "one-time" costs and expenses, etc. are forecasted to be substantial. Many of these costs, e.g. the derivative litigation, are extremely difficult to estimate or forecast. The Company's forecast for cash flow for 2019 and 2020, inclusive of all expected cash outflows, is ($300,000) for 2019, but increasing to $2.8 million for 2020. The Company's forecasts are discussed more in detail below.

17

vi. Analysis of Specific Business Issues:

Although there are a limited number of companies that provide all of the specific services in the health care sector in which VAC operates, several of these companies are extremely large (some hundreds of times the size of VAC) and some are well established, well capitalized public companies. In addition, there are hundreds if not thousands of hospitals that provide at least some, if not all, of the services provided by the Company. As such, the competitive landscape for the Company is challenging. In addition, the health care sector itself is under significant continuing scrutiny and perceived pressure, if not actual "assault" from politicians, government regulations and other special interest groups, as health care costs continue to rise, all of which serves as a "lightning rod" for the many parties.

The Company has experienced some fairly serious negative incidents and circumstances in the past two to three years. These include the aforementioned change in Medicare insurance reimbursement rates, the DOJ litigation resulting in the imposition of millions of dollars of fines and penalties, the derivative litigation which has been a significant drain on cash flow as well as having had a deleterious effect on the Company's physicians and employees, and certain other business issues. As previously alluded to, each of these events have affected the Company in a substantive and momentous manner, negatively affecting the Company's cash flow, financial positions and liquidity, and sometimes well beyond the immediate dollar impact, and are described below:

- Medicare reimbursement rates – the majority of health care providers are significantly affected by insurance reimbursement rates. VAC is no exception. Companies that provide a single service are potentially most affected by insurance reimbursement rates. Companies such as VAC, which provide a suite of services, do have some flexibility to alter their service mix although this is not always practical or feasible. As regards VAC, the 2017 Medicare rate changes substantially reduced the reimbursement for HD services an average of 30%, and HD represented by volume, about 70% of the Company's cases. PAD services were largely unaffected by the 2017 reduction in Medicare reimbursement rates and in fact, have somewhat increased in the last several years. VAC has reacted to these reimbursement rate changes by changing its service mix, increasing the volume and percentage of PAD procedures on an absolute basis and as a percentage of the total procedures performed. Medicare reimbursement rates also depend on the type of facility that perform these services. In order to maximize Medicare reimbursements, the Company would need to convert its facilities from its current model of OBLs to ASCs. Furthermore, in order to capitalize on more favorable rates for HD services in ASCs and virtually all other services (including PAD) in OBLs, the Company would then operate the centers as "hybrid" centers, wherein HD services would be performed on days the center operated as an ASC and all other services would be performed on days the center operated as an OBL. However, building and/or converting the Company's centers to ASC centers requires substantial capital, far more than the Company has or is likely able to

18

generate or raise from outside sources given its present circumstances. In addition, certain states e.g. Pennsylvania now require all new centers built in PA to be built and licensed as ASCs. Other states are showing signs of following the same licensing path. In New Jersey, existing facilities are "grandfathered" but if you move or sell, you must rebuild as an ASC. In Florida, the law is "trending" towards requiring any vascular procedure to be performed in an ASC and other centers may need to convert. Although the Company believes that it will prevail in its existing licensing matters, there are numerous challenges that must be met, including political influence being exerted by hospitals or other entities that would be negatively affected by licensing of facilities such as VAC that pose a competitive threat, the difficulty in dealing with a myriad of states and state agencies that view and approach the licensing issues differently, and perhaps most importantly, the financial challenges associated with conversion of existing facilities and/or building new facilities;

- Violation of the U.S. False Claims Act with respect to the Company's Medicare reimbursement claims Department of Justice settlement – the DOJ settlement requires significant cash to pay fines of $3.8 million through 2023. However, the settlement also provides for potential additional payments of $14.6 million through 2023 in the event that VAC's annual revenues exceed $48.5 million. The settlement also requires VAC to make additional payments in the event of a sale or partial sale of the Company or its assets. As such, this $14.6 million of potential payments serves as an impediment to external financing or sale of the Company. Further limiting the opportunity for sale is the Company's present poor financial condition which would eliminate the potential by a "financial buyer" i.e. a buyer not already in the industry or a related industry, as opposed to a "strategic buyer" seeking to augment or grow its existing service offerings. There are annual termination amounts ranging from $5.9 million in 2019 to $9.1 million in 2023, which, if paid by VAC, eliminate all future liability of VAC to the DOJ. As previously described, the negative publicity of the Medicare issue and the DOJ settlement have adversely affected VAC's physicians and employees;

- Other matters related to or caused by the settlement of the DOJ litigation—as part of the settlement of the litigation, the Company is required to:

  o Enter into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services. The Company expects that compliance with the CIA will require substantial internal resources as well as external consulting services from an independent review organization ("IRO") and outside counsel, which will cost the Company a total of $800,000 in 2019 and 2020;

19

- o Pay the legal costs (expected to total $200,000 in 2019 and 2020) of the "Relators" (those individuals which were in effect the "whistleblowers" with respect to the Company's violations of the False Claims Act);

- o Obtain an audit or a review of the Company's financial statements starting with calendar year 2019, by an independent CPA firm, whose services are estimated to cost at least $50,000 annually;

- Derivative litigation – the derivative litigation is estimated to have cost the Company hundreds of thousands if not millions of dollars (the legal bills are privileged and not available to the Monitor). It is possible that substantially more litigation costs will be incurred with respect to this matter if the litigation continues for a long period of time. In addition, the derivative litigation has occasioned the assignment of a Monitor, which is a significant expense for the Company. Perhaps more importantly, the uncertainty of the derivative litigation has caused unrest and ostensibly some key physician resignations, some of whom have begun to compete with the Company. In addition, the loss of physicians has significantly affected the Company's revenues as its centers are forced to reduce the volume and change the mix of procedures performed, utilize VAC physicians at other centers, or in some cases, close centers.

- The Company entered into an employment agreement with a former physician, Dr. Atassi, to serve as the Company's Chief Medical Director for a period of five years commencing December 1, 2018. Dr. Atassi's compensation is $250,000 per year. However, Dr. Atassi is, in essence, required to be fully compensated whether he serves in the role or not. Dr. Atassi provided notice to the Company that he would not be serving the five-year term and would be resigning shortly after signing the contract. Accordingly, the Company recorded the entire contract value of $1,250,000 in its 2018 financial statements.

vii. Analysis of Company Centers:

As of the date of this Report to the Court, the Company operated 11 centers (its Jacksonville, FL center closed June 30, 2019). The centers are located as follows: New Jersey (3); Tennessee (3); Louisiana (2); Pittsburgh (1); and Maryland (2). The Company has operated over 20 centers in previous years.

