## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| VASCULAR ACCESS CENTERS, L.P., | Case No. 19-17117-AMC |
| Debtor. | |

**ORDER (A) APPROVING ASSET PURCHASE AGREEMENTS BY AND BETWEEN STEPHEN V. FALANGA, CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF VASCULAR ACCESS CENTERS, L.P. AND PISCATAWAY ENDOVASCULAR CENTER LLC AND WEST ORANGE ENDOVASCULAR CENTER LLC, RESPECTIVELY; (B) AUTHORIZING AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF VASCULAR ACCESS CENTER OF WEST ORANGE, LLC AND VASCULAR ACCESS CENTER OF CENTRAL NEW JERSEY, LLC AND CERTAIN OTHER RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (C) AUTHORIZING AND APPROVING THE ASSUMPTION AND/OR ASSIGNMENT OF CERTAIN RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) WAIVING THE FOURTEEN (14) DAY STAY; AND (E) GRANTING OTHER RELATED RELIEF**

This matter having been opened to the Court upon the motion of Stephen V. Falanga, in his capacity as chapter 11 trustee (the "Trustee") of the bankruptcy estate of Vascular Access Centers, L.P. (the "Debtor"), by and through his counsel, Walsh Pizzi O'Reilly Falanga LLP, pursuant to 11 U.S.C. §§ 105(a), 363, and 365, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and Local Bankruptcy Rule 6004-1, for entry of an Order authorizing and approving, among other things: (a) entry into that certain Asset Purchase Agreement submitted with the Motion (the "Central Jersey APA") with Piscataway Endovascular Center LLC ("Piscataway Endovascular") a copy of which is attached hereto as **Exhibit A**; (b) entry into that certain Asset Purchase Agreement submitted with the Motion (the "West Orange APA" and, together with the Central Jersey APA, the "Asset Purchase Agreements" and the transactions contemplated thereby, the "Transaction"), a copy of which is attached hereto as **Exhibit B**, with West Orange

Endovascular Center LLC ("West Orange Endovascular" and, together with Piscataway Endovascular, (the "Purchasers"); (c) authorizing the proposed sale (the "Sale") of all or substantially all of the assets of non-debtor subsidiaries, Vascular Access Center of West Orange, LLC ("VAC West Orange") and Vascular Access Center of Central Jersey, LLC ("VAC Central Jersey") (collectively, the "New Jersey Centers" and, together with the Debtor, "Seller"), and certain related assets (collectively, the "Purchased Assets") free and clear of all Liens, Claims, Interests and Encumbrances (as defined below); (c) authorizing the assumption and/or assignment of certain related executory contacts and unexpired leases (the "Assigned Contracts") to the Purchaser; (d) waiving the fourteen day stay provided by Fed. R. Bank. P. 6004(h) and 6006(d); and (e) granting other related relief (the "Motion") [Dkt. No. 744];[1] and the Court having conducted a hearing on the Motion on  May 7, 2021 (the "Sale Hearing") and having heard and considered the statements of counsel, any testimony or offer of proof as to testimony on the record at the Sale Hearing at which time all creditors and other parties in interest of the Debtor were offered an opportunity to be heard with respect to the Motion and the Asset Purchase Agreements; and it appearing that good and sufficient notice of the Motion having been provided to all creditors and other parties-in-interest as evidenced by the Certification of Service filed with the Court; and all objections to the Motion having been withdrawn, resolved or overruled as provided in this Order; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor's estate, creditors and all other parties in interest; and other good cause having been shown, and for the reasons set forth on the record at the Sale Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

      A.     The findings and conclusions set forth herein constitute the Court's findings of fact

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Asset Purchase Agreements.

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014;

B.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  The relief requested in the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

C.    The statutory predicates for the relief sought in the Motion are Sections 105(a), 107(b)(1), 363, 365 and 1146(a) of the United States Bankruptcy Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9014 and 9018, and Local Rule 6004-1.

D.    On November 12, 2019, an involuntary petition was filed against the Debtor for relief under chapter 11 of the Bankruptcy Code.  The Debtor consented to the relief, and an Order for relief was entered on November 25, 2019.

E.    On November 22, 2019, the Debtor's majority limited partner, William Whitfield Gardner ("Gardner") filed a *Motion of Majority Limited Partner for Entry of an Order Dismissing the Debtor's Involuntary Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code, With Prejudice, or in the Alternative, Appointing a Chapter 11 Trustee Pursuant to Section 1104(a) of the Bankruptcy Code* [Dkt. No. 52].

F.    The Court granted Gardner's motion and on February 12, 2020, entered an Order approving the appointment of Stephen V. Falanga as Chapter 11 Trustee [Dkt. No. 245].

G.    On May 7, 2020, the Court approved the Trustee's application to employ SSG Capital Advisors, LLC ("SSG") as investment banker to the Trustee to assist the Trustee with his efforts on behalf of the Debtor to explore strategic alternatives, including a potential sale of the

Debtor's business and/or some or all of the Debtor's assets in furtherance of the Trustee's duties under the Bankruptcy Code [Dkt. No. 367].

H.     The Debtor conducts its business through several limited liability company subsidiaries throughout the United States (the "Centers"), including the New Jersey Centers.

I.     Due to restrictions on the corporate practice of medicine in the State of New Jersey, VAC West Orange operated under a State of New Jersey Surgical Practice Registration (the "SPR") issued to James F. McGuckin, MD of NJ, PA ("McGuckin NJ"), an entity controlled by Dr. James F. McGuckin ("McGuckin"), the former chief executive officer of the Debtor and manager of the Debtor's former general partner, Vascular Access Centers, LLC ("VAC LLC"), and, together with McGuckin NJ and any other entity owned or controlled by McGuckin with an interest in the SPR, the "McGuckin Entities").  McGuckin NJ held the SPR for the beneficial interest of the Debtor and VAC West Orange.

J.     Further due to restrictions on the corporate practice of medicine in the State of New Jersey, VAC Central Jersey operated under a State of New Jersey Ambulatory Surgical License (the "License") issued to James F. McGuckin, M.D., PA, which was held for the beneficial interests of the Debtor and the VAC Central Jersey.

K.     To the extent McGuckin or the McGuckin Entities do not cooperate with the Trustee, on behalf of the Debtor and the New Jersey Centers, and Purchasers in effectuating the Transaction, the Trustee should be authorized to take all action necessary to effectuate the transfer of the SPR and the License to Purchasers as contemplated by the Purchase Agreement.

L.     The Debtor holds a majority of the Class A membership interests in each of the New Jersey Centers.

M.     As the holder of the majority of Class A membership interests in each of the New

Jersey Centers, and pursuant to their respective corporate governance documents, the Debtor is entitled to take such actions as may require affirmance by a majority of the voting interests. Accordingly, the Trustee, having assumed control of the Debtor's affairs, is entitled to vote the Debtor's interest in the New Jersey Centers as may be required to consummate the Transaction on the terms set forth in the Purchase Agreement.

N.      In his capacity as chapter 11 trustee of the Debtor, the Trustee has the authority to sell the Purchased Assets on the terms set forth in the Asset Purchase Agreements.

O.      The United States Attorney's Office for the Southern District of New York (the "DOJ") and the Debtor and certain of the Debtor's subsidiaries entered into that certain prepetition Stipulation and Order of Settlement and Dismissal, so ordered on October 19, 2018 in Civil Case No. 12-5103 (S.D.N.Y.) (the "DOJ Settlement").  On March 19, 2021, judgment in the principal amount of $18,360,794 was entered in favor of the DOJ and against the Debtor and certain of the Debtor's subsidiaries in the United States District Court for the Southern District of New York in Civil Case No. 12-5103 at Docket No. 208 (the "DOJ Judgment").

P.      Notice of the Motion has been provided to: (i) the Debtor; (ii) the Office of the United States Trustee; (iii) the United States Attorney for the Eastern District of Pennsylvania; (iv) all secured creditors; (v) all known entities holding or asserting a security interest in or lien against any of the Purchased Assets; (vi) the parties to the Debtor's and the New Jersey Centers' material executory contracts and unexpired leases that the Trustee believes may be subject to assumption and/or assignment or rejection; (vii) all potential purchasers identified by the Trustee; (viii) the Debtor's 20 largest unsecured creditors; (ix) all interest holders of the Debtor and the New Jersey Centers; (x) the Internal Revenue Service; (xi) counsel for the Purchasers; (xii) all other creditors and persons required to be served pursuant to Bankruptcy Rules 2002, 6004 and 6006 including

all parties on the Clerk's Service List, and applicable local bankruptcy rules; and (xiii) counsel for James F. McGuckin and the McGuckin Entities (as defined here); (b) such notice was good, adequate and sufficient under the circumstances of this chapter 11 case and this proceeding complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; (c) a reasonable opportunity to object and be heard with respect to the Motion, the Sale Hearing and the transactions set forth in the Asset Purchase Agreements was afforded to all interested persons and entities; and (d) no other or further notice of the Motion, the Sale Hearing and the Transaction is or shall be required.

Q.    Prior to the hearing, the Trustee received a competing offer from K&H Medical – NJ LLC to purchase the assets of VAC Central Jersey for $350,000 and the assets of VAC West Orange for $425,000 (the "K&H Competing Bid"). The Trustee considered the K&H Competing Bid and deemed it a Qualified Bid. Prior to the hearing, the Trustee received a competing offer from Surgcenter of Central New Jersey, LLC to purchase the assets of VAC Central Jersey for $300,000 (the "Surgcenter Competing Bid"). The Trustee considered the Surgcenter Competing Bid and deemed it a Qualified Bid.

R.    On May 6, 2021, the Trustee and his professionals conducted an auction (the "Auction"). In connection with the bidding at the Auction, Piscataway Endovascular increased its offer from $250,000 to $1,080,000 and West Orange Endovascular increased its offer from $350,000 to $625,000. The Trustee, in consultation with his professionals, considered the bids made at the Auction including, without limitation, all non-monetary terms, and, in his business judgment, concluded that Purchasers were the highest and best bids for the Purchased Assets.

S.    At the conclusion of the Auction, the Trustee designated K&H as the Backup Bidder for the VAC West Orange sale transaction (the "VAC West Orange Backup Bid") and the

VAC Central Jersey sale transaction (the "VAC Central Jersey Backup Bid") pursuant to the Bid Procedures contained in the Motion, which Bid Procedures were approved by the Court by Order dated May 5, 2021 [Dkt. No. 783]. The K&H Asset Purchase Agreements relating to the VAC West Orange Backup Bid and the VAC Central Jersey Backup Bid will be docketed with the Court in the event the Trustee elects to seek approval of a transaction pursuant to the VAC West Orange Backup Bid or the VAC Central Jersey Backup Bid.

T.      The Trustee has demonstrated (i) good, sufficient and sound business purposes and justifications for, and (ii) compelling circumstances to consummate the Transaction as contemplated by the Asset Purchase Agreements other than in the ordinary course of business under Section 363(b) of the Bankruptcy Code and before and outside of a plan of reorganization, and such action is an appropriate exercise of the Trustee's business judgment and in the best interests of the Debtor, its estate, creditors, stakeholders and all other parties-in-interest. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of loss of the value of Purchased Assets if the Transaction is not consummated quickly, which could result in significantly diminished creditor recoveries; (ii) the Asset Purchase Agreements present the best opportunity to maximize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets, and (iii) the contemplated Transaction constitutes the highest or best offer received for Purchased Assets.

U.      Due to restrictions on the corporate practice of medicine in the State of New Jersey, (a) the registration to operate the West Orange Center as a surgical practice in the State of New Jersey is held for the beneficial interest of the Debtor and the West Orange Center by James F McGuckin MD of NJ PA; and (b) the license to operate VAC Central Jersey as an ambulatory surgery facility is held for the beneficial interest of the Debtor and the VAC Central Jersey by

James F McGuckin, M.D., P.A. (James F McGuckin MD of NJ PA and James F McGuckin, M.D.,

P.A. collectively, the "McGuckin Entities"), which McGuckin Entities are controlled by Dr. James

F. McGuckin ("McGuckin"), the former chief executive officer of the Debtor and manager of the

Debtor's former general partner, Vascular Access Centers, LLC.

V.    To the extent McGuckin and the McGuckin Entities do not cooperate with the

Trustee on behalf of the Debtor and the New Jersey Centers and the Purchasers in effectuating the

transactions contemplated by the Asset Purchase Agreements, the Trustee should be authorized to

take all action necessary to effectuate the transfer of the Licenses to the Purchasers as contemplated

by the Asset Purchase Agreements.

W.    Entry of an Order approving the Transaction is a necessary condition precedent to

the consummation of the Transaction.

X.    Approval of the Motion and the Transaction on the terms of the Asset Purchase

Agreements and this Order are in the best interests of the Debtor, its estate, creditors, stakeholders,

and all other parties-in-interest.  No alternative to the Transaction exists that would provide a

greater value to the Debtor, its estate, creditors, stakeholders, or other parties-in-interest.

Y.    The Purchase Price and other consideration to be paid and provided by the

Purchasers for the Purchased Assets constitutes reasonably equivalent value and fair consideration

for the Purchased Assets as the case may be under the Bankruptcy Code, the Uniform

Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United

States, any state, territory, or possession thereof or the District of Columbia.  The Asset Purchase

Agreements were not entered into, and the Transaction is not being consummated, for the purpose

of hindering, delaying or defrauding creditors of the Debtor under the Bankruptcy Code or under

the laws of the United States, any state, territory, or possession thereof, or the District of Columbia,

or any other applicable law.  Neither the Trustee nor the Purchasers have entered into the Asset Purchase Agreements with any fraudulent or otherwise improper purpose.  The Asset Purchase Agreements represent a fair and reasonable offer to purchase the Purchased Assets under the circumstances of the Debtor's chapter 11 case and constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtor, its estate, creditors, stakeholders, and other parties-in-interest than would be provided by any other available alternative.  No other person or entity or group of entities, other than the Purchasers have offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtor and its estate.  The Trustee's determination that the Transaction constitute the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

Z.    Subject to entry of this Order, the Trustee: (i) has full power and authority to execute the Asset Purchase Agreements and any ancillary agreements or other documents contemplated thereby; (ii) has all of the power and authority necessary to consummate the Transaction; and (iii) has taken all action necessary to authorize and approve the Asset Purchase Agreements, including the sale of the Purchased Assets.  No consents or approvals, other than those expressly provided for in the Asset Purchase Agreements or this Order, are required for the Trustee to consummate the Transaction.

AA.    The Asset Purchase Agreements and the Transaction were negotiated, proposed, and entered into by the Trustee and the Purchasers without collusion or fraud, from arm's-length bargaining positions, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  The Purchasers are good faith purchasers of the Purchased Assets within the meaning of Bankruptcy Code Section 363(m) and are therefore entitled to all of the protections afforded by

Bankruptcy Code Section 363(m).  The Purchasers are not "insiders" of the Debtor, the New Jersey Centers, or the Trustee, as that term is defined in Bankruptcy Code section 101(31).   The Purchasers have proceeded in good faith in all respects in connection with this proceeding in that: (a) the Purchasers recognized that the Trustee was free to deal with any other party interested in acquiring the Purchased Assets; and (b) all payments to be made by the Purchasers and other agreements or arrangements entered into by the Purchasers in connection with the Transaction have been adequately disclosed.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction.   No stay pending appeal of this Order has been requested, or, if requested, has been denied, and the stay contained in Bankruptcy Rule 6004(h) and 6006(d) has been and hereby is expressly and irrevocably waived as set forth below.

BB.    Neither the Debtor, the Trustee nor the Purchasers nor any of their respective affiliates, partners, principals, agents, members, or their representatives has engaged in any conduct that would cause or permit the Asset Purchase Agreements or other documents and instruments related to or connected with the Transaction to be avoided, or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code. Specifically, the Purchasers have not acted in a collusive manner with any person and the Purchase Price and other consideration was not controlled by any agreement among bidders. The terms and conditions of the Asset Purchase Agreements, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and the Transaction shall not be avoided under Section 363(n) of the Bankruptcy Code.

CC.    The Purchasers would not have entered into the Asset Purchase Agreements and would not consummate the Transaction, thus adversely affecting the Debtor, its estate and its

creditors, if the sale of the Purchased Assets to the Purchasers was not free and clear of all Liens, Claims, Interests and Encumbrances (each as defined below) pursuant to Section 363 of the Bankruptcy Code, or if the Purchasers would, or in the future could, be liable for any of such Liens, Claims, Interests or Encumbrances.  The total consideration to be provided under the Asset Purchase Agreements reflects the Purchasers' reliance on this Order to provide it, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).  A sale of the Purchased Assets other than one free and clear of all Liens, Claims, Interests and Encumbrances would yield substantially less value for the Debtor's estate, with less certainty, than the Transaction, and would adversely impact the Trustee's efforts to maximize the value of the Debtor's estate.  Therefore, the Transaction contemplated by the Asset Purchase Agreements is in the best interests of the Debtor, its estate, creditors, stakeholders, and all other parties-in-interest.

DD.    The Trustee, on behalf of the Debtor, may sell the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances because, with respect to each creditor or interested party asserting a Lien, Claim, Interest or Encumbrance in any of the Purchased Assets, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens, Claims, Interests and Encumbrances who did not object or who withdrew their objections to the Transaction or the Motion are deemed to have consented to the Motion and the Transaction pursuant to Section 363(f)(2) of the Bankruptcy Code. All holders of Liens, Claims, Interests and Encumbrances are adequately protected by having their Liens, Claims, Interests and Encumbrances attach to the proceeds of the Transaction ultimately attributable to the Purchased Assets against or in which such Liens, Claims, Interests and

Encumbrances are asserted, or otherwise satisfied in connection with the Closing[2], subject to the terms of such Liens, Claims, Interests and Encumbrances, with the same validity, force and effect, and in the same order of priority, which such Liens, Claims, Interests and Encumbrances now have against the Purchased Assets or their proceeds, if any, subject to any rights, claims and defenses the Debtor may possess with respect thereto.

EE.    The Purchasers are not holding themselves out to the public as a continuation of the Debtor or the New Jersey Centers.  The sale of the Purchased Assets and consummation of the Transaction is not, and does not amount to, a consolidation, merger or *de facto* merger of the Purchasers and the Debtor and/or the Debtor's estate, or the New Jersey Centers, there is not substantial continuity between the Purchasers and the Debtor or the Debtor's estate, or the New Jersey Centers, there is no continuity of enterprise between the Purchasers and the Debtor or the Debtor's estate, or the New Jersey Centers, the Purchasers are not a mere continuation of the Debtor or the Debtor's estate, and the Purchasers do not constitute a successor to the Debtor or the Debtor's estate, or the New Jersey Centers.  Upon the Closing, the Purchasers shall be deemed to have assumed only the Assumed Liabilities and shall not be liable in any manner whatsoever for the Excluded Liabilities. The (i) transfer of the Purchased Assets to the Purchasers, and (ii) assumption and/or assignment to the Purchasers of any assumed and or Assigned Contracts, do not and will not subject the Purchasers to any liability whatsoever with respect to the operation of the Debtor's business before the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any

---

[2] Pursuant to the terms of the Asset Purchase Agreements, the Transaction contemplates transfers of some of the Purchased Assets to Purchasers at various points. For purposes of this Order, each such transfer shall be defined as a "Closing" with respect to those Purchased Assets, and the rights granted to Purchasers herein shall apply with respect to those Purchased Assets at the time of each such Closing.

theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability. Except for the Assumed Liabilities, the Purchasers' acquisition of the Purchased Assets shall be free and clear of any and all Excluded Liabilities and any "successor liability" claims of any kind or nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Court finds that the Purchasers would not have entered into the Asset Purchase Agreements but for the foregoing protections against claims related to Liens, Claims, Interests and Encumbrances, the Excluded Liabilities and/or potential claims based upon "successor liability" theories.

FF.      The Trustee has demonstrated that it is an exercise of his sound business judgment to assume and/or assign the Assigned Contracts to the Purchasers in connection with consummation of the Transaction, and the assumption, assignment, and sale of the Assigned Contracts to the Purchasers is in the best interests of the Debtor, its estate, creditors, stakeholders, and all other parties-in-interest.  The Assigned Contracts being assigned to the Purchasers are an integral part of the Purchased Assets being purchased by the Purchasers, are in the best interests of the Debtor and its estate and represent the reasonable exercise of the Trustee's sound business judgment. Specifically, the assumption and/or assignment of the Assigned Contracts (i) is necessary to sell the Purchased Assets to the Purchasers, (ii) limit the losses suffered by counterparties to the Assigned Contracts, and (iii) maximize the recoveries to other creditors of the Debtor by limiting the amount of claims against the Debtor's estate by avoiding the rejection of the Assigned Contracts.

GG.      As evidenced by the certificates of service filed with the Court, the Trustee has served, prior to the Sale Hearing, notice (the "Cure Notice") of the intent to assume and/or assign the Assigned Contracts and of the related proposed cure amount (the "Cure Amount") upon each

non-Debtor counterparty to the Assigned Contracts.  The service of the Cure Notice was good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Amounts for the assumption and/or assignment of the Assigned Contracts.  All non-Debtor parties to the Assigned Contracts have had a reasonable opportunity to object both to the Cure Amounts listed on the applicable Cure Notice and to the assumption and/or assignment of the Assigned Contracts to the Purchasers.

HH.    Except as otherwise set forth in the Asset Purchase Agreements or this Order, all Cure Amounts shall be determined and paid by the Trustee, on behalf of the Debtor, in accordance with the terms thereof.   Payment of the Cure Amounts shall be in full satisfaction and cure of any and all defaults under the Assigned Contracts, whether monetary or nonmonetary.  Each non-Debtor party to an Assigned Contract is forever barred, estopped, and permanently enjoined from asserting against the Trustee, Debtor, Debtor's estate, the New Jersey Centers, the Purchasers, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing. A Cure Objection may be resolved after the Closing; provided that the Trustee maintains the alleged Cure Amount in escrow pending resolution.

II.    Upon the Trustee's assignment of Assigned Contracts to the Purchasers under the provisions of this Order, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted to declare a default by the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers, or the Purchasers, or otherwise take action against the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers or the Purchasers as a result of the Debtor's or the New Jersey Centers' financial condition, bankruptcy or failure to perform any of the obligations under the relevant Assigned Contract.    Any provision in any

Assigned Contract that prohibits or conditions the assignment of such Assigned Contracts (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Trustee, the Debtor, the New Jersey Centers, or the Purchasers to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Trustee's, Debtor's, the New Jersey Centers', and the Purchasers' rights to enforce every term and condition of the Assigned Contract.

JJ.    With respect to each of the Assigned Contracts, the Trustee, on behalf of the Debtor, has met all requirements of Section 365(b) of the Bankruptcy Code to the extent applicable. Further, based on the arguments and representations of counsel made, and the evidence proffered and adduced at, the Sale Hearing, the Purchasers have provided adequate assurance of future performance under the Assigned Contracts in satisfaction of Sections 365(b) and 365(f) of the Bankruptcy Code to the extent applicable and to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts. Accordingly, the Assigned Contracts may be assumed and/or assigned by the Trustee to the Purchasers as provided for in the Asset Purchase Agreements.

KK.    Each and every provision of the Assigned Contracts that purport to prohibit, restrict, or condition or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assigned Contracts have been satisfied or are otherwise unenforceable under Section 365 of the Bankruptcy Code.

LL.    Upon the consummation of the Transaction at Closing, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms and subject to

the provisions of this Order.

MM.    Good and sufficient reasons for approval of the Asset Purchase Agreements and the

Transaction have been articulated to the Court in the Motion and on the record at the Sale Hearing,

and the relief requested in the Motion and set forth in this Order is in the best interests of the

Debtor, its estate, creditors, stakeholders, and other parties-in-interest.

NN.    The transfer of the Purchased Assets to the Purchasers at Closing will be a legal,

valid, and effective transfer of the Purchased Assets, and shall vest the Purchasers with all of the

Debtor's and the New Jersey Centers' right, title and interest of, in and to the Purchased Assets,

free and clear of (i) all Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever

(other than Assumed Liabilities), and (ii) all Excluded Liabilities.

OO.    The Transaction does not constitute a *sub rosa* chapter 11 plan.

PP.    Time is of the essence in consummating the Transaction.  In order to maximize the

value of the Debtor's estate, it is essential that the Closing of the Transaction occur within the time

constraints set forth in the Asset Purchase Agreements.  Accordingly, there is cause to waive the

stay as contemplated by Bankruptcy Rules 6004(h) and 6006(d).

**IT IS HEREBY ORDERED THAT:**

1.    The Motion and the relief requested therein is granted and approved as set forth

herein.  All objections (except for objections to Cure Amounts, if any, solely to the extent such

objections relate to any asserted cure obligations pursuant to Sections 365(b)(1)(A) and (B) of the

Bankruptcy Code), if any, to the Motion or the relief requested therein that have not been

withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation  filed

with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

2.    Pursuant to Sections 105, 363, 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, 9014, 9018, and Local Bankruptcy Rule 6004-1, the Asset Purchase Agreements and all of the terms and conditions therein, the sale of the Purchased Assets and consummation of the Transaction are hereby approved and authorized.

3.    The Trustee has demonstrated sound business judgment and is authorized and empowered pursuant to Section 363 of the Bankruptcy Code to sell the Purchased Assets to the Purchasers on the terms and conditions as set forth in the Asset Purchase Agreements.

4.    The Trustee, on behalf of the Debtor, is authorized to execute and deliver such assignments, conveyances, and other documents and instruments of transfer that may be reasonably necessary or desirable to implement the Asset Purchase Agreements and to take all further actions as may be (a) reasonably requested by the Purchasers for the purpose of assigning, transferring, granting, conveying and conferring to the Purchasers, or reducing to possession, the Purchased Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreements, all without further order of the Court.

5.    Pursuant to Section 365 of the Bankruptcy Code and applicable non-bankruptcy law, notwithstanding any provision of any Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assigned Contracts to the Purchaser, the Trustee is authorized to assume and/or assign the Assigned Contracts to the Purchaser.

6.    Payment of the Cure Amounts shall be in full satisfaction and cure of any and all defaults under the Assigned Contracts, whether monetary or nonmonetary. Each non-Debtor party to an Assigned Contract is forever barred, estopped, and permanently enjoined from asserting

against the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers, the Purchasers, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing. A Cure Objection may be resolved after the Closing; provided that the Trustee maintains the alleged Cure Amount in escrow pending resolution.

