**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                                          :
In re:                                                                  :    **Case No. 19-17117 (AMC)**
                                                                          :
**Vascular Access Centers, L.P.,**                     :    **Chapter 11**
                                                                          :
            Debtor.                                                :
                                                                          :
_____:

Ashely M. Chan, United States Bankruptcy Judge

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In early February 2020, after finding that Dr. James McGuckin ("McGuckin"), the former

sole member and manager of the former general partner of the debtor, Vascular Access Centers,

L.P. ("VAC" or "Debtor"), had orchestrated an involuntary petition under Chapter 11 of the

Bankruptcy Code against VAC in bad faith and that appointing a Chapter 11 trustee would serve

the best interests of VAC's creditors, the Court ordered the appointment of a Chapter 11 trustee

("Trustee Order"). McGuckin and VAC's former general partner, Vascular Access Centers, LLC

("VAC LLC" or "General Partner"), quickly appealed the Trustee Order. Now, following the

dismissal of the appeal with a remand for this Court to determine whether reconsideration of the

Trustee Order is warranted in light of certain new evidence advanced by McGuckin, McGuckin

and VAC LLC move for this Court to recuse itself from proceedings which directly involve the

rights and interests of McGuckin or any of his solely and majority owned entities on the basis of

certain circumstances surrounding the Court's issuance of the Trustee Order and supporting

opinion ("Trustee Opinion"), well over a year after they were entered ("Recusal Motion").

McGuckin and VAC LLC ground their request in 28 U.S.C. § 455. For the reasons described below, the Recusal Motion is denied.

## II.    BACKGROUND

The background relating to the Court's decision to appoint a Chapter 11 trustee is thoroughly described in the Trustee Opinion. Accordingly, the Court will only recount those circumstances necessary to the disposition of the Recusal Motion.

VAC was founded by McGuckin as a Pennsylvania limited partnership through a limited partnership agreement ("LPA") executed on April 22, 2005. Op. 1, Feb. 7, 2020 ("Op."). As mentioned *supra,* the general partner of VAC was a non-debtor entity, VAC LLC, of which McGuckin was the sole member and manager. *Id.* As of the petition date, VAC operated its business through a number of limited liability company subsidiaries. Case No. 19-17117 ECF No. ("ECF") 21 Mot. for Cash Coll. ¶ 8; Op. 2. The subsidiaries operated and managed outpatient vascular access centers, whereby physician interventionalists performed dialysis access procedures and certain other vascular access procedures on patients with end-stage renal disease and other vascular conditions or diseases. Op. 2.

In May 2005, William Whitfield Gardner ("Gardner") became a limited partner of VAC. *Id*. Gardner's investments and substantial capital infusion into VAC made him the majority-in-interest limited partner. *Id.* Pursuant to an amended version of the LPA, the general partner was prohibited from making certain fundamental decisions without the consent of the holders of a majority of all limited partners, including the decision to execute and file on behalf of the partnership a petition for relief under the United States Bankruptcy Code under which a partnership may be a debtor. *Id.* at 3.

Over time, Gardner began to have concerns about the possibility that McGuckin was engaging in impermissible self-dealing transactions and violating his duties as the sole member

of VAC's general partner. *Id.* at 4. Based upon his concerns, on January 13, 2016, Gardner

commenced a derivative action on behalf of VAC by filing a complaint in the Delaware County

Court of Common Pleas ("State Trial Court") against VAC LLC and McGuckin, in his capacity

as VAC LLC's sole member and manager, for breach of fiduciary duty, breach of contract, and

unjust enrichment ("Derivative Litigation"). *See Gardner v. Vascular Access Centers, LLC et al.,*

No. 16-cv-00367; Op. 5. In September 2017, Gardner amended his complaint in the Derivative

Litigation to, *inter alia*, add other limited partners of VAC as plaintiffs (together with Gardner,

"Derivative Litigation Plaintiffs"). Op. 7. On October 2, 2017, trial was set in the Derivative

Litigation for July 12, 2018. *Id.* at 8.

Meanwhile, in early 2017, the Centers for Medicare and Medicaid Services implemented

rate reductions for the types of services VAC's centers performed at the time. *Id.* at 7. Despite

McGuckin's appeals to the limited partners for a capital infusion to convert VAC's centers to

ambulatory surgical centers to enable VAC to take advantage of higher reimbursement rates for

its services, many limited partners had previously expressed in writing their desire to have

McGuckin step down in his role as member and manager of VAC's general partner. *Id.* at 8.

 On July 9, 2018, just days before the trial in the Derivative Litigation, McGuckin filed a

petition to compel arbitration. *Id.* at 10. On July 13, 2018, after an evidentiary hearing, the State

Trial Court denied the petition to compel arbitration. *Id*. On July 16, 2018, McGuckin filed a

notice of appeal of the denial of his petition to the Pennsylvania Superior Court. ("Superior

Court"). *Id.* On April 22, 2019, the Superior Court unanimously ruled against McGuckin and

affirmed the State Trial Court's decision to deny McGuckin's petition to compel arbitration. *Id.*

at 15. McGuckin subsequently filed an application for reargument *en banc* on May 6, 2019. *Id.*

On June 12, 2019, the Superior Court denied McGuckin's application for reargument. *Id.* The

Derivative Litigation Plaintiffs subsequently filed a motion to recover certain attorneys' fees and costs. *Id.*

On July 3, 2019, independent CPA, Michael Dubin, who had been appointed financial monitor ("Monitor") in the Derivative Litigation to assess VAC's financial condition and solvency, filed his first report ("First Monitor Report") assessing VAC's financial condition as of March 31, 2019, finding that VAC was in poor financial health, was losing money from operations, had liabilities that substantially exceeded its assets, and was not likely solvent. *Id.* at 16. In the First Monitor Report, the Monitor observed

> 'the Company's process for the preparation of its financial statements requires significant revision' since the current process results in significant delay; that the company would benefit from internal, fully adjusted monthly, quarterly, and annual financial statements; that 'it is clear that better internal controls are required to be implemented…' and that 'there are fewer individuals than would be optimal to maintain a system of checks and balances' which subjects the company to a 'greater likelihood of errors and/or misstatements in its financial reporting.' *Id.* at 18 (citing First Monitor Report 23, 27).

The Monitor further observed that "VAC's past financial forecasts had not been reliable or consistent and differed depending on the intended purpose of the forecast" and that "the Company has over the period circa 2012 through 2017…sometimes 'comingled' funds of various entities including entities not owned by the Company. This practice is not appropriate and results in internal control weakness that can materially negatively affect the Company." First Monitor Report 27-28.

Meanwhile, on July 10, 2019, McGuckin filed a petition for allowance of appeal with the Pennsylvania Supreme Court. Op. 18. On July 31, 2019, the Superior Court granted the Derivative Litigation Plaintiffs' motion to recover certain attorneys' fees and costs, concluding that McGuckin's "submission and reliance upon documents that were not part of the record at the trial court was frivolous, and therefore [Plaintiffs] are entitled to reasonable attorneys' fees for

having to respond to the documents on appeal" and that "the petition for re-argument was also frivolous, and only done to further delay this matter," entitling the Derivative Litigation Plaintiffs to fees for responding to the petition. Op. 18-19.

