# UNITED STATES BANKRUPTCY COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>Vascular Access Centers, L.P.,<br><br>Debtor. | Chapter 11<br><br>Case No. 19-17117 (AMC) |

## OPPOSITION OF MAJORITY LIMITED PARTNER TO MOTION OF VASCULAR ACCESS CENTERS, LLC AND DR. JAMES F. MCGUCKIN SEEKING TO VACATE ORDER APPOINTING TRUSTEE

William Whitfield Gardner ("Gardner"), the majority-in-interest limited partner of the Debtor herein, Vascular Access Centers, L.P. ("VAC" or "Debtor"), by and through his undersigned counsel, submits the following opposition to the motion (the "Motion")[1] of Vascular Access Centers, LLC (the "VAC LLC") and Dr. James F. McGuckin ("Dr. McGuckin", and together with VAC LLC, "McGuckin"[2]) requesting this United States Bankruptcy Court for the Eastern District of Pennsylvania ("Court") vacate the Order to appoint a chapter 11 trustee ("Trustee Order") [Docket No. 235] and respectfully represents as follows:

## I.    INTRODUCTION

1.      By his Motion, McGuckin requests that the Court vacate the Trustee Order and the accompanying opinion ("Trustee Opinion") [Docket No. 234] because alleged "new evidence refut[es] the conclusions underlying the [Trustee Order]." Motion at 1. Specifically, McGuckin alleges that VAC's attorney who drafted the company's Limited Partnership Agreement ("LP

---

[1] *Vascular Access Centers, LLC's and James F. McGuckin, M.D.'s Motion for the Court to Consider the Deposition of John E. Royer, Esquire and Related Evidence on Remand from the District Court* [Docket No. 774].

[2] VAC LLC is solely owned and controlled by Dr. McGuckin.

Agreement") recently recanted prior testimony regarding the LP Agreement's restrictions on

McGuckin's ability to operate competing businesses. As a threshold matter, McGuckin lacks

standing to seek reconsideration of an order he did not oppose in the first place and, in light of

his sudden resignations prior to entry of the Trustee Order, vacating the order would have no

effect on his position relative to the company.

2.      The Motion should be denied because it is based on the fiction that the Court

appointed the trustee "primarily" because it believed the claims in the Derivative Action

("Derivative Claims") were strong. That is a gross mischaracterization of the Court's reasoning.

The Court expressly did not consider the merits of the Derivative Claims when it decided to

appoint a trustee. Indeed, the testimony that McGuckin claims Royer "recanted" was never

submitted to the Court and therefore could not have played any role in the Court's ruling. Rather,

the Court decided to appoint a trustee because McGuckin's conduct and other circumstances, as

evidenced by ample documentary and testimonial evidence submitted by Gardner, elicited in

discovery, and disastrously provided by Dr. McGuckin himself on the stand, clearly established

his inability to remain in control of the Debtor and this chapter 11 case. Thus, the alleged "new

evidence" largely irrelevant to the reasons relied upon by the Court in appointing the trustee.

3.      To the extent the Court believes the strength of the Derivative Claims are relevant

to the need for a trustee, most of the Derivative Claims are unaffected by the alleged "new

evidence". Even if the information had the effect McGuckin claims—the LP Agreement

authorized him to own competing centers—the Derivative Claims are based on a plethora of

McGuckin's misconduct unrelated to the subject section of the LP Agreement, including

McGuckin's breaching his fiduciary duties to VAC (as expressly provided in the LP Agreement),

causing VAC to incur obligations prohibited by the LP Agreement, diverting VAC's resources to

- 2 -

support his other businesses, executing employment agreements with himself that provided exorbitant compensation, entering onerous self-serving settlement agreements, performing experimental and non-FDA approved procedures that led to actual and reputational harms to the company, gross mismanagement, and more. Ultimately, however, the strength of the Derivative Claims is irrelevant to the fact that they exist and that McGuckin cannot be trusted to evaluate or prosecute them, which the Court found required the appointment of a trustee.

4.       With respect to the Trustee Order, the alleged "new evidence" is not new.  It is entirely consistent with evidence presented in the Derivative Litigation and was available when the Dismissal/Trustee Motion was litigated. If McGuckin thought this information was material to the Court's consideration of the Dismissal/Trustee Motion, he was required to have presented it (or any evidence) then.

5.       The Motion is the latest example of McGuckin's well-established pattern of meritless litigation tactics in this and other courts whose purpose is to avoid the well-deserved negative consequences of his own unlawful conduct. As this Court is aware, McGuckin stalled the Derivative Litigation for years with failed appeals and a frivolous motion to reconsider. Eventually, the matter was remanded to the state court for trial and a hearing to determine the appropriate amount of sanctions to be awarded against McGuckin. He engineered the filing of this chapter 11 case to avoid a trial on the merits and those sanctions, which would have been the first amount McGuckin would have paid out-of-pocket as a consequence of his various breaches of fiduciary duty because McGuckin forced the Debtor to fund his defense in the Derivative Litigation. The Court foiled his scheme by entering an order appointing a chapter 11 trustee. Despite offering no opposition in the first place, McGuckin now seeks to retroactively neutralize

- 3 -

Gardner and the Court's actions so he may regain control of the Debtor and its claims against

him. The motion should be denied.

## II.    RELEVANT BACKGROUND

### A.  Gardner and other limited partners sued McGuckin on VAC's behalf in Pennsylvania state court for betraying the company and its stakeholders.

6.      Since January 13, 2016, McGuckin has been the defendant in *Gardner v.*

*Vascular Access Centers, LLC et al.*, case no. 16-cv-000367 (the "Derivative Litigation")

pending before the Delaware County Court of Common Pleas (the "State Court"), in which

Gardner and certain other of the Debtor's limited partners filed suit on the Debtor's behalf. The

complaint in the Derivative Litigation asserts four counts against McGuckin for breach of

fiduciary duties, breach of contract, unjust enrichment, and injunctive relief (disgorgement)

based on, among other things, (1) McGuckin's opening and operation of competing centers using

Debtor's resources and without first presenting the opportunity to open these centers to VAC; (2)

incurring debts and obligations expressly prohibited by the LP Agreement and his fiduciary

duties, including by entering into self-dealing contracts that settled various lawsuits in ways that

burdened the Debtor but released McGuckin personally and by paying McGuckin astronomical

salaries for multiple positions at the Debtor; and (3) harming the Debtor directly and

reputationally by gross incompetence and mismanagement, such as by submitting false claims to

Medicare and forcing the Debtor to pay millions of dollars to settle False Claims Act allegations.

*See* Declaration of William Whitfield Gardner filed in support of Motion to Dismiss the

Involuntary Chapter 11 Case ("Gardner Declaration") [Docket No. 43] at Ex. 2.

