**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---------------------------------------------------------------

In re:                                                  :        **Case No. 19-17117 (AMC)**
                                                        :
**Vascular Access Centers, L.P.,**                       :        **Chapter 11**
                                                        :
                    Debtor                              :
                                                        :
                                                        :
---------------------------------------------------------------:

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

## I.      INTRODUCTION

In early February 2020, after finding that Dr. James McGuckin ("McGuckin"), the former

sole member and manager of the former general partner of the debtor, Vascular Access Centers,

L.P. ("VAC" or "Debtor"), had orchestrated an involuntary petition under Chapter 11 of the

Bankruptcy Code against VAC in bad faith and that appointing a Chapter 11 trustee would serve

the best interests of VAC's creditors, the Court ordered the appointment of a Chapter 11 trustee

("Trustee Order"). McGuckin and VAC's former general partner, Vascular Access Centers, LLC

("VAC LLC" or "General Partner"), quickly appealed the Trustee Order. Now, following the

dismissal of the appeal with a remand for this Court to determine in the first instance whether

certain new evidence warrants reconsideration of the Trustee Order, McGuckin and VAC LLC

move to have this Court vacate the Trustee Order based upon deposition testimony from VAC's

former corporate counsel in a legal malpractice action purportedly suggesting, *inter alia,* that

VAC's limited partnership agreement permitted McGuckin to open and operate vascular access

centers which compete with VAC. Ultimately, because the "new" deposition testimony and

related exhibits would have had no impact on the outcome of the proceedings related to the

1

appointment of a trustee had they been brought to the Court's attention prior to the issuance of

the Trustee Order, the Court must deny the motion to vacate the Trustee Order.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

VAC was founded by McGuckin as a Pennsylvania limited partnership through a limited

partnership agreement ("LPA") executed on April 22, 2005. Case No. 19-17117 ECF 234

Trustee Op. 1, Feb. 7, 2020 ("Trustee Op."). The general partner of VAC was a non-debtor

entity, VAC LLC, of which McGuckin was the sole member and manager. *Id.* VAC operated its

business through a number of limited liability company subsidiaries. *Id.* at 2. The subsidiaries

operated and managed outpatient vascular access centers, whereby physician interventionalists

performed dialysis access procedures and certain other vascular access procedures on patients

with end-stage renal disease and other vascular conditions or diseases. *Id.* In May 2005, William

Whitfield Gardner ("Gardner") became a limited partner of VAC. *Id*. Gardner's investments and

substantial capital infusion into VAC made him the majority-in-interest limited partner. *Id.*

On May 23, 2005, shortly after VAC was founded, McGuckin emailed Christopher Stief

("Stief"), a then-partner at Saul Ewing, seeking assistance with preparing employment

agreements for physicians working at VAC's vascular access centers ("McGuckin Email"). *See*

Ex. M-6 at 69:9-70:8; Ex. M-8 at 172. McGuckin attached to the McGuckin Email an early

version of the VAC LPA which had been prepared by previous counsel, Harris Savin, and which

included a provision stating that "[a]ny Partner, including the General Partner, may engage in

any other business activities, whether or not competitive with the business of the Partnership and

neither the Partnership nor any Partner shall have any rights with respect to any such activity or

any income or gain derived therefrom." *See* Ex. M-8 at 172, 179 Section 5.3; Ex. M-6 at 69:2-

70:8, 71:17-72:24, 75:3-22, 80:22-81:16. On May 27, 2005, Stief forwarded the McGuckin

Email with attachments, including the early version of the LPA, to John Royer, Esq. ("Royer"),

also of Saul Ewing, who around spring 2005 had become corporate counsel for VAC. *See* Ex. M-

8 at 173; Ex. M-6 at 13:4-12, 74:5-75:22; Ex. G-2 at 13:2-6, 18:6-15, 30:6-17.

Subsequently, pursuant to an amended version of the LPA executed on October 31, 2007

("Amended LPA"), section 6.7 entitled "Other Interests of Partners" ("Section 6.7" or "Other

Interests of Partners Provision") provided:

> [i]n view of the exclusive and limited purposes of the Partnership, no Partner, or
> any Affiliate of any Partner, shall have any obligation to make any other
> investment or business opportunity not involving the properties available to the
> Partnership or to any of its Partners. It is further expressly agreed that any Partner
> and/or its Affiliates may engage in and possess interests in other businesses and
> ventures of every nature and description, independently or with others, and any
> such engagement will not constitute a breach of the Partners' fiduciary duties to
> the Partnership, and neither the Partnership nor any Partner shall have any rights
> by virtue of this Agreement or the existence of this Partnership in and to such
> independent ventures or to the income or profits derived therefrom.

Ex. G-1.

Over time, Gardner began to have concerns about the possibility that McGuckin was

engaging in impermissible self-dealing transactions and violating his duties as the sole member

of VAC's General Partner. Trustee Op. 4. Therefore, on January 13, 2016, Gardner commenced

a derivative action on behalf of VAC by filing a complaint in the Delaware County Court of

Common Pleas ("State Trial Court") against VAC LLC and McGuckin, in his capacity as VAC

LLC's sole member and manager, for breach of fiduciary duty, breach of contract, and unjust

enrichment ("Derivative Litigation"). *See Gardner v. Vascular Access Centers, LLC et al.,* No.

16-cv-00367; Trustee Op. 5. In September 2017, Gardner amended his complaint in the

Derivative Litigation to, *inter alia*, add other limited partners of VAC as plaintiffs (together with

Gardner, "Derivative Litigation Plaintiffs"). Trustee Op. 7. The amended complaint reflects that

the Derivative Litigation is based upon, *inter alia,* McGuckin's alleged opening and operating of

vascular access centers which compete with VAC, and that the Derivative Litigation Plaintiffs are seeking, *inter alia*, an order directing McGuckin and VAC LLC to disgorge for the benefit of VAC all profits from McGuckin's alleged competitive centers, preventing McGuckin and VAC LLC from taking for themselves any profits generated by McGuckin's competitive centers, directing that McGuckin's competitive centers operate as VAC centers, and awarding money damages for the fair market value of resources McGuckin and VAC LLC allegedly misappropriated from VAC in opening and operating McGuckin's competitive centers and punitive damages. Ex. M-4 ¶ 4, p. 29.

On April 5, 2018, Royer participated in a deposition in connection with the Derivative Litigation ("Royer 2018 Deposition"). *See* Ex. G-2. Therein, the following exchange occurred between Royer and counsel for McGuckin with respect to the Other Interests of Partners Provision in the Amended LPA:

> Q [MR. HEIM, counsel for McGuckin]: Do you see…'Other interests of partners'?
> A: Yes.
> Q: The third sentence down in that paragraph, it states: 'It is further expressly agreed that any Partner and/or Affiliates may engage in and possess interests in other businesses and ventures of every nature and description, independently or with others, and any such engagement will not constitute a breach of the Partners' fiduciary duties to the partnership, and neither the Partnership, nor any Partner, shall have any rights by virtue of this Agreement, or the existence of this Partnership, in and to such independent ventures or to the income or profits derived therefrom.' Did I read that correctly?
> A: Yes.
> Q: That's your language in this limited partnership agreement that you drafted, correct?
> A: Well, it's a provision in this limited partnership agreement that we drafted, so, yes.
> Q: And that language allows the partners, including Dr. McGuckin, to own competitive vascular access centers, correct?
> MR. COE [counsel for Gardner]: Objection to form.
> A: Not necessarily. It's, you're looking at one sentence in a vacuum without the overlay of anything else in the agreement and any other, you know, laws that may apply.

4

BY MR. HEIM:

Q: Well, let me ask you this: This provision than [sic] I just read…is that the
provision that permitted Dr. McGuckin to own and operate the competitive
American Access Centers?

MR. COE: Objection to form.

A: I don't know if there's another provision or not. I don't know. I know it was
disclosed in the PPM that we discussed, that he did have ownership in other ones.

BY MR. HEIM:

Q: Okay, so you would agree with me that Dr. McGuckin's ownership of
competitive vascular access centers is not in breach of the limited partnership
agreement since it was disclosed to the limited partners?

MR. COE: Objection to form.

A: I believe I would agree with that, it was disclosed. His ownership of the AAC
centers was disclosed and so the partners would have been aware of it and he
wasn't prohibited from, specifically being a part owner of those centers.

BY MR. HEIM:

Q: Is there a specific provision in the limited partnership agreement that you can
point me to that allowed Dr. McGuckin to own those competitive vascular access
centers?

A: I don't recall – I'm not even – I mean, I can't tell you that this was the final
version that was signed by people also, I don't know that. But just putting that
aside, just taking it at face value, I don't recall there being a specific provision
that specifically addressed that. I don't recall that being crafted. This is more of a
general type of provision that is in many partnership agreements.

Q: Does the language in [Other Interests of Partners Provision]…have any
language which restricts any of the partners from owning or operating or working
in any competitive business?

MR. COE: Objection to form.

A: No, the language in [Other Interests of Partners Provision] does not.

Ex. G-2 at 138:9-141:16.

Royer and counsel for McGuckin further engaged in the following exchange during the Royer

2018 Deposition respecting Royer's recollection of ever discussing with McGuckin his desire to

explicitly preserve his ability to compete with VAC in the Amended LPA:

BY MR. HEIM: You're VAC, LP's corporate counsel, right?

A: Yes.

Q: And I'm just trying to get an understanding from you that Jim's position, Dr.
McGuckin's position in the case is not frivolous, right?

…

A: I understand his position.

Q: You understand where it comes from and you understand why he feels the way
he does, right?

…

A: You're putting a number of elements together that I don't have any recollection of – I don't have any recollection of our discussing that proviso and don't put that proviso in the VAC, LP agreement, I don't recall any discussion with Jim about that. I knew he was an investor in AAC. I knew he divested because I represented him in that transaction. I knew that happened. I knew the LPs knew that he – I don't know about all of them – I knew the major LPs knew that he was in an AAC because, in fact, that's where he had the knowledge of the industry and he sold them on that, to my knowledge and recollection. I don't recall that, I don't recall that he wanted to then start competing again. I don't recall any discussions with him that he wanted to do that. I understand his position on that though.

*Id.* at 182:3-183:20.

