## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| **In re:** | : | **Case No. 19-17117 (AMC)** |
|  | : |  |
| **Vascular Access Centers, L.P.,** | : | **Chapter 11** |
|  | : |  |
| **Debtor** | : |  |
|  | : |  |
| _____: |  |  |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

I.    **INTRODUCTION**

In early February 2020, after finding that Dr. James McGuckin ("McGuckin"), the former sole member and manager of the former general partner of the debtor, Vascular Access Centers, L.P. ("VAC" or "Debtor"), had orchestrated an involuntary petition under Chapter 11 of the Bankruptcy Code against VAC in bad faith and that appointing a Chapter 11 trustee would serve the best interests of VAC's creditors, the Court ordered the appointment of a Chapter 11 trustee ("Trustee Order"). Shortly after the entry of the Trustee Order, VAC's majority-in-interest limited partner, William Whitfield Gardner ("Gardner"), filed the motion currently before the Court seeking sanctions against McGuckin and one of his entities, Philadelphia Vascular Institute ("PVI") pursuant to Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011"), 11 U.S.C. § 105(a), and the Court's inherent powers based largely upon McGuckin and PVI's orchestration of the bad faith involuntary filing ("Sanctions Motion"). Ultimately, for the reasons described more fully below, the Court finds that sanctions are warranted against McGuckin and PVI jointly and severally due to their bad faith efforts to file the involuntary petition for

1

improper purposes without sufficient evidentiary support for the claims asserted in the petition.

Accordingly, the Court will award Gardner $1,417,861.75 in fees/expenses.

## II.    BACKGROUND

Given that the background relating to this case has been thoroughly discussed in multiple

opinions, particularly the Court's February 7, 2020 opinion explaining the basis for its decision

to order the appointment of a Chapter 11 trustee ("Trustee Opinion"), and its June 25, 2021

opinion explaining the basis for its decision not to recuse itself from matters involving

McGuckin and his entities ("Recusal Opinion"), both of which are incorporated herein by

reference, the Court will only recount those circumstances necessary to the disposition of the

Sanctions Motion.

### A.  Before the Involuntary Petition

VAC was founded by McGuckin as a Pennsylvania limited partnership through a limited

partnership agreement ("LPA") executed on April 22, 2005. Case No. 19-17117 ECF 234

("Trustee Op.") 1. The general partner of VAC was a non-debtor entity, Vascular Access

Centers, LLC ("VAC LLC" or "General Partner"), of which McGuckin was the sole member and

manager. *Id.* VAC operated its business through a number of limited liability company

subsidiaries. *Id.* at 2. The subsidiaries operated and managed outpatient vascular access centers,

whereby physician interventionalists performed dialysis access procedures and certain other

vascular access procedures on patients with end-stage renal disease and other vascular conditions

or diseases. *Id.*

In May 2005, Gardner became a limited partner of VAC. *Id.* at 1-2. Gardner's

investments and substantial capital infusion into VAC made him the majority-in-interest limited

partner. *Id.* at 2. Pursuant to an amended version of the LPA, the General Partner was prohibited

from making certain fundamental decisions without the consent of the holders of a majority of all limited partners, including the decision to execute and file on behalf of the partnership a petition for relief under the United States Bankruptcy Code under which a partnership may be a debtor. *Id.* at 3.

Over time, Gardner began to have concerns about the possibility that McGuckin was engaging in impermissible self-dealing transactions and violating his duties as the sole member of VAC's General Partner. *Id.* at 4. Therefore, on January 13, 2016, Gardner commenced a derivative action on behalf of VAC by filing a complaint in the Delaware County Court of Common Pleas ("State Trial Court") against VAC LLC and McGuckin, as VAC LLC's sole member and manager, for breach of fiduciary duty, breach of contract, and unjust enrichment ("Derivative Litigation"). *See Gardner v. Vascular Access Centers, LLC et al.,* No. 16-cv-00367; Trustee Op. 5. In September 2017, Gardner amended his complaint in the Derivative Litigation ("Amended Complaint") to, *inter alia*, add other limited partners of VAC as plaintiffs (together with Gardner, "Derivative Litigation Plaintiffs"). Trustee Op. 7. The Amended Complaint reflects that the Derivative Litigation Plaintiffs were seeking, *inter alia*, an order directing McGuckin and VAC LLC to disgorge for the benefit of VAC all profits from certain alleged competitive centers operated by McGuckin-owned entities ("McGuckin Competitive Centers"); preventing McGuckin and VAC LLC from taking for themselves any profits generated by McGuckin Competitive Centers; directing that McGuckin Competitive Centers operate as VAC centers; and awarding money damages for the fair market value of resources McGuckin and VAC LLC allegedly misappropriated from VAC in opening and operating certain McGuckin Competitive Centers and punitive damages. Case No. 19-17117 ECF 43 Gardner Decl. to Dismissal Mot. Ex. 2 at 29.

On July 9, 2018, just days before trial in the Derivative Litigation, McGuckin filed a petition to compel arbitration ("Arbitration Petition"). Trustee Op. 10. On July 13, 2018, after an evidentiary hearing, the State Trial Court denied the Arbitration Petition. *Id*. On July 16, 2018, McGuckin filed a notice of appeal of the denial of the Arbitration Petition to the Pennsylvania Superior Court. ("Superior Court"). *Id.* On April 22, 2019, the Superior Court unanimously ruled against McGuckin and affirmed the State Trial Court's decision to deny the Arbitration Petition. *Id.* at 15. McGuckin subsequently filed an application for re-argument *en banc* on May 6, 2019 ("Re-argument Application"). *Id.* On June 12, 2019, the Superior Court denied McGuckin's Re-argument Application. *Id.*

The Derivative Litigation Plaintiffs subsequently filed a motion to recover certain attorneys' fees and costs. *Id.* Meanwhile, on July 10, 2019, McGuckin filed a petition for allowance of appeal of the Superior Court's June 12, 2019 order denying the Re-argument Application with the Pennsylvania Supreme Court ("Supreme Court Petition"). *Id.* at 18; Case No. 19-17117 ECF 230 Ex. I. On July 31, 2019, the Superior Court granted the Derivative Litigation Plaintiffs' motion to recover certain attorneys' fees and costs, concluding that McGuckin's "submission and reliance upon documents that were not part of the record at the trial court was frivolous, and therefore [Plaintiffs] are entitled to reasonable attorneys' fees for having to respond to the documents on appeal" and that "the petition for re-argument was also frivolous, and only done to further delay this matter," entitling the Derivative Litigation Plaintiffs to fees for responding to the Re-argument Application. Trustee Op. 18-19.

On October 18, 2019, Dilworth Paxson LLP ("Dilworth") began to represent VAC in connection with financial restructuring efforts. Case No. 19-17117 ECF 340 Op. 20 ("Dilworth represented the Debtor from that moment on October 18, 2019 until February 7, 2020…"). To

that end, Dilworth sought Gardner's consent as the majority limited partner to file a voluntary

Chapter 11 bankruptcy petition on behalf of VAC. Trustee Op. 20. Initially, Gardner preferred to

explore resolutions outside of bankruptcy and requested terms for consent. *Id.* On November 7,

2019, Dilworth contacted Gardner's counsel once again to attempt to seek Gardner's consent. *Id.*

On November 8, 2019, Gardner's counsel responded to Dilworth that Gardner would be

willing to consider consenting to a bankruptcy petition upon receiving certain information,

including, *inter alia*, more information about who would run VAC during the bankruptcy. *Id.*

Dilworth responded on November 11, 2019 that VAC contemplated no management changes and

there was no time for protracted negotiations prior to a bankruptcy filing. *Id.* The same day,

counsel for Gardner responded that Gardner had offered multiple times to provide additional

capital to VAC predicated on governance changes. *Id.* at 20–21.

On November 12, 2019, Dilworth responded to counsel for Gardner that VAC preferred

to obtain capital from McGuckin which was not accompanied by demands or conditions. *Id.* at

21. The same day, the Pennsylvania Supreme Court denied McGuckin's Supreme Court Petition

in the Derivative Litigation. *Id.* In addition, the parties were scheduled to appear before the State

Trial Court the next day for a hearing on the amount of sanctions to be awarded on account of

McGuckin's submission and reliance upon documents not part of the trial record in his appeal of

the order denying his Arbitration Petition, as well as his "frivolous" Re-argument Application.

*Id.* VAC had for the most part been paying McGuckin and the General Partner's attorneys' fees

in the Derivative Litigation at that point. *See* Dismissal Hrg. Tr., Feb. 6, 2020 ("Feb. 6 Tr.")

91:25-93:16 (noting General Partner may be indemnified except in certain limited

circumstances), 253:5-11 (McGuckin agreeing that VAC has paid at least some of his and the

General Partner's attorneys' fees in the Derivative Litigation because he is indemnified by the

limited partnership agreement and believes he is entitled to have his fees advanced).

### B.  The Involuntary Petition and Cash Collateral Motion

Hours after the Pennsylvania Supreme Court denied McGuckin's Supreme Court

Petition, three purported creditors of VAC - (1) PVI, an entity owned and controlled by

McGuckin; (2) Metter & Company ("Metter"), an accounting firm owned by Stan Metter, one of

VAC's limited partners; and (3) Crestwood Associates, LLC ("Crestwood"), an entity partly

owned by McGuckin's brother, Brian McGuckin ("Brother") (collectively, "Petitioning

Creditors") - filed an involuntary petition under Chapter 11 of the Bankruptcy Code against VAC

("Involuntary Petition"), thereby staying the Derivative Litigation. Trustee Op. 21. The

Involuntary Petition asserted a secured claim in favor of PVI in the amount of $1,202,120 based

on "secured loans"; a claim in favor of Metter in the amount of $11,911.25 based on "accounting

services"; and a claim in favor of Crestwood as "vendor" in the amount of $6,090. Case No. 19-

17117 ECF 1. McGuckin signed the Involuntary Petition on behalf of PVI. *Id.* On November 13,

2019, McGuckin signed and filed a document consenting to the Involuntary Petition on behalf of

VAC as the sole member and manager of VAC's General Partner. Trustee Op. 22; Case No. 19-

17117 ECF 3 Ex. A.

In the days leading up to the involuntary filing, it appears that McGuckin and his Brother

were coordinating the logistics of VAC's bankruptcy filing. UST Dismissal Mot. Hrg. Ex. 27,

28. At the time, VAC had no outstanding balance due to Crestwood, the provider of VAC's

accounting IT platform, causing counsel for the Petitioning Creditors to express concern

regarding whether a "third party can be a petitioner if they're owing nothing[.]" *See* Gardner

Sanctions Mot. Hrg. Ex. Gardner 32. Although McGuckin's Brother knew that Crestwood did

not have any open accounts receivable with VAC, he nevertheless directed a Crestwood

employee to "create an invoice for $6,000" and stated that the "invoice absolutely has to be dated

today." UST Dismissal Mot. Hrg. Ex. 27, 28. When the Crestwood employee asked the Brother

for the applicable rate and how many hours VAC should be billed, the Brother replied "just use

the rate that we charge them and then extrapolate the hours based on that and the $6k." UST

Dismissal Mot. Hrg. Ex. 28. The Crestwood employee then replied "[t]heir Bill Rate is $210/hr

which comes out to 28.57 hours. Can we add $90 to make our lives easier and bill them for

$6,090.00 to make it an even 29 hours?" to which the Brother said "[s]ure thing." *Id.*

On November 19, 2019, at McGuckin's direction, VAC filed a motion to use cash

collateral and provide adequate protection in the form of security interests equivalent to a lien

granted under 11 U.S.C. § 364(c)(2) and (3) to PVI as a secured creditor ("Cash Collateral

Motion"). Trustee Op. 22-23. The Cash Collateral Motion represented that:

> 15. The Debtor's sole secured creditor is Philadelphia Vascular Institute LLC
> ('PVI'), of which Dr. McGuckin is the sole member and manager.
> 16. Pursuant to certain promissory notes issued on various dates beginning in
> 2007 and continuing through October 2019, *PVI has loaned funds to the Debtor*.
> 17. *As of the Petition Date, the aggregate outstanding indebtedness under the
> various promissory notes is $4,257,626, secured by a properly perfected, first
> priority security interest and lien on substantially all of the assets of the
> Debtor, including all of the Debtor's accounts receivable.*

*Id.* (citing Case No. 19-17117 ECF 21 Cash Collateral Mot. ¶¶ 15-17) (emphasis added in
Trustee Opinion).

Although the Involuntary Petition had listed PVI's debt as $1,202,120 based on "secured loans,"[1]

the Cash Collateral Motion directly contradicted that representation when it averred that PVI

---

[1] Specifically, the Involuntary Petition describes PVI's claim as a $1,202,120 claim based on "secured loans (claim
amount is principal only; unsecured portion of claim will be based upon collateral value, which is less than full
claim)."

held "various promissory notes" totaling $4,257,626 "secured by a properly perfected, first priority security interest in and lien on substantially all of the assets of the Debtor." *Id.* at 23.

On November 20, 2019, the United States Trustee ("UST") requested copies of PVI's promissory notes, UCC filings, and the payment history on PVI's liens. *Id.* On November 21, 2019, the UST informed Dilworth that he had located a UCC-1 financing statement which PVI had filed against VAC on November 4, 2019 asserting a purported lien on any and all receivables and equipment, personal property, and licenses in connection with a series of loans allegedly extended to VAC since 2007 totaling $4,257,626 ("UCC Statement"), and inquired about a possible preference action against PVI. *Id.* at 20, 23-24.

On the same day, VAC withdrew the Cash Collateral Motion. *Id.* at 24. At a subsequent hearing, as will be discussed further *infra*, it became clear that PVI did not hold a secured claim, or any other claim, against VAC because PVI never actually lent any money to VAC.

On November 22, 2019, Gardner filed a motion to dismiss the involuntary Chapter 11 petition pursuant to 11 U.S.C. § 1112(b) or to appoint a Chapter 11 trustee under 11 U.S.C. §1104(a) ("Gardner Motion"), alleging that the Petitioning Creditors had filed the Involuntary Petition in bad faith in conjunction with McGuckin so that McGuckin could get VAC into bankruptcy without the limited partners' consent in order to further delay the Derivative Litigation. *Id.* at 24.

Shortly thereafter, on December 19, 2019, the UST filed his own motion to dismiss, ("UST Motion" and, collectively with the Gardner Motion, "Dismissal Motions") largely on the bases that McGuckin had orchestrated the Involuntary Petition with the Petitioning Creditors to gain a tactical litigation advantage in the Derivative Litigation; McGuckin's conflicts of interest would make it impossible for him to satisfy his fiduciary duties as manager of the General

8

Partner controlling VAC-in-possession; and "irregularities" in the Cash Collateral Motion. *Id.* at

24-25. VAC filed its objection to the Gardner Motion on December 19, 2019, and an objection to

the UST Motion on December 24, 2019. *Id.* at 25. On January 16, 2020, Gardner filed a reply to

VAC's objection and incorporated certain discovery that he had subsequently obtained. *Id.*

On January 31, 2020, VAC's counsel sent an email to the UST attaching purported

"documentation of the PVI loans to VAC," which listed the following payments totaling

$1,202,119.57 which were loaned to VAC: (1) a $300,000 wire to VAC from Peripheral

Vascular on December 18, 2018; (2) a $200,000 wire to VAC from PA Vascular Institute on

December 19, 2018; (3) a $155,000 wire to VAC from Peripheral Vascular on May 17, 2019; (4)

a $70,000 wire to VAC from Peripheral Vascular on May 23, 2019; (5) a $250,000 check to

VAC from Peripheral Vascular on September 9, 2019; (6) a $145,523.92 check to VAC from

James and Allison McGuckin on October 10, 2019 (with a "credit to non-VAC 401k of

$18,404.35"); and (7) a $100,000 check to VAC from James and Allison McGuckin on October

31, 2019. *Id.* at 26-27.

### C. February 6, 2020 Dismissal Hearing

On February 6, 2020, the Court held a hearing on the Dismissal Motions ("Dismissal

Hearing"). Case No. 19-17117 ECF 207, 208, 239, 240, 251. At the Dismissal Hearing, the Court

heard testimony from independent CPA, Michael Dubin, who had been appointed as financial

monitor in the Derivative Litigation for VAC ("Monitor") and tasked with providing the State

Trial Court with an assessment of the financial condition of VAC and its solvency; McGuckin;

and Mark Tucci, VAC's chief financial officer (collectively, "Witnesses"). Feb. 6 Tr. 20:23,

22:14-20, 25:4-7, 69:1, 266:2-267:1. The Court was troubled by much of McGuckin's testimony.