The Company's centers, brief description of each center and certain salient information follow:

- Atlantic County, NJ—This center had previously been the best, most profitable center at one time. In 2018, the center's physician resigned and chose to compete with the Company. The Company has recently engaged another physician and believes that it has an additional physician as a prospect, but it is too soon to predict whether the center will become very profitable again. The Company had virtually eliminated staffing at the center

pending the new physician performing procedures. Year to date ("YTD") through May 2019, the center has been close to breakeven, but profitability is running substantially behind the comparable period in 2018. This is a center which the Company would strongly consider converting to an ASC;

- Central New Jersey and West Orange, New Jersey—These centers are geographically close enough to be considered together. There has been significant physician turnover, resulting in one remaining physician serving both of these centers, rotating between the centers. This has obviously reduced costs, but there has been, as expected, an adverse effect on revenues commencing in 2018, and which will continue until additional physicians are hired. YTD through May 2019, the centers' profitability is somewhat behind the comparable period in 2018 and the centers are operating at a loss. The Company would strongly consider converting one of these NJ centers to an ASC;

- Bolivar, Memphis, and Memphis East—These three centers are all in Tennessee and geographically close enough to be considered together. They have historically been very profitable for the Company and are served by very capable physicians who rotate among the centers. The physicians are also joint venture partners with the Company, which relationship serves as an added financial incentive. In late 2018, the centers experienced resignations of a significant number of employees, adversely affecting the centers' operational results and profitability. Within the past several months, staffing has improved measurably and Management of the Company expects these centers to return to substantial profitability. YTD through May 2019, the centers are substantially behind the comparable period in 2018, but are still very profitable for the Company. The company would strongly consider converting one center, likely Memphis, to an ASC;

- New Orleans and North Shore, Louisiana—These centers are geographically close enough to consider together. The centers are moving towards becoming one OBL and one ASC, which should increase their future profitability. The Company has signed a new lease and construction of an ASC is underway. It is expected that the construction will be completed in 15 months. The centers have reduced their physician count to 2.5 full time equivalent physicians, who are performing well. This should reduce physician cost and increase revenues and future profitability. YTD through May 2019, the centers are significantly more profitable than in the comparable period in 2018, although the centers are not yet among the most profitable of the Company's centers. The Company would strongly consider converting the North Shore, LA center to an ASC;

- Pittsburgh, PA – Although Pittsburgh (technically Cranbury, PA) is one center, it is in essence operating as two centers, since "VAC of Pittsburgh" is an OBL that is performing HD, PAD and other procedures, while this same location is serving as an ASC. The ASC has received its Medicare certification and is awaiting licensing by the State of PA. The center has physicians and its profitability has been affected by a delay in obtaining hospital

21

privileges, but that obstacle seems to have been solved. When the center is licensed by PA, it will operate as a hybrid center, thus allowing it to maximize reimbursement rates for each of the procedures it performs. YTD through May 2019, the center is the Company's most unprofitable center and performing worse than in the comparable period of 2018. The licensing from the State of PA would ostensibly dramatically increase the profitability of the center;

- Prince George, Maryland—This center had historically been considered one of VAC's best and most profitable centers, until the physician resigned in 2018 and the volume of cases plummeted. The trend has continued in 2019 and only in the last few months has a replacement physician been hired. The new physician has an excellent reputation, is extremely well qualified and has taken several actions to improve performance, including securing a relationship with a local nursing home and hiring a physician liaison. However, the center faces an "uphill battle" to regain its former status. YTD through May 2019 the center has been slightly unprofitable, which is slightly worse than in the comparable period of 2018. The Company would strongly consider converting this center or Southern Maryland center to an ASC;

- Southern Maryland – This center was the Company's second most profitable center in 2017, dropped to the fifth best performing center in 2018, and is for YTD May 2019 the Company's best performing and most profitable center. The center has excellent physicians and performs VAC's third most PAD procedures, which has caused profitability to more than triple through May 2019 compared to the similar YTD period in 2018. The Company would strongly consider converting this center or the Prince George, Maryland center to an ASC.

viii. Other Matters Affecting Financial Position:

In the assessment of financial position, the Monitor also considered related party transactions between VAC and other entities not part of VAC ("non-VAC entities") which entities are owned by the General Partner of VAC, Dr. McGuckin. These transactions, which had the potential to have enhanced or negatively affected VAC's financial position, were concerns described in the documents filed as part of the derivative litigation. The most salient matters and those potentially most important to the determination of VAC's financial position relate to VAC having provided working capital and substantial services, such as opening, staffing and support of four Dr. McGuckin owned centers, and those centers not having adequately reimbursed VAC for capital and services provided by VAC.  There are also considerations related to management fees provided by VAC to non-VAC entities and not reimbursed to VAC and Dr. McGuckin's VAC salary.

The Monitor's testing and analysis of these matters suggests that generally, the appropriate amount of reimbursements was made to VAC by the non-VAC entities and/or Dr. McGuckin and the minor reimbursements that were not made would not have materially affected VAC's

financial position or solvency. The Monitor did note that some of the reimbursements were not made timely, possibly including significant reimbursements made in 2017, but the effect of these late reimbursements, which in essence constituted an interest free loan, also do not have a material effect on VAC's financial position or solvency.

During the years circa 2012 through 2017, about $82 million (in the aggregate) of payments were made by VAC as a reimbursement to PVI (or less frequently to Dr. McGuckin and/or Vascular Access centers, LLC), most of which represented payments by VAC for physicians supplied by PVI to VAC (see "The Company/Business/Operations and Structure" section above). The 2017 and 2016 VAC financial statements compiled by Metter & Company agree with the amounts paid by VAC to Dr. McGuckin and/or the non-VAC entity for the reimbursement of physician compensation of $13,864,930 and $13,972,779, respectively, shown in the derivative litigation. The Monitor's testing and analysis suggests that these amounts in 2017 and 2016 were actually paid by VAC. The Monitor also analyzed Dr. McGuckin's compensation and it appears that the compensation materially agrees with the applicable compensation agreements, but it is clear that better internal controls are required to be implemented as relates to matters such as this wherein both parties to the agreements are one person (Dr. McGuckin, acting as General Partner of VAC and CEO of VAC).

ix. Prospects:

Considering the multitude of factors discussed above, the Company does not seem likely to "earn" its way out of its poor financial position. The Company's cash forecasts show expected cash flow after one-time and non-cash items of ($300,000) for 2019 and $2.8 million for 2020. The forecasts were prepared by management of the Company, with significant and substantive input from all of the members from the Company's executive team. The forecasts were prepared on a "center-by-center" basis, considering the market in which each center operates, expected acuity (as it relates to Medicare reimbursement), the effect of reimbursement rates by geography, and other factors. The expected results for all centers were aggregated and combined with the expenses and costs associated with "corporate" and overhead expenses. The forecasts were prepared using a combination of existing information and estimates based upon numerous assumptions, such as status of future centers (continuing or closing), physicians in each center (existing or to be replaced), potential for joint ventures with other physicians, and licensing requirements for centers in states requiring such licensing.