7.       Upon the assignment of Assigned Contracts to the Purchasers under the provisions of this Order, no default shall exist under any Assigned Contract. Except as set forth in herein with respect to assertion of a Claim for the Cure Amount, any and all counterparties to any Assigned Contract shall be forever barred and estopped from asserting a Claim against the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers or the Purchasers that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

8.       No counterparty to any Assigned Contract shall be permitted to declare a default by the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers, or the Purchasers, or otherwise act against the Trustee, the Debtor, the Debtor's estate, the New Jersey Centers, or the Purchasers as a result of Debtor's or the New Jersey Centers' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract. Any provision in any Assigned Contract that prohibits or conditions the assignment of such Assigned Contract (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Trustee, the Debtor, the New Jersey Centers, or the Purchasers to enforce at any time one or more terms or conditions of any Assigned Contract

shall not be a waiver of such terms or conditions, or of the Trustee's, Debtor's, the New Jersey

Centers', and the Purchasers' rights to enforce every term and condition of the Assigned Contract.

9.      As of the Closing Date, subject to the provisions of this Order, the Purchasers shall

be fully and irrevocably vested with all right, title and interest of the Trustee and the Debtor, and

the New Jersey Centers under the Assigned Contracts and shall assume only those obligations of

the Debtor and the New Jersey Centers under the Assigned Contracts first arising and attributable

to the time period occurring on or after the Closing Date. Upon assumption of the Assigned

Contracts and assignment to the Purchasers at Closing, the Assigned Contracts shall be deemed

valid and binding, in full force and effect in accordance with their terms, subject to the provisions

of this Order.

10.      Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code and in

accordance with the terms of the Asset Purchase Agreements, the Trustee, on behalf of the Debtor,

is authorized and directed to transfer the Purchased Assets to the Purchasers and upon the Closing,

such transfer shall: (a) be valid, legal, binding and effective, (b) vest the Purchasers with all right,

title and interest of the Debtor and the New Jersey Centers in the Purchased Assets, and (c) be free

and clear of all liens, including without limitation any lien (statutory or otherwise), mortgage,

pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement,

encroachment, right of way, restrictive covenant on real property, real property license, lease or

conditional sale arrangement, and claims, rights, causes of action, debts, liabilities and obligations

of any kind or nature, whether arising prior to or subsequent to the commencement of the Debtor's

chapter 11 case, whether known or unknown, whether accrued or fixed, direct or indirect,

liquidated or unliquidated, absolute or contingent, matured or unmatured, determined or

undeterminable, and whether imposed by agreement, understanding, law, equity or otherwise

arising under or out of, in connection with, or in any way related to McGuckin, the McGuckin Entities, the Debtor, the New Jersey Centers or their interests in the Purchased Assets, the operation of the Debtor's, McGuckin's and the New Jersey Centers' businesses before the Closing, or the transfer of the Debtor's and the New Jersey Centers' interests in the Purchased Assets to the Purchaser, including any tax or environmental liability (collectively, excluding the Assumed Liabilities, the "Claims, Interests and Encumbrances")[3], with all such Liens, Claims, Interests and Encumbrances to attach to the net proceeds of the Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Purchased Assets, and subject to any claims and defenses the Trustee, Debtor, the New Jersey Centers and other parties-in-interest may possess with respect thereto in each case immediately before the Closing; and (d) except as otherwise expressly provided in the Asset Purchase Agreements, all such Liens, Claims, Interests and Encumbrances shall be and hereby are released, terminated and

---

[3] Without limiting the generality of the foregoing, the term "Claims, Interests, and Encumbrances" shall include, without limitation, claims or causes of action arising under, without limitation: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to the Debtor or any of Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtor's business operations or the cessation thereof; (d) any litigation involving the Debtor; and (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws or (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with the Debtor or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any common to merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

discharged as to the Purchasers and the Purchased Assets. As used in this Order, the term "Claims" shall be given its broadest possible meaning, with reference to the definition of claim in section 101(5) of the Bankruptcy Code, but not by way of limitation.

11.     To the extent necessary, McGuckin and the McGuckin Entities are hereby authorized to transfer the SPR and the License to the Purchasers as contemplated by the Asset Purchase Agreements and, upon the Closing, such transfer shall: (a) be valid, legal, binding and effective, (b) vest the Purchasers with all right, title and interest of McGuckin, the McGuckin Entities, the Debtor and the New Jersey Centers in the SPR and the License, and (c) be free and clear of all Liens, Claims, Interests and Encumbrances, with all such Liens, Claims, Interests and Encumbrances to attach to the net proceeds of the Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Licenses, or otherwise be satisfied in connection with the Closing, and subject to any claims and defenses McGuckin, the McGuckin Entities, the Debtor, the New Jersey Centers and other parties-in-interest may possess with respect thereto in each case immediately before the Closing; and (d) all such Liens, Claims, Interests and Encumbrances shall be and hereby are released, terminated and discharged as to the Purchasers and the Purchased Assets.

12.     To the extent necessary or applicable, if McGuckin and/or the McGuckin Entities do not cooperate with the Trustee on behalf of the Debtor, the New Jersey Centers, and Purchasers in effectuating the transactions contemplated by the Asset Purchase Agreements, the Trustee and/or Purchasers are hereby authorized to take all action necessary to effectuate the transfer of the SPR and the License to the Purchasers, and take all other action on behalf of McGuckin and/or the McGuckin Entities that may be required to consummate the Transaction as contemplated by the Asset Purchase Agreements. Such actions shall include, but not be limited to: i) requesting

entry of an Order compelling McGuckin and the McGuckin Entities' cooperation in the required maintenance of the SPR and in the steps required to obtain the License; ii) requesting entry of an Order compelling McGuckin and the McGuckin Entities' cooperation in the subsequent transfer of the License to Purchasers once obtained by the McGuckin Entities; iii) requesting entry of an Order prohibiting McGuckin and the McGuckin Entities' from transferring, selling, or conveying the SPR or License to any person or entity other than Purchasers pursuant to the Asset Purchase Agreements and this Order; iv) requesting entry of an Order prohibiting McGuckin and the McGuckin Entities from transferring ownership within the McGuckin Entities at any time prior to the transfer of the Licenses to Purchasers.

13.    The Closing is without prejudice to the Debtor's right, at the Trustee's option, to reject and terminate any executory contract or unexpired lease of the Debtor or the New Jersey Centers (other than the Assigned Contracts) upon the filing and service of a notice of rejection upon the counterparty to any such rejected executory contract or unexpired lease.

14.    The Transaction is not and does not amount to a consolidation, merger or de facto merger of the Purchasers and the Debtor, the Debtor's estate, or the New Jersey Centers.  There is not substantial continuity between the Purchasers and the Debtor, the Debtor's estate, or the New Jersey Centers. There is no continuity of enterprise between the Purchasers and the Debtor or the Debtor's estate, or the New Jersey Centers. The Purchasers are not, and will not be, a mere continuation of the Debtor or the Debtor's estate, or the New Jersey Centers.  The Purchasers do not constitute a successor to the Debtor or the Debtor's estate, or the New Jersey Centers.

15.    Upon the Closing, the Purchasers shall be deemed to have assumed only the Assumed Liabilities and shall not be liable in any manner or under any legal or equitable theory whatsoever for the Excluded Liabilities. Except for the Assumed Liabilities, the Purchasers'

acquisition of the Purchased Assets shall be free and clear of any and all Excluded Liabilities and any "successor liability" Claims of any kind or nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of the Closing. The (i) transfer of the Purchased Assets to the Purchaser, and (ii) assumption and assignment to the Purchasers of the Assigned Contracts, do not and will not subject the Purchasers to any liability whatsoever with respect to the operation of the Debtor's or the New Jersey Centers' business before the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

16.    The Asset Purchase Agreements, and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreements or any related agreements, documents or other instruments.

17.    The Trustee, on behalf of the Debtor, is authorized to utilize the proceeds of the Transaction to satisfy any liens that are required to be satisfied under Section 363(f) of the Bankruptcy Code.

18.    Upon the DOJ's receipt of the agreed-upon payment to the DOJ from or on behalf of the Debtor (the "<u>DOJ Payment</u>"),[4] or as soon as reasonably practicable after Closing, the New

---

[4] The DOJ Payment shall constitute forty percent (40%) of the proceeds of the Transaction after deducting (a) $80,000 on account of agreed upon Transaction-related legal fees and expenses; (b) the SSG Commission; and (c) any applicable bulk sale tax liability, transfer tax liability and/or other similar liability or expense relating to the Transaction. The DOJ Payment shall be paid out of the Closing Date Payment as defined in the Asset Purchase

Jersey Centers, the Purchasers and the Purchased Assets shall be released from any liability under or related to the DOJ Settlement and the DOJ Judgment, and the DOJ is hereby authorized and directed to take such actions as reasonably necessary to effect such release, including without limitation to obtain any necessary approval by the United States District Court for the Southern District of New York and/or to cause the DOJ Judgment to be marked satisfied with respect to the New Jersey Centers, Purchasers and the Purchased Assets. For the avoidance of doubt, nothing in this order (a) affects the DOJ's rights under the DOJ Settlement or the DOJ Judgment against any Center that is not the New Jersey Centers, or (b) imposes any obligation on the DOJ to take any action with respect to any Center that is not the New Jersey Centers.

19.    Upon the Closing, and except as otherwise expressly provided in the Asset Purchase Agreements, the Purchasers shall not be liable for any Liens, Claims, Interests and Encumbrances against or relating to the Debtor or the New Jersey Centers or their operations prior to Closing.

20.    The Trustee and the Purchasers, and their respective affiliates, members, principals, and their respective advisors have proceeded in good faith and without collusion in all respects. The Asset Purchase Agreements and each of the transactions contemplated therein were negotiated, proposed, and entered into by the Trustee, on behalf of the Debtor, and the Purchasers in good faith, without collusion and from arm's-length bargaining positions. The Purchasers are "good faith purchasers" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, are entitled to all the benefits and protections afforded thereby. The reversal or modification on appeal of the authorization provided herein of the Transaction shall neither affect the validity of the Transaction nor the transfer of the Purchased Assets to the Purchasers, free

---

Agreements.

and clear of Liens, Claims, Interests and Encumbrances, unless such authorization is duly stayed before the Closing pending such appeal.

21.    Pursuant to Sections 105 and 363 of the Bankruptcy Code, the Trustee, on behalf of the Debtor, and the Purchasers are each hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the Transaction on the terms and subject to the conditions set forth in the Asset Purchase Agreements and the other transactions contemplated thereby; (b) assume and/or assign the Assigned Contracts to the Purchasers; and (c) perform, consummate, implement and fully close the transactions contemplated by the Asset Purchase Agreements and execute and deliver any additional instruments and documents that reasonably may be necessary or desirable to implement the Asset Purchase Agreements or any transactions relating thereto.

22.    Except as set forth in the Asset Purchase Agreements, the terms and provisions of the Asset Purchase Agreements and this Order shall be specifically enforceable and binding in all respects upon, or shall inure to the benefit of the Debtor, the Debtor's estate, the New Jersey Centers, the Debtor's creditors, the Purchasers, and their respective affiliates, successors and assigns, and any affected third parties, including all persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors or any trustee, examiner or receiver.

23.    Neither the provisions of New Jersey's Uniform Commercial Code, nor any other bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the Transaction on the terms set forth in this Order and in the Asset Purchase Agreements.

24.     Upon the consummation of the Transaction and the payment by Purchasers of the Purchase Price, SSG shall be entitled to a fee upon closing of such Transaction, equal to seven (7%) of the consideration for the Transaction, which has been previously approved by the Court (the "SSG Commission").  Other than SSG, no brokers were involved in consummation of the Transaction and no broker's commissions are due to any person or entity in connection with the Transaction.

25.     The consideration provided by the Purchasers for the Purchased Assets under the Asset Purchase Agreements shall be deemed for all purposes to constitute value and fair consideration under the Bankruptcy Code and any other applicable law, and the Transaction may not be avoided, or costs or damages imposed or awarded under Section 363(n) or any other provision of the Bankruptcy Code.

26.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchasers on the Closing Date pursuant to the terms of the Asset Purchase Agreements, free and clear of all Liens, Claims, Interests and Encumbrances.

27.     This Order is and shall be binding upon and shall authorize and direct all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, and/or report or insure any title or state of title in or to the Purchased Assets.  All such persons and entities

described above in this paragraph are authorized and specifically directed to strike all recorded Liens, Claims, Interests and Encumbrances against the Purchased Assets from their records, official and otherwise, and to accept and honor any documents or instruments relating to the Purchased Assets as contemplated by the Asset Purchase Agreements and this Order.

28.    If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or Interests in, the Purchased Assets shall not have delivered to the Trustee, on behalf of the Debtor, before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purposes of documenting the release of all Liens that the person or entity has or may assert with respect to any of the Purchased Assets, (a) the Trustee, on behalf of the Debtor, and the Purchasers are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets, and (b) the Purchasers are hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Interests and Encumbrances against the Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

29.    All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchasers, and shall not charge the Purchasers for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transaction.

30.     Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction and other transactions contemplated by the Asset Purchase Agreements.

31.     Except only to the extent otherwise expressly agreed to by the Debtor  and the Purchasers in the Asset Purchase Agreements, no governmental unit or regulatory authority may revoke or suspend any right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Purchasers on account of the filing or pendency of the chapter 11 case or the consummation of the Transaction.

32.     Except as otherwise provided in the Asset Purchase Agreements, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier, or employee of the Debtor shall be transferred to the Purchasers free and clear of all Liens, Claims, Interests and Encumbrances (other than the Assumed Liabilities) and shall be delivered at the time of Closing to the Purchasers.  All persons that are currently in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Purchasers as of the Closing.

33.     Upon the Closing, all persons and entities, including but not limited to the Debtor's and the New Jersey Centers' employees, former employees, all debt security holders, equity security holders, administrative agencies, governmental, tax and regulatory authorities, secretaries of state, state and local officials, lenders, contract parties, lessors, trade creditors and all other creditors holding Liens, Claims, Interests or Encumbrances of any kind or nature whatsoever against the Debtor, the New Jersey Centers or any of their respective interests in the Purchased

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

noncontingent, known or unknown, liquidated or unliquidated, senior or subordinated), arising

under or out of, in  connection with, or in any way relating to the Debtor's or the New Jersey

Centers' business operations or the Purchased Assets, or with respect to any Liens, Claims,

Interests and Encumbrances arising out of or related to the Transaction, shall be and hereby are

permanently and forever barred, estopped, restrained and enjoined from (a) commencing or

continuing in any manner any action or other proceeding against the Purchaser, its affiliates,

successors or assigns, assets or properties, (b) enforcing, attaching, collecting or recovering in any

manner any judgment, award, decree, or order against the Purchaser, their affiliates, successors or

assigns, assets, or properties, (c) creating, perfecting, or enforcing any Claims against the

Purchaser, their successors or assigns, assets or properties, (d) asserting  a  Claim  as  a  setoff,

right  of  subrogation  or  recoupment  of  any  kind  against  any obligation due the Purchasers or

their successors or assigns, or (e) commencing or continuing any action in any manner or place

that does not comply, or is inconsistent, with the provisions of this Order or the agreements or

actions contemplated or taken in respect thereof.

34.    Notwithstanding anything else in this Order, except as set forth in paragraph 18 of

this Order and/or unless expressly agreed to in writing by the United States, (a) this Order shall

not release, terminate, discharge, bar, estop, restrain, or enjoin any Liens, Claims, Interests, or

Encumbrances of the United States (including its departments, agencies, corporations, officers,

employees and/or agents) against the Debtor, the New Jersey Centers, the Purchased Assets, the

Purchasers (including each of their affiliates, successors or assigns, assets or properties) and this

Order does not limit, modify, or in any way affect the United States' ordinary course relationship

with the Debtor, the New Jersey Centers, the Purchased Assets, or the Purchasers, including the

United States' ability to regulate enrollment or participation as a Medicare supplier or provider or its related authority to review, approve, deny, pay, recoup or set off Medicare claims in the ordinary course of business in accordance with the Medicare statute and regulations under 42 U.S.C. §§ 1395-1395lll, 42 C.F.R. Chapter IV, and the policies and procedures thereunder, and (b) the United States takes no position with respect to, and nothing herein shall be construed as the United States' consent to, or acceptance of, the Asset Purchase Agreements or the underlying Transaction, or that by this Order any of the Debtor, the New Jersey Centers, the Purchased Assets, or the Purchasers, is granted any right, privilege, consent, release, termination, discharge, bar, estoppel, restraint, or injunction of any Liens, Claims, Interests, or Encumbrances under any United States federal law except as authorized under the Bankruptcy Code.  The Trustee, Debtor, New Jersey Centers, and Purchasers agree, and shall not challenge, that the United States may, in its sole discretion, set off or recoup against the New Jersey Centers any federal government payments due to the New Jersey Centers relating to time periods prior to the Closing, including Medicare payments, to collect the DOJ Judgment. For the avoidance of doubt, except to the extent set forth herein and in the Stipulation and Consent Orders [Dkt. Nos. 596 & 657], this Order does not otherwise resolve whether the United States of America has the ability to setoff or recoupment against federal government payments due to the Debtor or the Centers.

35.    Notwithstanding anything to the contrary in the Central Jersey APA (including any ancillary documents executed in connection therewith), any pleading with respect to the Transaction, or this Order, (a) TIAA Commercial Finance, Inc.'s ("TIAA") rights under certain lease agreements between TIAA, on the one hand, and Debtor's non-debtor subsidiaries (including without limitation, the Central New Jersey Center), on the other hand (collectively, the "Non-Debtor Subsidiary TIAA Contracts") are fully preserved against all non-Debtor parties and nothing

in the Central Jersey APA (including any ancillary documents executed in connection therewith), any pleading with respect to the Transaction, or this Order or the Transaction itself shall or be deemed to impair, release, infringe upon, limit, prejudice or otherwise adversely affect any such rights; (b) none of the Non-Debtor Subsidiary TIAA Contracts shall be Assigned Contracts absent further agreement or court order after notice and an opportunity to respond; and (c) none of the equipment that is the subject of the Non-Debtor Subsidiary TIAA Contracts shall be included in the Transaction absent further agreement or court order after notice and an opportunity to respond. The foregoing preservation of rights includes, without limitation, TIAA's rights under applicable non-bankruptcy law against all non-Debtor parties on account of any present or future defaults under the Non-Debtor Subsidiary TIAA Contracts, including any defaults that may arise out of or relate to the Transaction.

36.    Notwithstanding anything to the contrary in the Asset Purchase Agreements (including any ancillary documents executed in connection therewith), any pleading with respect to the Transaction, or this Order, any and all rights of Philips Medical Capital LLC ("Philips") in and to the Purchased Assets pursuant to the various leases (the "Philips Leases") between Philips and the Debtor are fully preserved, subject to any claims and/or defenses of the Debtor, and nothing in the Asset Purchase Agreement (including any ancillary documents executed in connection therewith), any pleading with respect to the Transaction, or this Order or the Transaction itself shall or be deemed to impair, release, infringe upon, limit, prejudice or otherwise adversely affect any such rights.

37.    The sale of the Purchased Assets shall be free and clear of any stamp or similar taxes, as and to the extent provided by 11 U.S.C. § 1146(a).

38.     The Trustee is hereby granted, on behalf of the Debtor and the New Jersey Centers, the authority (without obligation) to accept the tender of the Class B Interests in the New Jersey Centers from any holder of Class B interests wishing to tender such interests for no consideration.

39.     In the event that there is a direct conflict between the terms of this Order and the terms of (a) the Asset Purchase Agreements (including all ancillary documents executed in connection therewith), (b) any prior order of this Court, or (c) any pleading with respect to the Transaction, the terms of this Order shall govern.

40.     Nothing contained in any chapter 11 plan hereinafter confirmed in this chapter 11 case, or any order confirming such plan, shall conflict with or derogate from the provisions of the Asset Purchase Agreements or the terms of this Order unless expressly consented to in writing by the Purchaser.

41.     This Order and the Asset Purchase Agreements shall be binding in all respects upon all creditors and interest holders of the Debtor and the New Jersey Centers, their employees, all counterparties to the Assigned Contracts, any statutory committee appointed in this chapter 11 case, all successors and assigns of the Debtor or the New Jersey Centers and each of their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in this chapter 11 case or upon a conversion of this case to chapter 7 under the Bankruptcy Code, and the Asset Purchase Agreements shall not be subject to rejection or avoidance under any circumstances.

42.     The failure specifically to include or make reference to any particular provisions of the Asset Purchase Agreements or any agreement or document relating thereto in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the Asset Purchase Agreements and any document or agreement to be executed in connection therewith be authorized and approved in their entirety.

43.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) the terms of this Order shall be self-executing and immediately effective and enforceable upon its entry; (b) the Trustee, on behalf of the Debtor, is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Trustee, in his discretion and without further delay, may take any action and perform any act on behalf of the Debtor authorized under this Order.

44.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

45.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (a) interpret, implement and enforce the terms and provisions of either this Order (including any of the injunctive relief provided herein) or of the Asset Purchase Agreements including any amendments thereto and any waivers and consents provided in respect thereof (and of each of the agreements executed in connection therewith); (b) protect the Purchasers and/or the Purchased Assets from and against any Liens, Claims, Interests and Encumbrances and any claims related to the Excluded Liabilities or any "successor liability" Claims of any kind or nature whatsoever, including, without limitation, through the issuance of injunctive relief; (c) compel the transfer and delivery of all of the Purchased Assets to the Purchasers; (d) adjudicate any

disputes arising under or related to this Order, the Asset Purchase Agreements or related transactions; and (e) enforce the injunctions set forth herein.

46.    The provisions of this Order are final, non-severable and mutually dependent.

Dated: ___May 11th___, 2021

_____
HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**
**(VAC Central Jersey APA)**

**ASSET PURCHASE AGREEMENT**

**by and between**

**PISCATAWAY ENDOVASCULAR CENTER LLC as Purchaser**

**and**

**VASCULAR ACCESS CENTERS, L.P. AND VASCULAR ACCESS CENTER OF CENTRAL NEW JERSEY, LLC**

**as Seller**

**Dated as of April___, 2021**

# PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "Agreement") is dated as of February___, 2021 (the "Effective Date"), by and between Piscataway Endovascular Center LLC, a New Jersey limited liability company ("Purchaser"), **VASCULAR ACCESS CENTERS, L.P.**, a Pennsylvania limited partnership (the "Debtor") and **VASCULAR ACCESS CENTER OF CENTRAL NEW JERSEY, LLC** ("VAC Central Jersey," and together with the Debtor, collectively, the "Seller").

## WITNESSETH:

WHEREAS, on November 12, 2019, an involuntary petition was filed against Vascular Access Centers, L.P. for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"), Bankr. Case. No. 2:19-BK-17117-AMC; and

WHEREAS, on February 12, 2020, an Order was entered by the Bankruptcy Court approving the appointment of Stephen V. Falanga (the "Trustee") as chapter 11 trustee of the bankruptcy estate of the Debtor; and

WHEREAS, the Debtor conducts its business through several limited liability company subsidiaries throughout the United States, including VAC Central Jersey, located at 1 Wills Way Central NJ Medical Park, Piscataway, NJ 08854 (the "Leased Property")and

WHEREAS, due to restrictions on the corporate practice of medicine in the State of New Jersey, the New Jersey Department of Health (the "DOH") registration to operate VAC Central Jersey as a surgical practice in the State of New Jersey is held for the beneficial interest of the Debtor and VAC Central Jersey by an entity known as James F McGuckin MD of NJ, PA, a New Jersey professional association ("McGuckin NJ"); and

WHEREAS, VAC Central Jersey filed its Certificate of Organization with the New Jersey Department of State on March 26, 2010 and operates pursuant to an operating agreement effective as of that date (the "Operating Agreement"); and

WHEREAS, pursuant to the Operating Agreement, the Debtor holds a majority (51%) of the Class A membership interests in VAC Central Jersey; and

WHEREAS, as the holder of the majority of Class A membership interests in VAC Central Jersey, and pursuant to the Operating Agreement, the Debtor is entitled to take such actions as may require affirmance by a majority of the voting interests; and

WHEREAS, the Trustee, having assumed control of the Debtor's affairs, is entitled to vote the Debtor's interest in VAC Central Jersey; and

WHEREAS, Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets (as defined herein) and Assumed Liabilities (as defined herein), all as more specifically provided herein; and

WHEREAS, the Purchased Assets will be sold pursuant to an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code; and

WHEREAS, certain additional terms used in this Agreement are defined in ATTACHMENT A below.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements hereinafter contained, and the foregoing recitals, which are incorporated as if set forth at length herein below, and for good a valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1    PURCHASE & SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1      PURCHASE AND SALE OF ASSETS.

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall, subject to Section 1.4, sell, transfer, assign, convey and deliver to Purchaser (the "Contemplated Transaction"), all of each Seller's rights, title and interest in, to and under the Purchased Assets, free and clear of any and all existing Liens or adverse claims. "Purchased Assets" means all of the Seller's assets, rights and properties primarily pertaining to or used in connection with the Business as existing on the Closing Date, other than the Excluded Assets as defined herein, including:

1.1.1    Any furniture and equipment, including medical equipment, tools, and other tangible personal property owned by Seller, identified on **Schedule A**.

1.1.2    Any acquired disposable medical supply inventory (the "Purchased Inventory") on hand as of the Closing Date that is not within ninety (90) days of the manufacturer's expiration date, which payment shall be made ten (10) days after completion of a mutually performed inventory assessment.

1.1.3    The Equipment Leases[1], Real Property Lease and any other assumed and/or assigned contracts and/or leases identified on **Schedule B** hereto (the "Assigned Contracts"); provided, however, that, if the contractual counterparty to any Assigned Contract requests a Cure Amount, Purchaser may elect to remove such Assigned Contract from **Schedule B** at any time prior to Closing.

1.1.4    The License and all permits and applicable licenses used by Seller in the operation of the Business.

---

[1] Nothing in this Agreement shall be construed as a determination by the Trustee that the Equipment Leases, or any of them, are true leases and the Trustee reserves all rights with respect thereto.