On October 12, 2019, the Monitor issued another report ("Second Monitor Report") comparing VAC's financial condition in August 2019 to June 2019. *Id.* at 19. The Monitor concluded that VAC's financial condition "is not materially worse at August 31, 2019 as compared to June 30, 2019," but that "the Company's cash position remains extremely tight and is inadequate to satisfy its obligations on a current basis." *Id.* (citing Second Monitor Report 4, 7). The Monitor emphasized that if VAC was going to survive, it had to quickly find a way to satisfy "a variety of demands on its cash through December 31, 2019…" *Id.* (citing Second Monitor Report 5-7). The Monitor also observed that "the Company also needs to improve its ability to prepare accurate, complete financial statements supported by trial balances and appropriate supporting documentation." *Id.* (citing Second Monitor Report 14).

On October 17, 2019, VAC LLC, through McGuckin, met with Dilworth Paxson LLP ("Dilworth") to obtain legal services in connection with VAC's financial restructuring. *Id.* at 20. Subsequently, Dilworth sought Gardner's consent as the majority limited partner to file a voluntary Chapter 11 bankruptcy petition on behalf of VAC. *Id.* Initially, Gardner preferred to explore resolutions outside of bankruptcy and requested terms for consent. *Id.* On November 7, 2019, Dilworth contacted counsel for Gardner in the Derivative Litigation to continue seeking Gardner's consent to the filing of a Chapter 11 bankruptcy petition. *Id.*

On November 8, 2019, counsel responded that Gardner would be willing to consider consenting to a bankruptcy petition upon receiving certain information, including, *inter alia,* more information about who would run VAC during the bankruptcy. *Id.* Dilworth responded on

November 11, 2019 that VAC contemplated no management changes and there was no time for protracted negotiations prior to a bankruptcy filing. *Id.* The same day, counsel for Gardner responded that Gardner had offered multiple times to provide additional capital to VAC predicated on governance changes. *Id.* at 20-21.

On November 12, 2019, Dilworth responded to counsel for Gardner that VAC preferred to obtain capital from McGuckin which was not accompanied by demands or conditions. *Id.* at 21. The same day, the Pennsylvania Supreme Court denied McGuckin's petition for allowance of appeal in the Derivative Litigation. *Id.* In addition, the parties were scheduled to appear before the State Trial Court the next day for a hearing on the amount of sanctions to be awarded against McGuckin personally on account of McGuckin's submission and reliance upon documents not part of the trial record in his appeal of the order denying his motion to compel arbitration, as well as his "frivolous" petition for reargument. *Id.*

However, hours after VAC's petition for allowance of appeal was denied, three purported creditors of VAC: (1) Philadelphia Vascular Institute ("PVI"), an entity owned and controlled by McGuckin; (2) Metter & Company ("Metter"), an accounting firm owned by Stan Metter, one of VAC's limited partners; and (3) Crestwood Associates, LLC ("Crestwood"), an entity owned by McGuckin's brother, Brian McGuckin ("Brother"), filed an involuntary petition under Chapter 11 of the Bankruptcy Code against VAC, thereby staying the Derivative Litigation. *Id.* On November 13, 2019, VAC consented to the involuntary petition. *Id.* at 22.

On November 19, 2019, VAC filed a motion to use cash collateral and provide adequate protection in the form of security interests equivalent to a lien granted under 11 U.S.C. §364(c)(2) and (3) to PVI as a secured creditor ("Cash Collateral Motion"). *Id.* at 22, 23. The Cash Collateral Motion represented that:

15. The Debtor's sole secured creditor is Philadelphia Vascular Institute LLC ("PVI"), of which Dr. McGuckin is the sole member and manager.
16. Pursuant to certain promissory notes issued on various dates beginning in 2007 and continuing through October 2019, *PVI has loaned funds to the Debtor.*
17. *As of the Petition Date, the aggregate outstanding indebtedness under the various promissory notes is $4,257,626, secured by a properly perfected, first priority security interest in and lien on substantially all of the assets of the Debtor, including all of the Debtor's accounts receivable. Id.* (citing Cash Collateral Mot. ¶¶ 15-17) (emphasis added in Opinion).

Although the involuntary petition had listed PVI's debt as $1,202,120, the Cash Collateral Motion directly contradicted that representation when it averred that PVI held "various promissory notes" totaling $4,257,626 "secured by a properly perfected, first priority security interest in and lien on substantially all of the assets of the Debtor." *Id.* at 23.

On November 20, 2019, the United States Trustee ("UST") requested copies of PVI's promissory notes, UCC filings, and the payment history on PVI's liens. *Id.* On November 21, 2019, the UST informed Dilworth that he had located a UCC-1 financing statement which PVI had filed against VAC on November 4, 2019 asserting a purported lien on any and all receivables and equipment, personal property, and licenses in connection with a series of loans allegedly extended to VAC since 2007 totaling $4,257,626 ("UCC Statement"), and inquired about a possible preference action against PVI. *Id.* at 20, 23, 24.

On the same day, VAC withdrew the Cash Collateral Motion. *Id.* at 24. At a subsequent hearing, as will be discussed further *infra,* it became clear that PVI did not hold a secured claim, or any other claim, against VAC because PVI never actually lent any money to VAC.

On November 22, 2019, Gardner filed a motion to dismiss the involuntary Chapter 11 petition pursuant to 11 U.S.C. § 1112(b) or to appoint a Chapter 11 trustee under 11 U.S.C. §1104(a) ("Gardner Motion"), alleging that the petitioning creditors had instituted involuntary proceedings in bad faith in conjunction with McGuckin so that McGuckin could get VAC into

bankruptcy without the limited partners' consent in order to further delay the Derivative

Litigation. *Id.* Gardner submitted a declaration with thirty-nine (39) exhibits attached in support

of the Gardner Motion. Case No. 19-17117 ECF 43. On November 25, 2019, the Court entered

an Order for Relief. Op. at 24.

Shortly thereafter, on December 19, 2019, the UST filed his own motion to dismiss,

("UST Motion" and, collectively with the Gardner Motion, "Dismissal Motions") largely on the

bases that McGuckin had orchestrated the involuntary filing with the petitioning creditors to gain

a tactical litigation advantage in the Derivative Litigation; McGuckin's conflicts of interest

would make it impossible for him to satisfy his fiduciary duties as general partner controlling

VAC-in-possession; and "irregularities" in the Cash Collateral Motion. *Id.* at 24-25. VAC filed

its objection to the Gardner Motion on December 19, 2019, and an objection to the UST Motion

on December 24, 2019. *Id.* at 25. Neither McGuckin nor VAC LLC filed an objection to either of

the Dismissal Motions. On January 16, 2020, Gardner filed a reply to VAC's objection and

incorporated certain discovery that he had obtained in connection with the involuntary filing. *Id.*

On February 5, 2020, counsel for Gardner filed a request for the Court to take judicial

notice of certain facts related to the procedural history of the Derivative Litigation, and attached

certain pleadings, including the original complaint and amended complaint filed in that litigation,

to the request ("Judicial Notice Request"). Case No. 19-17117 ECF 230, Ex. A, C.