7.      The procedural history of the Derivative Litigation is set forth in detail in

Gardner's motion for entry of an order dismissing the Chapter 11 Case pursuant to section

1112(b) of the Bankruptcy Code or, in the alternative, appointing a Chapter 11 trustee pursuant

ACTIVE.127059137.06

to section 1104(a) of the Bankruptcy Code [Docket Nos. 42, 43] (the "Dismissal/Trustee

Motion"), and will not be repeated here.

8.      Briefly and for purposes of this matter, McGuckin's motion for summary

judgment in the Derivative Litigation was denied. On July 9, 2018—three days before trial and

after jurors had been summoned—McGuckin filed a petition to compel arbitration to delay the

trial based on an arbitration provision buried in a CEO Agreement he signed with himself. The

State Court issued an Order on July 13, 2018, denying McGuckin's last-minute attempt to

compel arbitration. *See* Gardner Declaration at Ex. 17.

9.      McGuckin unsuccessfully appealed the order denying arbitration. His motion for

reconsideration of the appellate loss was found by the Pennsylvania Superior Court to be

"frivolous, and only done to further delay this matter", and sanctionable. The matter was

remanded to the trial court for determination of the sanctions amount, and the Court of Common

Pleas scheduled a hearing for that determination on November 13, 2019. The day before the

hearing, on November 12, 2019, the Pennsylvania Supreme Court denied McGuckin's Petition

for Allowance of Appeal and returned jurisdiction of the Derivative Litigation to the State Court.

*See* Gardner Declaration at Ex. 19.

**B.    McGuckin orchestrated a bad faith involuntary bankruptcy to benefit himself.**

10.     This chapter 11 case ("Chapter 11 Case") was initiated on the evening of

November 12, 2019, when an involuntary chapter 11 petition [Docket No. 1] (the "Involuntary

Petition") was filed against VAC by three purported creditors: (1) Philadelphia Vascular

Institute, LLC ("PVI"), an entity solely owned and controlled by Dr. McGuckin; (2) Metter &

Company ("Metter"), an accounting firm engaged by VAC and several of Dr. McGuckin's other

businesses; and (3) Crestwood Associates, LLC, an entity owned in part by Brian McGuckin, Dr.

McGuckin's brother ("Crestwood" and, together with PVI and Metter, the "Petitioning Creditors"). *See* Docket No. 1; Trustee Opinion at 21.

**C.    Gardner promptly sought the dismissal of the case or the appointment of a chapter 11 trustee to protect the company.**

11.    In his Dismissal/Trustee Motion filed on November 22, 2019, Gardner argued that, *inter alia*, the Involuntary Petition should be dismissed for bad faith because it was a sham orchestrated by McGuckin to obtain a tactical litigation advantage in the Derivative Litigation or alternatively that the Court should appoint a chapter 11 trustee to safeguard the estate from McGuckin's self-dealing, dissipation and misuse of assets, and gross mismanagement. *See* Dismissal/Trustee Motion at 2. In support of the Dismissal/Trustee Motion, Gardner submitted a sworn declaration to which 39 exhibits were attached, including the Amended Complaint in the Derivative Litigation. [Docket No. 43]. A hearing on the Dismissal/Trustee Motion was scheduled for February 6, 2020.

12.    McGuckin never objected to the Dismissal/Trustee Motion, despite filing notices of appearance in the case. *See* Docket Nos. 45, 58. The only opposition to the Dismissal/Trustee Motion was filed and served by the Debtor. *See* Docket No. 106. McGuckin did not file a joinder to the Debtor's opposition.

13.    On February 6, 2020, the Court held an all-day evidentiary hearing on the Dismissal/Trustee Motion and a separate motion to dismiss the bankruptcy case brought by the U.S. Trustee (the "Evidentiary Hearing").

14.    The Court expressly declined to consider the merits of the Derivative Claims at the Evidentiary Hearing. Gardner had filed a Request for Judicial Notice of certain filings in the Derivative Litigation, in which he asked the Court to take notice of the filings but not the truth of their contents. *See* Transcript Regarding Hearings Held 2/6/2020 [Docket No. 251] ("2/6/2020

- 6 -

Hr'g Tr.") at 10.  In resolving an objection to the Request by counsel to the Debtor, the Court

clearly indicated it had not reviewed the Request and was not considering the truth of the

pleadings in the Derivative Litigation in making its decision. 2/6/2020 Hr'g Tr. at 14:15-21.  The

Court never granted the Request for Judicial Notice, did not cite to it in its Trustee Opinion or

rely on a single document that had not previously been provided to the Bankruptcy Court in

connection with the briefing on the Dismissal/Trustee Motion or was not otherwise admitted into

evidence.

15.     Counsel for Gardner moved his exhibits and deposition designations into

evidence.  There was no objection from VAC or McGuckin, so Gardner's 75 exhibits and

deposition excerpts were entered into evidence.  2/6/2020 Hr'g Tr. at 17.  The U.S. Trustee's

exhibits and VAC's exhibits were also entered into evidence, bringing the total number of

exhibits before the Bankruptcy Court to 120.  McGuckin did not submit any exhibits in

opposition to the Dismissal/Trustee Motion.

16.     The Court proceeded to hear argument and testimony.  As Gardner's counsel

explained to the Court, VAC planned on calling three witnesses, Michael Dubin, a financial

"monitor" that had been appointed in the Derivative Litigation, Dr. McGuckin, and Mark Tucci

(VAC's CFO), each of whom Gardner would cross-examine as part of his case.  2/6/2020 Hr'g

Tr. at 19.  McGuckin never questioned any of the witnesses that appeared at the Evidentiary

Hearing.

17.     Dubin testified that VAC was in financial distress caused by, among other things,

bad publicity and loss of referrals stemming from litigation with the United States Department of

Justice ("DOJ").  2/6/2020 Hr'g Tr. at 51-52. Dubin had prepared two reports in the Derivative

Litigation, which were attached to Gardner's declaration in support of the Dismissal/Trustee

ACTIVE.127059137.06

Motion and admitted into evidence. In them, Dubin opined, among other things, that VAC was in a state of financial distress caused by (1) changes in the Medicare reimbursement structure; (2) costs and expenses incurred in the Derivative Litigation; and (3) a settlement McGuckin negotiated with the DOJ. *See* Gardner Declaration, Ex. 21 at 3. Dubin also reported that VAC's financial processes and records were inadequate, and the company lacked appropriate controls with respect to its contracts with McGuckin. *See* Gardner Declaration, Ex. 14 at 23, 27-28.