In response to further questioning on whether McGuckin ever told Royer that he wanted to

preserve his right to compete in VAC's Amended LPA, Royer testified:

A: I don't recall him specifically saying I want to be able to open up other of my own centers in competition with VAC; I don't remember that discussion.
Q [by Mr. Heim]: If he had told you that, would you have drafted the limited partnership agreement differently?
A: Yes.
Q: How would you have changed it?
…
A: Typically, I would have wanted to have a more explicit provision that you see in certain kinds of partnership agreements like fund agreements where the GP that has a fund with LPs is, you know, creating, is going to create another GP fund that may invest in similar companies, are competitive with companies that advise in the first fund and there's a very specific provision in those type of LP agreements that, in fact, discloses that the GP, you know, is not bound by any restriction of competition or and [sic] may, you know, may lead another fund, may manage another fund that may have investments that are competitive with investments in the first fund. It's a more, much more explicit provision specifically allowing that to occur.
Q: Did Dr. McGuckin ever ask you whether he could open the McGuckin centers outside of VAC under the partnership agreement before he opened those centers?
A: You're talking about well after the partnership agreement, more currently with when he opened those?
Q: Correct.
A: No, he did not ask me that.

*Id.* at 226:13-228:12.

On July 9, 2018, just days before the trial in the Derivative Litigation, McGuckin filed a petition to compel arbitration. Trustee Op. 10. On July 13, 2018, after an evidentiary hearing, the State Trial Court denied the petition to compel arbitration. *Id.* On July 16, 2018, McGuckin filed a notice of appeal of the denial of his petition to the Pennsylvania Superior Court. ("Superior Court"). *Id.*

Meanwhile, also in the Derivative Litigation, hearings on a request for an injunction ("Injunction Request") was set for August 13, 2018 and August 15, 2018. Ex. M-6 at 21:13-22:17, 31:2-18. On August 10, 2018, Royer executed an affidavit in the Derivative Litigation which Gardner submitted in connection with the Injunction Request ("Royer 2018 Affidavit"). Ex. M-7; Ex. M-6 at 62:20-23; Recon. Mot. ¶ 4. Royer represented in the Royer 2018 Affidavit with respect to his availability to attend a hearing on the Injunction Request that "I will be on a prepaid vacation outside of the Commonwealth of Pennsylvania on August 13, 2018, and I am unavailable for the hearing set for August 13, 2018." Ex. M-7 ¶ 2. Royer also represented in the Royer 2018 Affidavit that:

> I do not recall having any discussions with Dr. McGuckin regarding Dr. McGuckin wanting to preserve his ability to compete with VAC at the time when I was drafting the various versions of the VAC limited partnership agreement. Around the time that I was drafting VAC's limited partnership agreements, I recall that I understood that Dr. McGuckin would be selling his interests in VAC and that he did not expect to have a long-term relationship with AAC.

*Id.* at ¶ 8.

Royer further represented in the Royer 2018 Affidavit that:

> [t]he purpose of the subsidiary operating agreements was different than the purpose of the VAC limited partnership agreements. The Provided, However, Language was included in some of the subsidiary operating agreements because the investors in the subsidiaries were doctors and VAC was concerned that those doctors could open their own vascular access centers. The 'Other Interests of Partners' provision of the VAC limited partnership agreements is intended to permit VAC's partners to own interests in other businesses outside of the limited

7

partnership as long as those businesses do not compete with the limited
partnership.

*Id.* at ¶ 15.

Finally, Royer represented in the Royer 2018 Affidavit that "I do not recall Dr. McGuckin

informing me that he wanted to preserve his right to compete with VAC at the time I was

drafting the VAC limited partnership agreements. If he had told me he wanted to preserve his

right to compete with VAC, I would have explicitly preserved Dr. McGuckin's ability to

compete in the VAC limited partnership agreement." *Id.* at ¶ 26.

On April 22, 2019, the Superior Court unanimously ruled against McGuckin and affirmed

the State Trial Court's decision to deny McGuckin's petition to compel arbitration. Trustee Op.

15. McGuckin subsequently filed an application for re-argument *en banc* on May 6, 2019. *Id.* On

June 12, 2019, the Superior Court denied McGuckin's application for re-argument. *Id.* The

Derivative Litigation Plaintiffs subsequently filed a motion to recover certain attorneys' fees and

costs. *Id.* Meanwhile, on July 10, 2019, McGuckin filed a petition for allowance of appeal with

the Pennsylvania Supreme Court. *Id.* at 18. On July 31, 2019, the Superior Court granted the

Derivative Litigation Plaintiffs' motion to recover certain attorneys' fees and costs, concluding

that McGuckin's "submission and reliance upon documents that were not part of the record at the

trial court was frivolous, and therefore [Plaintiffs] are entitled to reasonable attorneys' fees for

having to respond to the documents on appeal" and that "the petition for re-argument was also

frivolous, and only done to further delay this matter," entitling the Derivative Litigation

Plaintiffs to fees for responding to the petition. *Id.* at 18-19.

On November 12, 2019, the Pennsylvania Supreme Court denied McGuckin's petition for

allowance of appeal in the Derivative Litigation. *Id.* at 21. In addition, the parties were scheduled

to appear before the State Trial Court the next day for a hearing on the amount of sanctions to be

awarded on account of McGuckin's submission of and reliance upon documents not part of the record in his appeal of the order denying his petition to compel arbitration, as well as his "frivolous" petition for re-argument. *Id.*

However, hours after VAC's petition for allowance of appeal was denied, three purported creditors of VAC: (1) Philadelphia Vascular Institute ("PVI"), an entity owned and controlled by McGuckin; (2) Metter & Company ("Metter"), an accounting firm owned by Stan Metter, one of VAC's limited partners; and (3) Crestwood Associates, LLC ("Crestwood"), an entity owned by McGuckin's brother, Brian McGuckin ("Brother"), filed an involuntary petition under Chapter 11 of the Bankruptcy Code against VAC, thereby staying the Derivative Litigation. *Id.* On November 13, 2019, VAC consented to the involuntary petition. *Id.* at 22.

On November 22, 2019, Gardner filed a motion to dismiss the involuntary Chapter 11 petition pursuant to 11 U.S.C. § 1112(b) or to appoint a Chapter 11 trustee under 11 U.S.C. §1104(a) ("Gardner Motion"), alleging that the petitioning creditors had instituted involuntary proceedings in bad faith in conjunction with McGuckin so that McGuckin could get VAC into bankruptcy without the limited partners' consent in order to further delay the Derivative Litigation. *Id.* at 24. Gardner submitted a declaration with thirty-nine (39) exhibits attached in support of the Gardner Motion ("Gardner Declaration"). Case No. 19-17117 ECF 43. The Gardner Declaration did not include, attach, or reference the Royer 2018 Deposition or the Royer 2018 Affidavit. On November 25, 2019, the Court entered an Order for Relief. Trustee Op. 24.

Shortly thereafter, on December 19, 2019, the United States Trustee ("UST") filed his own motion to dismiss, ("UST Motion" and, collectively with the Gardner Motion, "Dismissal Motions"). *Id.* The UST Motion did not include, attach, or reference the Royer 2018 Deposition or Royer 2018 Affidavit. VAC filed its objection to the Gardner Motion on December 19, 2019,

and an objection to the UST Motion on December 24, 2019, neither of which included, attached, or referenced the Royer 2018 Deposition or Royer 2018 Affidavit. *Id.* at 25. Neither McGuckin nor VAC LLC filed an objection to either of the Dismissal Motions. On January 16, 2020, Gardner filed a reply to VAC's objection to the Gardner Motion and incorporated certain discovery that he had obtained in connection with the involuntary filing, which did not include the Royer 2018 Deposition or Royer 2018 Affidavit. *Id.*

On February 6, 2020, the Court held a hearing on the Dismissal Motions commencing around 9:30 a.m. and concluding at 6:05 p.m. ("Dismissal Hearing"). Case No. 19-17117 ECF 207, 251; Hrg. Tr. 352:14-15, Feb. 6, 2020 ("Dismissal Hrg. Tr."). The Court explained early in the Dismissal Hearing, "I'm not here to dispose of the State [sic] court action." Dismissal Hrg. Tr. 12:14-15. Ultimately, Gardner's exhibits were admitted into evidence with no objection. *Id.* at 16:11-17:8. In addition to Gardner's exhibits, the Court later admitted into evidence thirty-one (31) exhibits submitted by the UST without objection, as well as fourteen (14) exhibits submitted by VAC with no objection. *Id.* at 170:19-171:4, 309:25-310:6. No party ever sought to admit into evidence, or even referenced, the Royer 2018 Deposition or the Royer 2018 Affidavit at the Dismissal Hearing.

At the conclusion of the Dismissal Hearing, the Court immediately announced its decision to grant the Gardner Motion to have a Chapter 11 trustee appointed and stated its reasons in support of that decision on the record. *Id.* at 339:3-22, 348:6-349:15. Subsequently, counsel for VAC raised the issue of who would have authority to act on behalf of VAC until the Chapter 11 trustee was appointed. *Id.* at 349:18-350:4. The following exchange occurred in response to that inquiry:

> THE COURT: I mean, I feel that I don't want Dr. McGuckin making one more
> decision for this debtor, not one. And I don't know if there are immediate

decisions that need to be made, but my suggestion is and Mr. Herron, I'm open to possibilities. How long do you think, usually do you get a Chapter 11 trustee appointed?

COUNSEL FOR THE UST: I think we can expedite this, especially considering the circumstances that want to be appointed fairly quickly.

THE COURT: Okay. I also find Mr. Gardner to be entirely credible, I mean, obviously, he's not going to be up to date on every single thing going on in this debtor, but you ought to put together a list, if there are certain immediate actions that must be taken, please direct that e-mail to Mr. Herron and Mr. Argentina and then –

COUNSEL FOR VAC: Right.

THE COURT: -- we can, you know, if you need to have a phone conversation with me, but obviously, any immediate decisions that may need to be made, I'd like the two of you to confer together and figure out what the right decision ought to be in this case.

COUNSEL FOR GARDNER: We will, your Honor. Thank you.

*Id.* at 350:5-351:1.

Immediately after the Dismissal Hearing concluded, McGuckin resigned from his management positions at VAC and withdrew VAC LLC as the general partner of VAC, effective immediately. Subsequently, on February 7, 2020, the Court issued the Trustee Order granting Gardner's motion to appoint a Chapter 11 trustee and accompanying opinion ("Trustee Opinion") describing the basis for the order and elaborating on the reasons given on the record at the Dismissal Hearing the previous day for finding the appointment of a Chapter 11 trustee warranted. Case No. 19-17117 ECF 234, 235. The Trustee Opinion is incorporated herein by reference. *Id.* at ECF 234.