McGuckin continued to affirm and advocate the position, first advanced in the Involuntary

Petition which had been signed by McGuckin as representative of PVI, that PVI had loaned $1.2

million to the Debtor. For example, at one point during McGuckin's testimony, VAC's counsel

showed McGuckin a copy of a secured promissory note dated December 19, 2018 in favor of

PVI from VAC in the principal amount of $500,000 ("December 2018 Promissory Note"). *Id.* at

122:6–123:4. In response to VAC's counsel's questions about the details of PVI's loans to VAC,

McGuckin testified that PVI had loaned VAC: (1) $500,000 in December 2018; (2) $225,000 in

May 2019; (3) $250,000 in September 2019; and (4) $347,000 in October 2019. *Id.* at 122:6–

123:25. Based upon McGuckin's testimony, it did not appear that PVI had loaned any other

amounts to VAC despite the representation in the Cash Collateral Motion that PVI had loaned a

total of $4,257,626 to VAC. During the UST's cross examination of McGuckin, McGuckin

completely contradicted his testimony during his direct examination and admitted for the first

time that PVI actually had not loaned any amount to VAC. *Id.* at 176:22–181:7. When asked to

explain why he had testified that PVI had loaned these amounts to VAC, McGuckin testified that

he essentially considered himself and his entities which had loaned money to VAC – Peripheral

Vascular and PA Vascular Institute – to be the same entity as PVI since all of the money came

from him. *Id.* at 179:21–181:1.

Based upon McGuckin's admission during cross examination that PVI had not loaned

any money to VAC, it appeared that there was no basis in fact or law for PVI to have signed the

Involuntary Petition or for VAC to have filed the Cash Collateral Motion. Furthermore, if the

UST had not discovered these falsehoods, PVI would have held a blocking position in VAC's

bankruptcy, as VAC's sole secured creditor, which would have resulted in PVI's claim being

paid ahead of all of VAC's unsecured creditors and limited partners.

In addition, when asked why VAC had to be in bankruptcy by November 12, 2019, McGuckin could not come up with any credible explanation and testified that he had no idea that the sanctions hearing against him in the Derivative Litigation was scheduled to be held on November 13, 2019, a representation which the Court did not find to be credible. *Id.* at 142:13-24.

At the conclusion of the Dismissal Hearing, the Court went on to explain, based upon the record before it, that:

> [a]fter hearing the testimony of Dr. McGuckin today, frankly, I'm horrified. . . . I find Dr. McGuckin to be completely lacking in credibility. I find him to be untrustworthy. I find him to be self-dealing in every manner possible. I believe Dr. McGuckin, that you think that you put a ton of money into this debtor and you don't understand why the limited partners aren't supporting you and why they don't give capital contributions. I think that possibly you're lying, but certainly, perhaps, you're delusional. They don't want to give money to the debtor because they don't trust you. And frankly, I don't trust you. And although I cannot order something today, because my – my clerk's office is closed, it will be entered tomorrow. And you are not going to have anymore [sic] control of this debtor. It is absolutely clear to me that your [sic] unable to discharge your responsibilities to this debtor. It's absolutely clear to me that there are a number of conflicts of interests which you have acknowledged.

*Id.* at 339:3–22.

The Court then went on to describe the many reasons supporting its ruling that the Involuntary Petition was orchestrated by McGuckin in bad faith and that appointment of a Chapter 11 trustee was warranted based upon the extensive evidence presented at the Dismissal Hearing. *Id.* at 339:23–348:19. Immediately after the Dismissal Hearing concluded, McGuckin resigned from his management positions at VAC and withdrew VAC LLC as the general partner of VAC, effective immediately. Case No. 19-17117 ECF 840 ("Recusal Op.") 13.

On February 7, 2020, the Court formally entered the Trustee Order. Case No. 19-17117 ECF 235. As described in detail in the accompanying Trustee Opinion, the Court ultimately

determined that "the involuntary petition was orchestrated by McGuckin in order for McGuckin and the General Partner to obtain a tactical litigation advantage in the Derivative Litigation" and that "[w]hen Gardner reasonably refused to consent to VAC's bankruptcy filing without McGuckin stepping down as General Partner of VAC, McGuckin engineered the filing of VAC's involuntary petition in order to automatically stay the Derivative Litigation," including the sanctions hearing against McGuckin which was to take place the next day in connection with his frivolous litigation tactics in the Derivative Litigation. Trustee Op. 36-37. Furthermore, the Trustee Opinion found that

> (1) the petitioning creditors did not satisfy the statutory criteria for filing the petition, the involuntary petition was not meritorious, and the creditors failed to make a reasonable inquiry into the relevant facts and pertinent law before filing, as evidenced by the fact that: (a) Crestwood did not hold any claims against VAC immediately prior to the involuntary filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin and (b) PVI's $1.2 million claim was entirely false; (2) McGuckin caused PVI to file a UCC Statement on the eve of the involuntary filing which constituted a preference and, more importantly, PVI never loaned any money to VAC; (3) the involuntary filing was used by McGuckin to obtain a disproportionate advantage for himself, and a tactical advantage, in the Derivative Litigation, rather than to protect VAC's interests; and (4) as discussed *supra,* the timing of the filing of the involuntary petition was suspicious since there was no reason that VAC had to be in bankruptcy by November 12, 2019 and McGuckin needed VAC to be in bankruptcy by such date in order to avoid being sanctioned in the Derivative Litigation.

*Id.* at 37-38.

Finally, the Court also found that

> (1) the bankruptcy filing effectively allowed McGuckin to evade the State Trial Court's order to conduct a sanctions hearing against him and the Pennsylvania Supreme Court's denial of McGuckin's appeal to stop the Derivative Litigation; (2) the involuntary petition was filed on the eve of the sanctions hearing against McGuckin in the Derivative Litigation; (3) the Derivative Litigation is potentially one of VAC's largest assets; (4) there was no pressure from VAC's non-moving creditors to be in bankruptcy on November 12, 2019; and (5) the petition was filed solely to create the automatic stay.

*Id.* at 38.

Similarly, the Court concluded "[b]ased upon the evidence submitted to the Court and the
testimony provided at the hearing" that cause existed to appoint a Chapter 11 trustee under 11
U.S.C. § 1104 primarily because of McGuckin's numerous conflicts of interest, detailed in the
Trustee Opinion, which would substantially interfere with his ability as sole member and
manager of VAC's General Partner to discharge his fiduciary duties to VAC to preserve and
maximize estate assets. *Id.* at 39–40. Particularly, the Court noted in the Trustee Opinion that

> McGuckin admitted at trial that he holds multiple conflicts of interest. McGuckin
> is adverse to VAC in the Derivative Litigation, which appears to be a significant
> estate asset, potentially entitling VAC to substantial damages against McGuckin
> and the General Partner. McGuckin admitted at trial that he wants the Derivative
> Litigation to end and has gone to great lengths to hinder this potentially valuable
> litigation through frivolous litigation tactics. McGuckin also holds a conflict of
> interest in pursuing preference claims against his company, PVI, and other
> McGuckin-owned entities, potentially depriving the estate and creditors of
> additional assets.

*Id.* at 40.

Furthermore, the Court explained in the Trustee Opinion that

> not only did McGuckin put his own interests ahead of VAC when he attempted to
> perfect PVI's purported security interest by filing the UCC Statement on the eve
> of VAC's bankruptcy, he directed the filing of the unfounded Cash Collateral
> Motion which sought to give PVI replacement liens on VAC's assets, even
> though PVI has never loaned any funds to VAC. It is clear that, when faced with
> conflicts of interest with VAC, McGuckin always takes action to protect his own
> personal interests at the expense of VAC's interest. Although VAC later withdrew
> the Cash Collateral Motion, it was only after the UST discovered the preferential
> UCC Statement and before the UST even realized that PVI had not loaned VAC
> any money at all.

*Id.*

On February 12, 2020, the Court entered an order approving the appointment of Stephen V.
Falanga as the Chapter 11 trustee for the Debtor ("Chapter 11 Trustee"). Case No. 19-17117
ECF 245.

13

### D. Appeal and Sanctions Motion

Shortly after the Court issued the Trustee Order and Opinion, McGuckin and VAC LLC filed a notice of appeal of the Trustee Order and Opinion to the United States District Court for the Eastern District of Pennsylvania ("District Court") on February 20, 2020 ("Appeal") but did not seek a stay of the Trustee Order pending appeal. Case No. 19-17117 ECF 252. On March 18, 2020, Gardner moved to dismiss the Appeal on the basis that McGuckin and VAC LLC lacked standing to appeal the Trustee Order, and/or had waived their right to appeal by failing to object to the Dismissal Motions ("Motion to Dismiss Appeal"). Case No. 2:20-cv-01028-GEKP ECF 4.

Shortly thereafter, on March 20, 2020, Gardner filed the Sanctions Motion against McGuckin and PVI. Case No. 19-17117 ECF 304 ("Sanctions Mot."). Gardner based his request for sanctions on the Court's findings in the Trustee Opinion that McGuckin had orchestrated the Involuntary Petition in bad faith using false and manufactured claims for the purpose of interfering with state court proceedings and his continued defense of the validity of the false and manufactured claims subsequent to the filing of the Involuntary Petition. Sanctions Mot. 1-2.

Both PVI and McGuckin filed objections to the Sanctions Motion on April 17, 2020. Case No. 19-17117 ECF 351, 352. On April 29, 2020, the Court decided to continue the hearing on the Sanctions Motion in light of the pending Appeal since the basis for the Sanctions Motion related almost exclusively to findings made in connection with the Trustee Order and Opinion which had been appealed. Meanwhile, the parties completed appellate briefing for the District Court on June 24, 2020. *See* Case No. 2:20-cv-01028-GEKP ECF 30.

On March 10, 2021, a hearing on the Sanctions Motion was further continued to May 5, 2021 to give the parties an opportunity to submit briefing addressing this Court's concerns about

14

its jurisdiction to adjudicate the Sanctions Motion in light of the pending Appeal of the Trustee

Order. Case No. 19-17117 ECF 686.

In early April 2021, McGuckin filed a request with the District Court seeking to

supplement the record on Appeal to include deposition testimony from a separate malpractice

action brought by McGuckin against VAC's former corporate counsel concerning VAC's

partnership agreement ("Supplemental Deposition"). *See* Case No. 19-17117 ECF 896, 937

McGuckin Reconsideration Mot. Hrg., Sept. 30, 2021 ("McGuckin Recon. Mot. Hrg."), Ex. M-

1(1), Ex. M-1(2) at 1-2. Instead, on April 15, 2021, the District Court dismissed the Trustee

Order Appeal and remanded the case to this Court to give it an opportunity to determine in the

first instance whether the Supplemental Deposition justified reconsideration of the Trustee

Order. McGuckin Recon. Mot. Hrg. Ex. M-1(2) at 1, 6.

On April 23, 2021, just under two weeks prior to the hearing on the Sanctions Motion,

when concerns about jurisdiction had been mooted by the dismissal of the Appeal, McGuckin

and VAC LLC filed the Recusal Motion seeking this Court's recusal from all proceedings

directly involving the rights and interests of McGuckin or any of his solely or majority owned

entities. Case No. 19-17117 ECF 758. Then, on May 1, 2021, McGuckin and VAC LLC filed a

joint, redacted "Motion for the Court to Consider the Deposition of John E. Royer, Esquire and

Related Evidence on Remand from the District Court" ("Reconsideration Motion"), as well as a

motion to file the Reconsideration Motion under seal ("Motion to Seal"). *Id.* at ECF 774, 775.

However, due to the pending Recusal Motion, the Court refrained from considering the

Reconsideration Motion or Motion to Seal until disposing of the Recusal Motion.

On May 7, 2021, Gardner filed an objection to the Recusal Motion. *Id.* at ECF 794. On

May 19, 2021, the Chapter 11 Trustee filed an objection to the Recusal Motion. *Id.* at ECF 805.

A hearing on the Recusal Motion was conducted on June 9, 2021. *Id.* at ECF 821. On June 25,

2021, the Court issued the Recusal Opinion finding no grounds to recuse itself, and entered an

order denying the Recusal Motion ("Recusal Order"). *Id.* at ECF 840, 841. The Recusal Order

also scheduled a hearing on, *inter alia*, the Motion to Seal for July 7, 2021, and provided that a

hearing date for the Reconsideration Motion and Sanctions Motion would be selected at the July

7 hearing. *Id.* at ECF 841.

However, on July 6, 2021, the day before the hearing on the Motion to Seal, McGuckin

and VAC LLC filed a petition with the Third Circuit Court of Appeals ("Third Circuit") seeking

to have the Third Circuit issue a writ of mandamus reversing the Recusal Order ("Mandamus

Petition"). Case No. 19-17117 ECF 852 Mot. to Stay Ex. A ¶ 1. The same day, McGuckin and

VAC LLC filed with this Court a "Motion for Stay Pending Decision on Petition for Writ of

Mandamus" ("Stay Motion") seeking to have the Court issue an order staying consideration of,

*inter alia*, the Reconsideration Motion and Sanctions Motion pending a decision from the Third

Circuit on the Mandamus Petition.[2] Case No. 19-17117 ECF 852 Mot. to Stay ¶¶ 1. On July 6,

2021, this Court entered an order granting "a temporary stay with regard to the Court's resolution

of the outstanding motions to seal, the sanctions motion and the remand of the appointment of

the Chapter 11 trustee until the earlier of: (a) the Court's resolution of the Motion to Stay; or (b)

denial of the Petition for Writ of Mandamus" and setting a schedule for further briefing on the

Stay Motion. Case No. 19-17117 ECF 853. Ultimately, on July 20, 2021, the Third Circuit

denied the Mandamus Petition. Court of Appeals Case No. 21-2279 ECF 7. Subsequently, an

evidentiary Zoom hearing on the Reconsideration Motion and Sanctions Motion was set for

---

[2] In the Mandamus Petition, McGuckin and VAC LLC also sought a stay from the Third Circuit in the event this Court was not inclined to grant one. Case No. 19-17117 ECF 852 Mot. to Stay Ex. A ¶ 3.

September 30, 2021, and on August 4, 2021, the Court entered an order governing procedures for

that evidentiary hearing ("Zoom Order"). *See* Case No. 19-17117 ECF 881, 883, 908.

Later, on September 15, 2021, McGuckin filed a motion to continue the hearing on the

Sanctions Motion ("Motion to Continue") based upon the unavailability of one of his key

witnesses – Larry McMichael, Esq. ("Mr. McMichael"), former counsel for VAC in the

bankruptcy prior to the appointment of the Chapter 11 Trustee – on September 30, 2021. *Id.* at

ECF 914. Based upon the Motion to Continue, the Court amended the Zoom Order to provide

"[t]he 2nd day of hearings on the Motion of Majority Limited Partner for an Order Imposing

Sanctions against James F. McGuckin and Philadelphia Vascular Institute, LLC (Docket No.

304) will take place on October 1, 2021 at 2:00 p.m. by way of Zoom video conference" to

accommodate Mr. McMichael's scheduling conflict. *Id.* at ECF 920.

On September 30, 2021, the hearing on the Reconsideration Motion and Sanctions

Motion was convened over Zoom ("Sanctions Hearing"). *Id.* at ECF 934. In connection with the

Sanctions Motion, the Court heard testimony from Chris Hall, Esq. ("Mr. Hall"), a partner at

Saul Ewing, who offered extensive testimony respecting his representation of VAC in

connection with a pre-petition qui tam action brought against it by the United States Department

of Justice ("DOJ") which resulted in VAC entering into a settlement agreement with the DOJ to

resolve that litigation ("DOJ Settlement"). *Id.* at ECF 937 McGuckin Recon. Mot. Hrg. Tr., Sept.

30, 2021 ("Sept. 30 Tr.") 88:3-89:19, 92:9-25. While the Court found Mr. Hall to be a very

credible witness, his testimony was largely irrelevant given that the Sanctions Motion was not in

any way based upon McGuckin's actions in connection with the DOJ Settlement. *See generally*

Sanctions Mot.