As would be expected, the most important and the most difficult estimates and assumptions involve two major areas: (1) revenues including the volume and mix of procedures to be performed and insurance reimbursement rates for 2020 (as 2019 rates are already set); and (2) the ability to manage expenses, specifically those most directly associated with revenue production, physicians' compensation and compensation of medical and administrative employees as well as rent and facilities expense.

The forecast for 2019 assumes a cash loss of about ($300,000) inclusive of all items requiring a cash outlay during the year (regardless if only a one-time requirement). The appropriate evaluation and analysis of the forecast is by means of comparison to actual results for the respective periods. The Company's actual results for the three months ended March 31, 2019, adjusted for non-cash items and the timing of non-cash items, when compared to the forecast for the same period, are reasonably similar. However, the forecast was completed subsequent to March 31, 2019 and this similarity would be expected. Therefore, a better measure of the reliability of the forecast is a comparison of actual results to the forecasted results for months subsequent to March 31, 2019. The Company prepares actual (accounting system based) financial statements quarterly. However, monthly results are accumulated and presented in MBB which are generally reliable as to revenue metrics, but do not consider or include certain types of expenses that are judged either non-operating or one-time/unusual expenses, albeit these expenses do affect cash flow, so it is difficult to assess actual cash flow for those periods. As such, comparing actual expenses to forecasted expenses does not necessarily achieve the intended result, although certain individual categories of expense (e.g. physicians' compensation, employee and staff compensation and rent/facilities expense) are generally comparable. Examining actual results for April 2019 (per the MBB), case volume of 839 cases, the general mix of cases (procedures performed), revenue per case of $3,441 and gross profit of $2 million, are all reasonably comparable to the forecast. Examining actual results for May 2019 (per the MBB), we see that case volume of 845 cases and the general mix of cases are comparable to the forecast, but actual revenue per case of $3,087 and gross profit of $1.85 million, are significantly less than forecasted revenue per case of $3,413 and gross profit of $2.03 million, causing a revenue shortfall of about $180,000 as compared to the forecast. Actual operating expenses and corporate and overhead expenses also were about $160,000 higher than forecasted expenses, causing an actual net loss of about $100,000, approximately $340,000 less than the $240,000 of income forecasted for May 2019. Although a difference between actual results and forecasted results of $340,000 is certainly capable of being "made up" by actual performance exceeding forecasted performance through the balance of 2019 (June results were not yet available as of the date of submission of this Report) a shortfall of that amount in one month, although potentially explainable, does require a prudent, independent, objective evaluator to consider the overall reliability of the forecast.

As an overview, Management has expended a great deal of effort to address replacement of physicians in certain centers, including some of its most profitable centers, increasing the volume of procedures performed, changing the mix of procedures performed in order to maximize Medicare insurance reimbursements based upon reimbursement differentials that have manifested over the past several years and aggressively managing expenses in both centers as well as corporate/overhead expenses. There are, however, limitations to the success of these efforts since, ultimately, the volume and mix of procedures performed depends upon the demand in the market and the ability to attract demand in the market based on factors differentiating the Company from its competitors, some of whom are in far better financial

position and have greater resources. In addition, stimulation of demand also depends upon the Company's physicians' ability to generate referrals, which often are based on the reputation of the physicians (some of whom have been  hired in the past six months) as well as the Company's reputation in the industry, which has been damaged by the DOJ settlement related to the Medicare fraud publicity. Management continues to work hard to repair the damage done by the DOJ matter and the derivative litigation, particularly with respect to alleviating physician and employee concerns and hiring physicians to replace those that have left the Company. As with many issues, the passage of time will ultimately be most impactful in improving the Company's reputation and restoring more enthusiasm to the Company's physicians and employees. However, the longer the derivative litigation continues, the more damaging the effect on the Company's financial position, its physicians and employees and ultimately, its reputation in the industry.

A summary analysis of the cash flow forecast for the balance of 2019 and the year 2020 suggests that the forecasted results for both 2019 and 2020 will be somewhat difficult to achieve. Viewing the forecast from a "big picture" vantage point, the forecasted revenue and expense numbers appear possible, if not plausible. However, a detailed analysis of each of the individual center forecasts illustrate the following:

- The volume of cases ("procedures") increase significantly in the second half of 2019 and in 2020, particularly in the number of PAD cases, which are significantly more profitable cases than other services performed by the Company, but which are far more dependent on physicians than other types of cases. All of the Company's services require physician involvement, but PAD procedures not only involve more time and effort of physicians, but are often more dependent on external referrals than other types of cases. Assuming that there will be a significant increase in cases, especially PAD cases, also assumes that there will be: (1) replacement of physicians who have departed (or will depart) the Company; (2) enough physicians employed by the Company to perform these cases, particularly in centers performing the greatest volume of procedures; (3) enough referrals from external sources to meet the forecasted volume.  The discussion above has focused on the DOJ matter and the derivative litigation as to the effect of these matters on physician departures (and ostensibly the ability to hire new physicians) and the negative effect on external referrals to the Company. In addition, several of the Company's historically best centers have not yet replaced, are in the process of replacing or have just recently replaced the physicians that departed the Company in the past year. And, assuming that those physicians are hired, their success depends on the Company having hired the right physicians in each case and the physicians generating referrals as they attempt to "ramp up" the procedures in their respective centers.

- With respect to the five months ended May 31, 2019, total revenues in January, $3.1 million, exceeded total revenue in each of the other four months, by amounts ranging

from approximately $200,000-$500,000. Physician expense in January was $800,000. The forecast shows total revenues starting in October 2019 and continuing through December 2019 to significantly begin exceeding January's revenues of $3.1 million. However, total physician expense in October 2019 (and in fact for most months in 2019) is generally over $200,000 less than total physician expense in January 2019. This anomaly continues into 2020, as total Company revenues for 2020 exceed total 2019 revenues by about 18%, yet total physician expense in 2020 exceeds total physician expense in 2019 by about 7%. This seeming anomaly is based upon the Company's belief that their physicians are capable of producing significantly more revenue (possibly because of incentive payments). It might also implicitly assume that the physicians that are hired to replace those lost physicians, some of whom were among the best physicians in the Company, will also be capable of performing at the level at least as high as the former physicians and actually at a higher level than those physicians in some cases.