1.1.5    All rights in connection with any deposits, prepaid charges and expenses, escrows and similar items in connection with any Purchased Assets or Assumed Liabilities.

1.1.6    All claims, refunds, credits, causes of action, rights of recovery and rights of set-off of any kind relating to the Purchased Assets or Assumed Liabilities, whether arising by way of counterclaim or otherwise.

1.1.7    All transferable rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Purchased Assets.

1.1.8    All insurance benefits, including rights, claims and proceeds related to or arising from any Purchased Assets or Assumed Liabilities.

1.1.9    Employee files of Transferred Employees.

For the avoidance of doubt, none of the above listed Purchased Assets include the rights, claims, or causes of action set forth in Section 1.2.8 herein.

1.2    EXCLUDED ASSETS.

Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" means the following assets, properties, interests and rights of the Seller:

1.2.1    all cash, cash equivalents, bank deposits or similar cash items, all securities and interests, and all Pre-Closing Accounts Receivable or trade receivables;

1.2.2    the Excluded Contracts;

1.2.3    any rights to refunds, settlements and retroactive adjustments to the extent applicable to periods ending on or before the Closing Date arising in connection with the Business;

1.2.4    any:

1.2.4.1 personnel files for Employees of the Business who are not Transferred Employees;

1.2.4.2 other books and records that the Seller is or may be required by Law to retain; provided, however, that, subject to Section 1.7, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets;

3

1.2.4.3 Documents that Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third-party;

1.2.4.4 books and records and other Documents related to tort prevention programs, credentialing, incident reporting or quality assurance to the extent confidential under applicable Law that Seller elects or is required to retain;

1.2.4.5 Documents relating to proposals to acquire the Business by Persons other than Purchaser;

1.2.4.6 Documents related to Pre-Closing Accounts Receivable;

1.2.4.7 any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; and

1.2.4.8 Documents necessary to prepare the Seller's Tax Returns;

1.2.5   any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes incurred prior to the Closing Date, together with any interest due thereon or penalty rebate arising therefrom;

1.2.6   all insurance policies or rights to proceeds with respect to Excluded Assets and in respect of any excluded liabilities;

1.2.7   all deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

1.2.8   any rights, claims or causes of action of Seller relating to assets, properties, business or operations of the Seller including without limitation any actions under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code or applicable state law;

1.2.9   any right to receive or expectancy in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

1.2.10  all other rights of Seller under this Agreement and the Contemplated Transaction.

1.3      <u>ASSUMPTION OF LIABILITIES</u>.

1.3.1   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge when due in accordance with their respective terms, only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>") with respect to the Purchased Assets:

1.3.1.1 all Liabilities arising from and after the Closing with respect to the Purchased Assets, but only to the extent that such Liabilities relate to events occurring and/or actions taken by the Purchaser after the Closing; and

1.3.1.2 those Employee-related Liabilities of Seller that Purchaser has specifically agreed to assume in Section 8.2, but only to the extent provided in Section 8.2;

1.3.1.3 the Cure Amounts as required by Section 1.4.

Purchaser shall also assume, effective as of April 1, 2021until the Closing or the termination of this Agreement in accordance with the terms hereof, and shall timely pay, perform, and discharge when due in accordance with their respective terms, the following liabilities relating to VAC Central Jersey:

1.3.2 all Employee-related Liabilities relating to the Transferred Employees;

1.3.2.1 Omitted.

1.3.2.2 the Real Property Lease, Equipment Leases (as that term is defined on **Schedule B** hereto); and

1.3.2.3 any other carrying costs relating to VAC Central Jersey.

1.3.3    Except for the Assumed Liabilities or to the extent included in the Cure Amounts, Purchaser shall not be deemed to assume or accept the assignment of any Liabilities of Seller, McGuckin NJ or any of their respective Affiliates existing as of the Closing Date and/or relating to periods on or prior to the Closing Date, including, without limitation, any Liabilities which may be incurred by reason of any tax obligation arising on or prior to the Closing Date, or by reason of any breach of or default under any Assigned Contract arising on or prior to the Closing Date (the "Excluded Liabilities"). Further, Purchaser does not intend to be, and the Parties agree that Purchaser is not, a successor to Seller, VAC Central Jersey, the Central Jersey Center, McGuckin NJ or their respective Affiliates by any theory of law or equity.

1.4    CURE AMOUNTS.

Except as set forth in Section 1.1.3, at the Closing and pursuant to Section 365 of the Bankruptcy Code, where applicable, the Seller shall assign to Purchaser, and Purchaser shall assume from the Seller, the Assigned Contracts. Except as set forth in Section 1.1.3, the following amounts (the "Cure Amounts"), as determined by the Bankruptcy Court, or pursuant to the terms of the Assigned Contract(s), as applicable, necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any defaults under the Assigned Contracts shall (a) be paid by Purchaser

5

at the Closing; or (b) Purchaser shall have delivered into escrow at or prior to Closing, on terms reasonably acceptable to Seller, amounts sufficient to pay any Cure Amount that remains disputed as of the Closing. The Cure Amounts shall be determined by the Bankruptcy Court, except as otherwise agreed to by the counterparty to the Assigned Contracts:

**[INSERT DESCRIPTION OF CURE AMOUNTS]**

      1.5      <u>FURTHER CONVEYANCES AND ASSUMPTIONS</u>.

From time to time following the Closing, each party shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to the Seller, and their successors and assigns, the Purchaser's assumption of the Assumed Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby and thereby. If Purchaser or its Affiliates receives any Excluded Assets (or any payments or related proceeds) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. If Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver to Purchaser such Purchased Assets (or any payments or related proceeds).

      1.6      <u>BULK SALES LAWS</u>.

As soon as reasonably practicable following the Bankruptcy Court's approval of Purchaser as the prevailing bidder, Seller shall cooperate with Purchaser's preparation of an application, which shall be submitted by Purchaser to the New Jersey Department of the Treasury, Division of Taxation (the "<u>Division</u>") for a tax clearance letter from the Division (the "<u>Tax Clearance Letter</u>") in connection with the sale of the Purchased Assets hereunder. If the Division issues a tax escrow letter ("<u>Tax Escrow Letter</u>"), instead of a Tax Clearance Letter, Purchaser shall hold, or cause to be held, in escrow the amount specified in the Tax Escrow Letter ("<u>Tax Escrow Amount</u>"). Upon Purchaser's receipt of a Demand for Escrow Payment or similar correspondence from the Division, Purchaser shall, subject to Seller and Purchaser's right to terminate this Agreement, remit the required Tax Escrow Amount (the "<u>Bulk Sale Amount</u>") from the Purchase Price to the Division and the remaining balance shall be distributed to Seller in accordance with Section 2. Notwithstanding anything herein to the contrary, if Purchaser receives a Demand for Escrow Payment or similar correspondence from the Division that requires Purchaser to remit to the Division an amount greater than $10,000 with respect to the taxes due and owing by Seller, VAC Central Jersey and/or McGuckin NJ to the State of New Jersey, then Purchaser or Seller shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination. Notwithstanding anything to the contrary contained herein, Seller shall have fourteen (14) days from receipt of a Tax Escrow Letter or similar correspondence from the Division to resolve any alleged bulk sale tax liability to Purchaser's reasonable satisfaction prior to Purchaser exercising any termination right pursuant to this Section. Nothing herein shall prejudice or affect Seller's rights under the Bankruptcy Code and applicable law with respect to

the State of New Jersey including, without limitation, any claims or rights to payment asserted by the State of New Jersey.

1.7      CONFIDENTIALITY OF PATIENT INFORMATION.

**The Seller shall cause an appropriate medical records custody agreement ("Medical Records Custody Agreement") to be entered into whereby Seller will transfer custody to Purchaser of all medical records of all active patients treated at VAC Central Jersey during the \_\_\_\_\_ (\_) month period preceding the date of this Agreement. Except as set forth in the immediately preceding sentence,** Seller shall have no obligation to make available to Purchaser hereunder any confidential patient information until an appropriate Medical Records Custody Agreement is entered into, and then any such obligation of Seller shall be subject to Purchaser's compliance with the terms and conditions of such Medical Records Custody Agreement.

2   CONSIDERATION

2.1      CONSIDERATION.

Subject to the terms and conditions of this Agreement, the aggregate consideration for the Purchased Assets equals One Million Eighty Thousand Dollars ($1,080,000.00) (as adjusted, the "Purchase Price"), which shall be paid in the manner set forth in this Section 2.

2.2      PURCHASE PRICE DEPOSIT.

Within two (2) business days of execution of this Agreement, Purchaser shall tender to counsel to the Trustee ("Escrow Agent") a cash deposit equal to ten percent (10%) of the Purchase Price (i.e., $108,000.00) via wire transfer or other certified funds, which shall be held in a non-interest bearing trust account and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement (the "Initial Deposit"). The Initial Deposit shall be non-refundable, except as expressly provided herein, and, if applicable, shall be credited to the Purchase Price at Closing. For the avoidance of doubt, Seller and Purchaser shall hold Escrow Agent harmless from any liability in connection with its role as Escrow Agent, except for acts of intentional conduct or gross negligence. Should there be any dispute as to the disposition of the Initial Deposit, Escrow Agent shall have the right to either (1) continue to hold the Initial Deposit until resolution of the dispute; or (2) remit the Initial Deposit to the clerk of a court of competent jurisdiction. It is agreed that Escrow Agent shall not be disqualified from representing the interests of Seller or the Trustee by virtue of its service as Escrow Agent. The provisions of this paragraph 2.2 shall survive termination of this Agreement prior to Closing, and shall survive closing.

2.3      CLOSING DATE PAYMENT.

Subject to the terms and conditions of this Agreement, at the Closing, Escrow Agent shall release, in immediately available funds by wire transfer to one or more bank accounts (designated in writing by the Seller Parties at least two (2) business days prior to the Closing Date), an amount equal to the Purchase Price *less*: (i) the Initial Deposit; and (ii) any applicable any bulk sales amounts and Transfer Taxes to the extent set forth in Sections 1.6 and 10.1 (such amount, the "Closing Date Payment").

2.4    <u>DUE DILIGENCE PERIOD</u>.

Purchaser shall have until the filing of the Sale Motion with the Bankruptcy Court (the "<u>Due Diligence Deadline</u>") to inspect and investigate the Seller and their respective properties, assets, business or operations, books and records, independently or through agents, representatives or experts of Purchaser's choosing, as Purchaser considers necessary or appropriate. Purchaser shall give Seller reasonable advance notice of such entry, including the identity of the persons and entities who will seek entry and who will perform any inspection, testing or investigation, and Purchaser, and its employees, contractors and other agents, shall conduct such entry and all such inspections, testing and investigations in connection therewith so as to minimize interference with the operations of the Business. If Purchaser is not satisfied with the results of the due diligence investigation, Purchaser shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination and the Parties shall be free from further liability to one another.

2.5    INTERIM ARRANGEMENTS

Purchaser (or its designee) shall have the right to enter into a mutually agreeable interim management services agreement with Seller and/or McGuckin NJ, as applicable, pursuant to which Purchaser may provide business support, management, and other non-clinical administrative services to or on behalf of Seller and/or McGuckin NJ, as applicable.

3   <u>CLOSING AND TERMINATION</u>

3.1    <u>CLOSING DATE</u>.

Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Section 1.3 (the "<u>Closing</u>") shall take place virtually via the exchange of signatures electronically and via overnight mail at 10:00 a.m. (Eastern time) on a date that is no later than five (5) business days after the satisfaction or waiver of the conditions set forth in Section 9 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, shall have been agreed to in writing by Seller and Purchaser. Unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in any asset to be acquired by Purchaser hereunder, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.

3.2    <u>DELIVERIES BY SELLER</u>.

At or prior to the Closing, Seller shall deliver to Purchaser:

> 3.2.1  a true and complete copy of the Bankruptcy Court's Order approving the appointment of Seller as Chapter 11 Trustee for Debtor's estate;

3.2.2    a bill of sale duly executed by Seller in a form reasonably acceptable to Purchaser and Seller;

3.2.3    to the extent necessary, a duly executed assignment and assumption agreement with respect to each Assigned Contract (including all required consents associated therewith) in a form reasonably acceptable to Purchaser and Seller;

3.2.4    a duly executed Medical Records Custody Agreement in a form reasonably acceptable to Purchaser;

3.2.5    a copy of the final Sale Order;

3.2.6    the Purchased Assets free and clear of all Liens and adverse actions;

3.2.7    the License and Permits;

3.2.8    Omitted;

3.2.9    true and complete copies of the resolutions of Seller's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Seller or, alternatively, a Court Order authorizing the Trustee to consummate the Contemplated Transaction on behalf of the Debtor;

3.2.10   true and complete copies of the resolutions of VAC Central Jersey's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by VAC Central Jersey, or, alternatively, a Court Order authorizing the Trustee to consummate the Contemplated Transaction on behalf of VAC Central Jersey;

3.2.11   true and complete copies of the resolutions of the McGuckin NJ's Board of Managers, Board of Directors, or other governing body or manager, certified by its Secretary, if applicable, authorizing the License to be transferred from McGuckin NJ to Purchaser in connection herewith, or, alternatively, a Court Order authorizing the Trustee to transfer the License from McGuckin NJ to Purchaser;

3.2.12   all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens;

3.2.13  copies of all consents required by Section 9.3.4 for which Seller is responsible.

3.3      DELIVERIES BY PURCHASER.

At or prior to the Closing, Purchaser shall deliver to Seller:

3.3.1   the Closing Date Payment, in immediately available funds, as set forth in Section 2.3 hereof; together with instructions to the Trustee's counsel to disburse to Seller the Escrowed Funds as a credit against the Purchase Price then due;

3.3.2   a duly executed assignment and assumption agreement with respect to each Assigned Contract in a form reasonable acceptable to Purchaser and Seller;

3.3.3   the officer's certificates required to be delivered pursuant to Section 9.2.1;

3.3.4   a certificate of good standing of recent date of Purchaser from the State of New Jersey;

3.3.5   true and complete copies of Purchaser's certificate of formation and all amendments thereto, certified by the State of New Jersey;

3.3.6   true and complete copies of Purchaser's operating agreement or LLC agreement, certified by one of its authorized officers, members or managers;

3.3.7   certificates from Purchaser's authorized officers, members or managers that Purchaser's certificate of Formation has not been amended since the date of the certificate described in Section 3.3.5 above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in Section 3.3.4 above, that would adversely affect Purchaser's corporate existence or good standing;

3.3.8   true and complete copies of the resolutions of Purchaser's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Purchaser;

3.3.9   certificates from the Purchaser's Manager or other authorized officer as to the incumbency and signatures of each officer, member or manager of Purchaser executing this Agreement and any other documents required under this Agreement;

3.3.10  copies of all consents required by Section 9.3.4 for which Purchaser is responsible;

3.3.11  evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of Cure Amounts (if any) required by Section 1.4; and

3.3.12  such other documents, instruments and certificates as Seller may reasonably request.

3.4        TERMINATION OF AGREEMENT.

In respect of the Contemplated Transaction, this Agreement may be terminated prior to the Closing as follows:

3.4.1    Termination by Purchaser.  Purchaser may terminate this Agreement upon the occurrence of any of the following:

3.4.1.1 If Purchaser shall not be satisfied with the results of its investigation during the Due Diligence Period, Purchaser may, at its option, terminate this Agreement by giving written notice to Seller on or before the Due Diligence Deadline, **TIME BEING OF THE ESSENCE**. If Purchaser fails to notify Seller of its election to terminate the Agreement pursuant to this Section 3.4.1.1 on or before the Due Diligence Deadline, this contingency shall be automatically waived by Purchaser.  If Seller receives the election to terminate by Purchaser prior to the Due Diligence Deadline, this Agreement shall terminate forthwith. Purchaser shall deliver to Seller all information, inspections, tests, audits, studies, reports and other information about the Facility or the Business that Purchaser may have obtained during the Due Diligence Period.

3.4.1.2 If any of the conditions to the obligations of Purchaser to close that are set forth in Sections 9.1 and 9.3 shall have become incapable of fulfillment other than as a result of a material breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

3.4.1.3 if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement ("Event of Seller's Default"), which breach has not been cured within fifteen (15) Business Days after the giving of written notice by Purchaser to Seller; provided, however, that if the breach may be cured but is not susceptible of being cured within fifteen (15) days, Purchaser may not terminate this Agreement if Seller commences to cure the breach within such fifteen (15) day period and continues thereafter with reasonable diligence to effect a cure of the breach (the "Seller's Cure Period"); or

11

3.4.1.4 subject to the Court's availability, if the Sale Order shall not have been entered within sixty (60) days from the date hereof except as a result of a material breach by Purchaser of any covenant or agreement contained in this Agreement.

3.4.1.5 if the DOH determines that the License may not be transferred to Purchaser.

3.4.1.6 The termination, expiration or non-renewal of the Real Property Lease.

3.4.1.7 In the event Purchaser elects to terminate this Agreement pursuant to Section 3.4.1 or 3.4.3, Seller's sole obligation shall be to cause the Initial Deposit to be refunded to Purchaser; provided, however, that Seller may retain the Initial Deposit only by reason of the failure of the condition precedent set forth in Section 9.1.2 to be satisfied (unless such failure results, in whole or in part, from Seller breaching any material representation, warranty, or covenant contained in this Agreement or if the DOH determines that the License may not be transferred. Upon such refund being made, the Parties hereto shall have no further liability or responsibility of any nature whatsoever to each other hereunder. In no event shall Seller be liable to Purchaser for compensatory, consequential, punitive or any other form of damages, except in the case of Seller's fraud, gross negligence or willful misconduct.

3.4.2    Termination by Seller. Seller may terminate this Agreement upon the occurrence of any of the following:

3.4.2.1 if any of the conditions to the obligations of Seller to close that are set forth in Sections 9.2 and 9.3 shall have become incapable of fulfillment other than as a result of a material breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

3.4.2.1(a) if the DOH determines that the License may not be transferred to Purchaser;

3.4.2.2 if there shall be a material breach by Purchaser of any material representation or warranty, or by Purchaser of any material covenant or agreement contained in this Agreement ("Event of Purchaser's Default") which breach has not been cured within fifteen (15) Business Days after the giving of written notice by Seller to Purchaser; provided, however, that if the breach is not susceptible of being cured within fifteen (15) days, Seller may not terminate this Agreement if Purchaser commences to cure the breach within such fifteen (15) day period and continues thereafter with reasonable

diligence to effect a cure of the breach (the "Purchaser's Cure Period"); or

3.4.2.3 so long as Seller is not then in breach of its obligations under this Agreement in any material respect, if the Sale Order shall not have been entered within sixty (60) days from the date hereof.

3.4.2.4 In the event Seller elects to terminate this Agreement pursuant to Section 3.4.2.1 (but only to the extent such termination is the result of Purchaser's failure to satisfy any of the conditions set forth in Section 9.2) or Section 3.4.2.2, Seller shall be entitled to retain the Initial Deposit, as LIQUIDATED DAMAGES, it being understood between the Parties that damages would be difficult, if not impossible, to determine, and therefore the Parties hereto agree that the Initial Deposit represents appropriate liquidated damages. These liquidated damages shall be Seller's sole remedy and in no event shall Purchaser be liable to Seller for compensatory, consequential, punitive or any other form of damages other than the Initial Deposit. In the event Seller elects to terminate this Agreement under Sections 3.4.2.1 (other than as a result of Purchaser's failure to satisfy any of the conditions set forth in Section 9.2) or 3.4.2.3, the Initial Deposit shall be refunded to Purchaser and the Parties shall thereafter be free from further liability to one another.

PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT: (I) IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO DETERMINE SELLER'S ACTUAL DAMAGES IN THE EVENT THAT THE CLOSING FAILS TO OCCUR BY REASON OF PURCHASER'S DEFAULT UNDER THIS AGREEMENT, WHICH DAMAGES WOULD INCLUDE, BUT NOT BE LIMITED TO, SELLER'S LOST SALE OPPORTUNITIES DURING THE PERIOD THAT THE PROPERTY IS TAKEN OFF THE MARKET; AND (II), TAKING INTO ACCOUNT ALL OF THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE SUM OF THE INITIAL DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S ACTUAL DAMAGES IN SUCH EVENT. CONSEQUENTLY, IN THE EVENT THE CLOSING FAILS TO OCCUR BY REASON OF PURCHASER'S DEFAULT UNDER THIS AGREEMENT AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, SELLER'S SOLE AND EXCLUSIVE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT AND TO RECEIVE AND RETAIN THE INITIAL DEPOSIT; PURCHASER SHALL MAKE, GIVE, JOIN IN, EXECUTE AND/OR DELIVER TO THE ESCROW AGENT ANY INSTRUMENT REQUIRED IN THIS

REGARD. SELLER'S RETENTION OF THE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. SELLER AND PURCHASER ACKNOWLEDGE THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

THE FOREGOING PROVISIONS SHALL, HOWEVER, IN NO WAY LIMIT (A) PURCHASER'S INDEMNITY AND/OR RELATED OR SIMILAR OBLIGATIONS, LIABILITIES OR DUTIES (E.G., PURCHASER'S OBLIGATION, LIABILITY AND DUTY TO INDEMNIFY, DEFEND AND/OR HOLD HARMLESS), BUT ONLY WHERE SUCH OBLIGATIONS, LIABILITIES OR DUTIES ARE SPECIFICALLY STATED ELSEWHERE IN THIS AGREEMENT, OR (B) ANY OBLIGATION, LIABILITY OR DUTY OF PURCHASER TO RETURN, DELIVER, ASSIGN, TRANSFER OR MAKE AVAILABLE TO SELLER DOCUMENTS, LICENSES, PERMITS, RESULTS OF DUE DILIGENCE OR OTHER INVESTIGATIONS AND THE LIKE, IT BEING THE EXPRESS INTENTION OF THE PARTIES THAT THE LIQUIDATED DAMAGES PROVIDED HEREIN SHALL APPLY TO PURCHASER'S FAILURE TO CLOSE FOR THE REASONS SPECIFIED HEREIN, BUT SHALL NOT LIMIT THE OTHER OBLIGATIONS, LIABILITIES AND DUTIES OF PURCHASER SET FORTH HEREIN.

Purchaser: _____
(Initials)

Seller: _____
(Initials)

3.4.3    <u>Termination by Purchaser or Seller</u>.  Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

3.4.3.1 by mutual written consent of Seller and Purchaser;

3.4.3.2 if the Bankruptcy Court shall enter an order approving a Competing Bid, and a transaction associated with that bid actually closes;

3.4.3.3 upon written notice to the other party if the Closing shall not have occurred within twelve (12) months of the date the Sale Order

is entered; provided, however, that if the non-terminating party is otherwise capable of satisfying the conditions to its obligations to consummate the Contemplated Transaction set forth in Section 9 such termination shall not be effective if all conditions to the obligations of the non-terminating party to consummate the Contemplated Transaction set forth in Section 9 shall have been satisfied or otherwise waived and the Closing shall have occurred within 20-days after the provision of the written notice contemplated herein; provided, further, that if the Closing shall not have occurred by the close of such date due to an action or failure to act by a Governmental Body (including, without limitation, the DOH) that prevents consummation of the Contemplated Transaction, such termination shall not be effective, so long as the Government Body's approval of the Contemplated Transaction can still be reasonably expected to occur.

3.4.3.4 <u>Extension of Time Periods</u>. The time periods for termination of this Agreement set forth in this Section 3.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court. In the event the Agreement terminates under Section 3.4.3, the Initial Deposit shall be refunded to Purchaser and the Parties shall thereafter be free from further liability to one another.

3.5      <u>PROCEDURE FOR TERMINATION</u>.

In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4, written notice thereof shall be given to the other party such that said notice is received by the other party no later than one (1) Business Day after the event of termination, and upon the receipt of such notice (or at such time as specified in the particular termination right set forth in Section 3.4) the Contemplated Transaction shall be abandoned, and this Agreement shall terminate to the extent and with the effect provided by Section 3.6, without further action by the parties.

3.6      <u>EFFECT OF TERMINATION</u>.

3.6.1   If this Agreement shall have been validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination, and such termination shall be without liability to any party; provided, however, that the obligations of the parties expressly provided herein to survive termination shall survive any such termination and shall be enforceable in accordance with their terms.

3.6.2   Nothing in this Section 3.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination, provided, however, that any such liability shall be limited to a return of the Initial Deposit. Notwithstanding the foregoing, subject to Section 6.1, no

15

attorneys' fees reasonably incurred by a party in connection with the transactions contemplated hereby or out-of-pocket expense reimbursement or other fees shall be payable to any party upon termination of this Agreement.

3.6.3   If this Agreement shall have been terminated in accordance with Sections 3.4 and 3.5, Purchaser agrees that it shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of two (2) years from the date of this Agreement, solicit any employee of the Debtor or VAC Central Jersey to join the employ of Purchaser or any of its Affiliates. Notwithstanding the foregoing, and provided there was no direct solicitation by Purchaser or its Affiliates of any of the Debtor's or VAC Central Jersey's employees, Purchaser shall not be prohibited from hiring employee(s) of the Debtor or VAC Central Jersey during said two (2) year period to the extent said employee(s) contacted Purchaser as a result of a general employment advertisement by Purchaser.

## 4   NO REPRESENTATIONS & WARRANTIES OF SELLER

Purchaser acknowledges and agrees that, since the Debtor is under the control of a bankruptcy Trustee, Seller is not making any representations or warranties whatsoever, express or implied, with respect to the Business, the Facility, or the Purchased Assets and Seller is selling the Purchased Assets **"AS IS, WHERE-IS" "WITH ALL FAULTS" and "WITH NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO: (a) THE BUSINESS; (b) FACILITY, OR (c) THE PURCHASED ASSETS. THE PURCHASED ASSETS THAT ARE BEING SOLD TO PURCHASER UNDER THIS AGREEMENT ARE HEREBY SOLD AND TRANSFERRED WITHOUT RECOURSE OR WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED. PURCHASER FURTHER ACKNOWLEDGES AND AGREES WITH SELLER THAT PURCHASER HEREBY WAIVES, RELEASES AND FOREVER DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER WITH RESPECT TO THE CONDITION OF THE PURCHASED ASSETS.

## 5   REPRESENTATIONS & WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

### 5.1      ORGANIZATION AND GOOD STANDING.

5.1.1   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Jersey and has all requisite organizational power and authority to own, lease and operate its properties and to carry on its business as now conducted.