On February 6, 2020, the Court held a hearing on the Dismissal Motions commencing

around 9:30 a.m. and concluding at 6:05 p.m. ("Dismissal Hearing").[1] Case No. 19-17117 ECF

206, 251; Hrg. Tr. 352:14-15, Feb. 6, 2020 ("Hrg. Tr."). In preparation for the Dismissal

Hearing, the Court had drafted a bench memorandum, as it routinely does in advance of complex

---

[1] There was a lunch break lasting just shy of one hour and other short breaks throughout the day. *See* Hrg. Tr. 138:19-20.

proceedings, summarizing the applicable legal standards, and all of the background information

which was either undisputed or apparent from evidence submitted with the Dismissal Motions

and objections ("Bench Memorandum").

At the beginning of the Dismissal Hearing, counsel for VAC objected to the Judicial

Notice Request because it referenced unproven allegations from the Derivative Litigation. Hrg.

Tr. 10:2-11:3. The Court, prior to VAC's objection, had not been aware of the late Judicial

Notice Request. *Id.* at 10:5-9, 11:4-5. In response to counsel's objection, the following exchange

occurred:

> THE COURT: So you're basically asking –
> COUNSEL FOR VAC: And we believe they should be stricken.
> THE COURT: -- me not to consider the allegations that they made in the State
> Court action; is that –
> COUNSEL FOR VAC: Well they're – you can consider them but
> THE COURT: I mean, yeah, because they –
> COUNSEL FOR VAC: -- just as allegations… *Id.* at 11:17-12:1.

The Court then explained in response to the objection that "I'm not here to dispose of the State

[sic] court action." *Id.* at 12:14-15. Upon further explanation by counsel for Gardner that the

Judicial Notice Request was only filed to establish the procedural history of the Derivative

Litigation and not to have the Court determine the truth of the allegations in the Derivative

Litigation, the following exchange occurred between the Court and counsel for VAC:

> THE COURT: So what about that Ms. Aaronson [sic]?
> MR. MORGAN: [indiscernible]
> THE COURT: If I'm just supposed to note the procedural history in the derivative
> litigation?
> COUNSEL FOR VAC:  Exactly. And in this uncontested statement of facts, we
> have agreed to every date and every pleading that was filed. There's no need for
> the actual pleadings which are just hearsay to be before the Court.
> THE COURT: Okay. Well, personally, I'm not really seeing the import of this,
> but I think, my suggestion is that when we take a break, at some point, why don't
> you [counsel for Gardner] sit down with the debtors and go through the
> documents and see if they actually are going to object to, I mean, if it's just to –
> evidence the procedural history of the State Court litigation, that seems fine to me

and I'm not sure why they would object to you saying on this date these
allegations were made or this happened, because that's what happened. *Id.* at
14:7-23.

Counsel for Gardner agreed to the Court's suggestion and the objection was never subsequently

raised. *Id.* at 14:24-15:10. Shortly after the foregoing exchange, Gardner's seventy-five (75)

exhibits were admitted into evidence with no objection. *Id.* at 16:11-17:8. In addition to

Gardner's exhibits, the Court later admitted into evidence thirty-one (31) exhibits submitted by

the UST without objection, as well as fourteen (14) exhibits submitted by VAC with no

objection. *Id.* at 170:19-171:4, 309:25-310:6.

At the Dismissal Hearing, the Court heard testimony from the Monitor, McGuckin, and

Mark Tucci, VAC's chief financial officer (collectively, "Witnesses"). The Court was troubled

by much of McGuckin's testimony and, as a result, did not find McGuckin to be a credible or

trustworthy witness. For example, at one point during McGuckin's testimony, VAC's counsel

showed McGuckin a copy of a secured promissory note dated December 19, 2018 in favor of

PVI from VAC in the principal amount of $500,000. *Id.* at 122:6-8. In response to VAC's

counsel's questions about the details of PVI's loans to VAC, McGuckin testified that PVI had

loaned VAC: (1) $500,000 in December 2018, (2) $225,000 in May 2019, (3) $250,000 in

September 2019, and (4) $347,000 in October 2019. *Id.* at 122:6-123:25. Based upon

McGuckin's testimony, it did not appear that PVI loaned any other amounts to VAC despite the

representation in the Cash Collateral Motion that PVI had loaned a total of $4,257,626 to VAC.

During the UST's cross examination of McGuckin, however, McGuckin completely

contradicted his direct testimony and admitted for the first time that PVI actually had not loaned

*any* amount to VAC.[2] *Id.* at 176:22-181:7. When asked to explain why he had testified that PVI

---

[2] VAC's counsel had sent an email to the UST on January 31, 2020 attaching purported "documentation of the PVI
loans to VAC," which listed the following payments totaling $1,202,119.57 which were loaned to VAC: (1) a

had loaned these amounts to VAC, McGuckin testified that he essentially considered himself and his entities which had loaned money to VAC - Peripheral Vascular and PA Vascular Institute - to be the same entity as PVI since all of the money came from him. *Id.* at 179:21-180:22.

Based upon McGuckin's admission during cross examination that PVI had not loaned any money to VAC, it appeared that there was no basis in fact or law for PVI to have signed the involuntary petition or for VAC to have filed the Cash Collateral Motion. Furthermore, if the UST had not discovered these falsehoods, PVI would have held a blocking position in VAC's bankruptcy, as VAC's sole secured creditor, which would have resulted in PVI's claim being paid ahead of all of VAC's unsecured creditors and limited partners.

After extensive testimony from all the Witnesses, counsel for VAC, counsel for Gardner, and counsel for the UST made closing arguments. *Id.* at 318:6-337:25. After closing arguments, counsel for VAC objected to Gardner's counsel referring to an expert report from the Derivative Litigation in his closing argument. *Id.* at 339:16-21. The Court responded that it would not consider the expert report as part of its ruling. *Id.* at 339:22-23.

At the conclusion of the Dismissal Hearing, the Court went on to explain based upon the record before it that:

> [a]fter hearing the testimony of Dr. McGuckin today, frankly, I'm horrified. I can't enter an order tonight, because everyone in the clerk's office has gone home, but I find Dr. McGuckin to be completely lacking in credibility. I find him to be untrustworthy. I find him to be self-dealing in every manner possible. I believe Dr. McGuckin, that you think that you put a ton of money into this debtor and you don't understand why the limited partners aren't supporting you and why they don't give capital contributions. I think that possibly you're lying, but certainly, perhaps, you're delusional. They don't want to give money to the debtor because they don't trust you. And frankly, I don't trust you. And

---

$300,000 wire to VAC from Peripheral Vascular on December 18, 2018; (2) a $200,000 wire to VAC from PA Vascular Institute on December 19, 2018; (3) a $155,000 wire to VAC from Peripheral Vascular on May 17, 2019; (4) a $70,000 wire to VAC from Peripheral Vascular on May 23, 2019; (5) a $250,000 check to VAC from Peripheral Vascular on September 9, 2019; (6) a $145,523.92 check to VAC from James and Allison McGuckin on October 10, 2019 (with a "credit to non-VAC 401k of $18,404.35"); and (7) a $100,000 check to VAC from James and Allison McGuckin on October 31, 2019. Op. 26-27.