18.    Dr. McGuckin's testimony was damning, to say the least.  With respect to PVI and its purported loans to VAC, Dr. McGuckin testified that PVI loaned VAC $1,702,000, including a $500,000 secured loan.  2/6/2020 Hr'g Tr. at 116:6-25, 122:7-9, 123:2-25.  The U.S. Trustee's cross examination of Dr. McGuckin followed, during which, in the Court's words, "[Dr.] McGuckin completely contradicted his testimony during direct examination and admitted, for the first time, that PVI actually had not loaned *any* amount to VAC."  Trustee Opinion at 26.

19.    Regarding the suspicious timing of the filing of the Involuntary Petition—on the same day the Pennsylvania Supreme Court denied McGuckin's petition for allowance of appeal in the Derivative Litigation and on the eve of a hearing on the amount of sanctions to be awarded against Dr. McGuckin personally on account of his "frivolous" litigation conduct—Dr. McGuckin claimed it was "just a total and utter coincidence" despite a text message to his brother insisting that the Involuntary Petition "gotta go down today," i.e., November 12, 2020. 2/6/2020 Hr'g Tr. at 209:13-19, 212:23-213:1.

20.    VAC's counsel also elicited testimony from Dr. McGuckin concerning his numerous run-ins with various law enforcement agencies, regulatory agencies and state departments of health, presumably in an attempt to explain away or downplay the severity of these incidents and their impact on VAC's reputation and bottom line.  For example, Dr.

- 8 -

McGuckin admitted that he signed a consent decree that he claimed contained "multiple inaccuracies" and that he only signed it to avoid the loss of his medical license. 2/6/2020 Hr'g Tr. at 165:11-21. The Court was understandably troubled by Dr. McGuckin's willingness to sign a document he believed to be false.[3]

21.     At the conclusion of the Evidentiary Hearing, which lasted more than eight hours, the Court explained that the evidence supported an order granting Gardner's request for the appointment of a chapter 11 trustee. That evening, McGuckin resigned from his various management positions at VAC and withdrew VAC, LLC as general partner, effective immediately.[4]

22.     On February 7, 2020, the Court entered a thorough, well-reasoned written Trustee Opinion memorializing the ruling. [Docket No. 234]. In the Trustee Opinion, the Court exercised its sound discretion to order the appointment of a chapter 11 trustee under both section 1104(a)(1) and section 1104(a)(2) of the Bankruptcy Code, opining that the facts in the case "easily satisfy" the statutory requirements. Trustee Opinion at 1. The Bankruptcy Court found that:

> (1) the petitioning creditors did not satisfy the statutory criteria for filing the petition, the involuntary petition was not meritorious, and the creditors failed to make a reasonable inquiry into the relevant facts and pertinent law before filing, as evidenced by the fact that: (a) Crestwood did not hold any claims against VAC immediately prior to the involuntary filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin and (b) PVI's $1.2 million claim was entirely false; (2) McGuckin caused PVI to file a UCC Statement on the eve

---

[3]     The Court remarked:

> You know, Dr. McGuckin signed off on the consent decree and still to this day, thinks that things that he said in there were wrong. So that means that he either is willing to sign statements that are false, that he believes to be false, and yet he attests his signature to those documents or he's lying here today. All I know is that I don't believe anything that he says.

2/6/2020 Hr'g Tr. at 340:1-7.

[4]     These entirely voluntary actions are yet another example of McGuckin putting himself ahead of the company. His sudden resignation from management positions without notice disrupted the company and necessitated an emergency call with the Court the following morning.

ACTIVE.127059137.06

of the involuntary filing which constituted a preference and, more importantly, PVI never loaned any money to VAC; (3) the involuntary filing was used by McGuckin to obtain a disproportionate advantage for himself, and a tactical advantage, in the Derivative Litigation, rather than to protect VAC's interests; and (4) as discussed supra, the timing of the filing of the involuntary petition was suspicious since there was no reason that VAC had to be in bankruptcy by November 12, 2019 and McGuckin needed VAC to be in bankruptcy by such date in order to avoid being sanctioned in the Derivative Litigation.

Trustee Opinion at 37-38.

23.    The Court also found that "it is apparent that, based on the totality of the circumstances, McGuckin, acting as the General Partner of VAC, orchestrated the filing of this bankruptcy in bad faith in order to stop the Derivative Litigation from proceeding and to protect his own personal interests, as well as the interests of the General Partner and PVI." *Id.* at 39. Ultimately, the Court concluded that McGuckin "is not credible and trustworthy, and consistently puts his own interests ahead of VAC." *Id.* at 1.

24.    While the Trustee Opinion referenced Gardner's allegations with respect to McGuckin's violation of the LP Agreement's prohibition on operation of competing centers, the Court was careful to note the violations were only alleged by Gardner. *See* Trustee Opinion at 4, 6. The Court made scant reference to the strength of the Derivative Claims, and carefully qualified its statements:

> McGuckin is adverse to VAC in the Derivative Litigation, which **appears to be** a significant estate asset, **potentially** entitling VAC to substantial damages against McGuckin and the General Partner. McGuckin admitted at trial that he wants the Derivative Litigation to end and has gone to great lengths to hinder this **potentially** valuable litigation through frivolous litigation tactics.

- 10 -

Trustee Opinion at 40 (emphasis added). In addition to the Derivative Claims, the Court

observed how the VAC bankruptcy estate holds potential avoidance claims against McGuckin

and his related entities and individuals. *Id*.

25.     In comparison to the passing and qualified references to the LP Agreement's

prohibitions on McGuckin operating competing centers and potential value of the Derivative

Claims, the lengthy factual section of the Trustee Opinion details the many facts, unrelated to the

LP Agreement provisions regarding the General Partner's fiduciary duties, usurpation of

corporate opportunity, and ability to operate competing centers, that establish McGuckin

repeatedly put his own interests ahead of VAC's, including:

- causing VAC to enter into burdensome employment agreements with himself (*Id*. at 6-7 (citing the employment agreements themselves, which were attached to Gardner's Declaration and admitted into evidence));

- performing controversial, dangerous, and non-FDA approved procedures that led to state regulatory action and corresponding reputational and financial injury to VAC (*Id*. at 9-10 (citing a *USA Today* article attached to Gardner's Declaration and admitted into evidence));

- resolving VAC lawsuits with the United States Department of Justice and Dr. Atassi with settlement agreements that burdened VAC while securing personal releases for himself (*Id*. at 11, 13 (citing the settlement agreements attached to Gardner's Declaration and admitted into evidence));

- violating various state health laws by, among other things, failing to disclose the DOJ investigation to the Pennsylvania Department of Health, leading to a threat to revoke licenses and litigation (*Id*. at 10, 14 (citing documents from the Pa DOH attached to Gardner's Declaration and admitted into evidence));

- causing VAC to deliver a secured promissory note to PVI in violation of the LP Agreement notwithstanding the fact that PVI never loaned any

ACTIVE.127059137.06

money to VAC (*Id.* at 15 (citing the note attached to Gardner's
Declaration and admitted into evidence)), and, most obviously;

- filing the involuntary bankruptcy to benefit himself and PVI (*Id.* at 20-24).