In the background section of the Trustee Opinion, the Court summarized the conflict which arose between McGuckin and Gardner leading to the Derivative Litigation, explaining:

…conflict arose between McGuckin and Gardner based upon Gardner's growing concern that McGuckin was engaging in impermissible self-dealing transactions and violating his duties as sole member of the General Partner under the Amended L.P. Agreement.

For instance, in 2011 and 2012, McGuckin began opening and operating his own dialysis access centers which competed directly with VAC's subsidiaries.

11

> Specifically, Gardner alleges that, in 2011, McGuckin rejected a proposal for
> VAC to partner with another doctor in the 'Slate Belt' region of Pennsylvania to
> open a multi-use facility and, instead, opened his own center in the same region in
> Pen Argyl, Pennsylvania through PA Vascular Institute ('PAVI'), an entity owned
> solely by McGuckin, without informing the limited partners.

Trustee Op. 4.

The background section of the Trustee Opinion also summarizes some of the other allegations

which Gardner made against McGuckin in the Derivative Litigation, stating: "Gardner also

alleges that, when VAC's Philadelphia center was performing poorly, McGuckin failed to devote

efforts to saving VAC's Philadelphia center and, instead, opened his own competing center in

Philadelphia through an entity owned solely by him, Philadelphia Peripheral Vascular Institute

('PeVI'), without presenting the opportunity to the limited partners" and "Gardner also alleges

that McGuckin, through an entity owned separately by him named the Main Line Vascular

Institute ('MLVI'), opened a new competing center in King of Prussia, Pennsylvania in 2016

without presenting the opportunity to the limited partners." *Id.* at 5, 6.

As described in detail in the Trustee Opinion, the Court ultimately determined that cause

for dismissal of the case existed under 11 U.S.C. § 1112(b) primarily because "[w]hen Gardner

reasonably refused to consent to VAC's bankruptcy filing without McGuckin stepping down as

General Partner of VAC, McGuckin engineered the filing of VAC's involuntary petition in order

to automatically stay the Derivative Litigation," thereby orchestrating the involuntary petition in

bad faith. *Id.* at 36-37. The Trustee Opinion further elaborated:

> upon consideration of the factors surrounding the filing of the involuntary
> petition, the Court finds that: (1) the petitioning creditors did not satisfy the
> statutory criteria for filing the petition, the involuntary petition was not
> meritorious, and the creditors failed to make a reasonable inquiry into the relevant
> facts and pertinent law before filing, as evidenced by the fact that: (a) Crestwood
> did not hold any claims against VAC immediately prior to the involuntary filing,
> but nevertheless manufactured a false invoice for VAC at the direction of
> McGuckin and (b) PVI's $1.2 million claim was entirely false; (2) McGuckin

12

caused PVI to file a UCC Statement on the eve of the involuntary filing which
constituted a preference and, more importantly, PVI never loaned any money to
VAC; (3) the involuntary filing was used by McGuckin to obtain a
disproportionate advantage for himself, and a tactical advantage, in the
Derivative Litigation, rather than to protect VAC's interests; and (4) as discussed
*supra,* the timing of the filing of the involuntary petition was suspicious since
there was no reason that VAC had to be in bankruptcy by November 12, 2019 and
McGuckin needed VAC to be in bankruptcy by such date in order to avoid being
sanctioned in the Derivative Litigation.

Furthermore, the Court finds that: (1) the bankruptcy filing effectively allowed
McGuckin to evade the State Trial Court's order to conduct a sanctions hearing
against him and the Pennsylvania Supreme Court's denial of McGuckin's appeal
to stop the Derivative Litigation; (2) the involuntary petition was filed on the eve
of the sanctions hearing against McGuckin in the Derivative Litigation; (3) the
Derivative Litigation is *potentially* one of VAC's largest assets; (4) there was no
pressure from VAC's non-moving creditors to be in bankruptcy on November 12,
2019; and (5) the petition was filed solely to create the automatic stay.

*Id.* at 37-38 (emphasis added).

The Trustee Opinion next explained that "[b]ased upon the evidence submitted to the

Court and the testimony provided at the hearing," cause existed to appoint a Chapter 11 trustee

under 11 U.S.C. § 1104 in large part due to McGuckin's significant conflicts of interest, detailed

in the Trustee Opinion, which would substantially interfere with his ability as sole member and

manager of VAC's General Partner to discharge his fiduciary duties to VAC to preserve and

maximize estate assets. *Id.* at 39-40. The Trustee Opinion in detailing McGuckin's conflicts of

interest explained "McGuckin admitted at trial that he holds multiple conflicts of interest.

McGuckin is adverse to VAC in the Derivative Litigation, which *appears to be* a significant

estate asset, *potentially* entitling VAC to substantial damages against McGuckin and the General

Partner." *Id.* at 40 (emphasis added). Other factors buttressing the Court's finding of cause to

appoint a Chapter 11 trustee included*, inter alia,* McGuckin's inadequate, unreliable record-

keeping and reporting; the reputational damage he had inflicted on VAC in various prepetition

proceedings involving regulatory agencies, state health departments, and law enforcement

13

agencies; committing VAC's resources to highly burdensome settlements to secure releases for himself; paying himself excessive compensation from VAC's funds for duplicative roles without limited partner knowledge; signing consent decrees containing what he believed to be false statements; and his tendency to put his and his entities' interests above VAC's interests, such as by directing the filing of an "unfounded Cash Collateral Motion which sought to give PVI replacement liens on VAC's assets, even though PVI has never loaned any funds to VAC." *Id.* at 40-43 (emphasis added). The Trustee Opinion in summarizing the various factors justifying the appointment of a trustee explained "[u]ltimately, McGuckin, as sole member and manager of the General Partner, has repeatedly put his own interests above VAC, *may have* competed with VAC for years, engaged in numerous secret, self-dealing transactions, and sacrificed VAC's resources and reputation when it served him to do so." *Id.* at 43 (emphasis added).

Shortly after the Court issued the Trustee Order and Opinion, McGuckin and VAC LLC filed a notice of appeal of the Trustee Order and Opinion to the United States District Court for the Eastern District of Pennsylvania ("District Court") on February 20, 2020 ("Appeal"), but did not seek a stay of the Trustee Order pending appeal. Case No. 19-17117 ECF 252. On March 18, 2020, Gardner moved to dismiss the Appeal on the basis that McGuckin and VAC LLC lacked standing to appeal the Trustee Order, and/or had waived their right to appeal by failing to object to the Dismissal Motions. Case No. 2:20-cv-01028-GEKP ECF 4.

Shortly thereafter, on March 20, 2020, Gardner filed a motion for an order imposing sanctions against McGuckin and PVI ("Sanctions Motion"). Case No. 19-17117 ECF 304. The Court decided to continue the hearing on the Sanctions Motion indefinitely in light of the pending Appeal since the basis for the Sanctions Motion stemmed largely from findings made in connection with the Trustee Order and Opinion which had been appealed.

McGuckin initiated litigation against Royer in the Philadelphia Court of Common Pleas

for legal malpractice ("Royer Malpractice Action"). Recon. Mot. ¶ 24. *See generally* Ex. M-6.

On March 25, 2021, Royer participated in a deposition in the Royer Malpractice Action ("Royer

2021 Deposition"). *See* Ex. M-6. During the Royer 2021 Deposition, the following exchange

regarding the Royer 2018 Affidavit occurred between Royer and counsel for McGuckin:

> Q [BY MR. HEIM]: Now, when you signed it [the Royer 2018 Affidavit] on
> August 10, 2018, you certified that it was, to the best of your information,
> knowledge, and belief, it was true and correct, correct?
> A: Correct.
> Q: Can you confirm for me today, sir, that the contents of your affidavit that you
> signed on August 10, 2018 is true and correct to the best of your information and
> belief?
> A: Well, I would have to parse every sentence. I believe it's correct but it may be
> interpreted differently by other people and it may not be as complete as lengthy
> testimony would be or a lengthy memorandum on a particular subject.
> Q: But your answer to that question is that, yes, you're still –
> A: I did not answer that. That's not what I said. I said it may be that the sentence
> could be taken out of context, that that it may not be complete, that that was a
> time period then when I was looking at it while on vacation and rushed to go
> somewhere and it may not encapsulate my complete view of a particular subject.
> Q: Okay, can you identify for me any portions of the affidavit that would fall into
> that category that, in your words, may not be complete in context?
> A: Yes.
> Q: Okay. If you want me to, if you want to read the entire affidavit, that's fine. Or
> if you want to just tell me what portions of the affidavit do you believe are not
> complete.
> A: Well, in addition to the one that you pointed out where it was accurate in terms
> of I was not available on August 13th, but it may not have been complete if I was
> going to get back at night on the 14th so that potentially maybe I could have been
> called on the 15th, I don't recall. That's not as substantive. The substantive
> sentence, which I believe is not, is not complete is the last sentence of paragraph
> 15.
> Q: I will scroll to paragraph 15. What is inaccurate about paragraph 15, sir?
> A: Well, in hindsight, I would have written this differently and I didn't write it.
> So, in hindsight, I would have commented on this. As I said, I was on vacation. It
> was, I read this as the intention being that this other, the other interests provision,
> it certainly, it allows for partners to own any other interests in any other business.
> It's a broad, it provides a broad right and it doesn't specifically preclude any
> partners from having a business that competes with a limited partnership. It
> doesn't say that and that wasn't my intention. But someone may imply that that
> was the intention and it was not. The intention was that if a business was non-

competitive, end of story, there were no issues. If it was competitive, then you really had to look at the entire agreement and LLC and partnership law generally because there were competing provisions which I had discussed with the litigants previously and you had to look at all the facts and circumstances of the actions, not just was somebody competing or not competing, but what were all the facts and circumstances. So it was really a matter of degree. If it was a non-competitive business I thought it was an end of story, there were no issues. If it was competitive, then I thought you had to look more deeply. The provision itself, that sentence itself provides, you know, a wide allowance to be able to have ownership interests in other businesses. And, arguably, someone could argue, including competitive businesses, because it doesn't expressly say you cannot have a competitive business. What my point in agreeing to the sentence was that that doesn't tell the whole story; that you need look at all of the provisions of the agreement because if it's the general partner taking certain actions that may involve self-dealing and usurpation of corporate opportunities and other issues that you had to look at. There were, there's a fiduciary duty provision, 6.1.1, under general fiduciary duty law, you had to really weigh all of them and determine if the actions were, were appropriate or were a violation of fiduciary duty. And that would have taken a lot of language. That really is my view. That's what I've said previously multiple times in writing and orally in meetings. This sentence by itself is too limited.