The first day of the Sanctions Hearing concluded with testimony from David Smith, Esq. ("Mr. Smith"), counsel for the Petitioning Creditors and for PVI in defending against the Sanctions Motion. *See* Case No. 19-17117 ECF 1, ECF 351; Sept. 30 Tr. 186:13, 188:14-24. When questioned regarding Crestwood's assertion of a claim against VAC in the Involuntary Petition, Mr. Smith represented that he had become aware prior to filing the Involuntary Petition that Crestwood had already begun providing services to VAC prior to the petition date, which assured him of the validity of Crestwood's purported claim. Sept. 30 Tr. 194:19-22, 199:19-25, 202:22-203:3, 210:5-11. However, at the Brother's deposition in connection with the Gardner Motion, the Brother had testified consistently and repeatedly that as of November 11, 2019, the day before the Involuntary Petition was filed, and the day that McGuckin contacted him asking him to have Crestwood generate an invoice for VAC, Crestwood had not provided any services to VAC for which Crestwood was owed payment at that time. Sanctions Mot. Hrg. Ex. Gardner 53 at 23:16-18,[3] 24:9-15,[4] 25:2-13.[5]

Mr. Smith also testified that he had valued PVI's purported claim for purposes of the Involuntary Petition at $1.2 million for "secured loans" based primarily upon a spreadsheet detailing PVI's "loans" to VAC which VAC had provided to him; the December 2018

---

[3] Q: So had you provided VAC any services on the day [McGuckin] asked you to create this invoice?
A: No.
[4] Q: So on November 11, 2019, when [McGuckin] contacted you, VAC did not owe Crestwood any money, correct?
A: Correct.
Q: And there were no services provided by Crestwood that you were owed for, correct?
A: Correct.
[5] Q: And why was [McGuckin] requesting this invoice on November 11?
A: So that he can ensure we would be paid by VAC for services that we would perform.
Q: How would that ensure you were paid by VAC?
A: Because it would make them aware of services that they request that they will need to remit payment for.
Q: But you hadn't provided any services, correct, at that point?
A: At that point, correct.

Promissory Note;[6] and "the fact that PVI through Dr. McGuckin, was able to confirm that – that those advances were made along with the fact that VAC, LP confirmed its receipt of those advances…"[7] Sept. 30 Tr. 206:17-208:3, 224:3-7 ("before the petition was filed, I got written verification from PVI that the – the money was advanced to VAC, so I confirmed it on the PVI end through PVI and specifically through Dr. McGuckin.").

Despite Mr. Smith's representation at the Dismissal Hearing that "I was never directed by any of the other lawyers involved in the case, Mr. McMichael's office, any of the State Court counsel, any of the litigants, that filing the involuntary petition had to be done by November 12th…" and that "I was never directed… to file by a certain date…" it came out at the Sanctions Hearing that, in fact, Mr. Smith was directed by McGuckin to file by November 12. Feb. 6 Tr. 312:14-17, 313:8-12; Sanctions Mot. Hrg. Ex. Gardner 40 (email from McGuckin to Mr. McMichael, Mr. Smith, and others, stating "I spoke to Romans [the principal of another potential petitioning creditor, BioMedix] and he needs to convince his partner and he asked for tomorrow morning. If we don't have confirmation by 3pm 11/12/19 I want it filed with and signed on Crestwood.").

The Sanctions Hearing continued on October 1, 2021, and featured testimony from Mr. McMichael, former counsel for VAC in connection with the Involuntary Petition. At the Sanctions Hearing, Mr. McMichael mentioned having concerns leading up to the bankruptcy filing about urgently needing to get the Debtor into bankruptcy primarily in order to make the next payroll and the next payment for the DOJ Settlement, which was due January 1, 2020, and

---

[6] Mr. Smith acknowledged at the Sanctions Hearing that no other promissory notes documenting loans attributable to the remainder of the $1.2 million claim asserted in the Involuntary Petition existed between VAC and PVI. Sept. 30 Tr. 249:1-7.
[7] Although Mr. Smith explained he was provided with a filed UCC, it was "not quite what [he] was looking for" so he was thereafter provided with a record maintained by VAC that broke down the various obligations which VAC purportedly owed to PVI. Sept. 30 Tr. 203:20-204:3.

described the immediate priorities of VAC in bankruptcy as making payroll and restructuring VAC's settlement obligation to the DOJ.[8] Oct. 1 Tr. 13:12-21, 25:23-26:2, 26:22-27:1, 29:22-30:1, 82:13-22; Sanctions Mot. Hrg. Ex. McGuckin 65 at 6. However, Mr. McMichael had no recollection of when payroll was due. Oct. 1 Tr. 76:19-77:14. In fact, the Court observes that at no point during the Dismissal Hearing, particularly when directly questioned regarding the importance of the November 12 filing date, did Mr. McMichael mention that VAC had needed to be in bankruptcy by that date in order to make the next payroll. *See* Feb. 6 Tr. 135:23-136:19. Furthermore, despite Mr. McMichael's testimony at the hearing on the Sanctions Motion that the Debtor needed to be in bankruptcy to make payroll and address its next DOJ Settlement payment, it appears that as of February 26, 2020, shortly after the Chapter 11 Trustee was appointed, "the DOJ payment was made in January from available cash, which is to say without the need for a specific advance under the interim PVI DIP loan" which the Court had approved, and in fact, "generally the Debtor was able to pay its expenses without draws under the PVI DIP loan" with the exception of one unrelated $102,000 payment. Sanctions Mot. Hrg. Ex. Gardner 56.

Notably, evidence was presented at the Sanctions Hearing that on November 7, 2019, less than a week prior to the Involuntary Petition filing and upcoming Derivative Litigation sanctions hearing, counsel for McGuckin advised Mr. McMichael "[t]here is an assessment of fees hearing in Del [aware] County on NOV 13 [sic] *which we want to avoid, so need to be filed before then*." Sanctions Mot. Hrg. Ex. Gardner 23 (emphasis added). Furthermore, evidence from the Sanctions Hearing reflects that on Friday, November 8, 2019, only two business days prior to the November 13 sanctions hearing in the Derivative Litigation, Mr. McMichael and others decided

---

[8] Mr. McMichael incorrectly testified on direct examination that the next DOJ Settlement payment was due December 1, 2019, but it was actually due January 1, 2020. Oct. 1 Tr. 13:15-17, 26:22-27:1.

to pursue an involuntary as opposed to a voluntary petition based upon McGuckin's desire to

have a bankruptcy filed that day. *See* Sanctions Mot. Hrg. Ex. Gardner 27 (email from Mr.

McMichael to partner Anne Aaronson explaining "Change in plans. McGuckin really wants to

file today. The only thing that we can file today is an involuntary, so we need the three creditors.

David Smith will file the involuntary.").

When asked at the Sanctions Hearing to address the Cash Collateral Motion, Mr.

McMichael testified in a conclusory fashion that the Cash Collateral Motion was not an attempt

to elevate PVI's claim in the bankruptcy process and that the Cash Collateral Motion would not

have determined the validity, priority, or extent of any liens or validate an invalid lien, but he

made no attempt to explain the significant discrepancy between the $1.2 million PVI secured

claim asserted in the Involuntary Petition and the over $4 million secured claim asserted in the

Cash Collateral Motion, or address that an order granting the Cash Collateral Motion would have

provided PVI with "replacement liens" for use of cash which it did not have a claim to as

collateral. Oct. 1. Tr. 57:24-59:15. Mr. McMichael claimed to have no recollection of

withdrawing the Cash Collateral Motion, instead opting to speculate that his partner, Anne

Aaronson, who was not a witness at the Sanctions Hearing, was probably the one who handled

the UST's requests for documentation of the loans. *Id.* at 59:16-60:5.

Following the Sanctions Hearing, on October 28, 2021, the Court entered an order

finding McGuckin and PVI liable for sanctions pursuant to 11 U.S.C. § 105(a), the Court's

inherent power, and Rule 9011, and setting a briefing schedule respecting the amount of fees

sought by Gardner in connection with the Involuntary Petition and the reasonableness of the

requested amount. Case No. 19-17117 ECF 947. The initial round of briefing was completed on

January 17, 2022. *Id.* at 1034. Gardner initially requested a blanket award of all fees incurred for

the entirety of the bankruptcy case in his application ("Application"). *Id.* at ECF 1015 Appl. at 1,

¶ 6. In support of their objection to Gardner's blanket fee award request, McGuckin and PVI

submitted a declaration of Jeffrey L. Cohen, Esq. ("Mr. Cohen") ("Cohen Declaration") as an

expert based on his prior experience as a fee examiner in complex Chapter 11 cases, and a report

he drafted based upon the input of Gardner's invoices for his legal fees into "Legal Decoder,

Inc.," a software system which analyzes legal billing and invoice data to generate a list of

problematic billing behaviors ("Cohen Report"). *Id.* at ECF 1032 Obj. to Appl. Ex. 1 ¶¶ 4, 7.

On January 21, 2022, Gardner filed a motion "to strike and exclude the testimony and

declaration of Jeffrey L. Cohen, Esq. ('Cohen') and Legal Decoder, Inc. ('LDI')" ("Exclusion

Motion"). *Id.* at ECF 1041 Mot. to Exclude at 1. After a hearing on the Exclusion Motion, the

Court entered an order on February 3, 2022 ultimately granting the Exclusion Motion largely

based upon the Court's own expertise in fee examining obviating the need for expert testimony

("Exclusion Order"). *Id.* at ECF 1068. However, the Exclusion Order also made clear:

> [t]he Court's determination that given its own expertise, expert testimony would
> not aide it in assessing the reasonableness of the Application does not limit
> McGuckin/PVI's ability to raise any and all objections which it has to the
> reasonableness of the Application. The Court using its own expert knowledge will
> consider each and every one of those objections, simply, without testimony from
> Cohen or reference to his Declaration or Report.

*Id.*

A hearing was thereafter held on February 10, 2022, where the Court determined that it

would only consider those fees and expenses incurred from the petition date through February 7,

2020 and certain other specific categories of fees and expenses incurred after the appointment of

the Chapter 11 Trustee, including: (1) those incurred in connection with McGuckin's resignation

from his position as former CEO of VAC and withdrawal of VAC LLC as VAC's general

partner subsequent to the Dismissal Hearing; (2) those incurred in connection with the Sanctions

Motion; (3) those incurred in connection with the Appeal of the Trustee Order; (4) those incurred

in connection with the Recusal Motion; and (5) those incurred in connection with the

Reconsideration Motion. *Id.* at 1078, 1079. The Court requested a revised application from

Gardner reflecting only fees and costs attributable to the above-mentioned categories, permitted

McGuckin and PVI to submit any updated response they wished to submit, and permitted

Gardner the opportunity to reply to that. *Id.* at ECF 1079. The additional briefing was completed

on April 21, 2022, and a hearing on Gardner's revised application ("Revised Application") was

held and concluded on May 5, 2022.  *Id.* at ECF 1125, 1131.

## III.    DISCUSSION

The Court will now, referencing applicable legal principles, elaborate on its conclusion

that sanctions are warranted against McGuckin and PVI, and determine the reasonable amount of

sanctions to impose.

The Court imposes sanctions against McGuckin pursuant to the Court's inherent power

under 11 U.S.C. § 105(a) and under the Court's statutory power to sanction under Rule 9011.

Sanctions are first warranted against McGuckin pursuant to the Court's inherent power under 11

U.S.C. § 105(a) for orchestrating the filing of a meritless Involuntary Petition against VAC in

bad faith, directing Crestwood to manufacture a false claim in support of that petition, falsely

asserting PVI held a $1.2 million secured claim, consenting to the Involuntary Petition in bad

faith, and affirming the validity of the false claims to further delay the Derivative Litigation.

Second, sanctions are warranted under Rule 9011(b)(1) because McGuckin caused the meritless

Involuntary Petition to be filed for an improper purpose of delaying the Derivative Litigation.

Lastly, sanctions are warranted under Rule 9011(b)(3) because McGuckin certified in the

Involuntary Petition and then continued to affirm PVI's false claim in court representations without reasonable evidentiary support.

With respect to PVI, pursuant to the Court's inherent power under 11 U.S.C. § 105(a) and Rule 9011(b)(1), PVI is liable, jointly and severally with McGuckin, for signing and causing to be filed on PVI's behalf a meritless involuntary Chapter 11 bankruptcy petition against the Debtor in bad faith, and under Rule 9011(b)(3) for certifying without reasonable evidentiary support PVI's false $1.2 million secured claim in the Involuntary Petition.

### A.  Inherent Power to Sanction Improper Conduct Under 11 U.S.C. § 105(a)

Bankruptcy courts, like other federal courts, have inherent powers to impose sanctions for improper conduct that is abusive to the judicial system. *See, e.g.*, *Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc.*, 57 F.3d 1215, 1224 (3d Cir.1995) ("The imposition of sanctions . . . transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself . . . .") (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Bankruptcy courts exercise this inherent power pursuant to section 105(a) of the Bankruptcy Code ("Section 105(a)"). *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005).

Under Section 105(a), bankruptcy courts may "issue any order . . . necessary or appropriate to carry out the provisions" of Title 11 or to take any action or make any "determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). This broad power is intended to be exercised to prevent abuse of bankruptcy procedure.[9] *Ettinger & Assocs. LLC v. Miller (In re Miller)*, 529

---

[9] Under the federal court's inherent power and 11 U.S.C. § 105(a), a court may award sanctions against both attorneys and litigants without regard to the signed document requirement of Fed. R. Bankr. P. 9011. *Ettinger & Assocs. LLC v. Miller (In re Miller)*, 529 B.R. 73, 85 (Bankr. E.D. Pa. 2015); *In re Antonelli,* No. 11-20255/JHW, 2012 WL 280722, at *13 (Bankr. D.N.J. Jan. 30, 2012); *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005).

B.R. 73, 85 (Bankr. E.D. Pa. 2015) (citing *In re Volpert*, 110 F.3d 494, 500 (7th Cir.1997)); *In re Coquico, Inc.*, 508 B.R. 929, 940 (Bankr. E.D. Pa. 2014).

A bankruptcy court is "not required to apply available statutes and procedural rules in a piecemeal fashion where only a broader source of authority is adequate to justify all the necessary sanctions." *In re Rimsat, Ltd.,* 212 F.3d 1039, 1049 (7th Cir. 2000). To assess attorneys' fees as a sanction under the court's inherent power, the court must make an explicit finding that the party against whom sanctions are to be imposed "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 181 (3d Cir. 2002); *Ettinger,* 529 B.R. at 91 (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

### B.  Statutory Power to Sanction Under Rule 9011

Bankruptcy courts also have explicit statutory power to award sanctions. *See In re Bailey*, 321 B.R. at 177-78 (citing Fed. R. Bankr. P. 9011). Pursuant to Rule 9011(b),

> [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, – (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation…[and] (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery…

Ultimately, under Rule 9011(c), "[i]f, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Sanctions may be imposed on a represented party responsible for the violation of Rule 9011(b) because the statutory duties are

25

imposed on all "parties that . . . are responsible for the violation." Fed. R. Bankr. P. 9011(c).

There is no constraint on awarding sanctions against represented parties where the party is

presenting papers to the court for an improper purpose or making allegations or other factual

contentions without current or potential evidentiary support. *See id.*

Courts must evaluate whether Rule 9011(b) has been violated under an objective

standard. *In re Taylo*r, 655 F.3d 274, 282 (3d Cir. 2011). As such, the "pure heart, empty-head"

or subjective good faith defense is inapplicable. *See Lieb v. Topstone Industries, Inc.*, 788 F.2d

151, 157 (3d Cir. 1986). To assess a Rule 9011 violation, the court need not use the benefit of

hindsight but should instead inquire whether what the signer believed at the time the filing was

submitted was "reasonable under the circumstances." *Ettinger,* 529 B.R. at 90. With respect to

Rule 9011(b)(1), "courts may infer the purpose of a filing from the consequences of a pleading

or motion." 10 Collier on Bankruptcy P 9011.04 [7][c] (16th 2021). In fact, "an improper

purpose may be inferred when the effect of a pleading or motion is to delay the proceedings." *Id.*

(citing *Bay State Towing Co. v. Barge Am. 21,* 899 F.2d 129 (1st Cir. 1990)).

With respect to Rule 9011(b)(3), which ultimately imposes a duty on the signer of a

bankruptcy filing to ensure, based upon a reasonable investigation, that "the factual contentions

they submit to the court have (or are likely to have) evidentiary support," the Third Circuit has

directed courts to focus on "whether the party making the representation reasonably believed it at

the time to have evidentiary support" when determining whether a party violated that provision.

*In re Taylor*, 655 F.3d at 282. Where "the presenter knows there is no factual basis to support a

claim," the imposition of sanctions is justified—if not mandatory. 10 Collier on Bankruptcy P

9011.04[8][a] (16th 2021). To be reasonable, the signer must have had "an objective knowledge

or belief at the time of the filing of a challenged paper that the claim was well-grounded in . . .

26

fact." *In re Taylor*, 655 F.3d at 284. Subsequent findings that a claim has other factual support do not imply that an inquiry into the factual allegations was reasonable. *See Crippen v. Stites (In re Crippen)*, 346 B.R. 115, 121-22 (Bankr. E.D. Pa. 2006) (quoting *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994)) ("A signer making an inadequate inquiry into the sufficiency of the facts and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified.").