- The forecast assumes that a few of the Company's more important centers will be refinanced and/or licensed to continue as ASCs. These matters are uncertain, particularly is Pennsylvania whose state agencies responsible for licensing have to date, acted in difficult fashion and seemingly shown a predisposition (to date) of making licensing difficult to achieve. This is not to suggest that the ultimate financing, construction and licensing of these centers will not happen, but merely to consider that these challenges may require significant more time than expected and thereby affect the achievability of the forecast as relates to these centers.

- The non-cash and one-time items are fairly set, but do make assumptions about cash flow required for continuing litigation and internal compliance, some of which may require significantly greater cash and Company resources than expected.

- The forecast assumes certain Medicare reimbursement rates in 2020, which may or may not materialize. The Company has shown the ability to forecast and anticipate reimbursement rates, as well as the ability to adapt to changes in reimbursement rates. However, predicting what the federal government will do has shown to be difficult, particularly in the current political climate.

To summarize, the forecasts provide a basis for evaluating the Company's performance over the next 1.5 years. It is difficult to forecast for the next month in a dynamic environment in which the Company operates, let alone the next 1.5 years. The Company's executive team is well informed and capable. Notwithstanding, the ability to predict future periods in the industry in which the Company operates, especially considering the numerous factors to which have previously been alluded, would seem to be highly difficult and in this instance, has produced a result which seems to be optimistic in the opinion of the Monitor.

## VI. Other Comments, Observations and Recommendations

- Notwithstanding the Company's difficult financial position, the Company's executive team with whom the Monitor has worked, including the Controller, Chief Operating Officer, Chief Compliance Officer and the CEO, have been cooperative, responded to all of the Monitor's requests, and based on the Monitor's interactions with them, have acted with integrity and shown competence and capability. The Team seems to fully understand the industry and environment in which the Company operates, the myriad challenges and issues that the Company is facing, and the Team appears to be addressing those issues, albeit most of those issues will require significant time and resources to resolve and some of those issues may not be capable of resolution;

- The Company's process for the preparation of its financial statements requires significant revision. The trial balance to report process needs to be improved. The Company relies upon its external accountants to actually perform the final phase of the financial statement preparation including required adjustments. Therefore, this process is, as one would expect, delayed depending upon the time constraints of the external accountant. Much of the reason for this process is that the Controller's time is at a premium because of the high percentage of his time devoted to daily and overall cash management. However, the Company might benefit from the ability to more closely monitor its operations and potentially address certain matters more quickly, were it to have the benefit of internal, fully adjusted monthly and quarterly financial statements (which are not formally prepared) and annual financial statements;

- The Company does prepare a monthly document entitled "Monthly Business Briefing" which contains a substantial amount of financial information, including performance metrics by center, physician, number and type of procedures performed and reimbursement information. This information is very valuable to the management of the Company and is heavily utilized by its executive team. The MBB might be more valuable to some extent if it was reconciled to the actual historical financial statements (it excludes certain expenses that are judgmentally selected) and were the total of revenues by case to actually equal the total revenues for services performed for the year.

- Somewhat because of the Company's limited size and somewhat because of the initiative to reduce expenses, there are fewer individuals than would be optimal to maintain a system of "checks and balances" which is a hallmark of the best systems of internal control. This potentially subjects the Company to a greater likelihood of errors and/or misstatements in its financial reporting. However, this choice is ultimately a cost/benefit decision that the Company must make.

- Although Management's forecasting process seems to be detailed and comprehensive, past forecasts have not always been reliable or consistent. There have been a multitude of forecasts prepared over the last several years and the forecasts seem to differ

27

depending upon their intended purpose e.g. potential sale of the Company, DOJ, etc. The forecasting process requires more consistency and less discretion.

- The Company has, over the period circa 2012 through 2017, but primarily in the earlier part of that period, sometimes "commingled" funds of various entities, including entities not owned by the Company. This practice is not appropriate and results in an internal control weakness that can materially negatively affect the Company.

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

*Matthew E. K. Howatt, Assistant U.S. Attorney*
*Direct Dial: (215) 861-8335*
*Facsimile: (215) 861-8618*
*E-mail Address: matthew.howatt@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, PA 19106-4476*
*215-861-8200*

March 1, 2021

**Via Email**

Stephen V. Falanga, Esquire
Christopher M. Hemrick, Esquire
Walsh Pizzi O'Reilly Falanga LLP
Chapter 11 Trustee for Vascular Access Centers, L.P.
SFalanga@walsh.law
chemrick@walsh.law

Joseph N. Argentina, Jr.
Faegre Drinker Biddle & Reath LLP
Counsel for William W. Gardner
Joseph.Argentina@faegredrinker.com

Re:    *In re Vascular Access Centers, L.P.*, Case No. 19-bk-17117

Dear Counsel:

The above-noted Debtor and certain related non-debtor corporations (collectively, "VAC") are parties to the Stipulation and Order of Settlement and Dismissal with the United States of America (the "DOJ Settlement"), which was approved by the United States District Court for the Southern District of New York on October 19, 2019 in Civil Case No. 12-5103. The Debtor and the United States entered into a Stipulation and Consent Order (the "Bankruptcy Stipulation") authorizing the Debtor to honor and continue to perform under the DOJ Settlement, which was approved by the United States Bankruptcy Court for the Eastern District of Pennsylvania in the above-captioned case on June 11, 2020 (*see* docket number 395).

Pursuant to the DOJ Settlement and the Bankruptcy Stipulation, VAC was obligated to make two installment payments of $201,250 each, $402,500 in the aggregate, to the United States by close of business on October 1, 2020 (extended by agreement until December 1, 2020) and separately January 1, 2021. VAC has not paid any part of those installments. On October 2, 2020, the United States provided written notice of default to VAC. VAC and William W. Gardner stipulated to VAC's defaults in certain stipulations with the United States and agreed to provide certain adequate protection (*see* docket numbers 595 and 656, the "Adequate Protection Stipulations"). In exchange, the United States agreed to forbear from exercising its remedies,

Counsel for VAC and William W. Gardner
Page 2

which forbearance could be revoked by the United States with five-days written notice to the above-noted counsel.

Pursuant that section 2 of the January 21, 2021 stipulation (*see* docket number 656), the United States hereby provides notice that it revokes its forbearance and in five days intends to exercise the remedies granted by the DOJ Settlement, the Bankruptcy Stipulation, and the Adequate Protection Stipulations.