16

5.2      AUTHORIZATION OF AGREEMENT.

Purchaser has full organizational power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with consummation of the Contemplated Transaction (the "Purchaser Documents"), and to consummate the Contemplated Transaction. Purchaser's execution, delivery and performance of this Agreement and each Purchaser Document have been duly authorized by all necessary organizational action on Purchaser's behalf. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity). **Schedule C** lists or identifies the officers or senior managers of Purchaser who are involved in the Contemplated Transaction.

5.3      CONFLICTS: CONSENTS OF THIRD PARTIES.

5.3.1    Except as may be otherwise expressly set forth herein, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with Purchaser's execution and delivery of this Agreement, Purchaser's compliance with any of the provisions hereof; consummation of the Contemplated Transaction or Purchaser's taking of any other action contemplated hereby, except for

5.3.2    Such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay Purchaser's ability to perform or consummate the Contemplated Transaction.

5.3.3    None of Purchaser's execution and delivery of this Agreement or any of the Purchaser Documents, Purchaser's consummation of the Contemplated Transaction, or Purchaser's compliance with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of Purchaser's properties or assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a

material adverse effect on Purchaser's ability to consummate the Contemplated Transaction.

### 5.4    LITIGATION.

There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, that, if adversely determined, would reasonably be expected to have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement or Purchaser's ability to consummate the Contemplated Transaction. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement or Purchaser's ability to consummate the Contemplated Transaction.

### 5.5    FINANCIAL ADVISORS.

No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

### 5.6    HEALTHCARE REGULATORY COMPLIANCE STATUS.

5.6.1    Neither Purchaser nor any of its Affiliates is involved in any litigation, investigation or other Legal Proceeding by or with any Governmental Body that, if determined or resolved adversely, would have a material adverse impact on Purchaser's ability to obtain or maintain any governmental qualification, registration, filing, license, permit, Order, approval or authorization necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where failure to have such qualification, registration, filing, license, permit, Order, approval or authorization could reasonably be expected to prevent or materially delay Purchaser's consummation of the Contemplated Transaction or Purchaser's performance of any of its material obligations under this Agreement.

5.6.2    Neither Purchaser nor its managing member has

5.6.2.1 been indicted or convicted of a crime,

5.6.2.2 been suspended or excluded from the Healthcare Programs,

5.6.2.3 had a professional license suspended or revoked, or

5.6.3    To the Knowledge of Purchaser, there is no reason why Purchaser should fail to successfully obtain approval of a Change in Ownership ("CHOW") along with the successful transfer of all related exceptions to

18

allow the Purchaser to provide dialysis vascular access and peripheral access procedures.

5.7        REGARDING CONDITION OF THE BUSINESS.

Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representation or warranty whatsoever, express or implied, and Purchaser acknowledges and agrees that the Purchased Assets are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7.1   Purchaser further represents that neither Seller nor any of their employees or Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Debtor, VAC Central Jersey, the Business, the Facility, the Purchased Assets, or the Contemplated Transaction not expressly set forth in this Agreement. Neither Seller nor any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from distribution to Purchaser or its Representatives or use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with sale of the Purchased Assets and/or the Contemplated Transaction, except in the case of fraud.

5.7.2   Purchaser acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Contemplated Transaction, Purchaser has, or will have, relied exclusively on the results of its own independent investigation.

5.7.3   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE PURCHASED ASSETS REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, TITLE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION WITH

19

RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES.

5.7.4   PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION 5.7 AND IN SECTION 4 HEREINABOVE ARE AN INTEGRAL PORTION OF THIS AGREEMENT AND THAT WITHOUT DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SELLER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT.

THE RELEASES BY PURCHASER SET FORTH IN THIS AGREEMENT INCLUDE CLAIMS OF WHICH PURCHASER IS PRESENTLY UNAWARE OR WHICH PURCHASER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH, IF KNOWN BY PURCHASER, WOULD MATERIALLY AFFECT PURCHASER'S RELEASE OF SELLER.

PURCHASER: _____
            (INITIALS)

PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER, TOGETHER WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS, WAIVERS, RELEASES, INDEMNITIES, ETC., SET FORTH IN THIS AGREEMENT, AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF. THE TERMS AND CONDITIONS OF THIS SECTION 5.7 AND SECTION 4 WILL EXPRESSLY SURVIVE THE CLOSING, WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS, AND WILL BE INCORPORATED INTO THE DEEDS AND OTHER TRANSFER DOCUMENTS DELIVERED FOR THE TRANSFER OF THE PURCHASED ASSETS.

    5.8     <u>FINANCIAL ABILITY TO CLOSE</u>.

Purchaser has the financial ability to close and the ability to do so as outlined in this Agreement.

    5.9     <u>NO OTHER REPRESENTATIONS OR WARRANTIES</u>.

Except for the representations and warranties expressly set forth in this Section 5, neither Purchaser nor any of Purchaser's Representatives nor any other Person makes or will be deemed to make any representation or warranty to Seller or any other Person, express or implied, at law or in equity, with respect to any matter whatsoever, and Purchaser hereby disclaims any such representation or warranty, whether by Purchaser or any of Purchaser's Representatives or any other Person, notwithstanding the delivery or disclosure to Seller or any other Person, or any of their respective Representatives of any documentation or other information by Purchaser or any of Purchaser's Representatives or any other Person with respect to any one or more of the foregoing.

## 6   BANKRUPTCY COURT MATTERS

### 6.1     COMPETING TRANSACTION.

6.1.1    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid"). Purchaser shall cooperate in good faith with Seller in seeking the approval of this Agreement from the Bankruptcy Court.

6.1.2    Prior to Seller's furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Purchased Assets, Seller (or its Representative) shall enter into a customary confidentiality agreement with such Person on terms no less favorable to Seller than those contained in Section 7.5.

6.1.3    Until the Bankruptcy Court's entry of the Sale Order, Seller is permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiry, proposal or offer by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, during such time period, Seller has the responsibility and obligation to respond to any inquiry or offer to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including supplying to prospective purchasers information relating to the Business and Debtor's assets.

6.1.4    In connection with the process of considering Competing Bids, Seller shall use reasonable commercial efforts to cause the Bidding Procedures Order to require a $30,000.00 overbid from the Purchase Price and bidding increments of at least $10,000.00.

6.1.5     In addition, if Purchaser shall not be the prevailing bidder through the bankruptcy sale process, Purchaser shall be entitled to a $10,000.00 transaction fee for having set the opening bidding floor for the Purchased Assets. Additionally, Seller will support Purchaser's request for expense reimbursement up to a cap of $10,000, provided the Bankruptcy Court enters an order approving a Competing Bid, and a transaction associated with that Competing Bid actually closes.

### 6.2    BANKRUPTCY COURT FILINGS.

As promptly as practicable following the execution of this Agreement, Seller shall file and seek the Bankruptcy Court's approval of the Sale Motion. Purchaser shall promptly take such actions as Seller may reasonably request to assist in obtaining entry of the Sale Order and a finding of adequate assurance of Purchaser's future performance, including furnishing affidavits or other

documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of Purchaser's performance under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. If entry of the Sale Order shall have been appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.  If an appeal shall have been taken, or if a stay pending appeal shall have been requested from the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within ten (10) Business Days a copy of the relevant notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

6.3    NOTICE OF SALE.

Notice of the sale of Purchased Assets contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable Law (including, to the extent applicable, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice under applicable Law.

7    COVENANTS

Seller and Purchaser covenant and agree with each other as follows:

7.1    ACCESS TO INFORMATION.

Subject to Section 1.7 and the other provisions of this Section 7, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make copies of such books and records.

7.1.1    Notwithstanding the foregoing, Seller shall not be required to provide to Purchaser access to

7.1.1.1 the books, records and Documents referred to in Section 1.2.4;

7.1.1.2 any books, records or Documents that Seller reasonably determines that access to which by Purchaser would be competitively disadvantageous to Seller in any material respect or

7.1.1.3 any books, records or Documents the disclosure of which by Seller to Purchaser would

7.1.1.3.1    notwithstanding Section 1.7, violate any agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or

7.1.1.3.2    violate any obligation of confidentiality by which Seller is bound under applicable Law.

7.2    <u>CONSENTS: INSURANCE</u>.

7.2.1    Seller shall use commercially reasonable efforts, and Purchaser shall absolutely cooperate with Seller, including by taking the actions referred to in Section 7.3, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller pursuant to this Agreement and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transaction on the terms and in the manner provided hereby. Seller shall not be obligated to pay any consideration therefor to any third-party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 7.3. Nothing contained herein shall require Seller to expend any funds in order to remove or eliminate any Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free of such Lien; provided, however, in respect of any such Lien, Purchaser nevertheless shall not be required to consummate the Contemplated Transaction unless the conditions referred to in Section 9.1 shall have been satisfied or waived by Purchaser.

7.2.2    Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 7.3, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transaction on the terms and in the manner provided hereby and to operate the Business after the Closing. Purchaser shall not be obligated to pay any consideration therefor to any third-party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 7.3.

7.2.3    As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

7.3    <u>THE LICENSE</u>.

7.3.1    Between the Effective Date and the Closing (or earlier termination of this Agreement), Seller shall use its commercially reasonable efforts to take all actions reasonably necessary to maintain the License in full force

and effect; provided, however, that between the Effective Date and the Closing, Purchaser shall be responsible for paying all fees and costs required to preserve the License, including, without limitation, all ambulatory care facility assessments and renewal fees. Seller shall immediately notify Purchaser of any condition, event, cause or circumstance that has resulted, or would be reasonably likely to result, in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of the License of which Seller is aware.

7.3.2    RESERVED.

7.3.3    Within five (5) business days after entry of the Sale Order, Purchaser shall, at its sole cost and expense, file an application with the DOH (the date of such filing shall be referred to as the "Filing Date") for approval to transfer the License from the Central Jersey Center to Purchaser to allow Purchaser to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility as contemplated hereunder (the "Transfer"). Seller shall cooperate with the Purchaser in completing the application for the Transfer. Both Purchaser and Seller shall each use commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.

7.3.4    Each such party shall promptly inform the other through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.

7.4    FURTHER ASSURANCES.

7.4.1    Each party shall use its commercially reasonable efforts to

7.4.1.1 take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and

7.4.1.2 cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transaction.

7.4.2    Without limiting the generality of the foregoing, promptly after discovery by Seller or any of its Affiliates after the Closing of any item included within the definition of Purchased Assets but not transferred, conveyed or assigned to Purchaser,

7.4.2.1 Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance or non-assumption of such item and provide Purchaser with all the information in Seller's

possession about, and with access to such item as Purchaser may reasonably request, and

7.4.2.2 if requested by Purchaser, Seller shall and shall cause their respective Affiliates to, use commercially reasonable efforts to transfer, convey or assign to Purchaser such item in the manner and on the terms and conditions as applicable to a Purchased Asset.

7.4.3    In addition, if Seller or its Affiliate after the Closing receives payment on any account receivable that is a Purchased Asset, it shall as soon as practicable remit such amount received to Purchaser, together will such information identifying the account to which such payment relates as is reasonably available to Seller, and, if Purchaser or its Affiliates after the Closing receives payment on any account receivable that is an Excluded Asset it shall as soon as practicable remit such amount received to Seller, together with such information identifying the account to which such payment relates as is reasonably available to Purchaser, subject to Section 1.5. Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset or a Purchased Asset. The provisions of this Section 7.4 shall survive the Closing.

7.5    <u>CONFIDENTIALITY</u>.

From and after the date hereof, Purchaser shall, and shall cause its Representatives to maintain in confidence, not disclose to any third-party without Seller's prior written consent, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.

7.5.1    For purposes of this Section 7.5,

7.5.1.1 "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, or any excluded liabilities, including methods of operation, resident information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

7.5.1.2 "<u>Business Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or any excluded liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters;

7.5.2    Seller Confidential Information does not include information that:

7.5.2.1 becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives;

7.5.2.2 becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller,

7.5.2.3 is lawfully received by Purchaser from a third-party having the right to disseminate Seller Confidential Information without restriction on disclosure or

7.5.2.4 can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser.

7.5.2.5 Upon Closing by Purchaser, the restrictions contained in this Section 7.5 shall not apply to confidential or proprietary information related primarily to the Purchased Assets, the Assumed Liabilities or the Business. Prior to the Closing, Purchaser may disclose any of Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality.

7.5.3    Business Confidential Information does not include information that:

7.5.3.1 becomes generally available to the public other than as a result of a disclosure by Seller or any of its Representatives,

7.5.3.2 becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Purchaser to be bound by a

confidentiality agreement with, or other obligation of secrecy to, Seller or

7.5.3.3 is lawfully received by Purchaser from a third-party having the right to disseminate the Business Confidential Information without restriction on disclosure.

7.5.4   Purchaser may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Seller Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Seller Confidential Information, Purchaser shall provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or such Seller waives compliance with the provisions of this Section 7.5, Purchaser shall furnish only that portion of Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

7.5.5   From and after the date on which the Sale Order shall have been entered, unless this Agreement is terminated, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third-party without Purchaser's prior written consent, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with

7.5.5.1 operating the Business in the Ordinary Course of Business prior to the Closing Date,

7.5.5.2 any investigations by Governmental Bodies,

7.5.5.3 compliance activities prior to or after the Closing related to periods occurring prior the Closing Date;

7.5.5.4 any Legal Proceedings;

7.5.5.5 enforcing any rights or other claims of Seller under this Agreement;

7.5.5.6  performing any obligations of Seller under this Agreement; or

7.5.5.7 as permitted by the Medical Records Custody Agreement.

7.5.6    Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality.

7.5.7    If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 7.5, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

The obligations contained in this Section 7.5 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

7.6        PRESERVATION OF RECORDS.

Each of Seller and Purchaser shall preserve and keep the records held by them or their Affiliates relating to operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer; provided, however that this obligation shall cease in the event Seller ceases business operations, dissolves or otherwise ceases to exist as a going concern. Subject to the provisions of this Agreement, Purchaser and Seller, as applicable, shall make such records and personnel available to the other party as may be reasonably required by the other party in connection with, among other things, Purchaser's operation of the Business, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby or to enable Purchaser to operate the Business after the Closing Date substantially in the manner operated by Seller prior to the Closing Date. If Purchaser or Seller wishes to destroy such records before or after that time, Purchaser or Seller shall first give the other ninety (90) days' prior written notice and such party shall have the right at its option and expense, upon prior written notice given to the other within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

7.7        PUBLICITY.

Purchaser shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of Seller, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of Seller upon advice of counsel, disclosure is otherwise required by applicable Law or by the

Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

7.8      SUPPLEMENTATION AND AMENDMENT OF SCHEDULES.

Each of the parties may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific section in a Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such section. From time to time prior to the Closing, each party shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement. No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Sections 9.1.1 or 9.2.1, as applicable, unless such supplement or amendment discloses a matter that will cause a Material Adverse Effect, in which case Purchaser shall have the right to terminate this Agreement pursuant to the terms of Section 3.4.1. If the Closing shall have occurred, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including, without limitation, pursuant to Section 10 hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

7.9      COOPERATION.

Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof up through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

7.10      SURRENDER OF LICENSE.

Following Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender, or cause to be surrendered, all licenses and operating certificates issued to it by any Governmental Body relating to the VAC Central Jersey.

8      EMPLOYEES AND EMPLOYEE BENEFITS

8.1      OFFERS OF EMPLOYMENT.

8.1.1    Not later than ten (10) Business Days following the entry of the Bidding Procedures Order by the Bankruptcy Court, Seller shall deliver to Purchaser **Schedule D**. At Closing, Purchaser, or its agents or representatives, shall deliver an offer of employment to those Employees listed on **Schedule D** to which Purchaser, or its agents or representatives, desires to offer employment, in Purchaser's sole discretion.  Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on **Schedule D** that between the date of the delivery of **Schedule D** and the Closing Date is hired by, or transferred to, the Business as an

Employee consistent with the provisions of this Section. Such individuals who accept such offer of employment from Purchaser are hereinafter referred to as the "Transferred Employees." Notwithstanding anything herein to the contrary, nothing in this Agreement shall (i) confer any rights upon any employee of Debtor or VAC Central Jersey, (ii) constitute or create an employment agreement or other Contract, or (iii) obligate the Purchaser or its Affiliates to employ any individual or maintain any benefit plan, policy or program or any other term of employment for any specified period of time.

8.1.2    Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-34 IRB 320, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees relating to time periods prior to the Closing and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller. In making any offers to Employees, Purchaser shall not be obligated to change the nature of the employment of any Employee other than changing the Employee's employer (for example, Employees at will shall continue to be Employees at will).

8.2    EMPLOYMENT TERMS: EMPLOYEE BENEFITS.

8.2.1    As between Purchaser and Seller, Seller shall be responsible for all Liabilities with respect to the Transferred Employees referenced in Section 8.1.1 attributable to their accrued and unused vacation, sick days, personal days and other paid time off credit through the Closing Date.

8.2.2    Omitted.

8.2.3    To the extent Seller becomes subject to any Liabilities under the WARN Act or any comparable state or local law by reason of the termination of employment by Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor and shall indemnify Seller against such Liability. Without limiting the effect of the foregoing sentence, Purchaser shall be solely responsible for giving any notice to Transferred Employees required by the WARN Act or any comparable state or local law to be given after the Closing Date. Purchaser will retain all liability for any failure of Purchaser to comply with any of the requirements of WARN, including applicable notice requirements related to any "plant closing" or "mass layoff" (each as defined under WARN), with respect to any Employee who is not a Transferred Employee.

8.2.4   To the extent any other provision of this Agreement is inconsistent with the provisions of this Section 8.2, the provisions of this Section 8.2 will control.

## 9   CONDITIONS TO CLOSING

### 9.1        CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER.

Purchaser's obligations to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

9.1.1   The completion, to Purchaser's reasonable satisfaction, of Purchaser's due diligence pursuant to the terms and conditions of this Agreement.

9.1.2   A successfully approved Change in Ownership ("CHOW"), along with the successful transfer of all related exceptions to allow Purchaser to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility, including, without limitation, unconditional approvals from the DOH with respect to the Transfer. Alternatively, if the License is not transferable to the Purchaser for any reason, then a new license to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility shall have been issued by the DOH to Purchaser.

9.1.3   Omitted.

9.1.4   Seller shall have observed, performed or complied with all obligations and agreements required in this Agreement to be observed, performed or complied with by Seller prior to the Closing Date;

9.1.5   Omitted;

9.1.6   Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2; and

9.1.7   Purchaser shall have completed an inspection of the Leased Property and determined, in Purchaser's reasonable discretion, that the Purchased Assets are located at the Leased Property and are sufficient for, and constitute all of the rights, property and assets necessary to enable, Purchaser to conduct its business and to be fully operational and prepared to receive patients immediately upon the Closing.

9.1.8   Between the Effective Date and the Closing, there are no previously undisclosed liabilities related to the Purchased Assets or otherwise to be assumed by Purchaser if the Closing occurs, exceeding $25,000 in aggregate.

9.2         <u>CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER</u>.

Seller's obligation to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

9.2.1    Purchaser's representations and warranties set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Seller shall have received a certificate dated the Closing Date signed by an authorized officer of Purchaser to the foregoing effect;

9.2.2    Purchaser shall have observed, performed or complied with all obligations and agreements required by this Agreement to be observed, performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate dated the Closing Date.

9.2.3    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 3.3.

9.3         <u>CONDITIONS PRECEDENT TO MUTUAL OBLIGATIONS</u>

The respective obligations of the parties to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

9.3.1    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting consummation of the Contemplated Transaction;

9.3.2    Omitted

9.3.3    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a final order;

9.3.4    the parties shall have received from all applicable Governmental Bodies all consents, approvals, licenses or Permits, or waivers thereof, necessary to consummate the sale of the Purchased Assets and transfer of the License to Purchaser;

9.3.5   Between the date of this Agreement and the Closing, there shall not have occurred or been threatened any event, change, circumstance or effect that, alone or in the aggregate, resulted in, or is reasonably likely to result in, a Material Adverse Effect;

9.4      FRUSTRATION OF CLOSING CONDITIONS.

No party may rely on failure of any condition set forth in Sections 9.1 or 9.2 or 9.3, as the case may be, to excuse it from consummating the Contemplated Transaction if such failure was caused by such party's failure to comply with any provision of this Agreement.

10 TAXES

10.1      TRANSFER TAXES, CLOSING COSTS.

Seller shall be responsible for any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transaction, if any ("Transfer Taxes"). Notwithstanding anything herein to the contrary, if the Transfer Taxes are in an amount greater than $10,000.00 and Purchaser refuses to pay the amount in excess of $10,000.00, then Seller shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination and the Parties shall be free from further liability to each other.

10.2      PRORATIONS.

All income and expenses relating to the Purchased Assets including, without limitation, reimbursements, utilities, prepaid expenses, general real estate taxes for the then current year, and the Assumed Liabilities relating to the Purchased Assets and all bonds, special taxes or assessments assessed prior to the Closing Date shall be prorated or otherwise reflected as debits and credits (*i.e.* setoffs) as of the Closing Date on the closing statements. Seller shall provide Purchaser with a draft prorations schedule at least five (5) days prior to Closing. Purchaser and Seller shall cooperate with each other and shall provide all information to the other necessary to fully inform each of the income and all items of expenses existing as of the Closing Date. If the Closing shall occur before the real property actual taxes for the then current year are known, the apportionment of taxes shall be upon the basis of taxes for the Leased Property, if applicable, for the immediately preceding year, provided that, if the taxes for the current year are thereafter determined to be more or less than the taxes for the preceding year (after any appeal of the assessed valuation thereof is concluded), Seller and Purchaser promptly shall adjust the proration of such taxes and Seller or Purchaser, as the case may be, shall pay to the other any amount required as a result of such adjustment; provided, however, that the Purchaser shall be responsible for any supplemental taxes that may be due as the result of the change in ownership occurring by virtue of this transaction. Purchaser and Seller shall make good faith efforts to estimate the proration of income and expenses as of the Closing on or before the Closing. Purchaser and Seller shall make good faith efforts to settle reconciliation of income and expenses within ninety (90) days after the Closing Date. Any balance owing from one party to the other shall be paid within fifteen (15) Business Days of the rendering of the reconciliation.  Any errors in prorations shall be corrected.  This Section 10.2 shall survive the Closing.

10.3     OMITTED.

10.4     COOPERATION ON TAX MATTERS.

The parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for preparation for any Tax audit, for the preparation for any Tax protest, for prosecution or defense of any suit or other Legal Proceeding relating to Tax matters.

11  NOTICES

All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

| If to Purchaser to: | if to Seller, to |
|---|---|
| | Stephen V. Falanga, Esq.<br>Chapter 11 Trustee<br>WALSH PIZZI O'REILLY FALANGA LLP<br>Three Gateway Center<br>100 Mulberry Street, Floor 15<br>Newark, NJ 07102<br>PHONE: 973.757.1100<br>FAX: 973.757.1090<br>sfalanga@walsh.law |
| With a copy to: | With a copy to: |
| | Christopher M. Hemrick, Esq.<br>Sydney J. Darling, Esq.<br>Counsel to Chapter 11 Trustee<br>WALSH PIZZI O'REILLY FALANGA LLP<br>Three Gateway Center<br>100 Mulberry Street, Floor 15<br>Newark, NJ 07102<br>PHONE: 973.757.1100<br>FAX: 973.757.1090<br>chemrick@walsh.law<br>sdarling@walsh.law |

## 12  CERTAIN REMEDIES

12.1      INJUNCTIVE RELIEF.

Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and the Business and the Purchased Assets are unique and distinctive. In addition, Purchaser has learned or will learn substantial and valuable Seller Confidential Information that is critical to operation of the Business. Accordingly, except to compel a transfer of the Purchased Assets or Assumed Liabilities, any party hereto shall be entitled to injunctive relief, without the posting of a bond, with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  For the avoidance of doubt, under no circumstances shall either party have the right to specific performance or other injunctive relief for purposes of compelling a transfer of or closing with respect to the Purchased Assets or Assumed Liabilities. The rights set forth in this Section 12.1 shall be in addition to any other rights that a party may have pursuant to this Agreement.

12.2      SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

12.2.1 Without limiting any party's right to appeal any order of the Bankruptcy Court,

12.2.1.1      the Bankruptcy Court shall retain sole and exclusive jurisdiction to enforce the terms of this Agreement and to decide any claim or dispute that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transaction, and

12.2.1.2        any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11 hereof: provided, however, that if the Bankruptcy Case shall have closed, the parties agree unconditionally and irrevocably to submit to the exclusive jurisdiction of the United States District Court for the District of New Jersey sitting in Camden County or the Superior Court of the State of New Jersey sitting in Camden County and any appellate court from any thereof, for the resolution of any such claim or dispute.

12.2.2  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. The parties hereto

35

agree that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.

12.3      WAIVER OF RIGHT TO TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR OTHER LEGAL PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

13  INTERPRETATION

13.1      ENTIRE AGREEMENT; AMENDMENTS AND WAIVERS.

This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.2      GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to contracts made and performed in such State.

13.3      SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

Except as otherwise set forth in this Agreement, Seller's and Purchaser's representations and warranties in this Agreement are for diligence purposes only and do not survive the Closing, however, its disclaimers survive.

13.4      SEVERABILITY.

If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless

remain in full force and effect so long as the economic or legal substance of the Contemplated Transaction is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the Contemplated Transaction is consummated as originally intended to the greatest extent possible.

### 13.5     BINDING EFFECT ASSIGNMENT.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. A successor to Seller shall include Debtor as a reorganized debtor. Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Agreement except as otherwise provided in this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity managed by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), provided that any such assignee shall not be managed, owned, controlled or otherwise affiliated with the Debtor or any of the Debtor's present or former members, officers, directors, managers, shareholders, owners, interest-holders or affiliates, without Bankruptcy Court approval. Upon any permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

### 13.6     NO PERSONAL LIABILITY.

On entering into this Agreement, the Parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other Party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any Party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

### 13.7     OTHER DEFINITIONAL AND INTERPRETIVE MATTERS.

Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation apply:

> 13.7.1 Calculation of Time Periods. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in

calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

13.7.2  <u>Dollars</u>. Any reference in this Agreement to "$" means U.S. dollars.