> although I cannot order something today, because my – my clerk's office is closed, it will be entered tomorrow. And you are not going to have anymore [sic] control of this debtor. It is absolutely clear to me that your [sic] unable to discharge your responsibilities to this debtor. It's absolutely clear to me that there are a number of conflicts of interests which you have acknowledged. *Id.* at 339:3-22.

The Court then went on to describe the many reasons supporting its ruling that the involuntary petition was orchestrated by McGuckin in bad faith and that appointment of a Chapter 11 trustee was warranted based upon the extensive evidence presented at the hearing. *Id.* at 339:23-348:19. In so doing, the Court explained:

> I can understand why many of the limited partners don't have confidence in him. I understand there's a cost to appointing a Chapter 11 trustee, but I think that if I just dismiss this case, what will happen, Dr. McGuckin will remain at the helm of the debtor. He will go back to his frivolous litigation tactics in the State Court [sic] action. I don't know how long that will take to end, so I conclude that tomorrow I will enter an order and I will submit an opinion. I will not be able to give citations to the transcript from today's hearing, because I will not have it then, but I truly believe that it's imperative that I enter that order as soon as possible. So I'm going to enter an order tomorrow granting Gardner's motion to appoint a Chapter 11 trustee, between now and tomorrow, I don't want to see Dr. McGuckin or his CFO taking any actions in connection with any money of the debtor…So that will be my ruling tomorrow and I will try and be as thorough, but I probably will not be able to capture everything you gave to me in the documents, but I will do the very best that I can and that's it for today. *Id.* at 348:6-349:15.

Subsequently, counsel for VAC raised the issue of who would have authority to act on behalf of VAC until the Chapter 11 trustee was appointed. *Id.* at 349:18-350:4. The following exchange occurred in response to that inquiry:

> THE COURT: I mean, I feel that I don't want Dr. McGuckin making one more decision for this debtor, not one. And I don't know if there are immediate decisions that need to be made, but my suggestion is and Mr. Herron, I'm open to possibilities. How long do you think, usually do you get a Chapter 11 trustee appointed?
> COUNSEL FOR THE UST: I think we can expedite this, especially considering the circumstances that want to be appointed fairly quickly.
> THE COURT: Okay. I also find Mr. Gardner to be entirely credible. I mean, obviously, he's not going to be up to date on every single thing going on in this debtor, but you ought to put together a list, if there are certain immediate actions that must be taken, please direct that e-mail to Mr. Herron and Mr. Argentina and then –

> COUNSEL FOR VAC: Right.
> THE COURT: -- we can, you know, if you need to have a phone conversation
> with me, but obviously, any immediate decisions that may need to be made, I'd
> like the two of you to confer together and figure out what the right decision ought
> to be in this case.
> COUNSEL FOR GARDNER: We will, your Honor. Thank you.
> *Id.* at 350:5-351:1.

Subsequent to that exchange, the Court concluded the Dismissal Hearing with the following

comments:

> THE COURT: Thank you very much. I guess as a last note, I just wanted to say,
> Mr. Herron [counsel for the UST] and Mr. Argentina [counsel for Gardner], I
> thought your team did an excellent job preparing this case. And I'm very
> appreciative of the discovery that you were able to obtain in this case. I thought
> you did an outstanding job. And I'm going to send an e-mail to Andy Barrow [ph]
> [sic] [referring to Andy Vara, the UST]. *Id.* at 351:25-352:5.

Immediately after the Dismissal Hearing concluded, McGuckin resigned from his management

positions at VAC and withdrew VAC LLC as the general partner of VAC, effective immediately.

Subsequently, at the end of the day on February 7, 2020, after 4:00 p.m., the Court issued

the Trustee Order granting Gardner's motion to appoint a Chapter 11 trustee accompanied by the

forty-four (44) page Trustee Opinion describing the basis for the order and largely elaborating on

the reasons given on the record at the hearing the previous day for finding the appointment of a

Chapter 11 trustee warranted. Case No. 19-17117 ECF 234, 235. In drafting the Trustee Opinion,

the Court borrowed from the Bench Memorandum and described testimony and evidence which

had been presented at the Dismissal Hearing. *See generally* Op.

In the background section of the Trustee Opinion, the Court summarized some of the

allegations which Gardner had made against McGuckin in the Derivative Litigation, citing in

part to the amended complaint in the Derivative Litigation. For instance, the Trustee Opinion

states:

> *Gardner also alleges* that, when VAC's Philadelphia center was performing poorly,
> McGuckin failed to devote efforts to saving VAC's Philadelphia center and, instead,
> opened his own competing center in Philadelphia through an entity owned solely by him,
> Philadelphia Peripheral Vascular Institute ('PeVI'), without presenting the opportunity to
> the limited partners. *Gardner also alleges* that McGuckin made VAC act as surety to the
> lease for the PeVI center in violation of the Amended L.P. Agreement which required
> limited partner approval before using Partnership assets to secure a loan greater than or
> equal to $500,000. Op. 5 (emphasis added).

In the same section describing background information, the Trustee Opinion, citing to the expert

report, stated:

> [t]hrough discovery in the Derivative Litigation, Gardner learned that McGuckin had
> entered VAC into several management, billing, and services agreements in January 2012
> and January 2016 with certain McGuckin Centers, whereby VAC provided management,
> accounting, legal, human resources, billing, and administrative services to McGuckin's
> Centers for a reduce percentage of revenue than VAC typically charged for providing
> those services to its own subsidiaries. *Id.* at 6.

Finally, in the Trustee Opinion, after describing some of the aspects of McGuckin's testimony

which the Court had found most troubling, the Court explained in assessing McGuckin's

credibility that:

> [u]ltimately, the Court did not find McGuckin to be credible or trustworthy in any
> respect. In fact, it is clear to the Court that McGuckin is willing to sign documents, like
> the Consent Decree, even if he does not believe that his statements are true. In addition,
> McGuckin was either lying when he testified that PVI loaned millions of dollars to VAC
> or he is delusional. The Court suspects that PVI did not actually loan any amount to
> VAC. In any event, the Court finds that McGuckin is not truthful and cannot be relied
> upon for anything that he says. *Id.* at 27.

As described in detail in the Trustee Opinion, the Court ultimately determined that cause

for dismissal of the case existed under 11 U.S.C. § 1112(b) primarily because, "based upon

postpetition discovery obtained by Gardner and McGuckin's testimony," McGuckin had

orchestrated the involuntary petition in bad faith in order to stay the sanctions hearing in the

Derivative Litigation. *Id.* at 36-37. Similarly, the Court concluded "based upon the evidence

submitted to the Court and the testimony provided at the hearing" that cause existed to appoint a

14

Chapter 11 trustee under 11 U.S.C. § 1104 primarily because of McGuckin's numerous conflicts of interest, detailed in the Trustee Opinion, which would substantially interfere with his ability as sole member and manager of VAC's general partner to discharge his fiduciary duties to VAC to preserve and maximize estate assets. *Id.* at 39-40. Other factors buttressing the Court's finding of cause to appoint a Chapter 11 trustee included, *inter alia,* McGuckin's inadequate, unreliable record-keeping and reporting, as found by the independent Monitor; the reputational damage he had inflicted on VAC in various prepetition proceedings involving regulatory agencies, state health departments, and law enforcement agencies; and his tendency to put his and his entities' interests above VAC's interests. *Id.* at 41-43.