26.     Following the issuance of the Trustee Opinion, the Court entered the Trustee

Order.  On February 12, 2020, the Court approved the appointment of Stephen V. Falanga as the

chapter 11 trustee (the "Trustee").

### D. McGuckin appealed the Trustee Order.

27.     On February 21, 2020, McGuckin filed an appeal of the Trustee Order to the

United States District Court for the Eastern District of Pennsylvania ("District Court").

28.     On March 18, 2020, Gardner moved to dismiss the appeal because McGuckin

lacked standing to appeal the Trustee Order. Having resigned from his management positions at

the Debtor before the Trustee Order was even entered, and/or waived his right to appeal by

failing to object to the Dismissal/Trustee Motion or otherwise meaningfully participate in the

Evidentiary Hearing, he was not a "person aggrieved" as required for bankruptcy appellate

standing under controlling Third Circuit law. Briefing on the motion to dismiss the appeal and

the merits of the appeal itself was completed on June 24, 2020.

### E.     McGuckin sought to supplement the appellate record.

29.     On April 6, 2021, McGuckin delivered a letter to the District Court, asking that

the District Court refrain from ruling on the motion to dismiss the appeal because of purported

factual developments in a malpractice litigation brought by McGuckin against attorney John E.

Royer and others in the Philadelphia Court of Common Pleas styled *McGuckin v. Royer, et. al.*,

Case No. 00498 ("Malpractice Litigation"). Royer is the attorney who drafted the LP Agreement.

30.     In the letter, McGuckin claimed that during a deposition in the Malpractice

Litigation conducted on March 25, 2021 ("2021 Deposition" attached as Exhibit F to the

- 12 -

Motion), Royer recanted his prior testimony provided in the Derivative Litigation concerning a

particular provision in the LP Agreement and that this Bankruptcy Court's decision to appoint

the Trustee "was largely based on conclusions taken from Mr. Gardner's state court pleadings

charging Dr. McGuckin with breaching his fiduciary duties due to his ownership of alleged

competitive medical centers."  As discussed below, neither of these assertions are true. Based on

McGuckin's misrepresentations of Royer's testimony and this Court's ruling, the District Court

dismissed the appeal and remanded the case to this Court for reconsideration on April 14, 2021.

**F. The alleged "new evidence."[5]**

31.    One of the bases for some of the claims asserted in the Derivative Litigation is

that McGuckin violated various provisions of the LP Agreement. Specifically, section 6.1.1 of

the LP Agreement expressly imposes on the General Partner a duty to act in good faith in

accordance with its fiduciary duties and requires the General Partner to make decisions on behalf

of the company that benefit the limited partners and not the General Partner. Section 6.3.2

prohibits the General Partner from selling or otherwise encumbering company assets in excess of

$500,000. The Court noted these provisions in the Trustee Opinion. *See* Trustee Opinion at 3-4.

32.    In addition to the above sections, Section 6.7, titled "Other Business Activities",

addresses whether a partner has an obligation to make other investments available to the

Partnership or its Partners:

> In view of the exclusive and limited purposes of the Partnership, no
> Partner, or any Affiliate of any Partner, shall have any obligation to make

---

[5]    In addition to the alleged "new evidence", McGuckin also alleges a "scheme" between Royer and Gardner's
counsel to avoid cross-examination of Royer at a preliminary injunction hearing. *See* Motion at 12. These
allegations, even if true, are completely irrelevant to the Trustee Order or its reconsideration. No such scheme
ever existed. Further, McGuckin made no effort to call Royer at the subject hearing or otherwise object to the
use of the 2018 Affidavit (which was not even introduced into evidence at the hearing). The hearing was
resolved on the first day, so the 2018 Affidavit was completely accurate with respect to Royer's availability for
the only day of proceeding on the preliminary injunction motion.

ACTIVE.127059137.06

any other investment or business opportunity not involving the Properties available to the Partnership or to any of its Partners.[6]

LP Agreement at § 6.7.

33.    Royer was deposed on April 5, 2018 in the Derivative Litigation and questioned about the drafting of the LP Agreement ("2018 Deposition" attached hereto as "**Exhibit A**"). He opined that section 6.7, standing alone, does not expressly prohibit partners from operating competing centers. 2018 Deposition at 139-41.[7] Royer made clear, however, that section 6.7 cannot be read in a vacuum. McGuckin's ability to own and operate competing centers is circumscribed by other sections of the LP Agreement and applicable law. *Id*. Royer also testified that he did not recall McGuckin ever expressing a desire to open competing centers, and that if he had, Royer would have included express authority to do so in the LP Agreement. *Id*. at 224-28.

34.    Months later on August 10, 2018, Royer executed an affidavit consistent with his deposition testimony. *See* Affidavit of John E. Royer, Jr., attached as Exhibit G to the Motion ("2018 Affidavit"). In the 2018 Affidavit, Royer testified that section 6.7 of the LP Agreement "is intended to permit VAC's partners to own interests in other businesses outside of the limited partnership as long as those businesses do not compete with the limited partnership." 2018 Affidavit at 5. He again stated he did not recall having discussions with McGuckin about the

---

[6]    As noted in the Dismissal/Trustee Motion, current section 6.7 is an amended provision. The original provision expressly permitted partners to operate competing businesses:

> Any Partner, including the General Partner, may engage in any other business activities, **whether or not competitive with the business of the Partnership**, and neither the Partnership nor any Partner shall have any rights with respect to such activity or any income or gain derived therefrom.

Removal of the emphasized language above provided additional protections to the partners against self-dealing and usurpation of corporate opportunities. Gardner would not have provided additional funding in 2007 without the removal of the above language.

[7]    The reference to "section 6.6" is because the document was amended and the provision shifted to section 6.7.

ACTIVE.127059137.06

latter's desire to compete with VAC when he was drafting the LP Agreement, and *if* McGuckin

had expressed an intent to compete, Royer would have "explicitly preserved Dr. McGuckin's

ability to compete in the VAC limited partnership agreement." *See Id*. at 2, ¶ 8 and 7-8 ¶¶ 24-26.

35.    No party submitted any portion of the transcript of the 2018 Deposition or the

2018 Affidavit to this Court in connection with the Dismissal/Trustee Motion. McGuckin did not

seek to depose Royer prior to the Evidentiary Hearing, nor did McGuckin issue a subpoena

requiring Royer to testify at the Evidentiary Hearing.