Q: Well, let me, the sentence that you're referring to when you say 'this sentence,' is the last sentence of paragraph 15, correct?

A: Correct.

Ex. M-6 at 49:3-53:20.

Later in the Royer 2021 Deposition, Royer elaborated on his views on the Other Interests of

Partners Provision in the Amended LPA in the following exchange with counsel for McGuckin:

> Q [MR. HEIM]: Would you agree, sir, that, will you agree that the Other Interests of Partners provision was intended to allow VAC's partners to own interests in other businesses that do compete with the limited partnership?
>
> MR. KLEIN: Objection, asked and answered.
>
> A: I would say that that, that the Other Interests of Partners provision could allow VAC partners to own interests in other businesses that do compete. And, as I stated, the intention in my mind as written was not to say that VAC partners were only allowed to own interests in other businesses so long as those businesses do not compete. I understand someone may read it that way. That is not how I intended it as I testified. I intended it that at end of story there's no issue if the businesses do not compete. If the businesses do compete, it may still be okay under the VAC partnership agreement; it does provide for that allowance. But that's reading one sentence in the VAC partnership agreement in isolation without looking at the whole VAC partnership agreement and without looking at fiduciary duty law generally. So I believe you have to look at all the facts and

circumstances of the actions. Competing alone may be okay; what are all the other actions that somebody may have undertaken.

*Id.* at 55:13-56:20.

Royer then further clarified his position on the meaning of the Other Interests of Partners

Provision in the Amended LPA in the following exchange during the Royer 2021 Deposition:

> Q [MR. HEIM]: Was – or let me ask you this: Was the intent of the Other Interests of Partner provisions of VAC's partnership agreements to allow VAC's partners to own other businesses even if those businesses competed with the limited partnership?
> MR. KLEIN: Objection, asked and answered. Three times he said it depended on the facts and circumstances.
> MR. HEIM: I'm not asking about the facts and circumstances.
> MR. KLEIN: Well then you're mischaracterizing what he said.
> MR. HEIM: I'm asking him about the intent of the provision.
> MR. KLEIN: He's already told you what it was.
> A: Yeah, the specific intent, to my recollection, wasn't to expressly allow VAC partners to own competitive businesses. But the provision, the agreement certainly doesn't disallow partners from owning interests in competitive businesses and expressly they may own interests in any number or any nature of businesses, of any nature whatsoever, so it certainly may be competitive businesses.
> Q [MR. HEIM]: Okay.
> A: Depending on the facts and circumstances.
> Q: So you would agree with me that the way in which the Other Interests of Partners provision is drafted could potentially allow VAC's partners to own other businesses that were competitive to the partnership.
> MR. KLEIN: Objection to the form.
> A: Yes, I would agree that, and it's my view, that the way the Other Interests of Partners provision is drafted could potentially allow, in and of itself, that provision could potentially allow VAC's partners to own interests in other businesses that were competitive with the limited partnership.
> Q [MR. HEIM]: So in terms of this last sentence of paragraph 15 of your affidavit, you're saying that that sentence as written is incomplete, correct?
> MR. KLEIN: Objection, asked and answered. Go ahead.
> A: Yes, I'm saying it's incomplete and could be read, in hindsight could be read in a manner I didn't intend it.
> Q [MR. HEIM]: So this sentence here in your affidavit that's incomplete and is not the way in which you intended should be withdrawn from your affidavit?
> MR. KLEIN: Objection to the form.
> A: Well, I don't know what – and I'm not sure what you mean by that. If I were called to testify in the case, I, on this subject, I would give a much lengthier dissertation as I did earlier in this deposition as to what my belief was in terms of the meaning of the provisions.

*Id.* at 58:1-60:23.

When later asked again about his position with respect to the Other Interests of Partners

Provision in the Amended LPA, Royer and counsel for McGuckin engaged in the following

discussion:

> Q [MR. HEIM]: And it is your testimony, sir, that under [the Other Interests of
> Partners Provision], so long as other fiduciary duties are complied with, like, not
> usurping corporate opportunities and self-dealing, this provision does permit
> partners, like Dr. McGuckin, to own other businesses that are competitive to the
> VAC Limited Partnership. Is that your testimony, sir?
> Mr. KLEIN: Objection to the for [sic].
> A: Well, it's close. But what I said was this provision, which is broadly drafted,
> which provides for a broad allowance of partners to engage in other businesses
> and ventures of every nature, you know, certainly could indeed include
> competitive ventures, you know, subject to other duties and rights and obligations
> in other agreements or certainly not breaching fiduciary duties. But, yes, this is a
> broadly drafted, you know, Other Interests provision that could allow that.
> Q [MR. HEIM]: But it does not expressly say that the partner can have
> competitive businesses. Do you agree with that?
> A: Correct. It implies that they could. It doesn't expressly say that they could.
> Even if it expressly said that they could, they would still have the fiduciary duty
> obligations, so there's really not a material difference between whether it
> expressly said they could or not.

*Id.* at 154:9-155:24.

In another exchange transcribed below, Royer was also asked to comment on the portion

of the Royer 2018 Affidavit wherein he represented that he had not recalled McGuckin

informing him he wanted to expressly preserve his right to compete with VAC in the Amended

LPA:

> Q [MR. HEIM]: Paragraph 26 [of the Royer 2018 Affidavit] states: 'I do not
> recall Dr. McGuckin informing me that he wanted to preserve his right to compete
> with VAC at the time I was drafting the VAC Limited Partnership agreements. If
> he had told me he wanted to preserve his right to compete with VAC, I would
> have explicitly preserved Dr. McGuckin's ability to compete in the VAC Limited
> Partnership agreement.' Did I read that accurately?
> A: Yes.
> Q: Is that a true statement, true and accurate statement, sir?

A: The first sentence is correct. I do not recall Dr. McGuckin, having a conversation with Dr. McGuckin where he told me he wanted to make sure he could compete, you know, in the VAC Limited Partnership. I don't recall and I don't believe that conversation occurred at that time. And the second sentence is more of an assumption, but if he had told me that, my assumption is that I would have because I could have drafted something that was, that expressly allowed that. Whether limited partnerships would have agreed to that provision is very doubtful, but I could have drafted it that way.

Q: So the second sentence of paragraph 26 you're saying is accurate which was my initial question; is that right?

A: Yes, I would have drafted, if we had that discussion that did not occur, I would have drafted the provision to explicitly allow him to compete in the draft.

*Id.* at 63:11-64:22.

When further questioned regarding his recollection of McGuckin informing him he wanted to

preserve his right to compete with VAC in the Amended LPA, the following exchange occurred:

Q [MR. HEIM]: Mr. Royer, you received [the early version of the VAC LPA attached to the McGuckin Email] at the very beginning of your involvement with the VAC engagement, correct?

A: I did.

Q: And you understood that this limited partnership agreement, which is Royer-7, was drafted by prior counsel for McGuckin, correct?

A: To the best of my recollection, that was my understanding, that this agreement had been drafted by prior counsel to DAC [former name for VAC].

Q: And the agreement that you received drafted by prior counsel contained a provision explicitly preserving the general partner's rights to own other businesses that were competitive with the partnership correct?

A: Yes, this agreement contains a sentence that does provide that right to any partner, including the general partner, to engage in other businesses whether or not competitive with the business of the partnership.

Q: So when I asked you the question whether or not you ever received anything in writing where Dr. McGuckin was providing you with the parameters of what he wanted in an LP agreement that expressly preserved his right to own centers that were competitive, the answer to that question should be yes, he did, he provided me with this LP agreement which contains Section 5.3, correct?

MR. KLEIN: Objection. Are you telling him what his answer should be or do you have a question you want to ask him?

A: No, that's not correct.

Q [MR. HEIM]: Well, let me ask you this: Your affidavit in paragraph 26, which we just went over, it said that you don't recall Dr. McGuckin informing you that he wanted to have a provision that explicitly preserved his right to own centers that were competitive. That's not really an accurate or complete statement, is it?

A: I disagree with your characterization.

> Q: Well, don't you think that sentence in paragraph 26 of your under oath
> affidavit would be more complete by saying that Dr. McGuckin provided me with
> a written already prepared agreement that expressly preserved his right to own
> centers outside of the partnership that were competitive?
> A: Well, if that question had been asked, it could be answered. But the paragraph
> in the affidavit, the sentence in the affidavit went to – my interpretation of it was
> whether we had a discussion, whether he informed me in a discussion that he
> wanted that right and I have no recollection of that discussion. The fact that
> there's a sentence in the pre-existing LP agreement that he sent to my partner who
> then forwarded it to me is a far cry from him informing me which my
> interpretation of that sentence was in a discussion with him.

*Id.* at 86:4-89:1.

Finally, during the Royer 2021 Deposition, Royer was questioned extensively about his

availability to attend the hearing on the Injunction Request for which the Royer 2018 Affidavit

was submitted during the Derivative Litigation and, in connection therewith, the following

exchange occurred:

> Q [MR. HEIM]: So this appears to be the affidavit that Mr. Coe [Gardner's
> counsel in the Derivative Litigation] sent to you and Mr. Cohen at 3:45 p.m.
> under the e-mail which was marked as Exhibit 2, correct?
> A: It appears to be.
> Q: And some, if you look at some of the revisions, some of the revisions are, as
> Mr. Coe states, removing references to a transcript or citations. Do you see that?
> A: Yes.
> Q: And there are other crossouts to the affidavit, do you see that, of various words
> and phrases?
> A: Yes.
> Q: Are these revisions that Mr. Coe made at your request or your counsel's
> request?
> A: I don't specifically recall that.
> Q: It states that, on paragraph 2, which should be on your screen here, the initial
> draft said that 'I will be on a prepaid vacation outside of the Commonwealth of
> Pennsylvania beginning on' and then it has a placeholder for a date 'and will not
> return to Pennsylvania until' a date. Do you see that?
> A: I do.
> Q: And the revised version says, 'I will be on a prepaid vacation outside of the
> Commonwealth of Pennsylvania on August 13, 2018,' right?
> A: Right.
> Q: And is that consistent with your recollection, that you were on a prepaid
> vacation on August 13, 2018?