The requirements of Rule 9011 not only apply to the time papers are signed, filed, or submitted to the court, but also to "later advocating" certain representations to the court. Fed. R. Bankr. P. 9011(b). Continuing to represent a position to the court "after learning that the position no longer has merit" violates Rule 9011. *See In re Coquico, Inc.*, 508 B.R. at 940 (quoting *Theokary v. Abbatiello (In re Theokary)*, 468 B.R. 729, 746 (Bankr. E.D. Pa. 2012) *aff'd*, 2013 U.S. Dist. LEXIS 155413, 2013 WL 5823849 (E.D. Pa. Oct. 29, 2013) (quoting Federal Rules Advisory Committee Note (1993)). Parties have a "continuing responsibility to review and reevaluate pleadings and modify them when it is appropriate." *In re Jazz Photo Corp.*, 312 B.R. 524, 536 (Bankr. D.N.J. 2004) (quoting *Timmons v. Cassell (In re Cassell)*, 254 B.R. 687, 691 (B.A.P. 6th Cir. 2000)). If a party "learns, or has reason to learn, that he will not be able to offer evidence sufficient to sustain his burden," Rule 9011 requires a party to act—up to dismissing a cause of action. *See id.* (quoting *Halverson v. Funaro (In re Funaro)*, 263 B.R. 892, 903-04 (B.A.P. 8th Cir. 2001)).

### C.  McGuckin

#### 1.  Sanctions Against McGuckin are Warranted Pursuant to the Court's Inherent Power Under 11 U.S.C. § 105(a).

Sanctions are warranted against McGuckin under the Court's inherent power for orchestrating the meritless Involuntary Petition in bad faith, consenting to the Involuntary

Petition on behalf of the Debtor for the same bad faith purposes, falsely affirming the validity of the Crestwood and PVI claims in furtherance of that bad faith filing, directing VAC's attempt to obtain "replacement" liens on VAC's assets for PVI, and continuing to falsely affirm PVI's loans to the Debtor in bad faith at the Dismissal Hearing.

First, McGuckin's orchestration of the Involuntary Petition amounted to a bad faith abuse of the bankruptcy system warranting sanctions. *See* Trustee Op. 28, 36, 39. In order to protect his own personal interest in further delaying the Derivative Litigation, which threatened McGuckin and his solely owned entity with potentially significant liability, from finally proceeding to trial, and in avoiding the upcoming sanctions hearing in the Derivative Litigation, McGuckin used the bankruptcy system to interfere with the Derivative Litigation,[10] falsely representing that PVI had a $1.2 million secured claim when he was entirely aware that PVI had not loaned any funds to the Debtor, and directing his Brother to manufacture an invoice when he knew that Crestwood did not have an outstanding claim against VAC, in furtherance of that bad faith Involuntary Petition. *Id.* at 37. *See also* Feb. 6 Tr. 176:22–181:7; Sanctions Mot. Hrg. Ex. Gardner 53 at 22:10-22.

Although VAC was in financial distress at the time of filing, which the Court recognized in deciding to appoint a trustee, financial distress was clearly not the primary motivation for filing for bankruptcy on the specific date of November 12, 2019, the date McGuckin informed his Brother it had "to go down," for all the reasons stated in the Trustee Opinion.[11] Sanctions

---

[10] While Mr. McMichael testified that he had attempted to reassure Gardner's counsel that Gardner's position in the Derivative Litigation would not be prejudiced by the bankruptcy filing, he ignored that, in effect, the automatic stay would and did significantly prejudice Gardner and the Derivative Litigation Plaintiffs by further stalling the Derivative Litigation's resolution even more than McGuckin already had through his "frivolous" litigation tactics detailed *supra*. Oct. 1 Tr. 26:13-22.

[11] That the Court ultimately determined pursuant to 11 U.S.C. § 1112(b)(1) that appointing a trustee was preferable to dismissal, and in the best interests of creditors and the estate over dismissal, primarily to give VAC an opportunity to reorganize without concerns over McGuckin's management, does not undermine the Court's

Mot. Hrg. Ex. Gardner 53 at 27:23-28:1. In fact, McGuckin's counsel informed Mr. McMichael

on November 7, 2019, just days before the filing, that a bankruptcy petition had to be filed before

the sanctions hearing set for November 13, 2019 in the Derivative Litigation in order to avoid it,

and McGuckin himself directed Mr. McMichael and Mr. Smith on November 11, 2019 that the

Involuntary Petition had to be filed with Crestwood if they could not get a third creditor on board

by 3:00 PM on November 12, 2019, further belying the Court's conclusions reached in the

Trustee Opinion respecting the purpose of the petition to delay resolution of the Derivative

Litigation, which McGuckin had attempted to do many times prior to the bankruptcy through the

use of litigation efforts described as "frivolous" as detailed *supra*. Sanctions Mot. Hrg. Ex.

Gardner 23, Ex. Gardner 40. Furthermore, despite VAC facing financial distress for a few years

prior to the Involuntary Petition due in significant part to changes in the Medicare reimbursement

structure and DOJ Settlement, McGuckin had not previously taken any significant steps towards

this path until the sanctions hearing and trial in the Derivative Litigation became imminent. Mr.

McMichael's testimony that VAC needed to be in bankruptcy to obtain a DIP loan to make

payroll the following week and its DOJ Settlement payment, which was not due until January

2020, was not only not credible, but even more importantly, was not supported by the record. No

other reason was offered regarding why the filing had to take place on November 12, 2019.

McGuckin's bad faith abuse of the bankruptcy system only continued when he readily

consented to the Involuntary Petition on behalf of the Debtor despite the obvious falsehoods

contained therein respecting the Petitioning Creditors' bogus claims, which McGuckin was

certainly aware of as the principal of PVI and as the individual instructing his Brother to generate

an invoice on behalf of Crestwood. Through his consent to the Involuntary Petition, McGuckin

---

conclusion that the case was orchestrated in bad faith in order to gain a litigation advantage against Gardner and
others in the Derivative Litigation, and dismissal would have been fully justified on that basis.

affirmed the validity of the Crestwood and PVI claims despite the fact that both had been manufactured at his direction. Trustee Op. 21-22, 37.

The Court further finds that the meritless Cash Collateral Motion was advanced by McGuckin in bad faith in an outrageous attempt to obtain "replacement" liens on VAC's assets to which PVI had absolutely no entitlement. Filed a week after the Involuntary Petition claimed PVI had loaned VAC $1.2 million, the Cash Collateral Motion represented that PVI held *the only* secured claim in the case of over *triple* that amount at $4,257,626. Trustee Op. 21-23. No evidentiary support was ever offered to substantiate this amount aside from the bogus UCC Statement which had no basis in fact and was filed just one week before the petition date. In fact, by the Sanctions Hearing, Mr. McMichael claimed to have no recollection of proffering that amount in the Cash Collateral Motion. Oct. 1 Tr. 121:2-13, 123:3-10. Although VAC later withdrew the Cash Collateral Motion, it was only after the UST discovered the preferential UCC Statement and before the UST even realized that PVI had not loaned VAC any money at all. Trustee Op. 40. Advancing this Cash Collateral Motion amounted to a disturbing bad faith abuse of bankruptcy procedure because, as noted in the Recusal Opinion, if the UST had not discovered that PVI's purported secured claim advanced in the Cash Collateral Motion lacked any basis in fact, "PVI would have held a blocking position in VAC's bankruptcy, as VAC's sole secured creditor, which would have resulted in PVI's claim being paid ahead of all of VAC's unsecured creditors and limited partners." Recusal Op. 11.

Finally, McGuckin's false testimony at the Dismissal Hearing continuing to affirm the validity of PVI's false $1.2 million claim first asserted in the Involuntary Petition was given in bad faith in defense against the Dismissal Motions. This testimony was completely undone by the UST's cross examination at the Dismissal Hearing when McGuckin was forced to admit

PVI's purported $1.2 million claim had no basis in fact when confronted with the UST's

evidence that "PVI actually had not loaned any amount to VAC." Trustee Op. 26. On direct

examination at the Dismissal Hearing, McGuckin could have chosen to clarify on his own the

true basis for his asserted PVI claim, that he considered any funds paid by him or his entities to

VAC as attributable to PVI, which would not have changed the validity of PVI's claim, but

would have avoided misleading the Court. Based upon the foregoing, under the Court's inherent

power to prevent abuses of the bankruptcy process, sanctions are warranted against McGuckin

for all the bad faith conduct described *supra*.

### 2.  Sanctions Against McGuckin Are Warranted Under Rule 9011(b)(1).

The Court also finds sanctions are warranted against McGuckin pursuant to Rule

9011(b)(1) for causing the Involuntary Petition, which he signed on behalf of PVI, to be filed for

an objectively improper purpose, *i.e.*, stalling the Derivative Litigation and particularly, the

sanctions hearing in that litigation scheduled for the day after the petition date.[12] As discussed

*supra* in connection with Section 105(a), no one has ever offered any other credible explanation

for why VAC had to be in bankruptcy by November 12, 2019, and no evidence from the

Sanctions Hearing has given the Court any objectively reasonable basis to conclude that

McGuckin orchestrated the Involuntary Petition for a proper purpose, particularly given

McGuckin's desire to have the Petitioning Creditors proceed with the filing with such urgency

and in the absence of any merit to two of the three Petitioning Creditors' claims. Trustee Op. 37.

Ultimately, as discussed at length in the Trustee Opinion, the "suspicious" timing coincided with

McGuckin's need for "VAC to be in bankruptcy by such date in order to avoid being sanctioned

in the Derivative Litigation" and with the Pennsylvania Supreme Court's denial of his Supreme

---

[12] The twenty-one day "safe harbor rule" prescribed by Rule 9011(c)(1)(A) does not apply when the challenged paper is a petition. Fed. R. Bankr. P. 9011(c)(1)(A).

Court Petition, clearing the way for the Derivative Litigation to finally proceed to trial. *Id.* at 37-38. Based on the foregoing, it would have been objectively apparent that the Involuntary Petition had been orchestrated by McGuckin merely as a desperate, abusive attempt to further delay the Derivative Litigation.

### 3. Sanctions Against McGuckin Are Warranted Under Rule 9011(b)(3).

Sanctions are warranted against McGuckin pursuant to Rule 9011(b)(3) for asserting and later affirming factual allegations which did not have evidentiary support. By consenting to the Involuntary Petition on behalf of the Debtor, McGuckin as the individual signing the consent document certified without reasonable evidentiary support the false representations that PVI had lent VAC $1.2 million, and that Crestwood held a claim against Debtor. Trustee Op. 22, 37. McGuckin knew at the time the Involuntary Petition was filed that no evidentiary support existed for those positions, as he coordinated, with his Brother, Crestwood's participation in the involuntary as a creditor despite being informed by his Brother that VAC had no outstanding balance due to Crestwood as of November 2019, and despite knowing as the owner of PVI that it had not lent any funds to VAC. McGuckin continued to falsely affirm and advocate through his testimony on direct examination at the Dismissal Hearing that PVI had loaned $1.2 million to the Debtor despite the absence of any evidentiary support for that position. *Id.* at 22, 25-26. This is precisely what Rule 9011(b)(3) prohibits and what Rule 9011(c) defines as sanctionable.

### D. PVI Jointly and Severally with McGuckin

### 1. PVI Is Subject to Sanctions Pursuant to Rule 9011(b)(1).

Sanctions are also warranted against PVI jointly and severally with McGuckin under Rule 9011(b)(1) because McGuckin signed the bad faith Involuntary Petition on behalf of PVI for the improper purpose of advancing McGuckin's own personal interest in obtaining a tactical

litigation advantage in the Derivative Litigation. Given the timing of events in the Derivative

Litigation in relation to the Petition Date as discussed extensively *supra,* as well as the fact that

PVI held no claim against VAC based on secured loans at all, it is objectively apparent that PVI

improperly authorized the Involuntary Petition to serve McGuckin's own interests regardless of

the lack of merit to that petition,[13] and that sanctions under Rule 9011(b)(1) are warranted

against PVI jointly and severally with McGuckin for doing so.

### 2.    PVI Is Subject to Sanctions Pursuant to Rule 9011(b)(3).

Sanctions are also warranted against PVI jointly and severally with McGuckin under

Rule 9011(b)(3) based upon McGuckin falsely certifying on PVI's behalf in the Involuntary

Petition without *any* evidentiary support that PVI had lent VAC $1.2 million when in fact, it had

lent no money to VAC whatsoever. Thus, sanctions are warranted against PVI, jointly and

severally with McGuckin based upon McGuckin's conduct as its representative.

### IV.    SANCTIONS AMOUNT

#### A.  Reasonableness of Sanctions Amount

Gardner, McGuckin, and PVI appear to agree that *Goodyear Tire & Rubber Co. v.

Haeger,* 137 S. Ct. 1178 (2017), governs which of Gardner's fees and costs may be charged to

McGuckin as a sanction for bad faith conduct, particularly pursuant to the Court's inherent

power. *Goodyear,* 137 S. Ct. at 1183-84; Case No. 19-17117 ECF 1015 Appl. ¶¶ 10, 17, ECF

1032 Obj. to Appl. ¶¶ 11, 12, 13, 14, 15, 16, 17, 25, 32, 33, ECF 1034 Appl. Reply ¶ 14. Under

*Goodyear,* Gardner can "recover 'only the portion of his fees that he would not have paid but

---

[13] The Court is equally dismayed that it does not even appear that counsel for the Petitioning Creditors was
particularly concerned with the validity of the claims asserted in the Involuntary Petition. At least with respect to
Crestwood, Mr. Smith's testimony that he assured himself that Crestwood had begun to perform services in advance
of the petition date was entirely contradicted by the Brother's deposition testimony in connection with the Dismissal
Motions.

for' the misconduct."[14] *Goodyear,* 137 S. Ct. at 1187 (quoting *Fox v. Vice*, 563 U.S. 826, 836

(2011)). Such an order must be compensatory, not punitive, requiring the court to "establish a

causal link – between the litigant's misbehavior and legal fees paid by the opposing party." *Id.*

Any award of attorneys' fees pursuant to the court's inherent authority may only include fees the

complaining party would not have paid but for the misconduct. *Id.* Thus, under Section 105(a),

courts may impose remedial sanctions aimed at compensating an aggrieved party for damage

caused by the misconduct, including reimbursement for legal fees and expenses incurred.[15]

*Crawford v. Margabandhu (In re Maya Restaurants, Inc.),* 585 B.R. 761, 776 (Bankr. W.D. Pa.

2018).

Courts within this circuit apply the lodestar method to calculate a reasonable fee award.

*Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir. 2001) ("In assessing the reasonableness of a

claimed fee in cases like this, we use the 'lodestar' formula…"); *Cmty. Ass'n Underwriters of

Am. v. Queensboro Flooring Corp.*, No. 3:10-CV-1559, 2016 U.S. Dist. LEXIS 187125, at *5-6

(M.D. Pa. Mar. 18, 2016) ("The starting point for determining the reasonableness of attorney's

fees is the lodestar calculation…"); *In re Diloreto*, 388 B.R. 637, 652 (Bankr. E.D. Pa. 2008).

*See also In re Crystal Cathedral Ministries*, Case No. 2:12-bk-15665-RK, 2020 WL 1649619, at

*56 (Bankr. C.D. Cal. March 31, 2020) (fees awarded pursuant to the court's inherent power

must be reasonable and the lodestar calculation is the customary method for assessing the

amount of reasonable attorneys' fees to be awarded in a bankruptcy case). The lodestar method,

which multiplies hours worked by the attorney's hourly billing rate, is generally presumed to

---

[14] Similarly, Rule 9011(c)(2) permits courts to award as a sanction an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation if imposed on motion and warranted for effective deterrence.

[15] The Court observes that under Rule 9011(c)(2), sanctions may consist of or include an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation, echoing the mandate from *Goodyear* that courts award no more than those fees and costs which bear a direct causal link to the specific violation.

result in a reasonable fee. *Maldonado,* 256 F.3d at 184; *River Light V, L.P. v. Lin & J Int'l, Inc.*,

No. 13cv3669 (DLC), 2015 U.S. Dist. LEXIS 82940, at *29 (S.D. N.Y. June 25, 2015); *Tangible*

*Value, LLC v. Town Sports Intern. Holdings*, No. 10-1453-MAS-TJB, 2014 WL 6485972, at *4

(D. N.J. Nov. 19, 2014). However, the opposing party may object on the basis that an adjustment

is warranted, and courts have broad discretion to determine the number of hours reasonably

expended. *In re Crystal Cathedral Ministries*, 2020 WL 1649619, at *56; *Endurance Am. Spec.*

*Ins. Co. v. Hospitality Supp. Sys. LLC*, Civ. Act. No. 17-3983, 2018 WL 3861808, at *5 (E.D.