Sincerely,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

MATTHEW E. K. HOWATT
Assistant United States Attorney

# EXHIBIT C

*In re Vascular Access Centers, L.P.*, **Chapter 11 Bankruptcy**
**Equity and Asset Purchase Term Sheet**

Endovascular Health Services, LLC, a Delaware limited liability company ("Buyer"), William Whitfield Gardner ("Gardner"), and Stephen V. Falanga in his capacity as Chapter 11 Trustee acting on behalf of Vascular Access Centers, L.P. ("Seller", and together with Buyer and Gardner, the "Parties") are entering into this binding term sheet (this "Term Sheet"), dated as of March 22, 2021 (the "Effective Date"), setting forth the principal terms and conditions of Buyer's acquisition of the equity interests held by Seller in certain of its subsidiaries and/or certain other assets, in all cases subject to (i) Buyer's satisfactory completion of due diligence and (ii) the terms and conditions hereof and the documentation of such transaction in a definitive equity and asset purchase agreement in form reasonably satisfactory to the Parties. This Term Sheet constitutes a binding contract and the Parties hereto intend to be legally bound hereby, subject to the terms and conditions set forth herein and the Parties' final negotiation and execution of the Purchase Agreement (as defined below), and any ancillary documents related thereto. The Parties acknowledge and agree that (i) Seller is subject to a chapter 11 bankruptcy proceeding filed against Seller on November 12, 2019, that is currently pending before the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") under Case No. 19-17117 (the "Bankruptcy Case"), and (ii) this Term Sheet and the transactions contemplated herein are subject to the Bankruptcy Court's approval upon notice to required parties in interest under the Bankruptcy Code.

| | |
|---|---|
| **Structure of Acquisition** | The proposed acquisition will be structured as an acquisition to be effectuated pursuant to a definitive Equity and Asset Purchase Agreement (the "Purchase Agreement") by Buyer of all of the Seller's equity interests in, or substantially all assets of, certain of Seller's subsidiaries as set forth on Schedule A hereto (collectively, the "Purchased Centers," and each a "Purchased Center," and the equity interests to be acquired, collectively the "Acquired Equity Interests")  and of certain other business assets and the assumption of certain liabilities of Seller by Buyer necessary for the operation of Seller and the Purchased Centers' business (collectively as defined below the "Acquired Assets"). The transactions contemplated by the foregoing are hereinafter referred to as the "Transaction." |
| **Purchase Price; Consideration** | As consideration for the Acquired Assets (as defined below), upon the consummation of the Transaction (the "Closing"), or at such other time as specified below, Buyer and Gardner shall respectively pay the following to or for the benefit of Seller (the "Purchase Price"):<br><br>• On November 25, 2020, the Bankruptcy Court entered a Stipulation and Consent Order[1] granting the United States |

---

[1] *Stipulation and Consent Order Pursuant to Sections 105(a), 361, 363, 507(b) and 553 of the Bankruptcy Code and Local Bankruptcy Rule 9013-3 Granting the United States of America Adequate Protection with Respect to the Quarterly Settlement Payment Due October 1, 2020* [Docket No. 596].

Attorney's Office for the Southern District of New York (the "DOJ") a first priority, adequate protection lien (the "October Adequate Protection Lien") against Seller's assets to secure payment of the October 1, 2020 payment, in the amount of $201,250, due from Seller to the DOJ under that certain Stipulation and Order of Settlement and Dismissal entered into by and among Seller, certain of Seller's subsidiaries and the DOJ, dated as of October 19, 2018 (the "DOJ Settlement Agreement"). Subsequently, Seller, Gardner and the DOJ agreed that the DOJ would be granted a substantially identical lien to secure payment of the January 1, 2021 payment, in the amount of $201,250, due from Seller to the DOJ under the DOJ Settlement Agreement (the "January Adequate Protection Lien," together with the October Adequate Protection Lien, collectively, the "Adequate Protection Liens").

Pursuant to the agreements granting the Adequate Protection Liens, the DOJ agreed, among other things, to forbear from exercising its right to setoff accounts receivables due to be paid to all of the Seller's center subsidiaries, including the Purchased Centers. On March 1, 2021, the DOJ notified Seller and Gardner that it was revoking its forbearance effective March 5, 2021.

The Parties understand that (a) beginning March 5, 2021, the accounts receivables owed to the Seller's subsidiaries, including the Purchased Centers, are being held by the Centers for Medicare and Medicaid Services ("CMS") at the direction of the DOJ, and (b) upon the DOJ's receipt of $402,500 in immediately available funds, the DOJ will cause the freeze to be released ("CMS Release") with respect to the accounts receivables held by CMS that would have otherwise been paid to the Purchased Centers but for the hold ("Purchased Center Receivables").

- Upon the occurrence of: (a) the DOJ's confirmation that the CMS Release will cause the full amount of the Purchased Center Receivables to be released to the Purchased Centers, and (b) Bankruptcy Court approval of this Transaction, Buyer shall cause to be paid to the DOJ, on behalf of Seller, $402,500 in cash,[2] which shall be paid in full and final

---

[2] The exact amount to be paid to the DOJ is subject to confirmation by the DOJ regarding the effects of the CMS Release. If the CMS Release will release the full amount of the Purchased Center Receivables to the Purchased Centers, then Buyer shall cause payment of the full $402,500. If the CMS Release will cause less than the full amount of the Purchased Center Receivables to be released to the Purchased Centers, then Buyer shall cause payment of an amount equal to (a) $402,500, minus (b) the amount of the Purchased Center Receivables not released to the Purchased Centers. To the extent the amount paid by Buyer to the DOJ on behalf of Seller is less than

|  | satisfaction of the Adequate Protection Liens (the "Adequate Protection Lien Payment").  At Closing, on behalf of Seller, $400,000 of the sale proceeds of the Transaction (the "DOJ Purchase Price Payment"), shall be paid to the DOJ in full and final satisfaction of any claim that the DOJ may have to any of the sale proceeds related to this Transaction under the DOJ Settlement Agreement.<br><br>• Gardner's secured superpriority claim as a result of post-petition loans provided to Seller will be reduced by $297,500 pursuant to section 363(k) of title 11 of the United States Code (the "Bankruptcy Code").<br><br>• Buyer will assume the Assumed Liabilities (defined below).<br><br>• Buyer will be responsible for payment of the Cure Costs (defined below).<br><br>• Gardner will provide the Additional Post-Petition Financing (defined below). |
|---|---|
| **Acquired Assets** | **Acquired Assets**<br><br>Subject to the terms and conditions of the Purchase Agreement, subject to Bankruptcy Court approval, Buyer shall purchase from Seller and Seller shall sell to Buyer all of Seller's right, title and interest, free and clear of all liens, claims, and interests (other than customary permitted liens to be set forth in the Purchase Agreement), in and to the Acquired Assets (as defined below).<br><br>The Acquired Assets shall be defined as the assets of Seller necessary for the operation of the Purchased Centers (the "Business"), including the following assets listed herein (collectively, the "Acquired Assets"); provided that, the Acquired Assets shall not include the Excluded Assets (as defined below):<br><br>• Substantially all of the assets of, or all of the Acquired Equity Interests in, the Purchased Centers;<br><br>• additional physical assets (machinery, equipment, furniture, furnishings, appliances, leasehold improvements, supplies, and trade fixtures) owned by Seller, including such items listed in the Purchase Agreement required to operate the Purchased Centers;<br><br>• such executory contracts and/or unexpired leases of Seller necessary for the operation of the Business as set forth in the |