13.7.3  <u>Exhibits/Schedules</u>. All Attachments, Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

13.7.4  <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

13.7.5  <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "§," "Section" are to the corresponding Section of this Agreement unless otherwise specified.

13.7.6  <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

13.7.7  <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

13.7.8  <u>Survival of Certain Covenants</u>. Any covenant that by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

13.8     <u>JOINT AUTHORSHIP</u>.

The parties hereto have been advised by experienced counsel, and have participated jointly, in drafting, negotiation and execution of this Agreement and, if an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

14  MISCELLANEOUS

14.1        EXPENSES.

Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the drafting, negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transaction. Except for SSG Advisors, LLC, whose commission shall be paid by Seller from the sale proceeds for the Purchased Assets subject to Bankruptcy Court approval, Seller represents and warrants to Purchaser, and Purchaser represents and warrants to Seller that no person or entity can properly claim a right to a real estate commission, real estate finder's fee, real estate acquisition fee or other real estate brokerage-type compensation (collectively, "Real Estate Compensation") based upon the acts of that party with respect to the transactions contemplated by this Agreement. Each party hereby agrees to indemnify and defend the other against and to hold the other harmless from any and all loss, cost, liability or expense (including but not limited to reasonable attorneys' fees and returned commissions) resulting from any claim for Real Estate Compensation by any person or entity based upon the acts of the indemnifying party. The provisions of this Paragraph shall survive Closing.

14.2        COUNTERPARTS.

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Scanned or facsimile signatures shall have the same force and effect as originals.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.


VASCULAR ACCESS CENTERS, L.P.


By:_____
Name: Stephen V. Falanga
Title:    Chapter 11 Trustee


VASCULAR ACCESS CENTER OF CENTRAL NEW JERSEY LLC


By:_____
Name: Stephen V. Falanga
Title: Chapter 11 Trustee of Vascular Access Centers, L.P


PISCATAWAY ENDOVASCULAR CENTER LLC


By:_____
Name:
Title:


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

ATTACHMENT A

Certain Definitions

Capitalized terms used in the foregoing Agreement are used as follows, unless the context otherwise clearly indicates:

(a)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)    "Agreement" means this Asset Purchase Agreement dated as of April_, 2021.

(c)    "Asset Acquisition Statement" has the meaning ascribed to it in Section 10.3 of the foregoing Agreement.

(d)    "Assigned Contracts" has the meaning ascribed to it in Section 1.1.3 of the foregoing Agreement.

(e)    "Assumed Liabilities" has the meaning ascribed to it in Section 1.3.1 of the foregoing Agreement.

(f)    "Bankruptcy Case" means Debtor's Legal Proceeding (Case No. 19-17117 (AMC)) in the Bankruptcy Court.

(g)    "Bankruptcy Code" means United States Code, 11 U.S.C. & 101, *et seq*.

(h)    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(i)    Omitted

(j)    "Bulk Sale Amount" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(k)    "Business" means the business of (i) operating an ambulatory care facility licensed by the DOH to provide dialysis vascular procedures, peripheral access procedures and ambulatory surgery at the Facility, and/or (ii) providing related management and other non-clinical services required to operate such a business.

(l)    "Business Confidential Information" has the meaning ascribed to it in Section 7.5.1.2 of the foregoing Agreement.

1

(m)   "Business Day" means any day of the year on which national banking institutions in New Jersey are open to the public for conducting business and are not required or authorized to close.

(n)   "Closing" has the meaning ascribed to it in Section 3.1 of the foregoing Agreement.

(o)   "Closing Date" means the date on which the Closing shall have occurred.

(p)   "Closing Date Payment" has the meaning ascribed to it in Section 2.4 of the foregoing Agreement.

(q)   "Code" means the Internal Revenue Code of 1986, as amended.

(r)   "Competing Bid" has the meaning ascribed to it in Section 6.1.1 of the foregoing Agreement.

(s)   "Contemplated Transaction" has the meaning ascribed to it in Section 1.1 of the foregoing Agreement.

(t)   "Contract" means any written contract, indenture, note, bond, lease, license or other agreement.

(u)   "Cure Amounts" means the cure amounts to be paid by Purchaser in accordance with the provisions of Section 1.44 of the foregoing Agreement.

(v)   "DOH" means the New Jersey Department of Health.

(w)   "Division" means the New Jersey Department of the Treasury, Division of Taxation.

(x)   "Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc…), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc…), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc…), and other similar materials related to the Business or the Purchased Assets in each case whether or not in electronic form, other than Patient Records.

(y)   "Due Diligence Period" and Due Diligence Deadline have the meaning set forth in Section 2.4 of the Agreement.

(z)   "Effective Date" means the date this Agreement was fully executed as appearing in the first paragraph of the Agreement and approved by the Bankruptcy Court.

2

(aa) "Equipment Leases" means those leases identified on **Schedule B** hereto.

(bb) "Employees" means all individuals, as of any date specified herein, whether or not actively at work as of such date, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing.

(cc) "Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq*.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801, *et seq*.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq*.), the Clean Water Act (33 U.S.C. § 1251, *et seq*.), the Clean Air Act (42 U.S.C. § 7401, *et seq*.) the Toxic Substances Control Act (I5 U.S.C. § 2601, *et seq*.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136, *et seq*.), and the Occupational Safety and Health Act (29 U.S.C. § 651, *et seq*.), and the regulations promulgated pursuant thereto.

(dd) "ERISA" means the Employee Retirement income Security Act of 1974, as amended.

(ee) "ERISA Affiliate" means any entity that would be deemed to be a "single-employer" with Seller under Code §§ 414(b), (c), (m) or (o) or § 4001 of ERISA.

(ff) "Escrow Agent" has the meaning ascribed to it in Section 2.2.2 of the foregoing Agreement.

(gg) "Event of Purchaser's Default" has the meaning ascribed to it in Section 3.4.2.2 of the foregoing Agreement.

(hh) "Event of Seller's Default" has the meaning ascribed to it in Section 3.4.1 of the foregoing Agreement.

(ii) "Excluded Assets" has the meaning ascribed to it in Section 1.2 of the foregoing Agreement.

(jj) "Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Section 1.1 as a Purchased Asset.

(kk) "Excluded Liabilities" has the meaning ascribed to it in Section 1.3.3 of the foregoing Agreement.

(ll) "Facility" means the licensed ambulatory care facility located at the Leased Property.

3

(mm) "Filing Date" has the meaning ascribed to it in Section 7.3.4 of the foregoing Agreement.

(nn) "Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used in the conduct of the Business and located in the Ordinary Course of Business at the Leased Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

(oo) "GAAP" means generally accepted accounting principles in the United States as of the date hereof.

(pp) "Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

(qq) "Hardware" means any and all of Seller's computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

(rr) "Hazardous Material" means any substance, material or waste which is regulated by any Government Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

(ss) "Healthcare Programs" means collectively Titles XVIII and XIX of the Social Security Act and the Medicare and Medicaid programs.

(tt)  "Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to healthcare services of any kind and include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, appropriate New Jersey agencies and shall include Purchaser's obtaining a CHOW from the New Jersey Department of Health with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders,

licenses or Permits of any Government Body needed for them to consummate the Contemplated Transaction and for Purchaser to operate the Business:

(uu) "Initial Deposit" has the meaning ascribed to it in Section 2.2 of the foregoing Agreement.

(vv)    "Knowledge" means the actual knowledge of those officers of Purchaser as of or prior to the Closing, as applicable, each of which is identified on **Schedule C**, as the case may be.

(ww) "Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

(xx) "Legal Proceeding." means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

(yy) "Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

(zz) "License" means the DOH Ambulatory Care Facility License #R24588 to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility.

(aaa) "Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

(bbb) "Material Adverse Effect" means (i) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise), or (ii) a material adverse effect on the ability of Seller or Purchaser to consummate the Contemplated Transaction or to perform their respective obligations under this Agreement, in each case other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Seller operates (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser, or its respective Affiliates with respect to the transactions contemplated hereby or with respect to Seller, including its employees; (v) the effect of any changes in applicable Laws or GAAP rules; or (vi) any effect resulting from the public announcement of this Agreement, compliance with

terms of this Agreement or consummation of the transactions contemplated by this Agreement; or (vii) any effect resulting from the filing or pendency of the Bankruptcy Case or proceedings relating thereto and reasonably anticipated effects thereof.

(ccc) "Medical Records Custody Agreement" has the meaning ascribed to it in Section 1.7 of the foregoing Agreement.

(ddd) "McGuckin" means James F. McGuckin, MD.

(eee) "McGuckin Entities" means any entity owned or controlled by McGuckin.

(fff) "Operating Agreement" means the Operating Agreement of Vascular Access Center of Central New Jersey, LLC, with an effective date of March 26, 2010.

(ggg) "McGuckin NJ" means James F. McGuckin MD of NJ, PA, a New Jersey professional association.

(hhh) "Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

(iii) "Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, in respect of the period after November 12, 2019 (Debtor's petition date), to those actions necessary and incident to the Bankruptcy Case.

(jjj) "Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

(kkk) "Patient Records" means any Documents containing information concerning residential, medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. §§ 160 & 164.

(lll) "Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity.

(mmm) "Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust,

6

unincorporated organization, association, estate, Governmental Body or other entity.

(nnn) "Personal Property Leases" means all leases of personal property, including Equipment, used by Seller in the Business.

(ooo) "Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of services in connection with the Business in the Ordinary Course of Business for dates of service occurring prior to the Closing Date.

(ppp) "Purchase Price" has the meaning ascribed to it in Section 2.1 of the foregoing Agreement.

(qqq) "Purchased Assets" has the meaning ascribed to it in Section 1.1 of the foregoing Agreement.

(rrr) "Purchased Inventory" has the meaning ascribed to it in Section 1.1.2 of the foregoing Agreement.

(sss) "Purchased Personal Property Leases" has the meaning ascribed to it in Section 1.1.1 of the foregoing Agreement.

(ttt) "Purchaser Documents" has the meaning ascribed to it in Section 5.2 of the foregoing Agreement.

(uuu) "Purchaser's Cure Period" has the meaning ascribed to it in Section 3.4.2.2 of the foregoing Agreement.

(vvv) "Real Property Lease" means that certain lease agreement with respect to the Leased Property attached hereto as Exhibit [_].

(www)    "Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

(xxx) "Remedial Action" means any and all actions as required by a Governmental Body to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

(yyy) "Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

(zzz) "Sale Hearing" means the hearing on the Sale Motion.

(aaaa) "Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Sale Order.

(bbbb)    "Sale Order" means an order of the Bankruptcy Court substantially in the form of ATTACHMENT B to the foregoing Agreement, with such changes as are reasonably acceptable to the Bankruptcy Court, Purchaser and Seller.

(cccc) "Seller Confidential Information" has the meaning ascribed to it in Section 7.5.1.1 of the foregoing Agreement.

(dddd)    "Seller's Cure Period" has the meaning ascribed to it in Section 3.4.1.3 of the foregoing Agreement.

(eeee) "Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

(ffff) "Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

(gggg)    "Tax Clearance Letter" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(hhhh)    "Tax Escrow Amount" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(iiii)  "Tax Escrow Letter" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(jjjj) "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise,

severance, stamp, occupation, property, excise taxes under Code § 4358, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, tines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

(kkkk)        "Tax Return" means all returns, declarations, reports, estimates, information return(s) and statement(s) required to be filed in respect of any Taxes.

(llll) "Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

(mmmm)    "Transfer Taxes" has the meaning ascribed to it in Section 10.1 of the foregoing Agreement.

(nnnn)        "Transferred Employees" has the meaning ascribed to it in Section 8.1.1 of the foregoing Agreement.

(oooo)        "Trustee" means Stephen V. Falanga, chapter 11 trustee of Vascular Access Centers, L.P.

(pppp)        "VAC Central Jersey" means Vascular Access Center of Central New Jersey, LLC.

(qqqq)        "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

ATTACHMENT B

Form of Sale Order

SCHEDULE A

Furniture, Fixtures and Equipment

## SCHEDULE B

Schedule of Assumed Leases and Executory Contracts

## SCHEDULE C

Officers/Senior Managers of Purchase Involved in Contemplated Transaction

SCHEDULE D
Transferred Employees

**EXHIBIT B**
**(VAC West Orange APA)**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**WEST ORANGE ENDOVASCULAR CENTER LLC**

**AS PURCHASER**

**AND**

**VASCULAR ACCESS CENTERS, L.P. AND**

**VASCULAR ACCESS CENTER OF WEST ORANGE, LLC**


**AS SELLER**

**DATED AS OF APRIL＿, 2021**

# PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "Agreement") is dated as of April_, 2021 (the "Effective Date"), by and between West Orange Endovascular Center LLC, a New Jersey limited liability company ("Purchaser"), and **VASCULAR ACCESS CENTERS, L.P.**, a Pennsylvania limited partnership (the "Debtor") and **VASCULAR ACCESS CENTER OF WEST ORANGE, LLC** ("VAC West Orange" and, together with the Debtor, collectively, the "Seller").

WITNESSETH:

WHEREAS, on November 12, 2019, an involuntary petition was filed against Vascular Access Centers, L.P. for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"), Bankr. Case. No. 2:19-BK-17117-AMC; and

WHEREAS, on February 12, 2020, an Order was entered by the Bankruptcy Court approving the appointment of Stephen V. Falanga (the "Trustee") as chapter 11 trustee of the bankruptcy estate of the Debtor; and

WHEREAS, the Debtor conducts its business through several limited liability company subsidiaries throughout the United States, including VAC West Orange,

WHEREAS, the Debtor, VAC West Orange and James F McGuckin MD of NJ, PA, a New Jersey professional association (the "McGuckin NJ"), which holds the Registration[1] in accordance with the corporate practice of medicine regulations in the State of New Jersey, operate a surgical practice registered by the New Jersey Department of Health (the "DOH") and located at 347 Mount Pleasant Avenue, #100, West Orange, New Jersey 07052 (the "Leased Property"); and

WHEREAS, the Seller and McGuckin NJ, timely applied to the DOH for the License prior to January 12, 2019; and

WHEREAS, VAC West Orange filed its Certificate of Organization with the New Jersey Department of State on January 30, 2007 and operates pursuant to an operating agreement effective as of that date (the "Operating Agreement"); and

WHEREAS, pursuant to the Operating Agreement, the Debtor holds one hundred percent (100%) of the Class A membership interests in VAC West Orange; and

WHEREAS, as the holder of all of the outstanding Class A membership interests in VAC West Orange, and pursuant to the Operating Agreement, the Debtor is entitled to take such actions as may require affirmance by a majority of the voting interests; and

WHEREAS, the Trustee, having assumed control of the Debtor's affairs, is entitled to vote the Debtor's interest in VAC West Orange; and

---

[1] Capitalized terms not otherwise defined herein are defined in Attachment A to this Agreement.

WHEREAS, Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets (as defined herein) and Assumed Liabilities (as defined herein), all as more specifically provided herein; and

WHEREAS, the Purchased Assets will be sold pursuant to an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code; and

WHEREAS, certain additional terms used in this Agreement are defined in ATTACHMENT A below.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements hereinafter contained, and the foregoing recitals, which are incorporated as if set forth at length herein below, and for good a valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1    PURCHASE & SALE OF ASSETS; ASSUMPTION OF LIABILITIES

   1.1      <u>PURCHASE AND SALE OF ASSETS</u>.

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall, subject to Section 1.4, sell, transfer, assign, convey and deliver to Purchaser (the "<u>Contemplated Transaction</u>"), all of each Seller's rights, title and interest in, to and under the Purchased Assets, free and clear of any and all existing Liens or adverse claims. "<u>Purchased Assets</u>" means all of the Seller's assets, rights and properties primarily pertaining to or used in connection with the Business as existing on the Closing Date, other than the Excluded Assets as defined herein, including:

   1.1.1    Any furniture and equipment, including medical equipment, tools, and other tangible personal property owned by Seller, identified on **<u>Schedule A</u>**.

   1.1.2    Any acquired disposable medical supply inventory (the "<u>Purchased Inventory</u>") on hand as of the Closing Date that is not within ninety (90) days of the manufacturer's expiration date, which payment shall be made ten (10) days after completion of a mutually performed inventory assessment.

   1.1.3    The Equipment Leases[2], Real Property Lease and any other assumed and/or assigned contracts and/or leases identified on **<u>Schedule B</u>** hereto (the "<u>Assigned Contracts</u>"); provided, however, that, if the contractual counterparty to any Assigned Contract requests a Cure Amount, Purchaser may elect to remove such Assigned Contract from **<u>Schedule B</u>** at any time prior to Closing.

---

[2] Nothing in this Agreement shall be construed as a determination by the Trustee that the Equipment Leases, or any of them, are true leases and the Trustee reserves all rights with respect thereto.

1.1.4    The License and all permits and applicable licenses used by Seller in the operation of the Business.

1.1.5    All rights in connection with any deposits, prepaid charges and expenses, escrows and similar items in connection with any Purchased Assets or Assumed Liabilities.

1.1.6    All claims, refunds, credits, causes of action, rights of recovery and rights of set-off of any kind relating to the Purchased Assets or Assumed Liabilities, whether arising by way of counterclaim or otherwise.

1.1.7    All transferable rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Purchased Assets.

1.1.8    All insurance benefits, including rights, claims and proceeds related to or arising from any Purchased Assets or Assumed Liabilities.

1.1.9    Employee files of Transferred Employees.

For the avoidance of doubt, none of the above listed Purchased Assets include the rights, claims or causes of action set forth in Section 1.2.8 herein.

1.2    <u>EXCLUDED ASSETS</u>.

Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "<u>Excluded Assets</u>" means the following assets, properties, interests and rights of the Seller:

1.2.1    all cash, cash equivalents, bank deposits or similar cash items, all securities and interests, and all Pre-Closing Accounts Receivable or trade receivables;

1.2.2    the Excluded Contracts;

1.2.3    any rights to refunds, settlements and retroactive adjustments to the extent applicable to periods ending on or before the Closing Date arising in connection with the Business;

1.2.4    any:

1.2.4.1 personnel files for Employees of the Business who are not Transferred Employees;

1.2.4.2 other books and records that the Seller is or may be required by Law to retain; provided, however, that, subject to Section 1.7, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business as conducted

3

before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets;

1.2.4.3 Documents that Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third-party;

1.2.4.4 books and records and other Documents related to tort prevention programs, credentialing, incident reporting or quality assurance to the extent confidential under applicable Law that Seller elects or is required to retain;

1.2.4.5 Documents relating to proposals to acquire the Business by Persons other than Purchaser;

1.2.4.6 Documents related to Pre-Closing Accounts Receivable;

1.2.4.7 any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; and

1.2.4.8 Documents necessary to prepare the Seller's Tax Returns;

1.2.5   any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes incurred prior to the Closing Date, together with any interest due thereon or penalty rebate arising therefrom;

1.2.6   all insurance policies or rights to proceeds with respect to Excluded Assets and in respect of any excluded liabilities;

1.2.7   all deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

1.2.8   any rights, claims or causes of action of Seller relating to assets, properties, business or operations of the Seller including without limitation any actions under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code or applicable state law;

1.2.9   any right to receive or expectancy in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

1.2.10  all other rights of Seller under this Agreement and the Contemplated Transaction.

1.3      <u>ASSUMPTION OF LIABILITIES</u>.

1.3.1   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge when due in

4

accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities") with respect to the Purchased Assets:

> 1.3.1.1 all Liabilities arising from and after the Closing with respect to the Purchased Assets, but only to the extent that such Liabilities relate to events occurring and/or actions taken by the Purchaser after the Closing;
>
> 1.3.1.2 those Employee-related Liabilities of Seller that Purchaser has specifically agreed to assume in Section 8.2, but only to the extent provided in Section 8.2; and
>
> 1.3.1.3 the Cure Amounts as required by Section 1.4.

1.3.2   Notwithstanding the foregoing, Purchaser shall also assume, effective as of April 1, 2021 until the Closing or the earlier termination of this Agreement in accordance with the terms hereof ("Interim Period"), and shall timely pay, perform and discharge when due in accordance with their respective terms, the following Liabilities relating to VAC West Orange:

> 1.3.2.1 Omitted.
>
> 1.3.2.2 the Real Property Lease in accordance with the terms of the Sublease; and
>
> 1.3.2.1  any other carrying costs relating to the Premises.[3]

1.3.3   Except for the Assumed Liabilities or to the extent included in the Cure Amounts, Purchaser shall not be deemed to assume or accept the assignment of any Liabilities of Seller, McGuckin NJ or any of their respective Affiliates existing as of the Closing Date and/or relating to periods on or prior to the Closing Date, including, without limitation, any Liabilities which may be incurred by reason of any tax obligation arising on or prior to the Closing Date, or by reason of any breach of or default under any Assigned Contract arising on or prior to the Closing Date. (the "Excluded Liabilities"). Further, Purchaser does not intend to be, and the Parties agree that Purchaser is not, a successor to Seller, McGuckin NJ or any of their respective Affiliates by any theory of law or equity.

1.4      CURE AMOUNTS.

Except as set forth in Section 1.1.3, at the Closing and pursuant to Section 365 of the Bankruptcy Code (where applicable), the Seller shall assign to Purchaser, and Purchaser shall assume from the Seller, the Assigned Contracts. Except as set forth in Section 1.1.3, the following amounts (the

---

[3] "Premises" shall have the meaning ascribed to it in the Sublease.

"Cure Amounts"), as determined by the Bankruptcy Court or pursuant to the terms of the Assigned Contract(s), as applicable, necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any defaults under the Assigned Contracts, shall (a) be paid by Purchaser at the Closing; or (b) Purchaser shall have delivered into escrow at or prior to Closing, on terms reasonably acceptable to Seller, amounts sufficient to pay any Cure Amount that remains disputed as of the Closing. The Cure Amounts shall be determined by the Bankruptcy Court except as otherwise agreed to by the counterparty to the Assigned Contracts:

[**INSERT DESCRIPTION OF CURE AMOUNTS**]

<h3>1.5      FURTHER CONVEYANCES AND ASSUMPTIONS.</h3>

From time to time following the Closing, each party shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to the Seller, and their successors and assigns, the Purchaser's assumption of the Assumed Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby and thereby. If Purchaser or its Affiliates receives any Excluded Assets (or any payments or related proceeds) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. If Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver to Purchaser such Purchased Assets (or any payments or related proceeds).

<h3>1.6      BULK SALES LAWS.</h3>

As soon as reasonably practicable following the Bankruptcy Court's approval of Purchaser as the prevailing bidder, Seller shall cooperate with Purchaser's preparation of an application, which shall be submitted by Purchaser to the New Jersey Department of the Treasury, Division of Taxation (the "Division"), for a tax clearance letter from the Division ("Tax Clearance Letter") in connection with the sale of the Purchased Assets hereunder. If the Division issues a tax escrow letter ("Tax Escrow Letter"), instead of a Tax Clearance Letter, Purchaser shall hold, or cause to be held, in escrow the amount specified in the Tax Escrow Letter ("Tax Escrow Amount"). Upon Purchaser's receipt of a Demand for Escrow Payment or similar correspondence from the Division, Purchaser shall, subject to Seller and Purchaser's right to terminate this Agreement, remit the required Tax Escrow Amount (the "Bulk Sale Amount") from the Purchase Price to the Division and the remaining balance shall be distributed to Seller in accordance with Section 2. Notwithstanding anything herein to the contrary, if Purchaser receives a Demand for Escrow Payment or similar correspondence from the Division that requires Purchaser to remit to the Division an amount greater than $10,000 with respect to the taxes due and owing by Seller, VAC West Orange and/or McGuckin NJ to the State of New Jersey, then Purchaser or Seller shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination. Notwithstanding anything to the contrary contained herein, Seller shall have fourteen (14) days from receipt of a Tax Escrow Letter or similar correspondence from the Division to resolve any alleged bulk sale tax liability to Purchaser's reasonable satisfaction prior

to Purchaser exercising any termination right pursuant to this Section. Nothing herein shall prejudice or affect Seller's rights under the Bankruptcy Code and applicable law with respect to the State of New Jersey including, without limitation, any claims or rights to payment asserted by the State of New Jersey.

### 1.7    CONFIDENTIALITY OF PATIENT INFORMATION.

**The Seller shall cause an appropriate medical records custody agreement ("<u>Medical Records Custody Agreement</u>") to be entered into whereby the Seller will transfer custody to Purchaser of all medical records of all active patients treated at VAC West Orange during the_____(__) month period preceding the date of this Agreement. Except as set forth in the immediately preceding sentence,** Seller shall have no obligation to make available to Purchaser hereunder any confidential patient information until an appropriate Medical Records Custody Agreement is entered into, and then any such obligation of Seller shall be subject to Purchaser's compliance with the terms and conditions of such Medical Records Custody Agreement.

## 2    CONSIDERATION

### 2.1    CONSIDERATION.

Subject to the terms and conditions of this Agreement, the aggregate consideration for the Purchased Assets equals Six Hundred Twenty Five Thousand Dollars ($625,000.00) (as adjusted, the "<u>Purchase Price</u>"), which shall be paid in the manner set forth in this Section 2.

### 2.2    INITIAL INSTALLMENT; INITIAL DEPOSIT.

2.2.1    Within two (2) Business Days following the later of (a) Purchaser's receipt of a Tax Clearance Letter or payment of the Bulk Sale Amount; or (b) entry of a Sale Order in a form reasonably acceptable to Purchaser, Purchaser shall pay Seller the sum of Eighty Thousand Dollars ($80,000.00) *less* the Bulk Sale Amount (the "<u>Initial Installment</u>"). Upon Seller's receipt of such payment (the "<u>Initial Installment Payment Date</u>"), the Seller shall sell, transfer, assign, convey and deliver to Purchaser good, valid and marketable title to the Purchased Assets listed on **Schedule C** (the "<u>Initial Purchased Assets</u>") and any other Deliverables as listed in Section 3.2 as may be necessary to convey title to such Initial Purchased Assets to Purchaser, free and clear of all Liens. For the avoidance of doubt, the License, Registration and Assigned Contracts shall not constitute Initial Purchased Assets. Upon Seller conveying to Purchaser title to the Initial Purchased Assets as set forth in this Section 2.2.1, the Initial Installment shall be non-refundable. As a condition to payment of the Initial Installment, Purchaser shall have completed an inspection of the Leased Property and determined, in Purchaser's reasonable discretion, that the Purchased Assets are located at the Leased Property and are sufficient for, and constitute all of the rights, property and assets necessary to enable, Purchaser to conduct

its business and to be fully operational and prepared to receive patients immediately upon payment of the Initial Installment.