Shortly after the Court issued the Trustee Order and Opinion, McGuckin and VAC LLC filed a notice of appeal of the Trustee Order and Opinion to the United States District Court for the Eastern District of Pennsylvania ("District Court") on February 20, 2020 ("Appeal"), but did not seek a stay of the Trustee Order pending appeal. Case No. 19-17117 ECF 252. On March 18, 2020, Gardner moved to dismiss the Appeal on the basis that McGuckin and VAC LLC lacked standing to appeal the Trustee Order, and/or had waived their right to appeal by failing to object to the Dismissal Motions ("Motion to Dismiss Appeal").

Shortly thereafter, on March 20, 2020, Gardner filed a motion for an order imposing sanctions against McGuckin and PVI ("Sanctions Motion"). Case No. 19-17117 ECF 304. Both PVI and McGuckin filed objections to the Sanctions Motion on April 17, 2020. *Id.* at ECF 351, 352. On April 29, 2020, the Court decided to continue the hearing on the Sanctions Motion in light of the pending Appeal since the basis for the Sanctions Motion stemmed largely from findings made in connection with the Trustee Order and Opinion which had been appealed. Meanwhile, the parties completed appellate briefing for the District Court on June 24, 2020.

Since then, while awaiting a decision from the District Court, McGuckin, through counsel, has

participated in hearings in this Chapter 11 case, made submissions, and responded to an

adversary complaint. *See id.* at ECF 289, 307, 352, 711; Case No. 21-00021 ECF 7, 10.

On March 10, 2021, a hearing on the Sanctions Motion was further continued to May 5,

2021 to give the parties an opportunity to submit briefing addressing this Court's concerns about

its jurisdiction to adjudicate the pending Sanctions Motion in light of the pending Appeal of the

Trustee Order. Case No. 19-17117 ECF 686.

On April 6, 2021, McGuckin filed a letter with the District Court seeking to supplement

the record on appeal to include deposition testimony from an unrelated malpractice action

between McGuckin and his former counsel concerning VAC's partnership agreement

("Supplemental Deposition"). Instead, on April 14, 2021, the District Court dismissed the

Trustee Order Appeal and remanded the case to this Court to give it an opportunity to determine

in the first instance whether the Supplemental Deposition justified reconsideration of the Trustee

Order.

On April 23, 2021, just under two weeks prior to the hearing on the Sanctions Motion,

when concerns about jurisdiction had been mooted by the dismissal of the Appeal, McGuckin

and VAC LLC (collectively, "Moving Parties") filed the instant Recusal Motion. Case No. 19-

17117 ECF 758. On May 7, 2021, Gardner filed an objection to the Recusal Motion. *Id.* at ECF

794. On May 19, 2021, the Chapter 11 Trustee filed an objection to the Recusal Motion. *Id.* at

ECF 805. On June 8, 2021, counsel for the Moving Parties filed a "demonstrative exhibit" which

referenced for the first time concerns about the Court's compliments to counsel for the UST and

Gardner and the Court's offer to email the UST. *See id.* at ECF 820. A hearing on the Recusal

Motion was conducted on June 9, 2021. *Id.* at ECF 821.

## III.    DISCUSSION

As the basis for the Recusal Motion, made pursuant to 28 U.S.C. § 455, the Moving

Parties offer the following reasons for suggesting that the Court's impartiality may reasonably be

questioned: (1) the Court purported to "diagnose" McGuckin as "delusional" at the February 6

hearing and in the Trustee Opinion; (2) the Court referred to Gardner as "credible" when he did

not testify at the February 6 hearing; (3) the Court issued the Trustee Opinion too expeditiously;

(4) the Court purportedly accepted the truth of the allegations in the Derivative Litigation and the

expert report despite stating at the Dismissal Hearing that it would not consider those sources[3];

and (5) the Court complimented counsel for Gardner and the UST at the conclusion of the

Dismissal Hearing and intended to email the UST regarding his counsel's performance.

For the reasons described below, the Court concludes that the Recusal Motion is untimely

and that, in any event, no objectively reasonable person informed of the circumstances would

question the Court's impartiality based upon the foregoing concerns. Furthermore, the foregoing

does not suggest, let alone prove by compelling evidence, that the Court has an actual personal

bias or prejudice towards McGuckin or VAC LLC. Accordingly, finding no basis supporting

recusal, the Court will deny the Recusal Motion.

---

[3] Specifically, the Moving Parties take issue with the Trustee Opinion's reliance on the amended complaint in the Derivative Litigation in stating in the background section that "Gardner also alleges that, when VAC's Philadelphia Center was performing poorly, McGuckin failed to devote efforts to saving VAC's Philadelphia center, and instead, opened his own competing center in Philadelphia through an entity owned solely by him." Op. 5; Recusal Mot. ¶ 17. They also take issue with the Trustee Opinion's reliance on the Derivative Litigation expert report in stating in the background section that "[t]hrough discovery in the Derivative Litigation, Gardner learned that McGuckin had entered VAC into several management, billing, and services agreements…with certain McGuckin centers whereby VAC provided…services to McGuckin's centers for a reduced percentage of revenue than VAC typically charged for providing those services to its own subsidiaries." Op. 6; Recusal Mot. ¶¶ 19, 21.

### A. 28 U.S.C. § 455

Pursuant to 28 U.S.C. § 455(a), "any... judge...of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[4] Under this provision, the appearance of bias or prejudice, rather than actual bias or prejudice, must be demonstrated. *Dean v. Philadelphia Gas Works,* Civ. No. 19-04266, CIV. No. 19-04275, Civ. No. 19-04279, Civ. No. 19-04428, Civ. No. 19-04429, 2020 WL 7695751, at *6 (E.D. Pa. Dec. 28, 2020); *Holt v. Pennsylvania*, Civ. No. 10-5510, 2020 WL 264666, at *4 (E.D. Pa. Jan. 17, 2020); *Murphy v. U.S. Dep't of Educ. (In re Murphy),* 547 B.R. 875, 878 (Bankr. W.D. Pa. 2016). To determine whether recusal is warranted under 28 U.S.C. § 455(a), the Court must consider whether an objective, reasonable layperson knowing all the facts and circumstances would conclude the judge's impartiality might reasonably be questioned. *Allen v. Parkland School Dist.,* 230 Fed. Appx. 189, 193 (3d Cir. 2007); *In re Kensington Int'l. Ltd.,* 368 F.3d 289, 303 (3d Cir. 2004); *Dean,* 2020 WL 7695751, at *6; *In re Reese,* 482 B.R. 530, 534 (Bankr. E.D. Pa. 2012). A judge need not recuse herself based on the subjective view of the moving party no matter how strongly the view is held. *In re Reese,* 482 B.R. at 534 (citing *United States v. Sammons,* 918 F.2d 592, 599 (6th Cir.1990)).

In general, a judge's opinion formed about a litigant, even if the judge has become "exceedingly ill disposed toward that litigant," is not a basis for disqualification under § 455(a) when the "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Liteky v. United States*, 510 U.S. 540, 550-51 (1994). As the Supreme Court in *Liteky* explained:

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial

---

[4] This provision is made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 5004(a).

source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required…when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S.Ct. 230 (1921), a World War I espionage case against German–American defendants: 'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.' *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune. *Liteky,* 510 U.S. at 555-56.