36.    In the Motion, McGuckin presents a passage of Royer's 2021 Deposition

testimony out of context as evidence that Royer recanted or reversed his statement in paragraph

15 of the 2018 Affidavit. *See* Motion at 9-10.[8] Royer's complete response on this subject—as

opposed to the fragments McGuckin presents out of context—shows the consistency of his 2018

and 2021 views. Namely, he believes that section 6.7, read in isolation, does not prohibit partners

from having business interests that compete with VAC, but if a partner wanted to own such a

competing interest, additional analysis would be required and such ownership could be

prohibited by other provisions in the LP Agreement and/or applicable law, such as general

fiduciary duty law that prohibits a general partner from "self-dealing and usurpation of corporate

opportunities." *See* 2021 Deposition at 50:22-53:15.

37.    Royer disputed that his affidavit was inaccurate or needed to be withdrawn.  *See

id*. at 49:13-17 ("I believe [the affidavit is] correct but it may be interpreted differently by other

people and it may not be as complete as lengthy testimony would be or a lengthy memorandum

---

[8]    Royer, for his part, vehemently denies that he reversed or recanted his prior testimony in the Derivative
Litigation. On April 13, 2021, Royer's attorneys in the Malpractice Litigation sent a scathing letter to
McGuckin's counsel refuting the assertions McGuckin made in the letter to the District Court, and demanded
"Consistent with the Rules of Professional Conduct, we ask that you immediately correct these
misrepresentations and false statements that were made to Judge Pratter." A copy of the letter is attached hereto
as "**Exhibit B**".

on a particular subject."); 61:24-62:9 ("I don't know that I would say it should be withdrawn. I think that a much longer paragraph potentially would be included.").

38.     Royer also acknowledged at his 2021 Deposition that, based on emails shown to him at the 2021 Deposition, Dr. McGuckin sent VAC's original partnership agreement to Royer's partner, who then forwarded the document to Royer. *Id*. at 84:3-18. The form of partnership agreement contained a provision that expressly permitted partners to own competing centers. Royer disputed that forwarding a lengthy agreement with one sentence permitting competition was the same as an express instruction from McGuckin to make sure the agreement permitted him to compete.  *Id*. at 88:20-89:1. Royer again testified that if he had been given such an express instruction, he would have drafted the LP Agreement differently (although he acknowledged that it was "very doubtful" that Mr. Gardner and the other limited partners would have agreed to allow McGuckin to compete).  *Id*. at 63:11-64:22.

39.     McGuckin filed a motion asking the District Court for leave to supplement the record on appeal. *See* Appellants' Motion for Leave to Supplement the Record, Civ. Case No. 20-1028 (GEKP) (E.D. Pa. Apr. 14, 2021) [Docket No. 32]. Following the filing of that motion, the District Court issued an Order [Docket No. 38] and accompanying Memorandum [Docket No. 37] that dismissed the appeal, denied the motion to supplement the record as moot, and remanded the matter back to this Court for consideration of the alleged "new evidence."[9]

### III.    THE RELEVANT STANDARDS

40.     McGuckin does not cite any authority for the relief requested in the Motion.[10] That said, the Motion asks the court to "vacate" the Trustee Order. Motion at 1. A bankruptcy

---

[9]    The District Court was careful to avoid issuing any ruling with respect to the alleged "new evidence". *See* Memorandum at 6.

[10]    The District Court, for its part, dismissed the appeal "so that [McGuckin] may file a motion for reconsideration of the Bankruptcy Court's order." *See* Memorandum at 2. Thus, it appears the District Court anticipated this

ACTIVE.127059137.06

court can vacate a prior judgment or order under Federal Rule of Civil Procedure 60(b), made

applicable in bankruptcy by Federal Rule of Bankruptcy Procedure 9024. *In re Munoz*, 287 B.R.

546, 553 (B.A.P. 9th Cir. 2002). A court can grant relief under Rule 60(b) for six reasons,

including "... newly discovered evidence that, with reasonable diligence, could not have been

discovered in time to move for a new trial under Rule 59(b)."[11] *In re Express Car & Truck*

*Rental, Inc.*, 455 B.R. 434, 439 (Bankr. E.D. Pa. 2011). The remedy provided by Rule 60(b) is

extraordinary and may be granted only upon a showing of "exceptional circumstances"

*Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977); *Page v. Schweiker,* 786 F.2d 150,

158 (3d Cir. 1986); *Martinez-McBean v. Government of the Virgin Islands*, 562 F.2d 908, 911

(3d Cir. 1977); *Stradley v. Cortez,* 518 F.2d 488, 493 (3d Cir. 1975)).

41.    Under Rule 60(b)(2), the term "newly discovered evidence" refers to "evidence of

facts in existence at the time of trial of which the aggrieved party was excusably ignorant."

*United States v. 27.93 Acres of Land, More or Less, Situate in Cumberland Cty., Com. of Pa.*

---

Court would be guided by standards applicable to authority cited in support of the relief sought in the Motion. The Motion does not seek reconsideration as provided under Federal Rule of Civil Procedure 59(e), made applicable by Fed. R. Bankr. P. 9023. In any event, the standard is the same under either rule given the alleged basis for relief is newly discovered evidence. "Rules 59 and 60(b) share the same standard for granting relief on the basis of newly discovered evidence." *Brown v. William Penn Sch. Dist.*, No. CV 18-03674, 2020 WL 4436851, at *2 (E.D. Pa. Aug. 3, 2020) (quoting *Compass Tech., Inc. v. Tseng Labs., Inc.*, 71 F.3d 1125, 1130 (3rd Cir. 1995)) (internal quotation marks omitted).

[11]    The six grounds for relief under Rule 60(b) are:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60. The Motion asserts no ground for relief, and none of the subsections above are applicable other than (b)(2).

*Tract No. 364-07*, 924 F.2d 506, 516 (3d Cir. 1991). A party is entitled to a new trial only if such

evidence is (1) material and not merely cumulative, (2) could not have been discovered prior to

trial through the exercise of reasonable diligence, and (3) would probably have changed the

outcome of the trial. *Bohus v. Beloff*, 950 F.2d 919, 930–31 (3d Cir. 1991); *Colyer v. Consol.*

*Rail Corp.*, 114 F. App'x 473, 480 (3d Cir. 2004).  The movant under Rule 60(b) "bears a heavy

burden," which requires "more than a showing of the potential significance of the new

evidence." *Beloff*, 950 F.2d at 31 (*quoting Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir.

1967)).

## IV.    ARGUMENT

42.    McGuckin lacks standing to seek reconsideration because he did not oppose the

Dismissal/Trustee Motion in the first place. Should the Court decide the matter on the merits, the

Motion should be denied because the alleged "new evidence" is completely unrelated to the vast

majority of the reasons the Court decided to appoint the Trustee and does not contradict evidence

submitted to the Court. Moreover, the alleged "new evidence" is not new. It is entirely consistent

with evidence presented in the Derivative Litigation and available to McGuckin when the

Dismissal/Trustee Motion was adjudicated. Under controlling law, he is not authorized to seek

reconsideration of a matter based on evidence he failed to present in the first place.