A: I don't remember the specific date, but my general recollection is that the vacation that had been planned for many months was continuing through at least to the date of the hearing which appears to be August 13, 2018.

Q: And then in that same paragraph 2 the sentence continues: 'And I am therefore, unavailable for the preliminary injunction hearing set for August 13, 2018.' And then there's a crossout 'and August 15, 2018.' Do you see that?

A: I do.

Q: So the original version of the affidavit that Mr. Coe sent on July 31st stated that you were unavailable because you were on vacation for both August 13, 2018 and August 15, 2018, correct?

A: The original version appears to have said that, the version prior to this revised version.

*Id.* at 28:7-30:16.

Further elaborating on the revisions which had been made to the Royer 2018 Affidavit respecting his availability for the hearing on the Injunction Request in the Derivative Litigation, Royer testified as follows:

Q [MR. HEIM]: Now, after you and Mr. Coe and your counsel made revisions to the affidavit, you ultimately settled on a version of the affidavit that you were comfortable and ready to sign. Is that right, sir?

MR. KLEIN: Objection to the form.

A: Well, at that time while on vacation and, to my recollection, late for a family activity that was going to be all day and traveling some period, I signed off on the affidavit. So at that moment in time, yes.

MR. HEIM: I want to mark as Royer-4 another series of e-mails.

Q: Do you see the e-mail on your screen, sir, from August 8, 2018?

A: Yes.

Q: And that's from Mr. Coe to you, correct, and your lawyer Barry Cohen, correct?

A: It's from Mr. Coe to me and to Barry Cohen.

Q: And Mr. Coe states and directs the e-mail to you: 'John, a revised draft incorporating your edits and a redline from the version I sent you before vacation is attached.' He then states: 'The only changes I didn't make from your edits was including the statement that you return to PA on the night of August 14, 2018. If you disclose that, the judge or Bochetto [co-counsel for McGuckin] may make you appear on the 15th. If you want to disclose it, I'm okay with it. Rick.' Did I read that accurately?

A: Yes.

Q: Does this refresh your recollection as to the timing of when you were returning from your vacation?

A: Well, it doesn't refresh my recollection of the actual date that I returned, but I see this here so there is an e-mail that indicates that I was returning on the night of

August 14. I don't specifically remember that we were returning on the night of August 14.

Q: You don't have any reason to dispute that Mr. Coe is stating your schedule accurately saying that you were returning on the night of August 14, correct?

A: I do not.

Q: And Mr. Coe is indicating that he did not include your request to edit which was a statement that you return on the night of August 14th, correct?

A: It appears that way.

Q: And he's cautioning the reason why he didn't make that requested edit was because, if it's disclosed, the judge in the case, or my partner George Bochetto may make you appear on the scheduled hearing date on August 15th, correct?

A: That's what he stated.

Q: Did you ever contact Mr. Bochetto or the judge in the case to advise them that you were in fact, available for testimony on August 15th?

A: I think that would be highly irregular, don't you think? I did not do that. I was a witness. I'd be contacting a judge? I never heard of that.

Q: Did you ever contact Mr. Bochetto and say, George, I'm not available on the 13th, I'm traveling, I come back the night of the 14th, I could appear and testify on the scheduled date of August 15th which was a scheduled date for the hearing?

MR. KLEIN: Objection to the form.

A: I didn't have any direct contact to my recollection.

BY MR. HEIM

Q: Just so I'm clear, the answer to my question is, no, you did not contact Mr. Bochetto and tell him that you were available to testify on August 15th; is that right?

A: I do not recall contacting Mr. Bochetto to inform him that I was available on the 15th.

*Id.* at 36:1-40:1.

In early April 2021, McGuckin filed a request with the District Court seeking to supplement the record on the Trustee Order Appeal to include certain deposition testimony from the Royer 2021 Deposition. Ex. M-1(2) at 1-2.

On April 15, 2021, the District Court entered an order denying McGuckin's request to supplement the record on Appeal, dismissing the Appeal itself, and remanding "for reconsideration of the bankruptcy court's order appointing a trustee for the reasons discussed in the accompanying memorandum" ("Remand Order"). Ex. M-1(1). In the District Court's

memorandum accompanying the Remand Order ("Remand Memorandum"), the District Court

explained that:

> Appellants argue that factual developments in other litigation undermine the
> Bankruptcy Court's decision to appoint a trustee, which they argue was based on
> statements made by John E. Royer in an affidavit…Appellants represent that Mr.
> Royer's affidavit stated that the partnership agreement was not intended to allow
> the partners to own competing businesses. Appellants also represent that Mr.
> Royer recently recanted this statement during a deposition in a separate legal
> malpractice action, in which he adopted the opposite position: that the partnership
> agreement did in fact allow partners to own competing businesses. Appellants
> argue that because the Bankruptcy Court relied on Mr. Royer's earlier statement
> in deciding to appoint a trustee, the Court should consider this new evidence, i.e.,
> the deposition testimony, in reviewing the Bankruptcy Court's decision.

Ex. M-1(2) at 1-2.

Ultimately the Remand Memorandum stated "the Court will deny the motion for leave to

supplement the record…and remand the case to the Bankruptcy Court so that Appellants may file

a motion for reconsideration of the Bankruptcy Court's Order based on this evidence[,]"

reasoning that "the [District] Court is not inclined to exercise its equitable powers to reconsider

the Bankruptcy Court's opinion based on evidence that the Bankruptcy Court never had the

opportunity to consider" and that "it is also generally improper for appellate courts to act as triers

of fact." *Id.* at 2, 5. Therefore, the District Court determined a remand would be more

appropriate to permit the issues to be litigated in the first instance in the Bankruptcy Court. *Id.* at

5-6.

On April 23, 2021, McGuckin and VAC LLC filed a motion seeking this Court's recusal

from all proceedings directly involving the rights and interests of McGuckin or any of his solely

or majority owned entities ("Recusal Motion"). Case No. 19-17117 ECF 758. On May 1, 2021,

McGuckin and VAC LLC filed a joint, redacted "Motion for the Court to Consider the

Deposition of John E. Royer, Esquire and Related Evidence on Remand from the District Court"

("Reconsideration Motion"), as well as a motion to file the Reconsideration Motion under seal ("Motion to Seal"). *Id.* at ECF 774, 775. However, due to the pending Recusal Motion, the Court refrained from considering the Reconsideration Motion or Motion to Seal until disposing of the Recusal Motion.

On June 9, 2021, a hearing was held on the Recusal Motion. *Id.* at ECF 821. On June 25, 2021, the Court entered an order denying the Recusal Motion ("Recusal Order") and an accompanying memorandum opinion ("Recusal Opinion"). *Id.* at ECF 840, 841. The Recusal Order also scheduled a hearing on, *inter alia*, the Motion to Seal for July 7, 2021, and provided that a hearing date for the Reconsideration Motion and Sanctions Motion would be selected at the July 7 hearing. *Id.* at ECF 841.

However, on July 6, 2021, the day before the hearing on the Motion to Seal, McGuckin and VAC LLC filed a petition with the Third Circuit Court of Appeals ("Third Circuit") seeking to have the Third Circuit issue a writ of mandamus reversing the Recusal Order ("Mandamus Petition"). Case No. 19-17117 ECF 852 Mot. to Stay Ex. A ¶ 1. The same day, McGuckin and VAC LLC filed with this Court a "Motion for Stay Pending Decision on Petition for Writ of Mandamus" ("Stay Motion") seeking to have the Court issue an order staying consideration of, *inter alia*, the Reconsideration Motion pending a decision from the Third Circuit on the Mandamus Petition.[1] *Id.* at Mot. to Stay ¶¶ 1, 6, 7. On July 6, 2021, this Court entered an order granting "a temporary stay with regard to the Court's resolution of the outstanding motions to seal…and the remand of the appointment of the Chapter 11 trustee until the earlier of: (a) the Court's resolution of the Motion to Stay; or (b) denial of the Petition for Writ of Mandamus" and setting a schedule for further briefing on the Stay Motion. Case No. 19-17117 ECF 853.

---

[1] In the Mandamus Petition, McGuckin and VAC LLC also sought a stay from the Third Circuit in the event this Court was not inclined to grant one. Case No. 19-17117 ECF 852 Mot. to Stay Ex. A ¶ 3.

Ultimately, on July 20, 2021, the Third Circuit denied the Mandamus Petition. Court of Appeals Case No. 21-2279 ECF 7. Subsequently, an evidentiary Zoom hearing on the Reconsideration Motion and Sanctions Motion was set for September 30, 2021. *See* Case No. 19-17117 ECF 881, 883. On August 4, 2021, the Court entered an order governing procedures for the remote hearing on the Reconsideration Motion and Sanctions Motion, and pursuant to that order, all discovery and third party subpoenas were required to be served by August 5, 2021 ("Procedures Order"). Case No. 19-17117 ECF 883 ¶ 1.

Thereafter, the Court held a hearing on the Motion to Seal on August 18, 2021. Case No. 19-17117 ECF 885. After the August 18, 2021 hearing on the Motion to Seal, an order was entered on August 20, 2021 denying the Motion to Seal, directing that unredacted and unsealed versions of the Reconsideration Motion and opposition responses be filed on the docket within three business days, and preserving any applicable attorney-client/work product privilege which the Chapter 11 Trustee may hold on behalf of VAC. *Id.* at ECF 888. On August 31, 2021, the unredacted version of the Reconsideration Motion was filed on behalf of McGuckin and VAC LLC. *Id.* at ECF 896. Unredacted objection responses were filed by Gardner and the Chapter 11 Trustee. *Id.* at ECF 810, 890.

The Reconsideration Motion seeks to have the Court "vacate its February 7, 2020 Order appointing a trustee and accompanying Memorandum decision in light of recent Deposition Testimony of John E. Royer and Related Evidence…" Case No. 19-17117 ECF 896 ("Recon. Mot.") 1. According to the Reconsideration Motion, "[n]ew evidence refuting the conclusions underlying this Court's February 7, 2020 Order appointing a trustee only recently came into existence, and upon taking account of such evidence…this Court should vacate its February 7, 2020 Order and accompanying Memorandum decision." *Id.* at ¶ 1. The Reconsideration Motion

argues primarily that the Royer 2021 Deposition and certain exhibits to that deposition

undermine the "assumption" from the Trustee Opinion that McGuckin breached duties owed to

VAC by operating competitive centers, the "Court's conclusion that the Derivative Litigation is

the most valuable asset of the Estate," and Gardner's credibility. *Id.* at ¶ 2. According to the

Reconsideration Motion, McGuckin and VAC LLC appear to believe that the Trustee Order and

Opinion were "based largely on the idea that Dr. McGuckin's operation of competitive vascular

access centers was not permitted by the Partnership Agreement and was therefore unlawful, and

that the Derivative Litigation alleging Dr. McGuckin was unlawfully competing was the largest

asset of the Estate…" *Id.* at ¶ 14. The Reconsideration Motion further represents that the

dispositive issue in the Derivative Litigation is whether the Amended LPA permits McGuckin to

operate competitive vascular access centers. *Id.* at ¶ 16. The Reconsideration Motion does not

identify the legal basis upon which McGuckin and VAC LLC seek to have the Trustee Order and

Opinion vacated.