Pa. Aug. 14, 2018); *Tangible Value, LLC,* 2014 WL 6485972, at *5. The party requesting fees

bears the initial burden of demonstrating the reasonableness of the requested fees by submitting

evidence supporting the hours worked and rates claimed. *Community Ass'n Underwriters of*

*America,* 2016 WL 1076910, at *2; *River Light V, L.P.,* 2015 U.S. Dist. LEXIS 82940, at *29;

*Blakey v. Continental Airlines, Inc.,* 2 F. Supp. 2d 598, 602 (D. N.J. 1998) ("The party requesting

fees bears the burden of proving that the request is reasonable.").

    In determining reasonableness, the court must closely scrutinize the request to ensure the

fees do not exceed a reasonable amount. *Endurance*, 2018 WL 3861808, at *5. In particular,

when awarding fees, courts must conduct "a thorough and searching analysis" to decide whether

the hours were reasonably expended for each purpose described, and exclude those which are

excessive, redundant, or unnecessary. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 426 F.3d

694, 711 (3d Cir. 2005) ("in reviewing the hours claimed in a fee application, a district court

must conduct a 'thorough and searching analysis' to identify [excessive, redundant, or

unnecessary] charges."); *Maldonado,* 256 F.3d at 184 ("In calculating the hours reasonably

expended, a court should 'review the time charged, decide whether the hours set out were

reasonably expended for each of the particular purposes described and then exclude those that

35

are excessive redundant, or otherwise unnecessary.'"); *Endurance,* 2018 WL 3861808, at *5.

This task involves evaluating the billing records "line by line" and a fair amount of "judgment

calling" based on the court's experience. *Tangible Value*, 2014 WL 6485972, at *5-6. "Hours are

not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v.*

*Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). *See also Blakey,* 2 F. Supp. 2d at 604 ("No

compensation is due for…hours that are 'excessive, redundant, or otherwise unnecessary.'"). For

example, "where three attorneys are present at a hearing where one would suffice, compensation

should be denied for the excess time." *Blakey,* 2 F. Supp. 2d at 604.

Courts may also deduct hours that are inadequately documented, and the presentation of

billable hours should include sufficient detail to permit the court to determine how the hours

were divided. *Id.* "[A] bankruptcy judge's experience with fee petitions and his or her expert

judgment pertaining to appropriate billing practices, founded on an understanding of the legal

profession," will inform any analysis. *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 854 (3d Cir.

1994). All that said, the essential goal in fee shifting is to do "rough justice," not to achieve

"auditing perfection." *Goodyear,* 137 S.Ct. at 1187. Therefore, a court may take into account its

sense of a suit, use estimates in calculating an attorney's time, and decide that all or only a

percentage of a category of expenses were incurred solely because of the sanctioned party's

misconduct. *Id.*

### B.  $1,417,861.75 in Fees/Expenses Constitutes a Reasonable Award.

Initially, Gardner requested a sanctions award jointly and severally against McGuckin

and PVI in the base amount of $2,509,834.76, constituting all fees and costs expended during the

entirety of VAC's bankruptcy case as of the date the Application was submitted. Case No. 19-

17117 ECF 1015 Appl. at 1, ¶ 6. In applying the test set forth in *Goodyear*, that the Court may

only award those fees and costs which would not have been incurred "but for" McGuckin's

misconduct of orchestrating[16] and consenting to the bad faith Involuntary Petition, the Court

agrees that "but for" this conduct, Gardner would not have incurred certain fees and expenses in

this case, particularly those expended seeking dismissal or the appointment of a trustee from the

petition date through February 7, 2020 when the Trustee Order was entered. None of those fees

and costs would have been incurred had McGuckin not orchestrated or consented to the

Involuntary Petition or continued to defend it and the claims underlying it up to the Dismissal

Hearing, and bear a sufficient causal connection to the sanctioned conduct in this case. However,

once the Court granted Gardner's request to appoint the Chapter 11 Trustee in order to

immediately remove McGuckin from control of the Debtor, the remaining fees and costs

incurred, aside from certain categories which will be discussed below, were primarily

attributable to Gardner's desire to participate in the bankruptcy proceeding under the supervision

of a neutral trustee and to protect his interests, and not attributable solely to McGuckin and PVI's

sanctioned misconduct.[17]

        The Court has separately determined that only those fees and expenses incurred after

February 7, 2020 which are directly causally connected to McGuckin and PVI's sanctioned

conduct may be compensated, if reasonable. Those general categories include fees and expenses

incurred in connection with: McGuckin's resignation from his position as former CEO of the

Debtor and withdrawal of VAC LLC as the Debtor's general partner immediately subsequent to

the Dismissal Hearing;[18] Gardner's Sanctions Motion, as the Sanctions Motion was clearly

---

[16] And through McGuckin, PVI's misconduct of causing the Involuntary Petition to be filed in bad faith.

[17] Furthermore, the Court is well within its authority to exercise its potent inherent powers with "discretion and restraint" in this manner by limiting the categories of expenses for which Gardner may receive compensation. *See In re Crystal Cathedral Ministries*, 2020 WL 1649619, at *28 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

[18] Gardner's expenses incurred replacing the General Partner and CEO so immediately and assisting the new Trustee with quickly understanding the Debtor's complex business are expenses Gardner would not have had to incur had a

brought solely on account of McGuckin and PVI's sanctionable conduct in filing, consenting to, and defending the Involuntary Petition;[19] the District Court Appeal of the Trustee Order, which, similarly, is directly connected to the actions surrounding the filing of the bad faith Involuntary Petition, and expenses attributable to the Appeal would not have been incurred but for the orchestration and defense of the bad faith Involuntary Petition which resulted in the entry of the appealed Trustee Order; McGuckin's Recusal Motion because it related entirely to determinations and statements made in connection with the proceedings for the Dismissal Motions, and expenses for defending against the Recusal Motion would not have been incurred but for the orchestration of, consent to, and defense of the bad faith Involuntary Petition; and McGuckin's Reconsideration Motion, as expenses Gardner incurred defending against it would not have been incurred but for McGuckin orchestrating, consenting to, and defending the Involuntary Petition, as those actions necessitated the entry of the Trustee Order up for reconsideration.[20]

As mentioned *supra,* based on the Court's determination respecting which categories of fees and expenses Gardner may seek compensation for in connection with the Sanctions Motion, Gardner submitted the Revised Application requesting fees and costs in the total base amount of

---

bad faith bankruptcy petition never been filed. That these expenses were a natural consequence to the Court's entry of the Trustee Order does not change that they would not have been incurred absent the sanctioned bad faith conduct.

[19] The Court's determination that Gardner may apply for compensation for reasonable fees and costs incurred in connection with the Sanctions Motion is solely based upon the fact that those fees and costs would not have been incurred but for McGuckin and PVI orchestrating a bad faith Involuntary Petition, not upon any suggestion that defenses to the Sanctions Motion asserted by McGuckin and PVI were frivolous.

[20] The justification for permitting Gardner to apply for compensation for reasonable fees and costs incurred in connection with the Appeal, Recusal Motion, and Reconsideration Motion is not that these filings themselves were sanctionable or frivolous, but rather, that fees and costs incurred in connection with those filings simply would not have been incurred had McGuckin and PVI not orchestrated the filing of a bad faith involuntary bankruptcy petition. Thus, any award of reasonable fees and costs for these filings would not constitute an award for any type of misconduct occurring before an appellate court and, in fact, the Recusal Motion and Reconsideration Motion were filings in this Court, not an appellate court, in any event.

$1,480,029.35.[21] Case No. 19-17117 ECF 1106 Rev. Appl. ¶ 9. In support of the reasonableness

of the fees and costs sought in the Revised Application, Gardner submitted the invoices and

timesheets of his firm, Faegre Drinker Biddle & Reath LLP ("Drinker"), which evidence the

hours worked and rates claimed in this matter, and two declarations from one of his attorneys,

Richard Coe, Esq. ("Mr. Coe") who is a partner at Drinker, authenticating the invoices and

timesheets, and, *inter alia,* describing the background and credentials of Drinker attorneys who

performed significant portions of the services for the VAC bankruptcy case, and detailing how

the rates charged by Drinker compare to its peers in the marketplace. *Id.* at ECF 1015 Appl. Ex.

A, ECF 1106 Rev. Appl. Ex. A. Notably, the actual hourly rates billed by Drinker to Gardner in

this case are already discounted by 10% from the attorneys' standard hourly rates. *Id.* at ECF

1015 Appl. Ex. A ¶ 16. The materials submitted in support of the Revised Application specify

the date when the work was performed, the attorney performing the work, the nature of the work,

the amount of time spent on the task, and the hourly rate charged for that particular task.[22] *See id.*

---

[21] The Court observes that included in this amount is a charge for $810 which was billed on 11/8/19 prior to the petition date of 11/12/19. The Court set the cut off at the petition date, and accordingly, must reduce the requested amount by $810. *See* Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A.

[22] McGuckin and PVI have not objected to Gardner's attorneys' hourly rates. Gardner has offered evidence that those rates are in line with the prevailing market rate in the relevant community. *See* Case No. 19-17117 ECF 1015 Appl. Ex. A ¶¶ 15 ("I have reviewed the most recent available survey of standard hourly billing rates in comparable AmLaw 100 firms in the area, conducted by an industry leading third-party multinational consulting firm that…collects and analyzes legal billing data to help firms determine appropriate rates. That survey indicates that Faegre Drinker's standard billing rates are below the median of both the participating AmLaw 100 firms and, more directly, our immediate group of peer firms."), 17 ("Judges in the United States District Court for the Eastern District of Pennsylvania have repeatedly found that Faegre Drinker's rates are reasonable in comparison to other firms in the Philadelphia market."), 18, 19 ("The rates charged by Faegre Drinker in this matter also compare favorably to the rates listed by several peer firms in retention applications filed in cases in this Court and other bankruptcy courts in the Third Circuit. In addition to being court approved, the creditors' committees in those cases agreed to pay the rates, demonstrating that they are market."). The Court in its expert judgment agrees that the hourly rates of Gardner's attorneys are reasonable compared to the prevailing market rates in the community for other similarly situated practitioners. *See Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir. 2001) ("Generally, a reasonable hourly rate is calculated according to the prevailing market rates in the relevant community. The court 'should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'").

at ECF 1015 Appl. Ex. A; ECF 1106 Rev. Appl. Ex. A. McGuckin and PVI have lodged

objections, which the Court will address[23] in turn.[24] *See id.* at ECF 1032, 1119.

_____

[23] In addressing the objections of McGuckin and PVI, the Court references *infra* the Cohen Declaration and Cohen Report, including exhibits thereto, which McGuckin and PVI had submitted, only for ease of citation. *See* Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1. As the Court specified in its order granting the Exclusion Motion, the Court treats the problematic entries identified by Mr. Cohen in his Report, Declaration, and accompanying exhibits as entries which McGuckin and PVI themselves object to, and although the Court cites to the Report, Declaration, and exhibits simply to identify where the entries McGuckin and PVI find problematic are located on the record, the Court resolves the objections on its own without giving any weight or consideration to Mr. Cohen's opinions or Legal Decoder's assessment regarding the Application and Revised Application. *See id.* at ECF 1068.

[24]     Certain categories of objections will only be briefly addressed in this footnote. McGuckin and PVI initially objected to certain time entries which had been redacted from the timesheets in the original Application. Case No. 19-17117 ECF 1032 Obj. to Appl. ¶¶ 47, 58. The timesheets attached to the Revised Application do not contain any redacted entries, rendering that objection moot. *See id.* at ECF 1106 Rev. Appl. ¶ 8, Ex. A.

McGuckin and PVI also objected to entries purportedly reflecting legal research occurring in "an hourly amount in excess of client's guidelines for pre-approval." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at 6. This objection confuses the Court given that there is no evidence of record or indication that Gardner's counsel billed for legal research in excess of what Gardner would have pre-approved, or evidence reflecting how much legal research Gardner pre-approved at all. In fact, Gardner paid all fees, suggesting that the research did not exceed what he would have approved. Accordingly, the Court simply has no basis to make any reductions for this particular objection.

McGuckin and PVI further object to entries purportedly reflecting that "more than one timekeeper bills for the same telephonic call without client pre-approval." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. Again, the Court lacks evidence that Gardner's counsel billed for multiple timekeepers on a call without his pre-approval and, therefore, simply has no basis to make reductions for this objection.

Another objection McGuckin and PVI lodge to the Revised Application is based upon the contention, without citation to legal authority, that entries reflecting tasks for which a creditor's attorney would not be compensated in a routine chapter 11 case absent applying for a substantial contribution claim should be disallowed. *Id.* at ECF 1032 Obj. to Appl. 1 Cohen Decl. ¶¶ 26, 27. The Court is puzzled by this objection. The Court through its inherent powers as enforced through Section 105(a) may award fees and costs which would not have been incurred but for the sanctioned conduct, as discussed at length *supra*. This standard is completely unrelated to whether a creditor's attorney would be compensated for performing certain tasks without asserting a substantial contribution claim.

McGuckin and PVI also object to certain entries where multiple tasks were recorded in a single entry without breaking down the time spent on each task. *Id.* at ECF 1032 Obj. to Appl. ¶¶ 38, 39, 55. In the timesheets submitted with the Revised Application, "Faegre Drinker personnel broke down nearly all of the narratives that contained multiple tasks – so called 'lump billed' entries – by, among other things, comparing tasks without time details with corresponding entries by other timekeepers engaged in the same activity, reviewing contemporaneous records, and good faith estimates based on typical times needed for particular tasks." *Id.* at ECF 1106 Rev. App. Ex. A ¶ 5. Accordingly, Gardner's counsel has, at least for the most part, sufficiently addressed this objection.

McGuckin and PVI also object to entries which purportedly reflect "billing by junior legal personnel for activities where primary involvement by junior timekeeper pertains to his or her professional development and internal law firm training purposes." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. The two entries corresponding with this objection relate to one associate performing legal research on the standard for dismissing a Chapter 11 case and another associate performing research on sanctions cases for Mr. Coe. *See id.* ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. entry dated 11/14/19 for Dallas Taylor; Ex. 1 at Ex. E of Cohen Decl. entry dated 4/22/20 for Timothy Gilbert. The Court has no basis to conclude that this research was merely part of professional development or law firm training, and the Court has no idea how McGuckin and PVI arrived at the conclusion that it was, rather than simply exactly what the entries say – legal research in service of the Gardner Motion and Sanctions Motion.

McGuckin and PVI further object to the allowance of certain entries reflecting that timekeepers worked more than eight hours in a given day based upon their apparent position that "[t]imekeepers [sic] efficiency levels

decrease when working in excess of 8 [sic] hours per day." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. The Court simply has no basis to assign an arbitrary cut off time to the amount of hours which an attorney can reasonably work in a day and will, therefore, make no reductions on this basis.

McGuckin and PVI also object to Gardner recovering for entries reflecting a "[m]eeting or conference attended by more than one timekeeper." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. This objection also puzzles the Court, as meetings and conferences would necessarily require more than one timekeeper. The Court has not located any authority mandating disallowance of a requested fee solely based upon more than one timekeeper attending a meeting or conference. Therefore, the Court will not make any adjustments based on this objection.

McGuckin and PVI make another objection to entries which reflect a timekeeper billing in "round hour increments with statistically improbable frequency." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 Cohen Decl. ¶ 18. Ultimately, in assessing a fee application, while it should include "some fairly definite information as to the hours devoted to various general activities…it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted…" *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1037-38 (3d Cir. 1996). In fact, such a requirement would be completely impractical and unworkable. The timesheets submitted with the Revised Application provide sufficient documentation of the approximate time spent on each task and therefore, that timekeepers billed in some round hour increments alone does not provide a sufficient basis for an adjustment.

McGuckin and PVI also take issue with entries reflecting that a "narrative is repeated verbatim." Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. That tasks are described in the same manner alone does not mean that they were not performed or that they were not reasonable tasks. Therefore, without more, the Court has no reason to make an adjustment to any award on this basis.