$402,500.00, Buyer shall pay the difference to Seller at the same time as the payment to the DOJ and the funds will be subject to the same restrictions as the Seller's Use of the receivables of the Purchased Centers during the Gap Period as described below.

| | |
|---|---|
| | Purchase Agreement (collectively, the "Assumed Agreements"), subject to procedures consistent with section 365 of the Bankruptcy Code and approved by the Bankruptcy Court for the assumption and assignment of such Assumed Agreements in any order approving the Transaction;

• all security deposits or pre-paid expenses associated with the Acquired Assets;

• all accounts receivable of the Purchased Centers in the possession or control of Seller or any of the Purchased Centers, as of the Closing;

• to the extent transferable, all rights and obligations under or arising out of all insurance policies relating to the Acquired Assets or Assumed Liabilities (as defined below), including, without limitation, casualty and loss, medical malpractice, and business interruption insurance policies coverage;

• all personnel files for transferred employees in the possession or control of Seller except as prohibited by applicable law;

• all medical and other records related to the Purchased Centers' patients and procedures in the possession or control of Seller except as prohibited by applicable law such that Purchaser shall be the "custodian" of such information under applicable healthcare law;

• all licenses needed to operate the Purchased Centers;

• all of Seller's books and records that relate to the operation of the Purchased Centers and all books and records of the Purchased Centers in the possession or control of Seller;

• all of Seller's rights, title and interest in and to all intangible assets and intellectual property of the Seller, including all intangible assets and intellectual property that relate to the Business, the Acquired Equity Interests, or the operations of the Purchased Centers; and

• the existing bank accounts of the Purchased Centers as of the Closing ("Acquired Bank Accounts"). |
| **Excluded Assets** | The Excluded Assets shall be defined as all of the assets of Seller that are not the Acquired Assets, including without limitation:

• all causes of action, including without limitation:

    o any and all avoidance, recovery, subordination claims or causes of action of Seller under Sections 544 |

4

|  | through 553 of the Bankruptcy Code or under applicable Law arising under the Bankruptcy Code, |
|  | ○ all rights and/or recoveries against any current or former directors, officers, members, partners, interest holders, shareholders, managers, advisors or other professionals of Seller and/or its subsidiaries including without limitation the Derivative Action; |
|  | • any contract or lease that is not an Assumed Agreement; |
|  | • any assets of any "Seller Benefit Plan"; |
|  | • any security deposits or pre-paid expenses paid prior to the Closing Date (as defined below) and not associated with the Acquired Assets; |
|  | • any rights and obligations under insurance policies that are not Acquired Assets; and |
|  | • Equity in the Seller's subsidiaries other than the Acquired Equity Interests. |
| **Assumed Liabilities** | To the extent Buyer purchases the equity of a Purchased Center, Buyer shall assume the following liabilities of Seller (to the extent not paid prior to the Closing), or to the extent otherwise set forth in the Purchase Agreement:<br><br>• all liabilities under the Acquired Assets arising in the ordinary course of business of the Purchased Centers;<br><br>• all liabilities under the Assumed Agreements arising in the ordinary course of business of the Purchased Centers; and<br><br>• all liabilities under section 365 of the Bankruptcy Code required to cure monetary defaults under any of the Assumed Agreements as determined by procedures set forth in any order approving the Transaction ("Cure Costs");<br><br>provided, however, that the Assumed Liabilities shall not include any Excluded Liabilities (as defined below). |
| **Excluded Liabilities** | Buyer shall not be obligated to assume, and will not assume, any liabilities of Seller that are not Assumed Liabilities, including the following liabilities of Seller or of any predecessor of Seller, whether incurred or accrued before or after the Closing (collectively, the "Excluded Liabilities"):<br><br>• any liability not relating to the Acquired Assets, including any liability exclusively or primarily arising out of the Excluded Assets; |

| | |
|---|---|
| | • any liability of Seller in respect of any contracts or leases that are not Assumed Agreements; |
| | • all "Seller Benefit Plans" to be defined in the Purchase Agreement (including all assets, trusts, insurance policies and administration service contracts related thereto); |
| | • Other than the liabilities of the Purchased Centers to the extent the Bankruptcy Court does not provide otherwise in the Approval Order, all of Seller's liabilities relating to litigation, claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, governmental authorities, or otherwise) involving, against, or affecting any Acquired Asset, Seller or any assets or properties of Seller, commenced, filed, or initiated before or after the Closing and relating to facts, events or circumstances arising or occurring before the Closing, including any liabilities arising out of or relating to the DOJ Settlement Agreement; and |
| | • all of Seller's liabilities arising under environmental laws relating to facts, events or circumstances arising or occurring before the Closing. |
| **Reps/Warranties** | The Purchase Agreement shall include representations and warranties of the parties customary to transactions of this nature, including the representation and warranties to the effect that: |
| | • Each of the non-individual Parties is duly organized in their respective states of organization; |
| | • The Transaction has been duly authorized by each of the Parties upon approval by the Bankruptcy Court; |
| | • All federal, state and local tax returns required to be filed by Seller or any Purchased Center for the calendar year 2019 have been filed and that in the event of an audit by federal state or local tax authorities affecting the Business and a determination that additional taxes are due for any years prior to the Closing Date, Seller will pay said additional taxes due.; |
| | • Seller shall be responsible for all loans, liens, judgments, accounts payable and other financial obligations of the Business other than the Assumed Liabilities; Buyer is not purchasing or acquiring in any manner the debts, liabilities, contracts or other obligations of Seller or the Business, except to the extent specifically set forth herein, if any; and |