2.2.2   Simultaneously with the payment of the Initial Installment, Purchaser shall tender to counsel to the Trustee ("Escrow Agent") a cash deposit equal to One Hundred Twenty Thousand Dollars ($120,000.00) *less* any remaining balance of the Bulk Sale Amount not otherwise satisfied pursuant to Section 2.2.1 (the "Initial Deposit") via wire transfer or other certified funds, which shall be held in a non-interest bearing trust account subject to the conditions of this Agreement, which shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement. The Initial Deposit shall be non-refundable, except as expressly provided herein, and shall be credited to the Purchase Price upon release. For the avoidance of doubt, Seller and Purchaser shall hold Escrow Agent harmless from any liability in connection with its role as Escrow Agent, except for acts of intentional conduct or gross negligence. Should there be any dispute as to the disposition of the Initial Deposit, Escrow Agent shall have the right to either (1) continue to hold the Initial Deposit until resolution of the dispute; or (2) remit the Initial Deposit to the clerk of a court of competent jurisdiction. It is agreed that Escrow Agent shall not be disqualified from representing the interests of Seller or the Trustee by virtue of its service as Escrow Agent. The provisions of this subparagraph 2.2.2 shall survive termination of this Agreement prior to Closing and shall survive Closing.

2.2.3   Simultaneously with the payment of the Initial Installment, Purchaser shall tender to counsel to the Trustee ("Escrow Agent") a cash deposit equal to Four Hundred Twenty Five Thousand Dollars ($425,000.00) (the "Closing Deposit") via wire transfer or other certified funds, which shall be held in a non-interest bearing trust account subject to the conditions of this Agreement, which shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement. The Closing Deposit shall be refundable, except as expressly provided herein, and shall be credited to the Purchase Price upon release. Should there be any dispute as to the disposition of the Closing Deposit, Escrow Agent shall have the right to either (1) continue to hold the Closing Deposit until resolution of the dispute; or (2) remit the Closing Deposit to the clerk of a court of competent jurisdiction. It is agreed that Escrow Agent shall not be disqualified from representing the interests of Seller or the Trustee by virtue of its service as Escrow Agent. The provisions of this subparagraph 2.2.3 shall survive termination of this Agreement prior to Closing and shall survive Closing.

2.3      SECOND INSTALLMENT.

2.3.1   Within one (1) Business Day after the Filing Date (as defined below), Escrow Agent shall release the Initial Deposit to Seller (the "Second

Installment"). Notwithstanding anything in this Agreement to the contrary, upon Escrow Agent's release of the Second Installment to the Seller, such funds shall be deemed non-refundable.

2.4     CLOSING DATE PAYMENT.

Subject to the terms and conditions of this Agreement, at the Closing, Escrow Agent shall release from the Closing Deposit, in immediately available funds by wire transfer to one or more bank accounts (designated in writing by Seller at least two (2) business days prior to the Closing Date), an amount equal to the Purchase Price *less* (i) any remaining balance of the Bulk Sale Amount not otherwise satisfied pursuant to Section 2.2.1; (ii) the Initial Installment; (iii) the Second Installment; and (iv) any applicable Transfer Taxes to the extent set forth in Section 10.1 (such amount, the "Closing Date Payment").

2.5     DUE DILIGENCE PERIOD.

Purchaser shall have until the filing of the Sale Motion with the Bankruptcy Court (the "Due Diligence Deadline"), to inspect and investigate the Seller and their respective properties, assets, business or operations, books and records, independently or through agents, representatives or experts of Purchaser's choosing, as Purchaser considers necessary or appropriate. Purchaser shall give Seller reasonable advance notice of such entry, including the identity of the persons and entities who will seek entry and who will perform any inspection, testing or investigation, and Purchaser, and its employees, contractors and other agents, shall conduct such entry and all such inspections, testing and investigations in connection therewith so as to minimize interference with the operations of the Business. If Purchaser is not satisfied with the results of the due diligence investigation, Purchaser shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination and the Parties shall be free from further liability to one another.

2.6     INTERIM ARRANGEMENTS.

Simultaneously with the execution of this Agreement, Purchaser (or Purchaser's designee) and VAC West Orange shall enter into a sublease agreement (the "Sublease"), substantially in the form attached hereto as **Attachment C**, pursuant to which VAC West Orange shall sublease to Purchaser (or Purchaser's designee), on an exclusive basis, the Leased Property (together with all furniture, fixtures and equipment located therein) until the Licensure Date (or earlier termination of this Agreement or the Sublease, as applicable).

From and after the Licensure Date until the Closing, Purchaser (or its designee) shall have the right to enter into an interim management services agreement with Seller and/or McGuckin NJ, as applicable, pursuant to which Purchaser may provide business support, management and other non-clinical administrative services to or on behalf of Seller and/or McGuckin NJ, as applicable.

## 3   CLOSING AND TERMINATION

### 3.1      CLOSING DATE.

Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the License and the assumption of the Assumed Liabilities provided for in Section 1.3 (the "Closing") shall take place virtually via the exchange of signatures electronically and via overnight mail at 10:00 a.m. (Eastern time) on a date that is no later than five (5) business days after the satisfaction or waiver of the conditions set forth in Section 9 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, shall have been agreed to in writing by Seller and Purchaser. Unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in any asset to be acquired by Purchaser hereunder, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.

### 3.2      DELIVERIES BY SELLER.

At or prior to the Closing, Seller shall deliver to Purchaser:

> 3.2.1   a true and complete copy of the Bankruptcy Court's Order approving the appointment of Seller as Chapter 11 Trustee for Debtor's estate;

> 3.2.2   a bill of sale duly executed by Seller in a form reasonably acceptable to Purchaser and Seller;

> 3.2.3   to the extent necessary, a duly executed assignment and assumption agreement with respect to each Assigned Contract (including all required consents associated therewith) in a form reasonably acceptable to Purchaser and Seller;

> 3.2.4   a duly executed Medical Records Custody Agreement in a form reasonably acceptable to Purchaser;

> 3.2.5   a copy of the final Sale Order;

> 3.2.6   the Purchased Assets free and clear of all Liens and adverse actions;

> 3.2.7   the License and Permits;

> 3.2.8   Omitted.

> 3.2.9   true and complete copies of the resolutions of Seller's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and

10

performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Seller or, alternatively, a Court Order authorizing the Trustee to consummate the Contemplated Transaction on behalf of the Debtor;

3.2.10  true and complete copies of the resolutions of VAC West Orange's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by VAC West Orange, or, alternatively, a Court Order authorizing the Trustee to consummate the Contemplated Transaction on behalf of VAC West Orange;

3.2.11  true and complete copies of the resolutions of the McGuckin NJ's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing the License to be transferred from McGuckin NJ to Purchaser in connection herewith, or, alternatively, a Court Order authorizing the Trustee to transfer the License from McGuckin NJ to Purchaser.

3.2.12  all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens;

3.2.13  copies of all consents required by Section 9.3.3 for which Seller is responsible.

3.3      DELIVERIES BY PURCHASER.

At or prior to the Closing, Purchaser shall deliver to Seller:

3.3.1    the Closing Date Payment, in immediately available funds, as set forth in Section 2.4 hereof; together with instructions to the Trustee's counsel to disburse to Seller the Escrowed Funds as a credit against the Purchase Price then due;

3.3.2    a duly executed assignment and assumption agreement with respect to each Assigned Contract in a form reasonable acceptable to Purchaser and Seller;

3.3.3    the officer's certificates required to be delivered pursuant to Section 9.2.1;

3.3.4    a certificate of good standing of recent date of Purchaser from the State of New Jersey;

11

3.3.5   true and complete copies of Purchaser's certificate of formation and all amendments thereto, certified by the State of New Jersey;

3.3.6   true and complete copies of Purchaser's operating agreement or LLC agreement, certified by one of its authorized officers, members or managers;

3.3.7   certificates from Purchaser's authorized officers, members or managers that Purchaser's certificate of Formation has not been amended since the date of the certificate described in Section 3.3.5 above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in Section 3.3.4 above, that would adversely affect Purchaser's corporate existence or good standing;

3.3.8   true and complete copies of the resolutions of Purchaser's Board of Managers, Board of Directors or other governing body or manager, certified by its Secretary, if applicable, authorizing execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Purchaser;

3.3.9   certificates from the Purchaser's Manager or other authorized officer as to the incumbency and signatures of each officer, member or manager of Purchaser executing this Agreement and any other documents required under this Agreement;

3.3.10  copies of all consents required by Section 9.3.3 for which Purchaser is responsible;

3.3.11  evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of Cure Amounts (if any) required by Section 1.4; and

3.3.12  such other documents, instruments and certificates as Seller may reasonably request.

3.4     <u>TERMINATION OF AGREEMENT</u>.

In respect of the Contemplated Transaction, this Agreement may be terminated prior to the Closing as follows:

3.4.1   <u>Termination by Purchaser</u>.  Purchaser may terminate this Agreement upon the occurrence of any of the following:

3.4.1.1 If Purchaser shall not be satisfied with the results of its investigation during the Due Diligence Period, Purchaser may, at its option, terminate this Agreement by giving written notice to Seller on or before the Due Diligence Deadline **TIME BEING OF THE ESSENCE**. If Purchaser fails to notify Seller of its election to

12

terminate the Agreement pursuant to this Section 3.4.1.1 on or before the Due Diligence Deadline, this contingency shall be automatically waived by Purchaser. If Seller receives the election to terminate by Purchaser prior to the Due Diligence Deadline, this Agreement shall terminate forthwith. Purchaser shall deliver to Seller all information, inspections, tests, audits, studies, reports and other information about the Facility or the Business that Purchaser may have obtained during the Due Diligence Period.

3.4.1.2 If any of the conditions to the obligations of Purchaser to close that are set forth in Sections 9.1 and 9.3 shall have become incapable of fulfillment other than as a result of a material breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

3.4.1.3 if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement ("Event of Seller's Default"), which breach has not been cured within fifteen (15) Business Days after the giving of written notice by Purchaser to Seller; provided, however, that if the breach may be cured but is not susceptible of being cured within fifteen (15) days, Purchaser may not terminate this Agreement if Seller commences to cure the breach within such fifteen (15) day period and continues thereafter with reasonable diligence to effect a cure of the breach (the "Seller's Cure Period"); or

3.4.1.4 subject to the Court's availability, if the Sale Order shall not have been entered within sixty (60) days from the date hereof except as a result of a material breach by Purchaser of any covenant or agreement contained in this Agreement.

3.4.1.5 subject to the Court's availability, if Seller is unable to obtain the necessary Sale Order satisfying subpart (b) of Section 2.2.1 within sixty (60) days from the date hereof.

3.4.1.6 The application for Transfer has not been submitted to DOH within six (6) months of the date the Sale Order is entered, unless due to (i) the DOH having not issued the License as a result of Purchaser's sublease, use, occupancy and/or control of the Leased Property; or (ii) the fault of Purchaser.

3.4.1.7 The termination, expiration or non-renewal of the Real Property Lease.

3.4.1.8 In the event Purchaser elects to terminate this Agreement pursuant to Section 3.4.1 or 3.4.3, Seller's sole obligation shall be

to cause the Initial Deposit and Closing Deposit to be refunded to Purchaser; provided, however, that Seller shall cause the Closing Deposit be refunded to Purchaser and may retain the Initial Deposit only by reason of the failure of the condition precedent set forth in Section 9.1.2 to be satisfied (unless such failure results, in whole or in part, from Seller breaching any material representation, warranty, or covenant contained in this Agreement or if this Agreement is terminated pursuant to Section 3.4.1.6). Upon such refund being made, the Parties hereto shall have no further liability or responsibility of any nature whatsoever to each other hereunder. In no event shall Seller be liable to Purchaser for compensatory, consequential, punitive or any other form of damages, except in the case of Seller's fraud, gross negligence or willful misconduct.

3.4.2    Termination by Seller. Seller may terminate this Agreement upon the occurrence of any of the following:

3.4.2.1 if any of the conditions to the obligations of Seller to close that are set forth in Sections 9.2 and 9.3 shall have become incapable of fulfillment other than as a result of a material breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

3.4.2.1(a) if the DOH has not issued the License within twelve (12) months of the date the Sale Order is entered;

3.4.2.1(b) if the Sublease is terminated pursuant to Section 1(d) of the Sublease;

3.4.2.2 if there shall be a material breach by Purchaser of any material representation or warranty, or by Purchaser of any material covenant or agreement contained in this Agreement ("Event of Purchaser's Default") which breach has not been cured within fifteen (15) Business Days after the giving of written notice by Seller to Purchaser; provided, however, that if the breach is not susceptible of being cured within fifteen (15) days, Seller may not terminate this Agreement if Purchaser commences to cure the breach within such fifteen (15) day period and continues thereafter with reasonable diligence to effect a cure of the breach (the "Purchaser's Cure Period"); or

3.4.2.3 In the event the DOH provides a determination or decision confirmed in writing not to issue the License solely and exclusively as a result of Purchaser's entry into the Sublease and/or Purchaser's use, occupancy and/or control of the Leased Property, even if such Sublease, use, occupancy and/or control of the Leased Property is immediately terminated (the "DOH Decision");

14

3.4.2.4 In the event Seller elects to terminate this Agreement pursuant to Section 3.4.2.1 (but only to the extent such termination is the result of Purchaser's failure to satisfy any of the conditions set forth in Section 9.2) or Section 3.4.2.2, Seller shall be entitled to retain the Initial Deposit, as LIQUIDATED DAMAGES, it being understood between the Parties that damages would be difficult, if not impossible, to determine, and therefore the Parties hereto agree that the Initial Deposit represents appropriate liquidated damages. These liquidated damages shall be Seller's sole remedy, and in no event shall Purchaser be liable to Seller for compensatory, consequential, punitive or any other form of damages other than the Initial Deposit.

In the event Seller elects to terminate this Agreement under Section 3.4.2.1 (other than as a result of Purchaser's failure to satisfy any of the conditions set forth in Section 9.2),Section 3.4.2.1(a), Section 3.4.2.1(b), or Section 3.4.3, the Initial Deposit and Closing Deposit shall be refunded to Purchaser, and the Parties shall thereafter be free from further liability to one another.

Notwithstanding Section 3.5 below, in the event Seller elects to terminate this Agreement pursuant to Section 3.4.2.3, a) Seller shall provide written notice to Buyer of such election to terminate; b) Buyer shall have sixty (60) days from such written notice during which it may, at Buyer's own expense, directly initiate, coordinate or cause any legal challenge in any court or administrative proceeding seeking to invalidate, or challenge the DOH Decision (the "Challenge"); and c) Seller must reasonably cooperate with any such Challenge at no cost or expense to Seller. If the Challenge has not resulted in a reversal of the DOH Decision within such sixty (60) day period, Seller may terminate this Agreement, and Seller shall be entitled to retain the Initial Deposit and Closing Deposit, as LIQUIDATED DAMAGES, it being understood between the Parties that damages would be difficult, if not impossible, to determine, and therefore the Parties hereto agree that the Initial Deposit and Closing Deposit represents appropriate liquidated damages. These liquidated damages shall be Seller's sole remedy, and in no event shall Purchaser be liable to Seller for compensatory, consequential, punitive or any other form of damages other than the Initial Deposit and the Closing Deposit.

PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT: (I) IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO DETERMINE SELLER'S ACTUAL DAMAGES IN THE EVENT THAT THE CLOSING FAILS TO OCCUR BY REASON OF PURCHASER'S DEFAULT UNDER THIS AGREEMENT, WHICH DAMAGES WOULD INCLUDE, BUT NOT BE LIMITED TO, SELLER'S LOST SALE OPPORTUNITIES DURING THE PERIOD THAT THE PROPERTY IS TAKEN OFF

THE MARKET; AND (II), TAKING INTO ACCOUNT ALL OF THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE SUM OF THE INITIAL DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S ACTUAL DAMAGES IN SUCH EVENT. CONSEQUENTLY, IN THE EVENT THE CLOSING FAILS TO OCCUR BY REASON OF PURCHASER'S DEFAULT UNDER THIS AGREEMENT AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, SELLER'S SOLE AND EXCLUSIVE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT AND TO RECEIVE AND RETAIN THE INITIAL DEPOSIT; PURCHASER SHALL MAKE, GIVE, JOIN IN, EXECUTE AND/OR DELIVER TO THE ESCROW AGENT ANY INSTRUMENT REQUIRED IN THIS REGARD. SELLER'S RETENTION OF THE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. SELLER AND PURCHASER ACKNOWLEDGE THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

THE FOREGOING PROVISIONS SHALL, HOWEVER, IN NO WAY LIMIT (A) PURCHASER'S INDEMNITY AND/OR RELATED OR SIMILAR OBLIGATIONS, LIABILITIES OR DUTIES (E.G., PURCHASER'S OBLIGATION, LIABILITY AND DUTY TO INDEMNIFY, DEFEND AND/OR HOLD HARMLESS), BUT ONLY WHERE SUCH OBLIGATIONS, LIABILITIES OR DUTIES ARE SPECIFICALLY STATED ELSEWHERE IN THIS AGREEMENT, OR (B) ANY OBLIGATION, LIABILITY OR DUTY OF PURCHASER TO RETURN, DELIVER, ASSIGN, TRANSFER OR MAKE AVAILABLE TO SELLER DOCUMENTS, LICENSES, PERMITS, RESULTS OF DUE DILIGENCE OR OTHER INVESTIGATIONS AND THE LIKE, IT BEING THE EXPRESS INTENTION OF THE PARTIES THAT THE LIQUIDATED DAMAGES PROVIDED HEREIN SHALL APPLY TO PURCHASER'S FAILURE TO CLOSE FOR THE REASONS SPECIFIED HEREIN, BUT SHALL NOT LIMIT THE OTHER OBLIGATIONS, LIABILITIES AND DUTIES OF PURCHASER SET FORTH HEREIN.

Purchaser: _____
(Initials)

Seller: _____
(Initials)

3.4.3    Termination by Purchaser or Seller. Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

3.4.3.1 by mutual written consent of Seller and Purchaser;

3.4.3.2 if the Bankruptcy Court shall enter an order approving a Competing Bid, and a transaction associated with that bid actually closes;

16

3.4.3.3 upon written notice to the other party if the Closing shall not have occurred within twelve (12) months of the date the Sale Order is entered; provided, however, that if the non-terminating party is otherwise capable of satisfying the conditions to its obligations to consummate the Contemplated Transaction set forth in Section 9 such termination shall not be effective if all conditions to the obligations of the non-terminating party to consummate the Contemplated Transaction set forth in Section 9 shall have been satisfied or otherwise waived and the Closing shall have occurred within 20-days after the provision of the written notice contemplated herein; provided, further, that if the Closing shall not have occurred by the close of such date due to an action or failure to act by a Governmental Body (including, without limitation, the DOH) that prevents consummation of the Contemplated Transaction, such termination shall not be effective, so long as the Government Body's approval of the Contemplated Transaction can still be reasonably expected to occur.

3.4.3.4 Extension of Time Periods. The time periods for termination of this Agreement set forth in this Section 3.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court. In the event the Agreement terminates under Section 3.4.3, the Initial Deposit shall be refunded to Purchaser, Seller shall support Purchaser's request for reimbursement of its actual and necessary expenses as set forth in Section 6.1.5 of this Agreement, and the Parties shall thereafter be free from further liability to one another. For the avoidance of doubt, nothing in this Agreement shall affect the non-refundability of the Second Installment as set forth in Section 2.3 of this Agreement.

3.5      PROCEDURE FOR TERMINATION.

In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4, written notice thereof shall be given to the other party such that said notice is received by the other party no later than one (1) Business Day after the event of termination, and upon the receipt of such notice (or at such time as specified in the particular termination right set forth in Section 3.4) the Contemplated Transaction shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 3.6, without further action by the parties.

3.6      EFFECT OF TERMINATION.

3.6.1    If this Agreement shall have been validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination, and such termination shall be without liability to any party; provided, however, that the obligations of the parties expressly provided herein to survive

17

termination shall survive any such termination and shall be enforceable in accordance with their terms.

3.6.2   Nothing in this Section 3.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination, provided, however, that any such liability shall be limited to a return of the Initial Deposit. Notwithstanding the foregoing, subject to Section 6.1, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated hereby or out-of-pocket expense reimbursement or other fees shall be payable to any party upon termination of this Agreement.

3.6.3   If this Agreement shall have been terminated in accordance with Sections 3.4 and 3.5, Purchaser agrees that it shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of two (2) years from the date of this Agreement, solicit any employee of the Debtor or VAC West Orange to join the employ of Purchaser or any of its Affiliates. Notwithstanding the foregoing, and provided there was no direct solicitation by Purchaser or its Affiliates of any of the Debtor's or VAC West Orange's employees, Purchaser shall not be prohibited from hiring employee(s) of the Debtor or VAC West Orange during said two (2) year period to the extent said employee(s) contacted Purchaser as a result of a general employment advertisement by Purchaser.

## 4   NO REPRESENTATIONS & WARRANTIES OF SELLER

Purchaser acknowledges and agrees that, since the Debtor is under the control of a bankruptcy Trustee, Seller is not making any representations or warranties whatsoever, express or implied, with respect to the Business, the Facility, or the Purchased Assets and Seller is selling the Purchased Assets **"AS IS, WHERE-IS" "WITH ALL FAULTS" and "WITH NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO: (a) THE BUSINESS; (b) FACILITY, OR (c) THE PURCHASED ASSETS. THE PURCHASED ASSETS THAT ARE BEING SOLD TO PURCHASER UNDER THIS AGREEMENT ARE HEREBY SOLD AND TRANSFERRED WITHOUT RECOURSE OR WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED. PURCHASER FURTHER ACKNOWLEDGES AND AGREES WITH SELLER THAT PURCHASER HEREBY WAIVES, RELEASES AND FOREVER DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER WITH RESPECT TO THE CONDITION OF THE PURCHASED ASSETS.

## 5   REPRESENTATIONS & WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

18

5.1      ORGANIZATION AND GOOD STANDING.

      5.1.1   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Jersey and has all requisite organizational power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2      AUTHORIZATION OF AGREEMENT.

Purchaser has full organizational power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with consummation of the Contemplated Transaction (the "Purchaser Documents"), and to consummate the Contemplated Transaction. Purchaser's execution, delivery and performance of this Agreement and each Purchaser Document have been duly authorized by all necessary organizational action on Purchaser's behalf. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity). **Schedule D** lists or identifies the officers or senior managers of Purchaser who are involved in the Contemplated Transaction.

5.3      CONFLICTS: CONSENTS OF THIRD PARTIES.

      5.3.1   Except as may be otherwise expressly set forth herein, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with Purchaser's execution and delivery of this Agreement, Purchaser's compliance with any of the provisions hereof; consummation of the Contemplated Transaction or Purchaser's taking of any other action contemplated hereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay Purchaser's ability to perform or consummate the Contemplated Transaction.

      5.3.2   None of Purchaser's execution and delivery of this Agreement or any of the Purchaser Documents, Purchaser's consummation of the Contemplated Transaction, or Purchaser's compliance with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give

rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of Purchaser's properties or assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on Purchaser's ability to consummate the Contemplated Transaction.

5.4     LITIGATION.

There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, that, if adversely determined, would reasonably be expected to have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement or Purchaser's ability to consummate the Contemplated Transaction. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement or Purchaser's ability to consummate the Contemplated Transaction.

5.5     FINANCIAL ADVISORS.

No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.6     HEALTHCARE REGULATORY COMPLIANCE STATUS.

5.6.1   Neither Purchaser nor any of its Affiliates is involved in any litigation, investigation or other Legal Proceeding by or with any Governmental Body that, if determined or resolved adversely, would have a material adverse impact on Purchaser's ability to obtain or maintain any governmental qualification, registration, filing, license, permit, Order, approval or authorization necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where failure to have such qualification, registration, filing, license, permit, Order, approval or authorization could reasonably be expected to prevent or materially delay Purchaser's consummation of the Contemplated Transaction or Purchaser's performance of any of its material obligations under this Agreement.

5.6.2   Neither Purchaser nor its managing member has

5.6.2.1 been indicted or convicted of a crime,

5.6.2.2 been suspended or excluded from the Healthcare Programs,

5.6.2.3 had a professional license suspended or revoked,

20

5.7      REGARDING CONDITION OF THE BUSINESS.

Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representation or warranty whatsoever, express or implied, and Purchaser acknowledges and agrees that the Purchased Assets are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7.1    Purchaser further represents that neither Seller nor any of their employees or Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Debtor, VAC West Orange, the Business, the Facility, the Purchased Assets, or the Contemplated Transaction not expressly set forth in this Agreement. Neither Seller nor any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from distribution to Purchaser or its Representatives or use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with sale of the Purchased Assets and/or the Contemplated Transaction, except in the case of fraud.

5.7.2    Purchaser acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Contemplated Transaction, Purchaser has, or will have, relied exclusively on the results of its own independent investigation.

5.7.3    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE PURCHASED ASSETS REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, TITLE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY

21

OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES.

5.7.4   PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION 5.7 AND IN SECTION 4 HEREINABOVE ARE AN INTEGRAL PORTION OF THIS AGREEMENT AND THAT WITHOUT DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SELLER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT.

THE RELEASES BY PURCHASER SET FORTH IN THIS AGREEMENT INCLUDE CLAIMS OF WHICH PURCHASER IS PRESENTLY UNAWARE OR WHICH PURCHASER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH, IF KNOWN BY PURCHASER, WOULD MATERIALLY AFFECT PURCHASER'S RELEASE OF SELLER.

PURCHASER: _____
          (INITIALS)

PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER, TOGETHER WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS, WAIVERS, RELEASES, INDEMNITIES, ETC., SET FORTH IN THIS AGREEMENT, AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF. THE TERMS AND CONDITIONS OF THIS SECTION 5.7 AND SECTION 4 WILL EXPRESSLY SURVIVE THE CLOSING, WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS, AND WILL BE INCORPORATED INTO THE DEEDS AND OTHER TRANSFER DOCUMENTS DELIVERED FOR THE TRANSFER OF THE PURCHASED ASSETS.