Ultimately, just as a judge must recuse herself if her impartiality might reasonably be questioned, she also has a duty not to recuse herself if there are no grounds for disqualification. *Dean,* 2020 WL 7695751, at *6 ("In the absence of proof that a person would reasonably question the judge's impartiality, a judge 'has an affirmative duty not to recuse himself'"); *In re Reese,* 482 B.R. at 534.

Pursuant to 28 U.S.C. § 455(b)(1), any judge of the United States "shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." With respect to this provision, "courts have held that the litigant must prove 'actual bias or prejudice' 'by compelling evidence,' *Hook v. McDade,* 89 F.3d 350, 355 (7th Cir. 1996), and that the evidence of a 'negative bias or prejudice…must be grounded in some personal animus or malice

that the judge harbors against [him/her].'" *Holt*, 2020 WL 264666, at *3. "Personal bias or

prejudice" "connot[es] a favorable or unfavorable disposition or opinion [towards an individual

or his/her case] that is somehow *wrongful or inappropriate*, either because it is undeserved, or

because it rests upon knowledge that the subject ought not to possess…, or because it is

excessive in degree[.]" *Id.* (citing *Liteky,* 510 U.S. at 550). Ultimately, courts must determine

whether an informed, objective, reasonable observer would be convinced of the judge's bias. *Id.*

### B.  The Timeliness of the Recusal Motion Weighs Against Recusal.

One factor weighing against recusal is that the Recusal Motion is untimely under 28

U.S.C. § 455(a). With respect to the factor of timeliness when considering a recusal motion, the

Third Circuit Court of Appeals ("Third Circuit") has stated:

> notwithstanding that § 455 does not contain an express timeliness requirement,
> the Courts of Appeals cases that have addressed the issue have concluded that
> parties seeking disqualification under § 455(a) should do so in a timely manner.
> The reason most often given for applying a timeliness requirement to recusal
> motions is that '[t]he judicial process can hardly tolerate the practice of a litigant
> with knowledge of circumstances suggesting possible bias or prejudice holding
> back, while calling upon the court for hopefully favorable rulings, and then
> seeking recusal when they are not forthcoming.' Yet timeliness, as the Court in
> *Danyo* stated, is but one of the factors which engages a court's discretion in
> determining whether a judge shall be relieved from its assignment. *In re
> Kensington Int'l. Ltd.,* 368 F.3d 289, 312 (3d Cir. 2004).

In light of the foregoing, the Third Circuit has concluded that "when a party's attorney is aware

of the grounds supporting recusal, but fails to act until the judge issues an adverse ruling, the

recusal motion is not timely." *Id.* at 314-15.

Here, the Moving Parties have known of the circumstances which they allege suggest

possible bias or prejudice since February 2020, but only raised them, for the first time, *fourteen

(14) months* later, when the District Court dismissed the Trustee Order Appeal and remanded the

matter back to this Court. During the past fourteen months, McGuckin has opposed a motion for

sanctions, responded to an adversary complaint, participated in hearings, and filed submissions

with the Court without ever voicing any concern about the Court's impartiality. That the Moving

Parties only now call for the undersigned's recusal, because the matter has been remanded back

to this Court, undermines the bases for the Recusal Motion and renders the request untimely. The

foregoing circumstances constitute the type of abuse that the Third Circuit, and other Courts of

Appeal, sought to protect against by permitting the consideration of timeliness as a factor in

deciding whether to grant or deny a request for recusal under § 455(a).

### C. Because an Objectively Reasonable Person Informed of the Facts and Circumstances Would Not Question the Court's Impartiality on the Bases Advanced in the Recusal Motion, 28 U.S.C. § 455(a) Does Not Justify Recusal.

In addition, even if the Recusal Motion had been timely, when considered in context, the

reasons set forth in the Recusal Motion for seeking this Court's recusal would not cause an

objectively reasonable observer to question the Court's impartiality. First, the Court's conclusion

that McGuckin either lied during his testimony or was delusional was based on the evidence

presented and McGuckin's extensive testimony rather than an extrajudicial source. This

conclusion does not demonstrate the type of deep-seated antagonism or favoritism that would

make fair judgment impossible. Rather, the Court determined that McGuckin was dishonest or

delusional simply as part of its credibility assessment of McGuckin as a witness. *See United*

*States v. Ciavarella,* 716 F.3d 705, 719 (3d Cir. 2012) (negative comments expressing

dissatisfaction with a litigant were "merely assessments relevant to the case, whether they are

correct or not," and thus did not serve as a basis for questioning the judge's impartiality.); *In re*

*Shusterman,* 394 Fed. Appx. 888, 890-91 (3d Cir. 2010) (recusal under 28 U.S.C. § 455(a) was

not warranted based on judge's comment at a plea hearing that movant was "one of the most

specially-talented liars that I've ever met in my life," because the comment was a mere credibility determination based on evidence at the hearing).

The Court used strong language to describe McGuckin's lack of credibility due to the significant implications of what he had done and attempted to do by falsely representing that PVI held a secured claim against VAC. By virtue of this false representation, McGuckin was able to orchestrate an involuntary bankruptcy filing against VAC without the limited partners' consent. *See* 11 U.S.C. § 303. Furthermore, if the UST had not investigated this false representation, McGuckin would have succeeded in creating a blocking position, whereby unsecured creditors and equity holders would only have been paid from VAC's bankruptcy estate *after* PVI was paid more than $4 million, even though PVI had not actually lent any money to VAC. McGuckin's serious misconduct prompted the Court's serious language in assessing McGuckin's credibility. Accordingly, with that background and understanding in mind, no objectively reasonable person would think that the Court was attempting to diagnose McGuckin with a mental disorder based on comments related solely to his credibility.[5]

If finding a witness not credible could support a basis for recusal, judges, who must regularly make such determinations, would routinely be subject to recusal, a result 28 U.S.C. §455(a) could not have possibly intended. Ultimately, as the Supreme Court has held,

---

[5] The Moving Parties appeared to suggest at the hearing on the Recusal Motion that the Court's purported failure to consider McGuckin's reliance on counsel in its credibility determination, particularly in regard to his assertions about PVI's invalid claim, demonstrates bias against McGuckin. To be clear, the Court was also disappointed and dismayed with the lengths VAC's counsel went to justify McGuckin's view that PVI held a claim against VAC when in reality, it did not, and expressed as much at the Dismissal Hearing. *See* Hrg. Tr. 341:8-342:4. Nevertheless, that VAC's counsel improperly advanced McGuckin's position regarding PVI holding a claim against VAC does not absolve McGuckin of responsibility for directing the filing of the involuntary petition based upon PVI's nonexistent claim; for asserting conflicting amounts of such claim in the involuntary petition, the Cash Collateral Motion, and at the Dismissal Hearing; for directing the filing of a UCC Statement in favor of PVI on the eve of the bankruptcy filing; for attempting to secure a priority lien position for PVI based on a completely invalid claim; and for initially testifying falsely during the Dismissal Hearing that PVI had lent money to VAC when it had not. The Court is entitled to draw conclusions on McGuckin's credibility based on the foregoing, even in the event VAC's counsel improperly supported and encouraged his position. Simply holding a witness accountable for his own testimony and actions by drawing a negative conclusion regarding his credibility does not demonstrate bias or partiality.

expressions of impatience, dissatisfaction, annoyance, and even anger do not establish

impartiality or bias. "If the judge did not form judgments of the actors in those court-house

dramas called trials, he could never render decisions." *Liteky,* 510 U.S. at 551.