### A.    McGuckin lacks standing to seek reconsideration of the Trustee Order because he did not oppose the Dismissal/Trustee Motion or meaningfully participate in the February 6, 2020 hearing.

43.    "The rules of standing, whether as aspects of the Art. III case-or-controversy

requirement or as reflections of prudential considerations defining and limiting the role of the

courts, are threshold determinants of the propriety of judicial intervention." *Warth v. Seldin*, 422

ACTIVE.127059137.06

U.S. 490, 517–18 (1975). It is axiomatic that a party must have standing to pursue legal claims or

to appeal a court's order. *See Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).

44.     Standing in the bankruptcy context is more restrictive than Article III standing. *In

re Combustion Eng'g, Inc.*, 391 F.3d 190, 215 (3d Cir. 2004), *as amended* (Feb. 23, 2005).

Standing to appeal or seek reconsideration in a bankruptcy case is limited to "persons aggrieved"

by an order of the bankruptcy court." *Id.* at 214 (*citing Gen'l Motors Acceptance Corp. v. Dykes

(In re Dykes)*, 10 F.3d 184, 187 (3d Cir. 1993)); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 695

(Bankr. W.D. Tex. 2011) (standing to seek reconsideration requires movant to be "person

aggrieved").

45.     McGuckin spitefully resigned his positions at VAC and withdrew as general

partner before entry of the Trustee Order. Therefore, entry of the Trustee Order did him no harm

and reversal of the Trustee Order would have no effect.

46.     In the appellate setting, numerous courts have held that attendance and objection

of the contested matter in the bankruptcy court are prerequisites to fulfilling the "person

aggrieved" standard, but that such prerequisites can be excused when the parties at issue do not

receive proper notice of the complained of action. *See, e.g.*, *In re Commercial Western Finance

Corp.*, 761 F.2d 1329, 1335 (9th Cir. 1985); *Matter of Schultz Mfg. Fabricating Co.*, 956 F.2d

686, 690 (7th Cir. 1992) ("Prerequisites for being a 'person aggrieved' are attendance and

objection at a bankruptcy court proceeding."); *see also In re Weston*, 18 F.3d 860, 864 (10th Cir.

1994) (holding that an appellant did not satisfy the "person aggrieved" standard because "having

chosen not to participate in the resolution of the disputed election before the bankruptcy judge,

they have no standing to appeal the bankruptcy court's resolution of the matter."); *In re AFY*, 734

F.3d 810, 820 (8th Cir. 2013) (dismissing appeal because district court found appellants did not

ACTIVE.127059137.06

oppose original motion in bankruptcy court); *but see Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991) (bank that failed to formally intervene in bankruptcy proceeding was nevertheless a "person aggrieved" for purposes of appellate standing). Failure to object to entry of an order in bankruptcy court despite receiving notice deprives a movant of standing to seek reconsideration of that order except with respect to matters that can be raised at any time. *In re Camp Arrowhead, Ltd.*, 451 B.R. at 694 (noting movant simply "dropped the ball" and could not seek reconsideration of issues it should have raised in the first instance); *see also In re Brewster*, No. BR 10-54254, 2011 WL 4458792, at *4 (Bankr. W.D. Tex. Sept. 23, 2011) (denying reconsideration when movant failed to appear or contest initial entry of the order).

47.     Here, counsel to McGuckin filed notices of appearance in the Chapter 11 Case and received notice of the Dismissal/Trustee Motion. They were physically present at the Evidentiary Hearing. Yet, McGuckin did not object to the Dismissal/Trustee Motion, either in writing or orally at the Evidentiary Hearing. He did not submit any documentary evidence or argument on the Dismissal/Trustee Motion at the hearing. He simply "dropped the ball" and should not now be permitted to cure his prior unexcused failure to act. The Motion should be denied for this reason alone.

**B.      The alleged "new evidence" will not change the outcome of the Court's decision to appoint a trustee.**

48.     As noted above, McGuckin must prove, among other things, that Royer's alleged reversal of prior testimony "would probably have changed the outcome of the trial." *Bohus v. Beloff*, 950 F.2d 919, 930–31 (3d Cir. 1991); *Colyer v. Consol. Rail Corp.*, 114 F. App'x 473, 480 (3d Cir. 2004). The Motion should be denied because the Court's decision to appoint a trustee was only at most tangentially related to the relative strength of the Derivative Claims.

ACTIVE.127059137.06

Even if the alleged "new evidence" weakens those claims (which it does not), the vast majority of the facts and circumstances that lead the Court to appoint the Trustee would be unaffected.

49.    The relative strength of the Derivative Claims played no significant role in this Court's decision to appoint the Trustee. The Court expressly declined to consider the truth of the allegations in the Derivative Litigation. Further, the Court noted in the Trustee Opinion that the Derivative Claims are only potentially valuable. Even if the claims are strong on the merits, their value is reduced by collectability issues.  As such, their relative strength was not and is not material to the Court's determination to appoint the Trustee.

50.    As the Court noted in the Trustee Opinion, a chapter 11 trustee was appointed as a result of "McGuckin's clear inability to discharge his fiduciary responsibilities to VAC, his various conflicts of interest with VAC, his self-dealing, and the fact that he is not trustworthy on any level." Trustee Opinion at 28-29. None of these reasons relies upon the relative strength of the Derivative Claims or the value of a judgment in that action.

51.    More specifically, the Court noted that in order to establish "cause" to appoint a trustee under section 1104(a)(1) and (a)(2) of the Bankruptcy Code, Gardner was required to prove:

> … by clear and convincing evidence, that McGuckin has a conflict of interest with VAC, misused VAC's assets, maintained inadequate recordkeeping and reporting, failed to file required documents, failed to adequately disclose information, failed to impose appropriate cost controls, committed transgressions related to taxes, failed to make required payments, lacks credibility and creditor confidence; or breached his fiduciary duties….

*Id*. at 39-40.[12] Gardner proved nearly all of those things and none are affected by the alleged "new evidence."