On September 28, 2021, just days before the scheduled hearing on the Reconsideration

Motion, counsel for Royer filed an emergency motion to quash a subpoena demanding that

Royer testify at the September 30 Reconsideration Motion hearing, and which had been issued

by McGuckin on Friday, September 24, 2021, over a month after the deadline set forth in the

Procedures Order for serving third party subpoenas ("Motion to Quash"). Case No. 19-17117

ECF 927. The Motion to Quash alleges that the subpoena was delivered to Royer's receptionist

at his law office. Mot. to Quash ¶ 18, Ex. B. On September 29, 2021, the Court entered an order

granting the Motion to Quash ("Subpoena Order") providing:

> based upon (a) the failure of Dr. James McGuckin ('McGuckin') to properly serve
> a subpoena demanding Royer's presence at the September 30, 2021 hearing on
> McGuckin's motion to vacate this Court's February 7, 2020 order appointing a
> trustee ('Motion to Vacate') on Royer personally with a reasonable amount of

time to comply and (b) the irrelevance of further testimony from Royer to resolving the Motion to Vacate, the Motion to Quash is GRANTED; the subpoena issued to Royer by McGuckin to attend the hearing on September 30, 2021 is QUASHED; and the hearings scheduled for the Motion to Vacate and for William Whitfield Gardner's Motion for Sanctions will proceed as scheduled on September 30, 2021 and October 1, 2021 without Royer's participation.

Case No. 19-17117 ECF 928.

The Subpoena Order further explained, *inter alia,*

[i]n considering whether a subpoena may be quashed for placing an undue burden on a non-party, pursuant to Rule 45(d)(3)(A)(iv), courts may consider relevance and the requesting party's need for the testimony/evidence. *United States v. Massimino*, 368 F. Supp. 3d 852, 855 (E.D. Pa. 2019). Here, McGuckin's Motion to Vacate requests the Court vacate its order appointing a trustee based upon the discovery of new evidence – deposition testimony given by Royer in March 2021 in a legal malpractice action brought against him by McGuckin purporting to recant certain statements Royer had made in an affidavit in 2018 in connection with litigation which some of the limited partners of Vascular Access Centers, L.P. ('VAC') had initiated against VAC's general partner and McGuckin on VAC's behalf ('Derivative Litigation') concerning whether a certain provision in VAC's limited partnership agreement permitted McGuckin to compete with VAC, whether Royer recalled McGuckin requesting to include a provision in the limited partnership agreement permitting him to compete, and regarding his availability for a hearing in the Derivative Litigation on the 2018 affidavit. The Motion to Vacate is based entirely on the March 2021 deposition, arguing that this deposition undermines certain conclusions the Court made in connection with its order appointing a trustee. Mot. to Vacate ¶¶ 1-13. The Court has the deposition and the 2018 affidavit, making further testimony from Royer unnecessary and irrelevant. Additional testimony from Royer simply would have no bearing on whether the March 2021 deposition undermines the Court's conclusions reached in connection with its order appointing a trustee.

*Id.* at n.3.

The same day, McGuckin and VAC LLC filed a joint emergency motion to vacate the Subpoena Order ("Motion to Vacate Subpoena Order"). Case No. 19-17117 ECF 931.

On September 30, 2021, the hearing on the Reconsideration Motion was held ("Reconsideration Hearing"). Case No. 19-17117 ECF 934. At the beginning of the Reconsideration Hearing, the Court addressed the Motion to Quash, Subpoena Order, and Motion to Vacate Subpoena Order, explaining, *inter alia,*

I was left with a choice yesterday morning when Joan sent me his emergency motion, right? Obviously, I hate making decisions without giving all parties due process, right? I know that you've [addressing Mr. Bochetto, counsel for McGuckin] got your side to the story, and I want to hear it. But by filing his emergency motion on Wednesday morning after being served late on Friday, I had basically two choices available to me. I could either adjourn this hearing to some other date, which I know that the other parties in this case are vehemently opposed to…And so, I'm sensitive to the other parties' concerns about having a hearing immediately. So either I pushed it back, right, which, you know, didn't quite seem fair to the other parties when I do, you know, place the blame at your feet for not serving him the subpoena within sufficient time for him to file an emergency motion to vacate. I could have set up a very quick scheduling – a briefing schedule so that I could get, you know, the fulsome issues. And we could have had a hearing before this hearing today. But the choices between adjourning the hearing, for God knows when that would be to coordinate everyone's schedule when we've all picked this date months ahead of time versus me just granting the motion to quash the subpoena and invite you to file the motion to vacate, which I've seen, but I'm not going to hear it today. You know, you probably want to beef it up a little bit with the law. And I guess what I would say at this point is, at the end of today's hearing, we can pick a hearing date to hear that motion to vacate. Both Mr. Royer and the other parties may want to respond to that, and I'll hear it. We'll set a hearing date quickly. And if it turns out that I'm going to grant your motion, we can always pick an additional date to schedule Mr. Royer's attendance, and we'll be sure to make sure – you'll be sure to make sure, that is, to serve him the subpoena with sufficient time for him to respond…So I'm not saying that you don't have an opportunity to have a hearing and due process. I'm not saying that at all. I'm saying that I got jammed up. And when I – when I balanced the equities of the situation, it seemed the fairest thing for me to do was to continue with today and tomorrow's hearing, and we'll pick another date for you to try to convince me of that.

Case No. 19-17117 ECF 937 Recon. Hrg. Tr. 7:22-9:17, Sept. 30, 2021 ("Recon. Hrg. Tr.").

During the course of oral argument on the Reconsideration Motion, counsel for McGuckin confusingly began to raise certain findings from the Trustee Opinion which he felt the Court should reconsider, but which had no relation to the Royer 2021 Deposition whatsoever and had never been raised in the Reconsideration Motion. *See id.* at 19:14-22:17. Then, at the conclusion of oral argument from the Chapter 11 Trustee and Gardner, counsel for McGuckin represented, in responding to arguments regarding equitable mootness concerns with respect to vacating the Trustee Order:

> I think the opponents fundamentally misunderstand what relief we're looking for
> here. We cannot, obviously, undo everything that the Trustee has done. We're not
> asking that the Trustee be replaced or removed and Dr. McGuckin reinstalled.
> Those horses have left the barn, Judge. So to some extent, I think that that
> argument is to put up a strawman so that they could knock it down. That's not
> what we're after. What are we after? We are after the reconsideration of your
> Honor's judgment as to Dr. McGuckin. He's not the lowlife that you regarded
> him as in your February 6th opinion.

*Id.* at 50:13-24.

In light of these confusing representations given the nature of the Reconsideration Motion, the

Court asked counsel for McGuckin "am I clear in understanding that you are not seeking to

overturn my order appointing a Chapter 11 Trustee, rather that you want me to reconsider some

of the factual findings that I made in connection with Dr. McGuckin?" *Id.* at 53:15-19. Counsel

for McGuckin responded:

> [y]es, because I think that that will affect – let's make no mistake about this,
> Judge. Dr. McGuckin is a nationally celebrated physician who holds over 300
> patents [sic]. He is celebrated, Your Honor. Your opinion is a public record. Your
> opinion castigates Dr. McGuckin as if he were a common criminal. And he has to
> live with that, Judge, and he doesn't want to live with it, because it's not a fair
> characterization of who he is. The Trustee's actions, what has happened with the
> business and everything, you know, we can't put those pieces back together. But
> here's what we can do, Judge, is we can give Dr. McGuckin a more equitable look
> at who he is and what kind of person he is and what his character is like so that
> we can clarify that, Judge, so that Dr. McGuckin can have some sense of dignity
> in this world. And with that opinion on the public record, I don't think I need to
> suggest that the Court take public – take judicial notice, anytime anybody deals
> with anybody else, even if it's just to go out on a date, they Google them. This
> Google is – it's toxic to Dr. McGuckin.

*Id.* at 53:20-54:14.

Subsequently, the UST questioned "[a]fter hearing Mr. Bochetto's requested relief, I'm just

wondering what form of order, at the end of the day, he wants the Court to enter, aside from

simply vacating and removing of record the Court's decision of the 6th of February? What else

do you want in that order?" *Id.* at 56:12-16. In response, the Court opined that:

> I think it sounds to me, like what he wants me to do, in his ideal world, he wants
> me to find that this new evidence that he's giving me in connection with Royer
> would make me reconsider my factual findings about Dr. McGuckin, and I would,
> I guess, enter an amended order clearing up some of those factual findings to the
> extent that I, now, have a different view of it. But it seems like a relatively narrow
> issue. It's the findings of fact, I think, that he wants me to change so that Dr.
> McGuckin's reputation isn't sullied out there.

*Id.* at 56:17-57:1.

Counsel for McGuckin then, confusingly, responded that "vacating the February 6h [sic], 2020

opinion would go a long way towards that" even though he had just said he was not looking to

undo that order. *Id.* at 57:2-3. He then went on to elaborate

> …it is a little unusual, but I think the Court could also recognize that the
> profoundness of the opinion is a little unusual too. It's not every day that there's a
> 44-page opinion focused on a particular person's character and integrity such as
> this. But, Judge, it's – it's – I think, because we're in equity and because we've
> demonstrated that there are serious questions about Mr. Royer and everything, we
> should be given the opportunity to prove beyond a reasonable doubt to your
> Honor that some of the conclusions you reached about why the DOJ was
> structured the way it was, why the bankruptcy was filed in the first place, whether
> Delaware County's $20,000 sanction hearing was a motivating – I think – I think
> because of the strength of your opinion, Your Honor, equity cries out for an
> opportunity to let us clear that up. If, for no other reason – we can't put VAC back
> together; it's just not going to happen – but if for no other reason, we have one of
> the foremost doctors, inventors – do you know how many thousands of lives Dr.
> McGuckin has saved with some of the inventions that he has brought to market, in
> terms of venous filters and those types of things? Thousands of lives, Your
> Honor. This – this is a man that is a giant in his field, not because he wants to
> bang his own drum, but because he is. And I think he deserves an opportunity to
> clear it up on the record, Judge.