McGuckin and PVI also object to entries where legal research has been memorialized in a written medium. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. The Court has scrutinized the few entries objected to on this basis, and it has left the Court puzzled by objections to entries corresponding with this category. Some, for instance, do not reflect that research was put into a written medium. For example, on 11/15/19, associate Dallas Taylor billed to "[r]evise shell [Gardner Motion] with updated factual outline and introductory statement, research process to obtain expedited discovery in E.D. Pa. bankruptcy court." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. This entry does not reference Mr. Taylor memorializing his legal research into a written medium. The same is true of an entry dated 1/10/2020 where then-associate Nicholas Feltham billed to "[r]eview, revise, and draft outline for J. McGuckin deposition; research potential exhibits for same." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. This entry does not reflect that Mr. Feltham put any legal research into a written form. Similarly, on 10/1/21, Mr. Coe billed to "[p]repare for and attend hearing on motion for sanctions; conferences with J. Argentina and B. Morgan re: same; review and revise McMichael cross-examination outline; review research on authentication of emails; conference with J. Argentina, B. Morgan and M. Brown re: hearing and next steps; conference with client re: same." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. E of Cohen Decl. Again, this entry simply does not reflect that Mr. Coe put any legal research into a written medium. As for the other entries objected to under this category, one entered on 5/20/20 by then-associate Brian Morgan reflects that he billed to "[r]eview opinion appointing chapter 11 trustee, McGuckin's appellate brief and outline appeal brief; conduct accompanying research." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. E of Cohen Decl. Gardner's counsel had to draft an appellate brief in connection with the Trustee Order Appeal, and it strikes the Court as obvious that Gardner's counsel would need to conduct some research in order to do so. The Court fails to see anything objectionable about Mr. Morgan billing both to do research for an appellate brief and then to begin drafting that appellate brief. Lastly, an entry entered 6/8/21 by attorney Joseph Argentina reflects that he billed to "[g]ather pleadings and recommend edit to argument on Cohen MTD to FDBR personnel drafting (.3); call with counsel to Trustee on recusal hearing and other matters (.4); call with R. Coe on recusal hearing (.2); prepare for recusal hearing (research, argument outline) (5.4); email with EHS personnel regarding sale and operational issues (.3); email with counsel to North Shore landlord (.2)." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. E of Cohen Decl. It does not strike the Court as at all objectionable to prepare an outline for oral argument for a hearing. Therefore, the Court finds no basis to make adjustments for entries objected to under this category.

McGuckin and PVI also object to certain entries based upon their position that "[r]outine motions should be prepared by very junior personnel with a modest level of review by non-junior personnel." *Id.* at ECF 1032 Ex. 1 at Ex. B, D of Cohen Decl. The Court has reviewed the few entries objected to on that basis and is puzzled. For instance, they object to an entry from 11/21/19 reflecting then-senior attorney Joseph Argentina billed .4 hours to "[r]eview and revise form of pro hac vice motions and distribute drafts to DBR team," .2 hours to "confer with B.

Morgan on revisions to motion to appoint trustee or dismiss," and .7 hours to "review cash collateral motion and order." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. This entry appears to reflect the exact "modest level of review" which McGuckin and PVI demand from a senior attorney, and does not reflect that Mr. Argentina drafted any motion. The Court would be constrained to find more modest review than that described in this entry for both the pro hac vice motion and very complex Gardner Motion seeking dismissal or the appointment of a trustee. Similarly, in another objected to entry dated 11/21/19, then-associate Nicholas Feltham with a billing rate of only $550/hour billed .4 hours to review the motion to seal the Gardner Motion and pro hac vice motion, which is not only modest review, but modest review performed by a *junior* associate, and does not reflect that he drafted any motion. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Another objected to entry dated 11/25/19 reflects that Mr. Argentina billed only .3 hours at only $525/hour, less than that of then-associate Mr. Feltham, to coordinate preparation of notice and service of motion papers which, again, appears to the Court to be a very modest amount of time. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Finally, an objected to entry from 1/3/20 by then-associate Brian Morgan does not reflect he drafted or reviewed any motions at all. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. So, the Court simply finds no basis to make reductions under this category.

McGuckin and PVI have also lodged objections to certain entries on the basis that they purportedly reflect "multi-teaming," referring to the practice of "two timekeepers at the same level with the same area of expertise" handling an "identical task within the same time frame." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. The few entries objected to on that basis involve associate Kristen Perry and then-associate Brian Morgan both reviewing discovery produced by the Petitioning Creditors on the same day. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. The Court finds it entirely reasonable, and even efficient, to have two associates divide the task of reviewing discovery produced by multiple parties. Accordingly, no adjustments will be made on that basis.

McGuckin and PVI further object to entries reflecting that "administrative functions," referring to "billing, scheduling, calendaring, filing," were billed at attorney or other legal professional rates. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. It is apparent when reviewing the billing records that almost every single entry flagged as reflecting attorney billing rates for administrative tasks was redacted. Once Gardner filed the revised timesheets with the Revised Application and those entries were unredacted, those for which compensation was still requested did not reflect any administrative tasks whatsoever. Therefore, there is no basis to make any reductions on this basis. *See id.* at ECF 1106 Ex. A at Ex. 1 of Coe Decl., entries dated 1/14/20 for Jesse Witten, 1/30/20 for Nicholas Feltham, 9/17/20 Richard Coe, 7/29/21 Joseph Argentina.

McGuckin and PVI also point out that "[a]ll line item time entries should be dated within 60 days of the invoice date." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. While certainly preferable, the pertinent entries are nevertheless substantially contemporaneous, and the Court otherwise has no basis to conclude that the services contained in those entries were not actually performed.

Finally, McGuckin and PVI object to the allowance of entries billed by Drinker attorneys, Jessie Shields, associate, and Michael Pompeo, partner, in connection with the bankruptcy case on the basis that they are transitory timekeepers. *Id.* at ECF 1032 Obj. to Appl. ¶ 58, Ex. 1 Cohen Decl. ¶ 22. Typically, "[t]he primary concern with too many attorneys billing too little time is the learning curve." *In re Quigley Co.,* 500 B.R. 34, 362 (Bankr. S.D. N.Y. 2013). The "cost of this education can be saved or minimized if attorneys already familiar with the case perform the service instead." *Id.* The Court has scrutinized the entries detailing services performed by Jessie Shields and Michael Pompeo. It appears with respect to Ms. Shields that she billed two entries in November 2019 about a week after the Involuntary Petition was first filed, when the whole Drinker team aside from those involved in the Derivative Litigation would have been learning about the case. *See* Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. The entry dated 11/18/19 reflects she billed only six minutes meeting with Nicholas Feltham regarding the Gardner Motion and related next steps. *See id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. The next entry dated 11/19/19 reflects that she billed two hours reviewing the draft of the Gardner Motion, two hours drafting an exhibit list for the Gardner Motion, three hours compiling the exhibits, and .3 hours conferring with Nicholas Feltham about next steps. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. The actual time she appears to have spent becoming familiar with the matter as opposed to performing substantive work appears very minimal for a case of this history and complexity. After the two entries in November 2019, Ms. Shields billed six minutes in an entry dated 1/20/20 to "[c]onfer with J. Argentina regarding research for upcoming hearing," which again, does not strike the Court as a significant amount of time to get familiar with the case. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Finally, one more entry dated 2/7/20 reflects that Ms. Shields billed only .7 hours to "[r]eview disclosure requirements under Corporate Integrity Agreement and confer with R. Coe and N. Feltham regarding same." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. E of Cohen Decl. It does not appear in this

### C. Vague Entries

McGuckin and PVI object to Gardner being compensated for those entries which

McGuckin and PVI contend "lack sufficient detail as to the nature of the task(s) completed." *See*

Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 Cohen Decl. ¶ 18. "Attorneys seeking

compensation must document the hours for which payment is sought 'with sufficient specificity.'

More specifically, our jurisprudence has established that '[a] fee petition is required to be

specific enough to allow the district court to determine if the hours claimed are unreasonable for

the work performed.' It is an established proposition of law that '[w]here the documentation of

hours is inadequate, the district court may reduce the award accordingly.'" *Washington v.*

*Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1037 (3d Cir. 1996). That said,

while "a fee petition should include 'some fairly definite information as to the hours devoted to

various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by

various classes of attorneys, e.g., senior partners, junior partners, associates," "it is not necessary

to know the exact number of minutes spent nor the precise activity to which each hour was

devoted nor the specific attainments of each attorney." *Id.* at 1037-38.

---

entry that any time was spent simply coming up to speed on the case, and overall, the Court does not find the typical concerns with permitting recovery for transitory timekeepers present for Ms. Shields, as her learning curve appears to have been very minimal.

    With respect to partner Michael Pompeo, one entry for which Gardner seeks compensation is dated 11/12/19, the very day the Involuntary Petition was filed, where Mr. Pompeo billed only .1 hour to "[r]eview correspondence from L. McMichael" and only .4 hours for "telephone conferences with R. Coe and V. Slusher regarding BK preparation." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. To the extent this entry even reflects time spent becoming familiar with the VAC matter, it is very minimal, and it occurred right at the outset of the bankruptcy when everyone on the Drinker team who had not previously been involved with the Derivative Litigation would have been learning about the VAC matter as well. Mr. Pompeo's other entry potentially eligible for compensation is dated 2/18/20 when Mr. Pompeo billed .7 hours for "[t]elephone conferences with R. Coe, V. Slusher & A. Wilen regarding appointment of CRO and accountants to Trustee." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. It does not appear that this entry reflects any time getting caught up to speed, and even if it did, the time billed to do so is very minimal. Therefore, the Court does not find the typical concerns with transitory timekeepers present for Mr. Pompeo as well.

The Court does agree with McGuckin and PVI that certain entries, detailed in footnote 25, are simply not specific enough to permit the Court to assess the reasonableness of the time spent on the work performed in a meaningful way, and, accordingly, the award will be adjusted downward in the amount of $4,985.75[25] to account for that, amounting to a 50% reduction in the entries detailed in footnote 25.

### D. Churning

McGuckin and PVI object to certain entries on the basis that those entries reflect the practice of "churning" the file, described as "[t]imekeeper repeatedly undertakes seemingly legitimate tasks which adds marginal value for client (e.g., repeated updates of corporate minute book, checking dockets, updating form contracts)." Case No. 19-17117 ECF 1032 Obj. to Appl.

---

[25]    In an entry dated 11/26/19, Vince Slusher, partner, billed two hours at $1,010/hour to "work on motion to dismiss trustee matters; call to discuss path forward." Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. This description is so vague as to be meaningless in the absence of any indication of what "working" on the motion entailed; the identity of the counterparty to the call referenced in the entry; or even general topics discussed on the call. Particularly in light of Mr. Slusher's extremely high billing rate, his entries must include more specific detail to permit the Court to assess their reasonableness.

In entries dated 11/27/19, 12/18/19, and 12/27/19, paralegal Cathy Greer billed .3 hours, .1 hour, and .1 hour, respectively, at $350/hour for "document/file management" without further explanation. Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. This description provides no insight as to what "document/file management" entails, and such a vague description interferes with the Court's ability to assess if the time spent on it was reasonable.

On 12/4/19, partner Vince Slusher billed 1.90 hours at $1,010/hour to "attend to discovery issues," which fails to provide any context to assist the Court with assessing the reasonableness of this entry, particularly for a high-level partner. Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. The Court would have no way of knowing without further explanation, which this entry lacks, what "attending" to discovery issues entails.

On 1/3/20, partner Vince Slusher billed 2.40 hours at $1,065/hour to "work on discovery issues; review and respond to correspondence regarding discovery and other scheduling issues; review filings." Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. The lack of any specificity as to which filings were reviewed, who provided the discovery, or whom the correspondence was with simply makes it impossible for the Court to assess whether this time was reasonably spent by a partner billing at such a high rate.

On 1/28/20, Mr. Slusher billed one hour at $1,065/hour to "[w]ork on VAC preparations; calls re same." Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. This description simply fails to provide the Court with any context to assess the entry's reasonableness. Similarly, on 1/29/20, Mr. Slusher billed .50 hours at $1,065/hour to "[c]ontinue work on VAC preparations" with no description of the nature of the work, leaving the Court guessing as to what exactly that work entailed. Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

On 2/12/20, Mr. Slusher billed .90 hours at $1,065/hour to "attend to matters related to trustee appointment" which has no meaning to the Court. Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Similarly, on 2/14/20 Mr. Slusher billed .7 hours at $1,065/hour to "attend to matters related to trustee and COO," without describing what matters he was attending to in any way, making it impossible for the Court to assess the reasonableness of the task. Id. at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

Ex. 1 at Ex. B, Ex. D of Cohen Decl. Entries from Cathy Greer, paralegal, and Kristen Perry,

associate, flagged the most objections on the basis of churning. Ms. Greer alone billed over

$2,000 over the life of the VAC bankruptcy for repeatedly retrieving pleadings and circulating

the case docket with no explanation as to whom the pleadings were sent to, what pleadings were

retrieved, or who requested the pleadings. While certainly, it is reasonable to compensate

Gardner for some of these expenses, the Court finds it excessive that over $2,000 were incurred

simply retrieving the docket regardless of the necessity for doing so in the absence of any further

description or explanation. "If it finds excessive hours, a court has 'discretion simply to deduct a

reasonable percentage of the number of hours claimed as a practical means of trimming fat from

a fee application.'" *River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 U.S. Dist. LEXIS 82940, at

*36 (S.D. N.Y. June 25, 2015). Accordingly, the Court will reduce the fee award by $500 to

account for excessive billing for this task.

     Ms. Perry appeared to churn the VAC file primarily by billing small amounts multiple

times to "analyze" email correspondence. Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at

Ex. C of Cohen Decl. (*See* Kristen Perry entries dated 12/6/19, 12/18/19, 12/23/19, 1/8/20). In

the absence of any explanation respecting what "analyzing" email correspondence entails, the

Court questions the necessity of this task, and is concerned that permitting billing for it may

elevate the bill beyond that which would be reasonable for an adversary to have to pay.

Accordingly, the Court will deduct a percentage from those entries to account for that billing

practice in the amount of $100.

### E.  Lack of Communication Specificity

     McGuckin and PVI object to permitting Gardner to recover legal fees paid on account of

electronic or telephonic communications where the billing entry does not identify the subject

matter of the communication or name the counterparty to it. Case No. 19-17117 ECF 1032 Obj. to Appl. Ex.1 at Ex. B, Ex. D of Cohen Decl. The Court agrees that any entries reflecting telephonic or electronic communications which do not at the very least identify the subject matter or counterparty are too vague to permit the Court to assess their reasonableness, and as such, the Court is justified in reducing the requested award to account for such lack of communication specificity. *Washington,* 89 F.3d at 1037. The Court will make a downward adjustment in the amount of $2,907.75, amounting to a 50% reduction for the objectionable entries detailed in footnote 26.[26]

### F.  Paralegal Tasks

McGuckin and PVI also object to certain entries on the basis that "[a]ttorney level personnel should spend minimal time on tasks typically delegated to paralegals." Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D of Cohen Decl. "We have cautioned on a number of occasions that when a lawyer spends time on tasks that are easily delegable to non-professional assistance, legal service rates are not applicable. We cannot condone 'the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals.'"

---

[26]    On 11/18/19, partner Vince Slusher billed .2 hours at $1,010/hour simply for "internal call," which is far too vague a description to permit the Court to assess the reasonableness of the time billed for the call. Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

On 11/22/19, associate Dallas Taylor billed .40 hours at $455/hour for a conference call to discuss "case strategy and outstanding items," which simply lacks enough information to permit the Court to assess its reasonableness, particularly in the absence of the counterparties to the call. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

On 1/24/20, Mr. Slusher billed 2.5 hours at $1,065/hour for "[c]all with R. Coe. Review materials and hearing preparation." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Although this entry identifies the counterparty, it does not provide the Court with any context respecting the materials reviewed or what the hearing preparation on the call entailed, rendering the description too vague to assist the Court in assessing the reasonableness of the amount billed for these tasks.

On 1/31/20, Mr. Slusher billed 1.60 hours at $1,065/hour for "[c]all to discuss settlement issues; review internal analysis." *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Without any explanation of the general nature of the settlement issues or the counterparty, the lack of specificity of this entry impairs the Court's ability to meaningfully assess its reasonableness.

Finally, on 2/8/20, Mr. Slusher billed one hour at $1,065/hour for "[c]all with client and Stuart Walker," which fails to specify the subject matter of the call or who Stuart Walker is, impairing the Court's ability to determine this entry's reasonableness. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

*Planned Parenthood of Central New Jersey v. Attorney General of the State of New Jersey,* 297
F.3d 253, 266 (3d Cir. 2002). The Court does agree that certain billing entries reflect excessive
attorney time billed for tasks more appropriately handled by paralegals.[27] Accordingly, the Court
will reduce the award by $859 on this basis to account for the entries it found objectionable
detailed in footnote 27.

### G.  Increment Billing

McGuckin and PVI further object to certain entries on the basis that they reflect
"increment billing," described as when "[t]asks are separated and recorded in multiple time
entries in one-tenth hour increments where task is unlikely to take 6 minutes." Case No. 19-
17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, Ex. D of Cohen Decl. The Court does find that
certain entries flagged for "increment billing" do reflect excessive time billed for relatively
simple tasks unlikely to take a full six minutes and will adjust accordingly. Based on the
objectionable entries described in footnote 28,[28] the Court will reduce the sanctions award by
$124.25.