| | |
|---|---|
| | • Buyer's professionals shall be consulted during Seller's preparation and filing of federal, state and local tax returns for the Purchased Centers for the calendar year 2020; |
| **Closing** | Subject to the satisfaction of all conditions to closing and other terms and conditions of the Purchase Agreement, the Closing of the Transaction shall take place on a business day immediately following the entry of a sale order by the Bankruptcy Court and satisfaction of the other conditions to Closing set forth below, unless extended as directed by the Bankruptcy Court with prior notice to Buyer or as mutually agreed by the Parties. The date on which the Closing occurs is referred to in this Term Sheet as the "Closing Date."<br><br>Notwithstanding the occurrence of the Closing Date on any other date, upon the occurrence of the Closing Date on any date, the Transaction will be deemed to have been fully consummated and the Closing Date will be deemed to have occurred "as of" the date of entry of the Approval Order (defined below) for all purposes other than with respect to provisions in this Term Sheet or the Purchase Agreement that expressly address rights and obligations between the Effective Date of this Term Sheet and the Closing Date. |
| **Conditions to Closing** | The obligations of Buyer and Gardner to proceed with the Closing under the Purchase Agreement shall be conditioned upon the following, which shall be completed to the satisfaction of Buyer and Gardner unless otherwise waived by Seller, Buyer and Gardner:<br><br>• The CMS Release shall have occurred and the DOJ and CMS have ceased all holds and offsets of the Purchased Center Receivables;<br><br>• All governmental, regulatory and other material third party approvals, notifications, filings, licenses, waivers, authorizations and consents, including Bankruptcy Court approvals and health care related regulatory approvals and licenses, necessary or required for the consummation of the Transaction ("Approvals") shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened in writing by any governmental entity that would restrain, prevent or otherwise impose materially adverse conditions on the Transaction or, alternatively, the Parties have agreed (such agreement shall not be unreasonably withheld) to a strategy to obtain such Approvals after the Closing; |

- There shall not be in effect any order by a governmental body of competent jurisdiction or other governmental litigations or investigations (or written communications threatening the same) challenging the validity or restraining, enjoining or otherwise prohibiting the consummation of the Transaction, or enjoining, restraining or prohibiting the Purchase Agreement or the consummation of the Transaction;

- The applicable parties shall have executed the Purchase Agreement and all applicable ancillary documents;

- The Bankruptcy Court shall have entered an order approving the Transaction in accordance with the Purchase Agreement, free and clear of all liens, judgments, or encumbrances of any kind or nature pursuant to section 363 of the Bankruptcy Code (and any other provisions of the Bankruptcy Code deemed applicable by the Bankruptcy Court) (the "Approval Order") in form and substance acceptable to Buyer, and the Approval Order shall have become a final order and not be subject to stay or appeal on or before April 15, 2021;

- As of the Closing Date, there shall have been no material adverse change in the Business (as defined in the Purchase Agreement);

- Seller, Buyer, and the DOJ shall have executed a settlement and release agreement, in form reasonably satisfactory to Buyer, pursuant to which the DOJ shall release Buyer and the Purchased Centers from any liabilities or obligations under, relating to or arising from the DOJ Settlement Agreement and such agreement has been approved by final order of the United States District Court for the Southern District of New York (if necessary) and the Purchased Centers are released from all liabilities under the DOJ Settlement Agreement; provided, however, the settlement and release agreement will not release any obligations of the Seller or Purchased Centers under that certain Corporate Integrity Agreement between certain of the VAC Defendants (as defined in the DOJ Settlement Agreement) and the Office of Inspector General of the U.S. Department of Health and Human Services;

- Seller shall have delivered to Buyer a true, correct and complete list identifying all of the minority interest holders of the Purchased Centers;

- Seller shall have transferred to the Acquired Bank Accounts any cash on account of receivables of the Purchased Centers still in Seller's possession;

| | |
|---|---|
| | • Buyer shall have completed its due diligence and such diligence does not include a significant and previously undisclosed liability or detrimental circumstance, and such diligence shall include, but not be limited to, Seller's delivery to Buyer of the following documents and information to the extent reasonably available: |
| |     o A current list of the minority interest holders of the Purchased Centers |
| |     o A list identifying all known liabilities of the Purchased Centers; |
| |     o A list of all of the current employees of Seller and the Purchased Centers; |
| |     o A list of executory contracts and unexpired leases required for the operation of the Business, together with estimated cure costs for each; and |
| |     o Copies of any employment agreements between any personnel at Seller or the Purchased Centers, including physicians and nurse practitioners, related to the performance of their duties at Seller or the Purchased Centers; and |
| | • The Closing shall have occurred on or before April 15, 2021 unless otherwise agreed to in writing by Buyer and Seller. |
| **Covenants** | The Purchase Agreement shall contain covenants of the Parties customary to transactions of this nature, and consistent with any applicable orders of the Bankruptcy Court, but including, without limitation: |
| | • Conduct of business covenants, including that Seller shall not sell or otherwise transfer any inventory and equipment at the Purchased Centers, other than in the ordinary course of business; |
| | • Access to information covenants, including, without limitation, reasonable access to the properties, books and records (including business and medical records, to the extent permitted by applicable law) of Seller, the Purchased Centers and to the management of Seller; |
| | • Reporting and information rights covenants; |
| | • Covenants requiring Seller to preserve all business and medical records of Seller and the Purchased Centers; |

| | |
|---|---|
| | • Covenants imposing an obligation on Seller to use commercially reasonable effort to obtain consents to assignments;<br><br>• Covenants imposing an obligation on Seller to use commercially reasonable efforts to assist Buyer in obtaining all necessary regulatory approvals and licenses necessary for the operation of the Purchased Centers post-Closing; and<br><br>• A covenant imposing an obligation on Buyer to extend offers of employment, effective as of the Closing Date, to the individuals set forth on a <u>Schedule</u> to be attached to the Equity and Asset Purchase Agreement. |
| | |
| **Additional Material Terms and Agreements** | • **Post-Petition Financing**. Gardner shall extend to Seller immediately upon the execution of this Term Sheet, to the extent not previously extended to Seller prior to the date hereof, an additional[3] $250,000 in credit under, and pursuant to, the existing Fifth Final Post-Petition Financing Order[4] (the "<u>Additional Post-Petition Financing</u>"), which extension of credit will increase the total amount of Post-Petition financing extended by Gardner to Seller to a total principal amount of $3,500,000.<br><br>• **Transition Services Agreement/Additional Financing**. Given the exigencies relating to the current operations of the Seller and the Purchased Centers and in order to ensure an orderly transition of the Business to Buyer, the Buyer and Seller shall enter into a Transition Services Agreement ("**TSA**"), in a form which will be approved by the Bankruptcy Court and which shall be filed with the Bankruptcy Court prior to the hearing on the Approval Order, which shall provide for the following:<br><br>    o The TSA will be effective from the date of entry of the Approval Order until the Closing Date ("**Gap Period**");<br><br>    o The Buyer or its affiliates shall provide management services to the Purchased Centers during the Gap Period, including without limitation, human |

---

[3] Prior to the Effective Date of this Term Sheet, Gardner funded $150,000 to Seller in connection with this Transaction as authorized by the Fifth Post-Petition Financing Order.