5.8    <u>FINANCIAL ABILITY TO CLOSE</u>.

Purchaser has the financial ability to close and the ability to do so as outlined in this Agreement.

5.9    <u>NO OTHER REPRESENTATIONS OR WARRANTIES</u>.

Except for the representations and warranties expressly set forth in this Section 5, neither Purchaser nor any of Purchaser's Representatives nor any other Person makes or will be deemed to make any representation or warranty to Seller or any other Person, express or implied, at law or in equity, with respect to any matter whatsoever, and Purchaser hereby disclaims any such representation or warranty, whether by Purchaser or any of Purchaser's Representatives or any other Person, notwithstanding the delivery or disclosure to Seller or any other Person, or any of their respective Representatives of any documentation or other information by Purchaser or any of Purchaser's Representatives or any other Person with respect to any one or more of the foregoing.

## 6    BANKRUPTCY COURT MATTERS

### 6.1    COMPETING TRANSACTION.

6.1.1    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid"). Purchaser shall cooperate in good faith with Seller in seeking the approval of this Agreement from the Bankruptcy Court.

6.1.2    Prior to Seller's furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Purchased Assets, Seller (or its Representative) shall enter into a customary confidentiality agreement with such Person on terms no less favorable to Seller than those contained in Section 7.5.

6.1.3    Until the Bankruptcy Court's entry of the Sale Order, Seller is permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiry, proposal or offer by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, during such time period, Seller has the responsibility and obligation to respond to any inquiry or offer to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including supplying to prospective purchasers information relating to the Business and Debtor's assets.

6.1.4    In connection with the process of considering Competing Bids, Seller shall use reasonable commercial efforts to cause the Bidding Procedures Order to require a $50,000.00 overbid from the Purchase Price and bidding increments of at least $10,000.00.

6.1.5    In addition, if Purchaser shall not be the prevailing bidder through the bankruptcy sale process, Purchaser shall be entitled to a $10,000.00 transaction fee for having set the opening bidding floor for the Purchased Assets. Additionally,Seller will support Purchaser's request for expense reimbursement up to a cap of $15,000, provided the Bankruptcy Court enters an order approving a Competing Bid, and a transaction associated with that Competing Bid actually closes.

### 6.2    BANKRUPTCY COURT FILINGS.

As promptly as practicable following the execution of this Agreement, Seller shall file and seek the Bankruptcy Court's approval of the Sale Motion. Purchaser shall promptly take such actions as Seller may reasonably request to assist in obtaining entry of the Sale Order and a finding of adequate assurance of Purchaser's future performance, including furnishing affidavits or other

documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of Purchaser's performance under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. If entry of the Sale Order shall have been appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.  If an appeal shall have been taken, or if a stay pending appeal shall have been requested from the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within ten (10) Business Days a copy of the relevant notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

6.3     NOTICE OF SALE.

Notice of the sale of Purchased Assets contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable Law (including, to the extent applicable, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice under applicable Law.

7    COVENANTS

Seller and Purchaser covenant and agree with each other as follows:

7.1     ACCESS TO INFORMATION.

Subject to Section 1.7 and the other provisions of this Section 7, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make copies of such books and records.

7.1.1    Notwithstanding the foregoing, Seller shall not be required to provide to Purchaser access to

7.1.1.1 the books, records and Documents referred to in Section 1.2.4;

7.1.1.2 any books, records or Documents that Seller reasonably determines that access to which by Purchaser would be competitively disadvantageous to Seller in any material respect or

7.1.1.3 any books, records or Documents the disclosure of which by Seller to Purchaser would

7.1.1.3.1            notwithstanding Section 1.7, violate any agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or

7.1.1.3.2        violate any obligation of confidentiality by which Seller is bound under applicable Law.

7.2    CONSENTS: INSURANCE.

7.2.1    Seller shall use commercially reasonable efforts, and Purchaser shall absolutely cooperate with Seller, including by taking the actions referred to in Section 7.3, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller pursuant to this Agreement and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transaction on the terms and in the manner provided hereby. Seller shall not be obligated to pay any consideration therefor to any third-party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 7.3.  Nothing contained herein shall require Seller to expend any funds in order to remove or eliminate any Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free of such Lien; provided, however, in respect of any such Lien, Purchaser nevertheless shall not be required to consummate the Contemplated Transaction unless the conditions referred to in Section 9.1 shall have been satisfied or waived by Purchaser

7.2.2    Purchaser shall use commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 7.3, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transaction on the terms and in the manner provided hereby and to operate the Business after the Closing. Purchaser shall not be obligated to pay any consideration therefor to any third-party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 7.3.

7.2.3    As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

7.3    THE REGISTRATION, SUBLEASE, AND LICENSE.

7.3.1    Between the Effective Date and the Licensure Date (or earlier termination of this Agreement, Seller shall use commercially reasonable efforts to take all actions reasonably necessary to maintain the Registration

in full force and effect and obtain the License. After entry of the Sale Order and until the Licensure Date (or earlier termination of this Agreement), Seller shall not attempt to transfer, sell, or convey the Registration to any Person at any time prior to or after the Licensure Date. Seller shall immediately notify Purchaser of any condition, event, cause or circumstance that has resulted, or would be reasonably likely to result, in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of the Registration of which Seller is aware. Seller shall immediately notify Purchaser of any communication by any means from any Person, including but not limited to the DOH, pertaining to the Registration, and shall provide Purchaser a copy of any such communication, if provided to Seller in writing, within three (3) business days of receipt by Seller. Seller shall provide Purchaser a copy of any communication with any Person, including the DOH, pertaining to the Registration, if made by Seller in writing, within three (3) business days of transmission by Seller.

7.3.2    Between the Effective Date and the Licensure Date (or earlier termination of this Agreement), Seller shall use commercially reasonable efforts to take all actions necessary to execute the Sublease and fully abide by the terms of the Sublease.

7.3.3    Between the Licensure Date and the Closing Date (or earlier termination of this Agreement), Seller shall use commercially reasonable efforts to take all actions necessary to maintain the License in full force and effect. Notwithstanding the foregoing, between the Licensure Date and the Closing Date, Purchaser shall be responsible for paying all fees and costs required to preserve the License including, without limitation, all ambulatory care facility assessments and renewal fees. Between the Licensure Date and the Closing Date, Seller may in no way attempt to transfer, sell, or convey the License to any Person other than Purchaser. Seller shall immediately notify Purchaser of any condition, event, cause or circumstance that has resulted, or would be reasonably likely to result, in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of the License of which Seller is aware. Seller shall immediately notify Purchaser of any communication by any means from any Person, including but not limited to the DOH, pertaining to the License, shall provide Purchaser a copy of any such communication, if provided to Seller in writing, within three (3) business  days of receipt by Seller..

7.3.4    Within five (5) business days following Purchaser's receipt of written notice from Seller that the Licensure Date has occurred (which notice shall include a copy of the License and all relevant correspondence from the DOH in connection therewith), Purchaser shall, at its sole cost and expense, file an application with the DOH (the date of such filing shall be referred to as the "<u>Filing Date</u>") for approval to transfer the License to Purchaser (the "<u>Transfer</u>"). Seller shall cooperate with the Purchaser in

26

completing the application for the Transfer.  Both Purchaser and Seller shall use commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.

7.3.5   Each such party shall promptly inform the other through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.

7.4      FURTHER ASSURANCES.

7.4.1   Each party shall use its commercially reasonable efforts to

7.4.1.1 take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and

7.4.1.2  cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transaction.

7.4.2   Without limiting the generality of the foregoing, promptly after discovery by Seller or any of its Affiliates after the Closing of any item included within the definition of Purchased Assets but not transferred, conveyed or assigned to Purchaser,

7.4.2.1 Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item as Purchaser may reasonably request, and

7.4.2.2 if requested by Purchaser, Seller shall and shall cause their respective Affiliates to, use commercially reasonable efforts to transfer, convey or assign to Purchaser such item in the manner and on the terms and conditions as applicable to a Purchased Asset.

7.4.3   In addition, if Seller or its Affiliate after the Closing receives payment on any account receivable that is a Purchased Asset, it shall as soon as practicable remit such amount received to Purchaser, together will such information identifying the account to which such payment relates as is reasonably available to Seller, and, if Purchaser or its Affiliates after the Closing receives payment on any account receivable that is an Excluded Asset it shall as soon as practicable remit such amount received to Seller, together with such information identifying the account to which such payment relates as is reasonably available to Purchaser, subject to Section 1.5. Without limiting the generality of the foregoing, if Purchaser or any of

its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset or a Purchased Asset. The provisions of this Section 7.4 shall survive the Closing.

7.5    CONFIDENTIALITY.

From and after the date hereof, Purchaser shall, and shall cause its Representatives to maintain in confidence, not disclose to any third-party without Seller's prior written consent, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.

7.5.1    For purposes of this Section 7.5,

7.5.1.1 "Seller Confidential Information" means any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, or any excluded liabilities, including methods of operation, resident information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

7.5.1.2 "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or any excluded liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters;

7.5.2    Seller Confidential Information does not include information that

7.5.2.1 becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives;

7.5.2.2 becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller,

28

7.5.2.3 is lawfully received by Purchaser from a third-party having the right to disseminate Seller Confidential Information without restriction on disclosure or

7.5.2.4 can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser.

7.5.2.5 Upon Closing by Purchaser, the restrictions contained in this Section 7.5 shall not apply to confidential or proprietary information related primarily to the Purchased Assets, the Assumed Liabilities or the Business. Prior to the Closing, Purchaser may disclose any of Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality.

7.5.3   Business Confidential Information does not include information that

7.5.3.1 becomes generally available to the public other than as a result of a disclosure by Seller or any of its Representatives,

7.5.3.2 becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller or

7.5.3.3 is lawfully received by Purchaser from a third-party having the right to disseminate the Business Confidential Information without restriction on disclosure.

7.5.4   Purchaser may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Seller Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Seller Confidential Information, Purchaser shall provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or such Seller waives compliance with the provisions of this Section 7.5, Purchaser shall furnish only that portion of Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

7.5.5    From and after the date on which the Sale Order shall have been entered, unless this Agreement is terminated, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third-party without Purchaser's prior written consent, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with

7.5.5.1 operating the Business in the Ordinary Course of Business prior to the Closing Date,

7.5.5.2 any investigations by Governmental Bodies,

7.5.5.3 compliance activities prior to or after the Closing related to periods occurring prior the Closing Date;

7.5.5.4 any Legal Proceedings;

7.5.5.5 enforcing any rights or other claims of Seller under this Agreement;

7.5.5.6  performing any obligations of Seller under this Agreement; or

7.5.5.7 as permitted by the Medical Records Custody Agreement.

7.5.6    Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transaction and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality.

7.5.7    If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 7.5, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

The obligations contained in this Section 7.5 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

7.6      PRESERVATION OF RECORDS.

Each of Seller and Purchaser shall preserve and keep the records held by them or their Affiliates relating to operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer; provided, however that this obligation shall cease in the event Seller ceases business operations, dissolves or otherwise ceases to exist as a going concern. Subject to the provisions of this Agreement, Purchaser and Seller, as applicable, shall make such records and personnel available to the other party as may be reasonably required by the other party in connection with, among other things, Purchaser's operation of the Business, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby or to enable Purchaser to operate the Business after the Closing Date substantially in the manner operated by Seller prior to the Closing Date. If Purchaser or Seller wishes to destroy such records before or after that time, Purchaser or Seller shall first give the other ninety (90) days' prior written notice, and such party shall have the right at its option and expense, upon prior written notice given to the other within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

7.7      PUBLICITY.

Purchaser shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of Seller, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of Seller upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

7.8      SUPPLEMENTATION AND AMENDMENT OF SCHEDULES.

Each of the parties may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific section in a Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such section. From time to time prior to the Closing, each party shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement. No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Sections 9.1.1 or 9.2.1, as applicable, unless such supplement or amendment discloses a matter that will cause a Material Adverse Effect, in which case Purchaser shall have the right to terminate this Agreement pursuant to the terms of Section 3.4.1. If the Closing shall have occurred, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise including, without

31

limitation, pursuant to Section 10 hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

7.9    COOPERATION.

Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof up through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

7.10    SURRENDER OF LICENSE.

Following Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender, or cause to be surrendered, all licenses and operating certificates issued to it by any Governmental Body relating to VAC West Orange.

8    EMPLOYEES AND EMPLOYEE BENEFITS

8.1    OFFERS OF EMPLOYMENT.

8.1.1    Not later than ten (10) Business Days following the entry of the Bidding Procedures Order by the Bankruptcy Court, Seller shall deliver to Purchaser **Schedule E**. At Closing, Purchaser, or its agents or representatives, shall deliver an offer of employment to those Employees listed on **Schedule E** to which Purchaser, or its agents or representatives, desires to offer employment, in Purchaser's sole discretion. Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on **Schedule E** that between the date of the delivery of **Schedule E** and the Closing Date is hired by, or transferred to, the Business as an Employee consistent with the provisions of this Section. Such individuals who accept such offer of employment from Purchaser are hereinafter referred to as the "Transferred Employees." Notwithstanding anything herein to the contrary, nothing in this Agreement shall (i) confer any rights upon any employee of Debtor or VAC West Orange, (ii) constitute or create an employment agreement or other Contract, or (iii) obligate the Purchaser or its Affiliates to employ any individual or maintain any benefit plan, policy or program or any other term of employment for any specified period of time.

8.1.2    Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-34 IRB 320, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees relating to time periods prior to the Closing and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller. In making any offers to Employees, Purchaser shall not be obligated

32

to change the nature of the employment of any Employee other than changing the Employee's employer (for example, Employees at will shall continue to be Employees at will).

8.2    **EMPLOYMENT TERMS: EMPLOYEE BENEFITS.**

8.2.1    As between Purchaser and Seller, Seller shall be responsible for all Liabilities with respect to the Transferred Employees referenced in Section 8.1.1 attributable to their accrued and unused vacation, sick days, personal days and other paid time off credit through the Closing Date.

8.2.2    Omitted.

8.2.3    To the extent Seller becomes subject to any Liabilities under the WARN Act or any comparable state or local law by reason of the termination of employment by Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor and shall indemnify Seller against such Liability. Without limiting the effect of the foregoing sentence, Purchaser shall be solely responsible for giving any notice to Transferred Employees required by the WARN Act or any comparable state or local law to be given after the Closing Date. Purchaser will retain all liability for any failure of Purchaser to comply with any of the requirements of WARN, including applicable notice requirements related to any "plant closing" or "mass layoff" (each as defined under WARN), with respect to any Employee who is not a Transferred Employee.

8.2.4    To the extent any other provision of this Agreement is inconsistent with the provisions of this Section 8.2, the provisions of this Section 8.2 will control.

9    CONDITIONS TO CLOSING

9.1    CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER.

Purchaser's obligations to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

9.1.1    The completion, to Purchaser's reasonable satisfaction, of Purchaser's due diligence pursuant to the terms and conditions of this Agreement.

9.1.2    A successfully approved Change in Ownership ("CHOW"), along with the successful transfer of all related exceptions to allow Purchaser to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility, including, without limitation,

33

unconditional approvals from the DOH with respect to the Transfer. Alternatively, if the License is not transferable to the Purchaser for any reason, then a new license to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility shall have been issued by the DOH to Purchaser.

9.1.3   Omitted.

9.1.4   Seller shall have observed, performed or complied with all obligations and agreements required in this Agreement to be observed, performed or complied with by Seller prior to the Closing Date.

9.1.5   Omitted;

9.1.6   Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2; and

9.1.7   Between the Effective Date and the Closing, there are no previously undisclosed liabilities related to the Purchased Assets or otherwise to be assumed by Purchaser if the Closing occurs, exceeding $35,000 in aggregate.

9.2      CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER.

Seller's obligation to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

9.2.1   Purchaser's representations and warranties set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Seller shall have received a certificate dated the Closing Date signed by an authorized officer of Purchaser to the foregoing effect;

9.2.2   Purchaser shall have observed, performed or complied with all obligations and agreements required by this Agreement to be observed, performed or complied with by Purchaser on or prior to the Closing Date.

9.2.3   Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 3.3.

### 9.3      CONDITIONS PRECEDENT TO MUTUAL OBLIGATIONS

The respective obligations of the parties to consummate the Contemplated Transaction as provided by this Agreement are subject to fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

> 9.3.1    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting consummation of the Contemplated Transaction;

> 9.3.2    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a final order;

> 9.3.3    the parties shall have received from all applicable Governmental Bodies all consents, approvals, licenses or Permits, or waivers thereof, necessary to consummate the sale of the Purchased Assets and transfer of the License to Purchaser;

> 9.3.4    Between the date of this Agreement and the Closing, there shall not have occurred or been threatened any event, change, circumstance or effect that, alone or in the aggregate, resulted in, or is reasonably likely to result in, a Material Adverse Effect;

### 9.4      FRUSTRATION OF CLOSING CONDITIONS.

No party may rely on failure of any condition set forth in Sections 9.1 or 9.2 or 9.3, as the case may be, to excuse it from consummating the Contemplated Transaction if such failure was caused by such party's failure to comply with any provision of this Agreement.

## 10   TAXES

### 10.1      TRANSFER TAXES, CLOSING COSTS.

Seller shall be responsible for any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transaction, if any ("Transfer Taxes"). Notwithstanding anything herein to the contrary, if the Transfer Taxes are in an amount greater than $10,000 and Purchaser refuses to pay the amount in excess of $10,000, then Seller shall have the option of terminating this Agreement and shall not incur any expense or liability as a result of such termination and the Parties shall be free from further liability to each other.

### 10.2      PRORATIONS.

All income and expenses relating to the Purchased Assets including, without limitation, reimbursements, utilities, prepaid expenses, general real estate taxes for the then current year, and the Assumed Liabilities relating to the Purchased Assets and all bonds, special taxes or assessments assessed prior to the Closing Date shall be prorated or otherwise reflected as debits and credits (*i.e.*

setoffs) as of the Closing Date on the closing statements. Seller shall provide Purchaser with a draft prorations schedule at least five (5) days prior to Closing. Purchaser and Seller shall cooperate with each other and shall provide all information to the other necessary to fully inform each of the income and all items of expenses existing as of the Closing Date. If the Closing shall occur before the real property actual taxes for the then current year are known, the apportionment of taxes shall be upon the basis of taxes for the Leased Property, if applicable, for the immediately preceding year, provided that, if the taxes for the current year are thereafter determined to be more or less than the taxes for the preceding year (after any appeal of the assessed valuation thereof is concluded), Seller and Purchaser promptly shall adjust the proration of such taxes and Seller or Purchaser, as the case may be, shall pay to the other any amount required as a result of such adjustment; provided, however, that the Purchaser shall be responsible for any supplemental taxes that may be due as the result of the change in ownership occurring by virtue of this transaction. Purchaser and Seller shall make good faith efforts to estimate the proration of income and expenses as of the Closing on or before the Closing. Purchaser and Seller shall make good faith efforts to settle reconciliation of income and expenses within ninety (90) days after the Closing Date. Any balance owing from one party to the other shall be paid within fifteen (15) Business Days of the rendering of the reconciliation.  Any errors in prorations shall be corrected.  This Section 10.2 shall survive the Closing.

     10.3    <u>OMITTED</u>.

     10.4    <u>COOPERATION ON TAX MATTERS</u>.

The parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for preparation for any Tax audit, for the preparation for any Tax protest, for prosecution or defense of any suit or other Legal Proceeding relating to Tax matters.

## 11  <u>NOTICES</u>

All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

| If to Purchaser to: | if to Seller, to |
|---|---|
| West Orange Endovascular Center LLC<br>182 Industrial Road<br>Glen Rock, Pennsylvania 17327 | Stephen V. Falanga, Esq.<br>Chapter 11 Trustee<br>WALSH PIZZI O'REILLY FALANGA LLP<br>Three Gateway Center<br>100 Mulberry Street, Floor 15<br>Newark, NJ 07102<br>PHONE: 973.757.1100<br>FAX: 973.757.1090 |

| | sfalanga@walsh.law |
|---|---|
| With a copy to: | With a copy to: |
| Frier & Levitt, LLC<br>84 Bloomfield Avenue<br>Pine Brook, New Jersey 07058<br>Attn: Daniel B. Frier, Esq.<br>PHONE: (973)618-1660<br>dbfrier@frierlevitt.com | Christopher M. Hemrick, Esq.<br>Sydney J. Darling, Esq.<br>Counsel to Chapter 11 Trustee<br>WALSH PIZZI O'REILLY FALANGA LLP<br>Three Gateway Center<br>100 Mulberry Street, Floor 15<br>Newark, NJ 07102<br>PHONE: 973.757.1100<br>FAX: 973.757.1090<br>chemrick@walsh.law<br>sdarling@walsh.law |

12  CERTAIN REMEDIES

12.1  INJUNCTIVE RELIEF.

Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and the Business and the Purchased Assets are unique and distinctive. In addition, Purchaser has learned or will learn substantial and valuable Seller Confidential Information that is critical to operation of the Business. Accordingly, except to compel a transfer of the Purchased Assets or Assumed Liabilities, any party hereto shall be entitled to injunctive relief, without the posting of a bond, with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. For the avoidance of doubt, under no circumstances shall either party have the right to specific performance or other injunctive relief for purposes of compelling a transfer of or closing with respect to the Purchased Assets or Assumed Liabilities. The rights set forth in this Section 12.1 shall be in addition to any other rights that a party may have pursuant to this Agreement.

12.2  SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

12.2.1  Without limiting any party's right to appeal any order of the Bankruptcy Court,

12.2.1.1  the Bankruptcy Court shall retain sole and exclusive jurisdiction to enforce the terms of this Agreement and to decide any claim or dispute that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transaction, and

12.2.1.2    any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11 hereof: provided, however, that if the Bankruptcy Case shall have closed, the parties agree unconditionally and irrevocably to submit to the exclusive jurisdiction of the United States District Court for the District of New Jersey sitting in Camden County or the Superior Court of the State of New Jersey sitting in Camden County and any appellate court from any thereof, for the resolution of any such claim or dispute.

12.2.2  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. The parties hereto agree that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.

12.3    WAIVER OF RIGHT TO TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR OTHER LEGAL PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

13  INTERPRETATION

13.1    ENTIRE AGREEMENT; AMENDMENTS AND WAIVERS.

This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other

38

right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

### 13.2     GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to contracts made and performed in such State.

### 13.3     SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

Except as otherwise set forth in this Agreement, Seller's and Purchaser's representations and warranties in this Agreement are for diligence purposes only and do not survive the Closing, however, its disclaimers survive.

### 13.4     SEVERABILITY.

If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transaction is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the Contemplated Transaction are consummated as originally intended to the greatest extent possible.

### 13.5     BINDING EFFECT ASSIGNMENT.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. A successor to Seller shall include Debtor as a reorganized debtor.  Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Agreement except as otherwise provided in this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity managed by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), provided that any such assignee shall not be managed, owned, controlled or otherwise affiliated with the Debtor or any of the Debtor's present or former members, officers, directors, managers, shareholders, owners, interest-holders or affiliates, without Bankruptcy Court approval.  Upon any permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

13.6    <u>NO PERSONAL LIABILITY</u>.

On entering into this Agreement, the Parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other Party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any Party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

13.7    <u>OTHER DEFINITIONAL AND INTERPRETIVE MATTERS</u>.

Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation apply:

13.7.1 <u>Calculation of Time Periods</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

13.7.2 <u>Dollars</u>.  Any reference in this Agreement to "$" means U.S. dollars.

13.7.3 <u>Exhibits/Schedules</u>. All Attachments, Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

13.7.4 <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

13.7.5 <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "§," "Section" are to the corresponding Section of this Agreement unless otherwise specified.

13.7.6 <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a

40

subdivision in which such words appear unless the context otherwise requires.

13.7.7 <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

13.7.8 <u>Survival of Certain Covenants</u>. Any covenant that by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

13.8    <u>JOINT AUTHORSHIP</u>.

The parties hereto have been advised by experienced counsel, and have participated jointly, in drafting, negotiation and execution of this Agreement and, if an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

14  <u>MISCELLANEOUS</u>

14.1    <u>EXPENSES</u>.

Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the drafting, negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transaction. Except for SSG Advisors, LLC, whose commission shall be paid by Seller from the sale proceeds for the Purchased Assets subject to Bankruptcy Court approval, Seller represents and warrants to Purchaser, and Purchaser represents and warrants to Seller that no person or entity can properly claim a right to a real estate commission, real estate finder's fee, real estate acquisition fee or other real estate brokerage-type compensation (collectively, "<u>Real Estate Compensation</u>") based upon the acts of that party with respect to the transactions contemplated by this Agreement. Each party hereby agrees to indemnify and defend the other against and to hold the other harmless from any and all loss, cost, liability or expense (including but not limited to reasonable attorneys' fees and returned commissions) resulting from any claim for Real Estate Compensation by any person or entity based upon the acts of the indemnifying party. The provisions of this Paragraph shall survive Closing.

14.2    <u>COUNTERPARTS</u>.

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Scanned or facsimile signatures shall have the same force and effect as originals.

[*signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.


VASCULAR ACCESS CENTERS, L.P.


By:_____

Name: Stephen V. Falanga
Title:    Chapter 11 Trustee

VASCULAR ACCESS CENTER OF WEST ORANGE, LLC


By:_____

Name: Stephen V. Falanga
Title: Chapter 11 Trustee of Vascular Access Centers, L.P.


WEST ORANGE ENDOVASCULAR CENTER LLC


By:_____

Name:
Title:


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]


43

ATTACHMENT A

## Certain Definitions

Capitalized terms used in the foregoing Agreement are used as follows, unless the context otherwise clearly indicates:

(a)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)     "Agreement" means this Asset Purchase Agreement dated as of March_, 2021.

(c)     "Asset Acquisition Statement" has the meaning ascribed to it in Section 10.3 of the foregoing Agreement.

(d)     "Assigned Contracts" has the meaning ascribed to it in Section 1.1.3 of the foregoing Agreement.

(e)     "Assumed Liabilities" has the meaning ascribed to it in Section 1.3.1 of the foregoing Agreement.