Second, the Court's single reference to Gardner as "credible" at the conclusion of the

Dismissal Hearing, after it had already explained the basis for, and issued, its decision to appoint

a trustee, would not cause a reasonable person informed of the circumstances to question the

Court's impartiality. By way of background, as mentioned *supra*, Gardner submitted a

declaration in support of the Trustee Motion with dozens of exhibits attached and had dozens of

exhibits admitted into evidence at the hearing. As such, the Court's statement about Gardner was

based upon his declaration and the evidence which he submitted, not an extrajudicial source. *See

e.g., Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 245 (3d Cir. 2007); *Live Face on

Web, LLC v. Zeobit,* LLC, No. CV 17-1255, 2017 WL 4390505, at *5 (E.D. Pa. Oct. 3, 2017).

Furthermore, that the Court found Gardner's position credible is not a reflection of favoritism

which would make fair judgment impossible. In any event, the Court's reference to Gardner as

"credible" was not made in connection with its oral statement of reasons supporting its decision

to appoint a Chapter 11 trustee. Rather, it was made casually at the very end of a lengthy hearing

as the Court simply attempted to assist the parties with a side issue of who was best suited to act

on behalf of VAC pending the Chapter 11 trustee's appointment. Framed in that context, no

reasonable person would question the Court's impartiality based upon a random comment at the

end of a hearing after the ruling had already been issued.

Third, the Court's timing in issuing the Trustee Order and Opinion would not give a

reasonable person informed of the surrounding circumstances grounds to question the Court's

impartiality. First, the Trustee Opinion was issued almost twenty-four hours after the Dismissal

23

Hearing concluded and contains numerous references to testimony and evidence which had been presented at the hearing, belying any suggestion that the outcome was predetermined. That in drafting the Trustee Opinion the Court relied upon its own Bench Memorandum's discussion of the applicable legal principles and of background information, which was either uncontested or apparent from evidence submitted prior to the Dismissal Hearing, does not change the fact that the outcome was based upon the testimony and evidence presented at the Dismissal Hearing, as is apparent from the Trustee Opinion. In fact, the Trustee Opinion relies extensively on McGuckin's testimony to support its ultimate conclusions that cause existed to dismiss the case and that appointment of a trustee was warranted. *See* Op. 25, 26, 27, 36, 37, 39, 40, 42, 43.

Importantly, as the Court expressed to the parties at the conclusion of the Dismissal Hearing, based upon the extensive record, it was deeply concerned with McGuckin's significant conflicts of interest with VAC and his proven readiness to sacrifice VAC's interests to serve his own, at substantial cost to VAC. Hrg. Tr. 339:3-22, 340:19-341:6, 342:5-343:8, 346:8-12, 347:11-17. Given the serious findings the Court made with respect to McGuckin's management of VAC, the Court believed, based upon the evidence, that it was imperative to remove McGuckin from control of VAC as soon as possible to give VAC a chance of succeeding in bankruptcy and protect VAC from any further malfeasance by McGuckin. *See id.* at 348:6-17. Motions to appoint Chapter 11 trustees by their very nature require expeditious rulings, particularly when the Court finds, as this Court did, that the debtor's management poses a threat to the debtor. Accordingly, the Court does not find the timing of the Trustee Opinion constitutes a basis for recusal.

Fourth, no reasonable person would question the Court's impartiality based upon immaterial references to the Derivative Litigation allegations and expert report in the Trustee

Opinion. The references which McGuckin complains of were simply made by way of

background, and, in fact, the qualifier "Gardner alleges" precedes the reference to the Derivative

Litigation allegations McGuckin cited in the Recusal Motion as problematic.[6] *See* Recusal Mot.

¶17; Op. 5. Counsel for VAC stated on the record that the Court was permitted to consider

allegations in the Derivative Litigation as allegations, which it did. *See* Hrg. Tr. 11:17-12:1.

Furthermore, none of the references to the Derivative Litigation allegations or expert report

McGuckin complains of in the Recusal Motion had any material role in the Court's decision to

appoint a Chapter 11 trustee.[7] *See* Op. 36-44. Furthermore, even if they had, adverse rulings,

even erroneous ones, are not in themselves proof of prejudice or bias. *Arrowpoint Capital Corp.*

---

[6] At the hearing on the Recusal Motion, the Moving Parties appeared to take issue with these references falling under the section of the Trustee Opinion entitled "Factual Background," but have not explained how the Court simply stating the fact that Gardner made certain allegations in the Derivative Litigation against McGuckin is improper, or at all inaccurate, when that is exactly what happened.

[7] At the hearing on the Recusal Motion, the Moving Parties raised a concern that the Court concluded in the Trustee Opinion that "[u]ltimately, McGuckin as sole member and manager of the General Partner, has repeatedly put his own interests above VAC, *may have* competed actively with VAC for years, engaged in numerous secret, self-dealing transactions, and sacrificed VAC's resources and reputation when it served him to do so" and that based on that the Court found "McGuckin to be dishonest, not credible, incompetent, and completely untrustworthy to operate VAC and guide VAC through this chapter 11 reorganization." *See* Op. 43 (emphasis added). Specifically, the Moving Parties appeared to take issue with the Court referencing the allegation from the Derivative Litigation that McGuckin may have competed with VAC in making the foregoing conclusion. A full reading of the Trustee Opinion shows that the subject passage was merely a summary of the *many* factors the Court relied upon to support its conclusion about McGuckin's fitness to operate VAC during the bankruptcy case, including, *inter alia*, McGuckin's conflicts of interest as a defendant in the Derivative Litigation and as the owner of PVI, an entity with no claim, secured or unsecured, against VAC, and which attempted to secure a priority lien position relative to bona fide creditors and equity holders, in violation of McGuckin's fiduciary duty to VAC's bankruptcy estate; VAC funds being comingled with those of other entities, a finding the Monitor made; that McGuckin had committed VAC's resources to highly burdensome settlements which released McGuckin personally from liability; McGuckin paying himself excessive compensation in his roles at VAC without the limited partners' knowledge; the unreliability of VAC's financial statements and forecasts, a finding made by the Monitor; and McGuckin's actions like signing a consent decree he did not believe was accurate and performing experimental procedures unapproved by the FDA which damaged his credibility and VAC's reputation. *Id.* at 39-42. The foregoing justifications for the Court's conclusion that McGuckin was unfit to operate VAC during its bankruptcy are completely unrelated to the allegations in the Derivative Litigation and, in light of the foregoing, no reasonable person would believe that the Court's decision to appoint a Chapter 11 trustee was based in any material way upon allegations in the Derivative Litigation. Furthermore, the Court's statement in the Trustee Opinion that McGuckin "may have" competed with VAC is simply an accurate summary of the crux of the allegations in the Derivative Litigation and does not opine in any way on the merits of those allegations. Certainly allegations of that nature would impact creditor confidence in McGuckin, which is one of the factors relevant to the appointment of a Chapter 11 trustee. *See In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988). Therefore, in context of the Trustee Opinion as a whole, a reasonable person would not question the Court's impartiality based upon its passing reference to allegations in the Derivative Litigation amongst the many other reasons it offered justifying its conclusion about McGuckin.