---

[12]    The Court concluded Gardner met his burden:

ACTIVE.127059137.06

52.    The Trustee Opinion cites some of the various evidence submitted in connection with the Dismissal/Trustee Motion that supported the appointment of the Trustee. McGuckin himself admitted that he held multiple conflicts of interest. *Id*. at 40. McGuckin is adverse to VAC in the Derivative Litigation (a fact unchanged by the alleged "new evidence") *Id*. The estate holds potential preference claims against McGuckin and his related entities. *Id*. McGuckin placed his own interest ahead of VAC's when, among other things, he attempted to perfect PVI's security interest on the eve of bankruptcy, despite the fact that PVI never loaned any money to VAC. *Id*. The Court noted that those facts alone would support the appointment of a chapter 11 trustee. *Id*. None are undermined by the alleged "new evidence." Moreover, even if the evidence was new and went to the strength of one of the Derivative Claims, neither of which is true, the Court still had grounds for appointing a Trustee as McGuckin is in no position to assess the merits of the alleged new evidence given his conflicts of interest and expressed disdain for the Derivative Litigation.

53.    In addition, McGuckin diverted VAC's assets to his own benefit through burdensome contracts with himself and his onerous self-serving settlement agreements with the DOJ and Dr. Atassi (both of which were admitted into evidence). *Id*. at 41. VAC's record keeping and reporting were inadequate, as evidenced by testimony from the financial monitor. *Id*. McGuckin misrepresents VAC's financial condition when it serves him (as evidenced by exhibits entered into evidence). *Id*. at 42. McGuckin's credibility was further tarnished by his testimony on the stand regarding his performance of experimental, non-FDA approved

---

Based upon the evidence submitted to the Court and the testimony provided at the hearing on the Dismissal Motions, the Court finds that almost all of these factors have been proven by clear and convincing evidence and that McGuckin's prepetition and postpetition misconduct clearly warrant the appointment of a Chapter 11 Trustee in this case.

*Id*.

ACTIVE.127059137.06

procedures, willingness to sign a Consent Decree despite believing it contained false statements, and his inability to pass an ethics course despite multiple attempts to do so. *Id.* None of the above are affected by Royer's testimony in 2018 or 2021.

54.     The above findings more than suffice to justify appointment of a trustee and are almost completely unrelated to whether the LP Agreement authorized him to open competing centers without first presenting those opportunities to VAC. But even if section 6.7 of the LP Agreement granted McGuckin the authority he desired, all of the Derivative Claims would survive. McGuckin breached his fiduciary duties to VAC under Pennsylvania law by, among many other things unrelated to section 6.7 of the LP Agreement, diverting VAC's resources to his competing centers, burdening VAC with onerous settlement and employment agreements for his own benefit, performing unauthorized and experimental procedures, and grossly mismanaging the company. McGuckin breached the LP Agreement's requirement that he act in good faith in accordance with his fiduciary duties and for the benefit of the limited partners for the same reasons. He was unjustly enriched for the same reasons.

55.     The strength of the Derivative Claims are irrelevant to the fact that they exist and create an unavoidable conflict of interest for McGuckin, the first and most important factor courts should consider when appointing a trustee. *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988); *see also In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr.W.D. Tenn. 1989) (chapter 11 trustee appointed where debtor was not in a "strong position" to pursue possible claims due to a conflict of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (conflicting interest in various related entities held by the debtor's directors warranted the

ACTIVE.127059137.06

appointment of a trustee); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62–63 (Bankr. E.D.

Pa. 1981) (appointing a trustee in the best interests of the creditors when the principals of the

debtor occupied conflicting positions in transferee companies); *Smith v. Concord Coal Corp. (In

re Concord Coal Corp.)*, 11 B.R. 552, 554 (Bankr. W.Va. 1981) (appointment of a trustee was

justified where loyalty of debtor's current management was called into question due to

competing business interests and potential for intercompany dealings); *In re L.S. Good & Co.*, 8

B.R. 312, 315 (Bankr. W.Va. 1980) (appointing trustee under § 1104(a)(2) where "[t]he

magnitude of the number of intercompany transactions places current management [of the

debtor] in a position of having grave potential conflicts of interest and the presumption arises

that the current management of [the debtor] will be unable to make the impartial investigations

and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the

debtor].").

56.    Vacating the Trustee Order would, among other things, revive McGuckin's

conflict of interest with respect to the Derivative Litigation and other estate claims against him

and his related entities as described in the Trustee Opinion. Regardless of the strength of those

claims, the Court concluded that McGuckin should not be the person to evaluate and control

them. That condition is unchanged by anything Royer has said.

57.    Separate and apart from any of the Derivative Claims, McGuckin's conduct with

respect to the filing of the bankruptcy case, which evinces a complete disregard for ethical and

moral standards, more than justified appointment of a trustee. He orchestrated a sham

involuntary bankruptcy filing to circumvent restrictions on his ability to unilaterally file a

voluntary chapter 11 petition. He filed or caused to be filed false documents in this Court,

including the petition itself by bogus "creditors" two of which were owed no money and the

Debtor's consent (signed by McGuckin) that falsely represented confirmation of those lies. He sought to grant liens to himself through PVI despite that entity having never loaned the Debtor money. He doubled down on those actions when questioned at trial, unable to offer any credible explanations or any reason for the timing of the filing. Nothing in Royer's recent testimony justifies these fraudulent acts that obviously expose McGuckin as incapable of serving as a chapter 11 fiduciary.

58.    In sum, the question of whether section 6.7 of the LP Agreement permits a partner to own or operate competing business is very far removed from the many well-established facts and circumstances that led the Court to conclude that VAC and this Chapter 11 Case required (and still requires) an independent trustee at the helm. Even if the "new evidence" has the effect McGuckin hopes, it will, at most, cast a faint shadow on the claims in the underlying Derivative Litigation, the existence and strength of which this Court barely mentioned in its opinion appointing the Trustee.

**C.    The alleged "new evidence" is not new and was in McGuckin's possession when the Dismissal/Trustee Motion was litigated.**

59.    While fundamentally beside the point, the "new" evidence is not new because it is entirely consistent and nearly identical to the testimony that Royer gave in the Derivative Litigation.  Even if Royer's testimony, given three years apart, is not word for word, McGuckin's counsel questioned him extensively on Section 6.7 at the 2018 Deposition and could have obtained additional testimony from Royer that would have further clarified his opinion. Thus to the extent Royer's opinions about Section 6.7 were not stated repeatedly in 2018, and they were, this supposedly "new evidence" could have been discovered prior to litigation on the Dismissal/Trustee Motion.  McGuckin did not ask more detailed questions at the 2018

ACTIVE.127059137.06

Deposition because he already knew the answers.  Royer had already told McGuckin that he "would have said no you cannot and should not" compete with VAC.

60.     Royer's recent testimony in the Malpractice Litigation is entirely consistent with his testimony in the 2018 Deposition and the 2018 Affidavit. While Royer believes that Section 6.7, read in a vacuum, does not expressly prohibit VAC's partners from owning competing businesses, Royer made clear in 2018 and in 2021 that section 6.7 cannot be read in a vacuum. A general partner who wished to open competing centers was still constrained by other provisions in the LP Agreement and applicable law.  2018 Deposition at 139, 2021 Deposition at 55-56, 142, 155.