*Id.* at 57:11-58:11.

Later, after a break in the proceedings, counsel for McGuckin sought to clarify his position with

respect to the relief being sought in connection with the Reconsideration Motion, stating:

> [w]hen you ask for what relief we're requesting both in the vacation and in [the
> hearing on the Sanctions Motion], I believe pragmatically there's no one – there's
> no way to undo what the Trustee has done, those horses are out. From an
> appointment point of view we still do believe that there was not a proper basis to
> appoint the Trustee in the first place, and so part of our vacation and part of our

> position in the sanctions hearing is that we can't ask your Honor for any relief to undo what the Trustee has already done or what's already in play, you know, what other people may have been relying on and that type of thing, but we do from a technical point of view still object to the appointment of the Trustee in the first instance.

*Id.* at 86:18-87:9.

On October 1, 2021, at the conclusion of the hearing on the Sanctions Motion, the Court offered to schedule a hearing on the Motion to Vacate Subpoena Order and to allow everyone an opportunity to supplement their briefing and responses to that motion. Case No. 19-17117 ECF 938 Sanctions Hrg. Tr. 128:16-129:7, Oct. 1, 2021 ("Sanctions Hrg. Tr."). In response to the Court's offer, the following exchange occurred between the Court and counsel for McGuckin:

> MR. BOCHETTO: It may be, Your Honor – and I'm going to order the record for early next week. I want to review the record. It may be that I could contact Your Honor and say we do not need to redirect Mr. Hall [a witness for the hearing on the Sanctions Motion].
> THE COURT: Okay. That's fine.
> MR. BOCHETTO: That would make it easier. And at that point I could also inform Your Honor as to whether we should, or think about bringing Mr. Royer in.
> THE COURT: Yes.
> MR. BOCHETTO: It may not be necessary under the circumstances that we find ourselves in today.
> THE COURT: Okay…So if you'd like to take a week or two and figure out what you want to do with Hall. And if you want me to schedule a hearing then, just let me know. And I won't – I won't do anything in terms of issuing any orders or opinion with regard to the motion to vacate my February 7th order and opinion because you need to figure out what you're doing.

*Id.* at 129:16-130:11.

On October 22, 2021, counsel for McGuckin filed a letter advising the Court that "[h]aving reviewed the record and notes of testimony, we are withdrawing Dr. McGuckin's subpoena to Mr. Royer, and therefore there will be no need to convene further proceedings concerning the Motion to Vacate the Court's Order Quashing that Subpoena." Case No. 19-17117 ECF 942.

### III.    DISCUSSION

For the reasons described more fully below, the Court concludes that the Royer 2021

Deposition testimony and related exhibits do not give the Court a basis to vacate the Trustee

Order pursuant to Federal Rule of Civil Procedure 60(b) or Federal Rule of Civil Procedure 59(e)

because whether or not VAC's Amended LPA permitted McGuckin to compete with VAC was

immaterial to the Court's decision to appoint a trustee and because the Court's decision to issue

the Trustee Order was based upon the totality of many factors which are completely unaffected

by the Royer 2021 Deposition testimony and related exhibits.

### A.    Federal Rules of Civil Procedure 60(b) and 59(e)

The Reconsideration Motion does not identify which legal authority permits the Court to

reconsider and vacate the Trustee Order and Opinion. However,

> [a] motion to reconsider is generally considered under Fed. R. Civ. P. 59(e) or
> Fed. R. Civ. P. 60(b) (made applicable by Fed. R. Bankr. P. 9023 and 9024
> respectively). When a reconsideration motion is filed within fourteen (14) days of
> the judgment, it may be treated as a motion to alter or amend a judgment under
> Fed. R. Civ. P. 59(e).[2] Otherwise, a reconsideration motion may be treated as
> being one seeking relief pursuant to Fed. R. Civ. P. 60(b).

*Chaney v. Grigg (In re Grigg),* Bankr. No. 11–71206–JAD, Adv. No. 12–7008–JAD, 2013 WL
5310207, at *1 (Bankr. W.D. Pa. 2013).

Under Fed. R. Civ. P. 59(e) ("Rule 59"), the moving party must demonstrate an intervening

change in controlling law, the availability of new evidence that was not available prior to entry

of judgment, or the need to correct a clear error of law or fact or prevent manifest injustice in

order to satisfy its burden. *United States Tr. v. Harms (In re Harms),* 612 B.R. 288, 294 (Bankr.

W.D. Pa. 2020). Ultimately, the Reconsideration Motion was not filed within fourteen days of

---

[2] Federal Rule of Bankruptcy Procedure 9023 provides that Federal Rule of Civil Procedure 59 applies in cases
under the Bankruptcy Code and that "[a] motion for a new trial or to alter or amend a judgment shall be filed…no
later than 14 days after entry of judgment."

the entry of the Trustee Order. Therefore, the Court will treat the Reconsideration Motion as having been filed pursuant to Fed. R. Civ. P. 60(b) ("Rule 60(b)").

Pursuant to Rule 60(b), "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:…(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)…" "Rule 60(b) does not confer upon the district courts a 'standardless residual discretionary power to set aside judgments.' Rather, '[t]he remedy provided by Rule 60(b) is extraordinary and special circumstances must justify granting relief under it.'" *In re Express Car & Truck Rental, Inc.,* 455 B.R. 434, 439 (Bankr. E.D. Pa. 2011). "Rule 60(b) is not read liberally to give a disappointed party an opportunity to relitigate his or her case [or]…present facts that were otherwise available at the time of judgment." *Id.*

With respect to Rule 60(b)(2), the term "newly discovered evidence" refers to "evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." *Bohus v. Beloff,* 950 F.2d 919, 930 (3d Cir. 1991). This provision only entitles an aggrieved party to relief when the newly discovered evidence is "(1) material and not merely cumulative, (2) could not have been discovered prior to trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome…" *Singleton v. Beadle,* 839 Fed. Appx. 671, 674 (3d Cir. 2021); *Bohus,* 950 F.2d at 930. The Court observes that although the Court is treating the Reconsideration Motion as being brought pursuant to Rule 60(b)(2), Rule 59(e) and Rule 60(b)(2) share the same standard for granting relief on the basis of new evidence. *Bailey v. Navient Sols., LLC (In re Bailey)*, Case No.: 19-15531-ABA, Adv. No.: 19-1159-ABA, 2021 WL 4314217, at *7 (Bankr. D. N.J. Sept. 22, 2021).

**B.  The Testimony in the Royer 2021 Deposition and Related Exhibits Do Not Provide a Basis to Vacate the Trustee Opinion and Order.**

Ultimately, the Royer 2021 Deposition and related exhibits would not have altered the Court's decision to appoint a Chapter 11 trustee, thereby barring the relief which McGuckin and VAC LLC appear to seek[3] under Rule 60(b)(2).[4]

The Reconsideration Motion appears to ascribe particular significance to Royer's statements in the Royer 2021 Deposition respecting whether the Amended LPA permitted McGuckin to compete with VAC. However, in considering whether to order the appointment of a Chapter 11 trustee, the Court was not concerned with and did not arrive at any conclusions respecting whether the Amended LPA permitted McGuckin to open and operate competing centers. In fact, the Court considers Royer's views on whether the Amended LPA permitted McGuckin to open and operate competing centers or whether Royer recalled McGuckin instructing him to preserve his ability to compete with VAC in the Amended LPA immaterial to the decision to appoint a Chapter 11 trustee.[5] Even had Royer's views been made known to the Court in the first instance, the outcome of the proceedings related to the appointment of a Chapter 11 trustee would not have changed.[6]

---

[3] The Reconsideration Motion itself clearly requests that the Court vacate the Trustee Order and Opinion based upon the Royer 2021 Deposition testimony and related exhibits, irrespective of the confusing comments made by McGuckin's counsel at the Reconsideration Hearing regarding the relief sought. *See* Recon. Mot. 1, 14, ¶ 1.

[4] The Court is also aware that under Rule 60(c), a motion under Rule 60(b)(2) based upon newly discovered evidence must be made no more than a year after entry of the order sought to be vacated. Technically, the Reconsideration Motion was not brought within a year of the entry of the Trustee Order. In fact, the request to supplement the appellate record based on the Royer 2021 Deposition was not even brought before the District Court within one year of the issuance of the Trustee Order. The Court could deny the Reconsideration Motion on this basis alone, but will proceed to address the merits of the Reconsideration Motion in an abundance of caution and out of deference to the District Court's remand.

[5] The Court must observe that the significance McGuckin and VAC LLC appear to ascribe to Royer purportedly "recanting" portions of the Royer 2018 Affidavit, which the Court had never seen prior to the filing of the Reconsideration Motion and which, therefore, clearly could have had no impact on its decision to appoint a Chapter 11 trustee, is perplexing. *See* Recon. Mot. ¶¶ 6, 9, 30.

[6] The Court observes that McGuckin and VAC LLC have made no attempt to satisfy their burden to demonstrate why Royer's views with respect to the Amended LPA or his recollection regarding communications with McGuckin could not have been discovered in time to present to the Court in connection with the proceedings to appoint a

By way of explanation, aside from the Trustee Opinion summarizing as background some of the Derivative Litigation's allegations respecting McGuckin opening competing centers, the Trustee Opinion only references McGuckin's alleged opening of competitive centers one time when it states at the very end "[u]ltimately, McGuckin as sole member and manager of the General Partner, has repeatedly put his own interests above VAC, *may have* competed actively with VAC for years, engaged in numerous secret, self-dealing transactions, and sacrificed VAC's resources and reputation when it served him to do so." *See* Trustee Op. 43 (emphasis added). The Court's statement in the Trustee Opinion that McGuckin "may have" competed with VAC does not reflect that the Court arrived at any conclusion respecting whether McGuckin actually did compete, or whether the Amended LPA permitted any alleged competition. Rather, that statement simply refers to the fact that allegations were made in the Derivative Litigation respecting McGuckin allegedly competing with VAC. Such allegations by their very nature would impact creditor confidence, one of the factors relevant to whether cause exists to appoint a Chapter 11 trustee, irrespective of whether any alleged competition was technically permitted by the Amended LPA. *See In re Clinton Centrifuge, Inc.,* 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988). The Court in no way opined on the merits of the Derivative Litigation or whether the Amended LPA permitted McGuckin to open competing centers. In fact, it was careful not to do so. *See* Dismissal Hrg. Tr. 12:14-15.