### H.  Indistinguishable Prep Time

McGuckin and PVI object to compensation for billing entries reflecting
"indistinguishable prep time," which refers to when "[t]imekeeper combines 'preparation time

---

[27]    On 11/19/19, associate Kristen Perry billed four hours at $515/hour preparing Federal Rule of Civil
Procedure 30(b)(6) deposition notices for VAC and the Petitioning Creditors, which appears excessive to the Court
and more appropriately billed at a paralegal rate of $350/hour. Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at
Ex. C of Cohen Decl.
        On 12/19/19, associate Dallas Taylor billed 1.40 hours at $455/hour simply to prepare one subpoena for the
Monitor. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. Even though the Monitor was a major witness
in the Dismissal Hearing, the Court nevertheless considers almost two hours spent on this one subpoena by an
attorney excessive, and more appropriately billed at the paralegal rate of $350/hour.
        On 1/9/2020, Ms. Perry billed .20 hours at $570/hour to simply "[r]evise deposition notices based on
rescheduling Metter's deposition," which it seems to the Court could have easily been done by a paralegal, and more
appropriately billed at the paralegal rate of $350/hour. *Id.* at ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl.
[28]    In particular, the Court will reduce by half an entry dated 11/21/19 reflecting associate Kristen Perry billing
six minutes at $515/hour to "analyze" her one-page pro hac vice motion and just over one-page declaration, the first
of which only included four one sentence paragraphs, the second of which only included eight one sentence

and participation time' without specifying the type of preparatory task has been [sic] undertaken or time expended for it (e.g., prepare for and participate in all-hands conference call)." Case No. 19-17117 ECF 1032 Obj. to App. Ex. 1 at Ex. B, D of Cohen Decl. The Court agrees that certain entries fail to sufficiently detail the amount of time spent preparing for a meeting as opposed to attending the meeting, such that the Court's ability to assess the reasonableness of the time spent on the tasks detailed in those entries is impaired, permitting the Court to make an appropriate adjustment. *See River Light V, L.P.,* 2015 U.S. Dist. LEXIS 82940, at *30. Therefore, the Court will reduce the time documented for entries described in footnote 29 by 20%, amounting to a $432.90 reduction.[29]

## I.   Pyramiding

McGuckin and PVI object to billing entries reflecting "pyramiding," arguing that the "[l]egal professional rate should not be charged for task(s) not requiring legal training,

---

paragraphs, and neither of which included anything other than very basic personal factual information which would not require any "analysis." Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl.; ECF 35.

On 12/6/19, paralegal Cathy Greer billed six minutes at $350/hour to retrieve docket items and circulate them. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. However, the billing records reflect that Ms. Greer had also billed six minutes on 12/4/19 to retrieve docket items and circulate them. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Upon review of the docket, the Court observes that no new docket items were entered after 12/4/19 until 12/10/19. Therefore, the Court will disallow the 12/6/19 entry for retrieving docket items and circulating them. Similarly, on 12/9/19, Cathy Greer billed six minutes at $350/hour to retrieve docket items and circulate them even though there would be no new docket entries until 12/10/19. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Therefore, the Court will disallow that entry as well.

Finally, on 1/30/20, Ms. Perry billed six minutes at $570/hour to "[a]nalyze third supplemental declaration of Dilworth in preparation for trial." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Dilworth's third supplemental declaration made pursuant to Federal Rules of Bankruptcy Procedure 2014 and 2016(b) was one and a half pages long with only ten one-sentence paragraphs. *Id.* at ECF 215. Accordingly, the Court will reduce that entry by half.

[29]   On 11/25/19, Mr. Coe billed .70 hours at $655/hour to "[p]repare for and attend meet and confer with VAC counsel re: discovery," which does not sufficiently separate out the amount of time spent preparing for versus attending the meeting. Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Relatedly, on the same day, 11/25/19, then-associate Brian Morgan billed .7 hours at $605/hour to "[p]repare for and participate in meet and confer with counsel for the Debtors," which does not disclose to the Court how much time was spent preparing for versus attending the meeting, which inhibits the Court's ability to assess this entry's reasonableness. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

On 12/2/19, partner Jesse Witten billed .3 hours at $790/hour to "prepare for and participate in telephone conference with U.S. Attorney's Office," which does not provide sufficient detail regarding the time spent preparing for versus participating in the call nor the subject matter of the call such that the Court would be able to assess the reasonableness of the time billed. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

knowledge or judgment (e.g., reviewing newspaper articles re lawsuit)." Case No. 19-17117 ECF

1032 Ex. 1 at Ex. B, D of Cohen Decl. The Court did find some billing entries that reflect that

the legal professional rate was charged for certain tasks which do not require legal training and

as such, the Court will instead apply the paralegal rate of $350/hour to the entries detailed in

footnote 30, resulting in an $824 reduction in the requested award.[30]

## J.  Chipping

McGuckin and PVI also object to Gardner's Revised Application on the basis that some

billing entries reflect "chipping," described as "less productive senior level timekeepers" serving

as a "'sounding board' buying small time charges within a larger matter." Case No. 19-17117

ECF 1032 Obj. to Appl. Ex. 1 at Ex. B, D, of Cohen Decl. The entries identified in footnote 31[31]

---

On 12/22/19, Mr. Coe billed 1.10 hours at $655/hour to "[p]repare for and attend conference with
bankruptcy case team re: discovery issues and motion to dismiss." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe
Suppl. Decl. This description fails to enlighten the Court as to the breakdown of time spent on each task.

On 2/3/20, then-associate Brian Morgan billed .5 hours at $650/hour to "[p]repare for and participate in
hearing prep call" for the Gardner Motion. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. This entry fails
to break down for the Court the amount of preparation time and participation time for that call or the counterparties
to the call.

For other entries which McGuckin and PVI objected to on the basis that they reflect indistinguishable prep
time not included in this footnote, the Court was able to determine how much time was spent preparing for the
hearing or meeting versus attending it based upon either its record of the specific hearing, the Court's own
recollection of meetings, such as conferences calls, which it facilitated, or because entries from other timekeepers
did break down the length of the meeting versus the time spent preparing for it.

[30]    On 1/20/20, associate Kristen Perry billed 1.20 hours at $570/hour for a "[c]onference with [partner] Vince
Slusher re: update on settlement discussions; revise exhibit list; compile exhibits." Case No. 19-17117 ECF 1032
Obj. to Appl. Ex. 1 at Ex. C of Cohen Decl. A non-legal professional could have revised the exhibit list and
compiled exhibits, and accordingly, the Court will apply the $350/hour paralegal rate to one hour of this time.

On 1/21/20, then-associate Nicholas Feltham billed two hours at $595/hour to "[c]ompile final exhibits for
use at motion to dismiss hearing," which could have been performed by a non-legal professional. *Id.* at ECF 1106
Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

[31]    On 1/16/20, partner Andrew Kassner, who had not billed at all in connection with VAC's bankruptcy (and
actually has not billed since this entry), billed .3 hours at $1,020/hour to review Gardner's reply brief to VAC's
objection to the Gardner Motion, which to the Court, appears entirely unnecessary given the large team working on
the Gardner Motion for months prior including partners from both the Complex Commercial Disputes Team and
Finance & Restructuring Group. *Id.* at ECF 1015 Appl. Ex. A Coe Decl. ¶¶ 3, 5, 10. Accordingly, this entry will be
disallowed in its entirety.

On 2/18/20, partner Michael Pompeo billed .7 hours at $850/hour for "telephone conferences with R. Coe
[partner on Complex Commercial Disputes Team], V. Slusher [partner in Finance & Restructuring Group] & A.
Wilen regarding appointment of CRO and accountants to Trustee." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of
Coe Decl. This entry appears to reflect a senior level timekeeper, Mr. Pompeo, who had only been minimally
involved in the VAC matter essentially just prior to the bankruptcy being filed, doing no more than serving as a
sounding board, which the Court considers entirely unnecessary given the involvement of at least two other partners

appear to the Court to reflect unnecessary charges from some senior level timekeepers, justifying

a downward adjustment in the amount of $901 to account for those excess charges.

### K.  Partner Heavy Staffing Mix

McGuckin and PVI also object to the Revised Application based upon what they

characterize as a partner heavy staffing mix working on the VAC bankruptcy matter. Case No.

19-17117 ECF 1032 Obj. to Appl. Ex. 1 at Ex. A of Cohen Decl. Upon review of the billing

records submitted in support of the Application and Revised Application, the Court finds the

staffing mix appropriate. The VAC bankruptcy case involved multiple complex legal and factual

issues implicating the circumstances surrounding the Involuntary Petition and the preceding

complex Derivative Litigation, as well as corporate governance, restructuring, medical law, the

Debtor's subsidiaries, and more; an extensive procedural history featuring two dueling, highly

litigious parties; discovery resistance from the Petitioning Creditors; and a major claim asserted

by the DOJ involving the niche area of qui tam litigation. On top of that, Gardner's team had to

navigate challenge after challenge to the Trustee Order. The sheer magnitude of this case

mandated the help of numerous attorneys. *See Planned Parenthood of Central New Jersey v.*

*Attorney General of the State of New Jersey,* 297 F.3d 253, 272 (3d Cir. 2002).

From the outset of VAC's bankruptcy case through February 7, 2020, the Drinker team

members billing the most time to the VAC bankruptcy matter included one partner from the

---

in that discussion who had been heavily involved throughout VAC's bankruptcy case, one of whom is a partner in the Finance and Restructuring Group. Accordingly, the Court will disallow Mr. Pompeo's time on that call.

The other entries flagged as objectionable due to "chipping" appear to the Court either to (1) involve timekeepers who were actually very productive with their time and who appeared to have particular specialties or only worked on discrete tasks, such as Keith Costa, a partner who appeared to primarily handle the application to the UST for the appointment of the Chapter 11 Trustee, and partner William Clark, who primarily appeared to offer expertise in partnership matters in connection with McGuckin's withdrawal of the General Partner, or (2) involve timekeepers who were otherwise heavily involved with the VAC bankruptcy case from the outset, like Vince Slusher, thus making their time spent reviewing filings and pleadings entirely reasonable. *See id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

Complex Commercial Disputes Team who had worked extensively on the Derivative Litigation,

Mr. Coe; one partner from the Finance & Restructuring Group, Vince Slusher; one senior

attorney from the Finance & Restructuring Group with significant experience, but billing less

than some associates, Joseph Argentina; an associate from the Litigation Group, Nicholas

Feltham, who had been extensively involved in the Derivative Litigation; Kristen Perry, an

associate in the Finance & Restructuring Group; and Brian Morgan, an associate in the Finance

& Restructuring Group. Case No. 19-17117 ECF 1015 Appl. Ex. A Coe Decl. ¶¶ 3, 4, 5, 6, 7, 8,

10. Various other associates, partners, and paralegals billed over the course of that time as

needed. *Id.* at ¶ 10. Given the magnitude and complexity of VAC's bankruptcy, this staffing mix

was reasonable – one partner involved in the Derivative Litigation and one restructuring partner

overseeing a team of primarily associates assisting with the case makes sense and was justified

here.

That said, while the Court does find that the staffing mix from the outset of the case to

February 7, 2020 was not unreasonable, the billing entries for that time period do reflect some

degree of skillset mismatch for some of the tasks described, and those entries are detailed in

footnote 32.[32] Accordingly, the Court will make a downward adjustment in the amount of $8,109

to account for that.

---

[32]    On 11/18/19, partner Richard Coe billed six hours at $655/hour to "[r]esearch and draft bankruptcy
motion," tasks which the Court finds generally more appropriate for an associate. Case No. 19-17117 ECF 1106
Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Therefore, the Court will apply the rate of $550/hour to this entry.
    On 11/25/19, partner Vince Slusher billed 2.5 hours at $1,010/hour to "[a]ttend to matters related to
discovery." ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. This description is far too vague to permit the Court
to allow compensation for this task, as the entry lacks any context as to what specific tasks related to discovery Mr.
Slusher performed, which inhibits the Court's ability to assess the reasonableness of a partner being involved in
discovery on this level. Accordingly, the Court must disallow this entry.
    On 12/3/19, partner Vince Slusher billed 1.1 hour at $1,010/hour to "review pleadings." *Id.* at ECF 1106
Rev. Appl. Ex. A at Ex. 1 of Coe Decl. While not necessarily unreasonable for a partner working on a matter to
review pleadings in that matter, the Court finds the time Mr. Slusher billed to do so excessive for a partner billing
over $1,000/hour, and will reduce this entry by half.
    On 12/5/19, partner Vince Slusher billed 1.3 hours at $1,010/hour to "[w]ork on discovery issues" and 1.2
hours to "review discovery objections," tasks which generally appear more appropriate for an associate to perform,

Services in connection with McGuckin's resignation and withdrawal of the General

Partner immediately following the Dismissal Hearing were primarily performed by Mr. Coe

from the Complex Commercial Disputes Team; partner Vince Slusher from the Finance &

Restructuring Group; senior attorney Joseph Argentina from the Finance & Restructuring Group,

again, billing at a rate comparable to associates; associate Kristen Perry from the Finance &

Restructuring Group; associate Nicholas Feltham from the Litigation Group; and associate Brian

Morgan from the Finance & Restructuring Group, all of whom had been heavily involved in the

proceedings related to the appointment of the Chapter 11 Trustee from the outset of VAC's

bankruptcy. *See* Case No. 19-17117 ECF 1015 Appl. Ex. A Coe Decl. ¶¶ 3, 4, 5, 6, 7, 8, 10.

Other partners, associates, and paralegals stepped in to assist with largely discrete issues as

needed. *See id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Suppl. Decl. By April 2020,

associate Nicholas Feltham appears to have been promoted to senior attorney, but maintained his

same billing rate, making it more than reasonable to continue to have him assist with these

services. *See id.* at ECF 1015 Appl. Ex. A at Ex. 1 of Coe Decl. The Court finds the staff mix for

this subset of tasks reasonable, as the attorneys who had originally performed the vast majority

of the work on the Gardner Motion and who were most familiar with the case continued to do the

majority of the work related to responding to McGuckin's resignation and withdrawal of the

---

justifying the Court applying an associate rate of $550/hour to these tasks. The Court finds further justification for
this reduction in the vague nature of these entries.

    On 12/11/19, partner Vince Slusher billed one hour at $1,010/hour to review discovery and one hour to
review pleadings. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Reviewing discovery is a more
appropriate task for a more junior attorney, and thus the Court finds it more appropriate to apply an associate rate of
$550/hour for that task. As for reviewing pleadings, again, while not unreasonable for a partner to review pleadings,
the Court will reduce the time it should take for a partner with such a high billing rate to review pleadings by 25%.

    On 12/17/19, partner Vince Slusher billed 1.2 hours at $1,010/hour to "[a]ttend to discovery issues" which
is far too vague a description to permit compensation for this task. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe
Decl.

    On 12/31/19, partner Vince Slusher billed .7 hours at $1,010/hour to "review crestwood docs [sic]" which
Kristen Perry and Brian Morgan were also doing. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.
Accordingly, the Court will disallow this entry as duplicative.

General Partner and simply drew upon other attorneys and support staff on an as needed basis, which the Court finds appropriate.

The same team members who performed services in connection with McGuckin's resignation and in connection with the Gardner Motion also performed the majority of services necessary for the Sanctions Motion with the exception of associate Kristen Perry. *See* Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Instead, associate Emmanuel Brown was brought on to assist the team with the Sanctions Motion. *Id.* By January 2021, senior attorney Joseph Argentina had been promoted to counsel, and began billing in connection with the Sanctions Motion at $590/hour from his prior 2020 rate of $550/hour, still comparable to that of an associate. *See id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.; ECF 1015 Appl. Ex. A at Ex. 1 of Coe Decl. By June 2021, associate Brian Morgan had been promoted to partner and began billing in connection with the Sanctions Motion at $705/hour from his prior 2020 rate of $650/hour. *See id.* at ECF 1015 Appl. Ex. A at Ex. 1 of Coe Decl.; ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Other associates, partners, and paralegals billed as needed on the Sanctions Motion to assist with relatively discrete tasks. *See id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. The Court finds this staffing mix entirely appropriate, particularly given that this staffing mix largely maintained the same attorneys who had worked on the Gardner Motion, making them particularly well positioned to work on the Sanctions Motion, which was based on the findings in the Trustee Opinion.

The Court recognizes that two attorneys working on the Sanctions Motion happened to be promoted later into its prosecution. The Court finds the decision to keep those attorneys working on the Sanctions Motion very reasonable given the time they had already invested in it, their familiarity with the entire history of VAC's case, and given that their rate increases were not

particularly substantial. That said, some billing entries do reflect more senior attorneys performing tasks for which they are overqualified as described in footnote 33.[33] Therefore, the Court will make a downward adjustment in the amount of $3,687.50 to account for that.