[4] "<u>Fifth Post-Petition Financing Order</u>" means the *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Fifth Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 639].

resources and payroll, accounting, financial controller functions, operations and IT functions, as set forth in the TSA;

o   The Buyer or Gardner may make one or more loans to the Seller to be used exclusively to support operations at the Purchased Centers during the Gap Period on such terms being substantially identical to the loans made pursuant to the Fifth Post-Petition Financing Order ("Purchased Center Loans"); provided, however, any such financing shall not increase the Professional Fee Carve-Out (as defined in the Post-Petition Financing Orders); and

o   The Seller's obligations related to the Purchased Center Loans shall be assumed by the Purchased Centers at Closing.

- **Carve Out Cap**. The Approval Order shall provide that the Professional Fee Carve Out, as defined in the Final Post-Petition Financing Orders[5], shall be capped at an aggregate of $875,000, plus (i) all fees required to be paid to the Clerk of the Bankruptcy Court; and (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) effective as of the Closing.

- **Buyer Reimbursement**. In the event that Buyer is not the successful bidder in the Transaction, Seller shall reimburse to Gardner and Buyer, as applicable, (a) the DOJ Adequate Protection Payment, and (b) reasonable costs and expenses (including attorneys' fees) incurred in connection with the Transaction as approved by the Bankruptcy Court.

- **Buyer Administrative Claim**. Should Closing not occur as a result of the failure of a closing condition to be satisfied, Buyer shall hold a $402,500 allowed administrative claim

---

[5] "Final Post-Petition Financing Orders" means, collectively, the following Orders of the Bankruptcy Court: (i) *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 357]; (ii) *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Second Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 461]; (iii) *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Third Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 520]; (iv) *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Fourth Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 562]; and (v) *Final Order Authorizing Chapter 11 Trustee, on Behalf of the Debtor, to Enter into Fifth Post-Petition Credit Agreement with William Whitfield Gardner and to Obtain Post-Petition Financing, and Granting Liens, Security Interests and Other Relief* [Docket No. 639].

| | |
|---|---|
| | pursuant to section 503(b)(1)(A) of the Bankruptcy Code on account of its payment of the DOJ Adequate Protection Payment. |
| | • **DOJ Administrative Claim**. In the event that the DOJ does not receive an amount equal to the DOJ Purchase Price Payment upon the Closing of the Transaction or the Closing of an alternative transaction with an alternative bidder, the DOJ shall hold an allowed administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code in an amount equal to the accounts receivable received by the Purchased Centers between the Effective Date of this Term Sheet and the earlier of (a) the date the DOJ exercises its setoff rights with respect to the Purchased Centers, and (b) April 15, 2021. |
| | • **Seller's Use of Receivables of the Purchased Centers During Gap Period.**  During the Gap Period, Seller shall use the accounts receivable of the Purchased Centers to support operations at the Purchased Centers and those expenses of Seller necessary for the operation of the Business.  During the Gap Period, the accounts receivable of the Purchased Centers shall not be used to pay professionals retained under Section 330 of the Bankruptcy Code. |
| **Bid Procedures** | Given the exigencies relating to the current operations of the Debtor and the Purchased Centers including substantial accrued known and potential liabilities, the Parties intend to proceed by way of an expedited private sale under Section 363 of the Bankruptcy Code. In the event an objection to proceeding by expedited private sale is sustained by the Bankruptcy Court and/or a competing bid for the Acquired Assets on substantially the same terms as set forth herein in the discretion of the Seller, any alternative bidder's initial competing bid must be in an amount equal to or greater than $1,500,000 plus Buyer's reasonable costs and expenses (including attorneys' fees) incurred in connection with the Transaction as approved by the Bankruptcy Court. |
| **Expedited Sale Motion** | No later than one day after the execution and delivery of this Term Sheet and approval from the DOJ, Seller shall file an expedited sale motion based on this Term Sheet (the "<u>Sale Motion</u>") seeking entry of the Approval Order. Seller shall seek to schedule the hearing on the Sale Motion on an expedited basis to occur no later than March 31, 2021 subject in all respects to the Bankruptcy Court's approval. |
| **Term and Termination** | Unless otherwise agreed by the Parties in writing or provided herein, this Term Sheet will be in effect from the Effective Date until the earliest of (a) execution of the Purchase Agreement by the Parties, |

|  | or (b) March 31, 2021, whereupon this Term Sheet shall automatically terminate and be of no further force and effect. |
| --- | --- |
| **Jurisdiction** | Any dispute arising from the terms of this Term Sheet or the Purchase Agreement shall be resolved in the Bankruptcy Court. |
| **Governing Law** | This Term Sheet and the Purchase Agreement shall be governed by and construed in accordance with the laws of the state of Delaware, without giving effect to the principles of the conflicts of laws. |
| **Time is of the essence** | Time is of the essence in the performance of each and every obligation of this Term Sheet. |

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Term Sheet as of the date first above written.

**ENDOVASCULAR HEALTH SERVICES, LLC**

By:
Name:  William W. Gardner
Title:  Managing Member

**VASCULAR ACCESS CENTERS, L.P.**

By:_____
Name: Stephen V. Falanga
Title: Chapter 11 Trustee

**WILLIAM WHITFIELD GARDNER**

By:
Name: William Whitfield Gardner
Title: Individual

.

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Term Sheet as of the date first above written.

**ENDOVASCULAR HEALTH SERVICES, LLC**

By:_____
Name:
Title:

**VASCULAR ACCESS CENTERS, L.P.**

By:_____
Name: Stephen V. Falanga
Title: Chapter 11 Trustee

**WILLIAM WHITFIELD GARDNER**

By:_____
Name: William Whitfield Gardner
Title: Individual

## Schedule A

## Purchased Centers

| | Subsidiaries/Centers | Seller's Equity Interest |
|---|---|---|
| 1. | Vascular Access Center of Bolivar County LLC | 78.723404% |
| 2. | Vascular Access Center of New Orleans LLC | 64.4799% |
| 3. | Vascular Access Center of North Shore Louisiana LLC | 81.959% |
| 4. | Vascular Access Center of Prince George County LLC | 100% |
| 5. | Vascular Access Center of Southern Maryland LLC | 62.993% |
| 6. | Vascular Access Center of Atlantic County | 85.362161% |