(f)     "Bankruptcy Case" means Debtor's Legal Proceeding (Case No. 19-17117 (AMC)) in the Bankruptcy Court.

(g)     "Bankruptcy Code" means United States Code, 11 U.S.C. & 101, *et seq*.

(h)     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(i)     "Bulk Sale Amount" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(j)     "Business" means the business of (i) operating an ambulatory care facility licensed by the DOH to provide dialysis vascular procedures, peripheral access procedures and ambulatory surgery at the Facility, and/or (ii) providing related management and other non-clinical services required to operate such a business.

(k)     "Business Confidential Information" has the meaning ascribed to it in Section 7.5.1.2 of the foregoing Agreement.

(l)     "Business Day" means any day of the year on which national banking institutions in New Jersey are open to the public for conducting business and are not required or authorized to close.

(m)     "Closing" has the meaning ascribed to it in Section 3.1 of the foregoing Agreement.

(n)     "Closing Deposit" has the meaning ascribed to it in Section 2.2.3 of the foregoing Agreement.

(o)     "Closing Date" means the date on which the Closing shall have occurred.

(p)     "Closing Date Payment" has the meaning ascribed to it in Section 2.4 of the foregoing Agreement.

(q)     "Code" means the Internal Revenue Code of 1986, as amended.

(r)     "Competing Bid" has the meaning ascribed to it in Section 6.1.1 of the foregoing Agreement.

(s)     "Contemplated Transaction" has the meaning ascribed to it in Section 1.1 of the foregoing Agreement.

(t)     "Contract" means any written contract, indenture, note, bond, lease, license or other agreement.

(u)     "Cure Amounts" means the cure amounts to be paid by Purchaser in accordance with the provisions of Section 1.4 of the foregoing Agreement.

(v)     "DOH" means the New Jersey Department of Health.

(w)     "Debtor" means Vascular Access Centers, L.P.

(x)     "Division" means the New Jersey Department of the Treasury, Division of Taxation.

(y)     "Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business or the Purchased Assets in each case whether or not in electronic form, other than Patient Records.

2

(z)    "Due Diligence Period" and "Due Diligence Deadline" have the meaning set forth in Section 2.5 of the Agreement.

(aa) "Effective Date" means the date this Agreement was fully executed as appearing in the first paragraph of the Agreement and approved by the Bankruptcy Court.

(bb)  "Equipment Leases" means those leases identified on **Schedule B** hereto.

(cc)  "Employees" means all individuals, as of any date specified herein, whether or not actively at work as of such date, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing.

(dd)  "Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801, *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Clean Water Act (33 U.S.C. § 1251, *et seq.*), the Clean Air Act (42 U.S.C. § 7401, *et seq.*) the Toxic Substances Control Act (I5 U.S.C. § 2601, *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136, *et seq.*), and the Occupational Safety and Health Act (29 U.S.C. § 651, *et seq.*), and the regulations promulgated pursuant thereto.

(ee)    "ERISA" means the Employee Retirement income Security Act of 1974, as amended.

(ff) "ERISA Affiliate" means any entity that would be deemed to be a "single-employer" with Seller under Code §§ 414(b), (c), (m) or (o) or § 4001 of ERISA.

(gg) "Escrow Agent" has the meaning ascribed to it in Section 2.2.2 of the foregoing Agreement.

(hh) "Event of Purchaser's Default" has the meaning ascribed to it in Section 3.4.2.2 of the foregoing Agreement.

(ii)    "Event of Seller's Default" has the meaning ascribed to it in Section 3.4.1 of the foregoing Agreement.

(jj) "Excluded Assets" has the meaning ascribed to it in Section 1.2 of the foregoing Agreement.

(kk) "Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Section 1.1 as a Purchased Asset.

3

(ll)    "Excluded Liabilities" has the meaning ascribed to it in Section 1.3.3 of the foregoing Agreement.

(mm) "Facility" means (i) prior to the Licensure Date, the registered surgical practiced located at the Leased Property, and (ii) from and after the Licensure Date the licensed ambulatory care facility located at the Leased Property.

(nn) "Filing Date" has the meaning ascribed to it in Section 7.3.4 of the foregoing Agreement.

(oo) "Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by the Seller and used in the conduct of the Business and located in the Ordinary Course of Business at the Leased Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

(pp) "GAAP" means generally accepted accounting principles in the United States as of the date hereof.

(qq) "Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

(rr) "Hardware" means any and all of Seller's computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

(ss) "Hazardous Material" means any substance, material or waste which is regulated by any Government Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

(tt) "Healthcare Programs" means collectively Titles XVIII and XIX of the Social Security Act and the Medicare and Medicaid programs.

(uu) "Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to healthcare

4

services of any kind and include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, appropriate New Jersey agencies and shall include Purchaser's obtaining a CHOW from the New Jersey Department of Health with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Government Body needed for them to consummate the Contemplated Transaction and for Purchaser to operate the Business:

(vv)   "Initial Deposit" has the meaning ascribed to it in Section 2.2.2 of the foregoing Agreement.

(ww) "Initial Installment" has the meaning ascribed to it in Section 2.2.1 of the foregoing Agreement.

(xx)   "Initial Installment Payment Date" has the meaning ascribed to it in Section 2.2.1 of the foregoing Agreement.

(yy) "Interim Period" has the meaning ascribed to it in Section 1.3.2 of the foregoing agreement.

(zz)   "Knowledge" means the actual knowledge of those officers of Purchaser as of or prior to the Closing, as applicable, each of which is identified on **Schedule C**, as the case may be.

(aaa) "Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

(bbb) "Leased Property" means 347 Mount Pleasant Avenue #100, West Orange, NJ 07052.

(ccc) "Legal Proceeding." means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

(ddd) "Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

(eee) "License" means an ambulatory care facility license issued by the DOH to provide dialysis vascular access procedures, peripheral access procedures and ambulatory surgery at the Facility.

(fff) "Licensure Date" means the date on which the DOH issues the License to McGuckin NJ with respect to the Facility.

(ggg) "Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement,

servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

(hhh) "Material Adverse Effect" means (i) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise), or (ii) a material adverse effect on the ability of Seller or Purchaser to consummate the Contemplated Transaction or to perform their respective obligations under this Agreement, in each case other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Seller operates (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser, or its respective Affiliates with respect to the transactions contemplated hereby or with respect to Seller, including its employees; (v) the effect of any changes in applicable Laws or GAAP rules; or (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or consummation of the transactions contemplated by this Agreement; or (vii) any effect resulting from the filing or pendency of the Bankruptcy Case or proceedings relating thereto and reasonably anticipated effects thereof.

(iii)    "Medical Records Custody Agreement" has the meaning ascribed to it in Section 1.7 of the foregoing Agreement.

(jjj) "McGuckin" means James F. McGuckin, MD.

(kkk)  "McGuckin Entities" means any entity owned or controlled by McGuckin.

(lll) "McGuckin NJ" means James F. McGuckin MD of NJ, PA, a New Jersey professional association.

(mmm)  "Operating Agreement" means the Operating Agreement of Vascular Access Center of West Orange, LLC with an effective date of January 30, 2007.

(nnn) "Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

(ooo) "Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, in respect of the period after November 12, 2019 (Debtor's petition date), to those actions necessary and incident to the Bankruptcy Case.

(ppp) "Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

(qqq) "Patient Records" means any Documents containing information concerning residential, medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. §§ 160 & 164.

(rrr) "Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity.

(sss) "Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

(ttt) "Personal Property Leases" means all leases of personal property, including Equipment, used by Seller in the Business.

(uuu) "Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of services in connection with the Business in the Ordinary Course of Business for dates of service occurring prior to the Closing Date.

(vvv) "Purchase Price" has the meaning ascribed to it in Section 2.1 of the foregoing Agreement.

(www)      "Purchased Assets" has the meaning ascribed to it in Section 1.1 of the foregoing Agreement.

(xxx) "Purchased Inventory" has the meaning ascribed to it in Section 1.1.2 of the foregoing Agreement.

(yyy) "Purchased Personal Property Leases" has the meaning ascribed to it in Section 1.1.1 of the foregoing Agreement.

(zzz) "Purchaser Documents" has the meaning ascribed to it in Section 5.2 of the foregoing Agreement.

(aaaa) "Purchaser's Cure Period" has the meaning ascribed to it in Section 3.4.2.2 of the foregoing Agreement.

(bbbb)         "Real Estate Compensation" has the meaning ascribed to it in Section 14.1 of the foregoing Agreement.

(cccc) "Real Property Lease" means that certain lease agreement with respect to the Leased Property attached hereto as Exhibit [_].

(dddd)         "Registration" means surgical practice registration #R24377 with respect to McGuckin NJ.

(eeee) "Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

(ffff) "Remedial Action" means any and all actions as required by a Governmental Body to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

(gggg)         "Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

(hhhh)         "Sale Hearing" means the hearing on the Sale Motion.

(iiii) "Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Sale Order.

(jjjj) "Sale Order" means an order of the Bankruptcy Court substantially in the form of ATTACHMENT B to the foregoing Agreement, with such changes as are reasonably acceptable to the Bankruptcy Court, Purchaser and Seller.

(kkkk)         "Second Installment" has the meaning ascribed to it in Section 2.3 of the foregoing Agreement.

(llll) "Seller Confidential Information" has the meaning ascribed to it in Section 7.5.1.1 of the foregoing Agreement.

(mmmm)   "Seller's Cure Period" has the meaning ascribed to it in Section 3.4.1.3 of the foregoing Agreement.

(nnnn)         "Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies,

whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

(oooo)      "Sublease" refers to that certain Sublease by and between VAC West Orange and Purchaser dated March_, 2021.

(pppp)      "Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

(qqqq)      "Tax Clearance Letter" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(rrrr) "Tax Escrow Amount" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(ssss) "Tax Escrow Letter" has the meaning ascribed to it in Section 1.6 of the foregoing Agreement.

(tttt) "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Code § 4358, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, tines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

(uuuu)      "Tax Return" means all returns, declarations, reports, estimates, information return(s) and statement(s) required to be filed in respect of any Taxes.

(vvvv)      "Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the

foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

(wwww)    "Transfer Taxes" has the meaning ascribed to it in Section 10.1 of the foregoing Agreement.

(xxxx)      "Transferred Employees" has the meaning ascribed to it in Section 8.1.1 of the foregoing Agreement.

(yyyy)      "Trustee" means Stephen V. Falanga, chapter 11 trustee of Vascular Access Centers, L.P.

(zzzz) "VAC West Orange" means Vascular Access Center of West Orange, LLC.

(aaaaa)      "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

ATTACHMENT B

Form of Sale Order

ATTACHMENT C

Sublease

## <u>SUBLEASE</u>

**AGREEMENT OF SUBLEASE** (this "<u>Sublease</u>") dated as of April_, 2021 (the "<u>Effective Date</u>") by and between **VASCULAR ACCESS CENTER OF WEST ORANGE, LLC**, a New  Jersey limited liability company, ("<u>Sublandlord</u>"), and **NJ ENDOVASCULAR& AMPUTATION PREVENTION, LLC**, a New Jersey limited liability company ("<u>Subtenant</u>"), with a business address for notice purposes of: 182 Industrial Road, Glen Rock, Pennsylvania 17327. Sublandlord and Subtenant may hereinafter be referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS:

**WHEREAS**, Morris Union Holdings, LLC, a New Jersey limited liability company, assignee of 347 Mt Pleasant Limited Liability Company, a New Jersey limited liability company ("<u>Prime Landlord</u>"), and Sublandlord, as tenant, are parties to a Lease dated March 21, 2007, as amended by that certain First Amendment to Lease date March 31, 2017 (as amended, the "<u>Lease</u>"). A copy of the Lease is annexed hereto as **<u>Exhibit A</u>**. Under the Lease, Prime Landlord leases to Sublandlord the Premises, as more particularly set forth in the Lease (the "<u>Premises</u>") in the building located at 347 Mt. Pleasant Avenue, West Orange, New Jersey (the "<u>Building</u>"), and Sublandlord leases the Premises from Prime Landlord.

**WHEREAS**, Vascular Access Centers, L.P. ("<u>VAC LP</u>") is the holder of all of the outstanding Class A membership interests in Sublandlord, and pursuant to Sublandlord's Operating Agreement, is entitled to take such actions as may require affirmance by a majority of the voting interest.

**WHEREAS**, on November 12, 2019, an involuntary petition was filed against VAC LP for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "<u>Bankruptcy Court</u>"), Bankr. Case. No. 2:19-BK-17117-AMC.

**WHEREAS**, on February 12, 2020, an Order was entered by the Bankruptcy Court approving the appointment of Stephen V. Falanga as chapter 11 trustee of the bankruptcy estate of VAC LP.

**WHEREAS**, as of March 13, 2021, Sublandlord has ceased operations in the entire Premises.

**WHEREAS**, as of April_, 2021, Sublandlord and West Orange Endovascular Center LLC ("<u>WOEC</u>") have entered into an Asset Purchase Agreement pursuant to which WOEC has agreed to acquire substantially all of the assets of Sublandlord (the "<u>APA</u>"), and WOEC designates Subtenant to enter into this Sublease pursuant to the APA.

**WHEREAS**, Sublandlord desires to sublease to Subtenant, and Subtenant desires to sublease from the Sublandlord, on the terms and conditions hereinafter set forth, the Premises, and all furniture, fixtures, furnishings, equipment and other tangible property (the "<u>Equipment</u>")

located in the Premises, until such time as the Sublandlord obtains an Ambulatory Care Facility License for the Premises (the "License") from the New Jersey Department of Health (the "DOH"). (collectively, the "Subleased Property").

NOW, THEREFORE, for good and valuable consideration, Sublandlord and Subtenant hereby agree as follows:

1.    **Term and Termination.**

(a)    **Term**. The term of this Sublease shall commence on _____ ____, 20 (the "Commencement Date") and shall end at the earliest of: (i) 11:59pm on the day preceding the expiration of the term of the Lease; (ii) upon issuance of the License by the DOH; or (iii) an earlier termination pursuant to the provisions of this Sublease (the "Term").

(b)    **Termination Without Cause**. Subtenant may terminate this Sublease at any time, without cause, upon providing the Sublandlord with at least thirty (30) days prior written notice. Sublandlord may terminate this Sublease immediately, without cause, if: (i) Subtenant is not the prevailing bidder in the event of a Competing Bid[1] relating to the Contemplated Transaction; or (ii) the Contemplated Transaction with Purchaser is not approved by the Bankruptcy Court at the Sale Hearing; or (iii) Seller exercises any right to terminate the APA in accordance with the terms of the APA, except that Seller shall not have a right to terminate this sublease if Seller terminates the APA pursuant to its Section 3.4.2.3.

(c)    **Termination for Cause**.  A Party may terminate this Sublease if the other Party breaches any term, representation, warranty, covenant or condition of this Sublease and fails to cure such breach within fifteen (15) days of receipt of written notice from the non-breaching Party.

(d)    **Termination due to DOH Determination**. Subtenant may terminate this Sublease immediately upon any written adoption, ratification, implementation, or interpretation of applicable law or rules or regulations by the DOH providing that this Sublease and/or Subtenant's use, occupancy and/or control of the Premises may cause the DOH not to issue a License for the Premises.

2.    **Sublease and Use of Equipment**.

(a)    **Sublease**. Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord the Premises, subject to the terms and conditions set forth in this Sublease.

(b)    **Use of Equipment**. Sublandlord hereby allows Subtenant full use of the Equipment located in the Premises, including but not limited to those listed on Schedule ,

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in that certain Asset Purchase Agreement between Sublandlord and VAC, L.P., as Seller, and WOEC, as Purchaser, dated _____ (the "APA").

2

upon the terms, covenants and conditions of this Sublease. Pursuant to the APA, upon WOEC's payment of the Initial Installment Payment to Sublandlord, those items listed on Schedule shall be the property of WOEC and no longer subject to this Sublease.

    3.    **Rent**.

    (c)    **Rent**. During the Term, Subtenant shall pay Rent (as that term is defined in the Lease) as required under the Lease, currently in the amount of Fourteen Thousand Nine Hundred Dollars ($14,900.00) per month, plus any and all Additional Rent (as that term is defined in the Lease) that may become due under the Lease to Prime Landlord monthly in advance on the first day of each calendar month during the Term. Subtenant shall provide evidence of same to Sublandlord within five (5) days after its payment of any Rent orAdditional Rent payment.

    (d)    **Method of Payment**. Subtenant shall deliver all payments of Rent and Additional Rent to Prime Landlord in lawful money of the United States in accordance with the Lease.

    (e)    **Prorations**. If Subtenant occupies the Premises for a fraction of a month at the end of the Term, Subtenant shall pay a proportionate part of the applicable monthly installment of the Rent.

    4.    **Use**. The Premises shall be used only for the use permitted under the Lease. Notwithstanding the forgoing, Subtenant shall not perform any clinical services requiring a New Jersey Department of Health Surgical Practice Registration or Ambulatory Facility License within the Premises or with the Equipment.

    5.    **Assignment and Sublease**. Subtenant shall have no right to assign, encumber or mortgage the Lease in whole or in part, by operation of law or otherwise, nor sublet or suffer or permit all or any portion of the Premises to be used by others, without the prior written consent of Sublandlord and Prime Landlord, which consent shall not be unreasonably withheld, delayed, conditioned or denied. Any attempt by Subtenant to assign, sublet, encumber or mortgage the Lease or the Premises without the express written consent of Sublandlord and Prime Landlord shall be null and void.

    6.    **Covenants**.

    (a)    **Acknowledgment of Bankruptcy-Related Issues**. Subtenant hereby acknowledges that: (i) Sublandlord is owned and controlled by VAC LP, a debtor out of possession in bankruptcy; (ii) As of March 13, 2021, Sublandlord had ceased operations at the Premises; (iii) Sublandlord has not paid Rent or Additional Rent for the month of April 2021; and (iv) Sublandlord may not have the financial wherewithal to comply with the covenants set forth in Section 6(c) hereof.

    (b)    **Covenants.** Each party hereto agrees to perform and comply with the

terms, provisions, covenants and conditions of the Lease and not to do or suffer or permit anything to be done which would result in a default under or cause the Lease to be terminated or forfeited.

(c)   **Sublandlord's Covenants**. Unless otherwise agreed to between Sublandlord and Subtenant, Sublandlord shall remain responsible under the Lease to: (i) pay, when and as due, all Rent, Additional Rent and other charges payable by Sublandlord under the Lease; (ii) not, by its act or omission to act, cause a default or event of default under the Lease; (ii)  comply with all present and future laws, statutes, rules, ordinances and regulations of all applicable government authorities relating to the Premises; (iv) maintain the interior and exterior of the Premises in good order and condition; (v) make, or cause to be made, all repairs and replacements to the Premises and all systems serving the Premises including, without limitation, electrical, plumbing, heating and air conditioning, security and fire protection systems, and sprinkler systems; and (vi) perform obligations of "Tenant" under the Lease, except to the extent Subtenant has expressly assumed any such obligations in this Sublease.

(d)   **Subtenant's Covenants**. Subtenant shall, at Subtenant's own cost and expense: (i) maintain good housekeeping practices at the Premises at all times hereunder; (ii) obtain all permits, licenses, authorizations and approvals as required to operate Subtenant's business at the Premises; (iii) use all reasonable precaution to prevent waste, damage or injury to the Building and the Premises; (iv) do nothing to destroy, deface, damage or remove any part of the Building or the Premises; (v) do nothing to impair the peace and quiet of other occupants of the Building; (vi) use all electric, plumbing, heating, cooling and other facilities located in the Premises in a safe and reasonable way; (g) comply with the insurance requirements contained in Section 15 of the Lease and add Sublandlord and VAC, L.P. as additional insureds and loss payees on all policies of insurance obtained by Subtenant in satisfaction thereof, proof of which shall be provided to Sublandlord prior to Subtenant taking possession of the Premises. Notwithstanding anything herein to the contrary, unless otherwise agreed to between Sublandlord and Subtenant, Subtenant shall only be required to perform the obligations expressly set forth in this Sublease and shall not be required to perform any obligations applicable to "Tenant" set forth in the Lease.

7.   **Notices**. Any and all notices and other correspondence required or permitted to be given in connection with, or pursuant to, this Sublease shall be in writing and delivered by hand, by recognized national overnight courier that provides receipt against delivery, or by deposit in the United States mail, registered or certified mail, return receipt requested, with full postage or charges prepaid.  The notice shall be addressed to the recipient at the address set forth below in this Section, or to such other addresses as the Parties may, from time-to-time, designate by written notice to each other in the foregoing manner. Notices given by mail shall be deemed effectively given on the earlier of the date shown on the proof of receipt of such mail or, unless the recipient proves that the notice was received later or not received, three (3) days after the date of mailing thereof.

| If to Sublandlord: | With a copy to: |
|---|---|
| Vascular Access Center of West Orange, LLC<br>c/o Stephen V. Falanga, Chapter 11 Trustee of Vascular Access Centers, L.P.<br>Walsh Pizzi O'Reilly Falanga LLP<br>Three Gateway Center<br>100 Mulberry Street, 15th Floor<br>Newark, NJ 07102 | Christopher M. Hemrick, Esq.<br>Counsel to Chapter 11 Trustee<br>WALSH PIZZI O'REILLY FALANGA LLP<br>Three Gateway Center<br>100 Mulberry Street, 15th Floor<br>Newark, NJ 07102 |
| If to Subtenant: | With a copy to: |
| NJ Endovascular & Amputation Prevention, LLC 182 Industrial Road, Glen Rock, Pennsylvania 17327 | Frier & Levitt, LLC<br>84 Bloomfield Avenue<br>Pine Brook, New Jersey 07058<br>Attn: Daniel B. Frier, Esq |
| If to Landlord: | With a copy to: |
| Morris Union Holdings LLC<br>475 Prospect Avenue<br>West Orange, NJ 07052 | Trenk Isabel P.C.<br>290 W. Mt. Pleasant Ave., Suite 2350<br>Livingston, New Jersey 07039<br>Attn. Richard D. Trenk, Esq. |

8.    **Representation and Warranties**.  The Prime Landlord makes no additional representations or warranties outside of those made in the Lease.  Specifically, the Prime Landlord does not represent or warrant as to whether Subtenant may operate an ambulatory surgical center in the Premises without a use variance or other approvals from the Township of West Orange.

9.    **Continuing Liability of Sublandlord**.  Notwithstanding anything to the contrary set forth in this Sublease, the Sublandlord shall remain liable and responsible for any and all obligations under the Lease.

10.    **Amendments**. No amendment or modification of any provision of this Sublease shall be binding unless in writing and signed by the Party against whom the operation of such amendment or modification is sought to be enforced.

11.    **Waiver**. Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Sublease will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. No waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party. No waiver given will be applicable except in the specific instance for which it was given. No notice to or demand on a Party will constitute a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Sublease.

12.      **<u>Governing Law</u>**. All issues and questions concerning the construction, validity, enforcement and interpretation of this Sublease shall be governed by, and construed in accordance with, the laws of the State of New Jersey without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any other jurisdiction. Any and all disputes concerning this Sublease shall be adjudicated by the United States Bankruptcy Court for the Eastern District of Pennsylvania.

13.      **<u>Binding Effect.</u>** This Sublease shall be binding upon and inure to the benefit of the Parties hereto, and their respective heirs, executors, administrators, successors and permitted

assigns.

14.  **Titles and Captions**. All articles, section and paragraph titles and captions contained in this Sublease are for convenience only and are not deemed a part of the context hereof.

15.  **Use of Certain Terms**. All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter singular or plural as the identity of the persons may require. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and the terms "hereof," "herein" and "hereunder" and words of similar import shall be deemed to refer to this Sublease (or such other cross-referenced document) as a whole and not to any particular provision, unless the context clearly indicates otherwise.

16.  **Entire Agreement**. This Sublease together with the Exhibits attached hereto constitutes the complete and exclusive statement of the agreement among the Parties with respect to the subject matter hereof and shall supersede all prior written and oral statements, including any prior representation, statement, condition, or warranty, with respect to such subject matter. No agreements, promises, covenants, representations, warranties or indemnities have been made or relied upon by any of the Parties hereto, other than those that are expressly herein set forth.

17.  **Severability**. If any provision of this Sublease shall be deemed by a court of competent jurisdiction to be legally invalid or unenforceable, then the validity and enforceability of the remainder of the Sublease shall not be affected and such provision shall be deemed modified to the minimum extent necessary to make such provision consistent with applicable Law, and, in its modified form, such provision shall then be enforceable.

18.  **No Strict Construction**. The Parties have participated jointly in the negotiation and drafting of this Sublease. If an ambiguity or question of intent or interpretation arises, this Sublease shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Sublease.

19.  **Independent Contractors**.  No provision of this Sublease is intended to create, or shall be deemed or construed to create, any relationship between the Parties hereto other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Sublease. Neither Party, nor any of their respective employees, agents or representatives, shall be construed to be the agent, employee, or representative of the other, nor shall either party have an express or implied right or authority to assume or create any obligation or responsibility on behalf of or in the name of the other Party except as otherwise set forth herein.

20.  **Counterparts**. The Parties may execute this Sublease in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  The Parties may deliver executed signature pages to this Sublease via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method.  No Party

may raise as a defense to the formation or enforceability of this Sublease, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed this Sublease as of the date firstabove written.


**SUBLANDLORD**:

**VASCULAR ACCESS CENTER OF WEST ORANGE, LLC**
a New Jersey limited liability company



By:_____
Name: Stephen V. Falanga
Title: Chapter 11 Trustee of Vascular Access Centers, L.P.



**SUBTENANT**:
**NJ ENDOVASCULAR & AMPUTATION PREVENTION, LLC**
a New Jersey limited liability company


By:_____ Name:_____
Title:


Prime Landlord hereby executes
this Sublease to evidence its consent
hereto

**PRIME LANDLORD**

**MORRIS UNION HOLDINGS, LLC**
a New Jersey limited liability company



By:_____ Name:_____
Title:

## SCHEDULE A

Furniture, Fixtures and Equipment

SCHEDULE B

Schedule of Assumed Leases and Executory Contracts

## SCHEDULE C

Initial Purchased Assets

## SCHEDULE D

Officers/Senior Managers of Purchase Involved in Contemplated Transaction

## SCHEDULE E

Transferred Employees