*v. Arrowpoint Asset Management, LLC,* 793 F.3d 313, 330 (3d Cir. 2015). While erroneous

rulings may constitute proper grounds for appeal, they do not justify recusal.[8] *See Liteky,* 510

U.S. at 555.

Finally, with respect to the last ground, the Moving Parties did not raise in the Recusal

Motion their concerns about the Court complimenting counsel for the UST and Gardner and

proposing to e-mail the UST. Rather, they raised these concerns for the first time on the eve of

the Recusal Hearing by filing a "demonstrative exhibit" referencing the portion of the transcript

reflecting the Court's statements about counsel for Gardner and the UST. *Compare* Case No. 19-

17117 ECF 758 Recusal Mot. *to* ECF 820 Dem. Ex. Because Gardner and the Chapter 11

Trustee did not have an opportunity to respond to the Moving Parties' foregoing concerns in

writing, the Court will not consider these contentions in ruling on the Recusal Motion.

However, even if the Moving Parties had timely raised these concerns, the Court would

still conclude that a reasonable person informed of the facts and circumstances would not

question the Court's impartiality on those bases. With respect to the Court complimenting

counsel for Gardner and the UST, the Moving Parties have failed to demonstrate any impropriety

in the Court's comments. The Court simply stated based on the extensive evidence presented

during the day-long hearing on the Dismissal Motions that counsel for Gardner and the UST had

prosecuted their cases well. This benign, gratuitous compliment, based solely on judicial

proceedings over which the Court presided, did not stem from an extrajudicial source, was made

at the end of the Dismissal Hearing only *after* the ruling had already been issued, and does not

suggest a deep-seated favoritism towards the UST and Gardner nor antagonism against

McGuckin which would make impartial judgment impossible. *See In re Mitan,* 579 Fed. Appx.

---

[8] The foregoing all applies equally to references the Court made to averments in the Dismissal Motions, largely in
support of merely uncontested or immaterial information.

67, 71 (3d Cir. 2014) (three brief remarks about counsel doing a good job did not warrant recusal because the comments were based on counsel's performance rather than an extrajudicial source and did not reflect deep-seated favoritism which would make fair judgment impossible). "The judiciary must have the ability to inspire the Bar through the use of compliments when they are justified in the same way it offers criticism when justified as a method of control." *Certain Underwriters at Lloyds v. Oryx Energy Co.,* 944 F. Supp. 566, 568 (S.D. Tex. 1996).

With respect to the Court's proposal to e-mail the UST, the Moving Parties appear concerned that any e-mail the Court may have sent to the UST following the Dismissal Hearing regarding his counsel's performance in prosecuting the UST Motion would violate Federal Rule of Bankruptcy Procedure 9003(b) ("Rule 9003"), which provides:

> [e]xcept as otherwise permitted by applicable law, the United States trustee…shall refrain from ex parte meetings and communications with the court concerning matters affecting a particular case or proceeding. This rule does not preclude communications with the court to discuss general problems of administration and improvement of bankruptcy administration, including the operation of the United States trustee system.

The term "matters affecting a particular case or proceeding" refers to "matters which are not yet settled or adjudicated by the judge, unresolved matters still pending before the court." *In re Meltzer,* 534 B.R. 757, 764 (Bankr. N.D. Ill. 2015). For purposes of Rule 9003, a matter is no longer pending when a bankruptcy judge has already verbally ruled on the matter. *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1164 (5th Cir. 1988). Here, the Court merely suggested that it would e-mail the UST regarding his counsel's performance in, and not the substance of, the case, only after issuing its verbal ruling on the Dismissal Motions. Accordingly, because the verbal ruling had already been issued and the Dismissal Motions were no longer pending, the offer to e-mail communication about counsel's performance would not have run afoul of Rule 9003 since

the communication could not affect the outcome of the proceedings on the Dismissal Motions, which had already been adjudicated.

Based on the foregoing, the Court concludes that no grounds exist under 28 U.S.C. § 455(a) which would warrant recusal.

### D. The Moving Parties Have Not Demonstrated by Compelling Evidence Any Basis to Conclude the Court Has a Personal Bias or Prejudice Concerning McGuckin or VAC LLC or Personal Knowledge of Disputed Facts Concerning the Proceeding As Required for Recusal Under 28 U.S.C. §455(b)(1).

Although the Recusal Motion references 28 U.S.C. § 455(b)(1), it does not specifically articulate a basis for why the Court should be required to recuse itself under that provision. To the extent that the Moving Parties attempt to argue that the same five bases which they believe justify recusal under 28 U.S.C. § 455(a) would also justify recusal under 28 U.S.C. § 455(b)(1), the Court disagrees, particularly given that they do not even satisfy the more liberal standard under 28 U.S.C. § 455(a).

First, the Moving Parties do not appear to allege that the Court had personal knowledge of disputed evidentiary facts. Second, none of the Moving Parties' reasons for seeking the Court's recusal reflect compelling evidence of *actual* personal animus or malice against McGuckin stemming from a disposition or opinion which rests on knowledge it should not have, is undeserved, or is excessive in degree. Any opinions formed about McGuckin, including the Court's determination that he was either dishonest during his testimony or delusional, were based solely upon the evidence before the Court, including McGuckin's own testimony. The same goes for its statement about Gardner, which was made on the basis of his declaration and many supporting exhibits. No objectively reasonable observer would find the opinions the Court

formed about McGuckin and Gardner excessive or undeserved, or be convinced of the Court's bias on the basis of those opinions.

Similarly, the Court commending counsel for the UST and Gardner at the conclusion of the Dismissal Hearing based on the proceeding it had just witnessed does not connote by compelling evidence a favorable disposition towards those parties which was wrongful or inappropriate due to being undeserved or excessive in degree. "[A] judge's compliments in the course of legal proceedings should not ordinarily support a partiality challenge." *Andrade v. Chojnacki,* 338 F.3d 448, 458 (5th Cir. 2003). Neither does the Court's intention to e-mail the UST regarding his counsel's performance reflect, by compelling evidence, personal animus against McGuckin nor wrongful or inappropriate favoritism towards the UST.

While the timing of the Trustee Opinion, which cites extensively to testimony and evidence from the hearing, certainly reflects the Court's belief that removing McGuckin from control of VAC as soon as possible was critical, it does not demonstrate by compelling evidence any actual personal animus or prejudice towards McGuckin, and neither do the Trustee Opinion's references to the Derivative Litigation allegations and expert report complained of in the Recusal Motion. Accordingly, 28 U.S.C. § 455(b)(1) does not provide a basis for the Court to recuse itself.

## IV.   CONCLUSION

Based upon the foregoing, the Court finds no grounds to recuse itself. The Recusal Motion will accordingly be denied.

Date: June 25, 2021                          _____

                                             Honorable Ashely M. Chan
                                             United States Bankruptcy Judge