61.     Further, McGuckin cannot claim he was "excusably ignorant" of evidence that was already provided to him, repeatedly, in 2018 and available to him during litigation of the Dismissal/Trustee Motion. A motion for reconsideration should be denied if the moving party fails to demonstrate that it could not have discovered the supposedly new evidence if it had exercised reasonable diligence.  *Brown v. William Penn Sch. Dist.*, No. CV 18-03674, 2020 WL 4436851, at \*5 (E.D. Pa. Aug. 3, 2020) ("As much as Plaintiffs attempt to place Defendant at fault for their failure to obtain the newly discovered evidence sooner, there does not appear to be any genuine reason as to why Plaintiffs could not have done so prior to trial."); *Advanced Multilevel Concepts, Inc. v. Bukstel*, No. CIV.A. 11-3718, 2014 WL 6907973, at \*6 (E.D. Pa. Dec. 9, 2014) ("To the contrary, Bukstel's failure to learn of the evidence before agreeing to a settlement was due to his own lack of diligence."); *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 332 (3d Cir. 2002) ("Furthermore, even if such an internal decision had been made, Black Box has not shown that it exercised due diligence in attempting to obtain evidence of such a decision. Black Box did not attempt to depose or subpoena anyone from the PTO.").

ACTIVE.127059137.06

62.     Reasonable diligence means obtaining and presenting evidence available at the time of trial, and the motion should be denied if the party failed to either depose or subpoena a witness with the newly discovered evidence or failed to ask enough questions at a deposition. *See Urb. Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*, No. CIV.A. 06-4003, 2008 WL 282742, at \*10 (E.D. Pa. Jan. 31, 2008) ("Defendants present no evidence that they attempted to depose or subpoena Mr. Choukroun before or during the trial despite the fact that Defendants' principals clearly knew of Mr. Choukroun's important personal knowledge of the origin of the pink hang tag."); *Hendricks v. Belardo*, No. CIV. 1999-033, 2001 WL 1230609, at \*3 (D.V.I. Aug. 30, 2001) ("Both affiants were deposed, pursuant to notice and subpoena, on January 11, 2001. As the information provided in the affidavits resembles that in the depositions, this information could just as easily been uncovered before this Court's April 2nd order. The fact that Hendricks had notice and yet failed to appear at either of these depositions does not change this reasoning.").

63.     Despite knowing that Royer drafted section 6.7 and had opinions about it, McGuckin made no effort to depose him prior to, or call him to testify at, the Evidentiary Hearing. Far from being new evidence that was unknown despite the exercise of reasonable diligence, Royer's 2021 testimony was, in fact, known by McGuckin. His failure to present it in connection with the Dismissal/Trustee Motion is not grounds for reconsideration.

64.     McGuckin also argues in the Motion that Royer's 2021 deposition testimony has "proven to be false and untruthful" his position in 2018 that McGuckin did not expressly inform Royer that McGuckin wanted to own competing centers. *See* Motion at 11-12.  However, even a casual reading of the 2018 Deposition exposes the irrelevancy of the email and testimony that McGuckin relies upon to make this argument.

65.     Royer testified in 2018 that he did not recall McGuckin expressing a desire to

own competing centers, and if he had, Royer would have added express authority to do so in the

LP Agreement. 2018 Deposition at 109, 183, 226-28. In 2021, Royer was presented with an

email showing McGuckin forwarded a prior version of the partnership agreement to Royer's

partner that contained an express provision permitting partners to own competing businesses,

which McGuckin now claims was an express instruction to include the same provision in the

amended LP Agreement. Contrary to McGuckin's contention, Royer expressly denied that

receiving a lengthy agreement with one sentence permitting competition was the same as an

express instruction from McGuckin to make sure the agreement permitted him to compete.  *Id*. at

88:20-89:1 ("The fact that there's a sentence in the pre-existing LP agreement that he sent to my

partner who then forwarded it to me is a far cry from him informing me [that he wanted to

compete] which my interpretation of that sentence was in a discussion with him."). At his 2021

Deposition, Royer confirmed the statements in his affidavit that he was never given such an

instruction and, if he had, he would have drafted the LP Agreement differently (although he

testified that it was "very doubtful" the limited partners would have accepted such a provision).

*Id*. at 63:11-64:22 (discussing paragraph 26 of his affidavit).

66.     More importantly, McGuckin himself sent the prior version of the operating

agreement to Royer's partner and knew that Royer reviewed the prior operating agreement

before he drafted the LP Agreement. 2018 Deposition at 125:10-127:23. He had this evidence in

his possession prior to the Evidentiary Hearing. If McGuckin believed that Royer's receipt of the

prior operating agreement undermined Royer's 2018 testimony, and, in turn, undermined the

strength of the Derivative Claims and should have been considered by this Court in deciding to

appoint a chapter 11 trustee, then he should have presented that evidence in support of an

ACTIVE.127059137.06

objection to the Dismissal/Trustee Motion. Under the authority cited above, he was required to do so. Instead, he filed no objection and presented no evidence. Reconsideration of the Trustee Order should be denied because it is based on alleged "newly discovered" evidence that was within McGuckin's grasp all along.

## V.    **CONCLUSION**

67.    The alleged "new evidence" presented by the Motion does not change the Court's decision to appoint the Trustee. The vast majority of the reasons for the Court's appointment of a chapter 11 trustee in this case are completely unrelated to the relative strength of the Derivative Claims, which the Court expressly declined to consider. Even if Royer's new testimony undermines one of the bases for the Derivative Claims, it defeats none of them and has no effect on collectability issues. Moreover, the alleged "new evidence" is not new, and McGuckin's failure to present it in opposition to the Dismissal/Trustee Motion is not grounds to permit him to do so now. The Motion is another frivolous legal maneuver to avoid well-deserved negative outcomes, and should be denied.

WHEREFORE, Mr. Gardner respectfully requests that the Court enter an Order denying the Motion.

Dated: May 26, 2021                **FAEGRE DRINKER BIDDLE & REATH LLP**

                */s/ Joseph N. Argentina, Jr.*
                Joseph N. Argentina, Jr.
                Richard E. Coe (admitted *pro hac vice*)
                One Logan Square, Ste. 2000
                Philadelphia, PA 19103-6996
                Phone:  (215) 988-2700
                Fax:  (215) 988-2757
                Joseph.Argentina@faegredrinker.com
                Richard.Coe@faegredrinker.com

                -and-

Brian P. Morgan (admitted *pro hac vice*)
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
Brain.Morgan@faegredrinker.com


*Counsel for William Whitfield Gardner*

ACTIVE.127059137.06