---

Chapter 11 trustee in the first instance, particularly given that Royer was deposed in 2018 in the Derivative Litigation and that McGuckin and VAC LLC consider Royer's views on the Amended LPA dispositive of both the outcome in the Derivative Litigation, which was pending for years before the bankruptcy was ever filed, and the resolution of the Gardner Motion. Rule 60(b)(2) only permits the Court to reconsider orders based upon new evidence which could not have been discovered in advance through the exercise of reasonable diligence. It is not apparent to the Court why McGuckin or VAC LLC could not have discovered Royer's views through the exercise of reasonable diligence such as by simply deposing Royer in connection with the Gardner Motion and UST Motion. In fact, it appears that at least some of Royer's views on the Amended LPA as expressed in the Royer 2018 Deposition were available and are largely consistent with his testimony in the Royer 2021 Deposition, even if not entirely consistent with portions of the Royer 2018 Affidavit. *Compare* Ex. G-2 138:9-141:16, 226:13-228:11 *to* Ex. M-6 51:8-52:21, 58:18-59:3, 63:11-64:22, 88:3-89:1.

Furthermore, the Amended LPA potentially permitting McGuckin to open and operate competing centers or Royer recalling that McGuckin informed him that he wanted to preserve his ability to compete with VAC in the Amended LPA changes none of the Court's other findings justifying the appointment of a trustee. Regardless of whether the Amended LPA permitted McGuckin to compete with VAC or whether Royer recalled that McGuckin told him he wanted to preserve his ability to compete with VAC, the Court would have made the same determination that the appointment of a Chapter 11 trustee was appropriate based on the totality of the circumstances as set forth in detail in the Trustee Opinion. The Trustee Order and Opinion was based on *many* factors the Court relied upon to support its conclusion about McGuckin's fitness to operate VAC during the bankruptcy case, including, *inter alia,* McGuckin's conflicts of interest as a defendant in the Derivative Litigation and as the owner of PVI, an entity with no claim, secured or unsecured, against VAC, and which attempted to secure a priority lien position relative to bona fide creditors and equity holders, in violation of McGuckin's fiduciary duty to VAC's bankruptcy estate; VAC funds being comingled with those of other entities, a finding a financial monitor ("Monitor") in the Derivative Litigation who testified on behalf of VAC at the Dismissal Hearing made; that McGuckin had committed VAC's resources to highly burdensome settlements which released McGuckin personally from liability; McGuckin paying himself excessive compensation in his roles at VAC without the limited partners' knowledge; the unreliability of VAC's financial statements and forecasts, a finding made by the Monitor; and McGuckin's actions like signing a consent decree he did not believe was accurate and performing experimental procedures unapproved by the FDA which damaged his credibility and VAC's reputation. Trustee Op. 39-42. The foregoing justifications for the Court's conclusion that McGuckin was unfit to operate VAC during its bankruptcy fully justify the appointment of a

Chapter 11 trustee for the reasons stated in the Trustee Opinion and are completely unrelated to

whether Royer believed McGuckin was permitted to compete with VAC under the Amended

LPA or recalled McGuckin requesting to maintain his ability to compete in the Amended LPA.[7]

The Reconsideration Motion also appears to suggest that the Trustee Order should be

vacated because the Royer 2021 Deposition purportedly establishes that Gardner's claims on

behalf of the Debtor in the Derivative Litigation are weak and thus the Derivative Litigation

cannot be a significant estate asset. However, the Court simply did not opine with respect to the

merits of the Derivative Litigation in the Trustee Opinion and, in fact, did not consider the merits

of the Derivative Litigation in any respect in rendering its decision to appoint a Chapter 11

trustee. The Trustee Opinion never purports to weigh the merits of the claims in the Derivative

Litigation, stating merely that the Derivative Litigation appears to be a "potentially" significant

estate asset, given the substantial damages sought against McGuckin and VAC LLC on the

Debtor's behalf. Given the substantial damages sought against McGuckin and VAC LLC, the

significance of the Derivative Litigation for purposes of appointing a Chapter 11 trustee was its

existence, as McGuckin's position as a party adverse to the Debtor in that litigation clearly

created a conflict of interest between McGuckin and the Debtor's bankruptcy estate. *See* Trustee

Op. 40. In fact, at the Dismissal Hearing, McGuckin readily admitted that he wants the

Derivative Litigation to end, and acknowledged that he has many conflicts of interest with

respect to VAC. Dismissal Hrg. Tr. 235:21-236:1, 252:1-13. All the foregoing is completely

unchanged in any way by the Royer 2021 Deposition testimony respecting whether the Amended

---

[7] At the Reconsideration Hearing, counsel for McGuckin appeared to want the Court to reconsider any findings from the Trustee Opinion critical of McGuckin. However, the portions of the Royer 2021 Deposition testimony highlighted for the Court are simply unrelated to other findings which do not involve McGuckin's alleged opening of competing centers or whether Royer recalled him wanting to maintain the ability to do so. The Reconsideration Motion did not offer any other basis for further reconsideration of the Trustee Order or findings made in support of it.

LPA permitted McGuckin to compete with VAC or whether Royer recalled being instructed by

McGuckin to preserve his right to compete with VAC in the Amended LPA.[8]

Finally, the Reconsideration Motion attempts to have the Trustee Order vacated based

upon testimony from the Royer 2021 Deposition reflecting that Gardner's counsel in the

Derivative Litigation, who is also his counsel in the bankruptcy case, advised Royer that if he

disclosed that he would return from vacation on August 14 in the Royer 2018 Affidavit, he may

have to testify the following day in the Derivative Litigation at the hearing on the Injunction

Request, contending this testimony undermines Gardner's credibility. Knowing this in advance

would not have affected the Court's determination with respect to the appropriateness of

appointing a Chapter 11 trustee. First, the Trustee Order was based upon McGuckin's *own*

conduct and testimony, which Gardner's counsel's actions in separate litigation could not impact

or change. Furthermore, the Court's single comment referring to Gardner as "credible" was made

casually at the end of a lengthy hearing after it had already explained the basis for, and issued, its

decision to appoint a trustee, as the Court simply attempted to assist the parties with a side issue

of who was best suited to act on behalf of VAC pending the Chapter 11 trustee's appointment.

Gardner's credibility is not referenced anywhere in the Trustee Opinion as a justification for the

---

[8] The Reconsideration Motion also seems to suggest that the Royer 2021 Deposition establishes that McGuckin could not have been motivated to orchestrate an involuntary petition on VAC's behalf to interfere with the Derivative Litigation because Gardner's claims against McGuckin and VAC LLC are weak. Recon. Mot. ¶¶ 18, 22, 47. However, the Court's finding that dismissal of the case would have been warranted under 11 U.S.C. § 1112(b) was based upon, *inter alia*, McGuckin orchestrating the petition to disrupt the Derivative Litigation was not based upon any assessment of the merits of the Derivative Litigation claims. *See* Trustee Op. 36-39. Rather, the Court's finding regarding McGuckin utilizing the bankruptcy system for his own gain in the Derivative Litigation was based upon, *inter alia*, McGuckin's well-documented history of using frivolous litigation tactics to interfere with and delay resolution of the Derivative Litigation, as detailed at length in the Trustee Opinion; the timing of the petition corresponding with both the Pennsylvania Supreme Court's denial of his request to appeal the Superior Court's order affirming the State Trial Court's order denying his petition to compel arbitration in the Derivative Litigation and with a sanctions hearing scheduled for the next day; and that there was no pressure from non-moving creditors to be in bankruptcy on that date. Trustee Op. 10, 13, 18, 19, 21, 36-39. The Royer 2021 Deposition changes none of those bases for the Court's conclusion with respect to McGuckin's attempted abuse of the bankruptcy system to gain a litigation advantage for himself.

Trustee Order.[9] In any event, the fact that Gardner's counsel, not even Gardner himself, appears

to have advised Royer of a potential outcome of including the end date of his trip in the Royer

2018 Affidavit is irrelevant to and would have changed none of the factual findings or legal

conclusions the Court made in connection with the Trustee Order and Opinion.[10]

## IV.    CONCLUSION

Based upon all the foregoing, the Court DENIES the Reconsideration Motion, having

found no basis to vacate the Trustee Order and Opinion.[11]

Date: December 1, 2022                              _____

                                                   Ashely M. Chan
                                                   United States Bankruptcy Judge

---

[9] In preparation for the Dismissal Hearing, the Court had drafted a bench memorandum, as it routinely does in advance of complex proceedings, summarizing the applicable legal standards, and all of the background information which was either undisputed or apparent from evidence submitted with the Dismissal Motions and objections ("Bench Memorandum"). In the Bench Memorandum, citations were made to exhibits Gardner had submitted in connection with the Gardner Motion and labeled based upon how the Gardner Declaration labeled them. As mentioned *supra*, at the Dismissal hearing, Gardner's exhibits were admitted into evidence without any objection whatsoever. In drafting the Trustee Opinion, which the Court found it imperative to do as expeditiously as possible given its findings with respect to McGuckin's serious misconduct detailed at length therein, the Court borrowed from the Bench Memorandum, and in doing so, in the interest of saving time, left the references to many of Gardner's exhibits as they had been labeled in the Gardner Declaration. The citation references in the Trustee Opinion to the Gardner Declaration are simply made to identify certain exhibits, again, none of which any party objected to being admitted into evidence, and Gardner's statements in the Gardner Declaration were not the basis for any material substantive conclusions about disputed issues made in the Trustee Opinion.

[10] The Court also observes that the Royer 2018 Affidavit appears to be completely accurate with respect to its representations regarding Royer's availability for the Injunction Request hearing – stating only that he was not available on August 13. It made no representations with respect to his availability on August 15 whatsoever.

[11] In any event, the Court also observes that VAC is no longer operating as a going concern. Accordingly, an order vacating the trustee appointment simply would have no practical effect, as neither McGuckin nor VAC LLC could be restored to their former positions with respect to VAC. It therefore strikes the Court that the relief requested in the Reconsideration Motion is simply moot.