Services in connection with appealing the Trustee Order were primarily performed by partner Mr. Coe from the Complex Commercial Disputes Team, partner Vince Slusher from the Finance & Restructuring Group, associate Nicholas Feltham from the Litigation Group, associate Brian Morgan from the Finance & Restructuring Group, and senior attorney Joseph Argentina from the Finance & Restructuring Group, all of whom were extensively involved in obtaining the Trustee Order. *See* Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Over the course of the appellate proceedings, Mr. Feltham was promoted to senior attorney, but continued to bill at the same rate he billed as an associate, and Mr. Argentina was promoted to

---

[33]     On 2/20/20, partner Vince Slusher billed two hours at $1,065/hour to "[r]eview sanctions cases and correspondence." Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. The Court considers reviewing cases a more appropriate task for a more junior associate and as such, will apply an associate rate of $550/hour to this entry.

Similarly, on 2/21/20, partner Vince Slusher billed 1.5 hours at $1,065/hour to "review case law regarding sanctions," which is a task better suited for a less expensive associate. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Accordingly, the Court will apply the associate rate of $550/hour to this task.

On 4/20/20, partner Richard Coe billed 2.9 hours at $690/hour to "[r]esearch and draft reply in support of sanctions motion." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. No justification has been offered explaining the need for a partner to perform initial research and drafting rather than a less expensive associate and accordingly, the Court will apply the associate rate of $550/hour to this entry.

On 4/21/20, partner Richard Coe billed five hours at $690/hour to "[r]esearch and draft reply in support of motion for sanctions." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. As the Court has explained, the initial research and drafting are more appropriate for an associate to perform in the first instance. Accordingly, the Court will apply an associate rate of $550/hour to this entry.

On 4/23/20, partner Richard Coe billed 3.6 hours at $690/hour to "[r]esearch and draft sanctions reply," which, as the Court has explained, should be performed by an associate. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Therefore, the Court applies an associate billing rate of $550/hour to this entry.

On 4/24/20, partner Richard Coe billed 2.5 hours at $690/hour to "[r]esearch and revise reply brief in support of motion for sanctions." *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. While certainly reasonable for a partner to review a filing, the research would be more appropriate for an associate to perform, and as such, the Court will apply an associate rate of $550/hour to one hour of this entry.

On 4/14/21, partner Richard Coe billed one hour at $725/hour to "review cases" regarding "bankruptcy court jurisdiction to award sanctions," which the Court considers more appropriate for an associate or less expensive senior attorney to perform. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. As such, the Court will apply to this entry the rate that senior attorney, Joseph Argentina, who was also researching this issue, billed, $590/hour.

counsel, billing only a few entries starting in late 2021 at $590/hour in that role, not significantly

higher than his previous 2020 rate of $550/hour, as mentioned *supra*. Otherwise, a few

paralegals and partners offered assistance with discrete tasks as needed. Given that the

promotions did not result in particularly significant rate increases, the Court finds no issue with

Drinker maintaining the same core team to defend the Trustee Order on appeal.

 Those performing the majority of services in connection with the Recusal Motion

included partner Vince Slusher, partner Richard Coe, counsel Joseph Argentina billing

$590/hour, comparable to an associate, and Brian Morgan who had been promoted to partner by

the time he started working on the opposition to the Recusal Motion. *See id.* at ECF 1015 Appl.

Ex. A at Ex. 1 of Coe Decl.; ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Despite the

admittedly partner and senior attorney heavy staffing mix working on the Recusal Motion, the

Court finds the mix reasonable given that the basis for the Recusal Motion stemmed from

proceedings related to the Trustee Order, and this team was heavily involved in those

proceedings and in securing the Trustee Order. Thus, keeping this small team involved in

defending against the Recusal Motion was entirely reasonable.

 Finally, those performing services in connection with the Reconsideration Motion, which

was based upon certain proceedings which had occurred in the Derivative Litigation, included

Joseph Argentina, who by the time he started working on the opposition to the Reconsideration

Motion had been promoted to counsel, Nicholas Feltham, who had been heavily involved in the

Derivative Litigation and who by that time had been promoted to senior attorney, partner

Richard Coe, who had also been heavily involved in the Derivative Litigation and who had, in

fact, drafted the affidavit in the Derivative Litigation at issue in the Reconsideration Motion, and

Brian Morgan, who had been promoted to partner by the time he began working on the

opposition to the Reconsideration Motion. *See id.* at ECF 1015 Appl. Ex. A at Ex. 1 of Coe

Decl.; ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Over the course of a case this long and

involved, it is inevitable that team members will be promoted over time, but the Court finds it

entirely reasonable to nevertheless maintain the involvement of those attorneys intimately

familiar with the matter, particularly the Derivative Litigation in this instance, as opposed to

bringing new more junior attorneys up to speed in such a complex matter. That said, the Court

found some work would have been more appropriate for more junior staff to perform as detailed

in footnote 34.[34] As such, the Court will reduce the requested award by $513 to account for that.

### L. Time for Repeated or Routine Task Exceeds Industry Norms for Similarly Experienced Timekeepers

McGuckin and PVI further object to certain entries on the basis that they reflect that the

time spent on repeated or routine tasks exceeds industry norms for similarly experienced

timekeepers. Case No. 19-17117 ECF 1032 Obj. to Appl. Ex. 1 Cohen Decl. ¶ 18. While the

Court would hardly characterize any of the matters involved in this bankruptcy case as "routine,"

the Court does recognize that time spent on certain tasks detailed in footnote 35[35] does appear to

---

[34]    On 5/10/21, partner Richard Coe billed 3.8 hours at $725/hour to "research and draft opposition to motion for reconsideration." Case No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. Although the Court understands that Mr. Coe was intimately involved in the events in the Derivative Litigation which formed the basis for the Reconsideration Motion, it still nevertheless would be more appropriate for a less expensive more junior attorney to perform the initial research and drafting with Mr. Coe serving in a primarily supervisory role – perhaps Mr. Argentina who had a billing rate closest to that of an associate. As such, the Court will apply Mr. Argentina's then-rate of $590/hour to this entry, the lowest on the team primarily involved in the Reconsideration Motion, particularly given that it appears he did do a significant amount of research and drafting of the opposition in any event. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl.

[35]    By way of explanation, in assessing this objection, the Court has solely focused on analyzing those entries specifically flagged for "excessive time" as the most practical and manageable way to address this objection.

First, approximately 32.9 hours spent researching and drafting the Gardner Motion were flagged as "excessive," amounting to $19,523 in potentially excessive charges. The Court recognizes that the Gardner Motion is an incredibly lengthy motion requiring Gardner to present a complex and extensive factual and procedural history as well as incorporate heavy legal discussion. That said, this much time just drafting and researching in addition to other time spent doing the same or similar tasks not flagged as excessive does appear to the Court to exceed that which the Court would characterize as necessary, and as such, the Court will reduce the amount flagged as excessive by 20%.

Approximately 12.3 hours spent reviewing and revising the Gardner Motion were flagged as "excessive" over and above other amounts billed performing the same or similar tasks, amounting to about $7,517.5 in

be excessive such that a reduction in the amount of $36,878.45 should be applied to account for

that as described in that footnote.

---

potentially excessive charges. As the Court has observed, the Gardner Motion was a very complex motion and, as such, it was certainly reasonable for Drinker to spend a significant amount of time reviewing and revising it. However, the Court questions the necessity of quite so many hours in addition to the ones spent reviewing and revising it not flagged as excessive and as such, will reduce the amount flagged as excessive by 20%.

Approximately 38.2 hours spent reviewing and revising the reply brief submitted in response to VAC's opposition to the Gardner Motion has been flagged as excessive amounting to approximately $26,122 in potentially excessive charges. With respect to the reply brief, which admittedly incorporated new discovery which had been obtained since the Gardner Motion had been filed and addressed a number of new arguments advanced by VAC in opposition to the Gardner Motion, almost forty hours just reviewing and revising the reply brief, not even considering the time spent initially drafting it, is just too excessive for the Court to consider reasonable, and significantly so. *See* Case No. 19-17117 ECF 188. As such, the Court will reduce the amount flagged as excessive for reviewing and revising the reply brief by 30%.

Approximately 36.6 hours spent simply preparing for Dr. McGuckin's deposition in connection with the Gardner Motion was flagged as excessive, amounting to approximately $22,562 in potentially excessive charges. It appears based on the billing records that the deposition lasted for a little over four hours. While Dr. McGuckin was certainly the most significant witness in connection with the Gardner Motion and thus it was reasonable for Drinker to spend significant time preparing for his deposition, this much time does border on excessive, particularly for a deposition that ended up lasting only 4 hours. As such, the Court will reduce the amount flagged as excessive by 20%.

Approximately 22 hours spent just preparing for the Monitor's deposition were flagged as excessive, amounting to $15,180 in potentially excessive charges. It appears from the billing records the Monitor's deposition ended up taking a little over five hours to complete. This time spent is more reasonable than that spent preparing for McGuckin's deposition but still borders on excessive for a deposition which lasted only 5 hours and as such, the Court will reduce the amount flagged as excessive by 15%.

Finally, approximately 65.8 hours spent preparing for the Dismissal Hearing in various ways were flagged as excessive, amounting to approximately $49,390 in potentially excessive charges. The Court observes that the Dismissal Hearing lasted all day and in fact, did not conclude until after the clerk's office had closed for the day, and that Gardner reasonably had a larger team working on the Gardner Motion. So, it does not surprise the Court that a significant amount of time was spent preparing for the Dismissal Hearing. That said, while hearing preparation certainly requires a great deal of rehearsal and consideration, requiring McGuckin and/or PVI to pay for over 60 hours of preparation simply is not reasonable. The Court is compelled to reduce the amount flagged as excessive for hearing preparation by 25%.

Approximately 14.6 hours of meetings with Richard Coe, Brian Morgan, and Joseph Argentina preparing for hearings on the Sanctions Motion and Reconsideration Motion are flagged as excessive, amounting to $9,994.5 of potentially excessive charges. Coordination to prosecute and defend against motions of such magnitude is absolutely necessary and required. That said, the Court does question the need for so much time spent in meetings, as it seems even coordination and discussion about strategies for these motions would not necessarily be so involved, particularly when also considered in light of additional time spent preparing for the hearings, which will be discussed below. Accordingly, the Court will reduce the amount recoverable on account of these meetings by 20%.

Additionally, 23.8 hours spent preparing in various ways for the hearings on the Sanctions Motion and Reconsideration Motion, such as by compiling and reviewing exhibits, drafting opening arguments, or creating outlines, to name a few tasks, were flagged as excessive, amounting to $16,653 of potentially excessive charges. Given the magnitude of these motions, including the fact that the hearings on them required a full day and a half to complete, spending a significant amount of time preparing for the hearings on them was absolutely reasonable. That said, the Court does find this amount of time borders on excessive and thus will reduce the amount flagged as excessive by 15%.

If the Court has not otherwise mentioned certain entries flagged as excessive, the Court does not consider the time spent on those tasks to be excessive.

McGuckin and PVI also assert in connection with this objection that the Court should not permit compensation for the attendance of certain personnel at various hearings over the life of the case. As this Court has explained in *Finkel v. WeVeel LLC (In re Atomica Design Group, Inc.)*, 591 B.R. 217 (Bankr. E.D. Pa. 2018):

> [g]enerally, to award attorneys' fees for court appearances, all professionals attending a hearing must have had a role. A presence as a mere spectator is not compensable. Unless the magnitude of a case demands it, the attendance of additional counsel representing the same interests as counsel actually conducting the litigation is wasteful and should not be included in a request for counsel fees.

*In re Atomica,* 591 B.R. at 242.

As discussed *supra,* the magnitude of the Gardner Motion itself was vast, and involved an incredibly complex factual and procedural history, the years long Derivative Litigation, legal implications involving partnership and commercial law, and multiple witnesses and petitioning creditors of questionable validity, necessitating a large legal team of both those who had been involved in the Derivative Litigation and those with expertise in bankruptcy and restructuring to assist Gardner with navigating this complex legal landscape. The time records reflect that all attendees of the Dismissal Hearing – Mr. Coe, senior attorney Joseph Argentina, associate Brian Morgan, associate Nicholas Feltham, partner Vince Slusher, and associate Kristen Perry – were extensively and intimately involved in the efforts in connection with the Gardner Motion. As the Court commented in *In re Atomica*, it was reasonable to compensate the chapter 7 trustee plaintiff for the attendance of an additional attorney at the sanctions hearings who performed a significant amount of the research and work associated with the chapter 7 trustee's request for sanctions, but who did not conduct the hearings themselves, given her extensive knowledge of the case. *In re Atomica,* 591 B.R. at 243. Similarly, as explained by the Third Circuit in *Planned Parenthood of Central New Jersey v. Attorney General of the State of New Jersey,* 297 F.3d 253

(3d Cir. 2022), the magnitude and complexity of a case can justify the use of multiple attorneys

at hearings to provide necessary support for each other. *Planned Parenthood,* 297 F.3d at 272.

Here, Gardner is already not seeking to be compensated for the attendance of Brian

Morgan and Kristen Perry at the Dismissal Hearing, leaving only Mr. Coe, who cross-examined

the Monitor and McGuckin and held extensive knowledge about the Derivative Litigation,

Nicholas Feltham, who cross examined Mark Tucci and who had worked on the Derivative

Litigation, partner Vince Slusher who had done much of the supervision of the Drinker team, and

Joseph Argentina, who appeared by all accounts as the lead attorney and who gave Gardner's

closing argument. Given all four of their heavy involvement in all aspects of the Gardner Motion

and that they all had particular roles, it is reasonable for them to have attended to provide

necessary support to one another and for the Court to allow compensation for such.

With respect to the hearing on the Reconsideration Motion, it was entirely reasonable for

both Mr. Argentina and Mr. Coe to bill for attending given that Mr. Argentina was the primary

drafter of the opposition to the Reconsideration Motion and Mr. Coe's extensive involvement not

only reviewing and revising the opposition, but also that he was the attorney in the Derivative

Litigation involved with drafting the affidavit at issue in the Reconsideration Motion. *See* Case

No. 19-17117 ECF 1106 Rev. Appl. Ex. A at Ex. 1 of Coe Decl. However, the record reflects

that associate Emmanuel Brown also attended the hearing on the Reconsideration Motion even

though he performed no work on the Reconsideration Motion prior to attending the hearing. *See*

*id.* Accordingly, the Court will make a downward adjustment to account for Emmanuel Brown's

time at the Reconsideration Motion portion of the hearing on the Reconsideration Motion and

Sanctions Motion in the amount of $535.[36]

  With respect to the Sanctions Motion, Mr. Argentina, Mr. Morgan, Mr. Coe, and Mr.

Brown attended the first day on September 30, 2021. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex. 1

of Coe Decl. At that hearing, Mr. Morgan gave the opening statement, handled the exhibits to be

admitted into evidence, and cross examined Mr. Smith. Mr. Coe performed the cross

examination of Mr. Hall. Mr. Argentina, Mr. Morgan, and Mr. Coe were all heavily involved at

the outset in drafting, revising, reviewing, and otherwise litigating the Sanctions Motion. The

revised timesheets reflect that Emmanuel Brown first became involved a few weeks prior to the

Sanctions Hearing in the beginning of September 2021, but in that time became heavily involved

in strategizing regarding exhibits for the hearing and other hearing preparations, including

assisting Mr. Coe with preparation for Mr. Hall's cross examination, rendering his presence at

the Sanctions Hearing entirely reasonable to the Court. *Id.* at ECF 1106 Rev. Appl. Ex. A at Ex.

1 of Coe Decl. In fact, the billing records reflect that he actually conducted research during the

Sanctions Hearing, and thus was an integral part of the hearing team, making it reasonable to

include compensation for his time at the Sanctions Hearing in the award. *Id.* at ECF 1106 Rev.

Appl. Ex. A at Ex. 1 of Coe Decl. With respect to the October 1, 2021 sanctions hearing, Mr.

Morgan, Mr. Coe, Mr. Argentina, and Mr. Brown attended, with Mr. Morgan performing the

cross examination of Mr. McMichael. Again, all team members were heavily involved in various

aspects of preparation for that hearing, making it reasonable for them all to attend. Finally, Mr.

Argentina and Mr. Coe, both of whom were heavily involved with the underlying proceedings

---

[36] The Court arrived at this number by reducing the time Emmanuel Brown billed attending the Reconsideration Motion and Sanctions Motion hearing by an hour, as the estimated time the Reconsideration Motion portion of the hearing took.

upon which the Recusal Motion was based and who worked significantly on the opposition to the

Recusal Motion, attended the hearing, with Mr. Argentina giving oral argument. It was more

than reasonable to have one other attorney there in support of those efforts.

## V.    CONCLUSION

Based upon the foregoing, the Court awards Gardner $1,417,861.75 in fees/

expenses against McGuckin and PVI jointly and severally.

Date: December 1, 2022                    _____

                                          Honorable Ashely M. Chan
                                          United States Bankruptcy Judge